# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

  v.

STATE OF TEXAS, *et al.*,

    Defendants.

Case No. 1:24-cv-00008-RP

## UNITED STATES' MOTION FOR
## PRELIMINARY AND PERMANENT INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................... 1

BACKGROUND .................................................................................................. 3

I.      The federal government controls foreign policy, and Congress has enacted a
        comprehensive statutory scheme governing the entry and removal of noncitizens. ... 3

II.     The United States has long enforced the comprehensive federal scheme—with
        only a limited role for States—and uses diplomatic tools to deter unlawful
        entry and encourage noncitizens to enter the United States legally ........................... 6

III.    Texas passes Senate Bill 4 to regulate the entry and removal of noncitizens. .......... 10

LEGAL STANDARDS .................................................................................... 13

ARGUMENT ...................................................................................................... 14

I.      The United States is likely to succeed on the merits because SB 4 intrudes
        into areas within the federal government's exclusive authority. ............................ 14

        A.      SB 4 is field preempted because it intrudes on the federal government's
                exclusive authority to regulate the entry and removal of noncitizens. .......... 14

        B.      SB 4 is conflict preempted by various provisions of federal law, including
                those that allow for state cooperation in only narrow circumstances............. 21

        C.      SB 4 violates the dormant Foreign Commerce Clause by regulating
                international commerce and interfering with the United States'
                foreign relations........................................................................................... 27

II.     SB 4 would impair foreign relations and immigration operations, causing
        irreparable harm to the United States and the public. ............................................ 30

III.    Texas has no legitimate countervailing interest in maintaining an
        unconstitutional law. ............................................................................................. 35

IV.     The Court should enter a permanent injunction because there are no material
        facts in dispute....................................................................................................... 36

CONCLUSION ................................................................................................. 36

# TABLE OF AUTHORITES

## Cases

*Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*,
  878 F.2d 806 (5th Cir. 1989) ..................................................................................... 14

*Am. Ins. Ass'n v. Garamendi*,
  539 U.S. 396 (2003) ................................................................................................. 3

*Arizona v. United States*,
  567 U.S. 387 (2012) ...........................................................................................*passim*

*Atkins v. Salazar*,
  677 F.3d 667 (5th Cir. 2011) ................................................................................... 37

*Barzelis v. Flagstar Bank, FSB*,
  784 F.3d 971 (5th Cir. 2015) ................................................................................... 18

*Biden v. Texas*,
  597 U.S. 785 (2022) ...........................................................................................24, 30

*Buckman Co. v. Plaintiffs' Legal Committee*,
  531 U.S. 341 (2001) ................................................................................................. 27

*Chy Lung v. Freeman*,
  92 U.S. 275 (1875) ............................................................................................29, 34

*City of El Cenizo v. Texas*,
  890 F.3d 164 (5th Cir. 2018) ................................................................................... 27

*Clark v. Martinez*,
  543 U.S. 371 (2005) ................................................................................................. 4

*Crosby v. Nat'l Foreign Trade Council*,
  530 U.S. 363 (2000) ...........................................................................................30, 33

*Crown Castle Fiber, L.L.C. v. City of Pasadena*,
  76 F.4th 425 (5th Cir. 2023) ................................................................................... 14

*DeCanas v. Bica*,
  424 U.S. 351 (1976) ...........................................................................................4, 17

*Ga. Latino All. for Hum. Rts. v. Governor of Ga.*,
  691 F.3d 1250 (11th Cir. 2012) ..................................................................18, 19, 21, 22

*Galvan v. Press*,
  347 U.S. 522 (1954) ................................................................................................ 1

*Gibbons v. Ogden*,
  22 U.S. (9 Wheat.) 1 (1824) ................................................................................ 28, 29

*Gordon v. Holder*,
  721 F.3d 638 (D.C. Cir. 2013) ............................................................................ 35

*Haaland v. Brackeen*,
  599 U.S. 255 (2023) .............................................................................................. 36

*Hernandez v. Mesa*,
  885 F.3d 811 (5th Cir. 2018) ............................................................................... 17

*Hillsborough Cnty. v. Automated Med. Lab'ys., Inc.*,
  471 U.S. 707 (1985) .............................................................................................. 16

*Hines v. Davidowitz*,
  312 U.S. 52 (1941) .................................................................................... 16, 22, 23

*Holmes v. Jennison*,
  39 U.S. 540 (1840) ................................................................................................ 23

*INS v. Cardoza-Fonseca*,
  480 U.S. 421 (1987) ................................................................................................ 5

*Jama v. Immigr. & Customs Enf't,,*
  543 U.S. 335 (2005) .............................................................................................. 17

*Japan Line, Ltd. v. Los Angeles Cnty.*,
  441 U.S. 434 (1979) ...................................................................... 2, 15, 28, 30

*Las Americas Immigrant Advocacy Center v. McCraw*,
  1:23-cv-01537 (W.D. Tex. Dec. 19, 2023) ....................................................... 13

*Lozano v. City of Hazleton*,
  724 F.3d 297 (3d Cir. 2013) ............................................................................... 18

*Massachusetts v. Mellon*,
  262 U.S. 447 (1923) .............................................................................................. 36

*Michelin Tire Corp. v. Wages*,
  423 U.S. 276 (1976) .............................................................................................. 28

*Molina v. Home Depot USA, Inc.*,
    20 F.4th 166 (5th Cir. 2021) ...................................................................... 37

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
    138 S. Ct. 1461 (2018) ............................................................................. 31

*Nat'l Collegiate Athletic Ass'n v. Christie*,
    926 F. Supp. 2d 551 (D.N.J. 2013) ........................................................... 31

*Nat'l Foreign Trade Council v. Natsios*,
    181 F.3d 38 (1st Cir. 1999) ...................................................................... 30

*Nat'l Pork Producers Council v. Ross*,
    598 U.S. 356 (2023) .................................................................................. 29

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*,
    491 U.S. 350 (1989) .................................................................................. 30

*Nken v. Holder*,
    556 U.S. 418 (2009) .................................................................................... 5

*Patel v. Garland*,
    596 U.S. 328 (2022) .................................................................................. 19

*Piazza's Seafood World, LLC v. Odom*,
    448 F.3d 744 (5th Cir. 2006) ............................................................... 29, 30

*Plyler v. Doe*,
    457 U.S. 202 (1982) .................................................................................. 24

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
    831 F.3d 500 (D.C. Cir. 2016) .................................................................. 14

*Rest. L. Ctr. v. U.S. Dep't of Lab.*,
    66 F.4th 593 (5th Cir. 2023) ..................................................................... 14

*Rest. L. Ctr. v. U.S. Dep't of Lab.*,
    2023 WL 4375518 (W.D. Tex. July 6, 2023) ............................................ 37

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013) .................................................................. 35

*Rowe v. N.H. Motor Transp. Ass'n*,
    552 U.S. 364 (2008) .................................................................................. 35

*Schrader v. Dist. Att'y of York Cnty.*,
    74 F.4th 120 (3d Cir. 2023) ................................................................. 36

*Takahashi v. Fish & Game Comm'n*,
    334 U.S. 410 (1948) ........................................................................... 16

*Truax v. Raich*,
    239 U.S. 33 (1915) .............................................................................. 2

*U.S. ex rel. Knauff v. Shaughnessy*,
    338 U.S. 537 (1950) ....................................................................... 1, 17

*United States v. Abbott*,
    87 F.4th 616 (5th Cir. 2023) ......................................................... 32, 34

*United States v. Alabama*,
    691 F.3d 1269 (11th Cir. 2012) ......................................................... 18

*United States v. Arizona*,
    641 F.3d 339 (9th Cir. 2011) ............................................................. 31

*United States v. Curtiss-Wright Exp. Corp.*,
    299 U.S. 304 (1936) ........................................................................... 20

*United States v. Delgado-Garcia*,
    374 F.3d 1337 (D.C. Cir. 2004) ......................................................... 17

*United States v. Guest*,
    383 U.S. 745 (1966) ........................................................................... 29

*United States v. Hanigan*,
    681 F.2d 1127 (9th Cir. 1982) ........................................................... 28

*United States v. Hernandez-Guerrero*,
    963 F. Supp. 933 (S.D. Cal. 1997) ..................................................... 29

*United States v. South Carolina*,
    720 F.3d 518 (4th Cir. 2013) ................................................... 18, 21, 34

*United States v. Texas*,
    557 F. Supp. 3d 810 (W.D. Tex. 2021) ........................................... 14, 31

*United States v. Valenzuela-Bernal*,
    458 U.S. 858 (1982) ........................................................................... 16

*Valle del Sol Inc. v. Whiting*,
    732 F.3d 1006 (9th Cir. 2013) ................................................................ 21

*Villas at Parkside Partners v. City of Farmers Branch*,
    726 F.3d 524 (5th Cir. 2013) ............................................................ 24, 26

*Washington Cnty. v. Gunther*,
    452 U.S. 161 (1981) ............................................................................... 19

*Ziglar v. Abbasi*,
    582 U.S. 120 (2017) ............................................................................... 17

*Zschernig v. Miller*,
    389 U.S. 429 (1968) ............................................................................ 3, 22

**Constitutional Provisions**

U.S. Const. art. I, § 8 ................................................................................ 3

U.S. Const. art. I, § 10 .......................................................................... 4, 23

U.S. Const. art. II, § 2 .............................................................................. 3

U.S. Const. art. IV .............................................................................. 4, 14

**Statutes**

6 U.S.C. § 202 ......................................................................................... 7

6 U.S.C. § 211 ..................................................................................... 7, 19

6 U.S.C. § 557 ......................................................................................... 4

8 U.S.C. § 1101 ....................................................................................... 5

8 U.S.C. § 1103 ................................................................................ *passim*

8 U.S.C. § 1158 ...................................................................... 5, 6, 23, 34

8 U.S.C. § 1181 ................................................................................... 4, 5

8 U.S.C. § 1182 ............................................................................ 4, 20, 22

8 U.S.C. § 1223 ....................................................................................... 4

8 U.S.C. § 1224 ....................................................................................... 4

8 U.S.C. § 1225 ..................................................................................................*passim*

8 U.S.C. § 1227 ...........................................................................................................5, 20

8 U.S.C. § 1229 ...........................................................................................................5, 20

8 U.S.C. § 1229a ...............................................................................................*passim*

8 U.S.C. § 1231 ..................................................................................................*passim*

8 U.S.C. § 1232 ...........................................................................................................6, 25

8 U.S.C. § 1252 ................................................................................................................ 5

8 U.S.C. § 1252c ..........................................................................................8, 19, 26, 36

8 U.S.C. § 1323 ............................................................................................................. 18

8 U.S.C. § 1324 ..................................................................................................*passim*

8 U.S.C. § 1325 ....................................................................................................4, 11, 18

8 U.S.C. § 1326 ...............................................................................................4, 12, 18, 24

