# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    *Plaintiff,*<br><br>v.<br><br>THE STATE OF TEXAS; GREG ABBOTT, in his official capacity as Governor of Texas; TEXAS DEPARTMENT OF PUBLIC SAFETY; STEVEN C. MCCRAW, in his official capacity as Director of Texas Department of Public Safety,<br><br>    *Defendants.* | Case No. 1:24-cv-00008-RP |

**DECLARATION OF DAVID S. BEMILLER**

I, David S. BeMiller, declare the following under 28 U.S.C. § 1746, and state under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

## I.    Personal Background

1.    I am currently serving as the Chief of Law Enforcement Operations for the U.S. Border Patrol in Washington, D.C. I have served in this position since November of 2022.  In my position as Chief of Law Enforcement Operations, I am responsible for executing the missions of the U.S. Department of Homeland Security (DHS), U.S. Customs and Border Protection (CBP), and Border Patrol. Border Patrol is the primary federal law enforcement organization responsible for securing the U.S. borders between the ports of entry by preventing the entry of terrorists and their weapons and the illicit trafficking of people and contraband.  Border Patrol has a workforce of over 19,000 agents who patrol more than 6,000 miles of U.S. land borders.  As Chief of Law Enforcement Operations, I am responsible for the oversight of day-to-day Border Patrol operations throughout the United States, among other duties.  For instance, I also serve as the principal advisor to DHS, CBP, and Border Patrol leadership on law enforcement operations, personnel, infrastructure, and technology requirements.

2.    Border Patrol, as a component of CBP, maintains a presence between ports of entry.  For operational purposes, the Border Patrol divides the United States into geographical areas known as "sectors."  There are five sectors that cover the Texas land border.  The Border Patrol utilizes various technologies to assist in detecting, identifying, and classifying those attempting to cross the border illegally.  Border Patrol also operates checkpoints at 19 locations in Texas.  There are 157 miles of border barrier in Texas owned and maintained by CBP.

3.    Prior to becoming Chief of Law Enforcement Operations, I served as the Chief Patrol Agent of Blaine Sector since March of 2021.  In my more than 25 years of service, I have held several other leadership positions in Washington, D.C. as well as in other locations throughout the nation.  From 2010 until 2014, within the San Diego Sector, I served as an

Assistant Chief Patrol Agent, the Executive Officer of Operations for San Diego Sector, Deputy Patrol Agent in Charge of the El Cajon Station, Patrol Agent in Charge of the San Clemente Station, and Patrol Agent in Charge of the Campo Station.  I was then promoted to Deputy Chief Patrol Agent of the Spokane Sector in December of 2016, where I directed and oversaw all law enforcement and intelligence collection activities of seven Border Patrol Stations spanning the states of Washington, Idaho, and Montana.

4.      Due to my experience and the nature of my official duties, I am familiar with Texas's recently enacted law, SB 4.  This declaration is based upon my personal knowledge and information provided to me in the course of my official duties.

## II.     SB 4's Effect on Border Patrol Operations

5.      SB 4 would inhibit CBP's statutory authorities to conduct border inspections as well as force costly resource reallocation.

6.      First, if Texas imposes criminal penalties for unlawful entry and reentry by migrants, I anticipate that migrants would instead seek to enter the United States through Arizona, New Mexico, and California.   In the event of such a shift in migrant traffic, it would create additional operational stress to CBP personnel and resources in these areas, requiring CBP to significantly alter its operations to continue executing our responsibilities by shifting personnel to those States at great expense and strain on CBP's operations.  A shift in crossing activity to remote areas over vast distances where there is little or no law enforcement presence would necessitate additional deployment of resources and personnel, potentially rapidly, to respond to a threat of increased cross-border activity.  It should be noted that the terrain in many of these areas is more rugged, with conditions that could lead to an increase in medical emergencies and deaths of migrants, further straining CBP's response options.  Resource allocation might include the reassignment or construction of processing facilities, detailing of law enforcement personnel, realignment of intelligence gathering assets, new transportation requirements, and technology needs.  For example, to construct a single new soft-sided facility capable of holding 500 migrants with features that include medical services, guards, shower

2

monitors, food service and janitorial services in New Mexico, Arizona, or California, it would cost approximately $20 million, with a monthly cost of about $15 million to operate.

