UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff*, v. THE STATE OF TEXAS; GREG ABBOTT, in his official capacity as Governor of Texas; TEXAS DEPARTMENT OF PUBLIC SAFETY; STEVEN C. MCCRAW, in his official capacity as Director of Texas Department of Public Safety, *Defendants*. | Case No. 1:24-cv-00008-RP |

**DECLARATION OF RUSSELL HOTT**

I, Russell Hott, declare the following under 28 U.S.C. § 1746, and state under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

**I.      Personal Background**

1. I am currently employed by the U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations as the Deputy Executive Associate Director. I have held this position since January 2024.

2. ICE's enforcement and removal efforts are conducted by more than 8,600 employees assigned to 25 field offices and headquarters, in more than 200 domestic locations and 30 overseas locations. Through this national and international network, ICE protects the homeland through the arrest and removal of noncitizens who undermine the safety of our communities and the integrity of our immigration laws. As Deputy Executive Associate Director, I oversee, direct, and coordinate all enforcement and removal field operations.

3. Prior to my current position, I have spent 22 years working for ICE and its predecessor agency, the Immigration and Naturalization Service (INS), in various positions. I began my career with the U.S. Government as a detention enforcement officer with the former INS in New York, NY. Throughout my career, I held a variety of positions including Immigration Enforcement Agent, Deportation Officer, Instructor at the Federal Law Enforcement Training Center, Supervisory Detention and Deportation Officer, Acting Assistant Field office Director, National Program Manager, Unit Chief, Acting Deputy Chief of Staff for Enforcement and Removal Operations, Chief of Staff for the ICE Deputy Director, Deputy Field Office Director for both the Boston and Washington field offices, Field Office Director, and Acting Deputy Assistant Director, and Assistant Director for the Custody Management Division.

4. Due to my experience and the nature of my official duties, I am familiar with ICE enforcement and removal operations. I am also familiar with Texas's recently enacted

law, SB 4. This declaration is based upon my personal knowledge and information provided to me in the course of my official duties.

## II.     ICE Priorities and Southwestern Border Efforts

5.     Following enactment of the Homeland Security Act of 2002, ICE was created from elements of several legacy agencies, including INS and the U.S. Customs Service. ICE is the principal investigative arm of DHS, and its primary mission is to promote homeland security and public safety through the enforcement of criminal and civil federal laws governing border control, customs, trade, and immigration.

6.     ICE is charged with enforcement of more than 400 federal statutes, and its mission is to protect the United States from the border-related crime and illegal immigration that threaten national security and public safety. ICE is charged with removing noncitizens who lack lawful immigration status or are otherwise removable from the United States under the immigration laws. The agency has statutory authority to detain noncitizens in pursuit of its mission pending their removal proceedings and/or removal from the United States.

7.     Within ICE, Enforcement and Removal Operations oversees programs and conducts operations to identify and apprehend removable noncitizens, to detain these individuals when necessary, and to remove noncitizens with final orders of removal from the United States. This includes domestic transportation, detention, alternatives to detention programs, bond management, supervised release, and removal to more than 190 countries around the world. As part of the removal process, ICE manages a non-detained docket of more than 6.8 million cases, which includes noncitizens currently in removal proceedings and those who have already received removal orders and are pending removal from the United States.

8.     Enforcement and Removal Operations employs approximately 6,000 immigration officers nationwide, including executive leadership, the supervisory chain of command, and all field officers. ICE's other law enforcement component, Homeland Security Investiga-

tions, employs approximately 6,100 Special Agents, who are primarily responsible for investigating a wide range of domestic and international activities arising from the illegal movement of people and goods into, within, and out of the United States.

9. On September 30, 2021, Secretary of Homeland Security Alejandro Mayorkas issued Department-wide civil immigration enforcement guidance in a memorandum titled Guidelines for the Enforcement of Civil Immigration Law (Mayorkas Memorandum). The Mayorkas Memorandum calls for the prioritization of DHS's limited law enforcement resources on the apprehension and removal of noncitizens who are a threat to national security, public safety, and border security.

