IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| PLAINTIFF, | |
| v. | |
| THE STATE OF TEXAS; GREG ABBOTT IN HIS OFFICIAL CAPACITY AS GOVERNOR OF TEXAS; TEXAS DEPARTMENT OF PUBLIC SAFETY; STEVEN C. MCCRAW, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF TEXAS DEPARTMENT OF PUBLIC SAFETY, | CASE NO. 1:24-CV-00008-DAE (LEAD CASE)  CONSOLIDATED WITH 1:23-CV-1537-DAE |
| DEFENDANTS. | |

**DEFENDANTS' CONSOLIDATED RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**

TABLE OF CONTENTS

Table of Contents ......................................................................................................... ii

Index of Authorities .................................................................................................... iii

Background .....................................................................................................................1

Standard of Review ...................................................................................................... 9

Argument ......................................................................................................................10

    I.   Plaintiffs are not likely to succeed on the merits...................................................10

        A.  SB4 is not preempted because it comports—rather than "conflicts"—with federal immigration laws. .....................................................................................11

        B.  No provision of SB4 is field preempted. ........................................................15

        C.  To the extent "field" preemption remains viable at all, SB4 is not preempted when the federal government has abandoned the "field" it now purports to occupy. ...................................................................................................... 19

        D.  Texas is entitled to defend itself from invasion when the federal government abdicates its own duties—and *Arizona* never said anything to the contrary.. 22

        E.  The Foreign Commerce Clause does not prohibit States from proscribing illicit cross-border traffic of goods and people. ........................................................31

        F.  All Plaintiffs face justiciability problems that bar this Court from awarding relief. ...................................................................................................... 35

    II.  Plaintiffs cannot satisfy the remaining factors for injunctive relief. .......................53

        A.  Allowing Texas to enforce state criminal laws that track federal criminal laws already on the books would not inflict irreparable harm on the Plaintiffs...... 54

        B.  The equities do not favor Plaintiffs, who either ignore their obligations under federal law or rest their injury on anticipated criminal entry. ......................... 55

        C.  Enforcing SB4 to deter drug smuggling, human trafficking, and terrorism is in the public interest. ......................................................................................... 56

    III. Other equitable considerations caution against broadly enjoining SB4. ...............58

        A.  Abstention doctrines caution against entertaining this pre-enforcement challenge. ...................................................................................................... 58

        B.  The Court should not enjoin the enforcement of constitutional applications of SB4. ............................................................................................................... 60

        C.  If the Court enters an injunction on behalf of the Organizational Plaintiffs, it should not protect any non-parties. ............................................................. 62

Conclusion ................................................................................................................... 62

CERTIFICATE OF SERVICE...................................................................................... 64

INDEX OF AUTHORITIES

**Page(s)**

## Cases

*S. Pac. Co. v. Arizona ex rel. Sullivan,*
  325 U.S. 761 (1945) ....................................................................................................32

*Abbott v. Biden,*
  70 F.4th 817 (5th Cir. 2023) ......................................................................................25

*In re Abbott,*
  954 F.3d 772 (5th Cir. 2020), *vacated as moot*, 141 S. Ct. 1261 (2021).....................61

*In re Abbott,*
  956 F.3d 696 (5th Cir. 2020), *cert. granted, judgment vacated as moot sub nom,*
  *Planned Parenthood Ctr. for Choice v. Abbott*, 141 S. Ct. 1261 (2021) ........................52

*In re Academy, Ltd.,*
  625 S.W.3d 19 (Tex. 2021)..........................................................................................14

*Alexander v. Sandoval,*
  532 U.S. 275 (2001)...................................................................................... 36, 38, 39, 40

*Am. Ins. Ass'n v. Garamendi,*
  539 U.S. 396 (2003) (Ginsburg, J., dissenting) ........................................................34

*Arizona v. United States,*
  567 U.S. 387 (2012) ............................................................................................. *passim*

*Armstrong v. Exceptional Child Ctr., Inc.,*
  575 U.S. 320 (2015)................................................................................................36, 42

*Arnone v. Dallas Cnty.,*
  29 F.4th 262 (5th Cir. 2022) .......................................................................................51

*Ass'n of Cmty. Organizations for Reform Now v. Fowler,*
  178 F.3d 350 (5th Cir. 1999) ......................................................................................47

*Ayotte v. Planned Parenthood of Northern New England,*
  546 U.S. 320 (2006)................................................................................................60, 61

*Babbitt v. United Farm Workers Nat'l Union,*
  442 U.S. 289 (1979) ....................................................................................................58

*Barber v. Bryant,*
    860 F.3d 345 (5th Cir. 2017) ........................................................................ 41

*Barclays Bank, PLC v. Franchise Tax Bd. of Cal.,*
    512 U.S. 298 (1994) ...................................................................................... 34

*Bas v. Tingy,*
    4 U.S. (4 Dall.) 37 (1800) (Washington, J.) ............................................... 24

*Booth v. Galveston Cnty.,*
    352 F.3d 718 (S.D. Tex. 2019) ..................................................................... 51

*Brown v. United States,*
    12 U.S. (8 Cranch) 110 (1814) ..................................................................... 27

*Bruni v. Hughs,*
    468 F. Supp. 3d 817 (S.D. Tex. 2020) ......................................................... 50

*Builder Recovery Servs., LLC v. Town of Westlake,*
    650 S.W.3d 499 (Tex. 2022) ......................................................................... 61

*Cal. Coastal Comm'n v. Granite Rock Co.,*
    480 U.S. 572 (1987) ...................................................................................... 31

*California v. Texas,*
    141 S. Ct. 2104 (2021) .................................................................................. 61

*California v. United States,*
    104 F.3d 1086 (9th Cir. 1997) ...................................................................... 23

*Camps Newfound/Owatonna, Inc. v. Town of Harrison,*
    520 U.S. 564 (1997) ................................................................................ 34, 53

*Canal Auth. of State of Fla. v. Callaway,*
    489 F.2d 567 (5th Cir. 1974) ........................................................................ 9

*CASA de Maryland, Inc. v. Trump,*
    971 F.3d 220 (4th Cir. 2020), *vacated on other grounds,* 981 F.3d 311 (4th Cir.
    2020) .............................................................................................................. 44

*Chacon v. Granata,*
    515 F.2d 922 (5th Cir. 1975) ........................................................................ 53

*Chae Chan Ping v. United States,*
    130 U.S. 581 (1889) ...................................................................................... 33

iv

*Chamber of Commerce of U.S. v. Whiting,*
   563 U.S. 582 (2011) ................................................................ 11, 13, 21

*Chiles v. United States,*
   69 F.3d 1094 (11th Cir. 1995) ...................................................... 23

*Chy Lung v. Freeman,*
   92 U.S. ......................................................................................... 32

*City of Austin v. Paxton,*
   943 F.3d 993 (5th Cir. 2019) ........................................................ 52

*City of Georgetown v. Alexandria Canal Co.,*
   37 U.S. (12 Pet.) 91 (1838) .......................................................... 37

*City of Trenton v. New Jersey,*
   262 U.S. 182 (1923) ..................................................................... 47

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) .............................................................. *passim*

*Commonwealth of Mass. v. Mellon,*
   262 U.S. 447 (1923) ..................................................................... 62

*Ctr. for Biological Diversity v. United States Envtl. Prot. Agency,*
   937 F.3d 533 (5th Cir. 2019) ........................................................ 41

*Davis v. Passman,*
   442 U.S. 228 (1979) ..................................................................... 35

*In re Debs,*
   158 U.S. 564 (1895) ................................................................ 37, 38

*DeCanas v. Bica,*
   424 U.S. 351 (1976) .............................................................. 15, 16, 18

*Def. Distributed v. U.S. Dep't of State,*
   No. 1:15-cv-372, 2018 WL 3614221 (W.D. Tex. July 27, 2018) .............. 45

*Denver & R.G.R. Co. v. United States,*
   241 F. 614 (8th Cir. 1917) ........................................................... 35

*Doran v. Salem Inn, Inc.,*
   422 U.S. 922 (1975) ..................................................................... 61

*Dorchy v. Kansas,*
   264 U.S. 286 (1924) ..................................................................... 61

*Douglas v. Indep. Living Ctr. of S. Cal., Inc.*,
132 S. Ct. 1204 (2012) (Roberts, C.J., dissenting, joined by Scalia, Thomas,
and Alito, JJ.) ............................................................................................................... 40

*Edelman v. Jordan*,
415 U.S. 651 (1974) ..................................................................................................... 51

*El Paso County v. Trump*,
982 F.3d 332 (5th Cir. 2020) ...................................................................................... 41

*English v. General Elec. Co.*,
496 U.S. 72 (1990) ....................................................................................................... 13

*Equal Access Educ. v. Merten*,
305 F. Supp. 2d 585 (E.D. Va. 2004) ........................................................................ 33

*Esteves v. Brock*,
106 F.3d 674 (5th Cir. 1997) ...................................................................................... 51

*Fla. Lime & Avocado Growers, Inc. v. Paul*,
373 U.S. 132 (1963) ..................................................................................................... 15

*Florida v. United States*,
660 F. Supp. 3d 1239 (N.D. Fla. 2023) .................................................................... 20

*Freedom From Religion Found., Inc. v. Mack*,
4 F.4th 306 (5th Cir. 2021) ........................................................................................ 38

*FW/PBS, Inc. v. City of Dallas*,
493 U.S. 215 (1990) ..................................................................................................... 41

*Gann v. United States*,
142 S. Ct. 1 (2021) ....................................................................................................... 37

*Gilbert v. Minnesota*,
254 U.S. 325 (1920) ..................................................................................................... 12

*Graber v. Fuqua*,
279 S.W.3d 608 (Tex. 2009) ....................................................................................... 11

*Green Valley Special Util. Dist. v. City of Schertz*,
969 F.3d 460 (5th Cir. 2020) (Oldham, J., concurring) .......................................... 39

*Guy v. Baltimore*,
100 U.S. 434 (1880) ..................................................................................................... 31

*Hafer v. Melo,*
    502 U.S. 21 (1991) ................................................................................................ 51

*Haitian Refugee Center v. Gracey,*
    809 F.2d 794 (D.C. Cir 1987) (Bork, J.) ........................................................ 46

*Harman v. Forssenius,*
    380 U.S. 528 (1965) ............................................................................................ 58

*Harris Cnty. Comm'rs Court v. Moore,*
    420 U.S. 77 (1975) .............................................................................................. 59

*Henderson v. Mayor of City of New York,*
    92 U.S. (2 Otto) 259 (1875) ......................................................................... 32, 33

*Hernandez v. Mesa,*
    140 S. Ct. 735 (2020) ......................................................................................... 39

*Hersh v. U.S. ex rel. Mukasey,*
    553 F.3d 743 (5th Cir. 2008) ........................................................................... 30

*Hines v. Davidowitz,*
    312 U.S. 52 (1941) .............................................................................................. 33

*House v. Mayes,*
    219 U.S. 270 (1911) ........................................................................................... 29

*Huron Portland Cement Co. v. City of Detroit,*
    362 U.S. 440 (1960) ........................................................................................... 11

*Int'l Shoe Co. v. Pinkus,*
    278 U.S. 261 (1929) ........................................................................................... 19

*Japan Line v. Los Angeles,*
    441 U.S. 434 (1979) ........................................................................................... 34

*Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Par. Gov't,*
    849 F.3d 615 (5th Cir. 2017) ........................................................................... 42

*Jones v. Wells Fargo Bank, N.A.,*
    No. 5-14-cv-943, 2015 WL 12734177 (W.D. Tex. Jan. 21, 2015) .............. 36

*Kansas v. Garcia,*
    140 S. Ct. 791 (2020) .................................................................................. passim

*Kurns v. R.R. Friction Prods. Corp.,*
    565 U.S. 625 (2012) (Kagan, J., concurring) .............................................. 19

*Lafler v. Cooper*,
566 U.S. 156 (2012) (Scalia, J., dissenting) ............................................................54

*Lane v. Holder*,
703 F.3d 668 (4th Cir. 2012) ................................................................44, 45

*Las Americas Immigrant Advocacy Center v. McCraw*,
1:23-cv-1537 (W.D. Tex.) ...............................................................................1

*Leavitt v. Jane L.*,
518 U.S. 137 (1996)..........................................................................................61

*Lebo v. State*,
90 S.W.3d 324 (Tex. Crim. App. 2002)........................................................14

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ..........................................................................................35

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ...........................................................................41, 43, 49

*Martin v. Mott*,
25 U.S. (12 Wheat.) 19 (1827) (Story, J.) ...................................................25

*Mathews v. Diaz*,
426 U.S. 67 (1976) ............................................................................................33

*Mayor of New York v. Miln*,
36 U.S. (11 Pet.) 102 (1837) ..........................................................................32

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) (per curiam)...................................................9, 39, 42

*McKenzie v. City of Chicago*,
118 F.3d 552 (7th Cir. 1997) ..........................................................................61

*McKinley v. Abbott*,
643 F.3d 403 (5th Cir. 2011) ..........................................................................51

*Medellin v. Texas*,
552 U.S. 491 (2008) .................................................................................35, 54

*Melendez v. City of New York*,
16 F.4th 992 (2d Cir. 2021) ............................................................................24

*Mi Familia Vota v. Abbott*,
977 F.3d 461 (5th Cir. 2020) ..........................................................................52

*Michelin Tire Corp. v. Wages*,
    423 U.S. 276 (1976) ..................................................................................32

*Miller v. United States*,
    78 U.S. 268 (1870) .................................................................................. 24

*Miss. Power & Light Co. v. United Gas Pipe Line Co.*,
    760 F.2d 618 (5th Cir. 1985)...................................................................10

*Moore v. La. Bd. of Elementary & Secondary Educ.*,
    743 F.3d 959 (5th Cir. 2014) ................................................................. 40

*Moyer v. Peabody*,
    212 U.S. 78 (1909) (Holmes, J.) .............................................. 23, 25, 29

*NAACP v. City of Kyle*,
    626 F.3d 233 (5th Cir. 2010) .......................................................... 41, 43

*Nat'l Pork Producers Council v. Ross*,
    598 U.S. 356 (2023) ......................................................................... 32, 33

*Nat'l Press Photographers Ass'n v. McCraw*,
    90 F.4th 770 (5th Cir. 2024) .................................................................. 15

*Nat'l Taxpayers Union, Inc. v. United States*,
    68 F.3d 1428 (D.C. Cir. 1995) .............................................................. 44

*Nat'l Treasury Emps. Union v. United States*,
    929 F. Supp. 484 (D.D.C. 1996) ...........................................................47

*Nationwide Mut. Ins. Co. v. Unauthorized Prac. of L. Comm., of State Bar of Texas*,
    283 F.3d 650 (5th Cir. 2002)..................................................................59

*Ne. Ohio Coal. for Homeless v. Blackwell*,
    467 F.3d 999 (6th Cir. 2006)................................................................. 41

*NetChoice, LLC v. Paxton*,
    49 F.4th 439 (5th Cir. 2022) ...........................................................58, 59

*New Jersey v. United States*,
    91 F.3d 463 (3d Cir. 1996) ....................................................................23

*New York v. New Jersey*,
    143 S. Ct. 918 (2023) .............................................................................55

*Nichols v. Alcatel USA, Inc.*,
    532 F.3d 364 (5th Cir. 2008) .................................................................53

*Nken v. Holder,*
    556 U.S. 418 (2009) ...........................................................................................55

*Novedea Sys., Inc. v. Colaberry, Inc.,*
    No. 6:20-cv-180, 2020 WL 9211073 (E.D. Tex. Dec. 11, 2020) ......................36

*O'Shea v. Littleton,*
    414 U.S. 488 (1974)...........................................................................................54

*Padavan v. United States,*
    82 F.3d 23 (2d Cir. 1996) ..................................................................................23

*Parker Drilling Mgmt. Serv., Ltd. v. Newton,*
    139 S. Ct. 1881 (2019).......................................................................................12

*Parker v. Brown,*
    317 U.S. 341 (1943)......................................................................................... 20

*Pennhurst State Sch. & Hosp. v. Halderman,*
    465 U.S. 89 (1984) ............................................................................................51

*Ex parte Perry,*
    483 S.W.3d 884 (Tex. Crim. App. 2016) ..........................................................14

*Piazza's Seafood World, LLC v. Odom,*
    448 F.3d 744 (5th Cir. 2006)..............................................................................32

*Portee v. Morath,*
    No. 1:23-cv-551, 2023 WL 4688528 (W.D. Tex. July 21, 2023) ......................55

*Preiser v. Rodriguez,*
    411 U.S. 475 (1973)..........................................................................................39

*Railroad Comm'n of Tex. v. Pullman Co.,*
    312 U.S. 496 (1941) ..........................................................................................58

*Richardson v. Tex. Sec'y of State,*
    978 F.3d 220 (5th Cir. 2020) .............................................................................55

*Rose v. Raffensperger,*
    584 F. Supp. 3d 1278 (N.D. Ga. 2022) .............................................................23

*Roy v. City of Monroe,*
    950 F.3d 245 (5th Cir. 2020)..............................................................................58

*Rucho v. Common Cause,*
    139 S. Ct. 2484 (2019) ......................................................................................23

*Sabine Consol., Inc. v. State,*
    806 S.W.2d 553 (Tex. Crim. App. 1991) ............................................... 14

*SBC Commc'ns, Inc. v. FCC,*
    154 F.3d 226 (5th Cir. 1998) ............................................................... 27

*Seals v. McBee,*
    898 F.3d 587 (5th Cir. 2018) ............................................................... 43

*Seminole Tribe of Florida v. Florida,*
    517 U.S. 44 (1996) ............................................................................. 39

*Siegel v. LePore,*
    234 F.3d 1163 (11th Cir. 2000) ........................................................... 53

*Smith v. Turner,*
    48 U.S. (7 How.) 283 (1849) (McLean, J.) ........................................... 22

*Speech First, Inc. v. Fenves,*
    979 F.3d 319 (5th Cir. 2020) ......................................................... 40, 45

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ........................................................................ 36, 41

*Sterling v. Constantin,*
    287 U.S. 378 (1932) ...................................................................... 23, 25

*Stockton v. Offenbach,*
    336 S.W.3d 610 (Tex. 2011) ................................................................ 14

*Stringer v. Whitley,*
    942 F.3d 715 (5th Cir. 2019) ............................................................... 41

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ........................................................................... 45

*Sumner v. Mata,*
    449 U.S. 539 (1981) ........................................................................... 23

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ...................................................................... 42, 43

*Sveen v. Melin,*
    584 U.S. 811 (2018) (Gorsuch, J., dissenting) ...................................... 24

*Tennessee Wine & Spirits Retailers Ass'n v. Thomas,*
    139 S. Ct. 2449 (2019) ....................................................................... 34

*Tex. Democratic Party v. Abbott*,
    978 F.3d 168 (5th Cir. 2020) .................................................................52

*Texas All. for Retired Americans v. Scott*,
    28 F.4th 669 (5th Cir. 2022) .................................................................52

*Texas v. Biden*,
    20 F.4th 928 (5th Cir. 2021), *rev'd*, 142 S. Ct. 2528 (2022) ................... 20

*Texas v. DHS*,
    No. 2:23-cv-55, 2023 WL 8285223 (W.D. Tex. Nov. 29, 2023) (Moses, C.J.) ............... *passim*

*Texas v. Florida*,
    306 U.S. 398 (1939) .................................................................35

*Texas v. White*,
    74 U.S. (7 Wall.) 700 (1868) .................................................................. 22

*Toledo v. State*,
    519 S.W.3d 273 (Tex. App.–Houston [1st Dist.] 2017).........................................14

*Town of Ball v. Rapides Par. Police Jury*,
    746 F.2d 1049 (5th Cir. 1984) .........................................................47, 48

*McCarthy ex rel. Travis v. Hawkins*,
    381 F.3d 407 (5th Cir. 2004) .................................................................52

