**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>v.<br><br>STATE OF TEXAS, *et al.*,<br><br>              Defendants. | No. 1:24-cv-00008-DAE<br>(lead case) |
| LAS AMERICAS IMMIGRANT<br>ADVOCACY CENTER, *et al.*,<br><br>              Plaintiffs,<br><br>v.<br><br>STEVEN C. MCCRAW, *et al.*,<br><br>              Defendants. | No. 1:23-cv-01537-DAE<br>(consolidated case) |

**BRIEF OF UNITED STATES REPRESENTATIVES JODEY C. ARRINGTON, ET AL.
AS *AMICI CURIAE* IN OPPOSITION TO
PLAINTIFFS' MOTIONS FOR PRELIMINARY AND PERMANENT INJUNCTION**

CHRISTOPHER J. HAJEC\*
MATT A. CRAPO\*
IMMIGRATION REFORM LAW INSTITUTE
25 Massachusetts Ave., NW, Suite 335
Washington, DC 20001
(202) 232-5590
chajec@irli.org
mcrapo@irli.org

\* Pending *pro hac vice* admission

Counsel for *Amici Curiae*

# TABLE OF CONTENTS

<u>Page</u>

TABLE OF AUTHORITIES ......................................................................................... ii

INTEREST OF *AMICI CURIAE* .................................................................................. v

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 3

I.     The Various States Retained Their Inherent Right to Self-Defense Upon
       Admission to the Union ...................................................................................... 3

II.    Texas's Exercise of Its Retained, Sovereign Prerogative to Repel an Invasion is
       Nonjusticiable ..................................................................................................... 6

III.   General Immigration Regulations Cannot Constrain Texas's Constitutional Power
       to Repel an Invasion ......................................................................................... 13

CONCLUSION ............................................................................................................ 17

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Arizona v. United States,*
   567 U.S. 387 (2012) ................................................................................................ 13

*Baker v. Carr,*
   369 U.S. 186 (1962) .................................................................................................. 6

*California v. United States,*
   104 F.3d 1086 (9th Cir. 1997) ................................................................................. 7

*Chiles v. United States,*
   874 F. Supp. 1334 (S.D. Fla. 1994), *aff'd* 69 F.3d 1094 (11th Cir. 1995) ................... 7

*Fourco Glass Co. v. Transmirra Products Corp.,*
   353 U.S. 222 (1957) ................................................................................................ 15

*Gregory v. Ashcroft,*
   501 U. S. 452 (1991) ................................................................................................ 5

*Kennedy v. Mendoza-Martinez,*
   372 U.S. 144 (1963) .................................................................................................. 5

*Lichter v. United States,*
   334 U.S. 742 (1948) ............................................................................................ 11, 14

*Morton v. Mancari,*
   417 U.S. 535 (1974) ............................................................................................ 15, 16

*Murphy v. Nat'l Collegiate Athletic Ass'n,*
   584 U.S. 453 (2018) .............................................................................................. 3, 5

*New Jersey v. United States,*
   91 F.3d 463 (3d Cir. 1996) ....................................................................................... 7

*Nishimura Ekiu v. United States,*
   142 U.S. 651 (1892) .................................................................................................. 3

*Posadas de Puerto Rico Assocs. v. Tourism Co.*,
  478 U.S. 328 (1986) ...................................................................... 11

*Sterling v. Constantin*,
  287 U.S. 378 (1932) ........................................................................ 8

*United States v. Borden Co.*,
  308 U.S. 188 (1939) ...................................................................... 16

*United States v. Estate of Romani*,
  523 U.S. 517 (1998) ...................................................................... 15

*United States v. S.-E. Underwriters Ass'n*,
  322 U.S. 533 (1944) ........................................................................ 9

*Young v. Hawaii*,
  992 F.3d 765 (9th Cir. 2021) ......................................................... 5

## CONSTITUTION

U.S. Const. art. I, § 10, cl. 3 ("State Self-Defense Clause") ................... 3, 4, 13

U.S. Const. art. IV, § 4 ................................................................................. 4, 7

U.S. Const. art. VI, cl. 2 ............................................................................... 15

U.S. Const. amd. X ......................................................................................... 5

## STATUTES

S.B. 4, 88th Leg., 4th C.S. (2023) ................................................................. 2

