# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,

    v.

STATE OF TEXAS, *et al.*,

               Defendants.

Case No. 1:24-cv-00008-DAE

# UNITED STATES' REPLY IN SUPPORT OF ITS MOTION FOR
# PRELIMINARY AND PERMANENT INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

ARGUMENT ..................................................................................................... 1

I.    The United States is likely to succeed on the merits.................................... 1

    A.    SB 4 is field preempted. ................................................................ 1

    B.    SB 4 conflicts with federal law in numerous respects...................... 6

    C.    SB 4 violates the dormant Foreign Commerce Clause................... 10

II.    Texas has no valid defense to the United States' claims........................... 13

    A.    Texas cannot rely on an alleged "invasion" to defend SB 4. ......... 13

    B.    The United States can sue in its own courts to enforce
        federal law. ................................................................................ 16

III.   SB 4 will irreparably harm the United States and any benefit it may provide
    Texas can be achieved through other lawful means. ............................... 18

IV.   There is no reason to apply any abstention or severability doctrine here................. 19

CONCLUSION ................................................................................................ 20

# TABLE OF AUTHORITIES

## Cases

*Arizona v. United States,*
    567 U.S. 387 (2012) ................................................................................*passim*

*Armstrong v. Exceptional Child Ctr., Inc.,*
    575 U.S. 320 (2015) ................................................................................ 17, 18

*Baker v. Carr,*
    369 U.S. 186 (1962) ................................................................................ 16

*Bell v. Hood,*
    327 U.S. 678 (1946) ................................................................................ 17

*California v. United States,*
    104 F.3d 1086 (9th Cir. 1997) ................................................................ 13, 16

*City of Houston. v. Hill,*
    482 U.S. 451 (1987) ................................................................................ 19, 20

*Covington & C. Bridge Co. v. Kentucky,*
    154 U.S. 204 (1894) ................................................................................ 12

*Equal Access Educ. v. Merten,*
    305 F. Supp. 2d 585 (E.D. Va. 2004) ...................................................... 11

*Ex Parte Young,*
    209 U.S. 123 (1908) ................................................................................ 18

*Georgia Latino Alliance for Human Rights v. Georgia,*
    691 F.3d 1250 (11th Cir. 2012) ............................................................... 3, 7

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.,*
    527 U.S. 308 (1999) ................................................................................ 17

*Heart of Atlanta Motel, Inc. v. United States,*
    379 U.S. 241 (1964) ................................................................................ 12

*Hines v. Davidowitz,*
    312 U.S. 52 (1941) .................................................................................. 3

*In re Debs,*
    158 U.S. 564 (1895) ............................................................................ 17

*Kansas v. Garcia,*
    140 S. Ct. 791 (2020) ............................................................... 3, 4, 5, 7

*Medellin v. Texas,*
    552 U.S. 491 (2008) ............................................................................ 11

*Mobile Cnty. v. Kimball,*
    102 U.S. 691 (1880) ............................................................................ 12

*Montana v. Blackfeet Tribe of Indians,*
    471 U.S. 759 (1985) ............................................................................ 15

*New Jersey v. United States,*
    91 F.3d 463 (3d Cir. 1996) ............................................................. 13, 16

*Ohio Bureau of Emp. Servs. v. Hodory,*
    431 U.S. 471 (1977) ............................................................................ 19

*Pa. R. Co. v. Pub. Serv. Comm'n of Com. of Pa.,*
    250 U.S. 566 (1919) .............................................................................. 3

*Padavan v. United States,*
    82 F.3d 23 (2d Cir. 1996) ......................................................... 13, 14, 16

*Parker v. Brown,*
    317 U.S. 341 (1943) .............................................................................. 5

*Piazza's Seafood World, LLC v. Odom,*
    448 F.3d 744 (5th Cir. 2006) ................................................. 10, 11, 12, 13

*Sanitary Dist. of Chi. v. United States,*
    266 U.S. 405 (1925) ............................................................................ 17

*Santa Clara Pueblo v. Martinez,*
    436 U.S. 49 (1978) ............................................................................. 15

*Takahashi v. Fish & Game Comm'n,*
    334 U.S. 410 (1948) .............................................................................. 2

*Taylor v. United States,*
    579 U.S. 301 (2016) ............................................................................ 12

*Texas v. United States*,
    50 F.4th 498 (5th Cir. 2022) ................................................................ 2

*Toll v. Moreno*,
    458 U.S. 1 (1982) ............................................................................... 12

*Truax v. Raich*,
    239 U.S. 33 (1915) ............................................................................... 3

*Turnage v. Britton*,
    29 F.4th 232 (5th Cir. 2022) .............................................................. 18

*United Servs. Auto. Ass'n v. Muir*,
    792 F.2d 356 (3d Cir. 1986) .............................................................. 19

*United States v. Abbott*,
    --- F. Supp. 3d. ---, 2023 WL 5740596 (W.D. Tex. Sept. 6, 2023) ....... 13, 15, 16

*United States v. Alabama*,
    691 F.3d 1269 (11th Cir. 2012) ......................................................... 3, 7

*United States v. Ballinger*,
    395 F.3d 1218 (11th Cir. 2005) .......................................................... 12

*United States v. Composite State Bd. of Med. Examiners*,
    656 F.2d 131 (5th Cir. 1981) ............................................................. 19

*United States v. Guest*,
    383 U.S. 745 (1966) ........................................................................... 12

*United States v. Hanigan*,
    681 F.2d 1127 (9th Cir. 1982) ........................................................... 12

*United States v. LeMay*,
    322 F.2d 100 (5th Cir. 1963) ............................................................. 17

*United States v. Minnesota*,
    270 U.S. 181 (1926) ........................................................................... 17

*United States v. South Carolina*,
    720 F.3d 518 (4th Cir. 2013) ............................................................. 3, 7

*United States v. Supreme Ct. of N.M.*,
    839 F.3d 888 (10th Cir. 2016) ........................................................... 18

*United States v. Texas,*
    557 F. Supp. 3d 810 (W.D. Tex. 2021) ........................................................ 18

*Valle del Sol, Inc. v. Whiting,*
    732 F.3d 1006 (9th Cir. 2013) ...............................................................3, 7

*Villas at Parkside Partners v. City of Farmers Branch,*
    726 F.3d 524 (5th Cir. 2013) ...............................................................6, 9

*Virginia Off. for Prot. & Advoc. v. Stewart,*
    563 U.S. 247 (2011) ........................................................................ 18

*Wyandotte Transp. Co. v. United States,*
    389 U.S. 191 (1967) ........................................................................ 17

