# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> *Plaintiff,* <br><br> v. <br><br> STATE OF TEXAS, et al., <br><br> *Defendants.* <br> _____ <br><br><br> LAS AMERICAS IMMIGRANT ADVOCACY CENTER; AMERICAN GATEWAYS; and THE COUNTY OF EL PASO, TEXAS, <br><br> *Plaintiffs*, <br><br> v. <br><br> STEVEN C. MCCRAW, in his official capacity as Director of the State of Texas Department of Public Safety, and BILL D. HICKS, in his official capacity as District Attorney for the 34th District, <br><br> *Defendants*. | CASE NO. 1:24-cv-00008-DAE (LEAD CASE) <br><br> CONSOLIDATED WITH 1:23-cv-01537 |

## PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 1

   I.   SB4 Is Preempted. ...................................................................................................... 1

  II.   Texas's Threshold Defenses Are Meritless. ............................................................. 9

      A.  Plaintiffs Have a Cause of Action at Equity and Satisfy *Ex parte Young*'s
            Exception To Sovereign Immunity. .................................................................. 9

      B.  Plaintiffs Have Standing ................................................................................. 11

          1.  Plaintiffs Have Preenforcement Standing ................................................. 11

          2.  Plaintiffs Have Demonstrated Standing. .................................................... 13

 III.   The Court Should Preliminarily Enjoin SB4 ......................................................... 17

      A.  *Pullman* Abstention Is Inappropriate. ........................................................... 17

      B.  SB4 Will Irreparably Harm Plaintiffs. ............................................................ 17

      C.  An Injunction Is In The Public Interest. .......................................................... 18

      D.  The Court Should Not Rewrite the Statute. ...................................................... 19

      E.  The Court Should Enjoin SB4 Statewide. ........................................................ 19

CONCLUSION ................................................................................................................. 20

## INTRODUCTION

SB4 is egregiously unconstitutional. It flies in the face of 150 years of Supreme Court precedent and conflicts with federal law in myriad ways. Because this is a textbook example of field and conflict preemption, Texas falls back on its claim that an "invasion" justifies its usurpation of federal authority. That baseless position is anathema to our constitutional structure.

Texas's threshold challenges similarly lack merit. Plaintiffs have standing where a sweeping law will interfere with the core of their operations and missions, and clear precedent establishes their ability to challenge state action that violates the Supremacy Clause.

Notably, Texas nowhere addresses the harms that SB4 will cause all Texans. Noncitizens seeking safety face summary removal to persecution or torture. Communities face the arrest and summary removal of loved ones and the separation of families. A preliminary injunction is necessary to prevent SB4, a patently unconstitutional law, from causing these severe harms.

## ARGUMENT

### I.      SB4 IS PREEMPTED.

SB4 is straightforwardly preempted. The core immigration function of regulating entry and removal is a quintessentially exclusive federal field. Mot. 5-10. SB4 additionally conflicts with Congress's protections for noncitizens; the federal Executive's broad discretion in this arena; exclusive federal control over foreign policy; and other features of the federal statutory regime. *Id*. at 10-17. Texas's contrary arguments ignore settled law, attempt to rewrite the statute, and advance an "invasion" defense that this Court has already rightly rejected.

1. For 150 years the Supreme Court has reiterated that entry and removal are exclusive federal matters. *Id.* at 6. Texas never (in 62 pages) grapples with that historical precedent, which is conclusive in this case. Texas likewise never addresses the numerous lower court decisions on

this question. *Id*. at 7 & n.3. Nor does it address the pervasive federal regulation of entry and removal matters. *Id*. at 8-9. This is a classic case of field preemption.

Texas does not contest that its statute operates in the field of entry, but does assert that SB4's "return orders" are not "removals." Opp. 16. However, SB4 itself defines a "removal" to include a return order. SB4 § 51.03(c). And just last week the Texas Office of the Attorney General confirmed to Congress that the statute operates by "expelling" noncitizens from the United States.[1] It does so by (1) ordering them to leave the country and (2) imprisoning them for up to 20 years if they fail to comply. Sophistry aside, that plainly amounts to deportation. *See Gutierrez v. State*, 380 S.W.3d 167, 170, 173 (Tex. Crim. App. 2012) (order to depart as probation condition was preempted "deportation" order). And even if SB4's orders did not amount to deportation, they would still infringe on exclusive federal removal authority. Mot. 7-8.

Texas also suggests that field preemption doctrine has been "questioned." Opp. 19. But the field preemption analysis Plaintiffs applied, Mot. 6, is black letter law. *See Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 795-96 (5th Cir. 2024) (cited by Texas).

And contrary to Texas's argument, Opp. 15, nothing in federal law "expressly contemplates concurrent regulation" of entry and removal. *Cf. Nat'l Press Photographers*, 90 F.4th at 797 (agency specifically invited state regulation). To the contrary, *federal* statutes are "the sole and exclusive procedure" for determining who is admitted and who is removed. 8 U.S.C. § 1229a(a)(3); Mot. 8. The statutes Texas cites involve domestic conduct and at most give states a small and peripheral role in assisting *federal* enforcement—they are not invitation to enact a

---

[1] *See Written Testimony Before the Subcomm. on the Constitution and Limited Gov't of the H. Comm. on the Judiciary*, 118th Cong. (2024) (written statement of Brent Webster, First Assistant Att'y Gen. of Texas), https://perma.cc/497P-6EHY.

parallel *state* immigration scheme.[2] Of course various ordinary state crimes might "involve entering the country" in particular circumstances. Opp. 18. But SB4 does not regulate a normal criminal matter, like speeding, that may incidentally affect the border. It directly regulates immigration, by criminalizing noncitizens entering the country and authorizing state deportations. Congress never permitted, much less invited, that usurpation of federal power.[3]