8 U.S.C. § 1327 ............................................................................................................. 18

8 U.S.C. § 1328 .......................................................................................................18, 19

8 U.S.C. § 1357 ..................................................................................................*passim*

**State Statutes**

Tex. Code of Crim. Proc. art. 5(B).002 ...................................................................12, 13

Tex. Code Crim. Proc. art. 5B.003 ...................................................................13, 23, 34

Tex. Penal Code § 12.21 ............................................................................................. 12

Tex. Penal Code § 12.22 ............................................................................................. 12

Tex. Penal Code § 12.23 ............................................................................................. 12

Tex. Penal Code § 12.35 ............................................................................................. 12

Tex. Penal Code § 51.02 .................................................................................. 11, 12, 24

Tex. Penal Code § 51.03 ..................................................................................... 12, 13, 25

Tex. Penal Code § 51.04 ................................................................................................ 13

**Rules**

Fed. R. Civ. P. 65(a)(2) ................................................................................................. 37

**Executive Orders and Regulations**

8 C.F.R. § 208.3 ........................................................................................................... 35

8 C.F.R. § 208.30 ........................................................................................................... 5

8 C.F.R. § 235.3 ............................................................................................................. 5

8 C.F.R. § 241.15 ........................................................................................................... 6

8 C.F.R. § 1208.16 ........................................................................................... 6, 23, 33, 35

8 C.F.R. § 1208.17 ..................................................................................................... 33, 35

8 C.F.R. § 1208.18 .................................................................................................. 6, 33, 35

88 Fed. Reg. 31314 (May 16, 2023) ......................................................................... 10, 11

Exec. Order 14010, 86 Fed. Reg. 8267 (Feb. 2, 2021) ............................................. 32, 33

**Other Authorities**

142 Cong. Rec. H2378-05, 1996 WL 120181 (Mar. 19, 1996) ........................................ 26

*Authorize*, Black's Law Dictionary (5th ed. 1979) ........................................................ 19

CBP, *CBP releases November 2023 monthly update* (Dec. 22, 2023),
    https://perma.cc/XQW4-55XW ................................................................................. 9, 10

CBP, Southwest Land Border Encounters,
    https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters ................... 9

Congressional Research Service, *The 287(g) Program: State and Local Immigration Enforcement*
    (Aug. 12, 2021), https://perma.cc/GQN4-DVVF ........................................................ 9

House Research Organization, Bill Analysis of SB 4 (Nov. 14, 2023),
    https://perma.cc/W8UV-XPKY ..................................................................... 13, 23, 35

ICE, *Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act*,
https://perma.cc/KJX7-Q9V3 ................................................................................9, 36

Jennifer Gordon, *Immigration As Commerce: A New Look at the Federal*
*Immigration Power and the Constitution*,
93 Ind. L.J. 653 (2018)........................................................................................ 28

Kif Augustine Adams, *The Plenary Power Doctrine After September 11*,
38 U.C. Davis L. Rev. 701 (2005) ...................................................................... 28

Press Release, Secretaría de Relaciones Exteriores (Nov. 15, 2023),
https://perma.cc/RP7H-JXZR ...................................................................... 2, 13, 24

The Federalist No. 11 (Gideon ed., 2001)........................................................... 28

The White House, *Mexico-U.S. Joint Communique* (Dec. 28, 2023),
https://perma.cc/92CW-APKE ........................................................................... 10

## INTRODUCTION

It is well settled that the "Government of the United States has broad, undoubted power over the subject of immigration and the status of" noncitizens. *Arizona v. United States*, 567 U.S. 387, 394 (2012). Entry into the United States "is granted to [a noncitizen] only upon such terms as the United States shall prescribe" and "must be exercised in accordance with the procedure which the United States provides." *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950). Similarly, "the removal process" for noncitizens must be "entrusted to the discretion of the Federal Government": it touches "on foreign relations and must be made with one voice." *Arizona*, 567 U.S. at 409. It is thus "about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government" that "the formulation of" policies "pertaining to the entry of [noncitizens] and their right to remain here" are "entrusted exclusively to Congress." *Galvan v. Press*, 347 U.S. 522, 531 (1954).

Texas's recently enacted Senate Bill 4 flouts these principles. In seeking to displace the federal government's "well settled" power "to determine immigration policy," *Arizona*, 567 U.S. at 395, SB 4 creates state immigration crimes for illegal entry and illegal reentry, allows state judges to order removal of noncitizens from the country, and mandates that state officials carry out those removal orders. But "[t]his is not the system Congress created." *Arizona*, 567 U.S. at 408. The federal government alone is responsible for the entry and removal of noncitizens. "Federal law specifies limited circumstances in which state officers may perform the functions of an immigration officer," *id.*, and States are not permitted to undertake their own *unilateral* immigration enforcement. Exclusive federal control is important because "[t]here are significant complexities involved in enforcing federal immigration law, including the determination whether a person is removable." *Id.* By authorizing state officials to arrest, detain, prosecute, and remove noncitizens, SB 4 disrupts Congress's finely reticulated immigration scheme and "violates the principle that the removal process is entrusted to the discretion of the Federal Government." *Id.* at 409.

The Supreme Court has already held that a State may not disrupt the federal statutory regime in this way. In *Arizona v. United States*, the Court held that States may not "undermine federal [immigration] law." 567 U.S. at 416. In that case, the Court prohibited Arizona from (1) requiring noncitizens to register with the State, (2) criminalizing unlawfully present persons from seeking work, and (3) arresting potentially removable noncitizens in the absence of a federal warrant. *Id.* at 403, 406, 410. SB 4 undermines federal immigration law even more directly than Arizona's law: Texas's law straightforwardly regulates the entry and removal of noncitizens, which is the core of the federal government's sovereign prerogatives to regulate immigration. *See id.* at 409 ("The authority to control immigration—to admit or exclude [noncitizens]—is vested solely in the Federal Government." (quoting *Truax v. Raich*, 239 U.S. 33, 42 (1915)). SB 4 is therefore preempted. *See id.* at 416. Texas's attempt to regulate the movement of persons across an international boundary also violates the Foreign Commerce Clause and impedes the federal government's ability to "speak with one voice" in foreign relations. *Japan Line, Ltd. v. Los Angeles Cnty.*, 441 U.S. 434, 449 (1979).

Implementation of SB 4 would likewise inflict irreparable harm on the federal government and the public, interfering with both the United States' conduct of foreign relations and its ability to execute the comprehensive federal immigration scheme. Internationally, the Government of Mexico has already objected, "categorically reject[ing] any measure that," like SB 4, "allows state or local authorities to detain and return Mexicans or foreign nationals to Mexican territory." Press Release, Secretaría de Relaciones Exteriores (Nov. 15, 2023), *available at* https://perma.cc/RP7H-JXZR. Domestically, SB 4 conflicts with federal statutes, impairing both the federal government's ability to enforce immigration laws and to conduct immigration operations, including ensuring that noncitizens eligible for relief or protection from removal are not removed.

To the extent Texas wishes to help with immigration enforcement, it can do so by working cooperatively with the federal government through the statutory framework Congress established, *see* 8 U.S.C. § 1357(g), or by working with Congress to change the law. It

may not unconstitutionally usurp the federal government's authority in core areas of federal control: the entry and removal of noncitizens.  Immigration policy can "affect trade, investment, tourism, and diplomatic relations for the entire Nation," and "[p]erceived mistreatment of" noncitizens "in the United States may lead to harmful reciprocal treatment of American citizens abroad." *Arizona*, 567 U.S. at 395.  It "is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States." *Id.*  Texas has disregarded that cardinal principle, and the Court should preliminarily and permanently enjoin SB 4.

## BACKGROUND

I.   **The federal government controls foreign policy, and Congress has enacted a comprehensive statutory scheme governing the entry and removal of noncitizens.**

"[T]he Constitution entrusts foreign policy exclusively to the National Government." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 419 n.11 (2003); *Zschernig v. Miller*, 389 U.S. 429, 436 (1968).  It is the national government that "make[s] Treaties," commissions and receives "Ambassadors, other public Ministers and Consuls," "regulate[s] commerce with foreign nations," and "establish[es] a uniform Rule of Naturalization."  U.S. Const. art. I, § 8; *id.* art. II, § 2.  It also has "inherent power as sovereign to control and conduct relations with foreign nations." *Arizona*, 567 U.S. at 395.  And when diplomacy fails, it is also the national government—with the President as "commander in chief"—that "raise[s] and support[s] Armies," "provide[s] and maintain[s] a Navy," "declare[s] war, grant[s] Letters of Marque and Reprisal," and "make[s] rules concerning captures on land and water."  U.S. Const. art. I, § 8; *id.* art. II, § 2.  In stark contrast, States are explicitly prohibited from conducting foreign affairs: "[n]o state shall enter into any treaty, alliance, or confederation" and "[n]o State shall," without Congress's consent, "enter into any agreement or Compact" with "a foreign Power." *Id.* art. I, § 10.

These constitutional provisions and the federal laws enacted thereunder are "the su-preme Law of the Land." *Id.* art. VI; *Arizona*, 567 U.S. at 399. And over the last seven decades, Congress has exercised its authority over foreign affairs to codify a vast framework of laws governing the entry and removal of noncitizens. Starting in 1952, Congress enacted the Immigration and Nationality Act as "the comprehensive federal statutory scheme for [the] regulation of immigration."[1] *DeCanas v. Bica*, 424 U.S. 351, 353 (1976).

As relevant here, the current federal scheme sets forth detailed rules governing the entry and removal of noncitizens. It identifies who may enter, *see, e.g.*, 8 U.S.C. §§ 1181–82, 1188, and how they may enter, *see, e.g.*, 8 U.S.C. §§ 1223–25. It also imposes both criminal and civil penalties on those who unlawfully enter the United States. Section 1325—titled "Improper entry by [noncitizen]"—makes it a crime for any noncitizen who "enters or at-tempts to enter the United States at any time or place other than as designated by immigration officers." 8 U.S.C. § 1325. For the first violation, the person will be fined, "imprisoned not more than 6 months, or both," and, for any subsequent violation, the person will be fined, "imprisoned not more than 2 years, or both." *Id.* The provision also imposes civil penalties "in addition to, and not in lieu of," those criminal penalties. *Id.* Similarly, § 1326—titled "Reentry of removed [noncitizens]"—mandates fines, imprisonment "not more than 2 years, or both" for any noncitizen who has been "denied admission" or "removed" and subse-quently "enters, attempts to enter, or is at any time found in, the United States." *Id.* § 1326.