7.      Second, if SB 4 goes into effect, we can expect increased operational challenges in Texas posed by potential conflicts between CBP's and Texas's differing operations.  For example, Border Patrol's ability to respond to medical emergencies, especially along the Rio Grande, has been impeded by Texas's measures under Operation Lone Star to limit access to migrants and/or common areas for crossings and boat ramps.  Texas did so without prior consultation or collaboration with CBP about the installation of concertina wire, lockable gates, and mounded dirt in areas patrolled by Border Patrol.  These efforts impede the ability of Border Patrol to detect, apprehend, and/or respond to migrants in distress.   The most recent example of this is the State of Texas blocking access by Border Patrol of an area spanning 2.5 miles along the border in Eagle Pass.  The area includes Shelby Park, which has the boat ramp most frequently used by Border Patrol to maintain situational awareness of that portion of the Rio Grande.  Texas's blocking of access to this area also prevents CBP from maintaining surveillance equipment and the presence of agents to identify locations where agent response is needed, determine what resources are required for Border Patrol to apprehend migrants, and respond when migrants are in distress.  If SB 4 goes into effect, Texas may take additional measures to deter or apprehend migrants in order to implement SB 4.  This could potentially also lead to conflicts between the respective law enforcement officers.

8.      Although the precise impact of SB 4 removal scheme is not yet fully known, I expect it would at least negatively affect certain populations of migrants.  CBP currently routinely answers foreign consulate inquiries about certain migrants in CBP's custody, and coordinates with such foreign consulates about the repatriation of such migrants.  If Texas has custody or control of such persons, Border Patrol would be unable to effectively respond to consulates and unable to coordinate appropriately on these persons.

9.       If large numbers of noncitizens were transported to CBP facilities, CBP would inspect those individuals.  Such inspection and potential detention would create an additional

3

burden on CBP.  Existing CBP facilities have limited space for inspection, processing, and holding noncitizens in a safe and orderly manner. Texas transporting noncitizens to facilities at or near capacity, particularly without a requirement for cooperation, would likely place further strain on CBP and federal resources.

10.     Intelligence and information collection and vetting under a state-managed immigration scheme would also become more complex, with the potential for missed collection and reporting opportunities if Border Patrol is unable to conduct immediate independent interviews with apprehended migrants who entered unlawfully.  Intelligence and information collection is another term for gathering information.  The specific type of collection varies depending on the demands of law enforcement missions and, in this case, the migrant population that is being assessed.  Border Patrol agents' ability to collect information from a custodial interview of a noncitizen is vital for gathering data such as methods/modes of travel, funding, and what messaging is being propagated outside of the United States, so that Border Patrol can gain awareness of the tactics of human trafficking networks, drug cartels, terrorist or foreign intelligence operations, or other criminal activity.  If noncitizens are not vetted through specially trained CBP officers, we may miss important timely national security information or be unable to develop analytical trends from the intelligence and information gathered.  Further, CBP would be unable to identify individuals important to sensitive national security interests, including special interest migrants or migrants with criminal or terrorist backgrounds. This risk is especially acute due to limited state access to federal and terrorist screening data sets, so Texas would not know if a migrant it has detained may be of special interest to the United States.

11.     Finally, timelines for immigration actions, such as expedited removal under current designation by the Secretary (where individuals who are inadmissible under covered grounds may be removed without initiating full immigration proceedings, but must be apprehended within 100 miles of an international boundary and within 14 days of illegally entering the country) may be impacted if an individual is in Texas's custody for a prolonged period

4

prior to any CBP apprehension.  Noncitizens who have illegally entered the country and have been detained by Texas over 14 days would not be eligible for expedited removal under current expedited removal designations and may need to be placed into full immigration proceedings to be removed, contributing to the massive backlog already present in the immigration system.

Executed on January 12, 2024.

DAVID S. BEMILLER
Chief of Law Enforcement Operations
U.S. Border Patrol