10. As relevant here, the Mayorkas Memorandum also identifies noncitizens who pose a threat to border security and prioritizes their apprehension and removal. Per the guidance, a noncitizen poses a threat to border security if they are apprehended: (1) at the border or port of entry while attempting to unlawfully enter the United States, or (2) in the United States after unlawfully entering after November 1, 2020. The guidance acknowledges that other border-security cases may present compelling facts that warrant enforcement action. The guidance further provides that mitigating or extenuating facts and circumstances may militate in favor of declining to take enforcement action in border-security cases.

### III.   Immigration Court Proceedings

11. The Immigration and Nationality Act establishes different avenues by which DHS can remove various categories of noncitizens. These avenues include expedited removal, administrative removal proceedings for certain noncitizens convicted of aggravated felonies, and removal proceedings under section 240 of the Immigration and Nationality Act. The latter (referred to as removal proceedings) are conducted by an immigration judge within the DOJ's Executive Office for Immigration Review.

12. A noncitizen placed into removal proceedings first receives notice of the proceedings, Notice to Appear (also called a Form I-862), which includes, *inter alia*, the nature of the proceedings; the legal authority under which the proceedings are being conducted; the

allegations of fact and charges being lodged against the noncitizen, including the statutory provisions alleged to have been violated; the time and place at which the proceedings will be held; and the consequences for failing to appear at such proceedings. In conjunction with the Notice to Appear, ICE must also provide noncitizens with a list prepared by the Department of Justice Executive Office for Immigration Review of persons and organizations available to provide pro bono legal representation.

13.    As indicated, alternatives to removal proceedings include, *inter alia*, expedited removal and, for limited categories of noncitizens, administrative removal orders issued by ICE. For example, noncitizens who are not lawful permanent residents and who have been convicted of an aggravated felony may be subject to proceedings under section 238(b) of the Immigration and Nationality Act.  As another example, a noncitizen whose prior order of removal is reinstated order may not be placed into removal proceedings, but instead may receive withholding-only proceedings if he or she establishes a reasonable fear of persecution or torture.

14.     In removal proceedings, the immigration judge advises the noncitizen of various rights afforded, such as the right to counsel at no cost to the government. Interpreters are also provided at no cost to the noncitizen. The noncitizen must be given at least 10 days from the date he or she is served with the Notice to Appear to the date of his or her first hearing to secure counsel—unless the noncitizen requests, in writing, an earlier hearing date.  The immigration judge also advises the noncitizen of his or her apparent eligibility to apply for relief and protection from removal, and the noncitizen is given the opportunity to make such an application during his or her removal proceedings. The noncitizen has the right to present evidence, to testify on his or her own behalf, and to cross-examine any witness presented by DHS. If the immigration judge decides that the noncitizen is removable and orders removal, the immigration judge shall advise the noncitizen of that decision and the consequences of

failing to depart under the order of removal, including civil and criminal penalties. Furthermore, the immigration judge shall inform the noncitizen of the right to appeal the decision. Appeals are heard by the Board of Immigration Appeals.

15.     Noncitizens may seek asylum in removal proceedings. To establish eligibility, they must establish that they have suffered persecution or have a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. A grant of asylum gives a noncitizen legal status in the United States. Noncitizens in removal proceedings may also seek withholding of removal under the Immigration and Nationality Act and protection from removal under the regulations implementing Article 3 of the Convention Against Torture. Both of these protections presuppose that an immigration judge will issue an order of removal, and they withhold or defer removal only as to the specific country in which the noncitizen fears persecution or torture.

16.     Besides an appeal, a noncitizen may file a motion to reconsider or a motion to reopen their proceedings before the immigration judge or the Board of Immigration Appeals, depending on which entity issued the order that is being challenged.