*Truax v. Raich*,
    239 U.S. 33 (1915) .................................................................17

*United States v. Abbott*,
    No. 1:23-cv-853, 2023 WL 5740596 (W.D. Tex. Sept. 6, 2023), *aff'd*, 87 F.4th
    616 (5th Cir. 2023), *reh'g en banc granted, opinion vacated,* 90 F.4th 870 (5th
    Cir. 2024).........................................................................8

*United States v. Abbott*,
    No. 23-50632, 2023 WL 6376357 (5th Cir. Sept. 21, 2023) ...................................10

*United States v. Brignoni-Ponce*,
    422 U.S. 873 (1975)..................................................................56

*United States v. California*,
    655 F.2d 914 (9th Cir. 1980) .................................................................35

*United States v. City of Jackson*,
    318 F.2d 1 (5th Cir. 1963).................................................................38

*United States v. City of Philadelphia,*
  644 F.2d 187 (3d Cir. 1980)............................................................38

*United States v. Cooley,*
  141 S. Ct. 1638 (2021) ..................................................................24

*United States v. Hansen,*
  143 S. Ct. 1932 (2023) ..................................................................30

*United States v. Hansen,*
  599 U.S. 762 (2023) ......................................................................54

*United States v. Hartford Acc. & Indem. Co.,*
  460 F.2d 17 (9th Cir. 1972) ..........................................................36

*United States v. Mattson,*
  600 F.2d 1295 (9th Cir. 1979) ......................................................38

*United States v. Solomon,*
  563 F.2d 1121 (4th Cir. 1977) ......................................................37

*United States v. Texas,*
  557 F. Supp. 3d 810 (W.D. Tex. 2021) ........................................36

*United States v. Texas,*
  No. EP-21-cv-173, 2022 WL 868717 (W.D. Tex. Feb. 17, 2022) (Cardone, J.) ..................... 42

*United States v. Verdugo-Urquidez,*
  494 U.S. 259 (1990) ......................................................................27

*United Steelworkers of Am. v. United States,*
  80 S. Ct. 177 (1959) (Frankfurter, J., concurring) ........................37

*Va. Office for Prot. & Advocacy v. Stewart,*
  563 U.S. 247 (2011) (Kennedy, J., concurring, joined by Thomas, J.)....................................40

*Virginia Uranium, Inc. v. Warren,*
  139 S. Ct. 1894 (2019) (lead opinion of Gorsuch, J., joined by Thomas and
  Kavanaugh, JJ.) .............................................................................19

*Virginia v. Hicks,*
  539 U.S. 113 (2003) ......................................................................61

*Vote.Org v. Callanen,*
  39 F.4th 297 (5th Cir. 2022) ........................................................55

*Wardair Canada, Inc. v. Fla. Dep't of Revenue*,
    477 U.S. 1 (1986) ...................................................................................34

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) ................................................................................55

*In re Wiles*,
    No. 08-18-00177-CR, 2019 WL 1810756 (Tex. App.—El Paso Apr. 24, 2019) ...................... 13

*Will v. Mich. Dep't of State Police*,
    491 U.S. 58 (1989) ............................................................................ 39, 51

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ......................................................................... 9, 10, 55

*Women's Med. Ctr. of Nw. Hous. v. Bell*,
    248 F.3d 411 (5th Cir. 2001) .....................................................................10

*Wyandotte Transportation Co. v. United States*,
    389 U.S. 191 (1967) ........................................................................... 37, 38

*Ex parte Young*,
    209 U.S. 123 (1908)........................................................................... *passim*

*Younger v. Harris*,
    401 U.S. 37 (1971) ...............................................................................59

*Ziglar v. Abbasi*,
    582 U.S. 120 (2017)........................................................................... 38, 39

*Zimmerman v. City of Austin*,
    881 F.3d 378 (5th Cir. 2018).................................................................. 43, 52

**Statutes**

8 U.S.C. § 1101(a)(15)(T)(i) ......................................................................18

8 U.S.C. § 1324(c)................................................................................15

8 U.S.C. § 1325 ................................................................................ 9, 17

8 U.S.C. §§ 1325 and 1326 .........................................................................17

8 U.S.C. §§ 1325, 1326, 1327......................................................................20

8 U.S.C. §1325(a)............................................................................. 12, 17

8 U.S.C. § 1325(a)(1) ............................................................................ 11

8 U.S.C. § 1326(a) ........................................................................... 12, 17

8 U.S.C. § 1326(b) ................................................................................ 12

18 U.S.C. § 758 ............................................................................... 15, 18

18 U.S.C. §§ 3559(a)(5), 3571(b)(3) ...................................................... 12

18 U.S.C. §§ 3559(a)(7), 3571(b)(6) ...................................................... 12

22 U.S.C. § 7105(c)(3)(C)(i) .................................................................. 15

42 U.S.C. § 1983 ................................................................................... 39

Pub. L. 107-40, § 2(a), 115 Stat. 224 (Sept. 18, 2001) ......................... 27

1 Stat. 264 ............................................................................................ 27

1 Stat. 424 ............................................................................................ 27

TEX. CODE CRIM. PROC. Art. 2.251(a) .................................................. 13

TEX. CODE CRIM. PROC. Art. 5B.002 ..................................................... 16

TEX. CODE CRIM. PROC. Art. 5B.002(c)(1) ............................................ 16

TEX. CODE CRIM. PROC. Art. 5B.002(c), (d) .......................................... 12

TEX. CODE CRIM. PROC. ch. 5B ............................................................... 9

TEX. GOV'T CODE § 411.002 .................................................................. 51

TEX. PENAL CODE ch. 51 .......................................................................... 9

TEX. PENAL CODE §§ 51.02 ..................................................................... 17

TEX. PENAL CODE § 51.02(b) .................................................................. 12

TEX. PENAL CODE § 51.02(c)(1)–(2) ......................................................... 9

TEX. PENAL CODE § 51.02(c)(2) .............................................................. 17

TEX. PENAL CODE § 51.02(c)(3) ............................................................... 9

TEX. PENAL CODE § 51.03(b) .................................................................. 12

TEX. PENAL CODE § 51.04(a) ........................................................................................12

**Other Authorities**

Wright & Miller, 17A Fed. Prac. & Proc. Juris. § 4242 (3d ed.) .....................................59

1 Noah Webster, American Dictionary of the English Language 113 (1828) ................... 28

David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41, 42 ........................35

Dictionary of the English Language 164 (1806) ........................................................... 28

Federal Constitution 413–14 (Jonathan Elliot ed., Washington, D.C., 2d ed. 1836) ....................26

Jennifer Gordon, *Immigration as Commerce: A New Look at the Federal Immigration Power and the Constitution*, 93 Ind. L.J. 653, 671 (2018) ...............................................33

John Harrison, *Ex Parte Young*, 60 Stan. L. Rev. 989, 999 (2008) ............................... 40

John Norton Pomeroy, Jr., *A Treatise on Equitable Remedies* 586 § 330 .........................35

Julian G. Ku, *Gubernatorial Foreign Policy*, 115 Yale L.J. 2380 (2006) ..........................19

Robert G. Natelson & Andrew T. Hyman, *The Constitution, Invasion, Immigration, and the War Powers of States*, 13 Br. J. Am. Leg. Studies 1, 7 (2024) ........................ 22

Tex. Const. art. IV, § 7 ...........................................................................................23, 25

U.S. Const. art. I, § 4, cl. 1 ..........................................................................................23

U.S. Const. art. I, § 8 ...................................................................................................26

U.S. Const. art. I, § 8, cl. 11 ........................................................................................27

U.S. Const. art. I, § 10, cl. 2 ....................................................................................24, 30

U.S. Const. art. I, § 10, cl. 3 .................................................................................. *passim*

U.S. Const. art. II, § 3 ..................................................................................................21

U.S. Const. art. VI, § 2 .................................................................................................21

U.S. Constitution Article IV, Section 4 ................................................................. *passim*

On December 19, 2023, Las Americas Immigrant Advocacy Center and American Gateways (the "Nonprofit Plaintiffs"), along with the County of El Paso (collectively, the "Organizational Plaintiffs") filed suit against Steven C. McCraw, in his official capacity as Director of the Texas Department of Public Safety; and Bill D. Hicks, in his official capacity as District Attorney for the 34th Judicial District of Texas. ECF No. 1 in *Las Americas Immigrant Advocacy Center v. McCraw*, 1:23-cv-1537 (W.D. Tex.). On January 3, 2024, the United States filed suit against the State of Texas; Greg Abbott, in his official capacity as Governor of Texas; the Texas Department of Public Safety; and Director McCraw in his official capacity. ECF No. 1. Both the Organizational Plaintiffs and the United States (collectively, the "Plaintiffs") filed motions for preliminary injunction on January 12, 2024. ECF No. 14 ("US PI Mot."); ECF No. 30 in *Las Americas*, 1:23-cv-1537 ("OP PI Mot."). On Defendants' unopposed motion, ECF No. 17; ECF No. 38 in *Las Americas*, 1:23-cv-1537, the Court consolidated the cases on January 31, 2024. ECF No. 45 in *Las Americas*, 1:23-cv-1537.

Plaintiffs seek to enjoin the enforcement of Texas's recently enacted Senate Bill 4 (SB4), which, among other things, creates criminal offenses related to illegal entry or reentry into the State from a foreign nation, and authorizes magistrates and judges to issue orders to return to the foreign nation from which illegal entry or reentry occurred. *See* S.B. 4, 88th Leg., 4th C.S. (2023). This law does not go into effect until March 5, 2024. Plaintiffs' pre-enforcement, facial challenges to SB4 are based on speculative assumptions about how SB4 will be implemented and unsound legal conclusions. The Court should deny their motions for a preliminary injunction.

## Background

There is a full-scale invasion of transnational criminal cartels across our southern border—and Texas is ground zero.[1] Despite the existence of twenty-eight legal entry points in the State,

---

[1] *See* Letter to Governor Abbott, Congress of the United States (Feb. 2, 2024), https://static.foxnews.com/foxnews.com/content/uploads/2024/02/Final-letter-to-Governor-Abbott-Texas-Del-2.2.2024.pdf ("[T]he current situation at our Southern Border is a complete and total invasion.").

U.S. Border Patrol encounters with aliens illegally crossing the border between ports of entry have increased from "a comparatively paltry 458,000 in 2020 to 1.7 million in 2021 and 2.4 million in 2022." *Texas v. DHS*, No. 2:23-cv-55, 2023 WL 8285223, at *3 (W.D. Tex. Nov. 29, 2023) (Moses, C.J.). And it is only getting worse. A new record for monthly encounters—over 225,000—was set in December 2023.[2] Unlawful crossings of the Southwest border in Fiscal Year 2023 further reached a record high of 2,475,699, and in the last three months of 2024, that record number appeared steady, with 785,422 border encounters.[3] President Biden has "smashed records for illegal immigration,"[4] and "America is suffering the highest volume of illegal immigration in the history of our country."[5]

The border crisis is not confined to harms caused by the unprecedented influx of unlawful immigration for which the cartels are responsible. It also includes deadly drug smuggling, human trafficking, and infiltration by suspected terrorists.

This rampant criminal activity along our southern border has had predictable and harmful

---

[2] *See* Camilo Montoya-Galvez, *Migrant Crossings at U.S. Southern Border Reach Record Monthly High in December*, CBS NEWS (Dec. 26, 2023), https://www.cbsnews.com/news/migrant-crossings-u-s-southern-border-record-monthly-high-december/.

[3] Banks Decl. ¶ 14.

[4] Governor of Texas, Statement (Jan. 24, 2024), https://gov.texas.gov/uploads/files/press/Border_Statement_1.24.2024.pdf (explaining that "President Biden has enticed illegal immigrants away from the 28 legal entry points along this State's southern border—bridges where nobody drowns—and into the dangerous waters of the Rio Grande" and that "more than 6 million illegal immigrants have crossed our southern border in just 3 years," which is "more than the population of 33 different States in this country").

[5] Letter from Governor of Texas, Greg Abbott, to President of the United States, Joseph R. Biden, Jr. (Nov. 16, 2022), https://gov.texas.gov/uploads/files/press/BidenJoseph_11.16.22.pdf.

effects in Texas and across the country.[6] Both Texas citizens and aliens themselves—many of them unaccompanied minors[7]—are often at the mercy of cartels that see illicit activity along the border as good business.[8] These transnational criminal organizations that ferry violent crime across the Rio Grande daily "have become potent paramilitary forces, with heavily armed mobile units able to stand their ground against the Mexican military."[9] One former U.S. Attorney General has stated that the cartels pose security threats that look "more like ISIS than like the American mafia."[10] In one recent incident, these hostile non-state actors were able to overwhelm Mexico's military with "700 cartel paramilitary fighters with armored cars, rocket launchers and heavy machine guns."[11] Under President Biden, the federal government has chosen to "accept a failed narco-state on our border, providing sanctuary to narco-terrorist groups preying on the American people."[12]

These violent criminal organizations shuttle deadly and illegal narcotics like fentanyl from Mexico into every corner of this country. In addition to trafficking drugs, Mexican cartels also traffic human beings. "For the first time in history, the cartel proceeds from human smuggling

---

[6] *See, e.g.*, Banks Decl. ¶¶ 18–19 (stating that ranches and homesteads are being burglarized by migrants while border community residents are regularly subjected to dangerous vehicle bailouts by illegal immigrants such that, as of February 5, 2024, roughly 4,353 bailouts and 9,886 criminal trespass arrests have occurred near the border since the beginning of OLS); *see also id.* ¶ 25 (declaring that Texas has spent $11.2 billion to help secure the border and protect public safety as part of OLS since 2021).

[7] "[T]he number of unaccompanied minors the department has cared for over the course of a year has skyrocketed from 15,381 in FY 2020 to 118,938 in FY 2023." Banks Decl. ¶ 15.

[8] TODD BENSMAN, OVERRUN: HOW JOE BIDEN UNLEASHED THE GREATEST BORDER CRISIS IN U.S. HISTORY 29–32, 193 (2023).

[9] William Barr, Opinion, *The U.S. Must Defeat Mexico's Drug Cartels*, WALL ST. J. (Mar. 2, 2023), https://www.wsj.com/articles/the-us-must-defeat-mexicos-drug-cartels-narco-terrorism-amlo-el-chapo-crenshaw-military-law-enforcement-b8fac731.

[10] *Id.*

[11] *Id.*

[12] *Id.*

[may] have surpassed those from drug smuggling."[13] Trafficking across the southern border has changed "from a scattered network of freelance 'coyotes' to a multi-billion-dollar international business controlled by organized crime, some of Mexico's most violent drug cartels."[14] These "cartels, terror groups, and other bad actors are taking advantage of the chaos by the border to orchestrate a mass influx of people."[15] "Gangs are using the flood of people to hide their 'predator' members as they enter the United States."[16] Cartels demand thousands of dollars from aliens to facilitate their illegal entry, commodifying them as human "inventory" with "numbered, colored wrist band[s]."[17] Women and children are raped and abused while journeying to the border, only to be trafficked for further sexual violence upon arriving in the United States.[18] Many newly arrived aliens live in constant fear of visits by cartel members shaking them down for the thousands of

---

[13] BENSMAN, *supra* n.8, at 41.

[14] Miriam Jordan, *Smuggling Migrants at the Border Now a Billion-Dollar Business*, N.Y. TIMES (July 25, 2022), https://www.nytimes.com/2022/07/25/us/migrant-smuggling-evolution.html.

[15] Letter from Multiple State Attorneys General to President of the United States, Joseph R. Biden, Jr., and Secretary of the U.S. Department of Homeland Security, Alejandro Mayorkas (Jan. 29, 2024), https://www.texasattorneygeneral.gov/sites/default/files/images/press/AGs%20Letter%20Supporting%20Abbott%20and%20Paxton.pdf.

[16] *Id.*

[17] BENSMAN, *supra* n.8, at 32.

[18] *See* Laura Gottesdiener *et al.*, *Migrants Are Being Raped at the Mexico Border as they Await Entry to US*, REUTERS (Sept. 29, 2023), https://www.reuters.com/world/migrants-are-being-raped-mexico-border-they-await-entry-us-2023-09-29/; Virginia Allen, *'America's New Slave Trade' Is Here at Hands of Mexican Cartels, Border Expert Tells Lawmakers*, DAILY SIGNAL (July 19, 2023), https://www.dailysignal.com/2023/07/19/new-slave-trade-arrived-america-hands-mexican-cartels-border-expert-tells-congress/.

dollars they still owe.[19] "What happens at the border does not stay at the border,"[20] and the cartels will make sure that their deadly fentanyl and human-trafficking victims "reach far and wide."[21]

And as of January of 2024, "DHS has still failed to account for over 85,000 missing children, many 'placed in the hands of probable traffickers by HHS.'"[22] In Fiscal Year 2023, "148 migrants died in just the El Paso Sector while attempted border crossings"—"the highest number ever recorded and more than double the number of fatalities in the Sector in FY 2022."[23] In sum, these cartels smuggle narcotics and weapons into the United States to fund their illegal enterprises; they force women and children into human and sex trafficking; and they murder innocent people, including women and children.[24] Thus, while cartels are growing wealthier by trafficking deadly fentanyl and even human beings across a porous border, Texans are paying an especially high price

---

[19] Tim Hains, *Sen. Katie Britt: What I Saw at the Border Was Not the American Dream, It Was a Nightmare*, REALCLEARPOLITICS (Sept. 27, 2023), https://www.realclearpolitics.com/video/2023/09/27/sen_katie_boyd_britt_what_i_saw_at_the_border_was_not_the_american_dream_it_was_a_nightmare.html.

[20] Letter from Multiple State Attorneys General to President of the United States, Joseph R. Biden, Jr., and Secretary of the U.S. Department of Homeland Security, Alejandro Mayorkas (Jan. 29, 2024), https://www.texasattorneygeneral.gov/sites/default/files/images/press/AGs%20Letter%20Supporting%20Abbott%20and%20Paxton.pdf.

[21] Letter from Governor of Texas, Greg Abbott, and Governor of Arizona, Doug Ducey, to Fellow Governors (Jun. 10, 2021), available at https://gov.texas.gov/uploads/files/press/Abbott-Ducey_Compact_Letter_to_Governors.pdf.

[22] Letter from Multiple State Attorneys General to President of the United States, Joseph R. Biden, Jr., and Secretary of the U.S. Department of Homeland Security, Alejandro Mayorkas (Jan. 29, 2024), https://www.texasattorneygeneral.gov/sites/default/files/images/press/AGs%20Letter%20Supporting%20Abbott%20and%20Paxton.pdf.

[23] Banks Decl. ¶ 17 (also explaining that "a total of 2,321 migrants have died attempted to cross the southern border," and "556 of those deaths were in the Del Rio Sector alone").

[24] Letter from Governor of Texas, Greg Abbott, to President of the United States, Joseph R. Biden, Jr., and Vice President, Kamala D. Harris (Apr. 15, 2021), available at https://gov.texas.gov/uploads/files/press/O-Biden_Harris202104140659.pdf.

for the Biden Administration's failure—sometimes even paying that price with their very lives.[25] After all, "as a result of drug trafficking by Mexican cartels, fentanyl is now the leading cause of death for citizens between the ages of 18 and 45," and "at least 5,351 Texans have died in fentanyl poisoning-related events" since President Biden has been in office.[26]

Texas has used the sovereign powers reserved to it under the U.S. Constitution to fight back.[27] In response to the multifaceted crisis at the Southwest Border, Governor Abbott declared a border security disaster in 2021 and has repeatedly renewed it.[28] As President Biden's border crisis worsened, Governor Abbott repeatedly explained that Texas was experiencing an unabated "invasion" into its territory by transnational criminal organizations.[29] And he repeatedly sought aid from the President of the United States pursuant to Article IV, Section 4 of the U.S.

---

[25] Letter from Governor of Texas, Greg Abbott, to President of the United States, Joseph R. Biden, Jr. (Jan. 8, 2023), https://gov.texas.gov/uploads/files/press/President_Joseph_R._Biden_sig_.pdf.

[26] Banks Decl. ¶ 24.

[27] For example, Texas has been able to deter hundreds of thousands of illegal immigrants from harming Texas, and America, through Operation Lone Star and its other recent border security measures. *See, e.g.*, Banks Decl. ¶¶ 29–32.

[28] May 31, 2021 Proclamation by the Governor of the State of Texas, https://gov.texas.gov/uploads/files/press/DISASTER_border_security_IMAGE_05-31-2021.pdf; *see also* Banks Decl. ¶ 26.

[29] *See, e.g.*, Governor of Texas, Executive Order GA-41 (July 7, 2022), https://gov.texas.gov/uploads/files/press/EO-GA-41.pdf; Banks Decl. ¶ 28 & Ex. B; Governor of Texas, Executive Order GA-42 (Sept. 21, 2022), https://gov.texas.gov/uploads/files/press/EO-GA-42_Mexican_cartels_foreign_terrorist_orgs_IMAGE_09-21-2022.pdf; Letter from Governor of Texas, Greg Abbott, to President of the United States, Joseph R. Biden, Jr. (Nov. 16, 2022), https://gov.texas.gov/uploads/files/press/BidenJoseph_11.16.22.pdf; Letter from Governor of Texas, Greg Abbott, to President of the United States, Joseph R. Biden, Jr. (Dec. 20, 2022), https://gov.texas.gov/uploads/files/press/BidenJoseph_12.20.22.pdf; Letter from Governor of Texas, Greg Abbott, to President of the United States, Joseph R. Biden, Jr. (July 24, 2023), https://gov.texas.gov/uploads/files/press/O-BidenJoseph_07.24.23.pdf; Governor of Texas, Statement (Jan. 24, 2024), https://gov.texas.gov/uploads/files/press/Border_Statement_1.24.2024.pdf.

Constitution. On one occasion, the Governor even hand-delivered a letter that explained how President Biden had "violated [his] constitutional obligation to defend the States against invasion" and detailed five steps the President could take immediately to begin securing the border and reining in "the cartels, who grow wealthy by trafficking deadly fentanyl and even human beings."[30]

Governor Abbott is not alone in recognizing that Texas is experiencing an invasion. Just last month, retired FBI officials explained that "an invasion of the homeland … is unfolding now. Military aged men from across the globe, many from countries or regions not friendly to the United States, are landing in waves on our soil by the thousands."[31] The numbers bear out their predictions that since "[t]he country has been invaded," America "is extraordinarily less safe." In 2020, Border Patrol apprehended just 3 aliens on the terrorist watchlist; in 2023, Border Patrol apprehended 172 of them—the "highest total ever recorded."[32] Border Patrol also encountered 336 persons on the terrorist watchlist from FY 2021 to FY 2024 at the southern border, which is up from 15 of such individuals encountered from FY 2017 to 2020, and in Fiscal Year 2023, Border Patrol agents arrested 15,267 illegal immigrants that had criminal convictions in the United States—a record high.[33] After Governor Abbott reiterated his declaration of an invasion, the Speaker of the U.S. House of Representatives and twenty-five Governors expressed their agreement: "The authors of the U.S. Constitution made clear that in times like this, states have a

---

[30] Letter from Governor of Texas, Greg Abbott, to President of the United States, Joseph R. Biden, Jr. (Jan. 8, 2023), https://gov.texas.gov/uploads/files/press/President_Joseph_R._Biden_sig_.pdf.

[31] Isabel Vincent & Jon Levine, *Biden Admin Border Policy Puts US in 'Imminent Danger' with Military-aged' Migrant Invasion: Former FBI Officials*, N.Y. POST (Jan. 27, 2024), https://nypost.com/2024/01/27/news/biden-admin-border-policy-puts-us-in-imminent-danger-with-military-aged-migrant-invasion-former-fbi-officials/.

[32] MaryAnn Martinez, *Feds Prevented Over 160 People on Terror Watchlist from Crossing US Borders Illegally—Highest Total Ever Recorded: DHS*, N.Y. POST (Sept. 15, 2023), https://nypost.com/2023/09/15/160-people-on-terror-watch-list-stopped-at-us-border-in-2023/.

[33] Banks Decl. ¶¶ 20–21 & Ex. A; *see also id.* ¶ 23 ("Border Patrol reported that it apprehended 1,819 illegal immigrants with gang affiliations from FY 2021 to FY 2024.").

right of self-defense" in the face of "historic levels of illegal immigrants, deadly drugs like fentanyl, and terrorists entering our country."[34] A few days later, twenty-six state Attorneys General—more than half of the chief law enforcement officers in the country—likewise agreed: "Millions of people illegally coming into Texas as part of a coordinated assault on our border is an invasion."[35] What is now obvious to all these government officials has long been clear to the American people, "[m]ore than half of [whom] say there's an 'invasion' at the southern border."[36]

Article IV, Section 4 of the U.S. Constitution obligates the United States to "protect each [State] against Invasion." Instead of coming to Texas's aid and repelling this invasion, the Biden Administration has chosen to compound the problem by allowing 99.7% of the illegal aliens in custody to be released.[37] Remarkably, its priority is to do everything in its power to stop Texas from defending itself. It has sued to prevent Texas from deploying a floating border barrier in the Rio Grande. *See United States v. Abbott*, No. 1:23-cv-853, 2023 WL 5740596, at *1 (W.D. Tex. Sept. 6, 2023), *aff'd*, 87 F.4th 616 (5th Cir. 2023), *reh'g en banc granted, opinion vacated,* 90 F.4th 870

---

[34] Republican Governors Association, Republican Governors Band Together, Issue Joint Statement Supporting Texas's Constitutional Right to Self-Defense (Jan. 25, 2024), https://www.rga.org/republican-governors-ban-together-issue-joint-statement-supporting-texas-constitutional-right-self-defense/; Rebecca Beitsch, *Speaker Johnson Backs Abbott's Border 'Invasion' Decree*, THE HILL (Jan. 25, 2024), https://thehill.com/homenews/house/4428993-speaker-johnson-backs-abbotts-border-invasion-decree/.

[35] David Zimmerman, *GOP Attorneys General, Arizona Lawmakers Back Texas's Right to 'Defend Against Invasion,'* NAT'L REV. (Jan. 29, 2024), https://www.nationalreview.com/news/gop-attorneys-general-arizona-lawmakers-back-texas-right-to-defend-against-invasion/.

[36] Joel Rose, *A Majority of Americans See an 'Invasion' at the Southern Border, NPR Poll Finds*, NPR (Aug. 18, 2022), https://www.npr.org/2022/08/18/1117953720/a-majority-of-americans-see-an-invasion-at-the-southern-border-npr-poll-finds.

[37] New Data Reveal Worsening Magnitude of the Biden Border Crisis and Lack of Interior Immigration Enforcement, Subcommittee on Immigration Integrity, Security, and Enforcement, United States House of Representatives, available at https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-document/2024-01-18-new-data-reveal-worsening-magnitude-of-the-biden-border-crisis-and-lack-of-interior-immigration-enforcement.pdf.

(5th Cir. 2024). It has repeatedly destroyed Texas's concertina-wire fencing to allow aliens to enter Texas by the thousands. All while "[t]he evidence amply demonstrates the utter failure of the Defendants to deter, prevent, and halt unlawful entry into the United States" in contradiction to "the statutory duties they are so obviously derelict in enforcing." *Texas*, 2023 WL 8285223, at *14. This lawsuit by the United States—tied to the similar one it is consolidated with here—is more of the same.

In response to this unprecedented crisis, the Texas Legislature passed SB4, which makes it a state-law crime to enter (or reenter after removal) the State of Texas directly from a foreign nation between lawful ports of entry, and allows magistrates and judges to order aliens who have crossed the border illegally to return to the foreign nation from which they entered. *See* TEX. CODE CRIM. PROC. ch. 5B; TEX. PENAL CODE ch. 51. SB4 provides an affirmative defense to prosecution if the alien's conduct does not violate 8 U.S.C. § 1325 (the federal illegal-entry statute), or if the federal government has granted the alien lawful presence or asylum. TEX. PENAL CODE § 51.02(c)(1)–(2). It also recognizes an affirmative defense if the alien was approved for benefits under the Deferred Action for Childhood Arrivals (DACA) program between June 15, 2012, and July 16, 2021. TEX. PENAL CODE § 51.02(c)(3). SB4 does not prevent illegal aliens from seeking asylum or other relief under federal law.

STANDARD OF REVIEW

"'A preliminary injunction is an extraordinary remedy never awarded as of right.'" *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To be entitled to a preliminary injunction, a plaintiff must establish: (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Id.* at 20. "The burden of persuasion on all of the four requirements for a preliminary injunction is at all times upon the plaintiff." *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974). This is a steep burden, indeed, and it requires a "*a clear showing*" as to each element. *Mazurek v. Armstrong*, 520

U.S. 968, 972 (1997) (per curiam).

If the movant fails to establish any one of the four prerequisites to injunctive relief, relief will not be granted. *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 419 n.15 (5th Cir. 2001). As Texas has explained before, the United States is not uniquely immune from the need to satisfy all four *Winter* factors. *See United States v. Abbott*, No. 23-50632, 2023 WL 6376357, at *40–41 (5th Cir. Sept. 21, 2023). And even when a movant satisfies each of the four factors, the decision whether to grant or deny a preliminary injunction remains discretionary with the district court. *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985). Granting a preliminary injunction is the exception—never the rule. *Id.*

## ARGUMENT

### I.     Plaintiffs are not likely to succeed on the merits.

SB4 is not facially preempted because a state law that duplicates federal law does not "conflict" with that federal law. Nor can Plaintiffs end-run this commonsense conclusion by retreating to "field" preemption. To the extent field preemption remains a viable ground for preemption at all, it cannot apply where the federal government has abandoned the field. And *Arizona v. United States*, 567 U.S. 387 (2012), does not tie this Court's hands because it did not address the types of provisions at issue here, and never considered how the U.S. Constitution allows the States to fend for themselves when the federal government would leave them at the mercy of hostile non-state actors.

Nor does SB4 violate some dormant aspect of the Foreign Commerce Clause. The United States concedes that SB4 is not motivated by economic protectionism—the principal concern of the Constitution's supposedly implied restrictions on State commercial regulations. The United States cannot then recast SB4 as discriminating against foreign commerce by prohibiting the illicit traffic in terrorism, human beings, and drugs—for contraband and criminal activity are not the kind of "commerce" the Constitution cares about.

Finally, even assuming some of these claims were somehow meritorious, all Plaintiffs run

into justiciability doctrines that would prevent this Court from awarding relief. The Supremacy Clause furnishes no cause of action—for the United States, the Organizational Plaintiffs, or anyone else. And the Organizational Plaintiffs lack standing and their claims are barred by sovereign immunity because they fail to fall within the exception of *Ex parte Young*.

### A. SB4 is not preempted because it comports—rather than "conflicts"—with federal immigration laws.

Plaintiffs principally challenge three elements of SB4—namely, its prohibition on illegal entry, its prohibition on illegal reentry, and its provision for orders to return. *See* US Compl. ¶¶ 22–26 (describing "three principal provisions" of SB4); Las Americas Compl. ¶¶ 26–43 (identifying "three new state law offenses" created by SB4). None of those elements are conflict-preempted by federal law.

Conflict preemption exists only where it is "impossib[le]" to comply with both state and federal law, or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (cleaned up). Courts do not lightly find conflict preemption. "In all cases," the alleged "conflict with state law must stem from either the Constitution itself or a valid statute enacted by Congress," *Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020), not from some "freewheeling judicial inquiry into whether a state statute is in tension with federal objectives," *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (cleaned up). And "[t]here is no federal preemption in *vacuo*." *Kansas*, 140 S. Ct. at 801 (cleaned up). "To hold otherwise would be to ignore the teaching of [Supreme] Court[] decisions which enjoin seeking out conflicts between state and federal [law] where none clearly exists." *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 446 (1960). In addition, where the preemption question is close, the court "must err in favor of the states." *Graber v. Fuqua*, 279 S.W.3d 608, 620 (Tex. 2009). Plaintiffs cannot satisfy this standard.

First, consider what federal immigration laws say. Congress has made it a crime for an alien to cross into this country at any location other than a port of entry. 8 U.S.C. § 1325(a)(1). Any alien who commits this crime of illegal entry "shall" be fined up to $5,000, imprisoned for up to 6

months, or both. *Id.* § 1325(a), (b); 18 U.S.C. §§ 3559(a)(7), 3571(b)(6). Congress has also made it a crime for an alien to re-enter this country after having previously been "denied admission," been involuntarily "removed," or voluntarily "departed the United States." 8 U.S.C. § 1326(a). Any alien who commits this crime of illegal reentry "shall" be fined up to $250,000, imprisoned for up to 2 years, or both. *Id.*; 18 U.S.C. §§ 3559(a)(5), 3571(b)(3). Aliens with certain aggravating circumstances may face harsher penalties. 8 U.S.C. § 1326(b). Finally, Congress has directed immigration officials to "order removed from the United States without further hearing or review," *id.* § 1225(b)(1)(A)(i), any alien who lacks a "valid entry document," *id.* § 1182(a)(7). In lieu of completing removal proceedings, an alien may agree to a "stipulated order" of removal or "voluntarily depart the United States." *Id.* §§ 1229a(d), 1229c(a)(1). Meanwhile, an alien who fails to comply with a removal order is guilty of a felony. *Id.* §§ 1253(a)(1), 1229a(c)(5).

Now, consider what state law says. "Like 8 U.S.C. §1325(a)," SB4 makes it a state crime for an alien to cross into this country at any location other than a port of entry. US Compl. ¶ 23 (citing Tex. Penal Code § 51.02(a)). That offense is punishable by a fine of up to $2,000 and imprisonment up to 180 days. Tex. Penal Code § 51.02(b). "SB4, similar to 1326(a)," also makes it a crime to illegally re-enter this country after having previously been "denied admission," been involuntarily "removed," or voluntarily "departed the United States." US Compl. ¶ 24 (citing Tex. Penal Code § 51.03(a)). That offense is punishable by a fine of up to $4,000 and imprisonment up to one year. Tex. Penal Code § 51.03(b). Finally, SB4 directs a state court judge to order an alien to return after completing custodial sentence or, in lieu of prosecution, permits an alien to depart voluntarily. Tex. Code Crim. Proc. Art. 5B.002(c), (d). Like federal law, SB4 makes it a crime to fail to comply with a return order, much as federal law criminalizes non-compliance with removal orders. Tex. Penal Code § 51.04(a). At every step, SB4 mirrors federal-law standards.

The federal government may adopt state law for federal-law purposes. *See, e.g.*, *Parker Drilling Mgmt. Serv., Ltd. v. Newton*, 139 S. Ct. 1881, 1886 (2019). State governments may adopt federal law for state-law purposes. *See, e.g.*, *Gilbert v. Minnesota*, 254 U.S. 325, 330-31 (1920).

"[T]here can by definition be no conflict" between the laws of two sovereigns when they *comport* with one another. *Whiting*, 563 U.S. at 601–03 (finding no conflict preemption where state law "trace[s] the federal law"); *cf. Arizona*, 567 U.S. at 402–03 (noting that challenged state law authorized harsher criminal penalties than federal law). It is certainly not "impossible" for an alien to comply with both the Immigration and Nationality Act and SB4. *English v. General Elec. Co.*, 496 U.S. 72, 79 (1990). He can easily comply with *both* sets of laws at the same time by not entering this country illegally between ports of entry, not reentering illegally, or complying with an order to depart this country.

Nor is SB4 somehow an "obstacle" to accomplishing "the full purposes and objectives of Congress." *Id.* Even the United States concedes that in all salient respects, the operative provisions in SB4 are "like" or "similar to" the proscriptions Congress provided in the INA. US Compl. ¶¶ 23–24. The conflict-preemption analysis ought to stop right there. "Our federal system would be turned upside down if we were to hold that federal criminal law preempts state law whenever they overlap. Indeed, in the vast majority of cases where federal and state laws overlap, allowing the States to prosecute is entirely consistent with federal interests." *Kansas*, 140 S. Ct. at 806.[38] None of the three provisions Plaintiffs assail in their motions conflict with federal law.

State officials can implement SB4 in a way that maximizes cooperation with federal authorities. Escalon Decl. ¶¶ 7–8, 10–14; Clark Decl. ¶ 6–12; Barnes Dec. ¶ 4. Because this Court

---

[38] Plaintiffs seem to suggest miscellaneous provisions of SB4 would conflict with federal law. But they do not identify them as challenged provisions in their complaint. In any event, these claims rest on speculation about how SB4 will operate, which highlights why this pre-enforcement challenge is premature. In any event, the speculation is wrong. Though Plaintiffs claim that SB4 will prevent aliens from pursuing discretionary relief, nothing prevents an alien from seeking such relief while in state custody or from another country. *Cf.* Myah Ward & Jennifer Haberkorn, *Biden Admin to Set Up Migrant Processing Centers in Latin America Ahead of End of Title 42*, POLITICO (Apr. 27, 2023), https://www.politico.com/news/2023/04/27/biden-migrant-processing-centers-latin-america-00094151. And Texas law requires law enforcement agencies to honor detainer requests from U.S. Immigrations and Customs Enforcement (ICE). TEX. CODE CRIM. PROC. Art. 2.251(a); *see In re Wiles*, No. 08-18-00177-CR, 2019 WL 1810756, at *2–3 (Tex. App.— El Paso Apr. 24, 2019).

is presented with a pre-enforcement challenge, the Court may not follow Plaintiffs in assuming that enforcement of SB4 will take the antagonistic form they imagine. Rather, *United States v. Salerno* instructs that if some applications of the law are constitutional, then it survives facial attack. 481 U.S. 739, 745 (1987) (recognizing that the challenge fails unless "no set of circumstances exists under which the Act would be valid.").

Moreover, to the extent SB4's text omits other defenses available under federal law, it does not preclude them. Texas "courts must determine whether federal law prevents enforcement of a conflicting state law," *In re Academy, Ltd.*, 625 S.W.3d 19, 35 n.19 (Tex. 2021)—and those courts will construe SB4 to be consistent with federal law to the extent possible. *See Stockton v. Offenbach*, 336 S.W.3d 610, 618 (Tex. 2011); *Lebo v. State*, 90 S.W.3d 324, 326 (Tex. Crim. App. 2002); *Toledo v. State*, 519 S.W.3d 273, 279 (Tex. App.–Houston [1st Dist.] 2017) ("We presume that the legislature intended to enact a statute that comports with the Texas and federal constitutions.") (citing TEX. GOV'T CODE § 311.021(1)). Aliens may raise federal preemption as a defense in Texas courts under SB4. *See Sabine Consol., Inc. v. State*, 806 S.W.2d 553, 554–55 (Tex. Crim. App. 1991). Indeed, facial and as-applied constitutional challenges are cognizable in Texas courts on pretrial habeas review. *Ex parte Perry*, 483 S.W.3d 884, 896 (Tex. Crim. App. 2016).

Of course, SB4 may be an obstacle to the purposes and objectives of President Biden, Secretary Mayorkas, and other executive branch officials who favor open-border policies over following the law.[39] But those are manifestly *not* the priorities laid out by Congress in federal statutes that the current administration is committed to ignoring. "The Supremacy Clause gives priority to 'the Laws of the United States,' not the criminal law enforcement priorities of federal officers." *Kansas*, 140 S. Ct. at 807 (quoting U.S. Const. art. VI, cl. 2).

---

[39] *See* Speaker of the U.S. House, Biden Administration Actions that Have Undermined Border Security and Encouraged Illegal Immigration (Jan. 9, 2024), https://www.speaker.gov/wp-content/uploads/2024/01/Biden-Admin-Actions-Undermining-Border-Security.pdf (collecting 64 actions taken by the Administration to systematically undermine border security).

### B.  No provision of SB4 is field preempted.

Courts find field preemption only when an "unambiguous congressional mandate" ousts the State from the field. *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 147 (1963). Nothing approaches such a mandate here. When, as here, the law "expressly contemplates concurrent regulation with States and localities," "[t]hat ends the matter;" there is no field preemption. *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 797 (5th Cir. 2024).

States enjoy wide latitude to regulate within the "field" of alien misconduct. Indeed, there are myriad instances in the federal code indicating States are encouraged to aid federal entry and removal efforts, and the federal immigration code expressly recognizes States' authority and role in carrying out the type of conduct described in SB4. *See, e.g.,* 18 U.S.C. § 758 (crime for alien to "flee" from "State or local law enforcement" around immigration checkpoints); 8 U.S.C. § 1324(c) (State law enforcement given explicit authority to make arrests for violation of alien smuggling prohibition); 22 U.S.C. § 7105(c)(3)(C)(i) (contemplating "State or local" prosecution of alien "trafficking"). And the Supreme Court has rejected the idea that federal law field preempts "every state enactment which in any way deals with aliens." *DeCanas v. Bica*, 424 U.S. 351, 355 (1976), (superseded by statute on other grounds as recognized in *Arizona*, 567 U.S. at 404). When the law "expressly contemplates concurrent regulation with States and localities," "[t]hat ends the matter;" there is no field preemption. *Nat'l Press Photographers Ass'n*, 90 F.4th at 797. The courts have likewise never "conclude[d] that the States are without any power to deter the influx of persons entering the United States … and whose numbers might have a discernable impact on traditional state concerns." *Plyler v. Doe*, 457 U.S. 202, 228 n.23 (1982).

Yet, Citing *Arizona v. United States*, Plaintiffs argue that Section 1 of SB 4 is field preempted because it intrudes on the government's "exclusive" federal authority to control entry and removal. OP PI Mot. at 12-13; US PI Mot. at 24–26. But *Arizona* says no such thing. The opinion uses the word "exclusive" twice, and only to describe the standard for finding field preemption. The only field preemption recognized in *Arizona* is "the field of alien registration." *Arizona*, 567 U.S. at 403. The Court did not find that state laws concerning entry and removal were

field preempted. Indeed, the *Arizona* court concluded that one of Arizona's immigration statutes was *not* preempted. So plainly *Arizona* does not support Plaintiffs' argument that immigration regulation is exclusively federal.

Among other things, SB4 authorizes a magistrate, during an initial appearance, to issue a written order requiring an illegal alien to return to the foreign country from which the person illegally entered, assuming there exists probable cause based on an illegal entry or reentry, and assuming the alien agrees to the entry of the order. TEX. CODE CRIM. PROC. Art. 5B.002. *Arizona*, the cornerstone of the Plaintiffs' arguments, does not address whether the sort of judicial proceedings described under this provision of SB4 are field preempted. The only field preemption that *Arizona* recognized was in the federal alien-registration program. *Id.* That program is factually distinguishable from anything regulated under SB4: alien registration deals with a uniquely domestic method of tracking immigrants present within the country. It requires a unified database that affects the entire interior of the United States. It has nothing to do with the only issue here: border protection. The federal field of alien registration that the Supreme Court acknowledges in *Arizona* is thus wholly irrelevant to SB4. Plaintiffs do not and cannot cite any other cases to demonstrate that the provisions of SB4 intrude on a recognized federal field.

Even if removal were an exclusively federal field (it is not, and *Arizona* does not say it is), it is fundamentally inaccurate to classify the return orders described in SB4 as removals. The return orders contemplate the voluntary departure of an illegal alien, TEX. CODE CRIM. PROC. Art. 5B.002(c)(1), and they implicate the State's ability to prosecute illegal entry similar to its prosecution of criminal trespass violations under Section 30.05 of the Texas Penal Code. The return order simply identifies how an alien will be transported to a federal port of entry and which state officer or agency will monitor compliance with that order. Once at a federal port of entry, no state actor removes the illegal alien.  Escalon Decl. ¶¶ 13–15. Effectuating any forced removal from the country remains the task of federal CBP officers.

Granted, federal immigration law controls "who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *DeCanas*, 424 U.S. at 355;

*cf. Truax v. Raich*, 239 U.S. 33, 42 (1915). But the federal government's control over admission and exclusion does not preclude States' authority to regulate aliens in a host of other ways, like those at issue here. SB4 does not affect who is admitted, whether they will ultimately be removed, or the legal standard under which they can remain in the country. And the law recognizes and bows to the federal scheme in all critical respects, including by recognizing that if an alien enters at a port of entry, even without a legally cognizable basis for protection from removal, then he is not subject to SB4's penalties. *See* 8 U.S.C. § 1325 (aliens *must* enter at port of entry); TEX. PENAL CODE § 51.02(c)(2) (providing affirmative defense if alien complies with § 1325); Escalon Decl. ¶ 5; Barnes Decl. ¶ 3.

Plaintiffs also argue that SB4's illegal entry and reentry provisions are entirely field preempted because the State's creation of illegal entry and reentry crimes, *see* TEX. PENAL CODE §§ 51.02 (illegal entry), 51.03 (illegal reentry), intrudes on the federal government's authority to criminalize entry and reentry, which it has already done in 8 U.S.C. §§ 1325 and 1326. *See* OP PI Mot. at 23–24; US PI Mot. at 24, 27. But these sections are not field preempted.

As discussed above, both sections mirror federal law. And, "with respect to illegal aliens," State laws that "mirror[] federal objectives" are *more*—not less—likely to be upheld. *Plyler*, 457 U.S. at 225. Specifically, Tex. Penal Code § 51.02 effectively makes it a state crime for an illegal alien to violate federal law, which prohibits aliens from "enter[ing], or attempt[ing] to enter the United States at any time or place other than as designated by immigration officers." 8 U.S.C. § 1325(a). Section 51.03 does the same with another provision of federal law, which prohibits aliens from "enter[ing], attempt[ing] to enter, or [be] found in the United States" if previously "denied admission … or removed" or if they have "departed the United States while an order of … removal is outstanding." 8 U.S.C. § 1326(a). "The mere fact that state laws like" SB4 "overlap to some degree with federal criminal provisions" on immigration "does not even begin to make a case for" preemption. *Garcia*, 140 S. Ct. at 806. And both provisions that mirror their federal counterparts are consistent with and reflect Texas's enforcement of its state criminal trespass law, TEX. PENAL CODE § 30.05, which has existed for years under Operation Lone Star to

prohibit an alien's illegal entry and presence in Texas. The federal government has not—and does not now—challenge State authority under Operation Lone Star to enforce the State's equally complementary, border-based criminal trespass law.

Nothing in *Arizona* precludes States from participating in entry and reentry; the *Arizona* Court does not say that these are exclusive federal fields, and indeed there are plenty of instances in which States have authority to create their own criminal immigration laws and prosecute federal immigration crimes that involve entering the country. *See* 8 U.S.C. § 1101(a)(15)(T)(i) (contemplating "State or local investigation or prosecution" of illegal trafficking); *id.* § 1101(a)(15)(U) (State and local criminal laws can include trafficking); 18 U.S.C. § 758 (making it a federal crime to evade an immigration checkpoint and "thereafter flee from Federal, State, or local law enforcement …").

*DeCanas* also confirms that SB4 is not field preempted. In that case, the Court upheld a California law prohibiting the knowing employment of illegal aliens. *DeCanas*, 424 U.S. at 355. There was no preemption because there was no "specific indication in either the wording or the legislative history of the [Immigration and Nationality Act] that Congress intended to preclude" such regulation. *Id.* at 358. So too here—nothing in the Immigration and Nationality Act suggests that Congress would prohibit the States from penalizing *exactly what the federal code already penalizes*.

Moreover, none of SB4 conflicts with the federal government's foreign relations—or even implicates it. Facilitating illegal aliens' compliance with federal law cannot possibly affect relations with other countries. Further, to the extent it might affect foreign relations, SB4's provisions do not present a conflict or obstacle to the federal government's foreign affairs because they do not require anything beyond what the federal government should already be doing. And Governors of States regularly interact with and make agreements with foreign governments.[40]

---

[40] *What Governor Newsom's Trip to China Accomplished*, Office of Governor Newsom,

None of the rest of the provisions of SB4, specifically Sections 3 through 9, are field preempted, and Plaintiffs do not argue otherwise. Plaintiffs only refer to Sections 1 and 2 in their Motion and only seek to enjoin those two sections.

### C. To the extent "field" preemption remains viable at all, SB4 is not preempted when the federal government has abandoned the "field" it now purports to occupy.

In *Arizona*, the Supreme Court used field preemption to invalidate a state-law misdemeanor concerning *alien registration. See* 567 U.S. at 400–03 (citing *Hines v. Davidowitz*, 312 U.S. 52 (1941)). It is no surprise, then, that Plaintiffs' lead argument here does not look for an express conflict between federal and state law, but instead focuses on the so-called "field" of immigration laws that Congress has passed in the INA. *See* US PI Mot. at 20–23; OP PI Mot. at 12–17.

Early field-preemption cases, however, required a plaintiff to identify an actual "conflict" between federal and state law. *See, e.g., Int'l Shoe Co. v. Pinkus*, 278 U.S. 261, 265–66, 268 (1929). Several members of the Supreme Court have questioned the more recent and profligate use of field preemption, unmoored from that earlier focus on a textual conflict between the laws of a State and laws that Congress has enacted. *See, e.g., Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1901 (2019) (lead opinion of Gorsuch, J., joined by Thomas and Kavanaugh, JJ.); *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 638 (2012) (Kagan, J., concurring); *id.* at 640–41 (Sotomayor, J., concurring in part and dissenting in part). Because "[t]he Supremacy Clause supplies a rule of priority" as between "the Laws of the United States" and the "Laws of any state to the Contrary," federal courts arguably have no business wielding field preemption absent a textual conflict between federal and state law. *Virginia Uranium*, 139 S. Ct. at 1901 (quoting U.S. Const. art. VI, cl. 2).

But even if this loose new brand of conflict-free field preemption is here to stay, courts must

---

http://tinyurl.com/yc3s8kty (last visited Feb 1, 2024) (article discussing Governor Newsom's joint declaration with "China and California to cooperate on subnational climate action"); *see also* Julian G. Ku, *Gubernatorial Foreign Policy*, 115 Yale L.J. 2380 (2006).

still take the field analogy seriously: State law cannot be impliedly preempted from some regulatory area unless federal law is also *occupying* the same field. For the federal government to preempt state law absent a genuine conflict, it is not enough for Congress to merely pass legislation in the pertinent field; the federal executive branch must, in fact, take action to occupy that field. That is how California's Director of Agriculture for Raisin Proration Zone No. 1 avoided federal preemption—the Supreme Court found "no such occupation of the legislative field by the mere adoption of the Agricultural Marketing Agreement Act," because the U.S. Secretary of Agriculture had not issued any order "putting it into effect." *Parker v. Brown*, 317 U.S. 341, 358 (1943).

This principle counsels rejection of Plaintiffs' field-preemption argument, because the federal executive branch has abandoned the very field it now purports to occupy. Congress has: imposed mandatory criminal penalties for perpetrating or assisting illegal entry and reentry, 8 U.S.C. §§ 1325, 1326, 1327; commanded federal officials to detain various categories of aliens, *id.* §§ 1221, 1225, 1226, 1231; allowed for the parole of aliens "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit," *id.* § 1182(d)(5)(A); directed federal officials to promptly dismiss asylum claims of economic migrants "at [the] port of entry," *id.* § 1225(b)(1)(B), and swiftly remove aliens in less than 90 days after ordering them removed, *id.* § 1231(a)(1)(A); and ordered federal officials to prevent illegal entry of aliens and secure the border, including by prioritizing "physical infrastructure enhancements," *id.* § 1701 Note.

The Biden Administration notoriously ignores each of these INA obligations, and others too, which is "akin to posting a flashing 'Come In, We're Open' sign on the southern border." *Florida v. United States*, 660 F. Supp. 3d 1239, 1253 (N.D. Fla. 2023). It "[d]isregard[s] that entering the United States by crossing the river other than at an official port of entry is a federal crime." *Texas*, 2023 WL 8285223, at *11 (Moses, C.J.). It paroles millions of aliens *en masse* into the United States—even though the INA says they "shall" be detained—"and tell[s] Congress to pound sand." *Texas v. Biden*, 20 F.4th 928, 982 (5th Cir. 2021), *rev'd*, 142 S. Ct. 2528 (2022). It refuses to dismiss at the port of entry the waves of economic migrants whose asylum claims are

patently frivolous. And rather than build up border infrastructure, it engages in escalatory self-help measures by tearing down Texas's concertina-wire fencing. In the words of Chief Judge Moses, the Biden Administration's "utter failure … to deter, prevent, and halt unlawful entry into the United States" is a sad product of "the statutory duties [it is] so obviously derelict in enforcing." *Texas*, 2023 WL 8285223, at *14.

Having refused to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, the federal executive branch cannot now invoke field preemption in service of the federal immigration statutes it is so committed to violating. Plaintiffs' field-preemption attack on SB4 correctly presupposes that our "Constitution, and the Laws of the United States which shall be made in Pursuance thereof," are "the supreme Law of the Land." U.S. Const. art. VI, § 2. Under the Supremacy Clause, however, "it is Congress rather than the courts that pre-empts state law." *Whiting*, 563 U.S. at 607. The Biden Administration cannot use opportunistic supremacy to defeat SB4—a state-law analogue to illegal-entry statutes Congress already has on the books—and then abandon the field again by ignoring the INA.

Indeed, the Supreme Court's decision in *Arizona* was further premised on the idea that the federal government was, at the time, making good-faith efforts to carry out its obligations under federal immigration statutes. *See, e.g.*, 567 U.S. at 397. Perhaps that is why Arizona never pressed this argument before the Supreme Court. In any event, it should be obvious that the border circa 2009 is nothing like the border of today. The federal government's abdication of duty is unprecedented, and so are the numbers. In FY2009, the year immediately preceding Arizona's passage of its challenged immigration bill, Border Patrol recorded a total of 540,851 apprehensions along the southwest border.[41] In FY2023, Border Patrol apprehended more than 2.4 million

---

[41] *See* U.S. Dep't of Homeland Security, Office of Immigration Statistics, Apprehensions by the U.S. Border Patrol: 2005-2010, at 2 (July 2011), https://www.dhs.gov/xlibrary/assets/statistics/publications/ois-apprehensions-fs-2005-2010.pdf.

aliens.[42] That huge surge in numbers is the predictable response to deliberate steps the Biden Administration has taken, contrary to federal statutes, to undermine the security of our international border.

### D. Texas is entitled to defend itself from invasion when the federal government abdicates its own duties—and *Arizona* never said anything to the contrary.

Even if federal immigration laws somehow did run up against SB4, those statutes could not be read to vitiate the federal government's obligation to protect the States from invasion, nor to trump Texas's constitutional entitlement to defend itself against invasion. Upon joining the Union, "the States did not part with that power of self-preservation which must be inherent in every organized community." *Smith v. Turner*, 48 U.S. (7 How.) 283, 400 (1849) (McLean, J.). After all, "[t]he Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States." *Texas v. White*, 74 U.S. (7 Wall.) 700, 725 (1868).

The Constitution provides that "[n]o state shall, without the Consent of Congress, … engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay." U.S. Const. art. I, § 10, cl. 3. This self-defense provision represents "an acknowledgement of the States' sovereign interest in protecting their borders." *Arizona*, 567 U.S. at 419 (Scalia, J., concurring in part and dissenting in part). The Constitution thus "leaves intact [States'] inherent power to protect their territory," *id.,* which the law of nations at the founding recognized for political subdivisions even in the absence of express authorization. *See* Robert G. Natelson & Andrew T. Hyman, *The Constitution, Invasion, Immigration, and the War Powers of States*, 13 Br. J. Am. Leg. Studies 1, 7 (2024). "[U]nder both the Articles of Confederation and the Constitution, the source of most *state* authority" for defensive war "preceded the Union and was largely reserved to the [S]tates," and the provisions addressing state war powers in both of those charters "served only as limitations or descriptions [of that pre-existing power], not grants" of authority. *Id*. at 11–

---

[42] Congressional Research Service, *U.S. Efforts to Manage Western Hemisphere Migration Flows*, https://crsreports.congress.gov/product/pdf/IF/IF12538.

12; *see also id.* at 16–19. The Constitution actually removed limits on state war powers imposed by the Articles—States could now engage in defensive war without any need to consult with the central government. *Id.* at 18.

The authority to determine whether Texas has been "actually invaded," U.S. Const. art. I, § 10, cl. 3, is vested in the Governor of Texas as the "Commander-in-Chief of the military forces of the State," Tex. Const. art. IV, § 7. Governor Abbott has asserted this power because, through President Biden's open-border refusal to faithfully execute federal immigration laws, the United States has unconstitutionally refused to "protect [the State of Texas] against Invasion" by transnational criminal cartels. U.S. Const. art. IV, § 4.

Whether a particular set of circumstances constitutes an "invasion" for purposes of these two constitutional clauses is a nonjusticiable political question. That is because "the nature of the power itself" is committed to executive discretion, *Sterling v. Constantin*, 287 U.S. 378, 399 (1932), ensuring a lack of judicially manageable standards to determine whether or when an cartel-driven influx of illegal aliens and deadly fentanyl will amount to constitute an invasion. *See California v. United States*, 104 F.3d 1086, 1090–91 (9th Cir. 1997); *New Jersey v. United States*, 91 F.3d 463, 469–70 (3d Cir. 1996); *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996); *Chiles v. United States*, 69 F.3d 1094, 1097 (11th Cir. 1995).

Political questions are not the sole province of the federal government. They attach whenever the Constitution textually commits a decision to a political actor—federal *or* state—who is tasked with making the sorts of decisions courts are ill-equipped to make. *See Rucho v. Common Cause*, 139 S. Ct. 2484, 2495–96 (2019) (noting that U.S. Const. art. I, § 4, cl. 1 assigns districting to state legislatures); *id.* at 2498–2506 (identifying no judicially manageable standard to police partisan districting). Because the power of self-defense goes to the very core of sovereignty, its invocation poses a nonjusticiable question committed to the sovereign that wields it, *Moyer v. Peabody*, 212 U.S. 78, 83–85 (1909) (Holmes, J.), subject only to limited review as to whether the sovereign has invoked that authority in "good faith," *Constantin*, 287 U.S. at 400.

That does not mean the self-defense power is limitless. For one thing, federal courts should

presume that state officials will follow the Constitution. *See, e.g.*, *Sumner v. Mata*, 449 U.S. 539, 549 (1981); *Rose v. Raffensperger*, 584 F. Supp. 3d 1278, 1288 (N.D. Ga. 2022). As relevant here, that presumption includes the requirement that a State be "actually invaded" or "in … imminent Danger." U.S. Const. art. I, § 10, cl. 3. More fundamentally, though, States authorized to "engage in War" are—presumably like the United States itself—bound by the law of nations when responding to such threats. *See Miller v. United States*, 78 U.S. 268, 305–06 (1870).[43]

The *only* question here, then, is whether the States have the same kind of power when faced with an invasion as the federal government has. They most certainly do, because States—like other sovereigns—have "inherent power to protect their territory." *Arizona*, 567 U.S. at 419 (Scalia, J., concurring in part and dissenting in part); *cf. United States v. Cooley*, 141 S. Ct. 1638, 1643 (2021) (Indian tribes "retain inherent power" to address conduct that "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe").

The Constitution memorializes that inherent power in the ratified text. If "actually invaded, or in such imminent Danger as will not admit of delay," States *may* take action even "without the Consent of Congress." U.S. Const. art. I, § 10, cl. 3; *see Sveen v. Melin*, 584 U.S. 811, 827–28 (2018) (Gorsuch, J., dissenting); *Melendez v. City of New York*, 16 F.4th 992, 1018 (2d Cir. 2021). And Congress cannot countermand such state action by statute as it can *other* state action. *See* U.S. Const. art. I, § 10, cl. 2 (subjecting state tax laws "to the Revision and Controul of the Congress"). Elsewhere, the Constitution obliges the federal government to protect each State "against Invasion[] and … domestic Violence." U.S. Const. art. IV, § 4. On its face, this provision imposes an obligation on the federal government—not a limitation on States. But it also establishes two different rules for dealing with two different scenarios. For a "domestic" attack, States may seek help from the federal government, "on Application of the Legislature, or of the Executive."

---

[43] States, like other sovereigns, may take lesser defensive measures than full-scale war in an "imperfect" state of hostilities. *Bas v. Tingy*, 4 U.S. (4 Dall.) 37, 40–41 (1800) (Washington, J.); *see also* Natelson & Hyman, *supra*, at 8. Texas's restrained tactics in the face of imminent danger—including the enactment and implementation of SB4—are prudent.

*Id.* For an "Invasion," however, States need not invite federal protection. *Id.* Together, the two Invasion Clauses memorialize concurrent federal and state authority to repel invasions.

The framers took for granted that States had independent authority to defend themselves: "If the interposition of the general government should not be needed"—because a State could handle the matter itself under Article I, Section 10, Clause 3—the provision for federal intervention under Article IV, Section 4 "will be a harmless superfluity." The Federalist No. 43 (Madison). When it came to repelling an invasion, the Constitution permitted a State to work with the federal government—but if the federal government proved unnecessary or unwilling, the State could go it alone.

Supreme Court precedent further confirms that federal and state governments exercise the *same* power. Just as the President has exclusive "authority to decide whether the [foreign or domestic] exigency has arisen" for purposes of Article I, Section 8, Clause 15, *Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 29–30 (1827) (Story, J.), so too does the State have exclusive authority to decide whether the foreign or domestic exigency has arisen under Article I, Section 10, Clause 3, *Moyer*, 212 U.S. at 83–85. And because "the nature of the power itself" "necessarily" confers discretion, federal and state exercises of this power are subject only to the *same* good-faith constraint—not judicial second-guessing. *Constantin*, 287 U.S. at 399.

Other States may choose to allocate their self-defense power differently. But in Texas, the power to determine whether it has been "actually invaded" or otherwise faces "imminent Danger as will not admit of delay," U.S. Const. art. I, § 10, cl.3, is vested in the Governor as the commander-in-chief of Texas's militia, *see* Tex. Const. art. IV, § 7; *see also Abbott v. Biden*, 70 F.4th 817, 822–23, 842 (5th Cir. 2023). Governor Abbott has here asserted this power on behalf of the State because the United States has unconstitutionally refused to protect Texas—and, more importantly, its citizens—against the dangers posed by transnational cartels. There is no basis to second-guess Governor Abbott's determination that a sudden and unprecedented influx into Texas of hostile non-state actors perpetrating human slavery, violent assaults, weapon- and drug-smuggling, and other crimes justify Operation Lone Star's initiatives, including the enactment and

implementation of SB4. *See* Natelson & Hyman, *supra*, at 5–6, 9–10 (discussing law of war at the founding as applied to non-state actors).

In any event, this crisis that the federal government refuses to acknowledge—the sudden and mass entry of criminal cartels trafficking human beings, drugs, and weapons—plainly triggers Texas's self-defense authority.

Texas's sovereign power of self-defense is not limited to repelling invasions by state actors. Article I, Section 10, Clause 3 applies to invasions of all types, including invasions from non-state or quasi-state actors, such as the cartels. Natelson & Hyman, *supra*, at 23. Indeed, throughout American history, States have had to use military force to respond to hostile non-state actors. For example, James Madison referred to a band of smugglers at the Virginia Ratifying Convention to illustrate how state militia were customarily used at the time, in response to concerns about a federal standing army:

> Can any government be established, that will answer any purpose whatever, unless force be provided for executing its laws? The Constitution does not say that a standing army shall be called out to execute the laws. Is not this a more proper way? The militia ought to be called forth to suppress smugglers. Will this be denied? The case actually happened at Alexandria. There were a number of smugglers, who were too formidable for the civil power to overcome. The military quelled the sailors, who otherwise would have perpetrated their intentions. Should a number of smugglers have a number of ships, the militia ought to be called forth to quell them. We do not know but what there may be a combination of smugglers in Virginia hereafter.

3 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 413–14 (Jonathan Elliot ed., Washington, D.C., 2d ed. 1836). Later that day, Madison discussed the concurrent military powers of the federal and state governments. *Id.* at 424–25. He first quoted the invasion provision in Article IV, Section 4, which guarantees that the federal government "shall protect each [State] against Invasion." He then quoted Article I, Section 10, Clause 3's reservation to the States of the right to self-defense. Pointing to that constitutional text, Madison said of the States: "They are restrained from making war, unless invaded, or in imminent danger. When in such danger, they are not restrained. I can perceive no competition in these clauses.  They cannot

be said to be repugnant to a concurrence of the power." *Id.* at 426.

And in 1792, Congress exercised its power "[t]o provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions," U.S. Const. art. I, § 8, by authorizing the President to call forth the militia "whenever the United States shall be invaded, or be in imminent danger of invasion from any foreign nation or *Indian tribe.*" An Act to provide for calling forth the Militia to execute the laws of the Union, suppress insurrections, and repel invasions, 1 Stat. 264, 2d Cong., Sess. I, Ch. 28 (1792) (emphasis added). Congress reenacted the same provision in 1795. *See* An Act to provide for calling forth the Militia to execute the laws of the Union, suppress insurrections, and repel invasions; and to repeal the Act now in force for those purposes, 1 Stat. 424, 3d Cong., Sess. II, Ch. 36 (1795) ("imminent danger of invasion from any foreign nation or Indian tribe").

Any notion that "invasion" somehow hinges on the difference between state actors and non-state actors would seem wholly artificial to the framers, who drafted the Constitution to give Congress power to "grant Letters of Marque and Reprisal" authorizing *private actors* to cross international borders to commit hostile acts. U.S. Const. art. I, § 8, cl. 11; *see also Brown v. United States*, 12 U.S. (8 Cranch) 110 (1814); 1 Blackstone, Commentaries *249–51. In the immediate aftermath of the Constitution's ratification, Congress exercised this power to authorize private citizens to engage in piracy against French ships. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 267 (1990) (citing 1 Stat. 579); *see also* 4 Blackstone, Commentaries *82–83.

A historical practice of American governments engaging with non-state actors continued from the founding up to the present day. Joseph Story conceived of the Whiskey Rebellion—an uprising of nonstate actors in Pennsylvania between 1791 and 1794—as an insurrection. 3 Story, *supra*, § 1808; *see also SBC Commc'ns, Inc. v. FCC*, 154 F.3d 226, 236 n.17 (5th Cir. 1998) (quoting 4 Annals of Cong. 788 (1794)) (same). In 1916, the United States sent forces into Mexico to pursue a band of non-state actors because the Mexican government "was incapable of policing" its own border and tracking down Pancho Villa. John S.D. Eisenhower, Intervention! The United States and the Mexican Revolution 1913-1917, at 227–50 (1993). After the terrorist attacks of September

11, 2001, Congress authorized the use of military force against not only responsible "nations" but also "organizations" and "persons." Authorization for the Use of Military Force, Pub. L. 107-40, § 2(a), 115 Stat. 224 (Sept. 18, 2001). As the Obama Administration rightly observed, "[t]he inherent right of self-defense is not restricted to threats posed by States." Report on the Legal and Policy Frameworks Guiding the United States' Use of Military Force 9 (2016).

This lack of a limitation to state actors is consistent with the use of the word "invasion" near the founding. *See* Natelson & Hyman, *supra*, at 23. Webster's 1806 dictionary—the first American English dictionary—defines "invade" broadly, as meaning "to enter or seize in hostile manner." Noah Webster, A compendious Dictionary of the English Language 164 (1806). Webster's 1828 dictionary also defines "invade" broadly, to include not just the entrance of a foreign army into a country, but also "1 … to enter as an enemy, with a view to conquest or plunder; to attack"; "2. To attack; to assail; to assault"; "3. To attack; to infringe; to encroach on; to violate." 1 Noah Webster, American Dictionary of the English Language 113 (1828). Dictionary definitions at the time defined "invade" as simply "to enter in a hostile manner." Samuel Johnson, [Johnson's] Dictionary (reprint, Boston 1828). An "invasion" was a "hostile entrance" or "an attack." *Id.* Further, "hostile" is not defined to include only state actors. *Id.* ("HOSTILE. adj. [hostilis, Latin.] Adverse;     opposite;     suitable     to     an     enemy."), (E'nemy. n.s. [ennemi, French; inimicus, Latin.] 1. A publick foe …. 2. A private opponent; an antagonist … 3. Any one who regards another with malevolence; not a friend…."). And "hostile" meant "adverse," so "for an entry to be an invasion it must be unauthorized and uninvited." Natelson & Hyman, *supra*, at 23. An "invasion" was not limited to armed force, but "could refer also to uninvited entry by groups of immigrants." *Id.* at 23–24 (discussing use of term "invasion" at the founding to refer to occasions of unarmed but unauthorized mass settlements of people from Connecticut into Pennsylvania).

Millions of aliens have entered the State of Texas illegally under the Biden Administration, including members of cartels that traffic in people, weapons, and vast quantities of drugs like

fentanyl.[44] This amounts to "ent[ry] in a hostile manner." And the State has the constitutional power to repel that invasion. U.S. Const. art. I, § 10, cl. 3. The State may do so to protect the health, safety, morals, and general welfare of its citizens. *House v. Mayes*, 219 U.S. 270, 282 (1911).

Texas's sovereign right of self-defense, as reserved to the States in Article I, Section 10, Clause 3, independently forecloses Plaintiffs' preemption claims against SB4. Under ordinary circumstances, that provision would not allow Texas to "engage in War" to stop illegal border-crossings because "the Consent of Congress" has not been granted. But these are extraordinary times, thanks to the Biden Administration's lawless refusal to enforce federal immigration laws. Indeed, President Biden has breached the federal government's promise to "protect [the State of Texas] against Invasion," in violation of Article IV, Section 4, by ignoring a series of letters demanding that he perform his constitutional duties and send reinforcements to secure the border. Pursuant to Article I, Section 10, Clause 3, therefore, Governor Abbott has declared that Texas is being "actually invaded" by hostile non-state actors—namely, the cartels—or is "in such imminent Danger as will not admit of delay."

As a result, Texas is empowered to take all necessary steps to repel the cartel invasion at our southern border by "engag[ing] in War." As Justice Holmes has explained, the greater power includes the lesser. *See Moyer*, 212 U.S. at 84–85. Accordingly, those measured steps include the Operation Lone Star deployment of Guardsmen from the Texas Military Department and Troopers from the Texas Department of Public Safety, who have enforced Texas's criminal laws against trespassing, human smuggling, drug trafficking, and the like; the deployment of border-barrier infrastructure such as concertina-wire fencing, border wall, and floating buoys barriers in

---

[44]     Press Release, *Governor Abbott Designates Mexican Cartels As Terrorist Organizations*, Office of the Texas Governor (Sept. 21, 2022), https://gov.texas.gov/news/post/governor-abbott-designates-mexican-cartels-as-terrorist-organizations; Victor Nava, *Armed Men Believed to be Mexican Cartel Members Wearing Body Armor Spotted Crossing Southern Border into Texas*, New York Post (August 8, 2023), https://nypost.com/2023/08/08/armed-men-in-body-armor-spotted-crossing-southern-border/.

the Rio Grande; and now the enactment and implementation, beginning on March 5, 2024, of SB4's state-law prohibitions against illegal entry and reentry. Under Article I, Section 10, Clause 3, Texas does not need "the Consent of Congress" to do any of these things in accordance with law. Natelson & Hyman, *supra*, at 8.

Nor is SB4 "subject to the Revision and Controul of the Congress." U.S. Const. art. I, § 10, cl. 2. Of course, that intratextual distinction hardly matters in this case, because Plaintiffs can point to no provision of the INA expressly preempting anything in SB4. That is why they must rely so heavily on the Supreme Court's implied-preemption holdings in *Arizona*, 567 U.S. at 400–10. But that case is not controlling here. The State of Arizona did not invoke, and thus the Supreme Court did not pass upon, the self-defense power that is expressly reserved to the sovereign States in Article I, Section 10, Clause 3.

This Court should decline Plaintiffs' invitation to conduct a "freewheeling judicial inquiry into whether [SB4] is in tension with federal objectives." *Kansas*, 140 S. Ct. at 801 (quoting *Whiting*, 563 U.S. at 599). There is no "brooding federal interest" or "judicial policy preference" to be found in this case that could overtake Article I, Section 10, Clause 3. *Id.* (quoting *Virginia Uranium*, 139 S. Ct. at 1901). Instead, this Court should construe the INA narrowly, so as to avoid the constitutional questions presented by its interaction with Texas's constitutional authority to repel invasions. *See United States v. Hansen*, 143 S. Ct. 1932, 1946 & n.3 (2023) (applying constitutional avoidance in immigration context). "Under the doctrine of constitutional avoidance, '[w]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.'" *Hersh v. U.S. ex rel. Mukasey*, 553 F.3d 743, 753–54 (5th Cir. 2008) (quoting *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568 (1988)). Here, Texas has adopted SB4 to prevent cartels from trafficking an unprecedented number of aliens, an unknown number of terrorists, and deadly drugs like fentanyl into the State. To prevent a collision between federal immigration laws and Texas's right to protect itself under Article I, Section 10, Clause 3, the Court should hold that the INA does

not impliedly preempt the new state-law crimes enacted in SB4.

Further, the failure of Plaintiffs to demonstrate that "no set of circumstances exists under which [SB4] would be valid," *Salerno*, 481 U.S. at 745,—*i.e.*, they have not overcome a "possible set" of "conditions not in conflict with federal law," *Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 593 (1987)—dooms their facial challenge. Because this is a necessarily such a challenge— as there have yet to be any actual applications of SB4—the Court need not decide all the contours of the self-defense powers of the States, or the full scope of the term "invasion." Whatever circumstances may be on the outer edge of that latter category sufficient to invoke a State's self-defensive war powers, they at least include violent, armed, organized groups of people unlawfully intruding into a State's territory. As at least some applications of SB4 will apply to members of such groups, those would clearly fall within the State's reserved defensive war powers and could not be preempted by any federal statutory law. The facial challenges here therefore must be rejected and the preliminary-injunction motions denied.

### E. The Foreign Commerce Clause does not prohibit States from proscribing illicit cross-border traffic of goods and people.

The United States contends that SB4 also violates the Constitution by encroaching on the United States' power to regulate foreign commerce. Yet the United States offers no explanation how a state law that prohibits illegal entry will impact international commerce. Instead, its argument presumes that illegal immigration is *itself* international commerce. Worse yet, the United States presents its challenge in the language of dormant Commerce Clause jurisprudence to argue that SB4 discriminates against foreign commerce by restricting entry into Texas. US PI Mot. at 37–40.

To begin, States have considerable authority to enact laws that affect interstate or international commerce. As the Supreme Court has explained, "a State may exclude from its territory, or prohibit the sale therein of any articles which, in its judgment, fairly exercised, are prejudicial to" its citizens. *Guy v. Baltimore*, 100 U.S. 434, 443 (1880). If illegal immigration can be said to have a "substantial effect" on interstate or foreign commerce, it may be an appropriate

object for the federal government's Commerce Clause power. But that does not mean States may not concurrently regulate it under their general police powers: "Although the commerce clause conferred on the national government power to regulate commerce, its possession of the power does not exclude all state power of regulation." *S. Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 766 (1945). Nothing prevents States from enacting laws that touch on foreign commerce. *Id.*; *see also Michelin Tire Corp. v. Wages*, 423 U.S. 276, 286 (1976) (stating that nondiscriminatory tax, when applied to imported goods, does not impact federal government's regulation of foreign commerce).

The United States also argues that SB4's entry and reentry provisions violate the dormant aspect of the Foreign Commerce Clause. The Constitution permits States to regulate commerce when it takes place inside their territory, so long as they do not discriminate against out-of-state economic interests. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368–70 (2023); *cf. Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 749 (5th Cir. 2006). The United States claims that SB4 implicitly discriminates between citizen and non-citizen entrants, as it prohibits only the latter's entry between ports. US PI Mot. at 39. This theory, however, treats illegal entry as a commercial transaction and alien entrants as articles of international commerce.

The United States' theory hearkens back to a long-disregarded line of precedent. During part of the nineteenth century, the Foreign Commerce Clause was understood to permit the federal government to control at least some aspects of immigration. *See, e.g., Chy Lung v. Freeman*, 92 U.S. (2 Otto) 275, 280 (1875). Significantly, during this period the Supreme Court did not develop a consistent position on whether state regulations of entry through their ports violated the Foreign Commerce Clause. *Compare Henderson v. Mayor of City of New York*, 92 U.S. (2 Otto) 259, 273–74 (1875) (holding state requirement that shipowners pay a per-passenger tax on foreign nationals violates Foreign Commerce Clause), *with Mayor of New York v. Miln*, 36 U.S. (11 Pet.) 102, 113 (1837) (upholding state regulation on entry as valid exercise of state police power and finding it would be valid concurrent regulation if it implicated foreign commerce).

The link between the Foreign Commerce Clause and the immigration power—always

tenuous—did not last. *See* Jennifer Gordon, *Immigration as Commerce: A New Look at the Federal Immigration Power and the Constitution*, 93 Ind. L.J. 653, 671 (2018) ("It has been well over a century since the Supreme Court last held that the federal immigration power was rooted in the Foreign Commerce Clause."). The *Chinese Exclusion Case* began a trend of regarding Congress's power to regulate immigration as an inherent aspect of federal sovereignty. *Id.* at 676; *see generally Chae Chan Ping v. United States*, 130 U.S. 581, 609 (1889) (holding that "[t]he power of exclusion of foreigners [is] an incident of sovereignty belonging to the government of the United States as a part of those sovereign powers delegated by the constitution," and not addressing the Foreign Commerce Clause as a source of Congress's immigration power). Deepening the trend, modern cases source the United States' authority in immigration matters to "its inherent sovereign power to control and conduct foreign relations." *Arizona*, 567 U.S. at 387; *Mathews v. Diaz*, 426 U.S. 67, 81 (1976); *Hines*, 312 U.S. at77 (declining to follow *Henderson* in finding that "[t]he registration of aliens resident in a state is not a regulation of interstate or foreign commerce or of the entry or deportation of aliens").

Contemporary courts have largely declined invitations by various federal litigants to find state laws affecting immigrants violative of the Foreign Commerce Clause. *See, e.g., Equal Access Educ. v. Merten*, 305 F. Supp. 2d 585, 608–11 (E.D. Va. 2004) (rejecting argument that state policy denying public university admission to illegal aliens imposes an undue burden on foreign commerce). There is no reason for this Court to break with recent caselaw and follow the United States through the looking glass into a bygone era of jurisprudence. Indeed, the United States provides no reasons for this Court to revive a defunct understanding of the Foreign Commerce Clause that imagines aliens themselves as foreign commodities and entry as foreign trade.

SB4 does not discriminate against foreign commerce, because it has no impact on foreign economic interests. The dormant Commerce Clause does not prohibit discrimination against out-of-state persons or entities across the board but against "out-of-state economic interests." *Pork Producers*, 598 U.S. at 369. The purpose of the dormant Commerce Clause is to "prevent[] the States from adopting protectionist measures and thus preserve[] a national market for goods and

services." *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019) (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988)); *see also Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 578 (1997) (stating that "economic isolationism" is "the very evil that the dormant Commerce Clause was designed to prevent"). To be sure, if SB4 targeted foreign transportation companies, it would intrude into familiar dormant Commerce Clause territory. *See, e.g., id.* at 577–79. However, stretching the dormant Commerce Clause to cover discrimination against migrants who enter between ports of entry would imbue it with a novel purpose.

The United States points out that SB4 could affect foreign relations with Mexico and other countries, albeit without explaining how these concerns are related to the Foreign Commerce Clause. US PI Mot. at 39–40. Precedent has acknowledged that certain areas of international and interstate commerce benefit from uniform legislation. *See, e.g., Japan Line v. Los Angeles*, 441 U.S. 434, 446–49 (1979) (concluding that taxation of foreign entities requires uniformity to prevent multiple taxation). However, the concern of this caselaw is with commercial relations, not with international relationships generally. *See id.* at 448 (endorsing need for "the Federal Government [of] speaking with one voice *when regulating commercial relations* with foreign governments" (emphasis added)); *Wardair Canada, Inc. v. Fla. Dep't of Revenue*, 477 U.S. 1, 8 (1986) (noting that "[i]n the *unique context of foreign commerce*, we have alluded to the special need for federal uniformity" (emphasis added)). Furthermore, because SB4 complements federal statutes, it does not disturb the uniformity of federal immigration law. Finally, the potential diplomatic repercussions of an otherwise valid state law do not furnish an independent legal argument. *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 441–42 (2003) (Ginsburg, J., dissenting) (agreeing with the majority that firm international agreements can preempt state law but cautioning that this does not extend to federal statements of foreign policy needs); *Barclays Bank, PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298, 324–29 (1994) (finding foreign-government protests against California tax irrelevant to dormant Foreign Commerce Clause analysis). The United States' relationship with Mexico may or may not be strained due to SB4, but federal courts have refused to restrain far more

severe exercises of state power despite their ramifications for foreign affairs. *See Medellin v. Texas*, 552 U.S. 491, 496–98 (2008) (refusing to stay Texas's execution of Mexican national despite protest by Government of Mexico and the President's foreign affairs authority).

### F. All Plaintiffs face justiciability problems that bar this Court from awarding relief.

#### 1. The Supremacy Clause furnishes no cause of action.

To have any likelihood of success, Plaintiffs must show that they have a cause of action— that "a legislatively conferred cause of action encompasses [that] particular plaintiff's claim." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014). In other words, courts "ask[ ] whether this particular class of persons ha[s] a right to sue under this substantive [federal] statute." *Id.* (cleaned up); *see also Davis v. Passman*, 442 U.S. 228, 239 n.18 (1979) ("*[C]ause of action* is a question of whether a particular plaintiff is a member of the class of litigants that may, as a matter of law, appropriately invoke the power of the court"); David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41, 42 ("No one can sue … unless authorized by law to do so").

#### a. The United States has no cause of action.

"The federal government, of course may sue a state in federal court under any valid cause of action," but it "must first have a cause of action against the state," just "like any other plaintiff." *United States v. California*, 655 F.2d 914, 918 (9th Cir. 1980). The federal government's sovereign status does not alter this. "When the state as plaintiff invokes the aid of a court of equity, it is not exempt from the rules applicable to ordinary suitors." John Norton Pomeroy, Jr., *A Treatise on Equitable Remedies* 586 § 330 (1905). "[I]t must establish a case of equitable cognizance, and a right to the particular relief demanded." *Id.* Thus, a court cannot award relief unless it is convinced "that a cause of action cognizable in equity is alleged and proved," even when one sovereign sues another. *Texas v. Florida*, 306 U.S. 398, 411 (1939). For this reason, the United States must establish "a right of action given by some statute" or "a common-law right of action." *Denver & R.G.R. Co. v. United States*, 241 F. 614, 616 (8th Cir. 1917) (rejecting a claim by the federal government).

The United States has not identified any cause of action that could support this suit. It seeks an injunction, but "an injunction is not a cause of action." *Novedea Sys., Inc. v. Colaberry, Inc.*, No. 6:20-cv-180, 2020 WL 9211073, at *2 (E.D. Tex. Dec. 11, 2020); *see also Jones v. Wells Fargo Bank, N.A.*, No. 5-14-cv-943, 2015 WL 12734177, at *4 (W.D. Tex. Jan. 21, 2015). "[T]he Supremacy Clause is not the source of any federal rights" and "certainly does not create a cause of action," either expressly or by implication, and it "is silent regarding who may enforce federal laws in court, and in what circumstances they may do so." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–25 (2015) (cleaned up) (holding there is no private cause of action to enforce the Supremacy Clause). Instead, the Supremacy Clause "creates a rule of decision." *Id.* at 324. When the Supreme Court has allowed suits "to enjoin unconstitutional actions by state and federal officers," those cases have not been brought under the Supremacy Clause. *Id.* at 327. The United States is not singularly exempt from this rule. No precedent "hold[s] that considerations of federal supremacy can create a cause of action where none exists under state law or otherwise." *United States v. Hartford Acc. & Indem. Co.*, 460 F.2d 17, 19 (9th Cir. 1972) (affirming judgment against the federal government).

Rather, "private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Plaintiffs fail to identify a statute that contains any "'rights-creating' language" permitting their suits. *Id.* at 288. They therefore have no cause of action to enforce the supremacy of federal law.

The fact that the United States "has brought many lawsuits under the Supremacy Clause … without any questioning of [it] as the basis for a federal cause of action," *United States v. Texas*, 557 F. Supp. 3d 810, 820 (W.D. Tex. 2021), does not support this Court finding a cause of action on that basis. Cases where other courts did not address whether there was a cause of action—an argument that is subject to waiver or forfeiture, *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998)—are not precedent on this. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Gann v. United States*, 142 S. Ct. 1, 2 (2021) (quoting *Webster*

*v. Fall*, 266 U.S. 507, 511 (1925)).

Nor is *In re Debs*, 158 U.S. 564 (1895), to the contrary. The Supreme Court there had no occasion to imply a cause of action under the Supremacy Clause because it was considering a petition for habeas corpus, not an appeal from the underlying injunction, but it was the well-known equitable cause of action to abate a public nuisance. "[T]he obstruction of a highway is a public nuisance, and a public nuisance has always been held subject to abatement at the instance of the government." *Id.* at 587 (citation omitted). Since long before *Debs*, it had been "settled, that a court of equity may take jurisdiction in cases of public nuisance, by an information filed by the attorney general." *City of Georgetown v. Alexandria Canal Co.*, 37 U.S. (12 Pet.) 91, 98 (1838). "The crux of the *Debs* decision" was "that the Government may invoke judicial power to abate what is in effect a nuisance detrimental to the public interest." *United Steelworkers of Am. v. United States*, 80 S. Ct. 177, 186 (1959) (Frankfurter, J., concurring).

The cause of action to abate a public nuisance, however, is no help to the United States in this case. Moreover, even if *Debs* had created a cause of action, it would not apply where "there is … no factor of interstate commerce." *United States v. Solomon*, 563 F.2d 1121, 1129 (4th Cir. 1977). "Where … there was no basis on which to claim that interstate commerce was obstructed by a denial of civil rights in violation of some congressional enactment, four courts have held that the government lacks nonstatutory authority to sue." *Id.* at 1128.

*Sanitary District of Chicago v. United States* was, like *Debs,* a suit to enjoin a public nuisance—"to remove obstructions to interstate and foreign commerce." 266 U.S. 405, 426 (1925). *Sanitary District* "is not authority for a broad reading of *Debs*" because "the *Debs* elements of commerce and nuisance were both present and in *Sanitary District,* there were both a treaty and a federal statute defining the interests to be protected." *Solomon,* 563 F.2d at 1127. *Sanitary District* also involved an express statutory cause of action regarding obstructions of navigable waterways. 266 U.S. at 428.

*Wyandotte Transportation Co. v. United States*, 389 U.S. 191 (1967), is also inapposite. That case was about implied causes of action found in statutes. Because the United States does not claim

a statutory cause of action here, *Wyandotte* is irrelevant. In any event, "the unrefined analysis employed in *Wyandotte* is no longer an accurate statement of the law." *United States v. City of Philadelphia*, 644 F.2d 187, 192 (3d Cir. 1980). "In the mid-20th century, the Court followed a different approach to recognizing implied causes of action than it follows now." *Ziglar v. Abbasi*, 582 U.S. 120, 131 (2017); *Alexander*, 532 U.S. at 287.

Nor can the United States rely on *United States v. City of Jackson*, 318 F.2d 1 (5th Cir. 1963). In the opinions on rehearing, two members of the original three-judge panel partially withdrew their concurrences. *See* 320 F.2d 870 (5th Cir. 1963). Depriving the original opinion of a majority, those two judges specified that the federal government had "ample statutory authorization for the maintenance of th[e] suit" and therefore did "not reach the question whether the United States would have standing to sue under the Commerce Clause of the Constitution absent all of these enactments of the Congress." *Id.* at 872–73 (Bootle, J., specially concurring); *accord. id.* at 873 (Ainsworth, J., specially concurring). *Jackson*, then, depended on "statutory authorization" to sue, *id.* at 872 (Bootle, J., specially concurring), not any extra-statutory cause of action. In any event, the reasoning in the original majority opinion is not persuasive and has been "much criticized." *United States v. Mattson*, 600 F.2d 1295, 1298 (9th Cir. 1979).

This dooms *both* the United States's preemption claim *and* its claim under the Foreign Commerce Clause, but it is not based on any "affirmative enactment[] of Congress"—it is based on the dormant aspect of that Clause, which by definition involves no congressional exercise of that power. *In re Debs* and its progeny do not support a cause of action here for the United States.

If Plaintiffs mean to rely on *Ex parte Young*, 209 U.S. 123 (1908), for their cause of action, they must abide by that action's limitations. Thus, even when "no one … is arguing about sovereign immunity,"—as with the United States' claims—"the *second* of *Ex parte Young*'s holdings" is relevant to "whether [a plaintiff] has an equitable cause of action against" the named Defendants here. *Freedom From Religion Found., Inc. v. Mack*, 4 F.4th 306, 311 n.3 (5th Cir. 2021).

Notably, the federal government cannot rely on the equitable cause of action provided by *Ex parte Young. First*, that cause of action may not be brought by governments—it is limited to

private parties. *See Whole Women's Health v. Jackson*, 142 S. Ct. 522, 532 (2021) (describing the doctrine as "a narrow exception … that allows certain private parties to seek judicial orders in federal court preventing state executive officials from enforcing state laws" against them); *Armstrong*, 575 U.S. at 326–327 (similar). Expanding this traditional equitable remedy to use by the United States would violate *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), which prohibits courts from invoking "equity" to create remedies and causes of action that did not exist when the original Judiciary Act was enacted in 1789. *See id.* at 318. Courts may not extend traditional causes of action even to closely related situations. *See id.* at 319 (refusing to recognize an equitable remedy that would allow pre-judgment creditors to restrain a debtor's assets, because this relief was traditionally available *only* to "creditor[s] who had already obtained a judgment establishing the debt").

The unifying theme of the Supreme Court's cause-of-action precedent is that judicially recognized causes of action may not undermine the more limited remedial schemes that Congress has established. *See Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 499–501 (5th Cir. 2020) (Oldham, J., concurring); *see also Hernandez v. Mesa*, 140 S. Ct. 735, 747 (2020). When identifying implied statutory causes of action, for example, "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Sandoval*, 532 U.S. at 290. Similarly, "when alternative methods of relief are available, a *Bivens* remedy usually is not," especially if the absence of an express cause of action "might be more than 'inadvertent.'" *Abbasi*, 582 U.S. at 143. And "where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young*." *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 74 (1996). Even when interpreting an express cause of action like Section 1983, the Supreme Court is careful to ensure that the cause of action is not so broad that it would allow a plaintiff to "evade" a "requirement" of a more limited habeas remedy. *Preiser v. Rodriguez*, 411 U.S. 475, 489–90 (1973).

Section 1983, for example, creates a private cause of action for private individuals to sue

local governments as well as local and state officials to vindicate almost all federal-law rights. *See* 42 U.S.C. § 1983; *see Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989). But Congress has not provided a similarly broad *civil* cause of action *for* the United States or *against* a State.

**b. The Organizational Plaintiffs have no cause of action.**

The Organizational Plaintiffs also fail to point to any authorization of a private cause of action for any of their claims. As noted above, "the Supremacy Clause is not the source of any federal rights" and "certainly does not create a cause of action" either expressly or by implication, and "is silent regarding who may enforce federal laws in court, and in what circumstances they may do so." *Armstrong,* 575 U.S. at 324–25 (cleaned up) (holding there is no private cause of action to enforce the Supremacy Clause). Rather, "private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Organizational Plaintiffs fail to identify a statute that contains any "'rights-creating' language" permitting their suit. *Id.* at 288. They therefore have no cause of action to enforce the supremacy of federal law.

*Ex parte Young* cannot help the Organizational Plaintiffs here. Although equity sometimes provides a cause of action that "enable[s] potential legal defendants to assert their defenses preemptively," John Harrison, *Ex Parte Young*, 60 Stan. L. Rev. 989, 999 (2008), the Organizational Plaintiffs do not and cannot invoke that proposition here. *Ex parte Young* involved that "staple of equity," the bill to restrain proceedings at law which permitted potential defendants to obtain an anti-suit injunction by preemptively asserting a defense as plaintiffs. *Id.* at 997. That was "the preemptive assertion in equity of a defense that would otherwise have been available in the State's enforcement proceedings at law." *Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 132 S. Ct. 1204, 1213 (2012) (Roberts, C.J., dissenting, joined by Scalia, Thomas, and Alito, JJ.); *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 262 (2011) (Kennedy, J., concurring, joined by Thomas, J.). However, plaintiffs can invoke *Young* only when the state officers responsible for enforcing the challenged statute "threaten and are about to commence proceedings" against them. *Young*, 209 U.S. 123, 155–56.

The Organizational Plaintiffs do not allege they are potential defendants to an enforcement action based on SB4. Nor have they asserted a defense by suing a defendant who may potentially enforce the law against them. In fact, Organizational Plaintiffs have not identified any way in which Director McCraw or District Attorney Hicks could theoretically enforce SB4 against them.

Organizational Plaintiffs therefore lack even an *Ex parte Young* cause of action against any of the Defendants, and they necessarily cannot prevail on the merits.

### 2. Organizational Plaintiffs lack standing.

The Organizational Plaintiffs' claims against Director McCraw and District Attorney Hicks are jurisdictionally barred. *See, e.g.*, *Speech First, Inc. v. Fenves*, 979 F.3d 319, 329 (5th Cir. 2020) ("A preliminary injunction, like final relief, cannot be requested by a plaintiff who lacks standing to sue."); *Moore v. La. Bd. of Elementary & Secondary Educ.*, 743 F.3d 959, 964 (5th Cir. 2014) (reversing grant of preliminary injunction when the State defendants were immune and *Ex parte Young* did not apply).

None of the Organizational Plaintiffs has made a clear showing that they have the standing necessary to maintain a preliminary injunction. "[S]tanding is perhaps the most important of the jurisdictional doctrines." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (quotation omitted). Courts persistently inquire into standing because "[w]ithout jurisdiction the court cannot proceed at all in any cause*." Steel Co.,* 523 U.S. at 94 (cleaned up). "Each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof"—"with the manner and degree of evidence required at the successive stages of the litigation" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). At the preliminary-injunction stage, plaintiffs must make a "clear showing" that they have standing. *Barber v. Bryant,* 860 F.3d 345, 352 (5th Cir. 2017).

Nonprofit Plaintiffs do not describe themselves as having members; they therefore rely

exclusively on organizational standing, not associational standing.[45] *See NAACP v. City of Kyle*, 626 F.3d 233, 237–38 (5th Cir. 2010). This means that the Nonprofit Plaintiffs must themselves satisfy the three elements of Article III standing: (1) an actual or imminent, concrete and particularized "injury-in-fact"; (2) that is fairly traceable to the challenged action of the defendant; and (3) that is likely to be redressed by a favorable decision. *El Paso County v. Trump,* 982 F.3d 332, 337 (5th Cir. 2020). Where, as here, plaintiffs seek prospective relief, they "can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury." *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019).

Because this is a facial pre-enforcement challenge, the Organizational Plaintiffs must show an imminent judicially cognizable injury through the test described in *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014). That means they must show an "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [law], and there exists a credible threat of prosecution thereunder." *Id*. at 158–59 (quotation omitted).

In their sole claim, the Nonprofit Plaintiffs allege that SB4 "violates the Supremacy Clause." OP PI Mot. at 25. But—as explained above regarding the cause-of-action requirement— "the Supremacy Clause is not the source of any federal rights." *Armstrong*, 575 U.S. at 324 (internal quotation marks and citations omitted) (citing *Golden State Corp.*, 493 U.S. at 107); *see also Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Par. Gov't*, 849 F.3d 615, 626 (5th Cir. 2017). Rather, it "creates a rule of decision." *Armstrong*, 575 U.S. at 324. As the Supreme Court has explained, the Supremacy Clause instructs courts to "not give effect to state laws that conflict with federal laws."

---

[45] To be sure, both Nonprofit Plaintiffs—Las Americas and American Gateways— claim to work on behalf of various communities, *see, e.g.*, Babaie Decl. ¶ 10; Yang Decl. ¶¶ 3, 4, 25, but the beneficiaries of a plaintiff's services do not qualify as members for purposes of associational standing. *See Ne. Ohio Coal. for Homeless v. Blackwell*, 467 F.3d 999, 1010 n.4 (6th Cir. 2006). A plaintiff cannot have associational standing unless one of its members independently satisfies the Article III standing requirements. *Ctr. for Biological Diversity v. United States Envtl. Prot. Agency*, 937 F.3d 533, 536 (5th Cir. 2019). It goes without saying that an organization that lacks members is unable to satisfy this threshold requirement.

*Id.* In other words, the Supremacy Clause does not create a right to preemption a litigant can preemptively assert; instead, it "instructs courts what to do when state and federal law clash." *Id.* at 325–26. Accordingly, preemption is not a "right[] secured by the Constitution or laws of the United States." *Id.* at 324.

Because the Supremacy Clause is not the source of any rights, none of the consequences the Nonprofit Plaintiffs seek to avoid are affected with a constitutional interest or constitute an injury in fact. *See United States v. Texas*, No. EP-21-cv-173, 2022 WL 868717, *5 (W.D. Tex. Feb. 17, 2022) (Cardone, J.) (finding immigration groups lacked standing on this basis when challenging Texas immigration policy under Supremacy Clause).

Further, because the Nonprofit Plaintiffs' intended conduct is not itself "arguably proscribed by [the law] they wish to challenge" they lack standing in this pre-enforcement challenge. *Susan B. Anthony List*, 573 U.S. at 162. In *Susan B. Anthony List*, non-profit groups that intended to make statements about candidates' voting records challenged an Ohio statute that prohibited making "false statements concerning the voting record of a candidate." *Id.* at 152–53. The Supreme Court found that the groups' intended conduct was "arguably proscribed" because the law "swe[pt] broadly" and "cover[ed] the subject matter of [the nonprofits'] intended speech. *Id.* at 162. But the Nonprofit Plaintiffs' conduct is not subject to enforcement by any provision of SB4, which only applies to illegal aliens, not organizations. None of the conduct in which they intend to engage is "arguably proscribed" by any provision of SB4 and is therefore not traceable to Defendants' enforcement of that statute. For the same reason, relief from this Court enjoining enforcement of SB4 will not redress the Nonprofit Plaintiffs' injuries.

This also means Nonprofit Plaintiffs fail to satisfy the requirement that they face "a credible threat of prosecution." *Id.* at 158–59. They must show a threat of "prosecution [under SB4] if *plaintiffs* engage[] in their intended course of conduct." *Seals v. McBee*, 898 F.3d 587, 592 (5th Cir. 2018) (emphasis added). As SB4 may only be used to prosecute natural persons—illegal aliens—Nonprofit Plaintiffs cannot show this necessary element of standing in a pre-enforcement case.

Las Americas Immigrant Advocacy Center ("Las Americas") and American Gateways describe themselves as non-profit organizations dedicated to providing legal services to aliens. Neither has established that SB4 inflicts a cognizable harm on them sufficient to confer standing. To start with, Nonprofit Plaintiffs are not "the object of the government action or inaction [they] challenge[]," making it "substantially more difficult to establish" an injury in-fact. *Lujan*, 504 U.S. at 562 (quotation omitted). Instead, Plaintiffs argue that SB4's effects on third parties not before this court will force Las Americas and American Gateways to divert resources from their routine activities.

Though the diversion of resources can constitute a requisite injury under certain circumstances, "[n]ot every diversion of resources to counteract [a] defendant's conduct … establishes an injury in fact." *City of Kyle*, 626 F.3d at 238. "The change in plans must still be in response to a reasonably certain injury imposed by the challenged law." *Zimmerman v. City of Austin*, 881 F.3d 378, 390 (5th Cir. 2018). Here, Plaintiffs bring their claim pursuant to the Supremacy Clause, which is not the source of any rights. *See* OP PI Mot. at 25. Hence, none of the consequences Nonprofit Plaintiffs seek to avoid are affected with a constitutional interest or constitute an injury in-fact.

Moreover, Nonprofit Plaintiffs' diversion of resource theory fails as it stems from voluntary strategic and budgetary choices. *See Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012). For example, Nonprofit Plaintiffs argue that they will need to develop a new service program to assist people in state facilities, which could siphon funds from other projects. OP PI Mot. at 24–25; *see also* Babaie Decl. ¶¶ 30, 39; Yang Decl. ¶ 22. However, nothing in SB4 necessitates that Organizational Plaintiffs take this action. They can continue to maintain their current programs without interference. Their real objection is that after the effective date of SB4, some number of individuals, not yet known, may find themselves in a state court proceeding that the two organizations deem weighty enough to provide advice and representation. Many statutes can spur changes to an organization's strategy on how to best achieve its mission. But a "unilateral and uncompelled response to shifting needs of its [constituents] cannot manufacture an Article III

injury." *CASA de Maryland, Inc. v. Trump*, 971 F.3d 220, 238 (4th Cir. 2020), *vacated on other grounds*, 981 F.3d 311 (4th Cir. 2020). The Nonprofit Plaintiffs make no allegation that they currently serve all aliens detained by federal authorities, which would be implausible.  Even with SB4, they will have plenty of aliens detained by federal authorities to provide their services to— any expansion to also serve aliens detained by the State of Texas (which already occurs through Operation Lone Star criminal trespass prosecutions, as well as myriad other criminal laws applied to aliens) would be the Nonprofit Plaintiffs' voluntary choices.

Nonprofit Plaintiffs further argue that Las Americas and American Gateways both need to educate staff as well as members of the immigrant community about the new law. But the "self-serving observation that it has expended resources to educate its members and others regarding [the challenged law] does not present an injury in fact." *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995). If standing were so broad, legal groups would have standing whenever a statute changed the law in their practice area. "To determine that an organization that decides to spend its money on educating members … suffers a cognizable injury would be to imply standing for organizations with merely 'abstract concern[s] with a subject that could be affected by an adjudication.'" *Lane*, 703 F.3d at 675 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976)).

It is also not clear "how the activities" Las Americas and American Gateways plan to "undertake[] in response to the defendant's conduct differ from its 'routine [] activities.'" *Def. Distributed v. U.S. Dep't of State*, No. 1:15-cv-372, 2018 WL 3614221, at *4 (W.D. Tex. July 27, 2018) (quoting *City of Kyle*, 626 F.3d at 238). Las Americas and American Gateways already offer aliens help navigating the immigration process. *See, e.g.*, Babaie Decl. ¶¶ 17–18; Yang Decl. ¶¶ 12–15. The services they intend to offer aliens detained pursuant to SB4 represent more of the same, even if it occurs in a state, as opposed to federal, facility. Furthermore, Nonprofit Plaintiffs affirm that "a central feature of their mission is to engage and educate immigrant communities." Yang Decl. ¶ 16. Informing their constituents about their rights under the law is part and parcel of the routine activities of both Las Americas and American Gateways.

Nonprofit Plaintiffs next argue that SB4 frustrates their respective missions by "creating major, new impediments to the ability of individuals to seek asylum in the United States." Babaie Decl. ¶ 25. Specifically, they allege that SB4 will prevent aliens in state custody from beginning or completing asylum applications. *Id.* ¶¶ 25, 32–33; Yang Decl. ¶¶ 19–22. There are two flaws with this assertion.

*First*, Nonprofit Plaintiffs cannot obtain standing by expressing concern that a third party not before this court may be harmed by the challenged law. Las Americas and American Gateways are not membership organizations, and even if they were, neither has identified a specific member who has met the elements of Article III standing. *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). Nor can Nonprofit Plaintiffs establish some alternative to membership that would allow them to litigate a third-party's alleged injury. The individuals who will be detained pursuant to SB4 are yet unknown. Nonprofit Plaintiffs therefore cannot claim a close relationship with an alien for whom SB4 poses a "certainly impending" risk of interfering with his ability to pursue asylum. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Absent this connection, Nonprofit Plaintiffs merely have a "generalized and unspecific" preference "no different from that of any American" who shares their views. *Haitian Refugee Center v. Gracey*, 809 F.2d 794, 800 (D.C. Cir 1987) (Bork, J.) (noting that immigration groups lacking standing "do not assert that they have been deprived of an opportunity to meet with a particular alien concerning a particular subject, or, for that matter, that they know, or even know of, any of the interdicted Haitians with whom they wish to associate," but "merely that they have been deprived of an opportunity to associate with some number of a class of unidentified aliens seeking to enter the country.").

*Second*, even assuming the regulation of third parties could confer standing, Nonprofit Plaintiffs' assertions are entirely speculative. SB4 does not become effective until March 5, 2024— and thus no enforcement has yet to occur—and the Texas agencies responsible for implementing SB4 have yet to issue the policies and regulations that would govern the law's enforcement. Nonprofit Plaintiffs therefore do not know how SB4 will operate in practice but instead make unfounded assumptions about the actions state officials will take. Not only does this show that

Nonprofit Plaintiffs' alleged injuries are neither actual nor imminent, *see Clapper*, 568 U.S. at 402, but their description of how the law will operate is incorrect.

Illegal aliens detained pursuant to SB4 will have a full and fair opportunity to seek asylum, just as they would if detained by federal authorities. Texas agencies involved in the implementation of SB4's will fully accommodate the asylum process. Clark Decl. ¶ 12; Escalon Decl. ¶¶ 8, 11-13. Aliens in state custody will be allowed to speak with federal immigration officers on request as well as with counsel. Clark Decl. ¶ 9-11. They will be able to file an asylum application with the United States. *Id.* at ¶ 10, 12. And in the event an individual in state detention needs to attend a hearing or interview as part of the asylum process, state officers will either host the proceeding in the state facility or provide transportation to the appropriate location. *Id.* at ¶ 11.

The final injury Nonprofit Plaintiffs allege is that SB4 will frustrate their work representing victims of human trafficking and other violent crimes by instilling fear that reporting said crime will result in removal. However, a plaintiff's speculative belief about the reactions of third parties to a challenged law cannot support standing, both because it is based on "conjecture" and because it is "based on third parties' subjective fear" and therefore not traceable to SB4. *Clapper*, 568 U.S. at 417 n.7. Las Americas and American Gateways "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending. *Id.* at 416.

In a diversion of resources case, "[f]rustration of an organization's objectives is the type of abstract concern that does not impart standing." *Nat'l Treasury Emps. Union*, 101 F.3d 1423, 1429 (D.C. Cir. 1996) (quotation omitted). "These are simply setbacks 'to the organization's abstract social interests.'" *Ass'n of Cmty. Organizations for Reform Now v. Fowler*, 178 F.3d 350, 361 n.7 (5th Cir. 1999) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). The challenged action must make the organization's activities more difficult in addition to being at "loggerheads with the stated mission of the plaintiff." *Nat'l Treasury*, 101 F.3d at 1429 (quoting *Nat'l Treasury Emps. Union v. United States*, 929 F. Supp. 484, 489 (D.D.C. 1996)). Nonprofit Plaintiffs do not (and cannot) satisfy this burden since SB4 does not regulate, restrict, or otherwise impede the legal

services they currently provide aliens.

### 3. El Paso County cannot sue its parent State and has alleged no injury.

El Paso County's claim stumbles immediately out of the gate because a political subdivision of a State, as a rule, has no standing to sue the state that created it, and the very limited exception articulated in *Rogers v. Brockette* does not apply here since El Paso County does not have a federal statutory right put at risk by SB4. However, even if its claim were not barred by century-old precedent, El Paso County still fails to meet its Article III burden because the harm it alleges is speculative and pertains to El Paso County's abstract social interests, which do not constitute a cognizable injury in fact.

Precedent firmly establishes that local governments lack standing to sue their parent States. *See, e.g.*, *City of Trenton v. New Jersey*, 262 U.S. 182, 188 (1923); *Town of Ball v. Rapides Par. Police Jury*, 746 F.2d 1049, 1051 n.1 (5th Cir. 1984). In *Rogers v. Brockette*, the Fifth Circuit recognized, at most, a narrow exception for claims under the Supremacy Clause vindicating a federally created statutory right, but El Paso County does not fit within that carve out. 588 F.2d 1057 (5th Cir. 1979). There, a school district "allege[d] that Congress [] made it the proper body to decide" certain questions under the federal breakfast program but that the State had deprived the school district of that federally conferred discretion. *Id.* at 1062. Here, in contrast, there is no claim that Congress "interfere[d] with a state's internal political organization" to create a federal statutory right, which Texas law then undermined. *Id.* at 1070. To the contrary, the heart of Organizational Plaintiffs' argument is that SB4 interferes with the discretion of federal immigration officers—not that of local officials. *See* OP PI Mot. at 19–20.

The other case Organizational Plaintiffs rely on is equally unavailing. In *City of Alpine v. Abbott*, a group of local governments challenged the Texas Open Meetings Act as being violative of the First and Fourteenth Amendments. 730 F. Supp. 2d 630 (W.D. Tex. 2010). Despite ruling against the local governments, Organizational Plaintiffs latch onto an out of context statement by the court, which distinguished constitutional provisions that protect individual rights from those

that protect structural rights, such as the Supremacy Clause. OP PI Mot. at 25–26. Read in context, however, it becomes clear that the *City of Alpine* court merely summarized the holding in *Rogers*: namely, a claim brought by a political subdivision against its parent State to vindicate individual rights is categorically barred, while certain claims brought pursuant to the Supremacy Clause may be permitted so long as Congress conferred some federal statutory right upon the political subdivision. *City of Alpine*, 730 F. Supp. 2d at 632–33. After all, "Congress may interfere with a state's internal political organization in ways that the Constitution itself does not interfere." *Id.* at 632 (quoting *Rogers*, 588 F.2d at 1070).

In the present action, El Paso County seeks relief pursuant to the Supremacy Clause, but Plaintiffs do not allege—and the facts do not establish—that El Paso County has a federally-created statutory right put at risk by SB4. Its claim fails on this ground alone.

Likewise, even if El Paso County had not based its claim on the Supremacy Clause, it still would not have standing because SB4 does not inflict a cognizable injury in fact on it. Like Nonprofit Plaintiffs, El Paso County is not "the object of the government action or inaction [it] challenges," making it "substantially more difficult to establish" an injury in fact. *Lujan*, 504 U.S. at 562 (quotation omitted). Instead, it argues that SB4's effects on third parties not before this court will force El Paso County to expend additional funds, which could result in a diversion of resources or a tax increase. OP PI Mot. at 25–26. This argument fails. Not only are the consequences El Paso County seeks to avoid not affected with a constitutional interest, *see supra* Part I.F.2, but its argument turns on speculation and contradicts evidence that SB4 will deter illegal migration into Texas, thereby reducing the financial burden borne by Texas counties, including El Paso.

Indeed, El Paso County bases its diversion of resource theory on the assumption that "there *may be* over 8,000 additional arrests under S.B.4 in the El Paso area," Carrillo Decl. ¶ 11 (emphasis added), but this number is sheer guesswork. El Paso County extrapolated it from an estimate the Director of the Texas Department of Public Safety gave the House State Affairs Committee before the legislation was ever finalized and enacted. *Id.* ¶¶ 10–11. Also, El Paso County simply assumes that the financial responsibility for each arrestee will land on its shoulders, *Id.*

¶¶ 11–14, whereas in practice the State may make alternative arrangements or provide additional funds[46] and infrastructure to defray the costs. Many arrestees may also choose to voluntarily leave Texas or be transferred into federal custody.

The fact is that SB4 does not become effective until March 5, 2024, and the Texas agencies responsible for implementing SB4 have yet to issue the policies and regulations that would govern the law's enforcement. El Paso County—like the Nonprofit Plaintiffs—therefore does not know how SB4 will operate in practice but instead engages in conjecture, which is insufficient for standing since an injury in-fact must be "certainly impeding." *Clapper*, 568 U.S. at 409. What's more, evidence indicates that the criminal penalties introduced by SB4 will prompt noncitizens "to enter the United States through Arizona, New Mexico, and California" or even be deterred from entering the country at all. Hott Decl. ¶ 20; BeMiller Decl. ¶ 6. This is likely to lead to overall *fewer* aliens in El Paso County jails. And a reduction in the number of Texas crossings will alleviate the burden of all social services that weighs on Texas border towns and counties, such as El Paso County, *see*, *e.g.*, Gutierrez Decl. ¶ 11, which would result in financial savings.

El Paso County next contends that SB4 will cause it to lose "about $20 million in federal funds since El Paso County jails would no longer have the space to house federal prisoners." Carrillo Decl. ¶ 13. However, this is even more attenuated than the preceding allegations as it is premised on "numerous predicted effects" of the challenged law, any one of which may or may not occur. *Bruni v. Hughs*, 468 F. Supp. 3d 817, 823 (S.D. Tex. 2020). Although an injury that stems from a chain of events does not always foreclose standing, courts may "reject as overly speculative those links which are predictions of future events." *Id.* (quoting *Arpaio v. Obama,* 797 F.3d 11, 21 (D.C. Cir. 2015)). In this case, Plaintiffs fashioned each link out of speculation and

---

[46] Texas in fact has expanded its Operation Lone Star Grant Program to help local governments, among other things, "increase capacity for detention operations" as well as "increase capacity and expediency in case preparation, magistration, pre/post-adjudication proceedings, and criminal trials" of border and immigration related defendants. *See* https://egrants.gov.texas.gov/fundingopp/operation-lone-star-grant-program-ols-fy2025.

conjecture; the chain of events is too remote to sustain standing.

The remaining alleged injuries El Paso County identifies fare no better. El Paso County clams that uncertainty over the law "*may* create mass walkouts from the [Migrant Support Services] Center, leading to homelessness, street sleeping, public loitering, and [] public safety concerns." Gutierrez Decl. ¶ 14. But, again, the assertion relies on a speculative chain of events too attenuated to support a cognizable injury. The "subjective fear" of third parties "does not give rise to standing." *Clapper*, 568 U.S. at 418. Finally, El Paso County contends that SB4 will erode public trust in local government, which "the County has set as a strategic goal." OP PI Mot. at 26; Gutierrez Decl. ¶ 18. However, at most, this constitutes an abstract concern, which is not particularized enough to confer standing. The allegation is also entirely speculative and hinges on the subjective reactions of individuals not before this court. El Paso County's motion for preliminary injunction should be denied.

And for the same reasons that the Nonprofit Plaintiffs fail to satisfy the test for a pre-enforcement challenge, *see supra* at Part I.F.2, El Paso County cannot show that its intended conduct is arguably affected with a constitutional interest, that its intended conduct is "arguably proscribed" by SB4, or that there is a credible threat that it will be prosecuted under it. El Paso County has no standing to challenge SB4.

### 4. The Organizational Plaintiffs' claim is barred by sovereign immunity and not subject to any exception.

Absent a waiver of immunity, sovereign immunity bars suits against States in federal court, regardless of the nature of the remedy sought. *See, e.g.*, *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100–01 (1984); *see also Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974) ("[T]his Court has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State.") (internal citations omitted)). "A suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Michigan Dep't of State Police*, 491 U.S. at 71 (1989). "Suits against state officials in their official capacity [] should be treated as suits against the State." *Hafer*

*v. Melo*, 502 U.S. 21, 25 (1991).

The Organizational Plaintiffs name two Defendants—DPS Director McCraw and District Attorney Hicks. The Department of Public Safety is an agency of the State of Texas. *See* TEX. GOV'T CODE § 411.002 ("The Department of Public Safety of the State of Texas is an agency of the state to enforce the laws protecting the public safety and provide for the prevention and detection of crime."). DPS Director McCraw is sued in his official capacity, and sovereign immunity "extends to state officials who are sued in their official capacities because such a suit is actually one against the state itself." *McKinley v. Abbott*, 643 F.3d 403, 406 (5th Cir. 2011) (holding that the Eleventh Amendment barred a suit against the Texas Attorney General in his official capacity). And Texas district attorneys are agents of the State when sued regarding their prosecutorial enforcement of state laws like SB4. *See Arnone v. Dallas Cnty.*, 29 F.4th 262, 268–69 (5th Cir. 2022); *Esteves v. Brock*, 106 F.3d 674, 678 (5th Cir. 1997); *Booth v. Galveston Cnty.,* 352 F.3d 718, 744–45 (S.D. Tex. 2019).

Organizational Plaintiffs may overcome sovereign immunity only through the "exception" of *Ex parte Young*, 209 U.S. 123 (1908). *See McCarthy ex rel. Travis v. Hawkins,* 381 F.3d 407, 412 (5th Cir. 2004) ("[T]he principle of state-sovereign immunity generally precludes actions against state officers in their official capacities, subject to an established exception: the *Ex parte Young* doctrine.") (citation omitted). The "Article III standing analysis and *Ex parte Young* analysis significantly overlap." *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019) (cleaned up). For the same reasons that no Organizational Plaintiff has standing, they all fail to satisfy the requirements of *Ex parte Young*.

"*Ex parte Young* allows suits for injunctive or declaratory relief against state officials [in their official capacities], provided they have sufficient 'connection' to enforcing" a state action that allegedly violates federal law. *In re Abbott*, 956 F.3d 696, 708 (5th Cir. 2020) (citations omitted), *cert. granted, judgment vacated as moot sub nom, Planned Parenthood Ctr. for Choice v. Abbott*, 141 S. Ct. 1261 (2021). If there is no such connection to enforcement, "the suit is effectively against the state itself and thus barred by the Eleventh Amendment and sovereign immunity." *Id.*

(citations omitted).

To have the requisite connection to enforcement, an official must have more than "the general duty to see that the laws of the state are implemented." *City of Austin*, 943 F.3d at 999–1000 (quoting *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014)). Rather, the official must have "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020) (citation omitted). This means the analysis is "provision-by-provision": the officer must enforce "the particular statutory provision that is the subject of the litigation." *Id.* (citation omitted); *see also Mi Familia Vota v. Abbott*, 977 F.3d 461, 467–68 (5th Cir. 2020). And "'enforcement' means 'compulsion or constraint.'" *Texas All. for Retired Americans v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022) (quoting *City of Austin*, 943 F.3d at 1000). "If the official does not compel or constrain anyone to obey the challenged law, enjoining that official could not stop any ongoing constitutional violation." *Id.* (citing *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 520 (5th Cir. 2017)).

Organizational Plaintiffs do not establish—or even allege—a waiver of sovereign immunity or how they satisfy an exception under *Ex parte Young*. Just as the Organizational Plaintiffs lack standing to challenge SB4, *see supra* at Part I.F.2–3, they fail to show that they are subject to enforcement of that statute by any of the Defendants sufficient to come within the *Ex parte Young* exception. Their preemption claim thus does not raise a defense to any threatened enforcement against them, and thus is not consistent with sovereign immunity. *See Harrison, supra*, at 990 ("Sovereign immunity permits private people to assert defenses against the government, so a suit against an officer that enforces a defense is consistent with sovereign immunity, not an exception to it, and requires no fiction for its justification.").

## II.   Plaintiffs cannot satisfy the remaining factors for injunctive relief.

In a pre-enforcement facial challenge like this one, there has not yet been any harm inflicted on any of the Plaintiffs, making the merits of the preemption challenges the whole ballgame for

whether there is any injury inflicted on them. As Plaintiffs' claims fail on the merits, there can be no injury in this facial challenge.

### A. Allowing Texas to enforce state criminal laws that track federal criminal laws already on the books would not inflict irreparable harm on the Plaintiffs.

Plaintiffs' bids for a preliminary injunction still should be denied at the outset because they cannot satisfy the key temporal prerequisite for such expedited, emergency relief: a "substantial threat of irreparable injury if the injunction is not granted." *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). "An injunction is appropriate only if the anticipated injury is imminent and irreparable." *Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975). Thus, "the asserted irreparable injury must be neither remote nor speculative." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citation omitted). Yet—as explained above—such unsubstantiated speculation about the effects of SB4 is all Plaintiffs offer in their motions.

SB4 merely enables one State to pick up a baton that the federal government has deliberately dropped. It cannot possibly constitute "irreparable harm" to the United States for another sovereign to enforce state laws that are consistent with the laws of the United States. As an alternative, the United States suggests SB4 harms its diplomatic relations with Mexico. US PI Mot. at 12. But States make decisions all the time that may displease neighboring countries. That does not confer upon the federal government a roving authority to superintend every decision of state governments that might offend international partners. *See, e.g.*, *Medellin*, 552 U.S. at 524, 530-32). In any event, Mexico's objections to SB4 are irrelevant, given it is (at best) incapable or (at worst) unwilling to abate an invasion from its own territory. A nominally friendly nation that cannot control invasions into a neighboring sovereign's territory forfeits its immunity from incursion and is subject to being treated as a hostile neighbor under the law of nations. *See* Vattel, Law of Nations Book II, §§ 72, 76-78 (1797) (describing how a nation may "become[] a party in the fault" by "authoris[ing] its citizens indiscriminately … to make inroads into the neighbouring countries").

The Organizational Plaintiffs fare no better. To the extent they rely on the actions of aliens whose conduct could be covered by SB4, they cannot claim irreparable harm based on anticipated

illegal activity. *Cf. O'Shea v. Littleton*, 414 U.S. 488, 496-97 (1974). In any event, even assuming SB4 could be unlawfully applied to a particular alien, that possibility is hardly irreparable. An alien subjected to prosecution under SB4 would be furnished a remedy capable of redressing any harm— namely, "the exorbitant gold standard of American justice—a full-dress criminal trial" in which he could press any argument in his defense. *Lafler v. Cooper*, 566 U.S. 156, 186 (2012) (Scalia, J., dissenting). Nor can the Organizational Plaintiffs avoid that problem by claiming SB4 will "chill" their activities. To the extent the organizational plaintiffs seek to facilitate illegal entries contrary to SB4, it is already a *federal crime* for them to encourage illegal entry under the INA. *See United States v. Hansen*, 599 U.S. 762, 766 (2023).

Texas and its officials, as the Defendants, do not need to show irreparable harm for this Court to deny a preliminary injunction. But if any parties could be irreparably harmed here it is Defendants. As the Chief Judge of this district has already found, the federal government is openly flouting its statutory duties at the border, enticing people to "undertake the dangerous task of crossing the river" and causing "irreparable harm" to Texas. *Texas,* 2023 WL 8285223, at *4, 17.

### B. The equities do not favor Plaintiffs, who either ignore their obligations under federal law or rest their injury on anticipated criminal entry.

Generally, the third and fourth factors under the preliminary injunction standard— weighing the alleged harm to both parties and assessing the public interest—"merge" when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). When determining whether to issue a preliminary injunction, "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24; *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

For the equities to weigh in favor of granting the extraordinary relief of a preliminary injunction "plaintiff[s] must establish that [their] irreparable harm is greater than the hardship that the preliminary injunction would cause Defendants." *Portee v. Morath*, No. 1:23-cv-551, 2023 WL 4688528, at *6 (W.D. Tex. July 21, 2023); *see also Winter*, 555 U.S. at 24 (2008) (stating that courts "must balance the competing claims of injury and must consider the effect on each party of the

granting or withholding of the requested relief.").

Here, equity favors denying Plaintiffs' requested injunction. Texas's interest in addressing the ongoing border crisis is manifest. That interest, and the irreparable harm if officials cannot act to protect the State, merges with the public's interest. *See, e.g.*, *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 243 (5th Cir. 2020). And the Fifth Circuit generally considers a State enjoined from giving effect to its statutes to automatically suffer a form of irreparable injury. *E.g.*, *Vote.Org v. Callanen*, 39 F.4th 297, 308 (5th Cir. 2022).

Not only do these harms outweigh Plaintiffs' alleged injuries, but Texas's stated interests are of the highest order. Just this past term, the Supreme Court was careful not to interpret an interstate compact broadly because it implicated "a fundamental aspect of a State's sovereign power—its ability to protect the people, property, and economic activity within its borders." *New York v. New Jersey*, 143 S. Ct. 918, 925 (2023). Those "fundamental" issues sit at the heart of the disaster that Texas seeks to address here, and state officials closest to the border crisis are also those best situated to respond to it effectively. As detailed above, former FBI officials recently warned that America is less safe today because of the unabated flow illegal entries into this Country and 2023 saw the highest number of suspected terrorists cross the southern border. Texas and its citizens, situated on the frontlines of this ongoing invasion, stand to lose more than those situated further inland. The injunction Plaintiffs seek here would plainly impede Texas's ability to defend its border and its citizens.

### C. Enforcing SB4 to deter drug smuggling, human trafficking, and terrorism is in the public interest.

It should be obvious that unlawful activity—like drug smuggling, human trafficking, terrorism, and the countless other ills associated with illegal immigration—harms the American public and aliens themselves. "[T]he public interest demands effective measures to prevent the illegal entry of aliens at the Mexican border." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). That is likely why Congress has passed laws prohibiting just what SB4 prohibits here—to deter illegal crossings and prevent the downstream harms accompanying that criminal activity.

Policing illegal entry not only helps secure sovereign territory. By directing aliens to ports of entry, it also reduces the risk to officers and aliens alike posed by dangerous river crossings. It prevents the risk of violent conflict between trespassers and landowners. It facilitates law enforcement's ability to detect contraband and criminal behavior. It enables authorities to carefully process, assess, and apprehend would-be entrants to this country. And it slows the pace of a wave of migration for which federal resources have proven inadequate.

Once again, the Chief Judge of this district has already found that the United States's open-borders approach to border security exacerbates harm to the public. Rather than prosecute aliens for the crime of illegal entry, "Defendants apparently seek to establish an unofficial and unlawful port of entry." *Texas*, 2023 WL 8285223, at *14. That approach to border security "provid[es] ample incentive for the individuals posing the greatest public danger to flee rather than deliver themselves to the Defendants," *id.* at *13, and entices people to "undertake the dangerous task of crossing the river," *id.* at *4. In other words, "the very [public] emergencies" the United States has pointed to elsewhere in challenged Texas's border security efforts "are of [the United States's] own creation." *Id.*

The United States and the Organizational Plaintiffs both argue that Texas has no legitimate interest in enforcing a preempted law, and that the public interest therefore favors an injunction. US PI Mot. at 45; OP PI Mot. at 26–27. But that argument merely recycles the merits. As discussed above, SB4 is *not* preempted by federal law. *See supra* at Part I.A.–D. The United States also heavily relies on supposed harms to foreign relations. US PI Mot. at 40–44. But for the reasons explained above, Mexico's repeated and ongoing failure to abide by its own law-of-nations obligations to Texas tips the equitable balance in Texas's favor. Finally, both sets of Plaintiffs claim SB4 will interfere with federal immigration relief available to aliens. US PI Mot. at 43–44; OP PI Mot. at 26–27. But nothing in SB4 precludes any alien applying for discretionary federal relief. Aliens in Texas's custody may meet with any federal immigration officer, attend any federal hearing, and Texas will comply with any federal immigration detainer.

Accordingly, given the substantial harms at stake for Texas and the relatively minor harms

about which Plaintiffs speculate, the balance of equities and the public interest weigh against granting a preliminary injunction here.

### III.   Other equitable considerations caution against broadly enjoining SB4.

Plaintiffs contend that this Court should enjoin the entirety of SB4. *See* OP PI Mot. at 17; US PI Mot. at 46. As detailed above, Plaintiffs challenge SB4 on its face. Because Plaintiffs' challenges are premature, they raise many questions about how, in fact, SB4 will be enforced. That provides a good reason to abstain entirely and wait for as-applied litigation. Even if this Court were inclined to grant a preliminary injunction, however, the Court should limit its injunction to those particular applications of SB4 that it finds unlawful. And the Court should, in all events, limit any injunctive relief to the parties.

### A.   Abstention doctrines caution against entertaining this pre-enforcement challenge.

When a federal court is considering a pre-enforcement facial challenge to legislation, any uncertainty as to its effects "can be ameliorated by a state court's authoritative interpretations." *Roy v. City of Monroe*, 950 F.3d 245, 252 (5th Cir. 2020) (internal quotation marks omitted). That exercise of comity, in which "the federal courts, exercising a wise discretion, restrain their authority because of scrupulous regard for the rightful independence of the state governments and the smooth working of the federal judiciary," is known as *Pullman* abstention. *Railroad Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501 (1941) (internal quotation marks omitted). "The paradigm of the 'special circumstances' that make abstention appropriate is a case where the challenged state statute is susceptible of a construction by the state judiciary that would avoid or modify the necessity of reaching a federal constitutional question." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 306 (1979). This is so because courts are loath to deprive "state courts of the opportunity to construe a law to avoid constitutional infirmities." *NetChoice, LLC v. Paxton*, 49 F.4th 439, 449 (5th Cir. 2022) (cleaned up). *Pullman* abstention serves values of federalism, comity, and judicial administration because "no matter how seasoned the judgment" of a federal court may be on an issue of state law, "it cannot escape being a forecast rather than a

determination," as "the last word" on state law always rests with the state's courts. *Pullman*, 312 U.S. at 499–500.

"Where resolution of the federal constitutional question is dependent upon, or may be materially altered by, the determination of an uncertain issue of state law, abstention may be proper in order to avoid unnecessary friction in federal-state relations." *Harman v. Forssenius*, 380 U.S. 528, 534 (1965). As Plaintiffs reiterate throughout their pleadings, their various federal constitutional theories are dependent upon, and may be materially altered by, determinations regarding uncertain issues of Texas law. *See, e.g.*, OP PI Mot. at 18 (speculating that aliens detained for SB4 offenses will have no opportunity to claim asylum); U.S. PI Mot. at 43–44 (same, in addition to other forms of immigration relief); *compare* U.S. PI Mot. at 34 (arguing SB4 would interfere with federal government's care of unaccompanied minors) with Escalon Decl. ¶ 7 & Barnes Decl. ¶ 4 (Texas turns them unaccompanied minors over to federal immigration authorities rather than arrest or prosecute them). To further the values of federalism, comity, and judicial administration, this Court should decline Plaintiffs' invitation to make the provisional pronouncements on these unsettled issues of Texas law that are necessary to adjudicate Plaintiffs' theories.

Abstention would be particularly appropriate here, where Plaintiffs seek a pre-enforcement facial challenge to a State's legislative acts. *See, e.g.*, *NetChoice*, 49 F.4th at 448–49. Pre-enforcement facial challenges are uniquely troubling because they "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id.* at 449 (further noting that "[t]he respect owed to a sovereign State" requires restraint when a plaintiffs asks "unelected federal judges to countermand the State's democratically accountable policymakers."). In abstaining from adjudication before the Texas courts can determine these questions of state law, this Court would be following the principled course of eschewing premature federal intervention as the States experiment with different approaches to this sensitive political issue. *Cf. Younger v. Harris*, 401 U.S. 37, 52 (1971) (even when pre-enforcement facial challenges present a case or controversy,

"the task of analyzing a proposed statute, pinpointing its deficiencies, and requiring correction of these deficiencies before the statute is put into effect, is rarely if ever an appropriate task for the judiciary.").

Normally abstention leads to a federal court "retain[ing] jurisdiction but … stay[ing] the federal suit pending determination of the state-law questions in state court." *Harris Cnty. Comm'rs Court v. Moore*, 420 U.S. 77, 88 n. 14 (1975). "The Supreme Court, however, has recognized a limited exception to this rule for cases from Texas, whereby the district court dismisses the case *without prejudice* rather than retaining jurisdiction." *Nationwide Mut. Ins. Co. v. Unauthorized Prac. of L. Comm., of State Bar of Texas*, 283 F.3d 650, 655–56 (5th Cir. 2002). This Court should therefore dismiss these actions without prejudice and allow Texas courts to resolve the constitutionality of SB4.[47]

## B. The Court should not enjoin the enforcement of constitutional applications of SB4.

More fundamentally, SB4 includes a severability clause in Section 8, which directs courts to consider severable not only "every provision, section, subsection, sentence, clause, phrase, or word in th[e] Act," but also "every application of the provisions in th[e] Act to every person, group of persons, or circumstances." (emphasis added).

"It is axiomatic that 'a statute may be invalid as applied to one state of facts and yet valid as applied to another.'" *Ayotte v. Planned Parenthood of Northern New England*, 546 U.S. 320, 329 (2006) (citing *Dahnke-Walker Milling Co. v. Bondurant*, 257 U.S. 282, 289 (1921)). "[W]hen confronting a constitutional flaw in a statute," this Court should "try to limit the solution to the problem." *Id.* at 328. It is preferable for courts "to enjoin only the unconstitutional applications of a statute while leaving other applications in force," or "sever its problematic portions while leaving

---

[47] Abstention applies equally to the claims of the Organizational Plaintiffs and the United States. *See* Wright & Miller, 17A Fed. Prac. & Proc. Juris. § 4242 (3d ed.) ("abstention … may be ordered, in a *Pullman*-type situation, even in a suit brought by the United States.").

the remainder intact." *Id.* at 329 (citing *United States v. Raines*, 362 U.S. 17, 20–22 (1960) and *United States v. Booker*, 543 U.S. 220, 227–29 (2005)).

"Three interrelated principles" should "inform [this Court's] approach to remedies." *Id.* First, the Court should not "nullify more of a legislature's work than is necessary" because a "ruling of unconstitutionality frustrates the intent of the elected representatives of the people." *Id.* (citing *Regan v. Time, Inc.*, 468 U.S. 641, 652 (1984)). "Accordingly, the 'normal rule' is that 'partial, rather than facial, invalidation is the required course,' such that a 'statute may ... be declared invalid to the extent that it reaches too far, but otherwise left intact.'" *Id.* (citing *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985)).

Second, the Court should be "mindful that [its] constitutional mandate and institutional competence are limited," and "restrain [itself] from 'rewrit[ing] state law to conform it to constitutional requirements' even as it strive[s] to salvage it." *Id.* (citing *Virginia v. American Booksellers Assn., Inc.*, 484 U.S. 383, 397 (1988)). And third, "the touchstone for any decision about remedy is legislative intent, for a court cannot use its remedial powers to circumvent the intent of the legislature." *Id.* at 330 (internal citation omitted). If this Court finds an application or section of SB4 unconstitutional, it should ask whether the legislature would "prefer[] what is left of its statute to no statute at all." *Id.*

Here, the Texas legislature has clearly expressed its preference for severability regarding the applications of SB4. *See* 2023 Tex. Sess. Law Serv. 4th C.S. Ch. 2 (S.B. 4) § 8 (addressing severability). "Severab[ility] is of course a matter of state law," *Virginia v. Hicks*, 539 U.S. 113, 121 (2003), and Texas law accords nearly dispositive weight to a severability clause. *See, e.g.*, *Builder Recovery Servs., LLC v. Town of Westlake*, 650 S.W.3d 499, 507 (Tex. 2022); *see also Leavitt v. Jane L.*, 518 U.S. 137, 138 (1996) ("Severability is of course a matter of state law."); *Dorchy v. Kansas*, 264 U.S. 286, 290 (1924) (same).

Plaintiffs should not prevail on any of their claims challenging SB4. However, if this Court holds otherwise on a challenge to any distinct provision, then it should craft a narrow remedy and sever only the particular applications of any provisions it determines are invalid rather than

preliminarily enjoining all applications of SB4.

### C. If the Court enters an injunction on behalf of the Organizational Plaintiffs, it should not protect any non-parties.

Organizational Plaintiffs' proposed order suffers from a fundamental defect. ECF No. 30-6 in Case No. 1:23-cv-1537 (proposed order seeking injunction against SB4 itself). "[N]either declaratory nor injunctive relief can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular … plaintiffs, and the State is free to prosecute others who may violate the statute." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975). A "district court lack[s] authority to enjoin enforcement of [a challenged law] as to anyone other than the named plaintiffs." *In re Abbott*, 954 F.3d 772, 786 n.19 (5th Cir. 2020), *vacated as moot*, 141 S. Ct. 1261 (2021); *accord McKenzie v. City of Chicago*, 118 F.3d 552, 555 (7th Cir. 1997). But Organizational Plaintiffs' proposed order is invalid because it purports to enjoin the statutes themselves and therefore protect other parties not in this case. Federal courts do not enjoin statutes. "Remedies … ordinarily operate with respect to specific parties. In the absence of any specific party, they do not simply operate on legal rules in the abstract." *California v. Texas*, 141 S. Ct. 2104, 2115 (2021) (quotations and citations omitted). Even when a court enjoins particular defendants, they enjoin "not the execution of the statute, but the acts of the official, the statute notwithstanding." *Commonwealth of Mass. v. Mellon*, 262 U.S. 447, 488 (1923). Any relief should be limited to the named Organizational Plaintiffs only.

### CONCLUSION

For the foregoing reasons, the Court should deny the Plaintiffs' Motions for Preliminary Injunction.

Date: February 7, 2024

Respectfully submitted.

**KEN PAXTON**
Attorney General

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**RALPH MOLINA**
Deputy Attorney General for Legal Strategy

**KIMBERLY GDULA**
Chief, General Litigation Division

*/s/Evan W. Weltge*
**EVAN W. WELTGE**
Tex. State Bar No. 24110523
Assistant District Attorney (deputized)
Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
 OF TEXAS
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2120
Evan.Weltge@oag.texas.gov

**COUNSEL FOR DEFENDANT**
**BILL D. HICKS**

*/s/Ryan D. Walters*
**RYAN D. WALTERS**
Chief, Special Litigation Division
Tex. State Bar No. 24105085

**AMY SNOW HILTON**
Special Counsel
Texas Bar No. 24097834

**MUNERA AL-FUHAID**
Special Counsel
Tex. State Bar No. 24094501

**HEATHER L. DYER**
Special Counsel
Tex. State Bar No. 24123044

**JACOB E. PRZADA**
Special Counsel
Tex. State Bar No. 24125371

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Ryan.Walters@oag.texas.gov
Amy.Hilton@oag.texas.gov
Munera.Al-fuhaid@oag.texas.gov
Heather.Dyer@oag.texas.gov
Jacob.Przada@oag.texas.gov

**COUNSEL FOR DEFENDANTS**
**STATE OF TEXAS, GREG ABBOTT, TEXAS**
**DEPARTMENT OF PUBLIC SAFETY, AND STEVEN**
**C. MCCRAW**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on February 7, 2024, and that all counsel of record were served by CM/ECF.

*/s/Ryan D. Walters*
**RYAN D. WALTERS**