8 U.S.C. § 1101(a)(15) .................................................................................. 4

8 U.S.C. § 1153 ............................................................................................. 4

8 U.S.C. § 1182 ............................................................................................. 4

8 U.S.C. § 1227 ............................................................................................. 4

8 U.S.C. § 1325 ............................................................................................. 4

8 U.S.C. § 1326 ............................................................................................. 4

# <u>MISCELLANEOUS</u>

9 Nicolay and Hay, Works of Abraham Lincoln (1894) .................................................. 14

Brnovich, A.G. Opinion, No. I22-001, Re: The Federal Government's Duty to
    Protect the States and the States' Sovereign Power of Self Defense when
    Invaded, Feb. 7, 2022 ........................................................................................... 10

C. Hughes, War Powers Under the Constitution (Sept. 5, 1917) ..................................... 11

Declaration of Independence ............................................................................................. 3

Samuel Johnson, *Dictionary of the English Language*, 1773 (4th folio ed.) ..................... 9

The Federalist No. 39 ........................................................................................................ 5

## <u>INTEREST OF *AMICI CURIAE*</u>

*Amici* are Representative Jodey C. Arrington, who represents the19th

Congressional District of Texas, and the following other members of the United States

House of Representatives:

- Representative Brian Babin, who represents the 36th Congressional District of Texas.

- Representative Jim Banks, who represents the 3rd Congressional District of Indiana.

- Representative Cliff Bentz, who represents the 2nd Congressional District of Oregon.

- Representative Andy Biggs, who represents the 5th Congressional District of Arizona.

- Representative Lauren Boebert, who represents the 3rd Congressional District of Colorado.

- Representative Michael Burgess, who represents the 26th Congressional District of Texas.

- Representative Kat Cammack, who represents the 3rd Congressional District of Florida.

- Representative John "Judge" Carter, who represents the 31st Congressional District of Texas.

- Representative Michael Cloud, who represents the 27th Congressional District of Texas.

- Representative Andrew Clyde, who represents the 9th Congressional District of Georgia.

- Representative Mike Collins, who represents the 10th Congressional District of Georgia.

- Representative Dan Crenshaw, who represents the 2nd Congressional District of Texas.

- Representative Monica De La Cruz, who represents the 15th Congressional District of Texas.

- Representative Jeff Duncan, who represents the 3rd Congressional District of South Carolina.

- Representative Jake Ellzey, who represents the 6th Congressional District of Texas.

- Representative Pat Fallon, who represents the 4th Congressional District of Texas.

- Representative Tony Gonzales, who represents the 23rd Congressional District of Texas.

- Representative Lance Gooden, who represents the 5th Congressional District of Texas.

- Representative Kay Granger, who represents the 12th Congressional District of Texas.

- Representative Marjorie Taylor Greene, who represents the 14th Congressional District of Georgia.

- Representative Kevin Hern, who represents the 1st Congressional District of Oklahoma.

- Representative Clay Higgins, who represents the 3rd Congressional District of Louisiana.

- Representative Erin Houchin, who represents the 9th Congressional District of Indiana.

- Representative Wesley Hunt, who represents the 38th Congressional District of Texas.

- Representative Ronny Jackson, who represents the 13th Congressional District of Texas.

- Representative Doug LaMalfa, who represents the 1st Congressional District of California.

- Representative Morgan Luttrell, who represents the 8th Congressional District of Texas.

- Representative Michael McCaul, who represents the 10th Congressional District of Texas.

- Representative Carol Miller, who represents the 1st Congressional District of West Virginia.

- Representative Mary Miller, who represents the 15th Congressional District of Illinois.

- Representative Nathaniel Moran, who represents the 1st Congressional District of Texas.

- Representative Troy Nehls, who represents the 22nd Congressional District of Texas.

- Representative Ralph Norman, who represents the 5th Congressional District of South Carolina.

- Representative Andrew Ogles, who represents the 5th Congressional District of Tennessee.

- Representative August Pfluger, who represents the 11th Congressional District of Texas.

- Representative Mike Rogers, who represents the 3rd Congressional District of Alabama.

- Representative David Rouzer, who represents the 7th Congressional District of North Carolina.

- Representative Chip Roy, who represents the 21st Congressional District of Texas.

- Representative Keith Self, who represents the 3rd Congressional District of Texas.

- Representative Pete Sessions, who represents the 17th Congressional District of Texas.

- Representative Elise Stefanik, who represents the 21st Congressional District of New York.

- Representative Beth Van Duyne, who represents the 24th Congressional District of Texas.

- Representative Randy Weber, who represents the 14th Congressional District of Texas.

- Representative Brandon Williams, who represents the 22nd Congressional District of New York.

- Representative Roger Williams, who represents the 25th Congressional District of Texas.

- Representative Ryan Zinke, who represents the 1st Congressional District of Montana.

As members of Congress, *Amici* have a strong interest in the correct interpretation of constitutional provisions, the faithful enforcement of federal law, and ensuring that Congress's statutory purposes are being advanced. This is particularly important where, as here, the administrative agencies are failing to take the necessary measures to secure the border as directed by Congress.

In addition, *Amici* represent constituents who live and work near the southern border and are adversely affected by the non-enforcement of federal immigration law and the resulting dangers and violence caused by the criminal activities of the cartels.

## INTRODUCTION

The measures of Texas challenged in this case are in response to the federal government's ongoing abdication of its duty to protect States from invasion and to take care that the nation's immigration laws are faithfully executed. Since January 20, 2021, the Biden administration has purposely facilitated mass illegal entries into this country. It has temporarily paused all removals, gutted immigration enforcement guidelines, terminated the Migrant Protection Protocols (colloquially known as the "Remain in Mexico policy"), halted all border wall construction projects, reinstated "catch and release" at the border, weakened asylum requirements, and adopted mass parole programs.

The abdication of both this administration's statutory duty to secure the border and its constitutional obligation to protect the States from invasion resulted in an estimated 5.5 million illegal aliens' crossing the border from inauguration day in 2021 through fiscal year 2022. *FAIR Analysis: 5.5 Million Illegal Aliens Have Crossed our Borders Since Biden Took Office—How is Secretary Mayorkas Still Employed?*, available at: https://www.fairus.org/press-releases/border-security/fair-analysis-55-million-illegal-aliens-have-crossed-our-borders (last visited Feb. 7, 2024). The number of encounters has only increased since. In fiscal year 2023 alone, Customs and Border Protection ("CBP") encountered over 3.2 million aliens, including nearly 2.5 million at the southwest border, with more than half of those encounters, or nearly 1.4 million, being in Texas alone. CBP, *Nationwide Encounters*, available at: https://www.cbp.gov/newsroom/stats/nationwide-encounters (last visited Feb. 7, 2024).

1

Over 85 percent of aliens encountered on the southern border are released into the United States. Fox News, *Mayorkas tells Border Patrol agents that 'above 85%' of illegal immigrants released into US: sources*, available at:

https://www.foxnews.com/politics/mayorkas-tells-border-patrol-agents-illegal-immigrants-released-into-us-sources (last visited Feb. 1, 2024).

In the absence of any meaningful federal action, Texas has taken several measures to secure its borders and repel the invasion of criminal drug cartels and the flood of illegal aliens from around the world whom the cartels traffic into Texas. Most recently, the Texas legislature passed and the Governor signed Senate Bill 4 ("SB4"), which criminalizes illegal entry and reentry into the State from a foreign nation and authorizes state judicial officers to order offenders to return to the foreign nation from which they illegally entered. S.B. 4, 88th Leg., 4th C.S. (2023). Although SB4 parallels similar federal criminal offenses and does not interfere with Congress's power to decide which classes of aliens are admissible or removable,[1] Plaintiffs seek to enjoin the enforcement of SB4, arguing that it is preempted by federal law. Because federal immigration regulations cannot preempt Texas's exercise of its sovereign self-defense power to repel an invasion, Plaintiffs cannot show a likelihood of success, and their requests for an injunction should therefore be denied.

---

[1] Texas represents that a return order under SB4 "simply identifies how an alien will be transported to a federal port of entry and which state officer or agency will monitor compliance with that order." ECF 25 at 32. According to Texas, no state actor forcibly removes illegal aliens; instead, "any forced removal from the country remains the task of federal CBP officers." *Id.*

2

## ARGUMENT

As Texas persuasively argues in its brief, SB4 is not preempted, because it is consistent with federal immigration law and does not conflict with parallel federal provisions. ECF 25 at 27-35.[2] In addition, under Article I, section 10, of the Constitution ("the State Self-Defense Clause"), Congress's regulation of immigration cannot preempt a State's valid invocation of its sovereign power, "without the consent of Congress," to "engage in War" if "actually invaded." To the extent that there is a conflict between Texas's valid exercise of its constitutional war power and the Immigration and Nationality Act ("INA"), it is the latter that must give way. To decide otherwise would read "without the consent of Congress" out of the State Self-Defense Clause.

## I.     The Various States Retained Their Inherent Right to Self-Defense Upon Admission to the Union.

"When the original States declared their independence, they claimed the powers inherent in sovereignty—in the words of the Declaration of Independence, the authority 'to do all . . . Acts and Things which Independent States may of right do.'" *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 470 (2018) (quoting Declaration of Independence ¶ 32). Inherent in the sovereignty of an independent State, "and essential to self-preservation," is the power "to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe." *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892). Since the

---

[2]  Page numbers refer to the ECF header pagination, not the internal document pagination.

ratification of the Constitution, Congress has adopted extensive regulations governing immigration. For example, Congress has defined the classes of aliens who are admissible and removable. *See* 8 U.S.C. §§ 1101(a)(15) (defining classes of nonimmigrant aliens); 1153 (allocating immigrant visas among various classes of aliens); 1182 (defining inadmissible aliens); 1227 (defining deportable aliens). Congress has also criminalized illegal entry and reentry. *Id.* at §§ 1325, 1326. No one questions Congress's power to set immigration policy, and no State may adopt immigration policies that conflict with federal immigration law.

When it came to invasion, however, the original States, though they entered the Union with the understanding that the federal government would be responsible for the common defense of the new nation, did not cede their own inherent right to self-defense. Rather, the Constitution explicitly recognizes that right in the State Self-Defense Clause, which reads (emphasis added):

> *No State shall, without the Consent of Congress*, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or *engage in War, unless actually invaded*, or in such imminent Danger as will not admit of delay.

U.S. CONST. art. I, § 10. A corresponding constitutional provision, sometimes referred to as "the Invasion Clause," requires the federal government to protect each state from invasion. U.S. CONST. art. IV, § 4 ("The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion").

These two constitutional provisions, read together with the reservation of state powers in the Tenth Amendment,[3] show that the people conferred upon the federal government the primary responsibility to protect each State against invasion, but that the States *retained* their respective sovereign prerogatives to "engage in War" if "actually invaded." Thus, the Founders foresaw the possibility that the federal government might not fulfill its obligation to protect the States from invasion and explicitly recognized the States' inherent, retained power to defend themselves. Providently, the State Self-Defense Clause ensures that "the Constitution . . . is not a suicide pact." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963).

The Constitution, therefore, "limited but did not abolish the sovereign powers of the States, which retained 'a residuary and inviolable sovereignty.'" *Murphy*, 584 U.S. at 470 (quoting The Federalist No. 39, p. 245 (C. Rossiter ed. 1961)). "[B]oth the Federal Government and the States wield sovereign powers, and that is why our system of government is said to be one of 'dual sovereignty.'" *Id.* (quoting *Gregory v. Ashcroft*, 501 U. S. 452, 457 (1991)). Thus, at the very least, if the federal government fails to protect a State from invasion, the various States, as recognized by the State Self-Defense Clause, retain their inherent authority to engage in war. *See Young v. Hawaii*, 992 F.3d 765, 815 (9th Cir. 2021) (citing the prohibition in the State Self-Defense Clause as

---

[3] The Tenth Amendment reads: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

5

"corresponding[]" to the federal government's duty to defend against invasion), *vacated and remanded on other grounds*, 142 S. Ct. 2895 (2022).

## II. Texas's Exercise of Its Retained, Sovereign Prerogative to Repel an Invasion is Nonjusticiable.

The Court should deny the requests for an injunction because this case calls for the Court to resolve nonjusticiable questions. The questions of whether an invasion has occurred within the meaning of the State Self-Defense Clause and what measures a State may take in response to such an invasion are both committed to the political branches of the various States.

In *Baker v. Carr*, the Supreme Court set forth the political question standard as follows:

> It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. 186, 217 (1962).

Under this standard, as several courts of appeals have held, the question of whether an invasion has occurred within the meaning of the Invasion Clause is nonjusticiable and committed to the political branches of the federal government. For

example, the Ninth Circuit has held that "to determine that the United States has been 'invaded' when the political branches have made no such determination would disregard the constitutional duties that are the specific responsibility of other branches of government, and would result in the Court making an ineffective non-judicial policy decision." *California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997). And the Third Circuit (quoting *Baker, supra*) has held this question nonjusticiable because of "'a textually demonstrable constitutional commitment of the issue to a coordinate political department,' and 'a lack of judicially discoverable and manageable standards for resolving it.'" *New Jersey v. United States*, 91 F.3d 463, 468-470 (3d Cir. 1996). *See also Chiles v. United States*, 874 F. Supp. 1334, 1342-1344 (S.D. Fla. 1994) (finding the invasion question nonjusticiable because of a lack of judicially discoverable and manageable standards for resolving it), *aff'd* 69 F.3d 1094, 1097 (11th Cir. 1995) (citing *Baker* generally). In short, the Invasion Clause in Article IV of the Constitution, because it places responsibility to protect against invasion on the federal government, and because there are no workable judicial standards to resolve whether an invasion has occurred, commits that question to the policy making (or political) branches of the federal government, not the judicial branch.

But, just as Article IV, § 4, of the Constitution commits the question of whether an invasion has occurred to the political branches of the *federal* government, the State Self-Defense Clause, at least within broad limits not reached here, commits the same question *to the States*. The Clause recognizes that the States *retain* their inherent power to engage in war in the event of an actual invasion. And they do not retain it subject to the oversight

of Congress, but rather even without its consent. To read the Clause as committing this decision to the *federal* government instead of the *State* government would read the phrase "without the consent of Congress" out of that provision.

As Texas points out, the States' invocation of the Self-Defense Clause is subject only to the limited review of whether the invocation is in "good faith." ECF 25 at 39 (citing *Sterling v. Constantin*, 287 U.S. 378, 400 (1932)). There is no question that Texas has met that minimum standard. On July 7, 2022, Governor Abbott issued Executive Order GA-41, in which he invoked the State of Texas's inherent right to self-defense, as recognized by Article I, § 10, of the United States Constitution, and to "secure the State of Texas and repel the illegal immigration that funds the cartels."[4] Governor Abbott authorized State officials "to respond to this illegal immigration by apprehending immigrants who cross the border between ports of entry or commit other violations of federal law, and to return those illegal immigrants to the border at a port of entry." Exec. Order GA-41 at 2.

The term "invasion," as used in the Self-Defense Clause, is not limited to hostile state actors. First, the ordinary meaning of "invade" is not limited to actions by foreign states. "Ordinarily courts do not construe words used in the Constitution so as to give

---

[4]  Executive Order No. GA-41, relating to returning illegal immigrants to the border, is available at: https://gov.texas.gov/uploads/files/press/EO-GA-41.pdf (last visited Feb. 8, 2024). Two months later, on September 21, 2022, Governor Abbott issued Executive Order No. GA-42, in which he designated certain Mexican drug cartels as foreign terrorist organizations. Available at: https://gov.texas.gov/uploads/files/press/EO-GA-42_Mexican_cartels_foreign_terrorist_orgs_IMAGE_09-21-2022.pdf (last visited Feb. 8, 2024).

them a meaning more narrow than one which they had in the common parlance of the times in which the Constitution was written." *United States v. S.-E. Underwriters Ass'n*, 322 U.S. 533, 539 (1944), *superseded by statute on other grounds*. As Texas points out, ECF 25 at 44, Webster's 1806 dictionary defines "invade" broadly, as "to enter or seize in hostile manner." And, in a dictionary widely known when the Constitution was ratified, "invasion" was defined, without limitation to state action, as "[h]ostile entrance upon the rights or possessions of another; hostile encroachment." Samuel Johnson, *Dictionary of the English Language*, 1773 (4th folio ed.). "Encroachment," in turn, was defined as "[t]o advance into the territories or rights of another." *Id.*

In light of this broad understanding of the terms used in the Self-Defense Clause, there is no reason to conclude that it applies only to hostilities by foreign states and not to those by non-state actors such as cartels or gangs. Indeed, historically, the State of Texas has exercised its self-defense powers against non-state actors. For example, in 1859, the governor of Texas authorized "an improvised expedition of state-funded Texas Rangers to counter" a Tejano militancy led by Juan Nepomuceno Cortina. Maj. Nathan Jennings, *The Army's Rio Grand Campaign of 1859: A Total Force Case Study*, Infantry Magazine, p. 36, Vol. 107, No. 2, April-June 2018, available at: https://www.moore.army.mil/infantry/magazine/issues/2018/Apr-Jun/PDF/APR-JUN18_mag.pdf (last visited Feb. 8, 2024). Cortina has been described as a "son of a respected Mexican ranching family" and also "the head of a band of desperadoes" who "was making life and property in the Brownsville area unsafe." William John Hughes, *"Rip" Ford, Texan: the Public Life and Services of John Salmon Ford, 1836-1883*, a

9

Dissertation in History, pp. 228 (June 1958), available at: https://ttu-

ir.tdl.org/items/26ee077d-4668-4526-8f3f-a816921c7f55 (last visited Feb. 8, 2024). The

Governor "distrusted the dispersed U.S. Army garrisons to respond quickly," Jennings, at

36, and dispatched John S. Ford, with the rank of major, to lead a company of Texas

Rangers with orders "to protect the western frontier against Cortinas and his band and to

arrest them if possible." Hughes, at 230. Eventually, the U.S. Army consolidated its

dispersed garrisons and joined forces with the Texas Rangers to combat Cortina's gang.

Jennings, at 36.

In addition, the then-Attorney General of Arizona, Mark Brnovich, issued an

opinion on February 7, 2022, in which he concluded that the well-documented and

persistent violence and lawlessness caused by cartels and gangs at Arizona's border "can

satisfy the definition of 'actually invaded' and 'invasion' under the U.S. Constitution."

Brnovich, A.G. Opinion, No. I22-001, Re: The Federal Government's Duty to Protect the

States and the States' Sovereign Power of Self Defense when Invaded, Feb. 7, 2022, at 3,

available at: https://www.azag.gov/sites/default/files/2022-02/I22_001b.pdf (last visited

Feb. 8, 2024). General Brnovich found that "[t]here is nothing in federal constitutional or

statutory law authorizing the federal executive to thwart States from ensuring on-the-

ground safety and an orderly border within the State's own territory. Nor is there any

conflict with this and the orderly conduct of immigration policy by the federal

executive." *Id.* at 3-4.

In short, because the Constitution commits the question of whether an invasion has

occurred to the policy-making branches of the State of Texas, and because Governor

Abbott's invocation of the State's inherent and retained authority to defend itself was made in good faith, the State's invocation of its right to self-defense is nonjusticiable.

Similarly, what actions constitute a permissible exercise of the war power is also, at least within broad limits, nonjusticiable and is committed by the Constitution to any State that has been invaded. As the Supreme Court has recognized, "'[t]he power to wage war is the power to wage war successfully.'" *Lichter v. United States*, 334 U. S. 742, 780 (1948) (quoting address by C. Hughes, War Powers Under the Constitution (Sept. 5, 1917)). Though it is for an invaded State to decide, the greater power to "engage in War" granted in the Constitution would unquestionably include the lesser power to return illegal entrants to the country from which they entered in order to prevent or deter invaders from entering the State and thereby harm the criminal cartels that profit from illegal immigration. *See*, *e.g.*, *Posadas de Puerto Rico Assocs. v. Tourism Co.*, 478 U.S. 328, 345-46 (1986) (holding under this principle that the greater power to ban gambling casinos includes the lesser power to ban their advertising); *Lichter*, 334 U.S. at 778-79 ("[T]he exercise of broad discretion as to methods to be employed may be essential to an effective use of its war powers by Congress.").

Here, Texas enacted SB4 as part of its effort to secure its border and repel the invasion by criminal cartels by reducing both their criminal activities—their trafficking of illegal immigrants and drugs—and their material support—profits from that trafficking.[5] According to the sponsor of SB4, it was designed to "[p]rotect Texans from

---

[5]  In addition to enacting SB4, Texas has taken several other measures to repel this invasion. For example, Texas deployed concertina wire along the Rio Grande to "prevent,

the danger of the border crisis" and to "address the issue of border security...." S.B. 4;

Bill Analysis, Author's/Sponsor's Statement of Intent, available at:

https://capitol.texas.gov/tlodocs/884/analysis/pdf/SB00004I.pdf#navpanes=0 (last visited

Feb. 6, 2024).[6] Upon signing SB4 into law, Governor Abbott stated that "[t]he goal of

Senate Bill 4 is to stop the tidal wave of illegal entry into Texas." CBS News, *Texas*

*immigration law known as SB4, allowing state to arrest migrants, signed by Gov. Greg*

*Abbott*, available at: https://www.cbsnews.com/news/texas-immigration-law-sb4-signed-

greg-abbott/ (last visited Feb. 6, 2024); see also Press Release, *Governor Abbott Signs*

*Historic Border Security Measures in Brownsville*, available at:

https://gov.texas.gov/news/post/governor-abbott-signs-historic-border-security-measures-

in-brownsville (last visited Feb. 6, 2024) (denouncing the Biden administration's

"deliberate inaction" on the border and proclaiming that SB4 and other laws "will help

stop the tidal wave of illegal entry into Texas").

---

detour, and interdict transnational criminal activity and illegal migration." FoxNews,
*Texas installs miles of concertina wire along border near Rio Grande* (June 8, 2022),
available at: https://www.foxnews.com/us/texas-installs-miles-concertina-wire-border-
rio-grande (last visited Feb. 7, 2024). Texas also deployed "marine floating barriers" in
the Rio Grande to "mak[e] it more difficult to cross the Rio Grande and reach the Texas
side of the southern border." Press Release, *Governor Abbott Signs Sweeping Package Of
Border Security Legislation* (June 8, 2023), available at:
https://gov.texas.gov/news/post/governor-abbott-signs-sweeping-package-of-border-
security-legislation (last visited Feb. 7, 2024).
[6] *See also* S.B. 4 House Committee Report, available at:
https://capitol.texas.gov/tlodocs/884/analysis/pdf/SB00004H.pdf#navpanes=0 (last
visited Feb. 6, 2024) (noting "record-high" migrant encounters along the southern border,
efforts such as "Operation Lone Star" to "help secure the border" and stating that "S.B. 4
seeks to further address the issue of border security by creating criminal offenses related
to illegal entry....").

Texas's enactment and implementation of SB4 is a modest, or, as Texas puts it, "prudent," ECF 25 at 40 n.43, self-defense measure. Inasmuch as Texas has the inherent power to "engage in War" in response to an actual invasion, U.S. CONST., art. I, § 10, cl. 3, it has the lesser-included power to jail illegal entrants or reentrants and order them to return to the country from which they illegally entered the State. As a war measure, this one is humane and notably restrained, but it remains a war measure adopted in good faith. As such, whether it is an appropriate means of advancing war aims is not for the judiciary to second-guess.

In sum, under the State Self-Defense Clause, the various States reserved and did not surrender their respective inherent sovereign prerogatives to engage in war in the event of an actual invasion. What constitutes an actual invasion is committed to the respective States, and neither this question nor the question of what means of waging war are appropriate is amenable to judicial resolution. This Court should hold that whether an invasion of Texas has occurred and whether Texas has chosen an appropriate means to engage in war are both nonjusticiable political questions, to be decided by Texas. And, because Texas's determinations are nonjusticiable, it is not for this Court to second-guess their validity under the Constitution.

## III.    General Immigration Regulations Cannot Constrain Texas's Constitutional Power to Repel an Invasion.

Plaintiffs contend that, under *Arizona v. United States*, 567 U.S. 387 (2012), SB4 is preempted by the INA. But to hold that the INA preempts SB4, even where Texas has validly invoked its right to self-defense in response to an actual invasion, would read

"without the consent of Congress" out of the State Self-Defense Clause. Plaintiffs rely

very heavily on *Arizona*, but, as Texas points out, ECF 25 at 46, the State of Arizona did

not invoke, and the Supreme Court in *Arizona* did not pass upon, the self-defense power

that is expressly reserved to the sovereign States in the State Self-Defense Clause.

*Lichter* is instructive in the preemption analysis. There, the Supreme Court quoted

President Lincoln's reflection on the power of Congress to pass a Conscription Act as

follows:

> The Constitution gives Congress the power [to raise and support armies], but
> it does not prescribe the mode, or expressly declare who shall prescribe it. In
> such case Congress must prescribe the mode, or relinquish the power. There
> is no alternative . . . . The power is given fully, completely, unconditionally.
> It is not a power to raise armies if State authorities consent; nor if the men to
> compose the armies are entirely willing; but it is a power to raise and support
> armies given to Congress by the Constitution, without an "if."

334 U.S. at 756 n.4 (quoting 9 Nicolay and Hay, Works of Abraham Lincoln 75-77

(1894)). Likewise, there is no "if" in the State Self-Defense Clause pertaining to

Congress or any political branch of the federal government, no condition allowing

Congress to control the States in exercising their inherent war-making power. On the

contrary, the Constitution recognizes that the various States may exercise this power even

*without the consent of Congress*.

Because the Constitution thus broadly dispenses with any need for approval by

Congress, Congress's otherwise-applicable immigration laws cannot be applied to the

detriment of a State's method of repelling an invasion. Impermissibly, such applications

would effectuate Congress's *dis*approval of these measures. Thus, that State war powers,

if validly invoked, may be exercised without congressional consent disposes of any

14

statutory or preemption arguments based on the INA. To accept Plaintiffs' preemption arguments would be to abrogate the phrase "without the consent of Congress" in the State Self-Defense Clause.

Finally, whether Texas is bound by Congress's general rules and regulations, and whether the INA preempts SB4, is also decidable by the more specific provision over the more general canon. The INA is a general law governing immigration. In contrast, the State Self-Defense Clause deals with the specific circumstance of a State's exercising its war power in the event of an invasion. Ordinarily, specific terms prevail over general terms. "However inclusive may be the general language of a statute, it will not be held to apply to a matter specifically dealt with in another part of the same enactment." *Fourco Glass Co. v. Transmirra Products Corp.*, 353 U.S. 222, 228 (1957) (citations omitted). The same principle should be used to resolve conflict between two constitutional provisions. *C.f.*, *United States v. Estate of Romani*, 523 U.S. 517, 532 (1998) (holding that a later, more specific statute governs); *Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) (holding that a general statute will not repeal by implication a more specific one unless there is "clear intention otherwise").

It is, of course, impossible for a statute to preempt a constitutional provision, since the only laws that are, along with the Constitution itself, "the supreme Law of the Land" are those "made in Pursuance" of the Constitution.  U.S. CONST. art. VI, cl. 2. To the extent that a federal statute conflicts with the Constitution, as would be necessary somehow to preempt it, it is not a constitutional statute and cannot preempt anything, let alone the constitutional provision with which it conflicts. Thus, States' exercises of their

15

authority under the State Self-Defense Clause are not preempted by the INA. Rather, as
with statutes,

> [t]he courts are not at liberty to pick and choose among congressional
> enactments, and when two statutes are capable of co-existence, it is the duty
> of the courts, absent a clearly expressed congressional intention to the
> contrary, to regard each as effective. "When there are two acts upon the same
> subject, the rule is to give effect to both if possible."

*Mancari*, 417 U.S. at 551 (quoting *United States v. Borden Co.*, 308 U.S. 188, 198
(1939)). The INA and the State Self-Defense Clause, both being the supreme law of the
land, should both be given effect, and that is accomplished by the displacement of the
INA only in narrow situations where the State Self-Defense Clause is validly invoked.
And, as shown above, the validity of an invocation of the Clause, at least within broad
parameters, is not to be decided by courts, but is a nonjusticiable political question
committed to the States.

In sum, even if the Court were to decide that SB4 conflicts with the terms of the
INA, Texas retains its inherent authority to implement SB4 under the State Self-Defense
Clause. As long as Texas validly takes this action to repel an actual invasion, as it has, the
Constitution recognizes its authority to take it without Congress's consent. Because
Texas's valid invocation of its retained inherent authority under the State Self-Defense
Clause, and its valid choice of means of defense, takes precedence over Congress's
otherwise-applicable law, Plaintiffs cannot show any substantial likelihood of success on
the merits of this action.

## <u>CONCLUSION</u>

For the forgoing reasons, the Court should deny the requests for a preliminary and permanent injunction.

Dated: February 13, 2024                    Respectfully submitted by,

                                      /s/ Christopher J. Hajec
CHRISTOPHER J. HAJEC*
D.C. Bar No. 492551
MATT A. CRAPO*
D.C. Bar No. 473355
Immigration Reform Law Institute
25 Massachusetts Ave., NW, Suite 335
Washington, DC 20001
(202) 232-5590
chajec@irli.org
mcrapo@irli.org

\* pending *pro hac vice* admission

Counsel for *Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on February 13, 2024, a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) and served on all counsel of record.

/s/ Matt Crapo