**Constitutional Provisions**

U.S. Const. amend. III ........................................................................ 15

U.S. Const. art. I, § 9 ........................................................................ 15

U.S. Const. art. I, § 10 .....................................................................13, 16

U.S. Const. art. IV, § 4.......................................................................... 14

**Statutes**

8 U.S.C. § 1101 ................................................................................ 4

8 U.S.C. § 1158 ..............................................................................1, 8

8 U.S.C. § 1181 ................................................................................ 1

8 U.S.C. § 1182 ................................................................................ 1

8 U.S.C. § 1225 ................................................................................ 1

8 U.S.C. § 1227 ................................................................................ 1

8 U.S.C. § 1229 ................................................................................ 1

8 U.S.C. § 1229a..............................................................................1, 2

8 U.S.C. § 1231 ..............................................................................1, 8, 9

8 U.S.C. § 1253 ................................................................................ 10

8 U.S.C. § 1323 ..................................................................................................... 2

8 U.S.C. § 1324 ......................................................................................... 2, 3, 4, 7

8 U.S.C. § 1325 .............................................................................................. 3, 10

8 U.S.C. § 1326 ........................................................................................... 3, 9, 10

8 U.S.C. § 1327 ..................................................................................................... 2

8 U.S.C. § 1328 ..................................................................................................... 2

8 U.S.C. § 1357 ..................................................................................................... 6

18 U.S.C. § 758 ..................................................................................................... 4

22 U.S.C. § 7105 ................................................................................................... 4

28 U.S.C. § 1331 ................................................................................................. 17

28 U.S.C. § 1651 ................................................................................................. 17

Tex. Code of Crim Proc. art. 5B.002 ................................................................... 9

Tex. Code of Crim Proc. art. 5B.003 ................................................................... 8

Tex. Gov't Code § 508.145 ................................................................................. 20

Tex. Penal Code ch. 17 ....................................................................................... 20

Tex. Penal Code § 12.33 ..................................................................................... 10

Tex. Penal Code § 51.02 ....................................................................................... 9

Tex. Penal Code § 51.03 .................................................................................. 9, 10

Tex. Penal Code § 51.04 .................................................................................. 9, 10

**Other Authorities**

3 J. Story, Commentaries on the Constitution § 1668 ........................................ 18

*Debates & Other Proceedings of the Convention of Virginia* (2d ed. 1805) .................................. 14

*Debates of the Convention of Virginia* (2d ed., 1805) .......................................... 14

Edmund Randolph, 3 Debates in the Several State Conventions (Elliot ed. 1836)............. 14

Invasion, Noah Webster, American Dictionary of the English Language (1828).............. 13

James Madison, *The Report of 1800* (Jan. 7, 1800), https://perma.cc/54f6-tw42 ............... 15

*The Federalist* No. 43 (Cooke ed.1961) ........................................................................... 14

*War*, Noah Webster, American Dictionary of the English Language (1828)..................... 14

## INTRODUCTION

The Supreme Court has repeatedly confirmed that "the Government of the United States has broad, undoubted power over the subject of immigration and the status of" noncitizens. *Arizona v. United States*, 567 U.S. 387, 394 (2012). And Congress has exercised that undoubted power to enact a comprehensive statutory scheme governing the entry and removal of noncitizens. SB 4 both intrudes on that exclusively federal field and conflicts with the laws Congress has enacted. Texas largely fails to respond to the United States' arguments and cited authorities demonstrating that SB 4 is unconstitutional. Instead, the State relies on a series of novel and unsupported arguments that primarily rest on a policy disagreement: in Texas's view, the federal government is not doing enough to combat irregular migration at the southern border. That policy disagreement, however, cannot override federal law. SB 4 is unconstitutional and should be enjoined.

## ARGUMENT

**I.     The United States is likely to succeed on the merits.**

**A.     SB 4 is field preempted.**

Congress has clearly occupied the field with respect to the entry and removal of noncitizens, displacing the ability of the 50 States to regulate in this area. PI Mot. at 14–21. The entry and removal of noncitizens implicate "dominant" federal interests relating to immigration, foreign relations, and the control of an international border. *Id.* at 14–17. There is also a "framework of regulation so pervasive that Congress left no room for the States to supplement it." *Id.* at 17 (quoting *Arizona*, 567 U.S. at 399). As explained in our motion (at 17–19), federal law sets forth in painstaking detail which noncitizens may be admitted to the United States (*see, e.g.*, 8 U.S.C. §§ 1181 & 1182), when, how, and to where they may be removed (*see, e.g., id.* §§ 1225, 1227, 1229, 1229a & 1231), and the protections afforded to noncitizens who are subject to removal (*see, e.g., id.* §§ 1158 & 1231(b)(3)). Indeed, Congress expressly specified that, unless otherwise provided, a *federal* removal proceeding shall be "the sole and exclusive procedure for determining whether [a noncitizen] may be . . . removed

from the United States." *Id.* § 1229a(a)(3).  Critically, federal law also sets forth a compre-hensive framework criminalizing unlawful entry (*id.* § 1325), unlawful reentry (*id.* § 1326), and various acts that facilitate unlawful entry (*see, e.g., id.* §§ 1323, 1324, 1327 & 1328).

Texas has no response to these arguments and, tellingly, does not even reference the standard for field preemption.  *Compare* PI Opp'n at 15–22 *with Arizona*, 567 U.S. at 399. Instead, Texas mischaracterizes the relevant field as "alien misconduct" (or sometimes "im-migration regulation") to argue that federal law does not field preempt "every state enactment which in any way deals with aliens."  PI Opp'n at 15–17.  But the United States does not contend otherwise; it has argued only that Congress occupied the field of entry and removal. *See* PI Mot. at 14, 21.  And, just as the federal alien-registration scheme field preempted the state law in *Arizona*, the federal statues governing entry and removal of noncitizens field preempt SB 4.  *See id.* at 19–20.

Texas argues that the "only field preemption that *Arizona* recognized was in the federal alien-registration program."  PI Opp'n at 15–16.  But Texas gives no reason why the Arizona registration scheme was more susceptible to field preemption than SB 4; if anything, SB 4 intrudes on a field—entry and removal of noncitizens—that has a *stronger* connection to the dominant federal interests in immigration and foreign affairs.  And Texas cannot dispute that "[t]he federal statutory directives" here "provide a full set of standards," including "punish-ment for noncompliance," and that SB 4 "adds a state-law penalty for conduct proscribed by federal law."  *Arizona*, 567 U.S. at 400–01.  *Arizona*'s reasoning thus fully supports field preemption here.

Texas contends that "Plaintiffs do not and cannot cite any other cases to demonstrate that the provisions of SB 4 intrude on a recognized federal field."  PI Opp'n at 16.  But the United States cited numerous cases explaining that the federal government has exclusive con-trol over the entry and removal of noncitizens.  PI Mot. at 17.  The Fifth Circuit has confirmed that "[p]olicies pertaining to the entry of [noncitizens] and their right to remain here . . . are entrusted exclusively to Congress."  *Texas v. United States*, 50 F.4th 498, 516 (5th Cir. 2022);

*see also Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 (1948) ("The Federal Government has broad constitutional powers in determining what aliens shall be admitted to the United States[.] . . . Under the Constitution the states are granted no such powers;"); *Hines v. Davidowitz*, 312 U.S. 52, 69 (1941) ("Congress has provided a broad and comprehensive plan describing the terms and conditions upon which aliens may enter this country . . . and the manner in which they may be deported."); *Truax v. Raich*, 239 U.S. 33, 42 (1915) ("The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal government."); *United States v. Alabama*, 691 F.3d 1269, 1293 (11th Cir. 2012) ("The power to expel aliens has long been recognized as an exclusively federal power.").

Multiple courts of appeals have held that the federal scheme criminalizing various aspects of illegal entry—especially the federal provision criminalizing transporting and harboring noncitizens who have unlawfully entered the country, 8 U.S.C. § 1324—field preempt state-law analogs. *See* PI Mot. at 20–21; *see also Georgia Latino Alliance for Human Rights v. Georgia*, 691 F.3d 1250, 1263-65 (11th Cir. 2012); *Valle del Sol, Inc. v. Whiting*, 732 F.3d 1006, 1023-26 (9th Cir. 2013); *Alabama*, 691 F.3d at 1285–87; *United States v. South Carolina*, 720 F.3d 518, 530–31 (4th Cir. 2013). Just as § 1324 and the related entry provisions field preempt state-law analogs, so too with SB 4. *See* PI Mot. at 20–21. Texas has no response these cases.

Texas emphasizes that SB 4 "mirror[s] federal law," but that is both incorrect and irrelevant. PI Opp'n at 17. As discussed below, SB 4 conflicts with federal law in critical ways. *See* Section I.B., *infra*. But more fundamentally, the Supreme Court has made clear that "[w]here Congress occupies an entire field," even "complementary state regulation is impermissible."[1] *Arizona*, 567 U.S. at 401. "Field preemption reflects a congressional decision to

---

[1] Texas cites *Kansas v. Garcia*, 140 S. Ct. 791, 806 (2020), for the proposition that "'[t]he mere fact that state laws like' SB 4 'overlap to some degree with federal criminal provisions' on immigration 'does not even begin to make a case for' preemption." PI Opp'n at 17 (quoting *Kansas*, 140 S. Ct. at 806). Texas, however, omits the word "conflict" from "conflict preemption." The passage of the *Kansas* opinion that Texas relies on was discussing *conflict* preemption, not *field* preemption. 140 S. Ct. at 806. Nothing in *Kansas* suggests that it was

foreclose any state regulation in the area, even if it is parallel to federal standards." *Id.* And that is important here because the *federal* government needs the exclusive discretion to prosecute illegal entry and conduct removals. *See* PI Mot. at 16. Were it otherwise, "the State would have the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Arizona*, 567 U.S. at 402.

Contrary to Texas's argument, federal law nowhere "expressly contemplates concurrent regulation with States and localities." PI Opp'n at 15. Rather, federal law specifies only narrow circumstances in which States may assist in enforcing federal immigration laws, which "would be meaningless if States already had the authority to criminalize, arrest, detain, and remove noncitizens for violating federal immigration law." PI Mot. at 18; *see* 8 U.S.C. § 1324(c) (allowing state arrests for human-smuggling); 18 U.S.C. § 758 (making it a *federal* crime for anyone at an immigration checkpoint to "flee[] Federal, State, or local law enforcement agents in excess of the legal speed limit"). Texas's other cited provisions recognize only that States can prosecute certain noncitizens if they violate *general* criminal laws (like those against trafficking). *See* 22 U.S.C. § 7105(c)(3) (contemplating the "prosecution of" usual "State and local crimes such as kidnapping" and "forced labor offenses" where "severe forms of trafficking appear to have been involved"); 8 U.S.C. § 1101(a)(15)(T)(i)(III) (referencing state "prosecution of acts of trafficking"); *id.* § 1101(a)(15)(U) (referencing state "criminal law[s]" against, among other things, "domestic violence," "murder," and "perjury"). None of Texas's cited laws invites States to regulate the entry and removal of noncitizens.

Texas's remaining two arguments—that field preemption may not be a viable doctrine and that there can be no field preemption where the Executive has allegedly "abandoned" the

---

overruling the century-old rule that even "complementary state regulation is impermissible" in an exclusively federal field. *Arizona*, 567 U.S. at 401; *Pa. R. Co. v. Pub. Serv. Comm'n of Com. of Pa.*, 250 U.S. 566, 569 (1919); *see also infra* p. 7 (discussing conflict-preemption holding).

field, PI Opp'n at 19–22—are wholly unsupported. Texas does not dispute that modern Su-
preme Court precedent recognizes field preemption; all nine justices recently applied that doc-
trine in a case Texas repeatedly relies on. *See Kansas v. Garcia*, 140 S. Ct. 791, 804 (2020); *id.*
at 808 (Thomas, J., joined by Gorsuch, J.) (applying field preemption despite some skepti-
cism); *id.* at 808–09 (Breyer, J., dissenting, joined by Ginsburg, Sotomayor, and Kagan, JJ.).
And the Court in *Arizona* applied it to the noncitizen registration. *See* 567 U.S. at 400–03.

Nor is there any reason to accept Texas's novel argument that SB 4 is not field
preempted because—in Texas's view—"the federal executive branch has abandoned the very
field it now purports to occupy." PI Opp'n at 20. Even apart from the fact that the federal
government has not abandoned the field—it regularly enforces the immigration laws, PI Mot.
at 9—the argument fundamentally misunderstands the doctrine. Whether a field is entirely
preempted depends on whether Congress has regulated comprehensively in the field. *See, e.g.,*
*Arizona*, 567 U.S. at 399 ("[T]he States are precluded from regulating conduct in a field that
*Congress*, acting within its proper authority, has determined must be regulated by its exclusive
governance." (emphasis added)). Texas cites no case holding that the manner of Executive
Branch enforcement in a field is relevant to the inquiry. In the only case Texas cites, *Parker
v. Brown*, 317 U.S. 341, 353–55 (1943), the Supreme Court found no preemption because the
federal law at issue became "effective only if a program is ordered by the Secretary," and the
Secretary had not issued any order "putting it into effect." *Id.* at 353. In other words, there
was no field preemption because the federal law specifically "contemplate[d] the existence of
state programs at least until such time as the Secretary shall establish a federal marketing
program." *Id.* at 354. It did not involve the Executive Branch allegedly "abandoning" a field.
Texas's theory also conflicts with its own argument that "[t]he Supremacy Clause gives pri-
ority to 'the Laws of the United States,' not the criminal law enforcement priorities of federal
officers." PI Opp'n at 14 (quoting *Kansas*, 140 S. Ct. at 807). Here, the "Laws of the United
States"—along with several dominant federal interests—pervasively occupy the field of
noncitizen entry and removal.

5

**B.    SB 4 conflicts with federal law in numerous respects.**

SB 4 also conflicts with federal law in multiple ways.  *See* PI Mot. at 21–27.  Texas almost entirely disregards these conflicts, and argues only that SB 4 supposedly mirrors federal law.  PI Opp'n 11–14.  But SB 4's attempt to duplicate federal law is incompatible with federal immigration laws, and regardless, SB 4 is different than federal law.

<u>Conflict with Limited State Enforcement Role under Federal Law</u>.  As an initial matter, SB 4 conflicts with federal law by giving Texas the ability to unilaterally engage in immigration enforcement efforts not permitted under the statutory scheme enacted by Congress.  Texas does not dispute that federal law specifies only "limited circumstances in which state officers may perform the functions of an immigration officer."  *Arizona*, 567 U.S. at 408; *see* PI Mot. at 24.  Most notably, under 8 U.S.C. § 1357(g), state officers may assist with apprehension and detention, or other immigration-related duties, under "the direction and supervision of the [Secretary of Homeland Security]" or in "cooperation" with federal officials.  *Id.* § 1357(g)(1)-(3), (10).  Congress's purpose in enacting this provision was to ensure that state immigration-enforcement efforts would be "conducted under the watch of" federal officials and "in conformity with Federal standards."  PI Mot. at 25.

SB 4 directly conflicts with this regime by allowing Texas officials to engage in immigration-enforcement activities unilaterally.  *See Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 531–32 (5th Cir. 2013) (plurality) (holding that ordinance "interferes with the careful balance struck by Congress" by "giving state officials authority to act as immigration officers outside the limited circumstances specified by federal law" (internal quotation marks omitted)).  Texas's brief has only a one-sentence response: "[s]tate officials can implement SB 4 in a way that maximizes cooperation with federal authorities."  PI Opp'n at 13.  But Texas disregards the requirement that it act under the § 1357(g) framework or at least in coordination with federal officials.  "[N]o coherent understanding" of "cooperation" would "incorporate the unilateral decision of state officers to arrest [a noncitizen] for being removable absent any request, approval, or other instruction from the Federal Government."

*Arizona*, 567 U.S. at 410.  SB 4 thus conflicts with the federal scheme in the same way that the challenged Arizona law did.  *See id.* at 407–10.

<u>Intrusion on Federal Discretion</u>.  SB 4 also conflicts with the federal scheme by allowing Texas to interfere with the federal government's exclusive discretion regarding prosecution of violations of federal immigration law.  Immigration matters inherently involve questions of foreign affairs and can lead to adverse actions against United States citizens abroad.  The federal government must take these competing interests into account when determining what actions, if any, to take against noncitizens.  Three courts of appeal found state-law analogs to 8 U.S.C. § 1324 to be conflict preempted for the same reason.  *See GLAHR*, 691 F.3d at 1265 ("The [state law], however, are not conditioned on respect for the federal concerns or the priorities that Congress has explicitly granted executive agencies the authority to establish."); *Valle del Sol*, 732 F.3d at 1027 ("[State law] conflicts with the federal scheme by divesting federal authorities of the exclusive power to prosecute these crimes."); *Alabama*, 691 F.3d at 1287 ("[State law] undermines the intent of Congress to confer discretion on the Executive Branch in matters concerning immigration."); *South Carolina*, 720 F.3d at 532 (finding conflict because the state law would "strip federal officials of the authority and discretion necessary in managing foreign affairs"); *see also Arizona*, 567 U.S. at 403.

Despite these differences, Texas argues that "[a]t every step, SB 4 mirrors federal law standards" and thus does not conflict with federal law under *Kansas v. Garcia*, 140 S. Ct. 791 (2020).  PI Opp'n at 12.  While *Kansas* recognizes that States generally may create state crimes that parallel federal crimes, *see* 140 S. Ct. at 806, that case did not overrule *Arizona* and does not stand for the proposition that even a truly parallel state immigration regime is lawful. *Kansas* involved a generally applicable law about "fraud, forgeries, and identity theft," which "apply to citizens and aliens alike," *id.* at 798, and which did not "frustrate[] any federal interests," *id.* at 806.  Here, by contrast, SB 4 regulates entry and removal, which necessarily implicate sensitive issues of national security, border security, and foreign affairs.  In that context, allowing a single State to imprison foreign nationals, or order them removed from

the United States, would fundamentally undermine the federal interests embodied in the scheme that Congress enacted. And SB 4 is not a generally applicable law that could apply to citizens and noncitizens alike. Rather SB 4 specifically targets the illegal entry of noncitizens and criminalizes their unlawful presence.

Conflict with Federal Protections for Noncitizens. Texas has no persuasive response to the fact that SB 4 conflicts with federal protections afforded noncitizens facing removal who claim a fear of persecution or torture in their home country or the country to which they would be removed. *See* PI Mot. at 21–22; Jacobstein Decl. ¶¶ 24–25. Texas does not dispute that SB 4 lacks comparable protections. To the contrary, the law makes clear that "a court may not abate the prosecution" on "the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated." Tex. Code of Crim Proc. art. 5B.003. Texas's only response, in a footnote, is that noncitizens can seek federal removal protection "while in state custody or from another country." PI Opp'n at 13 n.38. But SB 4 has no defenses to removal based on likely persecution or torture in the country of removal. For those already deported under SB 4 to "another country", the conflict is even more glaring: if the noncitizen would have been eligible for withholding because of fear of persecution in Mexico, the noncitizen would have been already been refouled, not to mention that the noncitizen also could not apply for asylum (or other protections) while outside of the United States, *see* 8 U.S.C. § 1158(a)(1) ("Any [noncitizen] who is physically present in the United States or who arrives in the United States . . . may apply for asylum").

Conflict with the Federal Removal. Nor does Texas dispute that, under SB 4, state judges can issue removal orders without following the federally prescribed process for removal. *See* PI Mot. at 22–23. State judges can order a noncitizen to return to Mexico without first coordinating with that country or following the detailed federal process for selecting the country of removal. *See id.* For noncitizens traveling from Mexico and who do not enter through ports of entry, the process of selecting a country of removal is governed by 8 U.S.C.

8

§ 1231(b)(2).  First, the noncitizen can designate a country of removal, which can be disregarded only in certain circumstances.  *See* 8 U.S.C. § 1231(b)(2)(A), (C).  If the noncitizen cannot be removed to that country, there is a hierarchy of removal countries, starting with the noncitizen's country of citizenship, the country where he last resided, and so forth, unless removal to the country is impracticable, inadvisable, or impossible.  *See id.* § 1231(b)(2)(D)– (E).  Accordingly, under federal law, not every removal can be to Mexico. Yet, under SB 4, removal is always "to the foreign nation from which the person entered." Tex. Code of Crim Proc. art. 5B.002(c) & (d).  While Texas notes that it would not physically execute its own removal orders, *see* PI Opp'n at 16, Texas judges would still be issuing orders requiring certain noncitizens to leave the country or face felony charges.  *See* Tex. Penal Code § 51.04(b).  SB 4 therefore conflicts with the federal statutory scheme, which details when and how noncitizens are subject to removal orders.

Conflict With Determining Lawful Presence.  Texas does not contest that SB 4 would require state judges to determine whether noncitizens are "lawfully present" in the United States. SB 4 provides an affirmative defense to unlawful entry where "the federal government has granted the defendant . . . lawful presence in the United States." Tex. Penal Code § 51.02(c)(1)(A).  But the Fifth Circuit has held that a state or local law requiring state judges to determine "lawful presence" conflicts with federal law given the significant complexities for making the determination.  *See* PI Mot. at 23 (*quoting Farmers Branch*, 726 F.3d at 535–36).

Conflict with Other Provisions of Federal Law.  Texas also does not deny that SB 4 is broader than its federal counterparts in certain respects.  *See* PI Mot. at 24.  For example, SB 4 criminalizes a noncitizen's reentry into the United States even when the federal government allows it.  Under federal law, a noncitizen who has previously been removed, for instance, may reenter if she has the consent of the Secretary of Homeland Security.  *See* 8 U.S.C. § 1326. But SB 4 does not include any "consent" exception. Tex. Penal Code § 51.03(a).  SB 4 thus criminalizes conduct that federal law deems permissible.  And because SB 4's reentry provi-

sion applies to a person who merely is "found" in the state after having been removed, regardless of whether their subsequent crossing was authorized, it has the effect of criminalizing mere unlawful presence, in conflict with federal law. *See Arizona*, 567 U.S. at 407 ("As a general rule, it is not a crime for a removable alien to remain present in the United States."). SB 4 also in certain respects imposes penalties that are more severe than those imposed by its federal counterparts. *Compare* Tex. Penal Code § 51.03(b) (unlawful reentry under SB 4 is "felony of the second degree if the defendant was removed subsequent to a conviction for the commission of a felony") *and* Tex. Penal Code § 12.33 (a second-degree felony conviction is punishable by up to 20 years in prison), *with* 8 U.S.C. § 1326(b)(2) (unlawful reentry under federal law is punishable by up to 20 years in prison only if the noncitizen's prior "removal was subsequent to" an "*aggravated* felony" conviction (emphasis added)). And the punishment for willfully failing to comply with a federal removal order is generally a sentence of up to four years (or 10 years in certain circumstances), *see* 8 U.S.C. § 1253; 8 U.S.C. § 1253(a)(1), whereas it is up to 20 years for violating a state removal order under SB 4, *see* Tex. Penal Code § 51.04. Yet Texas itself acknowledges that under *Arizona*, a State's imposition of greater penalty could create a conflict with federal law. *See* PI Opp'n at 13.

Texas also cannot sidestep conflict preemption by arguing that state courts may resolve these conflicts when noncitizens raise preemption defenses in criminal prosecutions under SB 4. *See* PI Opp'n at 14. Such proceedings are an impermissible intrusion on the federal scheme; no unilateral state prosecution is consistent with federal law. And the possibility that a state court may hold SB 4 preempted later does not disprove that SB 4 is preempted today.

### C.    SB 4 violates the dormant Foreign Commerce Clause.

The United States is also likely to succeed on its Commerce Clause claim. Under the Constitution, "[f]oreign commerce is preeminently a matter of national concern." PI Mot. at 27 (citation omitted). Applying binding Fifth Circuit precedent on this issue, *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 750 (5th Cir. 2006), the United States explained that SB 4 is invalid because it improperly discriminates against foreign commerce: it criminalizes

solely the movement of noncitizens across an international boundary *into* Texas, but nothing about movement *within* or *out of* Texas, and nothing about the movement of American *citizens* entering Texas.  PI Mot. at 29.  SB 4 also improperly "create[s] a substantial risk of conflicts with foreign governments" and "undermine[s] the ability of the federal government to 'speak with one voice' in regulating commercial affairs with foreign states."  *Id.* at 28 (quoting *Piazza's Seafood*, 448 F.3d at 750).  By definition, restricting movement over an international boundary implicates the United States' foreign affairs.  *Id.* at 29–30.  And Mexico has already decried SB 4, confirming SB 4's impact on the nation's foreign relations.  *Id.*

Texas hardly engages with the analysis mandated by the Fifth Circuit.  For example, Texas asserts that States can "enact laws that affect interstate or international commerce."  PI Opp'n at 31.  But Fifth Circuit precedent explains that such laws violate the Foreign Commerce Clause when they "discriminat[e] against or unduly burden[] foreign or interstate commerce."  *Piazza's Seafood*, 448 F.3d at 750.  And while Texas points to one case that applies this analysis in a different context—Virginia's denial of public university admissions to unlawfully present noncitizens—it never explains how that case is relevant here.  *See* PI Opp'n at 33 (citing *Equal Access Educ. v. Merten*, 305 F. Supp. 2d 585, 608–11 (E.D. Va. 2004)).[2]

Instead of engaging in the Commerce Clause analysis, Texas takes issue with the applicability of the legal standard itself, arguing under both prongs—discrimination and undermining federal uniformity—that "illegal entry" is not a "commercial transaction."  PI Opp'n at 32–34.  But Texas has no response to the United States' cited cases, which held that "movement of undocumented [noncitizen] laborers across a national boundary into this country" is

---

[2] Texas cites *Medellin v. Texas*, 552 U.S. 491, 496–98 (2008), for the proposition that even though "[t]he United States' relationship with Mexico may or may not be strained due to SB 4," federal courts "have refused to restrain far more severe exercises of state power despite their ramifications for foreign affairs."  PI Opp'n at 34–35.  But *Medellin* analyzed only the question of whether a treaty provision was self-executing and therefore had domestic legal effect.  *See Medellin*, 552 U.S. at 496.

"commerce" and the "illegal entry of foreign nationals" also "substantially affect[s] interstate commerce." PI Mot. at 27–28 (citations omitted).

More broadly, the movement of persons *is* commerce. The Supreme Court said long ago that "the thousands of people who daily pass and repass over" an interstate or international "bridge may be as truly said to be engaged in commerce as if they were shipping cargoes of merchandise from New York to Liverpool." *Covington & C. Bridge Co. v. Kentucky*, 154 U.S. 204, 218–19 (1894). "For more than 175 years of Commerce Clause precedent, this much has been clear: 'Within the flow of commerce' denotes movement or people or things across interstate borders." *United States v. Ballinger*, 395 F.3d 1218, 1232 (11th Cir. 2005) (collecting cases); *see Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 255–56 (1964) (explaining that commerce is "intercourse," which includes "the movement of persons through more States than one"); *United States v. Hanigan*, 681 F.2d 1127, 1130 (9th Cir. 1982). That's why Congress has used its commerce power to regulate the interstate and international movement of people since the Founding. *See, e.g.*, *Taylor v. United States*, 579 U.S. 301, 306 (2016) ("Congress may regulate under its commerce power . . . persons or things in interstate commerce."); *United States v. Guest*, 383 U.S. 745, 758–59 (1966) ("[P]recedents firmly establish[] that the federal commerce power surely encompasses the movement in interstate [or foreign] commerce of persons as well as commodities."); *Mobile Cnty. v. Kimball*, 102 U.S. 691, 702 (1880).

Texas argues that "modern cases source the United States' authority in immigration matters to 'its inherent sovereign power to control and conduct foreign relations.'" PI Opp'n at 33. But that is irrelevant: everyone agrees that Congress has the authority to regulate immigration and Texas never disputes the *current* test for Foreign Commerce Clause violations. *See Piazza's Seafood*, 448 F.3d at 750. In any event, Texas admits that "the Foreign Commerce Clause was understood to permit the federal government to control at least some aspects of immigration," and the State nowhere argues that the cases so holding have been overruled. *Id.* at 32. To the contrary, the Court has relied on the Foreign Commerce Clause as a basis

12

for immigration regulation even after Texas says the Supreme Court "began a trend of regarding Congress's power to regulate immigration as an inherent aspect of federal sovereignty." *Compare id.* at 33 (saying that this "trend" started in 1889), *with Toll v. Moreno*, 458 U.S. 1, 10 (1982) ("Federal authority to regulate the status of aliens derives from various sources, including the Federal Government's . . . power '[t]o regulate Commerce with foreign Nations.'").

Despite Texas's protestation that SB 4 purportedly "complements federal statutes," PI Opp'n at 34, the Fifth Circuit has explicitly held that even if a state law is "consistent with federal policy" or "furthers the goals we might believe that Congress had in mind," a "state statute that violates the Commerce Clause cannot be saved by a showing that it is consistent with the purposes behind federal law." PI Mot. at 29 (quoting *Piazza's Seafood*, 448 F.3d at 751). As the United States explained, "[a] law need not be designed to further local economic interests in order to run afoul of the Commerce Clause." PI Mot. at 29 (citation omitted). SB 4 therefore violates the Commerce Clause.

## II.     Texas has no valid defense to the United States' claims.

### A.     Texas cannot rely on an alleged "invasion" to defend SB 4.

Texas argues that because the United States purportedly has "refused to 'protect [the State of Texas] against Invasion,'" Texas can "engage in War" to defend itself by enacting legislation that otherwise would be preempted by federal law. PI Opp'n at 23. This Court has rejected that "breathtaking" argument before, and it should do so again here. *United States v. Abbott*, --- F. Supp. 3d. ---, 2023 WL 5740596, at *12 (W.D. Tex. Sept. 6, 2023) (Ezra, J.).

The State War Clause provides: "No State shall, without the Consent of Congress . . . engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay." U.S. Const. art. I, § 10, cl. 3. Under no reasonable understanding can irregular migration or criminal cartels' smuggling activities amount to an "invasion" justifying Texas engaging in "war." For constitutional purposes, an invasion is an "armed hostility from another political entity, such as another state or foreign country that is intending to overthrow the state's government." *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996); *California v.*

*United States*, 104 F.3d 1086, 1091 (9th Cir. 1997) (same); *New Jersey v. United States*, 91 F.3d 463, 468 (3d Cir. 1996) (same); *see also Invasion*, Noah Webster, American Dictionary of the English Language (1828) (defining "invasion" as "particularly, the entrance of a hostile army into a country for the purpose of conquest or plunder, or the attack of a military force").  It is not irregular migration or mere illegal activity by private, non-sovereign actors.

Texas invokes James Madison's discussion during the Virginian Ratifying Convention about the use of state militia to stop smugglers.  PI Opp'n at 26.  But as Texas acknowledges, *id.*, Madison's discussion was in response to concerns about Congress calling forth militia to execute federal law.  *See Debates & Other Proceedings of the Convention of Virginia*, 292–94 (2d ed. 1805).  And when Madison *did* discuss "invasion" in the context of the Invasion Clause, U.S. Const. art. IV, § 4, he recognized that it must be conducted by sovereigns.  *See, e.g., Debates of the Convention of Virginia*, 302 (2d ed., 1805) ("[the States] are to be protected from invasion from other states, as well as from foreign powers."); *The Federalist* No. 43 at 293 (Cooke ed.1961) ("A protection against invasion is due from every society to the parts composing it. The latitude of the expression here used seems to secure each State, not only against foreign hostility, but against ambitious or vindictive enterprises of its more powerful neighbors.").

Similarly, the State War Clause does not merely reference invasion in the abstract; it frees States from the restriction on "engag[ing] in War" when "actually invaded."  And "war" was traditionally understood to mean "[a] contest between nations or states, carried on by force." *War*, Noah Webster, American Dictionary of the English Language (1828).  To make sense of the Clause, the power granted to the State ("engage in War") must be commensurate with the triggering event ("actually invaded").  *See* Edmund Randolph, 3 Debates in the Several State Conventions 70 (Elliot ed. 1836) ("the powers to be given must be commensurate to the object" to be obtained).  Thus, to justify action as extreme as "engaging in war," the term "actually invaded" under this Clause must mean armed hostilities rising to the level of those typically engaged in war with a "state or foreign country" or at least the equivalent to a "political entity" that has comparable capacity, none of which Texas claims here.  *Padavan*,

82 F.3d at 28.[3]  Indeed, if the irregular migration and criminal cartels qualify as "invasion" justifying a "war" at the southern border, then the federal government could now suspend the constitutional writ of habeas corpus or provide for the quartering of soldiers.  *See* U.S. Const. art. I, § 9; *id.* amend. III.  Those would be obviously untenable results.

In any event, the State War Clause would not allow Texas to enact criminal legislation regarding entry and removal that conflicts with comprehensive federal law.  As an initial matter, enacting a criminal prohibition on entry and removal is not "engaging in War."  That is apparent as a matter of common sense, and it is consistent with the Founders' understanding.  S*ee* James Madison, *The Report of 1800* (Jan. 7, 1800) (noting that "[t]o protect against invasion is an exercise of the power of war" and arguing that removal of noncitizens was not an incident of war and could not be justified as a means of preventing an invasion), *available at* https://perma.cc/54f6-tw42.  There is also no basis to allow Texas to disregard federal law.  Texas claims that its declaration of an "invasion" allows it to override the pervasive federal scheme governing the entry and removal of noncitizens.  *See* PI Opp'n at 29.  But as this Court has previously recognized, "this is not a controversy between equals." *Abbott*, 2023 WL 5740596, at *10 (citation omitted).  There is no question that the United States' plenary authority over the entry and removal of noncitizens is "superior to that of the States to provide for the welfare or necessities of their inhabitants"—"the interests of the nation are more important than those of any state." *Id.* (citation omitted).  Texas acknowledges that in waging "war," it must still comply with the law of war.  *See* PI Opp'n at 23, 26.  But the State gives no reason why it need not similarly obey federal law.  Whatever the outer limits of a State's authority to repel an actual or imminent invasion, they do not cover the situation here: a State

_____

[3] Texas argues that an early statute authorizing the President to call forth militia if the United States is invaded by "any foreign nation and *Indian tribes*" confirms that "invasion" is not limited to state actors.  PI Opp'n at 27.  But such tribes were "separate sovereigns preexisting the Constitution," *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978), and retained their sovereign status, *see Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 764 (1985).

intruding into an exclusive federal field and overriding federal immigration laws because the State would enforce those laws differently.

Even if there is an actual or imminent "invasion," a State's authority to repel it (and purportedly ignore conflicting federal law) does not last indefinitely.  *See* U.S. Const. art. I, § 10 (noting Congress may consent to States waging war).  The State War Clause was ratified at a time when every State was bordered by the sea, a foreign power, or both, and it might take weeks for word of invasion to reach Congress, much less for Congress to assemble and then deploy federal forces.  Thus, this Court properly recognized that a State's "authority to act independently only lasts until resources of the federal government can reach the invasion." *Abbott*, 2023 WL 5740596, at *12.  "Texas may not claim self defense from invasion at the border to justify a long-term usurping of Congressional authority." *Id.*  And Congress has *already* enacted a statutory framework to address what Texas characterizes as an invasion.

Finally, this Court has already held that "whether Texas's claim of 'invasion' is legitimate is a non-justiciable political question." *Abbott*, 2023 WL 5740596, at *12.  The Court need not reach that issue because there is no doubt that Texas's invasion must fail: there is no "invasion" or "war" at the southern border.  *See Baker v. Carr*, 369 U.S. 186, 217 (1962) (political-question doctrine applies only when political question is inextricably linked with resolution of the case).  In any event, the lesson from the cases on which Texas relies was not that courts must unquestioningly accept a State's assertion that an invasion was occurring, but that States were prohibited from relying on their invocation of an invasion to secure judicial action to which they would not otherwise have been entitled.  *See Padavan*, 82 F.3d at 28; *California*, 104 F.3d at 1091 (same); *New Jersey*, 91 F.3d at 468 (same).  If the Court decides this issue, it must assess the United States' claims without regard to Texas's nonjusticiable defense.  *See Abbott*, 2023 WL 5740596, at *11.

### B.    The United States can sue in its own courts to enforce federal law.

Texas fares no better in arguing that the United States has no cause of action.  This preemption suit is no different than the one the United States successfully brought against

Arizona or the suits against Alabama and South Carolina, discussed above. Congress has empowered federal courts to exercise equity jurisdiction and to grant such relief as "was traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318–19 (1999); *see* 28 U.S.C. §§ 1331, 1651. "[E]quitable relief is traditionally available to enforce federal law" by a proper plaintiff unless Congress has "displace[d]" it. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 329 (2015); *see also Bell v. Hood*, 327 U.S. 678, 684 (1946) ("[I]t is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution . . . .").

Beyond the power federal courts possess generally to entertain actions for equitable relief, they have the power to grant injunctions to the United States to protect its sovereign interests. The Supreme Court has long recognized that "[e]very government, [e]ntrusted by the very terms of its being with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other." *In re Debs*, 158 U.S. 564, 584 (1895). Both the Supreme Court and the Fifth Circuit have reaffirmed "the general rule that the United States may sue to protect its interests." *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201–02 (1967); *see, e.g.*, *United States v. Minnesota*, 270 U.S. 181,194 (1926) (noting United States' "right to invoke the aid of a court of equity in removing unlawful obstacles to the fulfillment of its obligations"); *Sanitary Dist. of Chi. v. United States*, 266 U.S. 405, 425–26 (1925) ("The Attorney General [ ] may bring this proceeding [to carry out treaty obligations] and no statute is necessary to authorize the suit."); *United States v. LeMay*, 322 F.2d 100, 103 (5th Cir. 1963) ("The United States may lawfully maintain suits in its own courts to prevent interference with the means it adopts to exercise its powers of government and to carry into effect its policies").

Texas argues that these and other cases permitting suit by the United States involve the "well-known equitable cause of action to abate a public nuisance" or an implied right of action, are no longer good law, or fail to consider the issue. PI Opp'n at 36–37. But the case Texas centrally relies on, *Armstrong*, recognizes a nonstatutory cause of action in equity "to

sue to enjoin unconstitutional actions by state and federal officers." 575 U.S. at 327. "*Armstrong* holds only that the Supremacy Clause does not create a *private* cause of action"; it "does not limit the federal government's ability to enforce the supremacy of its laws." *United States v. Texas*, 557 F. Supp. 3d 810, 820 (W.D. Tex. 2021). Thus, as one court of appeals has observed, *Armstrong* "counsels in favor of—not against—permitting the United States to invoke preemption in order to protect its interest." *United States v. Supreme Ct. of N.M.*, 839 F.3d 888, 906 n.9 (10th Cir. 2016). Indeed, as Justice Story observed, "[i]t would be a perfect novelty in the history of national jurisprudence, as well as of public law, that a sovereign had no authority to sue in [its] own courts." 3 J. Story, Commentaries on the Constitution § 1668.

In any event, as *Armstrong* recognized, suits against state officials for prospective declaratory or injunctive relief are cognizable under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908); *see Turnage v. Britton*, 29 F.4th 232, 239 (5th Cir. 2022). Texas's argument that governmental plaintiffs may not rely on *Young* is meritless. *See* PI Opp'n at 39. Nothing in *Young* or later cases limits its scope to private parties, and the Supreme Court has squarely rejected that argument. *See Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 256 (2011).

### III. SB 4 will irreparably harm the United States and any benefit it may provide Texas can be achieved through other lawful means.

The balance of the equities counsels in favor of granting the United States' requested relief. The United States will suffer irreparable harm absent a preliminary injunction. Texas does not deny that a Supremacy Clause violation, by itself, constitutes irreparable harm. *See* PI Mot. at 30. Texas also does not deny that SB 4 will harm foreign relations and discourage international cooperation, as demonstrated by the United States in its motion and supporting declaration. *See* PI Mot. at 30–31; Jacobstein Decl. ¶¶ 6, 7, 9, 32. This can lead to mistreatment of U.S. citizens abroad, and limit foreign cooperation on issues critical to U.S. interests. *See* PI Mot. at 30–31. In response, Texas merely notes that other, unspecified state actions may also harm foreign relations, *see* PI Opp'n at 54, but that has no bearing on the United States's showing that it will suffer harm if SB 4 takes effect. In addition to international harms,

18

SB 4 will also impose domestic harms since enforcement of SB 4 could, for example, interfere with federal law enforcement and intelligence-gathering efforts.  *See* PI Mot. at 33–34.

While SB 4 would inflict concrete, irreparable harms on the United States, Texas fails to show that its absence will have any material impact.  It largely argues that illegal immigration causes many harms.  PI Opp'n at 56.  To the extent Texas wants to assist with immigration enforcement, however, it can use lawful mechanisms in federal law, such as § 1357(g) agreements with DHS.  Indeed, twenty-six Sheriff's Offices in Texas already have § 1357(g) agreements in place.  *See* PI Mot. at 35.  In any event, because this is a lawsuit by the United States, Texas can assert no cognizable interest in protecting its residents.  *See* PI Mot. at 36.

## IV.  There is no reason to apply any abstention or severability doctrine here.

Texas argues that the Court should refrain from reviewing this suit due to *Pullman* abstention.  PI Opp'n at 58–60.  That doctrine is an "exception" to judicial review.  *City of Houston. v. Hill*, 482 U.S. 451, 467–68 (1987).  And it allows federal courts to, in their discretion, abstain from resolving the constitutionality of a state law if "state courts may interpret" that law "so as to eliminate or at least to alter materially, the constitutional question presented."  *Ohio Bureau of Emp. Servs. v. Hodory*, 431 U.S. 471, 477 (1977).  But that doctrine has no applicability here: "abstention is inappropriate when, as here, the United States seeks in federal court to assert its federal interests against a [S]tate."  *United States v. Composite State Bd. of Med. Examiners*, 656 F.2d 131, 136 (5th Cir. 1981).  And *Pullman* abstention does not apply to preemption claims.  *See, e.g.*, *United Servs. Auto. Ass'n v. Muir*, 792 F.2d 356, 363 (3d Cir. 1986) ("The holdings of" several Supreme Court cases "suggest that a federal court should not abstain under *Pullman* from interpreting a state law that might be preempted by a federal law.").  Regardless, abstention is not justified if "the possible benefits of abstention" are "speculative."  *Hodory*, 431 U.S. at 481.  The statute must be "obviously susceptible of a limiting construction" that would resolve the constitutional issue.  *City of Houston*, 482 U.S. at 468.  Otherwise, "it is the duty of the federal court to exercise its properly invoked jurisdiction," including in "cases involving a facial challenge to a statute."  *Id.*

19

Here, Texas offers no "obviously susceptible" construction of SB 4 that would resolve the United States' claims.  Under any reasonable reading of SB 4, it will allow Texas to impose penalties on, and issue removal orders for, persons who have unlawfully entered or reentered the United States.  That is the entire purpose and effect of the statute.  SB 4 will thus invariably intrude on the federal government's exclusive control of the field of noncitizen entry and removal and interfere with the federal government's authority to enforce immigration law and regulate foreign commerce.  Abstention is therefore inappropriate here for this reason as well.

Texas also argues that, if the Court agrees with Plaintiffs on the merits, it "should craft a narrow remedy and sever only the particular applications of any provisions it determines are invalid."  PI Opp'n at 61.  But the United States is not challenging only certain "applications" of SB 4's new criminal and removal-order provisions; it is arguing that those provisions are facially unconstitutional.  Indeed, Texas does not identify a single "application" that could survive if the United States were to prevail on its claims.  And the other provisions of SB 4 are generally derivative of the criminal and removal provisions.  *See*, *e.g.*, Tex. Penal Code Ch. 17 (official immunity for enforcing SB 4); Tex. Gov't Code § 508.145(a) (denying parole to those serving a sentence for violating SB 4's criminal provisions).  If the Court finds that the United States is likely to prevail on the merits, it should enjoin SB 4 in full.

## CONCLUSION

For the reasons explained previously and above, the Court should grant the United States' motion and enjoin enforcement of SB 4.

DATED:  February 14, 2024           Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JAIME ESPARZA
United States Attorney

ALEXANDER K. HAAS
Director, Federal Programs Branch

JEAN LIN
Special Litigation Counsel, Federal Programs Branch

*/s/  Stephen Ehrlich*
KUNTAL CHOLERA
STEPHEN EHRLICH
Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC  20005
Phone:  (202) 305-9803
Email:   stephen.ehrlich@usdoj.gov

Samuel M. Shapiro
Assistant United States Attorney
601 N.W. Loop 410, Suite 600
San Antonio, TX 78216
samuel.shapiro@usdoj.gov
Tel: (210) 384-7392

*Attorneys for the United States*