In the end, Texas acknowledges that "[t]he authority to control immigration—to admit or exclude aliens—is vested solely in the Federal government." *Truax v. Raich*, 239 U.S. 33, 42 (1915); *see* Opp. 16-17. And none of Texas's cases remotely permit state regulation of such matters. *DeCanas v. Bica*, upheld a state *employment* regulation, but reiterated that the "[p]ower to regulate immigration is unquestionably exclusively a federal power." 424 U.S. 351, 354 (1976). *Kansas v. Garcia* rejected field preemption related to federal employment verification; it has no bearing on this law. 140 S. Ct. 791, 804 (2020). *Chamber of Commerce v. Whiting* permitted the state to "[r]egulat[e] in-state businesses through licensing laws" *because* that was not "an area of dominant federal concern." 563 U.S. 582, 604 (2011). And of course, after *Whiting*, the Court reiterated yet again in *Arizona v. United States* that "the removal process is entrusted to the discretion of the Federal Government." 567 U.S. 387, 409 (2012) (citing *Truax* and other cases). *Arizona* also held that states cannot even help enforce the *federal* immigration scheme outside of

---

[2] *See* 22 U.S.C. § 7105(c)(3)(C)(i) (addressing trafficking, which often involves purely domestic conduct, *see* 18 U.S.C. § 1590); 8 U.S.C. § 1101(a)(15)(T)(i) (same); 18 U.S.C. § 758 (addressing state assistance in pursuing fleeing vehicles fleeing checkpoints, which are typically not at the border); *Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1263-64 (11th Cir. 2012) ("Congress chose to allow state officials to arrest for § 1324 crimes," many of which are domestic, but did not "permit[] state regulation in the field.").

[3] Texas suggests that Operation Lone Star's ongoing use of the generally applicable trespass statute to effectively criminalize entry into the United States means SB4 is lawful. Opp. 17-18. Operation Lone Star differs from SB4 in numerous respects, and its legality is not before the Court. In any event, that systemic use of trespass prosecutions to criminalize entry and seize control of federal immigration policy is preempted for many of the same reasons as SB4.

the limited situations Congress has authorized. *Id.* at 407-10, 413-14. That precludes the idea that states could bypass the federal scheme altogether and create their own.

2. Texas's conflict preemption responses likewise fail. *First*, SB4 upends Congress's design by authorizing arrest and deportation *regardless* of the many forms of relief available in the federal system, including asylum and related protections. Mot. 10-12. In response, Texas asserts that noncitizens prosecuted under SB4 "will have a full and fair opportunity to seek asylum." Opp. 47. But in the federal system, a person's asylum claim must be resolved before they can be deported. Under SB4, state courts are *prohibited* from halting prosecutions—and orders to return—because "a federal determination" as to relief "is pending or will be initiated." Tex. Code Crim. Proc. Art. 5B.003; *see* Mot. 11. That is not a "full and fair opportunity to seek asylum," Opp. 47—it is a complete bypass of the asylum system.[4]

Texas's declarant states that if a person is seeking asylum, "DPS intends to *coordinate* with federal immigration authorities before *executing* the order to return." ECF 25-3 at ¶ 13 (emphasis added). That must, of course, be understood in light of SB4's clear commands. Under SB4, any such "coordination" is beside the point; noncitizens will be subject to 20 years in prison for failure to depart—and potential federal defenses to removal do not change that fact.[5]

---

[4] Texas voices concern for unaccompanied children and victims of sexual violence and trafficking, Opp. 3-4, but the statute it enacted *denies* these groups the protection of federal laws designed for their benefit, *see* Mot. 11.

[5] Texas suggests in passing that noncitizens should seek federal relief from removal "from another country," after Texas has already deported them. Opp. 13 n.38. But the news article it cites is about refugee processing, which is Congress's humanitarian system for noncitizens abroad. 8 U.S.C. § 1157. Congress *also* (in the same Refugee Act) established asylum to protect noncitizens "physically present in the United States." *Id*. § 1158(a)(1). Texas cannot simply write the latter out of federal law. And even if a person could obtain relief from removal in federal proceedings before state deportation, the order to return would still be in effect, and the result would be "conflicting state and federal rulings" on whether the noncitizen may remain in the United States. *Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 536 (5th Cir. 2013) (en banc); *id.* at 559 (Owen, J. concurring in part); *id.* at 584 (Jones, J., dissenting).

*Second*, SB4 wipes away federal discretion—a central feature of the federal system—by seizing all authority into state hands. Mot. 12-13. Without squarely addressing this problem, Texas attempts to avoid it by imagining that the federal statutes make criminal prosecution, denial of asylum in truncated proceedings, and rapid removal "mandatory." Opp. 20. But that ignores the Supreme Court's repeated teachings—including in Texas's loss last term—that in the immigration sphere the federal government has broad discretion "over arrests[,] prosecutions," and "whether to remove a noncitizen." *United States v. Texas*, 599 U.S. 670, 679 (2023) (collecting cases); *see also, e.g.*, *Biden v. Texas*, 597 U.S. 785, 802 (2022) (rejecting another Texas effort to transform federal discretion into a mandate); *Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520, 521-23 (BIA 2011) (agency has discretion to decide whether to invoke expedited removal provisions, *contra* Opp. 12, 20). Texas suggests there is no problem because it may "implement SB4 in a way that maximizes cooperation with federal authorities." Opp. 13. But it does not—and, under the text of SB4 cannot—say that federal authorities will get to choose whether noncitizens are arrested; prosecuted; removed; or granted relief from state deportation orders. *See* ECF No. 25-3 ¶ 13.

*Third*, SB4 infringes on the federal government's exclusive foreign affairs authority, particularly regarding Mexico. Mot. 13-14. Texas's primary response is that Mexico *should* be treated as a "hostile neighbor." Opp. 54. But that is a foreign policy judgment for the *federal* government to make. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 386 (2000); Mot. 13 (citing cases). It likewise argues that SB4 creates no foreign affairs problem because it does "not require anything beyond what the federal government should already be doing." Opp. 18. As already explained, Texas's misapprehension of federal law ignores the broad sweep of federal discretion, which the Supreme Court again expressly tied to the federal foreign affairs authority

last term. *Texas*, 599 U.S. at 679. Further, nothing in federal law remotely suggests a federal obligation to remove non-Mexican nationals *to Mexico* (as SB4 directs). *Biden*, 597 U.S. at 806.

*Fourth*, Texas refuses to grapple with SB4's conflicts with federal law. Mot. 16-17. It repeatedly says SB4 "mirrors federal-law standards." Opp. 12. Yet it ignores the fact that its reentry crime is far broader than 8 U.S.C. § 1326, criminalizing people whom the federal government has expressly allowed to return. Mot. 16; *contra* Opp. 17 (misleadingly suggesting that the *entry* crime's affirmative defense applies to all of SB4). It also ignores SB4's directive to assess "lawful presence"—an intrusion *Farmers Branch* unanimously held was preempted. Mot. 16-17 & n.8.

SB4 simply cannot be reconciled with the federal regime. Whether viewed through a field or conflict lens, Congress set out a comprehensive scheme that discourages and penalizes entry between ports while also safeguarding multiple forms of relief from removal for those who enter between ports. Mot. 2-3, 9, 10-11. That scheme imposes detailed procedures that must be followed to determine people's ultimate immigration status, and places numerous kinds of discretion in the hands of federal officials. *Id*. at 15. In SB4, Texas seeks to remake immigration law by eliminating humanitarian relief, federal discretion, and federal control. That is manifestly not Congress's plan.[6]

3. Unable to defend SB4 on the merits, Texas falls back on political rhetoric dressed up as law: its claim that increased immigration is an "invasion" triggering state war powers. Opp. 22-31. This court has already rightly rejected this claim as "breathtaking." *United States v. Abbott*, 2023 WL 5740596, at *12 (W.D. Tex. Sept. 6, 2023).[7] Plaintiffs emphasize three points.

---

[6] *Kansas v. Garcia* is far afield. There, the Court rejected an argument that prosecutions under a general identity-theft statute based on income tax withholding forms were preempted merely because the same information was also included in employment verification forms, finding no congressional intent to foreclose tax-withholding prosecutions. 140 S. Ct. at 800, 806. *Kansas* involved "[n]othing similar" to the intricate statutory balance at issue here. *Id*. at 806.

[7] Relatedly, there is no basis to conclude the federal government has "abandoned" the field of entry and removal. Opp. 20. Congress has extensively legislated in it, and thousands of executive branch

First, Texas's claim to unilateral, unreviewable authority to disregard the federal scheme is anathema to our constitutional structure. In Texas's view, the governor's declaration of "war" on migration is conclusive; courts must take the governor's word for it; the President has no say in the matter; and even Congress "cannot countermand such state action." Opp. 24 & n.3, 25, 30. This position—that "the fiat of a State Governor" represents a "supreme and unchallengeable edict" that operates "beyond control" of the federal authorities even as it "subvert[s] the federal authority"—is "obviously untenable" under our system of government. *Sterling v. Constantin*, 287 U.S. 378, 397-98, 402 (1932) (cited by Texas). Federal supremacy is an absolute cornerstone of our constitutional structure, particularly with regard to foreign affairs and immigration. *See United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 317-18 (1936). To read the "invasion" clause as offering Texas a blank check free of all federal control would render the Constitution "a solemn mockery." *United States v. Peters*, 9 U.S. 115, 136 (1809).

Second, and in any event, invasion refers to "armed hostility from another political entity, such as another state or foreign country that is intending to overthrow the state's government." *Padavan v. U.S.*, 82 F.3d 23, 28 (2d Cir. 1996); *California v. U.S.*, 104 F.3d 1086, 1091 (9th Cir. 1997); *New Jersey v. U.S.*, 91 F.3d 463, 469 (3d Cir. 1996). Texas argues at length that this can include "non-state actors." Opp. 27-28. But its sleight of hand becomes evident in suggesting that invasion "could refer" to immigration. *Id*. at 28. Of course the word "invasion" *can* be used in

---

employees apply the relevant statutes every day. Resisting this reality, Texas repeatedly cites criticisms of federal policy from the razor wire litigation—ignoring the Supreme Court's recent order vacating that injunction, *DHS v. Texas*, 2024 WL 222180 (U.S. Jan. 22, 2024)—but such assertions do not change the fact that entry and removal are exclusively federal matters. States cannot simply declare a field abandoned as a basis to interfere with a comprehensive federal scheme, and Texas fails to cite a single case that says otherwise.

numerous metaphorical ways.[8] But history, text, and common sense make clear the Constitution is talking about *literal* military invasion and *literal* war in response. Otherwise, any state could unilaterally turn a policy dispute into unlimited authority to upend federal law. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) (warning against interpreting "isolated clauses . . . torn from context" to defeat "a workable government").

The asylum seekers who are trying to find safety in this country are not an invading army that could trigger a state's war powers. Texas tries to tie them to drugs and "terror." Opp. 28-29. That is baseless—for example, "fentanyl is overwhelmingly smuggled by U.S. citizens," and nearly all of that smuggling occurs at ports of entry.[9] And, in any event, if "some" people enter Texas with weapons or drugs, Opp. 31, Texas already has laws to address that conduct. But there is no basis to suggest that vulnerable people fleeing persecution and instability around the world are some sort of armed hostile force commanded by cartels or anyone else.

Third, the State is, of course, not *actually* waging war. It does not propose to engage militarily with cartels, for example. Rather, it is claiming a sweeping power to take whatever "lesser defensive measures" it wants. Opp. 24 n.43. This apparently includes disregarding federal law, ignoring congressional enactments, and rewriting the national immigration system. That is

---

[8] For example, might Texas declare war based on the "invasion" of residents from other states? Hooks, *Californians Could Ruin Texas—But Not the Way You Might Think*, Texas Monthly (Mar. 2021), https://perma.cc/H86T-8KV7 (Governor addressing "fears that Texas is being invaded").

[9] David Bier, *Fentanyl Is Smuggled for U.S. Citizens by U.S. Citizens, Not Asylum Seekers*, Cato Inst. (2022), https://perma.cc/8RTW-MENH. Likewise, "undocumented immigrants have substantially lower crime rates than native-born citizens . . . across a range of felony offenses." Michael T. Light et al., *Comparing Crime Rates Between Undocumented Immigrants, Legal Immigrants, and Native-Born US Citizens in Texas*, PNAS (Dec. 22, 2020), https://perma.cc/J7ZJ-GJTD. As for the "terror watchlist," Opp. 7, it is "rife with inaccuracies" and leads to routine "false alarms," Levinson-Waldman & Gutiérrez, *Overdue Scrutiny for Watch Listing and Risk Prediction*, Brennan Ctr., at 2-3 (2023) (describing people added simply because of connections to a particular country, or relationships with relatives or friends).

not a type of war power, it is immigration policymaking based on a political disagreement with the current administration. "This is a job for the Nation's lawmakers, not for its military authorities." *Youngstown*, 343 U.S. at 587; *see id*. at 642, 644 (Jackson, J., concurring) (warning against "sinister and alarming" idea that war powers would make President "Commander-in-Chief of the country"). It is certainly not a job for one state's governor.[10]

## II.     TEXAS'S THRESHOLD DEFENSES ARE MERITLESS.

Texas raises several threshold defenses that are specific to the private plaintiffs. But the Court does not need to address any of them if it finds that the United States has standing and a cause of action, because the cases are consolidated, and only one plaintiff needs to satisfy these threshold requirements. *Bowsher v. Synar*, 478 U.S. 714, 721 (1986) (only addressing one plaintiff's standing in consolidated case); *La Union del Pueblo Entero v. Abbott*, 2023 WL 8263348, *1 n.2, 10, 12 (W.D. Tex. 2023) (same). In any event, all of the threshold defenses fail.

### A.     Plaintiffs Have a Cause of Action at Equity and Satisfy *Ex parte Young*'s Exception To Sovereign Immunity.

Plaintiffs have a straightforward equitable cause of action. In *Armstrong v. Exceptional Child Center, Inc.*, the Supreme Court confirmed the "power of federal courts of equity" to "issue an injunction upon finding the state regulatory actions preempted." 575 U.S. 320, 326-27 (2015) (courts "regularly consider[]" such claims). The Fifth Circuit has since held that a plaintiff has "a

---

[10] In *Moyer v. Peabody*, on which Texas relies, the Court merely indicated that in the case of a declared insurrection, if the governor is allowed to order insurrectionists to be killed he may take the "milder measure" of detaining them. 212 U.S. 78, 84 (1909). Nothing in that case justifies Texas's attempt to control immigration policy. But *Moyer* does place the make-believe quality of Texas's "invasion" theory in sharp relief. Does Texas really think it could shoot migrants crossing the border as a war power? That is the implication of its argument. But when asked about his comments seeming to endorse such summary executions of people fleeing for their lives, the governor described such conduct as "obviously illegal." Texas Tribune, *Abbott's immigration rhetoric criticized again after interview response about shooting migrants* (Jan. 11, 2024). SB4 is no less obviously illegal, and the "invasion" defense is baseless.

cause of action . . . at equity" to enjoin preempted action. *Crown Castle Fiber, L.L.C. v. City of Pasadena*, 76 F.4th 425, 434-35 (5th Cir. 2023) (quoting *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 475 & n.27 (5th Cir. 2020) (en banc)) (italics omitted).

To invoke this equitable cause of action against Defendant McCraw, Plaintiffs must satisfy the exception to sovereign immunity recognized in *Ex parte Young*, 209 U.S. 123 (1908).[11] *Ex parte Young* applies where a plaintiff seeks prospective relief against a state officer, *Green Valley*, 969 F.3d at 471, who has "some connection with the enforcement of the act," *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020). Texas does not contest that McCraw is a state officer charged with enforcing SB4. *See* Opp. 52-53 (discussing general *Ex parte Young* principles but not denying that Defendants have authority to enforce SB4); Tex. Gov't Code § 411.006(a)(1)-(2); 43.120(a)-(c).

Texas asserts just one objection regarding both of these issues. It claims that, under *Ex parte Young*, the equitable cause of action and the sovereign-immunity exception are available *only* to a "potential defendant[] to an enforcement action" who is "preemptively asserting a defense" to prosecution. Opp. 40-41 (cause of action); *id.* at 51-53 (sovereign immunity). But it does not cite a single case that limits *Ex Parte Young* in this way.[12] Cases laying out its requirements do not mention any such limit. *See, e.g.*, *Air Evac EMS, Inc. v. Texas, Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 515-19 (5th Cir. 2017). To the contrary, as the Supreme Court has explained, "there is no warrant in our cases for making the validity of an *Ex parte Young*

---

[11] Defendant Hicks has no sovereign immunity. *Nat'l Press Photographers*, 90 F.4th at 787.

[12] Other than a law review article, Texas cites only two opinions—a dissent and a two-Justice concurrence—neither of which even advocates for the rule Texas claims. One of those opinions approvingly explains that "[t]he Court has expanded the *Young* exception . . . to vindicate the federal interest in assuring the supremacy of federal law." *Va. Office for Protection & Advocacy v. Stewart*, 563 U.S. 247, 262 (2011) (Kennedy, J., concurring) (cleaned up).

action turn on the identity of the plaintiff." *Va. Office for Protection & Advocacy*, 563 U.S. at 256. And courts regularly hold that plaintiffs satisfy *Ex parte Young* even though they are not potential defendants in any future enforcement action. *See, e.g.*, *id.* at 252 (agency plaintiff sought access to records); *Tex. Democratic Party*, 978 F.3d at 179 (voter plaintiffs sued Secretary of State to change forms for requesting absentee ballots).

### B.   Plaintiffs Have Standing.

#### 1.   Plaintiffs Have Preenforcement Standing.

Texas makes two sweeping standing arguments that, if true, would eliminate standing in a huge number of cases that courts routinely adjudicate. Neither is correct.

First, Texas argues that because Plaintiffs are not themselves subject to prosecution under SB4, they cannot satisfy the preenforcement standing test laid out in *Susan B. Anthony List v. Driehaus*, which requires an "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [law], and [that] there exists a credible threat of prosecution thereunder." 573 U.S. 149, 158-59 (2014) (quotation omitted); Opp. 42-43.

But those requirements do not apply here, because they only govern standing "[w]hen an individual is subject to such a threat" of "arrest, prosecution, or other enforcement action." *Id.* at 159. For those plaintiffs, the *Susan B. Anthony* requirements simply ensure that a *potential defendant's* injury is not "speculative." *Id.* at 160. Those standards have no application to plaintiffs who are seeking to prevent harms *other* than prosecution. It would make no sense to require a "threat of prosecution" for a plaintiff who is injured by a policy but not regulated by it, or who is regulated but not subject to prosecution. Courts accordingly do not apply these requirements to plaintiffs whose injury does not involve prosecution. *See Davis v. FEC*, 554 U.S. 724, 734 (2008) (plaintiff had standing to prevent "prospective injury" from rule that regulated third party); *Young*

*Conservatives of Tex. Found. v. Univ. of N. Tex.*, 569 F. Supp. 3d 484, 489 (E.D. Tex. 2021) (citing *Susan B. Anthony* but applying regular *Havens* standing requirements to organizational plaintiff); *Mi Familia Vota v. Abbott*, 497 F. Supp. 3d 195, 208-209 (W.D. Tex. 2020) (same); *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109-10 (2d Cir. 2017) (same); *Common Cause Indiana v. Lawson*, 937 F.3d 944, 949-50 (7th Cir. 2019) (same).

Texas's position would amount to an Article III bar against preenforcement claims by any party who is not subject to prosecution under the law they challenge. It does not cite a single case endorsing that position. Opp. 42-43. And the implications would be stunning. It would mean that Texas itself has lacked standing in a host of challenges it has brought to policies that regulate third parties. *But see, e.g.*, *Texas v. United States*, 809 F.3d 134, 155-62 (5th Cir. 2015) (holding Texas had standing to bring preenforcement challenge). It would eliminate an enormous swath of litigation brought by states, organizations, businesses, and individuals. *See, e.g.*, *Shelby Cty. v. Holder*, 570 U.S. 529, 537 (2013) (cases "to block voting laws from going into effect"); *Sierra Club v. Morton*, 405 U.S. 727, 734 (1972) (environmental litigation); *Biden v. Nebraska*, 143 S. Ct. 2355, 2366 (2023) (APA cases by states harmed by third-party regulation).

Second, Texas argues that Plaintiffs lack standing because their preemption claim does not satisfy *Susan B. Anthony*'s requirement of a "constitutional interest." Opp. 43. But as explained above, *Susan B. Anthony*'s prosecution-focused requirements do not apply to plaintiffs whose injuries do not stem from future prosecution. That is enough to reject this defense.

In any case, Plaintiffs do have a constitutional interest under the Supremacy Clause, which is the basis for their claim. U.S. Const. art. VI, § 2. The Supreme Court has been clear that private parties have standing to "vindicate [their] own constitutional interests" in raising federalism claims, and "a direct interest in . . . laws that upset the constitutional balance." *Bond v. United*

*States*, 564 U.S. 211, 220-22 (2011). Accordingly, courts regularly hold that plaintiffs satisfy the *Susan B. Anthony* test when they challenge state laws under the Supremacy Clause. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1015 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 1876 (2014); *E.F. Transit v. Indiana Alcohol & Tobacco Comm'n*, 2016 WL 4761438, *8 (S.D. Ind. 2016), *rev'd in part*, 878 F.3d 606 (7th Cir. 2018); *cf. Kentucky v. Yellen*, 54 F.4th 325, 336 (6th Cir. 2022) (general "federalism principles" provided constitutional interest for preenforcement standing).

Like their previous defense, Texas's position here would cause a dramatic sea change, because it would mean that private parties of all kinds could no longer challenge preempted state laws. But such challenges are routine. *See, e.g.*, *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983) (collecting cases); *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 20 (2013); *Crown Castle Fiber*, 76 F.4th at 434-36; *Nat'l Press Photographers*, 90 F.4th at 795; *Farmers Branch*, 726 F.3d at 527; *Silva v. Farrish*, 47 F.4th 78, 86-87 (2d Cir. 2022).[13]

### 2.   Plaintiffs Have Demonstrated Standing.

SB4 would upend Plaintiffs' operations, finances, and client bases. Mot. 17-19. Texas offers nothing to overcome this basic fact, which is more than enough for standing.

Texas suggests that "nothing in SB4" requires the organizations modify their "current programs." Opp. 44-45. That fundamentally misunderstands Plaintiffs' missions. Representing noncitizens who are incarcerated and facing removal under SB4 is central to their longstanding mission to help noncitizens seek federal protections like asylum. Las Americas, for example, is dedicated to "ensur[ing] that everyone has a fair opportunity" to seek protection and avoid

---

[13] Texas cites only one case for the idea that private parties can't bring preemption claims. *See United States v. Texas*, 2022 WL 868717, at *5 (W.D. Tex. Feb. 17, 2022). But in that case, no party had raised this issue, it had not been briefed, and the opinion contains little analysis. The plaintiffs in that case have moved to reconsider. *See id.*, No. 21-cv-173, Dkt. 25 (Jan. 18, 2024).

wrongful removal, and it thus "focus[es] [its] efforts on ensuring that those noncitizens at the greatest danger from removal are able to access protection." Babaie Decl. ¶¶ 11-12. Because SB4 creates a new system of rapid deportation without *any* relief, those subject to it will now be the "most vulnerable to removal," so representing them will be "a necessary part of and consistent with" the organization's mission. *Id*. at 13-14 (describing shift to address earlier federal summary removal system). The same is true for Plaintiff American Gateways. Yang Decl. ¶ 23.

SB4 simply will not allow Plaintiffs to just "maintain their current programs." Opp. 44. Its sweep is staggering, applying at the border and throughout the interior, enforced not only by DPS but by the more than 80,000 peace officers and 300 prosecutors in the state. And Defendant McCraw projected some 80,000 additional arrests annually under the law. Carrillo Decl. ¶ 10.

Texas dismisses the organizations' diversion injuries as "voluntary strategic and budgetary choices," Opp. 44, but the Supreme Court has "made clear that an injury resulting from the application or threatened application of an unlawful enactment remains fairly traceable to such application, even if the injury could be described in some sense as willingly incurred." *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 297 (2022); *see Havens Realty Corp. v. Coleman*, 455 U.S. 363, 374 (1982) (organization had standing to challenge housing discrimination it had chosen to address). Here, the injuries the organizations face plainly "result[] from counteracting the effects of" SB4. *Louisiana ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 305 (5th Cir. 2000); *see also Vote.Org v. Callanen*, 89 F.4th 459, 471 (5th Cir. 2023) ("self-inflicted injuries" are those that are "not fairly traceable to the actions of the defendant") (quotation omitted).

Nor will representing those detained under SB4 be the same as the organizations' "routine activities." Opp. 44. People prosecuted under SB4 will be held in a different detention system, with different facilities and different rules. SB4 operates by threatening individuals into accepting

removal in lieu of prosecution, without any of the protections available in the federal removal system; it requires judges to order people removed upon conviction; and it provides no defense to those who are seeking or intend to seek federal immigration relief. SB4 thus completely changes the manner in which Plaintiffs must reach, counsel, and represent noncitizens. They must identify clients earlier in the process, to ensure they do not accept removal and therefore terminate their ability to obtain asylum or other relief; must help people navigate the federal immigration system from within state detention facilities; and must help them seek federal relief as quickly as possible. *See* Babaie Decl. ¶¶ 30-34; Yang Decl. ¶ 22. Most clients will still be seeking federal relief when the state sentence ends, given the length of time federal proceedings can take. Yang Decl. ¶ 19. Plaintiffs will then have to help clients navigate the conflict between the two regimes, with federal law providing a right to stay, and state law requiring them to leave.

Texas vaguely maintains that the Texas Department of Criminal Justice will accommodate people's attempts to apply for asylum from TDCJ custody. Opp. 47. But SB4 defendants will also be held in myriad local jails, about which Texas says nothing. And even if Texas preserves some ability to access the federal asylum system, these changes will still require profound shifts in Plaintiffs' operations—so such (potentially empty) promises are beside the point for standing.

Nor is it "speculative" (Opp. 47) that SB4 will make it much harder for Plaintiffs to continue serving people who are seeking visas designed for witnesses and victims of crime, domestic abuse, and human trafficking. Babaie Decl. ¶¶ 42-49; Gutierrez Decl. ¶¶ 8-13, 18 (explaining that SB4 is making people reluctant to interact with law enforcement). In fact, Plaintiffs are *already* encountering these fears and expending resources in response, for instance by changing the structure of their community education programs. Babaie Decl. ¶¶ 50-51.

These injuries match and exceed what the Fifth Circuit has held sufficient for standing. For instance, *OCA-Greater Houston v. Texas* held that a voter services organization had standing to challenge a new law that required it "to spend extra time and money" educating voters about the law. 867 F.3d 604, 610-12 (5th Cir. 2017) (diversion was "not large" but sufficient because it was aimed at "mitigating [the] real world" impact of the law). SB4 alters the core of Plaintiff Organizations' work, and thus they easily have standing.

Finally, despite the severe harms to El Paso County, Mot. 18-19, Texas argues that it cannot challenge a state law as preempted. Opp. 48-51. But, as courts in the Fifth Circuit and elsewhere have held, "a subdivision may sue its state under the Supremacy Clause." *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 73 (2d Cir. 2019) ("In reaching this conclusion we join the Fifth and Tenth Circuits.") (citing *Rogers v. Brockette*, 588 F.2d 1057 (5th Cir. 1979)); *Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 619, 630 (10th Cir. 1998); *City of Alpine v. Abbot*, 730 F. Supp. 2d 630, 633 (W.D. Tex. 2010); *Cty. of Ocean v. Grewal*, 475 F. Supp. 3d 355, 368 (D.N.J. 2020). Indeed, the Supreme Court has repeatedly entertained cases between instrumentalities of the same state. *See Stewart*, 563 U.S. at 257-59 (court had jurisdiction even though "the opposing parties are both creatures of the [state]"); *Lassen v. Arizona*, 385 U.S. 458, 459 n.1 (1967) (no standing problem even though suit was "a controversy between two agencies of the State of Arizona"); *Tweed*, 930 F.3d at 73 (listing cases). Texas cites several cases for its supposed no-standing rule, but the Fifth Circuit has explained that those same cases "are *not* decisions about a municipality's standing to sue its state," but rather involve "substantive interpretations of the constitutional provisions involved." *Rogers*, 588 F.2d at 1068-1071 (emphasis added) (those cases impose "no bar to conferring standing" for a preemption claim). *Rogers* thus does not create a

"narrow exception" to any anti-standing rule, Opp. 48; its whole point is that no such rule exists in the first place.

### III.    THE COURT SHOULD PRELIMINARILY ENJOIN SB4.

#### A.  *Pullman* Abstention Is Inappropriate.

*Pullman* abstention is plainly inapplicable. Opp. 58-60. Texas identifies no "issue of uncertain state law" that would "render unnecessary or substantially modify" the preemption issues. *Baran v. Port of Beaumont Nav. Dist.*, 57 F.3d 436, 442 (5th Cir. 1995) (cleaned up). Most obviously, Texas is field preempted from regulating entry and removal, regardless of how its courts resolve any minor ambiguities. Nor does Texas identify an interpretation that would restore federal discretion, end SB4's threat to foreign relations, or eliminate its mismatches with federal law. It suggests that state courts might address noncitizens' "opportunity to claim asylum." Opp. 59. But, as explained, SB4 is unambiguous—those applying for asylum are subject to conviction and removal regardless. *See City of Houston v. Hill*, 482 U.S. 451, 468 (1987) (*Pullman* abstention inappropriate where statute's "language is plain and its meaning unambiguous").

Even where the threshold *Pullman* requirement is met, "the district court must assess the totality of the circumstances . . . [including] the rights at stake and the costs of delay pending state court adjudication . . . before deciding whether to abstain." *Baran*, 57 F.3d at 442. The totality here—an unprecedented state usurpation of federal authority that will create chaos and subject vulnerable noncitizens to extraordinary harm—weighs decidedly against abstention.

#### B.  SB4 Will Irreparably Harm Plaintiffs.

SB4 will irreparably harm Plaintiffs' operations and missions. Las Americas and American Gateways must develop entirely new programs in state detention centers. *See supra*. The County must restructure its operations to increase spending on jails, public defenders, and court staff.

Carrillo Decl. ¶¶ 11-13. These constitute irreparable harm. *See Valle del Sol*, 732 F.3d at 1029 (harms to organization were irreparable); *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 56 (D.D.C. 2020) (same); *Texas Tribune v. Caldwell County, Tex.*, 2024 WL 420160, at *7 (W.D. Tex. Feb. 5, 2024) (similar).

Texas's contrary arguments are not persuasive. It contends that Plaintiffs cannot claim harm based on illegal activity. Opp. 54-55. But Plaintiffs are not and will not be engaging in illegal activity: They are providing legal and other services that are entirely consistent with longstanding law. Texas also asserts Plaintiffs won't be harmed because SB4 defendants will get a criminal trial. Opp. 55. But the criminal trial does nothing to mitigate Plaintiffs' operational harms described above, which are caused by Texas imprisoning and deporting asylum seekers.

### C.  An Injunction Is In The Public Interest.

Texas does not counter the significant harms SB4 will cause to noncitizens in the State: the separation of families, removal without access to humanitarian relief, and expulsion to violence. Mot. 19-20. Even people later granted federal relief from removal will live under the cloud of a potential 20-year prison sentence for failing to comply with the state's contrary deportation order. Nor does Texas address the severe impact SB4 will have on the public trust essential for public safety. Mot. 20. Texas contends that SB4 will prevent unlawful activity like fentanyl trafficking. Opp. 56-58. But, as noted above, fentanyl overwhelmingly enters Texas through ports of entry, smuggled by U.S. citizens, and Texas has a panoply of criminal statutes targeting drug trafficking and sales. More fundamentally, Texas has no interest in enforcing a preempted law. *See Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 784 (5th Cir. 1990); *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012).

### D.  The Court Should Not Rewrite the Statute.

Texas cites the severability clause, but does not specify which provisions it believes can be severed. Texas law rejects severance where, as here, "all the provisions are connected in subject-matter, dependent on each other, [and] operating together for the same purpose ... [or] inseparably connected in substance[.]" *Rose v. Doctors Hosp.*, 801 S.W.2d 841, 844 (Tex. 1990) (cleaned up).

The purpose and intent of SB4 was clear: to pass a unified bill providing for the arrest, conviction, and removal of noncitizens entering Texas from Mexico. As its sponsor explained, the legislature's goal was "not to incarcerate more people . . . . [T]he primary focus would be to return those folks to the country from which they came."[14] And the Legislature rejected a long series of narrower bills, insisting that all of SB4's provisions be enacted together.[15]

### E.  The Court Should Enjoin SB4 Statewide.

Texas maintains that an injunction for the private plaintiffs "should be limited to the named Organizational Plaintiffs only." Opp. 62. Such a limit is inappropriate for three separate reasons.

First, as Texas appears to acknowledge, no such limit is warranted as long as the United States is granted relief. *See id.* (proposing limited injunction only as to the private plaintiffs). Given

---

[14] Phil Prazan, NBC DFW "Feud between House and Senate leaders may scuttle far reaching border security bill" (Nov. 5, 2023) https://perma.cc/9V3D-4B59; *see also, e.g.*, *id.* (House Speaker condemning version that lacked removal provisions, because it would impose "the exorbitant costs of [noncitizens'] long-term detention, including healthcare, housing, and meals"); *Hearing on Tex. S.B. 11 Before the Texas House Committee on State Affairs*, 88th Tex. Leg. (2023) (statement of Rep. Raymond) (similar); *House Floor Debate on SB4, 88th Tex. Leg. C.S. 4* (2023) (opposing amendment that would have weakened the removal provision).
[15] *See, e.g.*, Tex. H.B. 1600, 88th Leg., R.S. (2023); Tex. H.B. 5270, 88th Leg., R.S. (2023); Tex. H.B. 5281, 88th Leg, R.S. (2023); S.B. 2424, Tex. 88th Leg., R.S. (2023); S.B. 2, Tex. 88th Leg., 1st C.S. (2023); Tex. H.B. 23, 88th Leg. 3d C.S. (2023); Tex. H.B. 79, 88th Leg., 4th C.S. (2023); Tex. H.B. 104, 88th Leg., 3d C.S. (2023); Tex. S.B. 11, 88th Leg., 3d C.S. (2023).

that the United States is a plaintiff in this consolidated case, the Court does not even need to reach this argument. It should simply enjoin SB4 statewide.

Second, courts *never* impose this kind of limit when state laws are preempted, because such laws undermine the supremacy of federal law, not just the rights of individual plaintiffs. *See, e.g.*, *Farmers Branch*, 726 F.3d at 527 (preempted law enjoined as to everyone); *Alabama*, 691 F.3d at 1301 (same); *Valle del Sol*, 732 F.3d 1006 (same); *United States v. South Carolina*, 720 F.3d 518 (4th Cir. 2013) (same); *Lozano v. City of Hazleton*, 724 F.3d 297 (3d Cir. 2013) (same).

Third, a narrower injunction would not adequately protect the private plaintiffs. The Fifth Circuit has held that an "injunction[] should be crafted to provide complete relief to the plaintiffs," even if it "benefit[s] non-parties" too. *Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023). Texas makes no attempt to explain how the Court could craft a narrower injunction that would still provide complete relief to the private plaintiffs, whose numerous constituents, offices, and operations are scattered throughout Texas, and whose client bases are constantly changing. *See* Babaie Decl. ¶¶ 3-4; Yang Decl. ¶ 4. Under these circumstances, the Fifth Circuit has held that it is appropriate to enjoin an illegal policy in full. *See Mock*, 75 F.4th at 587 (nationwide injunction appropriate for organization whose members were "scattered nationwide"). Any attempt to narrow the injunction "would prove unwieldy and would only cause more confusion." *Id.* (cleaned up).

**CONCLUSION**

SB4 should be preliminarily enjoined.

Dated: February 14, 2024

David A. Donatti (TX Bar No. 24097612)
Adriana C. Piñon (TX Bar No. 24089768)
AMERICAN CIVIL LIBERTIES UNION OF
TEXAS
P.O. Box 8306
Houston, TX 77288
Telephone: (713) 942-8146
Facsimile: (713) 942-8966
ddonatti@aclutx.org
apinon@aclutx.org

*For Plaintiffs Las Americas Immigrant
Advocacy Center, American Gateways, and
County of El Paso*

Tamara F. Goodlette (TX Bar No. 24117561)
Erin D. Thorn (TX Bar No. 24093261)
Daniel Hatoum (TX Bar No. 24099136)
TEXAS CIVIL RIGHTS PROJECT
1017 W. Hackberry Ave.
Alamo, TX 78516
Telephone: (512) 474-5073, ext. 207
Facsimile: (956) 787-6348
tami@texascivilrightsproject.org
erin@texascivilrightsproject.org
daniel@texascivilrightsproject.org

*For Plaintiffs Las Americas Immigrant
Advocacy Center and American Gateways*

Jo Anne Bernal, (TX Bar No. 02208720)
El Paso County Attorney
320 S. Campbell St., Suite 200
El Paso, Texas 79901
Tel: (915) 273-3247
joanneb@epcounty.com

Bernardo Rafael Cruz, (TX Bar No. 24109774)
Assistant County Attorney
320 S. Campbell St., Suite 200
El Paso, Texas 79901
Tel: (915) 273-3247
b.cruz@epcounty.com

*For Plaintiff County of El Paso*

*/s/ Anand Balakrishnan*
Anand Balakrishnan
Omar Jadwat
Lee Gelernt
Wafa Junaid
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
abalakrishnan@aclu.org
ojadwat@aclu.org
lgelernt@aclu.org
wjunaid@aclu.org

Cody Wofsy
Spencer Amdur
Hannah Schoen
Morgan Russell
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
425 California Street, 7thFloor
San Francisco, CA 94104
T: (415) 343-0770
F: (415) 395-0950
samdur@aclu.org
cwofsy@aclu.org
hschoen@aclu.org
mrussell@aclu.org

*For Plaintiffs Las Americas Immigrant
Advocacy Center, American Gateways,
and County of El Paso*

21

## CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2024, I electronically filed the foregoing with the Clerk of Court by using the District Court CM/ECF system. A true and correct copy of this document has been served via the Court's CM/ECF system on all counsel of record.

*/s/ Anand Balakrishnan*
Anand Balakrishnan