Federal law also comprehensively regulates the removal of noncitizens from the coun-try. It identifies the grounds for removal, the requirements for commencing and administer-ing removal proceedings, the protections afforded to noncitizens throughout the process, and the process for selecting the country to which noncitizens may be removed. *See, e.g., id.* §§ 1182(a), 1225, 1227, 1229, 1229a, 1231(a)–(b). For example, federal law mandates that

---

[1] After the Homeland Security Act of 2002, many references in the INA to the "Attor-ney General" are now read to mean the Secretary of Homeland Security. *See* 6 U.S.C. § 557; *Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005).

certain removal proceedings are overseen by specialized immigration judges. *See id.* § 1101(b)(4); *see id.* § 1229a. And during those proceedings, noncitizens must be given certain rights. These include the right to be represented by counsel of their choosing and to have "a reasonable opportunity to examine the evidence against the [noncitizen], to present evidence on the [noncitizen's] own behalf, and to cross-examine witnesses presented by the Government." *Id.* § 1229a(b)(4); *see also id.* § 1229a(b)(1). Congress has also provided for judicial review of final removal orders in a court of appeals and allowed for a stay of removal pending judicial review. *Id.* § 1252; *Nken v. Holder*, 556 U.S. 418 (2009). Certain noncitizens may alternatively be subject to expedited removal proceedings. *See id.* § 1225(b)(1). In those proceedings, noncitizens will be "removed from the United States without further hearing or review," unless they claim a fear of persecution or torture, or express an intent to apply for asylum. *Id.* § 1225(b)(1)(A)(i); 8 C.F.R. § 235.3(b)(4). There are further procedures to assess whether a noncitizen in expedited removal has a credible fear of persecution or torture. *See* 8 U.S.C. § 1225(b)(1)(B)(v); 8 C.F.R. § 208.30; Declaration of Ted Kim ¶¶ 12–15.

A noncitizen generally may also apply for relief or protection from removal under the federal scheme. For example, with certain exceptions, a noncitizen, "who is physically present in the United States or who arrives in the United States . . . whether or not at a designated port of arrival . . . may apply for asylum." 8 U.S.C. § 1158(a)–(b). And certain noncitizens may be entitled to withholding of removal, with limited exceptions, if they establish a likelihood that they would face persecution if removed to the proposed country of removal. *See id.* § 1231(b)(3); *see INS. v. Cardoza-Fonseca*, 480 U.S. 421 (1987). Noncitizens may also be entitled to protection from removal consistent with regulations implementing U.S. obligations under Article 3 of the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (Convention Against Torture), if they would be tortured when removed to the proposed country of removal. 8 C.F.R. §§ 1208.16(c), 1208.18(a). If the noncitizen is an unaccompanied child, Congress has provided additional protections. *See* 8 U.S.C.

§ 1232.  The child may not be subjected to expedited removal, *id.* § 1232(a)(5)(D)(i), and generally must be transferred to the Office of Refugee Resettlement (ORR) of the Department of Health and Human Services (HHS), where the child must generally be placed with a care provider in the least restrictive setting that is in the best interest of the child, *id.* § 1232(c)(2)(A).

Importantly, federal law establishes a comprehensive process for the execution of removal orders, including how the United States determines the country to which a noncitizen may be removed and the physical process of removal.  *See id.* § 1231(b)–(c).  Federal law explicitly gives federal officials the responsibility to work with foreign governments to determine whether they will accept noncitizens who are subject to final removal orders.  *See id.* § 1231(b)(1)–(2); 8 C.F.R. § 241.15; *see also* 8 U.S.C. § 1158(a)(2)(A) (noting bilateral agreements with foreign nations).  This can require extensive diplomatic negotiations, as each country—like the United States—has a sovereign right to allow or deny the entry of noncitizens into its territory.  Federal law also specifies how those officials must proceed if the government of the relevant country "is unwilling to accept the [noncitizen] into that country's territory."  8 U.S.C. § 1231(b)(1)(C).  It also regulates the logistics of how removals must occur.  *See id.* § 1231(d), (e).  And it identifies the scenarios in which a noncitizen subject to a removal order may be granted protection.  *See id.* § 1231(b)(3); *id.* § 1229a(c)(6)–(7) (noncitizens can move to reconsider or reopen removal decisions).

## II.   The United States has long enforced the comprehensive federal scheme—with only a limited role for States—and uses diplomatic tools to deter unlawful entry and encourage noncitizens to enter the United States legally.

Overlaying the substantive immigration-law provisions is a comprehensive enforcement scheme.  Congress has charged the Department of Homeland Security (DHS) and its component agency, U.S. Customs and Border Protection (CBP), with, among other things, controlling the border and ports of entry.  The Secretary of Homeland Security, for example, is given "the power and duty to control and guard" the border against illegal entry and to "perform such other acts" as "necessary for carrying out [such] authority."  8 U.S.C.

§ 1103(a)(3), (5); 6 U.S.C. § 202 (tasking the Secretary with "[s]ecuring the borders" and "[e]stablishing national immigration enforcement policies and priorities"); *see also* 8 U.S.C. § 1357(a) (detailing the authority of federal immigration officers to "interrogate" and "arrest" noncitizens "entering or attempting to enter the United States" or already "in the United States"). CBP—in coordination with U.S. Immigration and Customs Enforcement (ICE) and U.S. Citizenship and Immigration Services (USCIS)—is tasked with "enforc[ing] and administer[ing] all immigration laws," including "the inspection, processing, and admission of persons who seek to enter" the United States and "the detection, interdiction, removal, [and] departure from the United States" of "persons unlawfully entering, or who have recently unlawfully entered, the United States." 6 U.S.C. § 211(c)(8).

CBP must also "ensure the interdiction of persons and goods illegally entering or exiting the United States"; "facilitate and expedite the flow of legitimate travelers and trade"; and "safeguard the borders of the United States to protect against the entry of dangerous goods." *Id.* § 211(c). Among its many tasks, CBP, through the U.S. Border Patrol, also has responsibility "for interdicting persons attempting to illegally enter" the United States "at a place other than a designated port of entry" as well as "deter[ing] and prevent[ing] the illegal entry of terrorists, terrorist weapons, persons, and contraband." *Id.* § 211(e)(3). And in doing so, they are authorized to "board and search any vessel, aircraft, railway car, or other conveyance or vehicle in which they believe [noncitizens] are being brought into the United States," 8 U.S.C. § 1225(d)(1), and to access private lands within 25 miles of the border "for the purpose of patrolling the border to prevent the illegal entry of [noncitizens] into the United States," *id.* § 1357(a)(3).

Within this comprehensive enforcement scheme are specific avenues for state participation in immigration enforcement. For example, the federal government may "authorize any State or local law enforcement officer" to perform immigration duties in the face of an "imminent mass influx of" noncitizens. *Id.* § 1103(a)(10). And state officers are given the "authority" to arrest individuals for certain crimes of human smuggling. *See id.* § 1324(c).

7

State officers are also "authorized to arrest and detain an individual" who "is [a noncitizen] illegally present in the United States" but only if, among other things, the individual "has previously been convicted of a felony" and is detained "only for such period of time as may be required for" federal immigration authorities "to take the individual into Federal custody." *Id.* § 1252c.  And under 8 U.S.C. § 1357(g), "the [Secretary of Homeland Security] may enter into a written agreement with a State" allowing state officers "who [are] determined by the [Secretary] to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of [noncitizens] in the United States" to "carry out such function" consistent with state law.  *Id.* § 1357(g)(1).  The State must "certif[y]" that such state officers "performing the function under the agreement have received adequate training" and, "[i]n performing [that] function," the officer "shall be subject to the direction and supervision of the [Secretary]."  *Id.* § 1357(g)(2)–(3).

Historically, many state and local law enforcement entities have used § 1357(g) agreements to assist in immigration enforcement.  There were 72 such agreements in 2011, which more than doubled to 150 by 2020.  Congressional Research Service, *The 287(g) Program: State and Local Immigration Enforcement* (Aug. 12, 2021), https://perma.cc/GQN4-DVVF.  Notably, as of June 2023, 26 Sheriff's Offices *in Texas* have § 1357(g) agreements with the federal government.  *See* ICE, *Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act* (last visited Jan. 12, 2024), https://perma.cc/KJX7-Q9V3.  More broadly, ICE has § 1357(g) "agreements with 62 law enforcement agencies in 18 states" for the "identif[ication] and process[ing] [of] removable noncitizens" with "criminal or pending criminal charges" and § 1357(g) agreements "with 75 law enforcement agencies in 11 states" for state and local officers to "serve and execute administrative warrants on noncitizens" in their jails.  *Id.*  Beyond formal agreements, § 1357(g) also allows states to "communicate with the [Secretary] regarding the immigration status of any individual" and "otherwise to cooperate with the [Secretary] in the identification, apprehension, detention, or removal of [noncitizens] not law-

8

fully present in the United States." 8 U.S.C. § 1357(g)(10)(B). Such cooperation could include participation in a "joint task force with federal officers, provid[ing] operational support in executing a warrant, or allow[ing] federal immigration officials to gain access to detainees held in state facilities." *Arizona*, 567 U.S. at 410.

The federal government has been using its enforcement authority to address unlawful entry at the southwest border. CBP, for instance, had roughly 2.5 million noncitizen encounters at the southwest border in fiscal year 2023, and has so far had over 400,000 encounters at the southwest border in fiscal year 2024 (*i.e.* since October 1, 2023). *See* CBP, Southwest Land Border Encounters (last visited Jan. 12, 2024), https://www.cbp.gov/news-room/stats/southwest-land-border-encounters. "Individuals and families without a legal basis to remain in the U.S. continue to be subject to removal," and from May to November 2023, "DHS removed or returned over 400,000 individuals," the "vast majority" of whom were "from southwest border encounters." CBP, *CBP releases November 2023 monthly update* (Dec. 22, 2023), https://perma.cc/XQW4-55XW. These removal numbers "nearly [equal] the number removed and returned in all of fiscal year 2019 and exceeds the annual totals for each year 2015 – 2018." *Id.* "Daily removals and enforcement returns per day are nearly double what they were compared to the pre-pandemic average (2014 – 2019)." *Id.*

The federal government has adopted various measures that seek to deter unlawful entry and instead encourage noncitizens to enter the United States legally. For example, under the Circumvention of Lawful Pathways rule, "noncitizens who" cross "the southwest land border or adjacent coastal borders" without "avail[ing] themselves of a lawful . . . pathway to the United States [or] seek[ing] asylum or other protection in a country through which they travel" are, with certain exceptions, "presumed ineligible for asylum." 88 Fed. Reg. 31314 (May 16, 2023). DHS has also established parole processes for certain noncitizens that couple "a mechanism for those noncitizens to seek entry into the United States in a lawful, safe, and orderly manner, with the imposition of new consequences for those who cross the border without authorization to do so—namely returns to Mexico." *See id.* 31316–17.

9

Diplomatic negotiations with Mexico and other countries are part of U.S. efforts to address irregular migration at the southwestern border. In late December 2023, the President of Mexico met with senior U.S. officials, including the Secretary of State and the Secretary of Homeland Security. The White House, *Mexico-U.S. Joint Communique* (Dec. 28, 2023), https://perma.cc/92CW-APKE. The two countries noted their "[o]ngoing cooperation" and their "enhanced efforts to disrupt human smuggling, trafficking, and criminal networks, and continuing the work to promote legal instead of irregular migration pathways." *Id.* The Mexican President also "stressed the need to continue the diplomatic and political engagement with all countries in the region." *Id.*

The federal government has also engaged in other diplomatic efforts to "secur[e] the border and stem[] irregular migration." Declaration of Eric Jacobstein ¶ 14. The State Department, for example, has "sent a series of high-level delegations to Guatemala" and "worked with countries throughout the region, including by gaining agreement for flights repatriating irregular migrants without a lawful reason to remain in the United States; supporting enhanced border-enforcement efforts in Colombia, Panama, Costa Rica, Honduras, El Salvador, Guatemala, and Mexico; and leading the Los Angeles Declaration on Migration and Protection Working Group on Countering Human Smuggling and Trafficking." *Id.* DHS has also resumed "limited repatriations to Venezuela after securing the consent of representatives of Maduro to receive repatriated migrants," and the United States "also brought the governments of Colombia and Panama together to jointly increase efforts to stem the flow of irregular migrants through the Darién Gap." *Id.*

## III. Texas passes Senate Bill 4 to regulate the entry and removal of noncitizens.

Despite a comprehensive federal immigration framework, as well as the current enforcement and diplomatic efforts by the United States, the Texas legislature passed (and the Governor signed) SB 4. When the law goes into effect on March 5, 2024, it will impose state

criminal penalties on noncitizens who unlawfully enter or attempt to enter Texas from Mexico and will allow Texas courts to order the removal of noncitizens from the country.  SB 4 contains three principal provisions.

First, SB 4 effectively makes it a state crime for a noncitizen to violate 8 U.S.C. § 1325(a)—the federal unlawful entry statute—by barring noncitizens from "enter[ing] or attempt[ing] to enter [Texas] directly from a foreign nation at any location other than a lawful port of entry."  Tex. Penal Code § 51.02(a).  It is an affirmative defense to prosecution if the noncitizen (1) has been granted "lawful presence" or asylum by the federal government, (2) "was approved for benefits under the federal Deferred Action for Childhood Arrivals [(DACA)] program between June 15, 2012, and July 16, 2021," or (3) has not violated 8 U.S.C. § 1325(a).[2]  *Id.* § 51.02(c).  SB 4 does not explain what will constitute "lawful presence."  A § 51.02 violation is generally a Class B misdemeanor, *see id.* § 51.02(b), which is punishable by a fine of up to $2,000 and/or imprisonment for up to 180 days, *see id.* § 12.22.  But if the noncitizen had previously been convicted under § 51.02, then a subsequent violation is a "state jail felony," *see id.* § 51.02(b), which is generally punishable by a fine of up to $10,000 and/or imprisonment for between 180 days and two years, *see id.* § 12.35.

Second, SB 4 seeks to track 8 U.S.C. § 1326(a) by making it a state crime for a noncitizen to "enter[], attempt[] to enter," or be found in Texas after the person "has been denied admission to" or removed from the United States, or "has departed from the" United States "while an order" of "removal is outstanding."  Tex. Penal Code § 51.03.  There are no affirmative defenses to this new state crime, which is generally a Class A misdemeanor, *see id.* § 51.03(b), punishable by a fine of up to $4,000 and/or imprisonment for up to one year, *see*

---

[2] Section 51.02(d) also specifies that certain "federal programs"—the Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) program and "any program not enacted by the United States Congress that is a successor to or materially similar to [DACA or DAPA]"—are not affirmative defenses to prosecution.

*id.* § 12.21.  Under certain circumstances, a § 51.03 violation is a third-degree felony (maximum fine of $10,000 and/or imprisonment for a term between two to ten years, *see id.* § 12.34) or a second-degree felony (maximum fine of $10,000 and/or imprisonment for a term between two and twenty years, *see id.* § 12.33).

Third, SB 4 allows state judges to, under certain circumstances, order the removal of noncitizens.  Tex. Code of Crim. Proc. art. 5(B).002.  It states that, when a person is charged but not yet convicted under § 51.02 (SB 4's illegal entry) or § 51.03 (SB 4's illegal reentry), a magistrate judge or state judge may "discharge the person and require the person to return to the foreign nation from which the person entered or attempted to enter," if, among other things, "the person agrees to the order" and has not "previously been" charged with or convicted of specified crimes.  *Id.* art. 5(B).002(a)–(c).  If, however, a person is *convicted* under SB 4, then the state judge "*shall* enter" an "order requiring the person to return to the foreign nation from which the person entered or attempted to enter" after completion of the sentence. *Id.* Art. 5(B).002(d) (emphasis added).  A Texas law-enforcement officer must monitor a noncitizen's compliance with any state removal order.  *Id.*  Art. 5(B).002(e).  And a person's failure to comply with that order is itself a second-degree felony.  *See* Tex. Penal Code § 51.04.

SB 4 also states that a "court may not abate the prosecution of an offense under Chapter 51" of the Penal Code—*e.g.*, under § 51.02, § 51.03, or § 51.04—"on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated."  Tex. Code of Crim. Proc. art. 5(B).003.  And despite its intrusion into a federal field, SB 4 does not instruct state officers to coordinate with federal officials in any way.

Both before and after SB 4 was enacted, various groups and the Government of Mexico expressed their opposition.  Critics of SB 4 noted that "the obligation and power to control international borders and enforce immigration laws lies with the federal government" and SB 4 "would subject migrants across Texas to the threat of detention or forced removal and could lead to an increase in racial profiling."  House Research Organization, Bill Analysis of SB 4 at 8–10 (Nov. 14, 2023), *available at* https://perma.cc/W8UV-XPKY.  Mexico also took

issue with SB 4, asserting "its own legitimate right" to "determine its own policies regarding entry into its territory" and "categorically reject[ing] any measure that," like SB 4, "allows state or local authorities to detain and return Mexican or foreign nationals to Mexican territory." Press Release, Secretaría de Relaciones Exteriores (Nov. 15, 2023), *available at* https://perma.cc/RP7H-JXZR. And immediately after SB 4 was signed into law, two public-interest organizations and El Paso County sued to enjoin SB 4. *See Las Americas Immigrant Advocacy Center v. McCraw*, Compl., ECF No. 1, 1:23-cv-01537 (W.D. Tex. Dec. 19, 2023).

For its part, the federal government sent a letter to Texas in late December, explaining that "SB 4 is preempted and violates the United States Constitution," and providing notice that "the United States intends to file suit to enjoin the enforcement of SB 4 unless Texas agrees to refrain from enforcing the law." Compl. Ex. 1, ECF No. 1-1. The letter noted, however, that if Texas "believe[s] there are any facts or law supporting the validity of SB 4," the State should "promptly bring them to our attention." *Id.* It never did. The United States then filed this suit on January 3, 2024 and now moves for an order enjoining SB 4.

## LEGAL STANDARDS

"The decision whether to grant a preliminary injunction is within the discretion of a district court." *United States v. Texas*, 557 F. Supp. 3d 810, 814 (W.D. Tex. 2021) (quoting *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989)). "A preliminary injunction is meant to preserve the status quo and thus prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits." *Id.* To prevail, a movant must demonstrate (1) a likelihood of succeeding on the merits; (2) a "substantial threat of irreparable injury if the injunction is not granted"; (3) "the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted"; and (4) "the injunction will not disserve the public interest." *Rest. L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023). Where the federal government seeks a preliminary injunction, the second and fourth factors—irreparable harm and the public interest—merge because "the government's interest *is* the public interest." *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831

13

F.3d 500, 511 (D.C. Cir. 2016). Obtaining a permanent injunction requires a similar showing, but the movant must establish actual success on the merits for the first element. *See Crown Castle Fiber, L.L.C. v. City of Pasadena*, 76 F.4th 425, 441 (5th Cir. 2023).

## ARGUMENT

I.   **The United States is likely to succeed on the merits because SB 4 intrudes into areas within the federal government's exclusive authority.**

Under the Supremacy Clause, federal law is "the supreme law of the land," preempting any contrary state laws. U.S. Const. art. VI; *Arizona*, 567 U.S. at 399. While the Constitution or Congress can explicitly preempt state law, they can also do so implicitly in two ways. *Arizona*, 567 U.S. at 399. First, "States are precluded from regulating conduct in a field that" Congress commits to the federal government's "exclusive governance." *Id.* Second, "state laws are preempted when they conflict with federal law," either because compliance with both "is a physical impossibility" or the "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* Because Texas, through SB 4, is attempting to establish its own immigration system governing entry and removal of noncitizens, each of the law's challenged provisions is field and conflict preempted. And because SB 4 regulates foreign commerce and impedes the federal government's ability to "speak with one voice" in foreign relations, it also violates the Foreign Commerce Clause. *Japan Line*, 441 U.S. at 449. The United States is therefore likely to succeed on the merits.

A.   **SB 4 is field preempted because it intrudes on the federal government's exclusive authority to regulate the entry and removal of noncitizens.**

SB 4 is field preempted because it regulates a field—entry and removal of noncitizens—that Congress has committed to the federal government's "exclusive governance." *Arizona*, 567 U.S. at 399. Field preemption "can be inferred" both from "a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject" and from "a framework of regulation so pervasive that Congress left no room for the States to supplement it." *Id.* Here, Congress's clear intent was for the federal government—not the 50 individual States—to control the entry and removal of noncitizens.

SB 4 intrudes into a field marked by "dominant" "federal interest[s]" relating to immigration, foreign relations, and control of an international border. *Id.* It is the United States, not Texas, that "has broad, undoubted power over the subject of immigration and the status of" noncitizens. *Id.* at 394. The Supreme Court has repeatedly admonished that "the regulation of [noncitizens] is so intimately blended and intertwined with responsibilities of the national government that where it acts, and the [S]tate also acts on the same subject," the state law must give way. *Hines v. Davidowitz*, 312 U.S. 52, 62 (1941); *see Arizona*, 567 U.S. at 401; *Hillsborough Cnty. v. Automated Med. Lab'ys., Inc.*, 471 U.S. 707, 719 (1985) (recognizing "the dominance of the federal interest" in immigration and foreign affairs as the paradigmatic example of field preemption); *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 (1948) (acknowledging that States "can neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization and residence of [noncitizens] in the United States or the several states"); *cf. United States v. Valenzuela-Bernal*, 458 U.S. 858, 864 (1982) ("The power to regulate immigration—an attribute of sovereignty essential to the preservation of any nation—has been entrusted by the Constitution to the political branches of the Federal Government."). SB 4 not only regulates core aspects of immigration—noncitizens' entry, reentry, and removal—but also directly implicates the United States' foreign relations.

"Immigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of [noncitizens] in this country who seek the full protection of its laws." *Arizona*, 567 U.S. at 395. It is "fundamental" that "foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States." *Id.* That is important because "perceived mistreatment of [noncitizens] in the United States may lead to harmful reciprocal treatment of American citizens abroad." *Id.* As a result, "[o]ur system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free

15

from local interference." *Hines*, 312 U.S. at 63. If States can unilaterally arrest, detain, prosecute, and remove noncitizens for unlawful entry, the federal government cannot ensure the status, safety, and security of noncitizens in the United States, nor communicate effectively with foreign countries as "one national sovereign." *Arizona*, 567 U.S. at 395.

That is precisely why the federal government's discretion within the field of noncitizen entry and removal must be exclusive: the "discretionary decisions" on immigration enforcement "involve policy choices that bear on this Nation's international relations," and the "dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy." *Id.* at 396–97. This is especially true for removal decisions. Such decisions include "the selection of a removed [noncitizen]'s destination" and "may implicate our relations with foreign powers," requiring "consideration of changing political and economic circumstances." *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 348 (2005) (citation omitted). The "removal process" must be "entrusted to the discretion of the Federal Government" because it touches "on foreign relations and must be made with one voice." *Arizona*, 567 U.S. at 409.

The same is true for the federal power to control an international border. *De Canas*, 424 U.S. at 354 (determining which noncitizens may enter and remain in the United States "is unquestionably exclusively a federal power"). "[T]his country's border-control policies are of crucial importance to the national security and foreign policy of the United States," *Hernandez v. Mesa*, 885 F.3d 811, 819 (5th Cir. 2018) (quoting *United States v. Delgado-Garcia*, 374 F.3d 1337, 1345 (D.C. Cir. 2004)), *aff'd,* 140 S. Ct. 735 (2020), and "[n]ational-security policy" and foreign policy are "the prerogative of the Congress and President," *Ziglar v. Abbasi*, 582 U.S. 120, 142 (2017). As the Supreme Court explained long ago, "[a]dmission of [noncitizens] to the United States is a privilege granted by the sovereign United States Government." *Knauff*, 338 U.S. at 542. "Such privilege is granted to [a noncitizen] only upon such terms as the United States shall prescribe" and "must be exercised in accordance with the procedure which the United States provides." *Id.* Texas's attempt to criminalize actions

at an international border, and regulate core immigration functions, tramples on these over-riding, federal interests.[3]

SB 4 also runs headlong into a "framework of regulation so pervasive that Congress left no room for the States to supplement it." *Arizona*, 567 U.S. at 399; *see Texas v. United States*, 50 F.4th 498, 516 (5th Cir. 2022) ("Policies pertaining to the entry of [noncitizens] and their right to remain here are entrusted exclusively to Congress," so "[a]n attempt by Texas to establish an alternative classification system . . . would be preempted"). While SB 4's crim-inal provisions attempt to track the federal provisions on illegal entry and reentry (8 U.S.C. §§ 1325–26), there is already a comprehensive framework "of federal statutes criminalizing the acts undertaken by [noncitizens] and those who assist them in coming to" the United States. *Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1264 (11th Cir. 2012) ("*GLAHR*"). Congress has "authorized criminal penalties for individuals who bring [noncit-izens] into the United States," *id.* (citing 8 U.S.C. § 1323), has "penalize[d] the transportation, concealment, and inducement of unlawfully present [noncitizens]," *id.* (citing 8 U.S.C. § 1324), has "impose[d] civil and criminal penalties for unlawful entry" and reentry, *id.* (citing 8 U.S.C. § 1325–26), has prohibited "aid[ing] the entry of an inadmissible [noncitizen]," *id.* (citing 8 U.S.C. § 1327), and has banned the "import [of] [a noncitizen] for an immoral pur-pose," *id.* (citing 8 U.S.C. § 1328).

These comprehensive statutory provisions are backed by an equally comprehensive enforcement scheme. *See* Background Section II., *supra*. The Secretary of Homeland Security

---

[3] For these reasons, the presumption against preemption does not apply. *See Barzelis v. Flagstar Bank, FSB*, 784 F.3d 971, 973 n.2 (5th Cir. 2015) (no presumption of preemption where "there is a history of federal presence" in an area); *see United States v. South Carolina*, 720 F.3d 518, 529 (4th Cir. 2013) ("[T]he presumption against preemption does not apply here because immigration is an area traditionally regulated by the federal government."); *Lozano v. City of Hazleton*, 724 F.3d 297, 314 n.23 (3d Cir. 2013) (noting that state distinctions that hinge "solely on immigration status" intrude on an area of "significant federal presence" and therefore the presumption against preemption does not apply); *United States v. Alabama*, 691 F.3d 1269, 1296 (11th Cir. 2012) (immigration is "an area of core federal concern," and a State's "thinly veiled attempt to regulate immigration" is not entitled to the presumption).

has "the power and duty to control and guard" the border against illegal entry, and immigration officers are empowered to perform all necessary actions to effectuate those statutory mandates, including the ability to "interrogate" and "arrest" noncitizens, "board and search any" conveyance or vehicle "in which they believe [noncitizens] are being brought into the United States," and access private lands within 25 miles of the border to prevent illegal entry. *See id.*; 8 U.S.C. § 1103(a)(3), (5); *id.* § 1225(d)(1); *id.* § 1357(a). In short, Congress has vested DHS and its subagencies with the sole responsibility for "enforc[ing] and administer[ing] all immigration laws," especially "the inspection, processing, and admission of persons who seek to enter" the United States and "the detection, interdiction, removal, [and] departure from the United States" of those here unlawfully. 6 U.S.C. § 211(c)(8); Background Section II., *supra*.

Importantly, under this federal scheme, States wishing to assist in enforcing federal immigration laws may do so only in specified and narrow circumstances. *See* Background Section II., *supra*; 8 U.S.C. § 1103(a)(10) (state enforcement in the face of an "imminent mass influx of" noncitizens); *id.* § 1252c (state arrests and detention of noncitizens in particular circumstances until federal immigration authorities can take the person into federal custody); *id.* § 1324(c) (state arrests for human smuggling); *id.* § 1357(g) (state authority under a written agreement with the federal government). These provisions—each of which authorizes state officials to take certain immigration actions under circumscribed conditions—would be meaningless if States already had the authority to criminalize, arrest, detain, and remove noncitizens for violating federal immigration law.[4] And certainly none of those provisions leaves any room for States to enact a law, like SB 4, that empowers state officials to unilaterally *prosecute* and *remove* noncitizens based on their unlawful entry or reentry.

---

[4] "[T]he word 'authorize' . . . ordinarily denotes affirmative *enabling action*; "'[t]o empower; to give a right or authority to act.'" *Washington Cnty. v. Gunther*, 452 U.S. 161, 169 (1981) (quoting Black's Law Dictionary 122 (5th ed. 1979)) (emphasis added). So one can only be "authorized"—*i.e.* enabled—to do something if they otherwise lacked that authority.

Congress also could not have been clearer that unless otherwise provided by federal law, a removal proceeding shall be "the sole and exclusive procedure for determining whether [a noncitizen] may be admitted to the United States or, if the [noncitizen] has been so admitted, removed from the United States." 8 U.S.C. § 1229a(a)(3); *see Patel v. Garland*, 596 U.S. 328, 331 (2022) ("Congress has comprehensively detailed the rules by which noncitizens may enter and live in the United States. When noncitizens violate those rules, Congress has provided procedures for their removal."); *Arizona*, 567 U.S. at 399; *see also United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 318 (1936) (explaining that only the federal government is invested "with the powers of external sovereignty" and "the power to expel undesirable" noncitizens exists "as inherently inseparable from the conception of nationality"). Indeed, the comprehensive statutory scheme identifies the grounds for removal, the requirements for commencing and administering removal proceedings, the protections afforded to noncitizens throughout the process, and the process for selecting the country to which noncitizens may be removed. *See* Background Section I., *supra*; *see, e.g.*, 8 U.S.C. §§ 1182(a), 1225, 1227, 1229, 1229a, 1231. It also lays out, in detail, how removal orders are to be executed and calls upon federal officials to coordinate with foreign governments. *See* Background Section I., *supra*; 8 U.S.C. § 1231(b). Through these comprehensive enactments, Congress has occupied the field of noncitizen entry and removal.

Just as the Supreme Court found a state noncitizen-registration law field preempted in *Arizona*, SB 4 is field preempted here. There, as here, a State attempted to "add[] a state-law penalty for conduct proscribed by federal law." *Arizona*, 567 U.S. at 400. There, as here, "[t]he federal statutory directives provide a full set of standards," including "the punishment for noncompliance." *Id.* at 401. There, as here, the statutory framework "was designed as a harmonious whole." *Id.* And there, as here, "[p]ermitting the State to impose its own penalties for the federal offenses [ ] would conflict with the careful framework Congress adopted." *Id.* at 402. Thus, as in *Arizona*, even if SB 4 is a "complementary state regulation," it "is impermissible." *Id.* at 401. Otherwise, "the State would have the power to bring criminal

charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Id.* at 402. Worse yet, Texas can unilaterally *remove* noncitizens from the country under SB 4 without adhering to the panoply of federal removal requirements. Even the dissenters in *Arizona* did not think that was allowable; they agreed that ultimate removal decisions must be made by the federal government. *Id.* at 427 (Scalia, J., dissenting in part) (arguing that the Arizona law was constitutional because state officials were only allowed "to arrest a removable [noncitizen], contact federal immigration authorities, and follow their lead on what to do next"); *id.* at 438 (Thomas, J., dissenting in part) (similar); *id.* at 457 (Alito, J., dissenting in part) (arguing that "[s]tate and local officers do not frustrate the removal process by arresting criminal [noncitizens]" because "[t]he Executive retains complete discretion over whether those [noncitizens] are ultimately removed"). If anything, then, SB 4's determinations about unlawful entry and removal of noncitizens are even more intrusive than Arizona's unconstitutional noncitizen-registration law.

Since *Arizona*, courts have routinely held that state immigration crimes paralleling their federal counterparts are field preempted. For example, numerous courts have found that the federal provision on human smuggling (8 U.S.C. § 1324) preempts state human-smuggling crimes, both because § 1324 "provides a comprehensive framework," and because it functions as part of the larger statutory scheme of "federal statutes criminalizing the acts undertaken by [noncitizens]," including "§ 1325, [which] imposes civil and criminal penalties for unlawful entry into the United States." *GLAHR*, 691 F.3d at 1263–64; *see also United States v. South Carolina*, 720 F.3d 518, 530-31 (4th Cir. 2013) (holding that state laws making it a felony to violate § 1324 were "field preempted because the vast array of federal laws and regulations on this subject . . . is so pervasive . . . that Congress left no room for the States to supplement it"); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1024-25 (9th Cir. 2013) (holding that a state law "attempt[ing] to regulate conduct" that "the federal scheme also addresses" in § 1324 is field

preempted because the state scheme, "like the registration scheme addressed in *Arizona*" provides "a full set of standards designed to work as a 'harmonious whole'").  As those courts recognized, the breadth of these illegal-entry provisions "illustrates an overwhelmingly dominant federal interest in the field" concerning the "entry, movement, and residence of [noncitizens] within the United States." *GLAHR*, 691 F.3d at 1264.  Because SB 4 also seeks to track that "comprehensive framework," *id.* at 1263, it is field preempted in the same way the state human-smuggling crimes were field preempted.

In the end, "Congress has provided a broad and comprehensive plan describing the terms and conditions upon which [noncitizens] may enter this country, how they may acquire citizenship, and the manner in which they may be deported." *Hines*, 312 U.S. at 69.  And when Congress enacted the various provisions governing noncitizen entry and removal, "it plainly manifested a purpose to do so in such a way as to" create "one uniform national [ ] system." *Id.* at 74.  States "cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement, the federal law, or enforce additional or auxiliary regulations." *Id.* at 66–67.  If SB 4 were allowed to stand, and "every State could give itself independent authority to" unilaterally arrest, detain, prosecute, and remove noncitizens for federal immigration crimes, the United States would lose its ability to "ensure that enforcement policies are consistent with this Nation's foreign policy." *Arizona*, 567 U.S. at 397, 402.  There could be no "great[er] potential for disruption or embarrassment" than the chaos that would ensue from 50 different immigration systems with varying (and likely conflicting) provisions for illegal entry and noncitizen removal.  *Zschernig*, 389 U.S. at 435.  SB 4's unprecedented intrusion into the field of noncitizen entry and removal is wholesale preempted.

**B.    SB 4 is conflict preempted by various provisions of federal law, including those that allow for state cooperation in only narrow circumstances.**

Given the dominant federal interests and comprehensive federal scheme in this area, it is no surprise that SB 4 also "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399.  To begin, SB 4 allows

Texas to unilaterally remove noncitizens from the country without adhering to any of the federal grounds for removal, requirements for commencing and administering removal proceedings, and protections afforded to noncitizens. *See* Background Section I., *supra*; 8 U.S.C. §§ 1182, 1225, 1227, 1229, 1229a, 1231. Texas's removal orders could effectively prevent a noncitizen from asserting affirmative defenses to removal that would have been available in the federal system, including asylum, *see* 8 U.S.C. § 1158(a)(1), withholding of removal, *id.* § 1231(b)(3), or protection under regulations implementing Article 3 of the Convention Against Torture, 8 C.F.R. § 1208.16(c)(2). SB 4 even specifically says that "a court may not abate the prosecution" on "the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated." Tex. Code of Crim. Proc. art. 5B.003; *see* House Research Organization, Bill Analysis of SB 4 at 7 (Nov. 14, 2023) (supporters of SB 4 noting that "a pending asylum application would not be an affirmative defense to prosecution"). SB 4 thus expressly contemplates interference with the federal scheme by allowing Texas to imprison and remove people whose legal ability to remain in the United States may be under review by federal officials.

SB 4 also conflicts with the federal process for identifying the countries to which noncitizens may be removed, which allows federal officials to work with foreign governments to determine if they will accept those noncitizens. *See* 8 U.S.C. § 1231(b). But States have no authority to have those types of diplomatic discussions with foreign governments. *See* U.S. Const. art. I, § 10 ("No State shall enter into any Treaty, Alliance, or Confederation" and "[n]o State shall," without Congress's consent, "enter into any Agreement or Compact" with "a foreign Power."); *Hines*, 312 U.S. at 63 ("The Federal Government. . . is entrusted with full and exclusive responsibility for the conduct of affairs with foreign sovereignties."); *Holmes v. Jennison*, 39 U.S. 540, 572 (1840) (disallowing an informal extradition arrangement between the Governor of Vermont and a Canadian official and explaining that the Framers "anxiously desired to cut off all connection or communication between a state and a foreign power"). And yet, SB 4 simply notes that a removal order will "require the person to return to the

foreign nation from which the person entered or attempted to enter," regardless of nationality or whether that foreign nation has agreed to accept the person. Allowing Texas to conduct its own removal process will undoubtedly frustrate the United States' ability to handle foreign relations "with one voice." *Arizona*, 567 U.S. at 409.

Mexico's objection to SB 4 demonstrates exactly why that is a problem. Even before SB 4's enactment, Mexico "categorically reject[ed] any measure that," like SB 4, "allows state or local authorities to detain and return Mexican or foreign nationals to Mexican territory." Press Release, Secretaría de Relaciones Exteriores (Nov. 15, 2023). And as the Supreme Court recently explained, attempting to force "non-Mexican nationals" to return to Mexico "impose[s] a significant burden upon the Executive's ability to conduct diplomatic relations with Mexico." *Biden v. Texas*, 597 U.S. 785, 806 (2022).

Other attributes of SB 4 also illustrate its incompatibility with the comprehensive federal scheme. For example, SB 4 allows an affirmative defense to its illegal-entry provision if the noncitizen has been granted "lawful presence" by the federal government. Tex. Penal Code § 51.02(c). But federal law does not define "lawful presence"; it means different things in different contexts. An individual may be considered lawfully present for purposes of certain benefits, for instance, but not for purposes of accrual periods in admissibility. Under SB 4, however, a state magistrate or judge will purport to decide whether the noncitizen is "lawfully present"—a state determination that the Fifth Circuit has already held preempted. *Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 535–36 (5th Cir. 2013) (plurality). As the court explained, "[t]he federal government alone" has "the power to classify noncitizens." *Id.* at 536. There are "significant complexities" in determining immigration status. *Id.* at 535–36; *see also Plyler v. Doe*, 457 U.S. 202, 236 (1982) (Blackmun, J., concurring) ("[T]he structure of the immigration statutes makes it impossible for the State to determine which [noncitizens] are entitled to residence, and which eventually will be deported."). And "even a determinative federal answer on this question" would not bring SB 4 "into compliance with federal law." *Farmers Branch*, 726 F.3d at 535–36.

23

SB 4's proscriptions are also broader than their federal counterparts, creating another conflict. While both federal law and SB 4 criminalize the reentry of removed or deported noncitizens, federal law includes exceptions, like consent from the Secretary of Homeland Security. *See* 8 U.S.C. § 1326. But SB 4's reentry provision has no affirmative defenses or exceptions, prohibiting noncitizens' reentry even if they have the Secretary of Homeland Security's permission. Indeed, noncitizens who were removed but then permitted to reenter the United States for any reason may be prosecuted under SB 4 for illegal reentry because the law extends to *any* noncitizen who was previously removed and later "found in th[e] state." Tex. Penal Code § 51.03(a). And to the extent Texas seeks to arrest, detain, and prosecute unaccompanied noncitizen children, that would conflict with the protections Congress afforded such children, including transfer to HHS's ORR and placement in the least restrictive setting that is in the best interest of the child. *See* 8 U.S.C. § 1232. All of these features interfere with federal law and "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399.

Beyond that, SB 4 conflicts with the statutory scheme Congress enacted that "specifies [the] limited circumstances in which state officers may" assist with immigration enforcement. *Arizona*, 567 U.S. at 408; *see also* Argument Section I.A., *supra*. Most prominently, under 8 U.S.C. § 1357(g), the Secretary of Homeland Security "may enter into a written agreement with a State" or any of its "political subdivision[s]," allowing state or local officers "who [are] determined by the [Secretary] to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of [noncitizens] in the United States" to "carry out such function" consistent with state law. 8 U.S.C. § 1357(g)(1). The State must "certif[y]" that such officers "performing the function under the agreement have received adequate training" and, in performing that function, the officer "shall be subject to the direction and supervision of the [Secretary]." *Id.* § 1357(g)(2)–(3); *Arizona*, 567 U.S. at 409 ("There are significant complexities involved in enforcing federal immigration law," and

agreements under § 1357(g) must "contain written certification that officers have received adequate training."). The purpose of § 1357(g) was to "expand the number of personnel who are involved in picking up people in violation of the law" while subjecting those personnel to "ongoing Federal supervision" so that "everything will be conducted under the watch of the [federal government] and the [Secretary of Homeland Security] in conformity with Federal standards." 142 Cong. Rec. H2378-05, H2445, 1996 WL 120181 (Mar. 19, 1996) (Rep. Cox).

SB 4 flouts § 1357(g) and the other narrow provisions for state participation. *See* Background Section II., *supra*; 8 U.S.C. § 1103(a)(10); *id.* § 1252c; *id.* § 1324(c). Those federal provisions mean nothing if States can enact their own immigration crimes and then arrest, detain, prosecute, and remove noncitizens without federal authorization, without any special training, and without being "subject to the direction and supervision of the" United States. *See* 8 U.S.C. § 1357(g)(3). States could pick from the menu of federal immigration laws and enforce them as they see fit. "This is not the system Congress created." *Arizona*, 567 U.S. at 408; *cf. id.* at 413 (it would "disrupt the federal framework to put state officers in the position of holding [noncitizens] in custody for possible unlawful presence without federal direction and supervision"). Nor can SB 4 be treated as "cooperat[ion]." *See* 8 U.S.C. § 1357(g)(10)(B). That cooperation refers to joint action between the States and the federal government. As the Supreme Court emphasized, "no coherent understanding of the term would incorporate the unilateral decision of state officers to arrest [a noncitizen] for being removable absent any request, approval, or other instruction from the Federal Government." *Arizona*, 567 U.S. at 410. Texas's disregard for § 1357(g) and other cooperative provisions "stands as an obstacle" to the federal oversight Congress envisioned. *Id.* at 399.

The Fifth Circuit has suggested as much. In *Farmers Branch*, the court addressed a local ordinance that criminalized the housing of noncitizens. 726 F.3d at 531. Although the city argued that its ordinance "will concurrently enforce federal anti-harboring law" under § 1324, the court found it conflict preempted. *Id.* at 529. In so holding, the court explained that the "significant complexities involved in enforcing federal immigration law" reinforce

"the importance of the federal government's supervisory role over the limited contexts" where "the Attorney General has delegated arrest authority to state officers." *Id.* at 531 (citation omitted). And "by giving state officials authority to act as immigration officers outside the limited circumstances specified by federal law," the ordinance at issue "interfere[d] with the careful balance struck by Congress." *Id.* These concerns were reiterated in *City of El Cenizo*, where the Fifth Circuit noted that state officers can "become de facto immigration officers, competent to act on their own initiative" under § 1357(g) agreements with the federal government. *City of El Cenizo v. Texas*, 890 F.3d 164, 180 (5th Cir. 2018). And it specifically upheld a state law only because it did *not* allow "unilateral enforcement activity." *Id.*

Here, SB 4 does exactly what the Fifth Circuit and the Supreme Court warned against: it allows "unilateral enforcement" of the prohibitions on illegal entry (§ 1325) and illegal reentry (§ 1326) by state officials without the federal authorization, oversight, or training required by federal law. *Id.*; *see Arizona*, 567 U.S. at 410. This allows Texas to independently render judgments about the "investigation, apprehension, or detention" of noncitizens when Congress wanted those decisions to be made in coordination with the federal government. *See* 8 U.S.C. § 1357(g). And if Congress specified only narrow circumstances where States may assist in the "investigation, apprehension, or detention" of noncitizens, there is no reason to think it would have allowed unilateral state *prosecutions* followed by unilateral state *removal* of noncitizens to a foreign country.

As discussed above, the federal government alone must determine whether a noncitizen's entry into the United States is lawful, and whether any consequences should be imposed for unlawful entry. Just as there was an impermissible "conflict" when the FDA's enforcement sought to achieve a "somewhat delicate balance" that would be "skewed by allowing fraud-on-the-FDA claims under state tort law," *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 348 (2001), so too would the federal government's immigration enforcement be improperly skewed by SB 4. Immigration enforcement involves a sensitive balancing of United States' interests in national security and foreign relations, including the reciprocal

treatment of U.S. citizens abroad. *See* Argument Section I.A., *supra*. And allowing each State to arrest, detain, prosecute, and remove foreign nationals would fundamentally undermine that delicate balance. In sum, SB 4 directly interferes with the comprehensive federal immigration scheme; it is both field and conflict preempted.

**C.    SB 4 violates the dormant Foreign Commerce Clause by regulating international commerce and interfering with the United States' foreign relations.**

SB 4 also violates the Commerce Clause. The Constitution provides that Congress may "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. This power is critically important. "One of the major defects of the Articles of Confederation, and a compelling reason for the calling of the Constitutional Convention of 1787, was the fact that the Articles essentially left the individual States free to burden commerce both among themselves and with foreign countries very much as they pleased." *Michelin Tire Corp. v. Wages*, 423 U.S. 276, 283 (1976); *see* The Federalist No. 11, at 49 (Gideon ed., 2001) (Hamilton noting that "intercourse with foreign countries" is "one of those points about which there is least room to entertain a difference of opinion, and which has, in fact, commanded the most general assent of men who have any acquaintance with the subject"). Under the Constitution, therefore, "[f]oreign commerce is preeminently a matter of national concern." *Japan Line*, 441 U.S. at 448. "In international relations and with respect to foreign intercourse and trade the people of the United States act through a single government with unified and adequate national power." *Id.* (citation omitted). Simply put, "[t]he commerce of the United States with foreign nations, is that of the whole United States." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 195 (1824) (Marshall, C.J.).

Perhaps unsurprisingly, then, "[f]rom early in the nation's history, it was understood that the Commerce Clause permitted the federal government to control certain aspects of immigration." Jennifer Gordon, *Immigration As Commerce: A New Look at the Federal Immigration Power and the Constitution*, 93 Ind. L.J. 653, 671 (2018); Kif Augustine-Adams, *The Plenary Power Doctrine After September 11*, 38 U.C. Davis L. Rev. 701, 718 (2005) ("[M]any scholars

identify the Commerce Clause as an explicit constitutional text that empowers the federal government to control immigration into the United States."). And one of those aspects is the "movement of persons," including "the movement of undocumented [noncitizen] laborers across a national boundary into this country." *United States v. Hanigan*, 681 F.2d 1127, 1130–31 (9th Cir. 1982) (citing *Gibbons*, 22 U.S. at 190); *United States v. Guest*, 383 U.S. 745, 758–59 (1966) ("[P]recedents firmly establish[] that the federal commerce power surely encompasses the movement in interstate commerce of persons as well as commodities."). The "illegal entry of foreign nationals" also "substantially affect[s] interstate commerce." *United States v. Hernandez-Guerrero*, 963 F. Supp. 933, 938 (S.D. Cal. 1997), *aff'd,* 147 F.3d 1075 (9th Cir. 1998).

States therefore cannot regulate the movement of noncitizens across an international border. "Although the Commerce Clause speaks only of Congress's power, it has long been understood that there is a dormant or negative aspect of the Commerce Clause that limits the power of the states to regulate commerce." *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 749 (5th Cir. 2006); *see also Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368 (2023); *Chy Lung v. Freeman*, 92 U.S. 275, 280 (1875) (the authority to enact immigration laws "belongs to Congress, and not to the States" because Congress "has the power to regulate commerce with foreign nations," and "the responsibility for the character of those regulations, and for the manner of their execution, belongs *solely* to the national government" (emphasis added)). "State regulations violate the dormant Commerce Clause by discriminating against or unduly burdening foreign or interstate commerce." *Piazza's Seafood*, 448 F.3d at 750. "Regulations that facially discriminate" against foreign commerce "are virtually per se invalid," and "nondiscriminatory state regulations affecting foreign commerce are invalid if they (1) create a substantial risk of conflicts with foreign governments; or (2) undermine the ability of the federal government to 'speak with one voice' in regulating commercial affairs with foreign states." *Id*. Here, SB 4 is invalid on all these grounds.

SB 4 discriminates against foreign commerce on its face: it criminalizes *solely* the movement of noncitizens across an international boundary *into* Texas, including by imposing removal as a penalty. SB 4 criminalizes nothing about movement *within* or *out of* Texas. Nor does it criminalize anything about the movement of American *citizens* entering Texas. While SB 4 does not look like the protectionist economic regulations that usually arise under the dormant Commerce Clause, "[a] law need not be designed to further local economic interests in order to run afoul of the Commerce Clause." *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 67 (1st Cir. 1999), *aff'd sub nom. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000). And even assuming SB 4 were "consistent with federal policy" or "furthers the goals we might believe that Congress had in mind," a "state statute that violates the Commerce Clause cannot be saved by a showing that it is consistent with the purposes behind federal law." *Piazza's Seafood*, 448 F.3d at 751. There is simply no "express statement" in federal law that allows Texas to "discriminate[] against foreign commerce" by prosecuting noncitizens' illegal entry into the United States. *Id.*

But even if SB 4 were nondiscriminatory, it still improperly "create[s] a substantial risk of conflicts with foreign governments" and "undermine[s] the ability of the federal government to 'speak with one voice' in regulating commercial affairs with foreign states." *Id.* at 750. By definition, restricting movement over an international boundary implicates the United States' foreign affairs. It already has. As noted above, Mexico has "categorically reject[ed] any measure that," like SB 4, "allows state or local authorities to detain and return Mexican or foreign nationals to Mexican territory." Press Release, Secretaría de Relaciones Exteriores (Nov. 15, 2023). And the United States is currently using its diplomatic channels to discuss immigration with Mexico and other countries in the region. *See* Background Section II., *supra*. As the Supreme Court said, attempting to force "non-Mexican nationals" to return to Mexico "impose[s] a significant burden upon the Executive's ability to conduct diplomatic relations with Mexico." *Biden*, 597 U.S. at 806. By inappropriately regulating foreign

commerce—movement of noncitizens across an international border—SB 4 "impair[s] fed-eral uniformity in an area where federal uniformity is essential." *Japan Line*, 441 U.S. at 448.

## II.   SB 4 would impair foreign relations and immigration operations, causing irrepara-ble harm to the United States and the public.

The United States and the public will suffer immediate and irreparable harm if SB 4 takes effect. As courts have explained, irreparable harm necessarily results from enforcement of a preempted state law. *See New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 366–67 (1989) (noting that irreparable injury may be established "by a showing that the challenged state statute is flagrantly and patently violative of" the Supremacy Clause); *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011) (finding irreparable harm from only the "alleged constitutional infringement" because "the interest of preserving the Supremacy Clause is paramount"), *aff'd in part, rev'd on other grounds,* 567 U.S. 387 (2012); *United States v. Texas*, 557 F. Supp. 3d 810, 821 (W.D. Tex. 2021) ("Because the United States has established a likelihood that the [state law] violates the Supremacy Clause, irreparable harm is pre-sumed."); *Nat'l Collegiate Athletic Ass'n v. Christie*, 926 F. Supp. 2d 551, 578 (D.N.J. 2013) (A "violation of the Supremacy Clause, alone, likely constitutes an irreparable harm."), *reversed on other grounds Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018). SB 4's violation of the Supremacy Clause alone suffices to establish harm.

But SB 4's harm extends far beyond that legal injury. Internationally, "[i]f allowed to enter into force, SB 4 would result in significant and ongoing negative consequences for U.S. foreign relations." Jacobstein Decl. ¶ 6. When a State takes immigration enforcement actions "without any input from the Federal Government," it effectively "achieve[s] its own immi-gration policy" and "[t]he result could be unnecessary harassment of some [noncitizens] (for instance, a veteran, college student, or someone assisting with a criminal investigation) who federal officials determine should not be removed." *Arizona*, 567 U.S. at 408; *see also* Jacob-stein Decl. ¶¶ 7, 9, 32. This is especially true of SB 4, which imposes its own criminal penalties for unlawful entry and reentry on noncitizens and allows state magistrates and judges to force

non-Mexican nationals into Mexico, without any indication that Mexico is willing to accept them. This "[p]erceived mistreatment of [noncitizens] in the United States may lead to harmful reciprocal treatment of American citizens abroad." *Arizona*, 567 U.S. at 395; Jacobstein Decl. ¶¶ 31–32. And as the State Department's Deputy Assistant Secretary Eric Jacobstein further explains, "foreign governments' reactions to immigration policies and the treatment of their nationals in the United States affects not only immigration matters, but also any other issues in which the United States may seek cooperation with foreign countries, including international trade, tourism, and security cooperation." Jacobstein Decl. ¶ 5.

Here, "Mexico has signaled emphatically that [Texas's] actions would frustrate the United States' relations with Mexico regarding noncitizen removals and likely other important bilateral issues." *Id.* ¶ 12. That is significant because "Mexico is an essential partner for the United States" in addressing regional irregular migration and its root causes. *Id.* ¶ 19; *see also* Exec. Order 14010, 86 Fed. Reg. 8267 (Feb. 2, 2021). Indeed, the two governments have issued a joint declaration "in which they committed to immigration policies that recognize the dignity of migrants and the imperative of orderly, safe, and regular migration." Jacobstein Decl. ¶ 19. "They [have] further committed to collaborate on a joint effort to address the root causes of regional migration, improve migration management, and develop legal pathways for migration." *Id.*

Officials from the United States and Mexico meet frequently to "take stock of [their] cooperative efforts," "identify new areas of cooperation, and reinforce [the two governments'] joint commitments." *Id.* ¶ 20; *see also* Final Rule, Circumvention of Lawful Pathways, 88 Fed. Reg. at 31316–17 (noting that negotiations with Mexico permitted DHS to implement certain parole processes for citizens of countries where those noncitizens could be returned to Mexico as a consequence of not following certain pathways, and that Mexico previously "had not been willing to accept the return of such nationals"). "SB 4 undermines these efforts" because it represents a single State's unilateral attempt to regulate immigration without regard to the United States' foreign relations. Jacobstein Decl. ¶¶ 9–33. Just recently, the Fifth Circuit

upheld a preliminary injunction in part because Mexico protested Texas's actions at the border.  *United States v. Abbott*, 87 F.4th 616, 633–34 (5th Cir. 2023) (affirming preliminary injunction enjoining Texas's placement of a buoy barrier in the Rio Grande River to stop migrants from crossing into the United States); *see Crosby*, 530 U.S. at 385 (citing State Department testimony for the proposition that a state law "stands as an obstacle in addressing the congressional obligation to devise a comprehensive, multilateral strategy").  That should be enough here too.  And SB 4 will also "necessarily antagonize[ ] foreign governments and their populations, both at home and in the United States."  Jacobstein Decl. ¶ 9.  Because of how their citizens will be treated by Texas under SB 4, foreign nations may be "less willing to negotiate, cooperate with, or support the United States across a broad range of important foreign policy issues."  *Id.*

Not only will SB 4 undermine the United States' comprehensive policy framework to address regional irregular migration, *see* Jacobstein Decl. ¶¶ 18–23; Exec. Order 14010, but it also "threatens to undermine [the United States'] standing before regional and multilateral bodies that address migration and human rights matters" and hamper the United States' effective advocacy "for the advancement of human rights" and the "protection for individuals fleeing persecution or torture."  Jacobstein Decl. ¶ 29.  Specifically, SB 4 does not accommodate the United States' treaty obligations—like those under the Convention Against Torture and the Refugee Protocol—which were implemented through federal law to prevent refoulement (the return of noncitizens to a country where they are likely to face torture or persecution).  *See id.* ¶¶ 24–28; Kim Decl. ¶¶ 4–5, 16; 8 U.S.C. § 1231(b)(3); 8 C.F.R. § 1208.16(c)(3); *see* 8 U.S.C. § 1231 note; 8 C.F.R. § 1208.16–.18.  Consequently, the international community would view SB 4 as a sign that the United States is scaling back its commitment to international protection, which could encourage other governments to abandon or minimize their own efforts—all without a deliberate policy choice by the federal government.  Jacobstein Decl. ¶ 30.  SB 4 would therefore undermine U.S. efforts to convince governments worldwide to strengthen their international protection systems and uphold their

respective nonrefoulement obligations.  *Id.*  ¶ 29.  If States like Texas could implement their own laws governing the entry and removal of noncitizens, "a single State [could], at her pleasure, embroil us in disastrous quarrels with other nations."  *Chy Lung*, 92 U.S. at 280; *South Carolina*, 720 F.3d at 533 (finding "irreparable injury to the nation's foreign policy" if a State's parallel immigration law "take[s] effect").

SB 4 is just as likely to cause imminent harm domestically.  For one, the state law would impede the federal government's ability to assess a noncitizen's national-security and public-safety risks and take appropriate enforcement actions.  Declaration of David S. BeMiller ¶¶ 5–11.  For example, "if Border Patrol is unable to conduct immediate independent interviews with apprehended migrants" because they have been arrested, detained, or removed by Texas, the federal government "may miss important timely national security information or be unable to develop analytical trends from the intelligence gathered."  *Id.* ¶ 10.  This information "is vital for gathering data such as methods/modes of travel, funding, and what messaging is being propagated outside of the United States, so that Border Patrol can gain awareness of the tactics of human trafficking networks, drug cartels, terrorist or foreign intelligence operations, or other criminal activity."  *Id.*  For another, the time-sensitive enforcement tool of expedited removal (used to remove certain noncitizens within 14 days of their arrival) may be unavailable to federal officials if noncitizens are arrested, detained, and prosecuted by Texas.  *Id.* ¶ 11.  These "danger[s] to federal government operations, including those of the Border Patrol," independently constitute irreparable harm.  *Abbott*, 87 F.4th at 635 n.20.

SB 4 is also expected to interfere with federal immigration proceedings and operations.  *See* BeMiller Decl. ¶¶ 6–11; Declaration of Russell Hott, ¶¶ 19–26; Kim Decl. ¶¶ 17–18.  In fact, the law forbids abatement of an SB 4 prosecution when the federal government is making asylum or adjustment-of-status determinations for the noncitizens at issue.  Tex. Code Crim. Proc. art. 5B.003.  And a noncitizen facing simultaneous SB 4 enforcement proceedings and federal proceedings may be impeded from participating in the federal proceedings.  Kim Decl. ¶¶ 8–10, 14, 17–18.  Noncitizens can generally apply for asylum even when they have not

33

entered through a port of entry.  8 U.S.C. § 1158(a).  But if asylum applicants may be arrested, prosecuted, detained, and removed by Texas during the pendency of their application, they will be prevented from participating in federal processes that allow for a grant of asylum or related protection from removal.  Kim Decl. ¶¶ 17–18; House Research Organization, Bill Analysis of SB 4 at 7 (Nov. 14, 2023) (supporters of SB 4 noting that "a pending asylum application would not be an affirmative defense to prosecution"); *see* 8 C.F.R. §§ 208.3(b); 208.16-.18; 208.30.  A removal that inhibits screening for, or adjudication of, federal statutory withholding of removal or protection under the Convention Against Torture is harmful to the government and the public.  *See* 8 U.S.C § 1231(b)(3); 8 C.F.R. § 1208.16(c), 17–18.  And SB 4 can also be expected to cause a change in noncitizens' migration pattern, encouraging noncitizens to enter through other border States and potentially requiring DHS to reallocate its assets, resources, and personnel, which would be a significant undertaking.  BeMiller Decl. ¶ 6; Hott Decl. ¶¶ 19–24.

These serious harms are compounded by the fact that, if SB 4 is allowed to stand, other States could be emboldened to impose similar restraints.  *See Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 373 (2008) (noting that allowing a State to set a requirement that conflicts with federal law "would allow other States to do the same").  At best, this could create a problematic "patchwork" system of laws.  *Id.*  At worst, there may be a disastrous impact on the federal government's ability to carry out its core immigration functions.  *See South Carolina*, 720 F.3d at 533 ("[T]he likelihood of chaos resulting from [a State] enforcing its separate immigration regime is apparent.").  Either way, allowing other States to follow Texas's lead would severely undermine both the United States' conduct of foreign affairs and the "integrated scheme of regulation created by Congress," wresting control of immigration from "one national sovereign" and giving it to "the 50 separate States."  *Arizona*, 567 U.S. at 395, 402.

34

### III.    Texas has no legitimate countervailing interest in maintaining an unconstitutional law.

In contrast to the harm suffered by the United States and the public, Texas has no legitimate interest in running its own unconstitutional immigration system: it "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *see Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 784 (5th Cir. 1990). And "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013); *Schrader v. Dist. Att'y of York Cnty.*, 74 F.4th 120, 128 (3d Cir. 2023) (same). In any event, Texas would not be harmed by an injunction.

Texas is free to assist in the enforcement of federal immigration law without enacting its own parallel scheme; it must simply proceed under the constraints Congress established. *See, e.g.*, 8 U.S.C. § 1103(a)(10); *id.* § 1252c; *id.* § 1324(c); *id.* § 1357(g). Most expansively, Texas can enter an agreement with the federal government to aid in the "investigation, apprehension, or detention of [noncitizens] in the United States" if state officers receive adequate training and are "subject to the direction and supervision of the" federal government. *Id.* § 1357(g). This is no hardship: as of June 2023, 26 Sheriff's Offices in Texas *already have* § 1357(g) agreements in place. *See* ICE, *Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act* (last visited Jan. 12, 2024). But Texas has no lawful interest in unilaterally encroaching on an exclusive federal domain. This is nothing new for Texas. The United States has been enforcing *federal* crimes of illegal entry (§ 1325) and illegal reentry (§ 1326) in Texas since they were enacted in 1952. Yet Texas has gone at least seven decades without an unconstitutional state counterpart like SB 4.

And, in a suit brought by the United States, Texas can assert no cognizable interest in protecting its citizens from purported immigration-related harms. *Cf. Haaland v. Brackeen*, 599 U.S. 255, 295 (2023) (Texas had no standing to assert claim on behalf of its citizens because

"[a] State does not have standing as *parens patriae* to bring an action against the Federal Government"). As explained above, the entry and removal of noncitizens is an exclusively federal field. And "[i]n that field it is the United States, and not the [S]tate, which represents" Texans; "to the former, and not to the latter, they must look for such protective measures as flow from that status." *Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923). At bottom, any interest the State could muster cannot outweigh the imminent and irreparable harm to the United States and the public from enforcing an unconstitutional state statute.

## IV.    The Court should enter a permanent injunction because there are no material facts in dispute.

Because the purely legal issues in this motion are dispositive, the Court could proceed directly to final judgment. Under either Rule 56 or Rule 65, the Court can simply apply the Supremacy Clause and the Commerce Clause to the undisputed facts and enter a permanent injunction in favor of the United States. *See* Fed. R. Civ. P. 65(a)(2) ("Before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing."); *Molina v. Home Depot USA, Inc.*, 20 F.4th 166, 169 (5th Cir. 2021) (recognizing that district courts may "grant summary judgment *sua sponte*" if they give "the parties ten days' notice"); *Atkins v. Salazar*, 677 F.3d 667, 678 (5th Cir. 2011); *Rest. L. Ctr. v. U.S. Dep't of Lab.*, 2023 WL 4375518, at *4 (W.D. Tex. July 6, 2023) (Pitman, J.) (addressing a preliminary-injunction motion and cross motions for summary judgment under Rule 65(a)(2)). The Court should do so here.

## CONCLUSION

For the reasons explained above, the Court should grant the United States' motion and enjoin enforcement of SB 4.

DATED:  January 12, 2024                    Respectfully submitted,

                                            BRIAN M. BOYNTON
                                            Principal Deputy Assistant Attorney General

                                            JAIME ESPARZA
                                            United States Attorney

                                            ALEXANDER K. HAAS
                                            Director, Federal Programs Branch

                                            JEAN LIN
                                            Special Litigation Counsel, Federal Programs Branch

                                            */s/ Stephen Ehrlich*
                                            KUNTAL CHOLERA
                                            STEPHEN EHRLICH
                                            Attorneys
                                            U.S. Department of Justice
                                            Civil Division, Federal Programs Branch
                                            1100 L Street, NW
                                            Washington, DC  20005
                                            Phone:  (202) 305-9803
                                            Email:   stephen.ehrlich@usdoj.gov

                                            Samuel M. Shapiro
                                            Assistant United States Attorney
                                            601 N.W. Loop 410, Suite 600
                                            San Antonio, TX 78216
                                            samuel.shapiro@usdoj.gov
                                            Tel: (210) 384-7392

                                            *Attorneys for the United States*