17.     The noncitizen may also seek judicial review of certain adverse decisions from the Board of Immigration Appeals by filing a petition for review with the U.S. Court of Appeals in whose jurisdiction his or her removal proceedings took place. During the appellate process, the noncitizen can request, and the courts can order, stays of removal that prevent ICE from executing the order of removal until the stay is lifted.

18.     The plain language of SB 4 does not appear to ensure comparable procedures that would provide similar notice, process, and appellate procedures that are currently available in removal proceedings.

## IV.    Impact on Enforcement and Removal Operations

19.     As of December 26, 2023, ICE has a total of 19,102 beds under contract for detained noncitizens in Texas, spread across five field offices. In the other southwest border

states—California, Arizona, and New Mexico—ICE has a total of 11,236 beds under contract spread across six field offices.

20. If Texas imposes criminal penalties for unlawful entry and reentry by noncitizens, noncitizens may seek to enter the United States through Arizona, New Mexico, and California. In the event of such migration shifts, ICE's finite resources will be further strained.

21. The number of detention beds available at any given time will always fluctuate based on a variety of factors such as current occupancy levels, facility conditions, detention makeup, court orders, and contractual agreements. Currently ICE is required to transport noncitizens to the detention facilities in Texas or anywhere else in the United States where beds are available.

22. To accommodate the increase of noncitizens in other southwest border states, ICE must therefore continuously increase transportation of noncitizens who enter other States to other detention facilities nationwide (including to facilities in Texas). ICE does not currently have ground-transportation contracts sufficient to complete the necessary daily out-of-state transfers. So, ICE would need to continue to divert its law-enforcement personnel to transport noncitizens across the country.

23. This critically affects ICE's daily enforcement operations because ICE personnel will be used for transport duties, rather than arrest, detention, and removal functions.

24. Transportation of such noncitizens long distance to out-of-state facilities will further continue to strain ICE resources and heighten security concerns for detainees, federal personnel, and the public. Frequent transportation of detainees increases the amount of time these individuals are outside the heightened security of a detention facility. And because this frequent transportation may be regularly scheduled, individuals could gain additional opportunities to gather intelligence on ICE operations, thus increasing the chances of an adversarial encounter during transport. Detainees with medical or mobility concerns may be further adversely affected by frequent transport.

25. ICE facilities in Arizona, New Mexico, and California could become overcrowded due to the influx of migrants. That overcrowding, in turn, would place an even greater strain on ICE operations and increase the danger to federal personnel who would be supervising increased population with a higher detainee-to-officer ratio. Fewer personnel may also result in increased workhours, increasing fatigue and personnel turnover in detention facilities and eroding a dedicated and experienced workforce.

26. Immigration enforcement by Texas under SB 4 may also increase the operational burden on the Law Enforcement Support Center to respond, supervise, and monitor requests from law enforcement, both Texas and other law-enforcement agencies, regarding the immigration status of individuals arrested or under investigation as required by 8 U.S.C. § 1373(c). Congress established the Law Enforcement Support Center to provide immigration status determination support to federal, state, and local law enforcement on a 24-hours-a-day, seven-days-a-week basis. The Law Enforcement Support Center also responds to FBI requests for immigration status determinations on noncitizens seeking to purchase firearms; responds to U.S. Secret Service alien status determinations for noncitizens seeking access to a protected area (e.g., the White House Complex); and responds to alien status determinations related to employment issues at national security related locations that could be vulnerable to sabotage, attack, or exploitation.

27. Because Texas law-enforcement agencies will need to determine alienage and immigration status to enforce SB 4, this may significantly increase the number of queries to the Law Enforcement Support Center. Immigration enforcement by Texas contemplated by SB 4 may therefore inundate the Law Enforcement Support Center with requests from Texas agencies, diverting resources from other state and federal agencies, including those cases with significant public safety and national security concerns.

Executed on January 12, 2024.

_____
Russell Hott
Deputy Executive Associate Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement