**FILED**

February 29, 2024

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ ps

DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | No. 1:24-CV-8-DAE |
| | § | (lead case) |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| STATE OF TEXAS, GREG ABBOTT, *in his official capacity as Governor of Texas*, TEXAS DEPARTMENT OF PUBLIC SAFETY , and STEVEN C. MCCRAW, *in his official capacity as Director of Texas Department of Public Safety*, | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| LAS AMERICAS IMMIGRANT ADVOCACY CENTER, AMERICAN GATEWAYS, and COUNTY OF EL PASO, TEXAS, | § | No. 1:23-CV-1537-DAE |
| | § | (consol. case) |
| | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| STEVEN C. MCCRAW, *in his official capacity as Director of Texas Department of Public Safety*, and BILL D. HICKS, *in his official capacity as District Attorney for the 34th District*, | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |
| _____ | § | |

ORDER GRANTING PRELIMINARY INJUNCTION

Before the Court is Plaintiff United States of America's Motion for a

Preliminary Injunction, (Dkt. # 14). Also before the Court is Plaintiffs Las

Americas Immigrant Advocacy Center ("Las Americas"), American Gateways,

and County of El Paso, Texas's ("El Paso County") (collectively, the

"Organizational Plaintiffs") Motion for a Preliminary Injunction.[1] Defendants State

of Texas, Greg Abbott ("Abbott"), Texas Department of Public Safety ("DPS"),

Steven C. McCraw ("McCraw"), and Bill D. Hicks ("Hicks") (collectively,

"Defendants" or "Texas") filed a consolidated response to the motions. (Dkt. # 25).

Plaintiffs filed separate replies. (Dkts. # 32, 33). The Court held a hearing on the

motions on February 15, 2024. (Dkt. # 41). Having considered the parties' briefing

and the relevant law, the Court will preliminarily enjoin Defendants from

enforcing SB 4.

Several factors warrant an injunction. First, the Supremacy Clause and

Supreme Court precedent affirm that states may not exercise immigration

enforcement power except as authorized by the federal government. Second, SB 4

conflicts with key provisions of federal immigration law, to the detriment of the

United States' foreign relations and treaty obligations. Third, surges in

---

[1] The Organizational Plaintiffs filed their preliminary injunction in the member case, Las Americas Immigrant Advocacy Ctr. v. McCraw, No. 1:23-CV-1537-DAE (W.D. Tex. filed Dec. 19, 2023) ("Las Americas"), prior to consolidation.

immigration do not constitute an "invasion" within the meaning of the Constitution, nor is Texas engaging in war by enforcing SB 4. Finally, to allow Texas to permanently supersede federal directives on the basis of an invasion would amount to nullification of federal law and authority—a notion that is antithetical to the Constitution and has been unequivocally rejected by federal courts since the Civil War.

BACKGROUND

This case concerns a law passed by Texas that makes it a crime under state law for a noncitizen to commit certain immigration offenses. Senate Bill 4, § 2, 88th Legis., 4th Spec. Sess. (Tex. 2023) (codified at Tex. Penal Code § 51.02(a)) ("SB 4"). The Court will first describe the Parties and SB 4 before turning to the merits of the case.

**I. The Parties**

The United States filed suit on January 3, 2024, to enjoin SB 4 under the Supremacy Clause and Dormant Commerce Clause. (Dkt. # 1 at 1). In addition to the United States, three other plaintiffs have jointly sued to enjoin the law.

First, Plaintiff Las Americas is a nonprofit legal organization that serves the needs of low-income noncitizens and asylum seekers in West Texas, Southern New Mexico, and Ciudad Juarez, Mexico. Las Americas (Dkt. # 1 at 2). Las Americas aims to provide legal services to low-income immigrants and ensure

that they can avail themselves of humanitarian protections under federal law and integrate into the community. (Id. at 3). Las Americas alleges that SB 4 will force the organization to restructure its services, hinder its ability to inform asylum seekers about the application process and credible fear interviews, and reduce the effectiveness of programs that help noncitizen victims of violent crimes, abuse, and trafficking. (Id. at 11–12).

American Gateways is another nonprofit legal organization. It provides legal services to noncitizens, particularly around Austin, San Antonio, and Waco. (Id. at 3). It represents asylum seekers, victims of family violence, sexual assault, and human trafficking. (Id.). American Gateways alleges that SB 4 will frustrate its organizational mission because noncitizens will be arrested or deported before receiving asylum. (Id. at 14). Other noncitizen clients of American Gateways may fear reporting crimes of abuse or trafficking to police officers that will now be vested with the power to arrest them for immigration offenses under SB 4. (Id.). Like Las Americas, American Gateways states that it will have to spend more funds, resources, and time to achieve its same organizational goals. (Id.).

El Paso County is tasked with administering programs for its residents, including its county judicial system and jails, providing health and social services, and raising revenue.  (Id. at 4). El Paso County states that its immigrant

community pays $591,800,000 annually in taxes, much of which goes back to the County. (Id.).

El Paso County operates several programs that may suffer as a result of SB 4. First, El Paso County plans to establish the Office of New Americans, a program to improve the inclusion and integration of the County's immigrants through citizenship workshops, English as a Second Language classes, and education of legal rights. (Id. at 15). El Paso County also manages a migrant services support center, which assisted over 56,000 asylum seekers in 2022 to travel to United States destinations if they have proof of a sponsor in the country. (Id.). El Paso County alleges that SB 4 will interfere with these programs by subjugating noncitizens to criminal prosecution, hurting the County's ability to work with noncitizens, and interfering with the County's relationship with Mexico and other international partners. (Id. at 16).

El Paso County also alleges that SB 4 will strain its jail system. The County estimates that it may see an additional 8,000 state arrests per year under SB 4. (Id. at 17). The County will have to pay for the additional jail space, public defenders, and the judicial system that these arrests will require. (Id.). Because federal use of the County's jail is the third-largest source of its revenue, SB 4 will significantly reduce the County's budget by forcing the jail to house inmates arrested under the state's immigration law. (Id.). SB 4 will also interfere with El

Paso County's organizational goals by forcing it to incarcerate individuals who are not a risk to public safety and diminishing trust between noncitizens and the County's law enforcement agencies. (Id.).

Turning to the Defendants, the United States sues Greg Abbott, in his official capacity as Governor of Texas, the State of Texas, and the Texas Department of Public Safety. The Organizational Plaintiffs sue two other Defendants. First, they bring suit against Defendant Steven C. McCraw, who is the Director and Colonel of the Texas DPS. Las Americas, (Dkt. #1 at 4). He is "directly responsible . . . for the conduct of the department's affairs" and serves as "executive director of the department," among other duties and responsibilities, and has stated that DPS will enforce SB 4. (Id.) (citing Tex. Gov't Code § 411.006(a)(1)-(2)). He is sued in his official capacity. (Id.).

Second, the Organizational Plaintiffs bring suit Defendant Bill D. Hicks, who is the District Attorney for the 34th Judicial District, which includes El Paso County. (Id.) (citing Tex. Gov't Code § 43.120(a)). Hicks "represents the state in all criminal cases before every district court having jurisdiction in El Paso County" and "represents the state in all criminal cases pending in the inferior courts having jurisdiction in El Paso County," which will include charges brought under SB 4. (Id.) (citing Tex. Gov't Code §§ 43.120(b), (c)). Hicks is sued in his official capacity.

## II. SB 4

At a broad level, SB 4 criminalizes at the state level unauthorized entry or re-entry of noncitizens into Texas from outside the country, authorizes noncitizen removals to Mexico, and instructs state court judges not to abate proceedings on the basis of a pending federal determination of admissibility. Tex. Penal Code §§ 51.02–03; Tex. Code of Crim. Proc. arts. 5(B).002–003. In greater detail, SB 4 first makes it a crime for a noncitizen to "enter[] or attempt[] to enter [Texas] directly from a foreign nation at any location other than a lawful port of entry." Tex. Penal Code § 51.02(a). It is an affirmative defense to violations of § 51.02 if "the federal government has granted the defendant . . . lawful presence in the United States or asylum . . . ." Id. § 51.02(c). SB 4 does not define "lawful presence." Id. Individuals approved under the Deferred Action for Childhood Arrivals ("DACA") program have an affirmative defense, while those approved under the Deferred Action for Parents of Americans ("DAPA") and Lawful Permanent Residents program do not have an affirmative defense. Id. §§ 51.02(c)–(d)

Violations of § 51.02 are Class B misdemeanors under Texas law, punishable by up to $2,000 in fines and 180 days of imprisonment. Id. § 51.02(b); § 12.22. However, if a noncitizen has previously been convicted under § 51.02, a

subsequent violation is a felony, punishable by fines up to $10,000 and

imprisonment between 180 days and two years. Id. § 12.35.

Second, SB 4 makes it a crime for noncitizens to "enter[], attempt to

enter," or be found in Texas after they have "been denied admission to" or

removed from the United States or departed the United States while an order of

"removal is outstanding." Id. § 51.03.[2] The section has no affirmative defenses.

Violations of § 51.03 are Class A misdemeanors, punishable by fines up to $4,000

and imprisonment for up to one year. Id. § 51.03(b); § 12.21. Certain prior offenses

may either elevate violations of § 51.03 to third-degree felonies, punishable by

fines up to $10,000 and imprisonment between two and ten years, or second-

degree felonies, punishable by fines up to $10,000 and imprisonment between two

and twenty years. Id. § 12.21–23.

Third, SB 4 allows state judges to request or order the removal of

noncitizens under certain circumstances. Tex. Code of Crim. Proc. art. 5(B).002.

When an individual is charged with offenses under § 51.02 or § 51.03—but not yet

convicted—a magistrate or state judge may "discharge the person and require the

person to return to the foreign nation from which the person entered or attempted

---

[2] Section 51.02 criminalizes entry directly into Texas, so a noncitizen who enters directly into
New Mexico and then crosses the state border into Texas does not violate the law. Tex. Penal
Code § 51.02(a). Section 51.03, however, criminalizes a noncitizen who "is at any time found in"
Texas after a removal order—regardless of whether they crossed directly back into Texas or
through another state. Id. § 51.03(a).

to enter" if "the person agrees to the order" and has not "previously been" charged with or convicted of specific crimes. Id. art. 5(B).002(a)–(c). If a noncitizen is convicted under SB 4, the judge "shall enter" an "order requiring the person to return to the foreign nation from which the person entered or attempted to enter" after serving their prison sentence. Id. art. 5(B).002(d).[3] Texas law enforcement must monitor the noncitizen's compliance with the state removal order. Id. art. 5(B).002(e). Failure to comply with the removal order is an additional second-degree felony. Tex. Penal Code § 51.04.

Fourth and finally, SB 4 states that a "court may not abate the prosecution" of one of these offenses "on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated." Tex. Code of Crim. Proc. art. 5(B).003.[4]

## LEGAL STANDARD

A preliminary injunction is an extraordinary remedy, and the decision to grant such relief is to be treated as the exception rather than the rule. Valley v. Rapides Par. Sch. Bd., 118 F.3d 1047, 1050 (5th Cir. 1997). "A plaintiff seeking a

---

[3] Texas's response to the preliminary injunction effectively states that all removals under SB 4 will be to Mexico. (Escalon Decl., Dkt. # 25 at 2–4).

[4] SB 4 contains other miscellaneous provisions. It prohibits enforcement in certain buildings, such as primary schools and places of worship. Tex. Code of Crim. Proc. art. 5(B).001. SB 4 also instructs that violations of the law should be added to criminal record databases Id. art. 42A.059. Finally, it indemnifies officers enforcing the law. Tex. Civ. Prac. & Rem. Code § 117.002.

preliminary injunction must establish that he is likely to succeed on the merits, that

he is likely to suffer irreparable harm in the absence of preliminary relief, that the

balance of equities tips in his favor, and that an injunction is in the public interest."

Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). The party seeking

injunctive relief carries the burden of persuasion on all four requirements. PCI

Transp. Inc. v. W. R.R. Co., 418 F.3d 535, 545 (5th Cir. 2005).

Plaintiffs have met this high burden and have shown that a preliminary

injunction is warranted. Before reaching the merits of their motions, however, the

Court must first address threshold issues of standing, sovereign immunity, and

causes of action.

<u>JUSTICIABILITY</u>

**I. Standing**

*A. Nonprofit Plaintiffs*

Texas first contests the standing of the two nonprofit plaintiffs: Las

Americas and American Gateways ("Nonprofit Plaintiffs"). (Dkt. # 25 at 42). At

the preliminary-injunction stage, a plaintiff must make a "clear showing" that they

have standing. Barber v. Bryant, 860 F.3d 345, 352 (5th Cir. 2017). In particular, a

plaintiff must show: (1) an actual or imminent, concrete and particularized "injury-

in-fact"; (2) that is fairly traceable to the challenged action of the defendant; and

(3) that is likely to be redressed by a favorable decision. See, e.g., El Paso Cnty. v. Trump, 982 F.3d 332, 337 (5th Cir. 2020).

In certain pre-enforcement challenges, a plaintiff must show "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 160 (2014) (quoting Babbitt v. United Farm Workers Nat. Union, 442 U.S. 289, 298 (1979)). Because Plaintiffs bring a pre-enforcement challenge, Texas assumes that Susan B. Anthony applies and thereby suggests that the Nonprofit Plaintiffs lack a valid injury because their conduct is neither proscribed by statute nor threatened with prosecution. (Dkt. # 25 at 42–43).

However, the Babbitt/Susan B. Anthony line of cases sets out a test only for when a *directly* regulated party challenges a statute. See, e.g., Babbitt, 442 U.S. at 298; Susan B. Anthony, 572 U.S. at 160; Virginia v. Am. Booksellers Assn. Inc., 484 U.S. 383 (1988) (same). The test is simply not applicable to the Nonprofit Plaintiffs, who allege *indirect* harms under the law. The Nonprofit Plaintiffs allege impairment and frustration of their organizational purposes—not a direct threat of prosecution or regulation. Las Americas, (Dkt. # 1 at 11–14). Because no Plaintiffs claim that their injury stems from direct threats of prosecution, Babbitt does not apply. See Warth v. Seldin, 422 U.S. 490, 505 (1975) ("When a governmental

prohibition or restriction imposed on one party causes specific harm to a third party, . . . the indirectness of the injury does not necessarily deprive the person harmed of standing to vindicate his rights.").

A different test for pre-enforcement injury applies when a law's regulation *indirectly* harms a plaintiff. In this context, a plaintiff organization "may establish injury in fact by showing that it had diverted significant resources to counteract the defendant's conduct" and "the defendant's conduct significantly and 'perceptibly impaired' the organization's ability to provide its 'activities—with the consequent drain on the organization's resources.'" NAACP v. City of Kyle, Tex., 626 F.3d 233, 238 (5th Cir. 2010) (quoting Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982)).

Diversion of resources alone does not always suffice to confer standing. "The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization." Ass'n for Retarded Citizens v. Dallas Cnty. Mental Health & Mental Retardation Ctr. Bd. Of Trustees, 19 F.3d 241, 244 (5th Cir. 1994). Still, "the injury in fact requirement under Article III is qualitative, not quantitative in nature." Ass'n of Cmty. Organizations for Reform Now v. Fowler, 178 F.3d 350, 357–58 (5th Cir. 1999) ("ACORN"). The injury "need not measure more than an identifiable trifle" so long as it is concrete

and particularized and actual or imminent. Id. at 358 (internal quotations omitted).
The question is not whether the Nonprofit Plaintiffs face direct prosecution, but
whether they have shown a sufficiently concrete and identifiable injury that
extends beyond upsetting their abstract social or political goals. Warth, 422 U.S. at
505; Havens, 455 U.S. at 379.

   The Nonprofit Plaintiffs have met this burden. SB 4 will "completely
change[] the manner in which Plaintiffs must reach, counsel, and represent
noncitizens," including forcing them to identify clients earlier, help noncitizens
navigate the federal immigration process while in state prison, and seek federal
relief as quickly as possible before a removal under state law. Las Americas, (Dkt.
# 33 at 15). SB 4 will require them to spend *more* resources on education and
outreach only to achieve the same outcomes. (Id. at 14–15). The organizations will
have to "divert resources from community representation to the resource intensive
process of representing people detained under SB 4, decreasing the total number of
people served in obtaining immigration relief." Las Americas, (Dkt. # 30 at 18;
Babaie Decl., Dkt. # 30-1 at 9; Yang Decl., Dkt. # 30-2 at 2–4).

   SB 4 will also moot many asylum applications, because pending
asylum determinations must be disregarded by state court judges under the law.
Tex. Code of Crim. Proc. Art. 5(B).003. The Nonprofit Plaintiffs will risk
expending substantial time and resources on an application that will end up

irrelevant if their client is removed by state officials prior to a federal asylum ruling. The Nonprofit Plaintiffs will be forced to expedite asylum applications in the hopes of achieving a determination prior to a conviction or removal order under SB 4. In sum, SB 4's prohibition on abating the removal of asylum applicants will frustrate a core part of Las Americas' and American Gateways' mission.

SB 4 will also frustrate the preparation of asylum applications by incarcerating noncitizens prior to removal and making it substantially harder for those noncitizens to apply for asylum within one year of entry. See 8 U.S.C. § 1158(a)(2)(B). Because the Nonprofit Plaintiffs assert that they currently lack contacts in state court jails, see Las Americas, (Babaie Decl., Dkt. # 30-1 at 7–9; Yang Decl., Dkt. # 30-2 at 3–5), they will have reduced ability to find asylum seekers. For example, Las Americas represents clients once they have passed credible fear interviews ("CFIs"). (Babaie Decl., Dkt. # 30-1 at 7–9). Since state officials cannot conduct official CFIs, Las Americas will likely struggle to prioritize successful asylum claims (if those claims may even be adjudicated before removal). Incarceration will also limit Las Americas' and American Gateways' contact with their clients, making it harder to conduct client interviews, obtain application materials, and counsel clients on their hearings. (See id.).

In addition, the Nonprofit Plaintiffs have shown that SB 4 will frustrate their programs that seek to aid victims of sex crimes and human

trafficking.[5] Currently, Las Americas operates a "crime victims practice," which helps noncitizens who have suffered crimes, and a Human Trafficking Program, which assists noncitizens in reporting their trafficking to law enforcement. (Id. at 11–12). American Gateways similarly focuses much of its efforts on assisting noncitizen victims of abuse or trafficking. (Yang Decl., Dkt. # 30-2 at 5–6).

   Currently, under federal immigration law, victims of criminal activity may be offered a "U visa" that allows them to stay in the country if they have suffered certain crimes and are willing to assist law enforcement in the prosecution of the crime. 8 C.F.R. § 214.14. Alternatively, victims of human trafficking may apply for a "T visa" if they assist with any requests from law enforcement and would suffer extreme hardship if removed from the country. Id. § 214.11. Both Las Americas and American Gateways assist victims through the process of reporting crimes and obtaining U or T visas. See Las Americas, (Babaie Decl., Dkt. # 30-1 at 11–13; Yang Decl., Dkt. # 30-2 at 4–5). SB 4 will stifle those programs. Victims of crimes will likely fear reporting crimes to local law enforcement that has the authority to arrest or remove them under SB 4 for a previous unlawful entry. And SB 4 has no U or T visa counterpart. One of the organizations' key purposes—to protect noncitizen victims of crime—will become significantly tougher to

---

[5] El Paso County will suffer a similar harm. By criminalizing immigration offenses at the state level, SB 4 will make it less likely that victims of domestic violence and abuse report these crimes to police officers with the power to arrest noncitizens. The removal provisions will also result in the loss of the witnesses of these crimes.

accomplish, if not altogether impractical. The impairment of their mission and the

drain of organizational funds extends far beyond an abstract social harm and

suffices to show injury. City of Kyle, 626 F.3d at 237.

   In response, Texas first argues that "Nonprofit Plaintiffs' diversion of

resource theory fails as it stems from voluntary strategic and budgetary choices."

(Dkt. # 25 at 44) (citing Lane v. Holder, 703 F.3d 668, 675 (4th Cir. 2012)). Texas

might be correct if the Nonprofit Plaintiffs *solely* alleged the mere diversion of

resources. But their alleged injury goes further, alleging that SB 4 will frustrate

their organizational missions, disrupt programming, and increase the risks

associated with asylum applications and crime reporting. See Las Americas, (Dkt.

# 33 at 14–15); OCA-Greater Houston v. Tex., 867 F.3d 604, 612 (5th Cir. 2017)

(finding an "undertaking that consumed [an organization's] time and resources in a

way they would not have been spent absent the Texas law" conferred standing).

This is a perceptible and concrete drain of resources. See Havens, 455 U.S. at 379.

   Next, Texas argues that the Nonprofit Plaintiffs lack third-party

standing to assert the rights of their immigrant clients. (Dkt. # 25 at 46)

("Nonprofit Plaintiffs cannot obtain standing by expressing concern that a third

party not before this court may be harmed by the challenged law."). Again, Texas

is correct on the legal principle but wrong on its application to the case. The

Nonprofit Plaintiffs need not assert the rights of their clients or other noncitizens

detained under SB 4 to show standing. The Nonprofit Plaintiffs, as organizations, face discrete injuries distinct from those suffered by their members or clients. See OCA-Greater Houston, 867 F.3d at 610 ("The organization can establish standing in its own name if it meets the same standing test that applies to individuals.") (citations omitted). The organizations may challenge SB 4 without asserting the constitutional rights of their clients.

Finally, Texas argues that the Nonprofit Plaintiffs only allege a speculative injury. (Dkt. # 25 at 46–47). Because Texas has yet to implement the law or promulgate regulations about how it will take effect, Texas alleges the Nonprofit Plaintiffs cannot know that their injuries are certain. (Id.). As SB 4 is set to take effect mere days from today on March 5, the injury is imminent. As for how Texas intends to enforce the law, the Court need only look at Texas's response. In defense of SB 4, Texas has taken the position that the law is necessary to prevent a "complete and total invasion" of transnational criminal cartels coming from a "failed narco-state" "preying on the American people" "shuttle[ing] deadly and illegal narcotics like fentanyl from Mexico into every corner of this country." (Dkt. # 25 at 2–3). This plainly contrasts with its standing contention, where Texas alleges there is no real risk it will enforce the law or any guarantee that SB 4 will result in more arrests. (Id. at 46–47). Texas cannot have it both ways. If SB 4 is

necessary to stop an "invasion," then the risk of enforcement cannot be speculative.[6]

B.   *El Paso County*

1. El Paso is not barred from suit as a state subdivision

Texas next focuses its arguments on El Paso County. Texas asserts, "Precedent firmly establishes that local governments lack standing to sue their parent States." (Dkt. # 25 at 48) (citing City of Trenton v. New Jersey, 262 U.S. 182, 188 (1923); Town of Ball v. Rapides Par. Police Jury, 746 F.2d 1049, 1051 n.1 (5th Cir. 1984))). The precedent is not as firm as Texas posits. The Supreme Court has long since clarified that "legislative control of municipalities, no less than other state power, lies within the scope of relevant limitations imposed by the United States Constitution." Gomillion v. Lightfoot, 364 U.S. 339, 344–45 (1960). On at least six other occasions, the Supreme Court has decided suits between a state and its political subdivision. See Tweed-New Haven Airport Auth. V. Tong, 930 F.3d 65, 73 (2d Cir. 2019) (collecting cases).

The Fifth Circuit has explicitly recognized that a subdivision may sue the state under the Supremacy Clause. See Rogers v. Brockette, 588 F.2d 1057, 1070 (5th Cir. 1979) (affirming school district's standing to sue state under

_____

[6] Far from "disavow[ing] any intention of invoking the criminal penalty provision," Texas has made clear it intends to rigorously enforce SB 4. Babbitt, 442 U.S. at 302; (Dkt. # 25 at 2–5).

Supremacy Clause); Harrison v. Jefferson Par. Sch. Bd., No. CV 20-2916, 2021
WL 3286456, at *6 (E.D. La. Aug. 2, 2021) ("[A] subdivision can sue a state when
challenging state action under the Supremacy Clause.").[7] Both Rogers and
Gomillion limit the City of Trenton line of cases to claims under the Fourteenth
Amendment and Contract Clause. See Gomillion, 364 U.S. at 344 (cabining City
of Trenton and related cases to "the particular prohibitions of the Constitution
considered in those cases"); Rogers, 588 F.2d at 1058 (noting same); see also Note,
Brian P. Keenan, Subdivisions, Standing and the Supremacy Clause: Can a
Political Subdivision Sue Its Parent State Under Federal Law, 103 Mich. L. Rev.
1899, 1905 (2005) ("A review of the Supreme Court's holdings in this area shows
that they were limited to the clauses at issue in the cases, the Fourteenth
Amendment and the Contract Clause.").[8]

      To the contrary, Rogers states explicitly that the "Trenton line of cases
do[es] not, properly speaking, deal with a municipality's standing to sue the state

---

[7] Texas argues that the Court ought to distinguish Rogers on the facts, as that case dealt with
Texas depriving a federal breakfast program to a school district. Id. at 1061. Texas argues that
Rogers should apply only to cases where the state interferes with a federal statutory right (such
as school breakfast programs). (Dkt. # 25 at 48). The distinction is unavailing. Nothing in Rogers
limited its holding to cases where Congress had interfered with the states to create a federal
statutory right. Rogers, 588 F.2d at 1070. Neither Rogers itself nor any subsequent cases citing
Rogers appear to make this distinction.
[8] Other circuits have since followed suit. See Branson Sch. Dist. RE-82 v. Romer, 161 F.3d 619
(10th Cir. 1998); Tweed-New Haven Airport, 930 F.3d at 73 ("A subdivision may sue its state
under the Supremacy Clause. In reaching this conclusion we join the Fifth and Tenth Circuits.").
But see Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank, 136 F.3d 1360 (9th Cir.
1998) (denying standing to sue under Supremacy Clause).

that created it." 588 F.2d at 1070; see also Branson Sch. Dist. RE-82 v. Romer, 161 F.3d 619, 629 (10th Cir. 1998) ("Neither the [Trenton] line of cases nor any other subsequent Supreme Court case has held that a political subdivision is barred from asserting the structural protections of the Supremacy Clause of Article VI in a suit against its creating state."). Put simply, the Supreme Court has long shifted away from Texas's broad reading of City of Trenton, and under binding Fifth Circuit precedent, a political subdivision is not barred from suing the state under the Supremacy Clause. Rogers, 588 F.2d at 1070.

### 2. El Paso County asserts a valid Article III injury.

El Paso County also asserts a valid injury in fact. El Paso County estimates that SB 4 will lead to 8,000 more annual arrests in the County, leading to a corresponding 8,000 more jail bookings. Las Americas, (Dkt. # 30 at 19). The County will have to increase expenditures to provide counsel for these defendants and hire additional sheriff staff and policy officers. (Id.). Texas disputes this number, alleging that it comes from testimony that "the Director of the Texas Department of Public Safety gave the House State Affairs Committee before the legislation was ever finalized and enacted." (Dkt. # 25 at 49) (citing Las Americas, (Carrillo Decl., Dkt. # 3 at 3)). However, the declarant—Steven McCraw—is not just a legislative witness, but the principal state officer in charge of DPS and a Defendant in this case. McCraw could, but did not, personally dispute this number

in his response. And Texas provides no other evidence to impeach McCraw's testimony. That McCraw testified prior to SB 4's passage is irrelevant. Virtually all legislative testimony comes prior to a bill's enactment. It is not evident why this timing should reduce the testimony's credibility.

At any rate, El Paso County does not need to predict the number of arrests with pressing exactitude. Rather, the inquiry is whether the additional costs amount to more than an "identifiable trifle." <u>ACORN</u>, 178 F.3d at 358. Texas's own declarant, Victor Escalon, states that DPS expects to house and process noncitizens detained under SB 4 "primarily in State-owned facilities and does not anticipate a need for extensive use of county-owned jails." (Escalon Decl., Dkt. # 25-3 at 2). But extensive use is not required for standing—and even some use will amount to more than an "identifiable trifle." And again, given Texas's own statements that it plans to deploy SB 4 to stop a "warlike invasion" of fentanyl-smuggling cartels,[9] it is not unreasonable to expect that many of those arrests will be in El Paso County.

Texas suggests that "in practice the State may make alternative arrangements or provide additional funds and infrastructure to defray the costs."

---

[9] <u>See United States v. Abbott</u>, No. 23-50632, 2024 WL 551412, at *5 (5th Cir. Feb. 9, 2024) ("Our Nation is presently faced with a historic national security crisis at the border. The State of Texas has determined that the United States is failing to protect Texans from this danger, and has thus taken its own measures to combat the uncontrolled outbreak of illegal border crossings.") (dissenting opinion); (Dkt. # 25 at 3) ("These violent criminal organizations shuttle deadly and illegal narcotics like fentanyl from Mexico into every corner of this country.").

(Dkt. # 25 at 50). But Texas has not yet done so. Just as the Court cannot recognize mere speculation as injury, the Court cannot reject El Paso County's harm based on unsupported speculation about what the state might or might not do to mitigate those harms. SB 4 is set to take effect in days, and Texas has provided no evidence it actually intends to defray El Paso County's costs. As it stands, El Paso County has made a clear showing that SB 4 will force it to increase expenditures and jail capacity. That imminent harm is sufficient to confer standing.

## II. Sovereign Immunity

Texas argues that the two Defendants in the Las Americas case, DPS Director McCraw and District Attorney Hicks are both entitled to sovereign immunity. (Dkt. # 25 at 52). Hicks, as a district attorney, is not entitled to sovereign immunity. The Fifth Circuit has repeatedly held "that Texas district attorneys are not protected by the Eleventh Amendment precisely because they are county officials, not state officials." Nat'l Press Photographers Ass'n v. McCraw, 90 F.4th 770, 787 (5th Cir. 2024) (quoting Hudson v. City of New Orleans, 174 F.3d 677, 682 (5th Cir. 1999)) (cleaned up). Texas cites a recent Fifth Circuit case for the proposition that "Texas district attorneys are agents of the State when sued regarding their prosecutorial enforcement of state laws like SB4." (Dkt. # 25 at 52) (citing Arnone v. Dallas Cnty., 29 F.4th 262, 267 (5th Cir. 2022)). That citation is inapplicable. Arnone dealt with whether district attorneys act as state or county

policymakers under Section 1983—not whether they are entitled to sovereign immunity. 29 F.4th at 267. Indeed, Texas omits a key sentence from the case, stating the Section 1983 policymaker "inquiry is distinct from what we use to decide whether an official is a state actor for Eleventh Amendment purposes." Id.

As to Defendant McCraw, the relevant question is whether Ex parte Young applies. "Ex parte Young allows suits for injunctive or declaratory relief against state officials, provided they have sufficient "connection" to enforcing an allegedly unconstitutional law." In re Abbott, 956 F.3d 696, 708 (5th Cir. 2020) (citations omitted), cert. granted, judgment vacated as moot sub nom, Planned Parenthood Ctr. for Choice v. Abbott, 141 S. Ct. 1261 (2021). To have the requisite connection, the official must have "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." Tex. Democratic Party v. Abbott, 978 F.3d 168, 179 (5th Cir. 2020) (citation omitted).

Texas argues that the "Organizational Plaintiffs do not establish—or even allege—a waiver of sovereign immunity or how they satisfy an exception under Ex parte Young." (Dkt. # 25 at 53). As to the particular duty to enforce the state's criminal laws, McCraw's enforcement position as head of DPS has already been established:

> Director McCraw [has] more than just the general duty to
> see that the state's laws are implemented—[he is] directly
> responsible for enforcing Texas's criminal laws . . . . DPS

[] officers arrest people for violating Texas law, exercising "compulsion or constraint" in service of the law.

Nat'l Press Photographers, 90 F.4th at 786.

McCraw has also demonstrated a clear willingness to enforce SB 4. Once again, this is evident from the face of Texas's response, alleging "unprecedented influx of unlawful immigration for which the cartels are responsible," "deadly drug smuggling, human trafficking, and infiltration by suspected terrorists," "rampant criminal activity" and that the federal government has "has chosen to 'accept a failed narco-state.'" (Dkt. # 25 at 2–3). Indeed, the whole purpose of SB 4, as described by Texas, is to enforce immigration law where the federal government allegedly will not. A "scintilla of enforcement by the relevant state official with respect to the challenged law" will do, and McCraw has easily met that threshold. City of Austin v. Paxton, 943 F.3d 993, 1002 (5th Cir. 2019). In sum, McCraw has the legal authority to enforce SB 4 and has concretely demonstrated a willingness to do so, and therefore falls under the Ex parte Young exception. Thus, neither McCraw nor Hicks are entitled to sovereign immunity.

## III. Cause of Action

Relying principally on a 2015 Supreme Court case, Texas contends that the United States lacks a valid cause of action. (Dkt. # 25 at 35–36) (citing Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320, 324–25 (2015)). In Armstrong, the Supreme Court clarified that there is no implied cause of action

24

under the Supremacy Clause. 575 U.S. at 323–28 ("It is equally apparent that the Supremacy Clause is not the source of any federal rights and certainly does not create a cause of action. It instructs courts what to do when state and federal law clash, but is silent regarding who may enforce federal laws in court, and in what circumstances they may do so.") (cleaned up). Because the United States lacks an implied cause of action under the Supremacy Clause, Texas believes that the United States "therefore [has] no cause of action to enforce the supremacy of federal law." (Dkt. # 25 at 35).

Texas misreads Armstrong. The absence of an implied cause of action is not necessarily a bar to suit altogether. Armstrong itself shows this. There, the Supreme Court found no implied cause of action and then immediately turned to whether it could entertain the suit in equity. 575 U.S. at 327 ("We turn next to respondents' contention that, quite apart from any cause of action conferred by the Supremacy Clause, this suit can proceed against Idaho in equity."). Nothing in Armstrong bars suits in equity that are not displaced by Congress.

The plaintiffs' case in Armstrong was not dismissed solely for lack of a statutory cause of action, but also because the equitable cause had been displaced. Id. at 327–30. Armstrong noted that suits in equity are "subject to express and implied statutory limitations" that cannot be disregarded. Id. at 327. The act at issue in Armstrong—the Medicaid Act—precluded certain enforcement

actions by private parties, establishing a congressional "intent to foreclose equitable relief." Id. at 328 (internal quotations omitted). That foreclosure, combined with the "judicially administrative nature of" the Medicaid Act, left the plaintiffs in Armstrong without a cause of action. Id.

Displacement by federal statutory causes of action does not apply here. Id. at 329 (noting that "equitable relief is traditionally available to enforce federal law" by a proper plaintiff unless Congress has "displace[d]" it). Texas does not identify any displacement. It alleges only that the United States[10] has failed to identify a cause of action. But for Texas's argument to succeed, Texas must identify some law that has displaced equitable relief, and it has not done so here.

Unsurprisingly, courts before and after Armstrong have allowed suits in equity under the Supremacy Clause. See United States v. Texas, 557 F. Supp. 3d

---

[10] Texas focuses its argument on the United States, but at times suggests that the Organizational Plaintiffs also lack a valid cause of action. (Dkt. # 25 at 34–35). However, Armstrong itself reaffirmed the availability of Ex parte Young as an example of a permissible suit. 575 U.S. at 326 ("[A]s we have long recognized, if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted." (citing Ex parte Young, 209 U.S. at 155–56). And although the opinion mentions a direct enforcement challenge as an example of Ex parte Young, the doctrine is not limited to potential defendants of a state criminal regulation. See Tex. Democratic Party v. Abbott, 978 F.3d 168, 179 (5th Cir. 2020) (finding Texas Democratic Party asserted valid Ex parte Young challenge against secretary of state in challenge to absentee voting provisions); Virginia Office for Prot. & Advocacy v. Stewart, 563 U.S. 247, 256 (2011) ("Although respondents argue that [plaintiff's] status as a state agency changes the calculus, there is no warrant in our cases for making the validity of an Ex parte Young action turn on the identity of the plaintiff.").

810, 820 (W.D. Tex. 2021) (listing, as an example, six cases after <u>Armstrong</u> where the United States brought lawsuits under the Supremacy Clause). <u>Arizona v.</u> <u>United States</u>, the most recent Supreme Court immigration preemption case, was based off equitable remedies under the Supremacy Clause, like many preemption cases before it. 567 U.S. 387, 392 (2012); <u>see also Sanitary Dist. of Chicago v.</u> <u>United States</u>, 266 U.S. 405 (1925) ("The Attorney General [] may bring this proceeding [to carry out treaty obligations] and no statute is necessary to authorize the suit."). And the availability of suits in equity under the Supremacy Clause is established precedent in the Fifth Circuit. <u>See Crown Castle Fiber, L.L.C. v. City</u> <u>of Pasadena, Tex.</u>, 76 F.4th 425, 434–35 (5th Cir. 2023) ("Even though [the statute] does not confer a private right, a plaintiff is not prevented from gaining equitable relief on preemption grounds. Accordingly, [plaintiff] can bring its federal preemption claim."). Another circuit even emphasized that <u>Armstrong</u> "counsels in favor of—not against—permitting the United States to invoke preemption in order to protect its interest." <u>United States v. Supreme Ct. of N.M.</u>, 839 F.3d 888, 906 n.9 (10th Cir. 2016). Here, as there, "Defendants' reliance on <u>Armstrong</u> is misguided." <u>Id.</u>

## **IV. Abstention**

Texas also argues that the Court should abstain from deciding Plaintiffs' motions for preliminary injunctions under <u>Pullman</u> abstention. (Dkt. #

25 at 58–60). <u>Pullman</u> counsels that federal courts may abstain from resolving the constitutionality of a state law "so as to eliminate or at least to alter materially, the constitutional question presented." <u>Ohio Bureau of Emp. Servs. v. Hodory</u>, 431 U.S. 471, 477 (1977); (citing <u>R.R. Comm'n of Tex. v. Pullman Co.</u>, 312 U.S. 496 (1941)). Key to <u>Pullman</u> abstention is that "the challenged state statute is susceptible of a construction by the state judiciary that would avoid or modify the necessity of reaching a federal constitutional question." <u>Babbitt</u>, 442 U.S. at 306.

Generally, <u>Pullman</u> abstention does not apply to preemption claims. <u>See, e.g.</u>, <u>United Servs. Auto. Ass'n v. Muir</u>, 792 F.2d 356, 363 (3d Cir. 1986) ("The holdings of [<u>Pullman</u> and <u>Hodory</u>], read together, suggest that a federal court should not abstain under <u>Pullman</u> from interpreting a state law that might be preempted by a federal law . . . ."). Nor does Texas identify "uncertain state law" issues that would "render unnecessary or substantially modify" the preemption issues. <u>Baran v. Port of Beaumont Nav. Dist.</u>, 57 F.3d 436, 442 (5th Cir. 1995) (cleaned up). Field preemption applies no matter how Texas courts interpret ambiguities in SB 4. <u>See</u> *infra*, p. 29–52. And as the Court will explain in its discussion of conflict preemption, the Court need not wait to see if state courts abate proceedings under SB 4 pending federal determinations of admissibility, because SB 4 specifically prohibits them from doing so. <u>See</u> *infra*, p. 52–61.

Because Texas identifies no material ambiguity, there would be no value in

abstaining.

LIKELIHOOD OF SUCCESS ON THE MERITS

## I. Field Preemption

Next, the Court turns to the merits, beginning with field preemption.

"The Government of the United States has broad, undoubted power over the

subject of immigration and the status of [noncitizens]." Arizona, 567 U.S. at 394.

The U.S. Constitution empowers the federal government to "regulate commerce

with foreign nations" and "establish a uniform Rule of naturalization." U.S. Const.

art. I, § 8; id. art. II, § 2. Pursuant to this authority, Congress has created a complex

and expansive system to regulate entry into and removal from the United States.

See, e.g., De Canas v. Bica, 424 U.S. 351, 353 (1976); Toll v. Moreno, 458 U.S. 1

(1982); Padilla v. Kentucky, 559 U.S. 356 (2010).

SB 4 directly challenges the federal government's long-held power to

control immigration, naturalization, and removal.[11] SB 4 extends federal

immigration penalties by authorizing Texas state officials to detain, arrest,

---

[11] Despite Texas's argument that SB 4 does nothing more than complement federal law. (Dkt. #
25), Greg Abbott himself declared that SB 4 was an exercise of constitutional authority
superseding federal immigration laws. See Press Release, Greg Abbott, Governor of Texas,
Statement on Texas's Constitutional Right to Self-Defense, (Jan. 24, 2024),
https://gov.texas.gov/uploads/files/press/Border_Statement_1.24.2024.pdf.  (noting that "Texas's
constitutional authority to defend and protect itself . . . is the supreme law of the land and
supersedes any federal statutes to the contrary.").

prosecute, and remove noncitizens without federal supervision. Supreme Court precedent squarely holds that SB 4's attempt to regulate the unlawful entry of noncitizens is field preempted. Arizona, 567 U.S. at 399. Field preemption "can be inferred" both from "a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject" and from "a framework of regulation so pervasive that Congress left no room for the States to supplement it." Id. Applied to the field of immigration, the federal government has both a dominant interest and a pervasive regulatory framework that preclude state regulation in the area.

*A. The United States has a dominant interest in regulating immigration.*

As over a century of Supreme Court cases hold, "The authority to control immigration—to admit or exclude [noncitizens]—is vested *solely* in the Federal Government." Truax v. Raich, 239 U.S. 33, 42 (1915) (emphasis added) (citing Fong Yue Ting v. United States, 149 U.S. 698 (1893)). The Supreme Court has repeatedly stressed that "the regulation of [noncitizens] is so intimately blended and intertwined with responsibilities of the national government that where it acts, and the [S]tate also acts on the same subject," the state law must give way. Hines v. Davidowitz, 312 U.S. 52, 62 (1941); see also Hillsborough Cnty. v. Automated Med. Lab'ys., Inc., 471 U.S. 707, 719 (1985) (recognizing "the dominance of the federal interest" in immigration and foreign affairs as the

paradigmatic example of field preemption); <u>Takahashi v. Fish & Game Comm'n</u>, 334 U.S. 410, 419 (1948) (acknowledging that States "can neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization and residence of [noncitizens] in the United States or the several states"); <u>United States v. Valenzuela-Bernal</u>, 458 U.S. 858, 864 (1982) ("The power to regulate immigration—an attribute of sovereignty essential to the preservation of any nation—has been entrusted by the Constitution to the political branches of the Federal Government."); <u>Chy Lung v. Freeman</u>, 92 U.S. 275, 280 (1875) ("The passage of laws which concern the admission of citizens and subjects of foreign nations to our shores belongs to Congress, and not to the States."); <u>De Canas</u>, 424 U.S. at 354 ("Power to regulate immigration is unquestionably exclusively a federal power."); <u>Arizona</u>, 567 U.S. at 409 ("[T]he removal process is entrusted to the discretion of the Federal Government.").

Beyond the federal government's interest in the admission and removal of noncitizens, the field of immigration is also deeply intertwined with the United States' foreign relations. First, "[i]mmigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of [noncitizens] in this country who seek the full protection of its laws." <u>Arizona</u>, 567 U.S. at 395. It is "fundamental" that "foreign countries concerned about the status, safety, and security of their nationals in the

United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States." Id. The "perceived mistreatment of [noncitizens] in the United States may lead to harmful reciprocal treatment of American citizens abroad." Id. "Our system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." Hines, 312 U.S. at 63.

Second, "discretionary decisions" on how to enforce the nation's immigration laws "involve policy choices that bear on this Nation's international relations" and the "dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy." Id. at 396–97. That is particularly true for removal decisions. Such decisions include "the selection of a removed [noncitizen]'s destination" which "may implicate our relations with foreign powers," requiring "consideration of changing political and economic circumstances." Jama v. Immigr. & Customs Enf't, 543 U.S. 335, 348 (2005) (citation omitted). The "removal process" must be "entrusted to the discretion of the Federal Government" because it touches "on foreign relations and must be made with one voice." Arizona, 567 U.S. at 409.

Third, the federal government must be entrusted with the power to control the country's international borders. "[T]his country's border-control policies are of crucial importance to the national security and foreign policy of the United States," Hernandez v. Mesa, 885 F.3d 811, 819 (5th Cir. 2018) (quoting United States v. Delgado-Garcia, 374 F.3d 1337, 1345 (D.C. Cir. 2004)), aff'd, 140 S. Ct. 735 (2020), and "[n]ational-security policy" and foreign policy are "the prerogative of the Congress and President," Ziglar v. Abbasi, 582 U.S. 120, 142 (2017). Determination of which noncitizens may enter and remain in the United States "is unquestionably exclusively a federal power." De Canas, 424 U.S. at 354.

In short, it is undisputed that the federal government has a dominant and supreme interest in the field of immigration. Texas's own state courts acknowledge "the matter of entry into the United States" is "wholly preempted by federal law," Hernandez v. State, 613 S.W.2d 287, 290 (Tex. Crim. App. 1980), as are "matters involving deportation." Gutierrez v. State, 380 S.W.3d 167, 173, 176 (Tex. Crim. App. 2012). By regulating a sphere dominated by federal interests, SB 4 violates the Supremacy Clause.

*B. Congress has enacted a pervasive regulatory framework.*

In regulating immigration, the federal government has also enacted a "framework of regulation so pervasive that Congress left no room for the States to supplement it." Arizona, 567 U.S. at 399 (internal quotations omitted); see also

Texas v. United States, 50 F.4th 498, 516 (5th Cir. 2022) ("[B]ecause policies pertaining to the entry of [noncitizens] and their right to remain here are entrusted exclusively to Congress[,] [a]n attempt by Texas to establish an alternative classification system . . . would be preempted.") (cleaned up). Congress has created a comprehensive framework "of federal statutes criminalizing the acts undertaken by [noncitizens] and those who assist them in coming to" the United States. Ga. Latino All. for Hum. Rts. v. Governor of Ga., 691 F.3d 1250, 1264 (11th Cir. 2012) ("GLAHR").

　　　　Congress regulates immigration through countless statutes and treaties,[12] far too numerous to list in full. Congress has "authorized criminal penalties for individuals who bring [noncitizens] into the United States," GLAHR, 691 F.3d at 1264 (citing 8 U.S.C. § 1323), has "penalize[d] the transportation, concealment, and inducement of unlawfully present [noncitizens]," id. (citing 8 U.S.C. § 1324), has "impose[d] civil and criminal penalties for unlawful entry" and re-entry, id. (citing 8 U.S.C. § 1325–26), has prohibited "aid[ing] the entry of an

---

[12] See, e.g., Immigration and Nationality Act of 1952, Pub. L. 82-414, 66 Stat. 163 (codified as amended in scattered sections of 8 U.S.C.); Refugee Act of 1980, Pub. L. 96-212, 94 Stat. 102 (codified as amended in scattered sections of 8 U.S.C.), Immigration Act of 1990, Pub. L. 101–649, 104 Stat. 4978 (codified in scattered sections of 8 U.S.C.); Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. 104–132, 110 Stat. 1214, 28 U.S.C. § 2254 et. seq.; REAL ID Act of 2005, Pub. L. 109-13, 119 Stat. 3028 (codified in scattered sections of 8 U.S.C.); Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135 (codified in scattered sections of 6 U.S.C); USA Patriot Act, Pub. L. 107-56, 115 Stat. 272 (codified as amended in scattered sections of 8 U.S.C. 12 U.SC., 15 U.S.C., 18 U.S.C., 31 U.S.C., and 42 U.S.C.); Illegal Immigration Reform and Immigrant Responsibility Act of 1986, Pub. L. 99-603, 100 Stat. 3445 (codified as amended in scattered sections of 8 U.S.C. and 42 U.S.C.).

inadmissible [noncitizen]," id. (citing 8 U.S.C. § 1327), and has banned the

"import [of] [a noncitizen] for an immoral purpose," id. (citing 8 U.S.C. § 1328).

As one circuit court has held, the country's immigration laws have "been described

as second only to the Internal Revenue Code in complexity." Singh v. Gonzales,

499 F.3d 969, 980 (9th Cir. 2007) (cleaned up). Another has noted the striking

resemblance between immigration law and "King Minos's labyrinth in ancient

Crete." Lok v. INS, 548 F.2d 37, 37 (2d Cir. 1977). The country's immigration

laws are massive, sprawling, detailed, complex, and pervasive.

   Although Texas claims that the Biden Administration[13] has abandoned

the field, Congress has vested DHS and other executive agencies with substantial

enforcement power and duties.[14] DHS has "the power and duty to control and

guard the boundaries and borders of the United States." 8 U.S.C. § 1103(a)(5).

DHS and its subagencies retain the sole responsibility for "enforc[ing] and

administer[ing] all immigration laws," especially "the inspection, processing, and

admission of persons who seek to enter" the United States and "the detection,

---

[13] Throughout its briefing, Texas faults only the Executive Branch for abandoning the field of immigration. But congressional regulation of a field is far more relevant to preemption, or else the preemption analysis would constantly fluctuate depending on an agency's or administration's enforcement priorities.

[14] At the preliminary injunction hearing, the United States emphasized the scope of its recent immigration enforcement actions, noting that it removed 472,000 individuals between May through December of 2023—more than any single year since 2015. (Dkt. # 40 at 12).

interdiction, removal, [and] departure from the United States" of those here unlawfully. 6 U.S.C. § 211(c)(8).[15]

Congress has also made clear it occupies the field. Under the Immigration and Nationality Act ("INA"), a removal proceeding shall be "the sole and exclusive procedure for determining whether [a noncitizen] may be admitted to the United States or, if the [noncitizen] has been so admitted, removed from the United States." 8 U.S.C. § 1229a(a)(3).[16] The federal government alone is vested "with the powers of external sovereignty" and "the power to expel" noncitizens. United States v. Curtiss-Wright Exp. Corp., 299 U.S. 304, 318 (1936). The power of removal is "inherently inseparably from the conception of nationality." Id.

In sum, there is no genuine question that the federal government occupies the field of immigration. Accordingly, the Court will next turn to whether SB 4 unlawfully intrudes upon the federal government's immigration authority.

   *C. SB 4's criminalization of unlawful entry and re-entry intrudes into the federal government's field.*

Beginning with Texas's prohibitions on unlawful entry and re-entry, Arizona expressly forbids the sort of "concurrent" criminalization that Texas seeks to impose. 567 U.S. at 400; Tex. Penal Code § 51.02–51.03. There, in response to

---

[15] State authorities may assist in this enforcement under federal supervision. E.g., 8 U.S.C. § 1357(g).
[16] Subject to certain other federal provisions.

surging numbers of immigrants crossing its southern border, Arizona passed SB 1070 to "discourage and deter the unlawful entry and presence of" noncitizens in the country. Id. at 392–93. SB 1070 had four separate provisions: Section 3, which made it a state crime to comply with federal registration requirements; Section 5(c), which made it a state crime for an unauthorized noncitizen to seek or engage in work in Arizona; Section 6, which authorized officers to arrest a person without a warrant if there was probable cause to believe they were removable; and Section 2(B), which allowed officers conducting stops or arrests to verify a person's immigration status. Id. at 393–94. The Court found that all provisions were preempted, except for Section 2(B), which the Court believed would be better suited to resolution after the law took effect. Id. at 415–16.

SB 4 and SB 1070 contain striking similarities. As SB 1070 did previously, SB 4 attempts to "add[] a state-law penalty for conduct proscribed by federal law." *Arizona*, 567 U.S. at 400; see Tex. Penal Code §§ 51.02–51.03 (criminalizing under Texas law violations that mostly match 8 U.S.C. § 1325(a) and 8 U.S.C. § 1326(a)). As the Supreme Court found in Arizona, these federal provisions already act as "a full set of standards" "designed as a harmonious whole." Arizona, 567 U.S. at 401. Even accepting for purposes of argument that SB 4 merely imposes state law penalties for existing federal crimes, ""[p]ermitting the State to impose its own penalties for the federal offenses [] would conflict with

the careful framework Congress adopted." Id. at 402. SB 4 allows the state to "bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." Id. at 402. For that reason, "[w]here Congress occupies an entire field, as it has in the field of [noncitizen] registration, complementary state regulation is impermissible." Id. at 401. "Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." Id. (citing Silkwood v. Kerr–McGee Corp., 464 U.S. 238, 249 (1984)).

In sum, Sections 51.02 and 51.03 of SB 4 cannot be differentiated from Section 3 of SB 1070. Tex. Penal Code § 51.02–51.03. Both laws attempt to vest a state with the power to punish federal immigration offenses. But the "basic premise of field preemption," reaffirmed in Arizona, is that "[s]tates may not enter, in any respect, an area the Federal Government has reserved for itself[.]" Id. at 402. Under the holding of Arizona, SB 4 must be pre-empted.

### D. SB 4's removal authorization is patently unconstitutional.

Texas's criminalization of unauthorized entry and re-entry is preempted under Arizona and the federal government's dominant interest in regulating immigration enforcement. Article 5(B).002 of SB 4, however, is an especially problematic intrusion on federal prerogatives. Tex. Code of Crim. Proc.

art. 5(B).002. Article 5(B).002 goes even further than Arizona's SB 1070 by authorizing Texas state or magistrate judges to remove noncitizens from the United States without notice or consent from the federal government. Id. Before conviction, a judge may only order removal if a noncitizen consents, but after conviction, a state judge "*shall* enter" a removal order. Id. art. 5(B).002(a)–(d) (emphasis added).

This exceeds even what the dissenting Justices in Arizona believed to be constitutional. Arizona, 567 U.S. at 427 (Scalia, J., dissenting in part) (arguing that SB 1070 was constitutional because it only allowed detention and "does not represent commencement of the removal process unless the Federal Government makes it so"); id. at 438 (Thomas, J., dissenting in part) (suggesting states have power to make arrests but not discussing power of removals); id. at 457 (Alito, J., dissenting in part) ("State and local officers do not frustrate the removal process by arresting criminal [noncitizens]. The Executive retains complete discretion over whether those [noncitizens] are ultimately removed.").

Removal touches upon some of the most sensitive foreign affairs considerations of federal immigration policy. Id. at 409 (majority opinion) ("A decision on removability requires a determination whether it is appropriate to allow a foreign national to continue living in the United States. Decisions of this nature touch on foreign relations and must be made with one voice."); Jama, 543 U.S. at

348 ("Removal decisions, including the selection of a removed [noncitizen's]

destination, may implicate [the United States'] relations with foreign powers and

require consideration of changing political and economic circumstances.") (internal

quotation marks omitted). To that end, the INA vests removal authority exclusively

with the federal government. 8 U.S.C. § 1229a(a)(3) ("[A] proceeding under this

section shall be the sole and exclusive procedure for determining whether a

[noncitizen] may be admitted [or] removed from the United States."). To allow

Article 5(B).002 to take effect would allow states and state-court judges to shape a

key aspect of American foreign policy and intrude upon a field explicitly entrusted

to federal control by Congress. The federal government's domain over removal

prohibits concurrent state regulation. By authorizing state officials to conduct

removals, Article 5(B).002 of SB 4 intrudes into a particularly sensitive area of

foreign affairs and is field preempted.

### E. Arguments Against Field Preemption

#### 1. Nothing in Arizona limited field preemption to noncitizen registration.

Given that SB 4 goes even further to regulate immigration than SB

1070, the law is likely field preempted. Texas's arguments against field preemption

are unavailing.

First, in response to the Plaintiffs' arguments on field preempted,

Texas first argues that the "only field preemption recognized in Arizona is the

'field of [noncitizen] registration.'" (Dkt. # 25 at 15) (quoting <u>Arizona</u>, 567 U.S. at

403). This is simply not an accurate recitation of <u>Arizona</u>, which explicitly applied

field preemption to parts of SB 1070 besides noncitizen registration. 567 U.S. at

403–11. Nothing in <u>Arizona</u> suggests [noncitizen] registration was the *sole* area of

immigration to be field preempted. <u>Id.</u> The Supreme Court merely used the phrase

"field of [noncitizen] registration" because it was discussing the specific portion of

SB 1070 that regulated registration in that quote.

   <u>Arizona</u>'s preemption of other portions of SB 1070 shows that the

decision was not limited to noncitizen registration. In its discussion of Section 6,

<u>Arizona</u> explicitly ruled, "By authorizing state officers to decide whether [a

noncitizen] should be detained for being removable, [Section 6 of SB 1070]

violates the principle that the removal process is entrusted to the discretion of the

Federal Government." <u>Id.</u> at 409.

   In fact, the Supreme Court's treatment of SB 1070's provision on

removability determinations was even more harsh than its discussion of the

provision on noncitizen registration. <u>See Arizona</u>, 567 U.S. at 401–09. SB 4's

regulation of unauthorized entry and removability cuts against—not for—the

constitutionality of the law. Regulation of unlawful entry has an even stronger

connection to federal interests than noncitizen registration. Unlawful entry

implicates key federal interests, including regulation of the border, the power of

removal, and diplomatic considerations such as when and where noncitizens may apply for asylum. See, e.g., id. at 401–11; Hines, 312 U.S. at 64–66. For those reasons, Congress has explicitly stated that federal immigration law is the "sole and exclusive" means of determining admissibility. 8 U.S.C. § 1229a(a)(3). Texas cannot dispute that "[t]he federal statutory directives" here "provide a full set of standards," including "punishment for noncompliance," and that SB 4 "adds a state-law penalty for conduct proscribed by federal law." Arizona, 567 U.S. at 400–01. Field preemption applies to the regulation of unlawful entry under SB 4, just as much as it applied to noncitizen registration and removability determinations in Arizona.

### 2. SB 4 authorizes the removal of noncitizens, and the power of removal is preempted.

Next, Texas argues that orders under SB 4 are not "removals." (Dkt. # 25 at 16). Texas relies on a declaration from a regional DPS director stating that Texas will not remove detainees from the state, but instead "have an officer escort the [noncitizen] to a port of entry." (Escalon Decl., Dkt. # 25-3 at 2). Despite stating that Mexico is a "failed narcostate" (Dkt. # 25 at 2), Texas's declarant Victor Escalon insists that Texas DPS "enjoys a cooperative relationship with" Mexican police and "expects to work with Mexican authorities to request they allow entry of [noncitizen] returnees." (Escalon Decl., Dkt. # 25-3 at 2–3). "If Mexican authorities do not accept the entrance of [a noncitizen] subject to an order

to return, the escorting DPS officer will deliver him to the American side of a port of entry and observe the [noncitizen] go to the Mexican side." (Id.).

Under Escalon's description, an officer takes a noncitizen, escorts them to another country, and departs after the noncitizen enters the other country. This is the same thing as a removal. Removal, Black's Law Dictionary (11th ed. 2019) ("The transfer or moving of a person or thing from one location, position, or residence to another."); see also Deportation, Black's Law Dictionary (11th ed. 2019) ("The act or an instance of removing a person to another country; esp., the expulsion or transfer of [a noncitizen] from a country."). Texas escorts a noncitizen to the border and they either depart into Mexico or are face 20 years in prison if they do not. Given that Texas may incarcerate someone for 20 years if they do not cross into Mexico, it is rather absurd to argue, as Texas does, that DPS officers are not "forcing" the noncitizen to cross. Tex. Penal Code § 51.04(b).

Texas contends, "Effectuating any forced removal from the country remains the task of federal CBP officers." (Dkt. # 25 at 16). This is simply not what Texas's declarant says. Escalon states that a Texas officer will deliver a noncitizen to a port of entry and the noncitizen will be charged with a second-degree felony if they do not then enter Mexico. (Escalon Decl., Dkt. # 25-3 at 2–3); Tex. Penal Code § 51.04. The sole difference, then, is whether the removal occurs

in handcuffs or under threat of handcuffs (and 20 years of prison), and that is not a distinction of constitutional significance.

Texas seems to argue that there are no foreign affairs considerations implicated by these removals so long as Mexican border officers consent to the entry. (Dkt. # 25 at 16). Mexico's own position on SB 4 flatly contradicts this theory. Despite Escalon's statement that DPS has a solid working relationship with Mexico, the country has repeatedly condemned SB 4. When SB 4 was adopted, Mexico expressed its opposition. See Press Release 476, Mexican Government opposes the anti-immigrant legislation passed in Texas, Secretary of Foreign Relations of Mexico (Nov. 15, 2023), available at https://perma.cc/RP7H-JXZR. Mexico noted that SB 4 would violate its own sovereign right "to determine its own policies regarding entry into its territory." Id. Mexico's President, Andrés Manuel López Obrador, called SB 4 "inhumane" and protested the law with the United States federal government. (Jacobstein Decl., Dkt. # 14-1 at 4). A representative of the U.S. State Department notes that "Mexico has signaled emphatically that" "removal orders under SB 4" would "frustrate the United States' relations with Mexico regarding noncitizen removals and likely other important bilateral issues." (Id. at 5). In sum, there is no need to engage in theoretical discussions about why removals *might* impact foreign affairs—it is

clear from the evidence that SB 4 *already has* impacted the United States' foreign relations.

Supreme Court precedent shows that only the federal government may remove noncitizens. <u>Arizona</u>, 467 U.S. at 409 (majority opinion); <u>Jama</u>, 543 U.S. at 348. Texas's attempts to circumvent this well-established precedent are unavailing. Regardless of whether DPS officers physically force noncitizens across the border, or if Mexican police officers agree to a removal, SB 4's removal provision significant implicates foreign affairs. These foreign policy decisions must be made by one voice: the federal government's.

### 2. Immigration enforcement laws with "concurrent" purposes are preempted.

Texas next argues that SB 4 "mirror[s] federal law" and is "consistent with" its federal counterparts. (Dkt. # 25 at 17-18). But Congress has spoken clearly on the issue, noting that federal statutes are the "the sole and exclusive procedure" for determining admissibility and removability of noncitizens. 8 U.S.C. § 1229a(a)(3). However, by permitting removals, SB 4 effectively allows state officials to make removability determinations, thereby authorizing state regulation of an exclusive federal field. There can be no "consistent" state regulation when Congress has explicitly designated federal law as the "sole and exclusive" authority. <u>See Villas at Parkside Partners v. City of Farmers Branch</u>, 726 F.3d 524, 531–32 (5th Cir. 2013) (plurality) (holding that an ordinance "interferes with the

careful balance struck by Congress" by "giving state officials authority to act as immigration officers outside the limited circumstances specified by federal law" (internal quotation marks omitted)).

Again, this was squarely addressed by Arizona. 567 U.S. at 408. Arizona makes clear that even concurrent laws risk thwarting federal immigration objectives. Id.; see also GLAHR, 691 F.3d at 1264 (noting from Arizona that "the Supreme Court dismissed the state's argument that its goal of concurrent enforcement was appropriate in a field occupied by federal regulation."). Allowing state officers to arrest noncitizens based on removability "would allow the State to achieve its own immigration policy. The result could be unnecessary harassment of some [noncitizens] . . . who federal officials determine should not be removed." Id. That is especially the case with SB 4, which will lead to the arrest and incarceration of (eventual) successful asylum applicants, noncitizens with credible fears of torture, and victims of abuse and trafficking who report their crimes to the police.

Due to the careful considerations involved in determining admissibility and how to treat removable noncitizens, Arizona specifies that Congress created a system with "limited circumstances in which state officers may perform the functions of an immigration officer." Id. SB 4 goes beyond those limited circumstances and exceeds the role Congress has granted the states in

immigration enforcement. For the same reason, courts have found state laws on human-smuggling preempted by federal immigration law. See, e.g., GLAHR, 691 F.3d at 1263–64 (finding a state human smuggling law preempted by comprehensive federal immigration provisions); United States v. South Carolina, 720 F.3d 518, 530-31 (4th Cir. 2013) (same); Valle del Sol Inc. v. Whiting, 732 F.3d 1006, 1024-25 (9th Cir. 2013) (same). "Congress has provided a broad and comprehensive plan describing the terms and conditions upon which [noncitizens] may enter this country, how they may acquire citizenship, and the manner in which they may be deported." Hines, 312 U.S. at 69. Congress "plainly manifested a purpose to do so in such a way as to protect the personal liberties of law-abiding [noncitizens] . . . and to leave them free from the possibility of inquisitorial practices and police surveillance." Id. at 74. States "cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement, the federal law, or enforce additional or auxiliary regulations." Id. at 66–67. SB 4's supposed concurrent purpose with federal law cannot save it from preemption.

### 3. Texas's dissatisfaction with immigration enforcement does not show complete abandonment by the United States.

Texas takes aim at existing Supreme Court precedent, suggesting that "[s]everal members of the Supreme court have questioned the more recent and profligate use of field preemption . . . ." (Dkt. # 25 at 19). A district or appeals court is not at liberty to disavow Supreme Court precedent based off freewheeling

speculation about whether the Supreme Court will change its mind. Stare decisis

commands that "today's Court should stand by yesterday's decisions" and this rule

applies inflexibly to lower courts. Kimble v. Marvel Entm't, LLC, 576 U.S. 446,

456 (2015). Whether Texas agrees with field preemption or not, Arizona

unambiguously instructs that field preemption forecloses state attempts to regulate

entry and removal. 567 U.S. at 400.[17]

       Nonetheless, Texas argues, field preemption does not apply because

the federal government has abandoned the role of immigration enforcement.[18]

(Dkt. # 25 at 19-20) ("[T]he federal executive branch has abandoned the very field

it now purports to occupy."). Texas relies on dicta in a recent decision from

another court in this district that found "[t]he evidence presented amply

demonstrates the utter failure of [DHS] to deter, prevent, and halt unlawful entry

into the United States." Texas v. DHS, No. DR-23-CV-00055-AM, 2023 WL

---

[17] The principle of stare decisis is particularly important in the context of a preliminary injunction. Preliminary relief is granted to maintain the status quo. See Ruiz v. Estelle, 650 F.2d 555, 565 (5th Cir. 1981). A change in precedent, by definition, cannot serve to maintain the status quo.

[18] In making this argument, Texas parrots the statements made by its governor and state politicians decrying the federal government's immigration policy. See, e.g., Greg Abbott, Press Release, Greg Abbott, Governor of Texas, Statement on Texas's Constitutional Right to Self-Defense, (Jan. 24, 2024), https://gov.texas.gov/uploads/files/press/Border_Statement_1.24.2024.pdf ("President Biden has refused to enforce [immigration] laws . . . ."). Political hyperbole cannot substitute for legal argument. The Court must decide issues based the laws and facts before it. It is improper for courts to accept a fact as true simply because a governor has declared it so or the House of Representatives narrowly declares so in a non-binding resolution.

8285223 (W.D. Tex. Nov. 29, 2023); rev'd by injunction pending appeal, 88 F.4th

1127 (5th Cir. 2023), vacated, No. 23A607, 2024 WL 222180 (U.S. Jan. 22, 2024).

The Court cannot transfer the evidentiary findings of one case into

this one.[19] The record before this Court in this case does not establish

abandonment—in Texas or otherwise in the United States.[20] The Court is

sympathetic to Texas's concerns at the border, but to say that the Biden

Administration has "abandoned" the field of immigration is to take hyperbolic

criticism literally. Contrary to Texas's position, the record is replete with examples

and evidence of the federal government carrying out its immigration duties. DHS's

Executive Office for Immigration Review ("EOIR") employs 6,000 immigration

officers nationwide, while Homeland Security employs 6,100 special agents. (Hott

Decl., Dkt. # 14-4 at 2–3). Immigration and Customs Enforcement ("ICE")

manages a docket of 6.8 million cases, including noncitizens in removal

proceedings or those who have received removal orders. (Id.). ICE has 19,102 beds

for detained noncitizens in Texas alone. (Id. at 5).

---

[19] And at any rate, the failure to prevent all unlawful entries does not equate to abandonment.
Texas cites no cases for the proposition that the failure to regulate with complete effectiveness
constitutes abandonment.

[20] A party cannot simply rest on the dicta of a previous district court case to estop this court's
fact-finding role. That is especially true when Texas described that district court's reasoning
elsewhere as "mistaken" "unavailing" and an "outlier holding" parting ways with established
circuit precedent. Texas v. DHS, 88 F.4th 1127 (5th Cir. 2023), (Pet. Br., Dkt. # 25 at 12, 17;
Reply, Dkt. # 47 at 4).

From May 2023 to November 2023, DHS "removed or returned over 400,000 [individuals]", the vast majority at the southwest border. CBP, CBP releases November 2023 monthly update (Dec. 22, 2023), https://perma.cc/XQW4-55XW. These numbers "nearly [equal] the number removed and returned in all of fiscal year 2019 and exceeds the annual totals for each year 2015 – 2018." Id. "Daily removals and enforcement returns per day are nearly double what they were compared to the pre-pandemic average (2014 – 2019)." Id.

Beyond arresting and removing noncitizens, the United States has engaged in successful diplomatic talks to reduce unauthorized immigration. For example, the United States has "secured commitments from partner governments to" advance two programs designed to reduce immigration flows: the "Root Causes Strategy, which focuses on the main challenges that drive irregular migration, and the Collaborative Management Strategy, which is devoted to fostering the international cooperation necessary to enhance safety . . . and reduce irregular migration." (Jacobstein Decl., Dkt. # 25-1 at 6–7). The United States has partnered with Mexico for both initiatives and led a multilateral framework in Central America to reduce irregular migration. (Id.). Most recently, high-ranking cabinet officials met with President López Obrador in December 2023 stressing the need to reduce irregular migration and enhance border security efforts. (Id.; Dkt. # 14, at 10). Again, Texas may disagree with diplomatic efforts or contest their

effectiveness, but it cannot maintain in good faith that those efforts constitute

"abandonment."

It is simply not accurate to say that hundreds of thousands of removals

constitute abandonment. Texas mistakes the figurative for the literal. Whatever

hyperbole Texas employs, DHS's actions do not constitute genuine abandonment

as a legal determination. Texas may disagree with the number of removals or the

way that DHS goes about immigration enforcement, but it cannot legitimately

maintain that DHS does *nothing* at the southwest border.[21]

Again, Texas's argument on this point is foreclosed by Arizona.

There, the Court recognized in the very first sentence of its opinion that Arizona

passed SB 1070 "[t]o address pressing issues related to the large number of

[noncitizens] within its borders who do not have a lawful right to be in this

country." Arizona, 567 U.S. at 392. Nonetheless, it ruled that three of SB 1070's

operative provisions were preempted. Id. Texas contends that Arizona was

premised "on the idea that the federal government was, at the time, making good-

---

[21] Texas's sole citation on this point is to Parker v. Brown, 317 U.S. 341, 358 (1943). (Dkt. # 25 at 20). In Parker, California had established programs to restrict competition among farmers to help stabilize prices. Id. at 344–48. Brown, a farmer, sued, arguing the law was preempted by the federal Sherman Act and the Commerce Clause. Id. In particular, Brown argued that the federal Agricultural Marketing Agreement Act, which authorized the Department of Agriculture to limit certain agricultural quantity sales, preempted the law. The Court rejected that argument, noting that the Secretary had not issued any order "putting [the law] into effect." Id. at 358. That is plainly not the case here, where DHS and a litany of other federal agencies have issued hundreds of regulations related to immigration enforcement and conduct thousands of removals each day. See generally 8 C.F.R. §§ 1001. et. seq.

faith efforts to carry out its obligations under federal immigration statutes." (Dkt. # 25, at 21). But Arizona made the same arguments about abandonment as Texas does. Arizona's brief before the Supreme Court complains at length about the federal government's allegedly deficient immigration enforcement. See id., Brief in Support of Petitioners, Arizona, 567 U.S. 387 (No. 11-182), 2012 WL 416748, at *1 ("The President fairly describes our Nation's system of immigration regulation and enforcement as 'broken.'"); id. at *8 ("Arizona has repeatedly asked the federal government for more vigorous federal enforcement, but to no avail."). Over these objections, the Supreme Court ruled that "authorizing state and local officers to engage in [removal] enforcement activities as a general matter . . . creates an obstacle to the full purposes and objectives of Congress" and should be preempted. Arizona, 567 U.S. at 410.[22]

In sum, the federal government has not abandoned the field of immigration. Undoubtedly, these government efforts fail to deter all unlawful migration, and the federal government does not detain or timely remove all

---

[22] If Texas disagrees with the scope or allocation of federal resources to the border, it may still assist with immigration enforcement under the current congressional scheme. Under 8 U.S.C. § 1357(g), DHS may "enter into a written agreement with the state" to carry out "a function of an immigration officer in relation to the investigation, apprehension, or detention of [noncitizens]" in the United States. DHS has signed 150 agreements with local law enforcement, more than half of which have been signed after 2011. Congressional Research Service, The 287(g) Program: State and Local Immigration Enforcement (Aug. 12, 2021), https://perma.cc/GQN4-DVVF. Twenty-six Texas Sherrif's Offices have agreements with the federal government under § 1357(g). (Dkt. # 14 at 8).

noncitizens who unlawfully enter its borders. But those failures are a far cry from abandonment. The federal government retains a dominant interest in immigration and a complex legal framework to regulate noncitizen entry and removal. SB 4's intrusion into that federal arena is field preempted.

## II. Conflict Preemption

Beyond field preemption, SB 4 is conflict preempted. A state law is preempted where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Hines, 312 U.S. at 67. To show conflict preemption, Plaintiffs need not show that the laws achieve different ends. Rather, a "[c]onflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy." Motor Coach Employees v. Lockridge, 403 U.S. 274, 287 (1971).

Arizona is again instructive. There, Section 5(c) of SB 1070 made it a state misdemeanor for "an unauthorized [noncitizen] to knowingly apply for work, solicit work in a public place or perform work as an employee or independent contractor." Arizona, 567 U.S. at 403. [23] The Court found that "Congress enacted . . . a comprehensive framework for combatting the employment of illegal [noncitizens]." Id. Namely, Congress combatted this by regulating domestic

---

[23] In a brief discussion, the Supreme Court also found Section 3 to be conflict preempted. See Arizona, 567 U.S. at 402–03.

employers under the INA, whereas SB 1070 punished noncitizen employees. Id. Although federal law and SB 1070 both generally punished the employment of noncitizens, the Court found that SB 1070's differing enforcement mechanism "would interfere with the careful balance struck by Congress with respect to unauthorized employment of [noncitizens]." Id. at 406.

Arizona shows that state restrictions on immigration that exceed or differ in enforcement mechanisms from federal regulations are preempted. The question for SB 4 is whether its operative provisions conflict with federal law, stand as an obstacle to the objectives of Congress, or employ disruptive or conflicting techniques. See id. at 405–06.

At the broadest level, SB 4 conflicts with federal immigration law because it provides state officials the power to enforce federal law without federal supervision. See Farmers Branch, 726 F.3d at 531–32 (ordinance preempted where it gives "state officials authority to act as immigration officers outside the limited circumstances specified by federal law"); Arizona, 567 U.S. at 408 (noting that federal law specifies only "limited circumstances in which state officers may perform the functions of an immigration officer"). Congress has enacted a statutory scheme to ensure that federal immigration law is conducted under the watch of federal officials in a uniform way across all 50 states, and SB 4 interferes with that goal. See 8 U.S.C. § 1057(g).

SB 4 also divests federal immigration authorities of the discretion of the enforcement of immigration laws, which touches on delicate considerations of foreign affairs. Several circuit courts have held similar laws to be conflict preempted for this reason. See GLAHR, 691 F.3d at 1265 ("The [state laws], however, are not conditioned on respect for the federal concerns or the priorities that Congress has explicitly granted executive agencies the authority to establish."); Valle del Sol, 732 F.3d at 1027 ("[State law] conflicts with the federal scheme by divesting federal authorities of the exclusive power to prosecute these crimes."); United States v. Alabama, 691 F.3d 1269, 1287 (11th Cir. 2012) ("[State law] undermines the intent of Congress to confer discretion on the Executive Branch in matters concerning immigration."); United States v. South Carolina, 720 F.3d at 532 (finding conflict because the state law would "strip federal officials of the authority and discretion necessary in managing foreign affairs").

As the United States argues, SB 4's removal orders will also "prevent noncitizens from asserting affirmative defenses to removal that would have been available in the federal system, including asylum, see 8 U.S.C. § 1158(a)(1), withholding of removal, see id. § 1231(b)(3), or protections under the Convention Against Torture, see 8 C.F.R. § 1208.16(c)(2). (Dkt. # 14 at 22). SB 4 specifies that "a court may not abate the prosecution" on "the basis that a federal determination

regarding the immigration status of the defendant is pending or will be initiated."
Tex. Code of Crim. Proc. art. 5B.003.

In response, Texas contends that "to the extent SB 4's text omits other defenses available under federal law, it does not preclude them" because Texas "courts must determine whether federal law prevents enforcement of a conflicting state law[.]" (Dkt. # 25 at 14) (citing In re Academy, Ltd., 625 S.W.3d 19, 35 n.19 (Tex. 2021)). But Texas ignores the provision of SB 4 that specifically instructs its courts "not [to] abate the prosecution" of noncitizens on "the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated." Tex. Code of Crim. Proc. Art. 5B.003. SB 4 plainly conflicts with federal law by instructing state judges to disregard pending federal defenses.

Texas invokes constitutional avoidance, but that doctrine is inapplicable to SB 4. "Under the doctrine of constitutional avoidance, where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." Hersh v. U.S. ex rel. Mukasey, 553 F.3d 743, 753–54 (5th Cir. 2008) (cleaned up). However, the "canon of constitutional avoidance 'comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction.'" Jennings v. Rodriguez, 583 U.S. 281, 296 (2018) (quoting Clark v.

Martinez, 543 U.S. 371, 385 (2005)). "In the absence of ambiguity, the canon

simply 'has no application.'" Id. (quoting Warger v. Shauers, 574 U.S. 40, 50

(2014)). Here, there is only one plausible interpretation of Article 5B.003: State

courts may not abate a prosecution based on the pending federal determination of a

noncitizen's immigration status. Tex. Code of Crim. Proc. Art. 5B.003.[24] By

expressly disallowing the consideration of federal admissibility determinations, SB

4 conflicts with federal law. No substantive canons statutory construction can save

the law from that conclusion.

Asylum, withholding, and protection against torture are all federal

methods of determining a noncitizen's immigration status. *See* 8 U.S.C. §

1158(a)(1), id. § 1231(b)(3); 8 C.F.R. § 1208.16(c)(2). Refusal to abate removal

pending these determinations undermines federal law. See 8 U.S.C. § 1158(a)(1)

("Any [noncitizen] who is physically present in the United States or who arrives in

the United States (whether or not at a designated port of arrival . . .), irrespective of

such [noncitizen's] status, may apply for asylum."); id. § 1158(c)(3) (authorizing

removal upon determination of inadmissibility). A noncitizen cannot readily avail

---

[24] In addition, SB 4 supplants the role of Article I and Article III judges. At the preliminary
injunction hearing, Texas attempted to defend SB 4 by suggesting that state court judges will
interpret the state law consistent with the U.S. Constitution and federal law, including asylum
defenses. But only federal judges may make these determinations. See, e.g., 8 U.S.C. §
1158(d)(1); id. § 1252; 8 C.F.R. § 1003.10; id. § 1003.1(b). A state court may not substitute a
federal determination of credible fear of persecution for its own assessment. There can be no
consistency in the state's assumption of powers delegated exclusively to the federal government.

themselves of these defenses if the state court cannot abate removal pending its determination. Because a state court cannot follow both SB 4 and federal immigration defenses, they conflict. Like SB 1070, SB 4's removal provision "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Arizona, 567 U.S. at 399.

       SB 4 also conflicts with federal law because noncitizens will be removed to Mexico, regardless of their country of origin and in contrast to federal law on removal destinations. (Dkt. # 14 at 22; Escalon Decl., Dkt. # 25 at 2–3). Federal law sets out the circumstances for where the federal government may remove a noncitizen, and the United States regularly engages in diplomatic discussions with foreign governments to determine whether they will accept noncitizens. See 8 U.S.C. § 1231(b). SB 4 states a judge may order a person "to the foreign nation from which the person entered or attempted to enter . . . ." Tex. Code of Crim. Proc. art. 5(B).002. Texas's response makes clear that these removals will all be to Mexico. (See Escalon Decl., Dkt. # 25-3 at 2–4). That policy decision conflicts with federal law, which requires officials to remove a noncitizen to their designated country of removal, subject only to certain exceptions. See 8 U.S.C. §§ 231(b)(2)(A), (C). The Department of State, for its part, has made clear that Texas's removal policy will hamper diplomatic discussions regarding immigration with Mexico. (Jacobstein Decl., Dkt. # 14-1 at

4–5, 10). Texas's decision to remove all noncitizens detained under SB 4 to Mexico will cause the federal government to lose the ability to speak "with one voice" on removals. Arizona, 567 U.S. at 409; Jama, 543 U.S. at 348.

Mexico's objection to SB 4 shows why SB 4's choice-of-country removal is a serious problem. SB 4 will directly harm the United States's relationship with Mexico. Even before SB 4's enactment, Mexico "categorically reject[ed] any measure that," like SB 4, "allows state or local authorities to detain and return Mexican or foreign nationals to Mexican territory." Press Release, Secretaría de Relaciones Exteriores (Nov. 15, 2023), available at https://perma.cc/RP7H-JXZR. The Supreme Court recently explained that attempting to force "non-Mexican nationals" to return to Mexico "impose[s] a significant burden upon the Executive's ability to conduct diplomatic relations with Mexico[.]" Biden v. Texas, 597 U.S. 785, 806 (2022).

Texas suggests that state laws should not be enjoined on the basis that it strains foreign relations. (Dkt. # 25 at 34–35) (citing Medellín v. Texas, 552 U.S. 491, 496–98 (2008)). Medellín dealt with the execution of a Mexican citizen in violation of the Vienna Convention on Consular Relations as determined by a non-self-executing decision of the International Court of Justice ("ICJ"). 552 U.S. at 493–96. In Medellín, Texas acted within its domestic police powers with no "directly enforceable federal law that pre-empt[ed] state limitations . . . ." Id. at

498. Here, by contrast, Texas attempts to act within a field directly related to foreign affairs that is governed by vast and sensitive agreements, treaties, and laws made by the federal government. (See Dkt. # 14 at 22–23; Jacobstein Decl., Dkt. # 14-1 at 4–5, 10). Put another way, Medellín deals with foreign policy's ability to regulate a state's police powers, not a state's ability to regulate foreign policy.

SB 4 conflicts with federal immigration law in other ways, too. It authorizes an affirmative defense for individuals who are "lawfully present" in the country, even though the Fifth Circuit has held that state judges may not make admissibility determinations due to the complexities of federal immigration law. Tex. Penal Code § 51.02(c)(1)(A); Farmers Branch, 726 F.3d at 535–36. SB 4 also lacks consent exceptions for re-entry into the United States, even though federal immigration law will allow it. See 8 U.S.C. § 1326. Penalties under SB 4 also exceed those under federal law. For example, failure to comply with a federal removal order generally includes a sentence of up to four years, see 8 U.S.C. § 1253; 8 U.S.C. § 1253(a)(1), but the penalty up to 20 years for violating a state removal order under SB 4. See Tex. Penal Code § 51.04.

Finally, the United States argues that SB 4 "conflicts with the statutory scheme Congress enacted that 'specifies [the] limited circumstances in which state officers may' assist with immigration enforcement." (Dkt. # 14 at 24) (citing Arizona, 567 U.S. at 408).  8 U.S.C. § 1357(g) specifies how and when a

state may cooperate with federal law enforcement to assist with immigration enforcement. Section 1357(g) serve a dual role, allowing the federal government to utilize state and local personnel to assist with enforcement while retaining ultimate monitoring and implementation control for the federal government. Arizona, 567 U.S. at 409; see also 142 Cong. Rec. H2378-05, H2445, 1996 WL 120181 (Mar. 19, 1996) (Rep. Cox) (noting the purpose of § 1357(g) was to "expand the number of personnel who are involved in picking up people in violation of the law" while ensuring "everything will be conducted under the watch of the [federal government] and the [Secretary of Homeland Security] in conformity with Federal standards."). Texas does not argue this point, and its response makes no mention of § 1357(g) at all. (See Dkt. # 25). SB 4 and § 1357(g) conflict because Congress cannot limit the authority of state officials to assist with enforcement while the state itself claims unlimited concurrent immigration authority.

Given the "significant complexities involved in enforcing federal immigration law," Congress delegated enforcement authority to state officials only under the supervision of DHS. Arizona, 567 U.S. at 409; 8 U.S.C. § 1357(g). "[N]o coherent understanding" of "cooperation" would "incorporate the unilateral decision of state officers to arrest [a noncitizen] for being removable absent any request, approval, or other instruction from the Federal Government." Arizona, 567

U.S. at 410. SB 4 frustrates key aspects of federal immigration law and is conflict preempted.

## III. Foreign Commerce Clause

The United States[25] argues that SB 4 violates the Foreign Commerce Clause because it regulates the movement of noncitizens across an international border. (Dkt. # 14 at 27–28). The Constitution provides that Congress may "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. "[P]recedents firmly establish[] that the federal commerce power surely encompasses the movement in interstate commerce of persons as well as commodities." United States v. Guest, 383 U.S. 745, 758–59 (1966); see also Edwards v. People of State of California, 314 U.S. 160, 172 (1941) ("[I]t is settled beyond question that the transportation of persons is 'commerce', within the meaning of that provision."). "State regulations violate the dormant Commerce Clause by discriminating against or unduly burdening foreign or interstate commerce." Piazza's Seafood World, LLC v. Odom, 448 F.3d 744, 749 (5th Cir. 2006). "Regulations that facially discriminate" against foreign commerce "are virtually per se invalid." Id. Conversely, "nondiscriminatory state regulations affecting foreign commerce are invalid if they (1) create a substantial risk of conflicts with foreign governments; or (2) undermine the ability of the

---

[25] The Organizational Plaintiffs do not raise a Foreign Commerce Clause claim.

federal government to 'speak with one voice' in regulating commercial affairs with foreign states." Id. at 750.

In response, Texas argues that courts have long shifted the federal government's authority to control immigration away from the Commerce Clause and towards an inherent aspect of federal sovereignty. (Dkt. # 25 at 32–35). Ultimately, Texas is correct that courts have shifted away from rooting the federal government's power to regulate immigration in the Commerce Clause towards the plenary power doctrine. See Jennifer Gordon, Immigration as Commerce: A New Look at the Federal Immigration Power and the Constitution, 93 Ind. L.J. 653, 671 (2018). But those cases do not signal a rejection of the Commerce Clause's ability to regulate immigration as much as a preference to locate that power in the nation's sovereignty and foreign affairs. Id. at 672–78 (discussing how the Supreme Court's opinion "offers no explanation for the Court's abandonment of the Commerce Clause as the primary source of the immigration power, and few commentators have explored the question."). Indeed, Texas cites no cases[26] holding the Commerce Clause to be inapplicable to immigration even after the shift in the late Nineteenth Century. See Chae Chan Ping v. United States, 130 U.S. 581, 609 (1889). The Supreme Court has repeatedly emphasized that the movement of

---

[26] Texas does cite Equal Access Educ. v. Merten, 305 F. Supp. 2d 585, 608–11 (E.D. Va. 2004), but that case applied a Dormant Commerce Clause test and found that the plaintiff had not met their burden under that standard. It does not hold that the standard is altogether inapplicable.

persons between states is commerce. See, e.g., Heart of Atlanta Motel, Inc. v.

United States, 379 U.S. 241, 255–56 (1964); Taylor v. United States, 579 U.S. 301,

306 (2016) ("Congress may regulate under its commerce power . . . persons or

things in interstate commerce."). That SB 4 may be preempted under federal

immigration power does not negate the possibility it also violates the Dormant

Commerce Clause.

Turning to the Fifth Circuit's Dormant Commerce Clause test,

"regulations that facially discriminate" against foreign commerce "are virtually per

se invalid," and "nondiscriminatory state regulations affecting foreign commerce

are invalid if they (1) create a substantial risk of conflicts with foreign

governments; or (2) undermine the ability of the federal government to 'speak with

one voice' in regulating commercial affairs with foreign states." Piazza's Seafood,

448 F.3d at 750. On its face, SB 4 discriminates against foreign commerce: it

criminalizes solely the movement of noncitizens across an international boundary

into Texas but says nothing about movement within or out of Texas or movement

by U.S. citizens.[27] If SB 4 were not facially discriminatory, it would still violate the

Dormant Commerce Clause by "undermin[ing] the ability of the federal

government to speak with one voice in regulating commercial affairs with foreign

---

[27] Even if SB 4 is consistent with federal purposes, it "cannot be saved by a showing that it is consistent with the purposes behind federal law." Piazza's Seafood, 448 F.3d at 751.

states." Id. at 750 (internal quotations omitted). Forcing "non-Mexican nationals" to return to Mexico "impose[s] a significant burden upon the Executive's ability to conduct diplomatic relations with Mexico." Biden, 597 U.S. at 806. Under the standard set out in Piazza's Seafood, SB 4 violates the Dormant Commerce Clause.

TEXAS'S "INVASION" DEFENSE

In Governor Abbott's words, these federal laws do not apply because "Texas's constitutional authority to defend and protect itself" against an invasion "is the supreme law of the land and supersedes any federal statutes to the contrary." Press Release, Greg Abbott, Governor of Texas, Statement on Texas's Constitutional Right to Self-Defense, (Jan. 24, 2024), https://gov.texas.gov/uploads/files/press/Border_Statement_1.24.2024.pdf. To discuss "invasion" at length is to take the argument more seriously than it deserves. Still, in a dissenting opinion in a separate but related case, several judges on the Fifth Circuit expressed the importance of analyzing Texas's invasion claim. See United States v. Abbott, No. 23-50632, 2024 WL 551412, at *7–8 (5th Cir. Feb. 9, 2024) (dissenting opinion). That discussion, even if non-binding, weighs on this case. Accordingly, the Court will thoroughly discuss—but ultimately reject— Texas's invasion defense.

In short, Texas's argument fails for at least three reasons. First, unauthorized immigration does not constitute an "invasion" within the meaning of

the U.S. Constitution. Second, Texas is not "engag[ing] in war" by enforcing SB 4. Third, if Texas were engaging in a war, it would have to abide by federal directives in waging that war.

## I. Overview

Article I, Section 10 of the U.S. Constitution limits the states' power to undertake certain activities. U.S. Const. art. 1, § 10. Apart from the final few words, Section 10 describes what a state may *not* do, specifying that a state may not coin money, pass a bill of attainder or an ex post facto law, impose duties, keep troops, enter into foreign agreements, or "engage in war." Id. Clause 3 (the "State War Clause") says in full:

> No State shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay.

Id. art. 1, § 10, cl. 3.

In short, the State War Clause provides that a state shall *not* engage in war, with a narrow exception of when it is "actually invaded[.]" When a state—and by extension the United States—is invaded, the federal government must protect from the invasion. As Article IV, Section 4 (the "Guarantee Clause") states:

> The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application

> of the Legislature, or of the Executive (when the
> Legislature cannot be convened) against domestic
> Violence.

Id. art. IV, § 4.

Together, these provisions, along with the broad, interrelated provisions of the federal government's authority to wage war, lay out a structure where the state may respond to immediate military threats until "resources of the federal government can reach the invasion." United States v. Abbott, No. 1:23-CV-863, 2023 WL 5740596, at *12 (W.D. Tex. Sept. 6, 2023); Torres v. Tex. Dep't of Pub. Safety, 597 U.S. 580, 590 (2022) (detailing federal government's authority over war).

## II. Immigration does not constitute an invasion under Section 10.

To start, surges in unauthorized immigration alone do not qualify as an "invasion" as described in the Constitution. A court "must interpret the Constitution in light of its text, structure, and original understanding—as informed by history and tradition." See Abbott v. Biden, 70 F.4th 817, 827 (5th Cir. 2023) (internal quotations omitted). Therefore, the Court will analyze the phrase "actually invaded" through the definition of the term in the Eighteenth Century, its position within the Constitution, and the history and tradition of war powers and immigration.

Ultimately, all tools of constitutional construction cut against Texas's position. Contemporary definitions of "invasion" and "actually invaded" as well as common usage of the term in the late Eighteenth Century predominantly referred to an "invasion" as a hostile and organized military force, too powerful to be dealt with by ordinary judicial proceedings. This Court could not locate a single contemporaneous use of the term to refer to surges in unauthorized foreign immigration. The text and structure of the State War Clause imply that "invasion" was to be used sparingly for temporary, exigent, and dangerous circumstances. Put simply, the overwhelming textual and historical evidence does not support Texas's understanding of the State War Clause.

### A. Circuit courts have unanimously rejected Texas's position.

Before undertaking this textual and historical analysis, however, the Court notes that each circuit court to have discussed whether immigration qualifies as an invasion has rejected that characterization. See California v. United States, 104 F.3d 1086, 1090–91 (9th Cir. 1997) (noting the State War Clause "afford[s] protection in situations wherein a state is exposed to armed hostility from another political entity" and "not intended to be used as urged" in the context of immigration); New Jersey v. United States, 91 F.3d 463, 469–70 (3d Cir. 1996) (noting the state failed to show "'invasion' to mean anything other than a military invasion"); Padavan v. United States, 82 F.3d 23, 28 (2d Cir. 1996) ("invasion"

must involve "armed hostility from another political entity" and does not

encompass "the influx of legal and illegal [noncitizens] into" the state). No case

differs from this unanimous position.

### B. *"Actually invaded" refers to an armed and organized hostile force.*

#### 1. Definitions of "invasion" and "actually invaded" do not accord with Texas's understanding

Turning to the text, the Court's "analysis must begin with the

language of the instrument, which offers a fixed standard for ascertaining what our

founding document means." Dobbs v. Jackson Women's Health Org., 142 S. Ct.

2228, 2244–45 (2022) (cleaned up); see also N.Y. State Rifle & Pistol Ass'n v.

Bruen, 597 U.S. 1, 36 (2022) ("[T]o the extent later history contradicts what the

text says, the text controls."). Definitions of "actually invaded" and "invasion"

show that the terms refer to an armed, hostile, organized force entering an area to

conquer or plunder. Immigration does not accord with this definition.

"Invade" is defined as: "To enter (a country, city, or area) using

military force, in order to take control of it" Invade, Black's Law Dictionary (11th

ed. 2019). "Invasion" is defined as the "incursion of an army for conquest or

plunder." Invasion, Black's Law Dictionary (11th ed. 2019).[28] Webster's 1828

---

[28] Black's Law Dictionary also defines "invasion" to mean a "hostile or forcible encroachment on the rights of another." Invasion, Black's Law Dictionary (11th ed. 2019). An "invasion of rights" is an alternative definition not employed by the Constitution or by Texas.

Dictionary defines the term as a "hostile entrance into the possessions of another; particularly, the entrance of a hostile army into a country for the purpose of conquest or plunder, or the attack of a military force." 1 Noah Webster, American Dictionary of the English Language 113 (1828).[29] The 1828 Webster's dictionary defines "invade" as: "To enter a country, as an army with hostile intentions; to enter as an enemy, with a view to conquest or plunder; to attack." Id. As an example, it gives, "The French armies invaded Holland in 1795. They invaded Russia and perished." Id. Other definitions include, "To attack; to assault; to assail" and "To violate with the first act of hostility; to attack, not defend." Samuel Johnson, [Johnson's] Dictionary (reprint, Boston 1828).

It is not enough that Texas, scouring the contemporary dictionaries, argues that illegal immigration could be an invasion because it could arguably be considered "a hostile entrance." (Dkt. # 25 at 28). Courts look to the natural or normal meaning, not the broadest possible meaning. Noel Canning v. N.L.R.B., 705 F.3d 490, 500 (D.C. Cir. 2013), aff'd, 573 U.S. 513 (2014); Abbott, 70 F.4th at 829 ("[W]e start with the original public meaning of the Constitution's text.")

---

[29] The 1806 definition of "invasion" states, "a hostile entrance, attack, assault." Noah Webster, A Compendious Dictionary of the English Language 164 (1806). It defines "invade" as "to enter or seize in a hostile manner." Id. Johnson's dictionary defines "invasion" as a "hostile encroachment." Samuel Johnson, [Johnson's] Dictionary (reprint, Boston 1828). Providing an example of the term, the dictionary states, "We made an invasion upon the Cherethites," id., referring to military hostilities between King David and the Amalekites. 1 Samuel 30:14 (King James).

(quotation omitted). The natural and normal meaning of "invade," as shown by the predominant dictionary definition, is to enter a country with hostile intent, typically to assault, attack, seize, or plunder. Even accepting that some small number immigrants do traffic drugs or have cartel affiliations, Texas cannot genuinely maintain that noncitizens crossing the border are an organized military force aimed at conquest or plunder.

As for the definition of "actually invaded," crucially, this phrase appears as a term of art in the late eighteenth century, referring specifically to military occupation that is ongoing (as opposed to imminent).[30] It is not, as a modern reader might suppose, synonymous with "genuinely invaded" but instead was used exclusively to describe ongoing military incursions. As one researcher notes, a search of the phrase "actually invaded" (or "actual invasion") appears multiple times in the correspondence of the Founding Fathers. See Founders Online, Nat'l Archives, https://founders.archives.gov.[31] Each example refers to "actually invaded" as a wartime description of military hostilities. For example, George Washington wrote a colonel during the Revolutionary War,

> Application having been made to me by Governor
> Trumbull for Liberty to draw a Quantity of Arms out of

---

[30] See Joshua Treviño, The Meaning of Invasion Under the Compact Clause of the U.S. Constitution, at 6, Tex. Pub. Pol. Foundation (Nov. 2022) (analyzing uses of the phrase "actually invaded" and noting that the "phrase was used as a common term of art, first appearing in Georgia's 1732 colonial charter and at least 60 times in the Revolutionary- and Framing-era correspondence found in the National Archives' online database.").

[31] Id.

> the Magazine at springfield for the Militia of that state in case it should be invaded, I have complied with his request upon the following Conditions which you will please observe. That should the state be *actually invaded*, & a sufficiency of Arms remains in the Magazine after complying with the Orders which you will receive from me in a short time under these Circumstances you are to furnish him with a thousand stand . . . .

Letter from Gen. Goerge Washington to Col. Ezekiel Cheever, (July 7, 1777),

https://founders.archives.gov/documents/Washington/03-10-02-0205 (emphasis

added).

In another passage, Patrick Henry wrote to Henry Laurens:

> When the requisition arrived here the Assembly was sitting. It became necessary to lay the matter before them as the Law gave the power of marching the Militia to a Sister State only in cases of *actual Invasion*. An Act was thereupon passed to enable the Executive to send out the Militia when certain Intelligence of an intended Invasion should be received.

Letter from Patrick Henry to Henry Laurens, (Nov. 23, 1778),

https://founders.archives.gov/documents/Madison/01-01-02-0088 (emphasis

added).

Dozens more examples abound,[32] each time in the context of war or a

military incursion. In the expansive sources reviewed by this Court, the Framers

---

[32] Governor William Livingston of New Jersey wrote to George Washington for requisitions, stating that New Jersey had "been during all that time either actually invaded, or having the Enemy so near us, as to require a constant Guard . . . ." Letter from William Livingston to George Washington, (15–16 Aug 1777), https://founders.archives.gov/documents/Washington/03-10-02-0613. Maryland delegates wrote

never use "actually invaded" to refer to immigration or anything less than a coordinated armed hostile foreign power. The historical use of "actually invaded" refers specifically to ongoing hostilities by a coordinated armed hostile military force. While some small fraction of immigrants may cross the border with malicious intent and some small fraction may be affiliated with paramilitary cartels, SB 4 simply does not target a coordinated armed hostile military force.

### 2. Texas's interpretation does not accord with the structure or context of the Constitution.

Beyond the definition, the Constitution's structure does not support Texas's broad reading of invasion. Article I specifies the powers granted to Congress, including powers related to foreign affairs and immigration. U.S. Const. art. 1; U.S. ex rel. Knauff v. Shaughnessy, 338 U.S. 537 (1950). Section 10 is often called the "Powers Denied States Clause" because it specifies what states may *not* do. U.S. Const. art. 1 § 10. It declares that "[n]o State shall, without the Consent of Congress, . . . engage in war." Id. The power to "engage in war" when "actually

---

to Washington, "[W]e do not look for any immediate aid from the main Army. Such as is consistent with the good of the whole, should the State be actually invaded." Letter from Maryland Delegates to George Washington, (May 23, 1779), https://founders.archives.gov/documents/Washington/03-20-02-0529.
As another example, a letter from Thomas Jefferson states, "I have ever understood that the rule of Congress was to admit no expences to be Continental which were incurred by any state merely under an apprehension of an invasion, but that whenever a state was actually invaded all expences became Continental." Letter from Thomas Jefferson to Friedrich Wilhelm von Steuben, (Jan. 9, 1781), https://founders.archives.gov/documents/Jefferson/01-04-02-0397 (emphasis added).

invaded" is not a broad grant of power but a narrow, temporary exception to a restriction on the states.

It is not a plausible interpretation that the Framers, in carefully specifying Congress's exclusive duty to wage war and control immigration, intended to grant states the unilateral power to disrupt that balance whenever they disagreed with federal immigration policy. To borrow a phrase from statutory construction, the Framers did not hide an elephant in a mousehole. See Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 468 (2001). The natural and plain meaning of "invasion" within the State War Clause is a narrow and time-constrained response in the face of imminent military emergency. The extreme reading adopted by Texas is inconsistent with a rational understanding of "invasion" and the structure of the Constitution.

The natural meaning of the State War Clause grants states the power to engage in war for a very limited time before the federal government can respond. This is clear from the phrase "in such imminent Danger as will not admit of delay," which places "actually invaded" in context. U.S. Const. art. 1, § 10, cl. 3. Again, borrowing from statutory construction, "[A] word is known by the company it keeps[.]" Yates v. United States, 574 U.S. 528, 543 (2015) (holding that words should be read in immediate context to avoid giving "unintended breadth" to certain words). It would be internally inconsistent for the Constitution

to refer to "invasion" as the regular and ongoing intrusion of immigrants into the state, while referring to "imminent danger" as an immediate military threat to which the federal government must rush to respond.[33]

### 3. Other mentions of "invasion" in the Constitution do not support Texas's expansive interpretation.

The Constitution mentions "invasion" three other times. No instance supports Texas's broad reading. See U.S. Const. art I, § 8 cl. 15; id. art. I, § 9, cl. 2; id. art. IV, § 4. First, Article I, Section 8 states that "Congress shall have Power To . . . provide for calling forth the Militia to execute the Laws of the Union, supress Insurrections and *repel Invasions*." Id. art. 1, § 8, cl. 1, 15 (emphasis added). If an "invasion" requires "calling forth the militia," it cannot naturally refer to routine unlawful immigration that is enforced by DPS or DHS officers through routine bureaucratic judicial proceedings.

Second, Article 1, Section 9 mentions "invasion" to note that the "Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." Id. art. 1, § 9, cl. 2. The suspension of habeas corpus is a stunning exercise of power. The Writ of Habeas Corpus has been suspended only four times in this country's history: the

---

[33] Similarly, being "actually invaded" must be something to prompt the state to "engage in war." U.S. Const. art. 1, § 10, cl. 3. Unauthorized immigration, even if some small number of immigrants have cartel affiliations, does not provoke states to "engage in war." Id.

Civil War,[34] KKK insurrections during Reconstruction, a guerilla war in the Philippines, and in Hawaii during World War II.[35] *See* Amanda L. Tyler, *Suspension as an Emergency Power*, 118 Yale L.J. 600, 662–64 (2009). These examples show that the Writ of Habeas Corpus has only ever been suspended in the face of imminent and overwhelming violent direct threats to the stability of the state or federal government.

Immigration, however large and taxing on a state's resources, does not accord with these instances. Unauthorized immigration is not akin to armed and organized insurrection against the government. Even as Texas points to cartel violence, it cannot maintain in good faith that the cartels will imminently overthrow the state government. Nor can the mere presence of ongoing organized crime, which has long existed in the United States, suffice to justify the suspension of habeas corpus. Despite the serious threat to public safety that cartels may pose, it is difficult to accept that the threat is so severe as to justify the wholesale suspension of Due Process rights in Texas.

Indeed, British suspension of the writ of habeas corpus was a leading concern among American Revolutionaries and carefully limited by the Framers in

---

[34] See Ex parte Merryman, 17 F. Cas. 144, 151–152 (C.D. Md. 1861) (rejecting Lincoln's suspension as unconstitutional).

[35] The writ was also restricted to certain enemy combatants in 2006 before that restriction was ruled unconstitutional. See Military Commissions Act of 2006, 10 U.SC 948, Pub. L. 109-366, 120 Stat. 2600; Boumediene v. Bush, 553 U.S. 723 (2008).

the Constitution. <u>See</u> Amanda L. Tyler, <u>Habeas Corpus and the American Revolution</u>, 103 Cal. L. Rev. 645 (2014); <u>Boumediene</u>, 553 U.S. at 739–40 ("The Framers viewed freedom from unlawful restraint as a fundamental precept of liberty, and they understood the writ of habeas corpus as a vital instrument to secure that freedom."). For that reason, the Framers drafted the Constitution such that the writ could be suspended only in times of great emergency. <u>See id.</u> ("[H]istory counseled the necessity for specific language in the Constitution to secure the writ and ensure its place in our legal system."); Akhil R. Amar, <u>Of Sovereignty and Federalism</u>, 96 Yale L.J. 1425, 1509, n.329 (1987) ("[T]he non-suspension clause is the original Constitution's most explicit reference to remedies"). And as the Court explained in <u>Boumediene</u>, the Framers enacted the Constitution with structural barriers to prevent abusive suspension of the writ. <u>Boumediene</u>, 553 U.S. at 739–40. It is not plausible that the Framers, so cognizant of past abuses of the writ and so careful to protect against future abuses, would have granted states the unquestioned authority to suspend the writ based on the presence of undocumented immigrants.[36]

---

[36] Accepting, for the purposes of argument, that Texas is under invasion, the power to suspend the writ would lead to enormously disproportionate consequences. The Governor and the President would have unilateral and unchecked authority to detain anyone who might be suspected of entering the United States illegally. Anyone suspected of drug or arms trafficking could be arrested and indefinitely imprisoned without review. That suspension would carry on indefinitely, so long as there remained some level of unauthorized immigration or some threat of organized crime.

Finally, the Constitution mentions "invasion" in reference to the Guarantee Clause.[37] The Guarantee Clause is noteworthy because it differentiates "invasion" from "domestic violence." Texas's argument, however, rests on equating domestic criminal activity with a military "invasion." (See Dkt. # 25 at 25) (noting that Texas has launched operations to respond to "non-state actors perpetrating human slavery, violent assaults, weapon- and drug smuggling" within Texas). Again, the Court need not downplay the cartels' criminal activity to show that it does not speak to the wartime activity envisioned by "invasion" within the meaning of the Constitution.

In sum, the uses of "invasion" in the Constitution refer to pressing military emergencies. The power to suspend the writ of habeas corpus or repel invasions with militias strongly suggests that an "invasion" was not a term used lightly or metaphorically. In light of the Constitution's structure and contemporary use of "invasion," the original public meaning of the term would have referred to an exceptionally dangerous incursion of organized armed hostiles.

*C. The historical tradition of the United States refers to invasion as an armed hostile force.*

---

[37] Texas posits that the Clause "establishes two different rules for dealing with two different scenarios." (Dkt. # 25 at 24). In domestic violence, a state "may seek help from the federal government," but for an "invasion," a state "need not invite federal protection." Id. Texas interprets the clause backwards. The federal government always retains the guarantee to "protect . . . against Invasion" but only has the same duty to protect against "domestic violence" if requested by the state. U.S. Const. art. IV, § 4. In other words, the federal government has more, not less, authority to protect against invasion than domestic violence.

<u>1. The Federalist Papers</u>

The history and tradition of the United States does not support the broad reading of invasion that Texas suggests. From the Federalist Papers to ratification debates, scant evidence supports Texas's understanding of invasion. In the Federalist Papers, every relevant invocation of the word speaks in terms of organized, hostile military or naval actions.

In support of its argument, Texas cites Federalist 43 for the proposition that a federal government's power to assist an invasion "will be a harmless superfluity" if the state is able to defend itself. (Dkt. # 25 at 25). Texas, however, cites a line that does not refer to "invasion"—much less to one under the State War Clause. (<u>Id.</u> at 25) (citing The Federalist No. 43 (Madison)). In the passage that Texas quotes, Madison discusses why the federal government must ensure a republican form of state governments under the Guarantee Clause—not why it must repel invasion. <u>Id.</u> The "harmless superfluity" is that the federal government will not need to intervene if a state already has a republican form of government. <u>Id.</u> Madison's quote does not refer to invasion.

To the contrary, Madison's actual discussion of "invasion" in Federalist 43 shows that the term referred to the incursion of hostile foreign militaries. Madison states, "A protection against invasion is due from every society to the parts composing it," again emphasizing the need for a *federal* response to

invasion. The Federalist No. 43 (Madison), at 275 (Clinton Rossiter ed., 1961). His discussion of "invasion" then invokes the Revolutionary War—"[a] recent and well-known event among ourselves [that] has warned us to be prepared for emergencies of a like nature." Id.

In his next essay, Madison again appears to reject Texas's broad expansion of the State War Clause. Federalist No. 44 (Madison). Rather than understanding the invasion clause to grant unchecked emergency powers to a state, Madison passes over the clause entirely, stating, "The remaining particulars of this clause fall within reasonings which are either so obvious, or have been so fully developed, that they may be passed over without remark." Federalist No. 44 (Madison), at 283 (Clinton Rossiter ed., 1961). Again, elephants do not hide in mouseholes. The natural and plain reading of the invasion clause, which allows Madison to pass it over without remark, is that the states may employ the war power as a stopgap military measure—not that states may unilaterally nullify the Supremacy Clause and indefinitely regulate immigration.

The other mentions of "invasion" in the Federalist Papers accord with the United States's view. In Federalist 41, for example, Madison refers to invaders as "predatory" and "licentious" pirates who force residents to "yield[] to their exactions" with residents "compelled to ransom themselves from the terrors of a conflagration . . . ." The Federalist No. 41 (Madison), at 261 (Clinton Rossiter ed.,

1961). Even as Texas might compare modern-day cartels to founding-era pirates, there is no evidence that cartels intend to seize American land, militarily plunder cities, or ransom U.S. citizens, as Madison discusses. Their crimes are not aimed at violently overwhelming domestic police and are not repelled via military responses.

Hamilton, meanwhile, repeatedly writes of "invasion" in the context of war, primarily to emphasize the need for a federal response to war.[38] Criticizing those who argued against two-year appropriations for military funds, Hamilton writes, "Few persons will be so visionary as seriously to contend that military forces ought not to be raised to quell a rebellion or resist an invasion." The Federalist No. 26 (Hamilton), at 187 (Clinton Rossiter ed., 1961). In the Federalist 25, Hamilton again writes that the United States must be able to raise armies so it is not "incapacitated by its Constitution to prepare for defense, before it was actually invaded." The Federalist No. 25 (Hamilton), at 165 (Clinton Rossiter ed.,

---

[38] In one essay, Hamilton encourages the federal government's power to raise duties by asking, "But would it be wise, or would it not rather be the extreme of folly, to stop at this point, and to leave the government intrusted with the care of the national defense in a state of absolute incapacity to provide for the protection of the community against future *invasions* of the public peace, *by foreign war or domestic convulsions*?" The Federalist No. 34 (Hamilton), at 207 (Clinton Rossiter ed., 1961) (emphasis added).
In another, Hamilton writes, "In times of insurrection, or *invasion, it would be natural and proper that the militia of a neighboring State should be marched into another, to resist a common enemy, or to guard the republic against the violence of faction or sedition.* . . . If the power of affording it be placed under the direction of the Union, there will be no danger of a supine and listless inattention to the dangers of a neighbor . . . ." The Federalist No. 29 (Hamilton), at 187 (Clinton Rossiter ed., 1961) (emphasis added).

1961). In the Federalist 8, Hamilton discusses how "chains of fortified places . . . mutually obstruct invasion." The Federalist No. 8 (Hamilton), at 66 (Clinton Rossiter ed., 1961). He explains that Great Britain's insular geography "guard[s] it in a great measure against the possibility of foreign invasion" and therefore does not need a large standing army within the kingdom. Id.

The third Federalist Paper author, John Jay, specifically used the term "invasion" to refer to war. In the Federalist 4, Jay warns against independent state responses to invasion, asking,

> What would the militia of Britain be if the English militia obeyed the government of England, if the Scotch militia obeyed the government of Scotland, and if the Welsh militia obeyed the government of Wales? *Suppose an invasion*; would those three governments (if they agreed at all) be able, with all their respective forces, to operate against the enemy so effectually as the single government of Great Britain would?

The Federalist No. 4 (Jay), at 48 (Clinton Rossiter ed., 1961) (emphasis added).

In sum, the Federalist Papers mention "invasion" solely in the context of an organized, hostile military incursion. And even then, Jay, Madison, and Hamilton all emphasize the need for a unified federal response to invasion. No use of "invasion" refers to immigration.

2. Other mentions of the State War Clause at the time of the Founding

Beyond the Federalist Papers, other mentions of "invasion" at the time of the Founding do not support Texas's definition.[39] In the <u>Debates in the Several State Conventions</u>, this Court could not locate a single mention of "invasion" that refers to unlawful immigration. <u>See</u> Debates in the Several State Conventions on the Adoption of the Federal Constitution (Jonathan Elliot ed., 1836). To the contrary, uses of "invasion" refer to the term as a military incursion. <u>See, e.g.</u>, 2 Debates in the Several State Conventions on the Adoption of the Federal Constitution (Jonathan Elliot ed., 1836), at 234 ("Those that were attacked called in foreign aid to protect them; and the ambitious Philip [of Macedon], under the mask of an ally to one, invaded the liberties of each, and finally subverted the whole.") (statement of Alexander Hamilton); <u>id.</u> at 137 ("Do you, sir, suppose that, had a British army invaded us at that time, such supineness would have been discovered?") (statement of Elias Mason).

Nor does early congressional legislation support Texas's interpretation. The First, Fifth, and Ninth Congresses all addressed immigration,

---

[39] Professor Frank Bowman III highlights several speeches from the Constitutional Convention mentioning "invasion" as a need to repel a foreign enemy. Frank O. Bowman III, Immigration Is Not an "Invasion" under the Constitution, Just Security, (Jan. 29, 2024), https://www.justsecurity.org/91543/immigration-is-not-an-invasion-under-the-constitution. As he notes, Massachusetts delegate Rufus King asked, "What are the great objects of the Genl. System? 1. defence agst. foreign invasion." <u>Id.</u> Hamilton disparaged the loose German confederation by stating it failed to "protect them against foreign invasion." <u>Id.</u> And Virgina Governor Edmund Randolph encouraged more executive military power to enable protection "against foreign invasion." <u>Id.</u> Bowman also notes that Rhode Island ratified the convention with the provision that "no person shall be compelled to do military duty otherwise than by voluntary enlistment, except in cases of general invasion." <u>Id.</u>

but none referred to it as an invasion. See Joshua Treviño, <u>The Meaning of Invasion Under the Compact Clause of the U.S. Constitution</u>, at 6, Tex. Pub. Pol. Foundation (Nov. 2022); First Congress, stat. II, ch. 33, § 5; Fifth Congress, stat. III, ch. 46, § 4; Ninth Congress, stat. II, ch. 46, § 1. Another early law, the Calling Forth Act of 1792 refers to invasion "from any foreign nation or Indian tribe." Ch. 28, 1 Stat. 264, <u>repealed by</u> the Calling Forth Act of 1795 1 Stat. 424, 3d Cong., Sess. II, Ch. 36 (1795) (repealed in part 1861 and codified at 10 U.S.C. § 12406).[40] The Calling Forth Act authorizes the militia to be deployed against "combinations too powerful to be suppressed by the ordinary course of judicial proceedings . . . ." <u>Id</u>. The notion that "invasions" will overcome judicial proceedings poses a challenge for Texas, which is attempting to regulate the purported immigrant "invasion" through judicial proceedings under SB 4.

In regulating the recently acquired Louisiana Territory, the Eighth Congress stated regional military commanders "shall be specially charged with the employment of the military and militia of his district, in cases of sudden invasion .

---

[40] Texas cites this act to suggest that "invasion" can refer to actions by non-state actors. (Dkt. # 25 at 27). The Court does not disagree with that proposition, but it also does not follow that all non-state actors are then "invaders." Indeed, the Calling Forth Act still speaks of invasion as the sort of hostile military necessity that the President must respond to with armed militias. Calling Forth Act of 1792, 1 Stat. 264, 2d Cong., Sess. I, Ch. 28. ("[W]henever the United States shall be invaded, or be in imminent danger of invasion from any foreign nation or Indian tribe, it shall be lawful for the President of the United States, to call forth such number of the militia of the state or states most convenient to the place of danger or scene of action, as he may judge necessary to repel such invasion, and to issue his orders for that purpose, to such officer or officers of the militia as he shall think proper.").

. . and at all times with the duty of ordering a military patrol . . . to arrest unauthorized settlers." Treviño, *supra*, at 7; Eighth Congress, stat. I, ch. 38, § 12. In other words, Congress specifically referred to unauthorized immigration as something separate from an invasion. Id.

Just over a decade after ratification, Madison categorically rejected the notion of removing noncitizens as an act of war in his Report of 1800:

> It is said, that the right of removing [noncitizens] is an incident to the power of war, vested in Congress by the constitution.
>
> This is a former argument in a new shape only; and is answered by repeating, that the removal of [noncitizen] enemies is an incident to the power of war; that the removal of [noncitizen] friends, is not an incident to the power of war.
>
> It is said, that Congress, are, by the constitution, to protect each state against invasion; and that the means of preventing invasion, are included in the power of protection against it.
>
> The power of war in general, having been before granted by the constitution; this clause must either be a mere specification for greater caution and certainty, of which there are other examples in the instrument; or be the injunction of a duty, superadded to a grant of the power.
>
> Under either explanation, it cannot enlarge the powers of Congress on the subject. The power and the duty to protect each state against an invading enemy, would be the same under the general power, if this regard to greater caution had been omitted. *Invasion is an operation of war. To protect against invasion is an exercise of the power of war*.

James Madison, <u>The Report of 1800</u>, (Jan. 7, 1800),

founders.archives.gov/documents/Madison/01-17-02-0202 (emphasis added).

Madison's report explicitly contradicts Texas's position. If the

removal of noncitizens is not an operation of war, then unlawful immigration

cannot constitute an "invasion" under the State War Clause.

*          *          *

Overall, neither the text of the Constitution nor the contemporary

usage of "actually invaded" supports Texas's argument that an influx of

unauthorized immigrants constitutes an invasion. From the text of the Constitution

to the Federalist Papers to early congressional acts, "invasion" does not refer to

unauthorized immigration.

## III. SB 4 is not a wartime measure.

The State War Clause is not an unlimited grant of power in times of

invasion. Rather, it grants states only the power to "engage in War[.]" U.S. Const.

art. 1, § 10, cl. 3. Setting aside that immigration is not an invasion, SB 4 would still

not be constitutional because it does not authorize or relate to any "engage[ment]

in war." <u>Id.</u>

Again, SB 4 generally has three operating provisions. Officers may

arrest noncitizens for unauthorized entry into the state, Tex. Penal Code § 51.02(a),

noncitizens may be arrested for entering or attempting to enter after previous

removals, id. § 51.03, and noncitizens may be removed if they agree to removal or are convicted of an offense under SB 4. Tex. Code of Crim. Proc. Art. 5(B).002.

None of these provisions are operations of war. Rather, they are standard operations of criminal enforcement by state civil authorities. SB 4 is a "war" inasmuch as the "War on Drugs" is a war—a metaphorical invocation of the term "war" to denote a serious effort. Nothing more. SB 4 does not require use of a military, nor will the State send the National Guard into Mexico to wage war on cartels, call upon NATO allies for aid, or hold unauthorized immigrants as prisoners of war as a result of SB 4. In the most basic sense, SB 4 is not an act of war.

Texas instead argues that "the greater power includes the lesser." (Dkt. # 25 at 29) (quoting Moyer v. Peabody, 212 U.S. 78, 84–85 (1909)). In other words, if Texas may engage in war to repel immigrants, Texas posits that it may engage in less militaristic activities that accomplish the same objective. That argument is without merit. Texas is not engaging in war—through SB 4 or otherwise—so it cannot claim that SB 4 is a necessary domestic component of the war effort. And even if it did, the power to "engage in war" does not grant unlimited legislative or immigration authority. See, e.g., Youngstown Sheet &

Tube Co. v. Sawyer, 343 U.S. 579, 642–45 (1952) (Jackson, J., concurring).[41] If

this is true for the federal government, then it is most certainly the case for the

temporary and narrow exception given to states under the State War Clause.

Engaging in war is one function of government; controlling immigration is

another. Again, Madison's Report of 1800 specifically rejected the idea that

control of immigration is incident to the power of war. James Madison, The Report

of 1800, (Jan. 7, 1800), founders.archives.gov/documents/Madison/01-17-02-0202.

        The state's limited and temporary authority to engage in war to repel

invasions of organized hostile forces does not amount to a wider authority to

regulate in fields preempted by the federal government. The State War Clause

itself makes this clear. Even when under invasion, the Clause forbids states from,

*inter alia*, entering into treaties, granting letters of marque, laying duties, or

keeping troops. The State War Clause authorizes a state only to "engage in war [if]

actually invaded," it does not suspend any other restrictions contained in Section

10. U.S. Const. art. 1 § 10 cl. 3. The "actually invaded" clause affects only the

power to engage in war and delegates no other powers to the state. Just as Texas

---

[41] See also id. at 649–50. ("[The Forefathers] knew what emergencies were, knew the pressures
they engender for authoritative action, knew, too, how they afford a ready pretext for usurpation.
We may also suspect that they suspected that emergency powers would tend to kindle
emergencies. Aside from suspension of the privilege of the writ of habeas corpus in time of
rebellion or invasion, when the public safety may require it, they made no express provision for
exercise of extraordinary authority because of a crisis.").

cannot unilaterally enter treaties or lay duties in wartime, the State War Clause does not grant it the power to violate the Supremacy Clause.

Texas defends SB4 because "[m]illions of [noncitizens] have entered the State of Texas illegally under the Biden Administration . . . and the State has the constitutional power to repel that invasion." (Dkt. # 25 at 28–29). But SB 4 is not limited to times of invasions. The law does not require the Governor's declaration of an invasion or war. Nor does SB 4 halt when immigration flows are reduced or when a new administration takes power or when the federal government increases border security measures. Even accepting for argument that SB 4 is a wartime response to an invasion, that would not make SB 4 constitutional. The law would remain preempted and unenforceable after the end of any "invasion" because the State War Clause affirmatively forbids enforcement of wartime acts once the invasion has ended. See U.S. Const. art. 1, § 10, cl. 3. If the state, by arresting removable noncitizens, is "engaging in war," then the state cannot continue to pursue a wartime measure once the invasion has ended.[42] The result, then, is that SB 4 must expire when immigration flows ebb to levels below those at the time of the governor's declaration. SB 4 contains no such clause.

---

[42] The absurd result of determining that routine criminal prosecutions are "engaging in war" is that the State War Clause would then forbid all state criminal enforcement except in times of invasion.

SB 4 does not begin when an invasion begins or end when an invasion ends. It has no characteristics of a wartime measure, nor does it support other operations of war. Under any rational sense of the phrase, Texas is not "engaging in war" by enforcing SB 4.

## IV. States may not derogate the federal government's war powers.

*A. States cannot engage in perpetual war against the federal government's directives.*

Accepting, again for the purposes of argument, that SB 4 would qualify as a wartime measure, it would be preempted by the federal government's wartime powers.[43] The federal government's control over war powers is uncontested in caselaw. See, e.g., Holmes v. Jennison, 39 U.S. 540, 551 (1840) ("The powers of war and peace, and of making treaties, are conferred upon the general government; and at the same time, expressly prohibited to the states. Every incident, therefore, which follows the grant, is equally included in the prohibition[.]"); United States v. Curtiss-Wright Exp. Corp., 299 U.S. 304, 318 (1936) ("The powers to declare and wage war, to conclude peace, . . . if they had never been mentioned in the Constitution, would have vested in the federal

---

[43] If it is difficult to imagine why SB 4 as a military action would be preempted by the federal government's military control, that is because it is not a wartime measure. But if the Court were to accept that Texas *could* take military actions to repel immigrants, then the State could also take other actions to repel immigrant "invaders," including launching airstrikes against cartels in Mexico and deploying the state's National Guard into Mexican border cities. That obviously untenable prospect highlights why a state may not, on its own directive and against the federal government's wishes, engage in an indefinite war.

government as necessary concomitants of nationality."); <u>Torres</u>, 597 U.S. at 590

("[T]he Constitution's text, across several Articles, strongly suggests a complete

delegation of authority to the Federal Government to provide for the common

defense. . . . [T]he Constitution spells out the war powers not in a single, simple

phrase, but in many broad, interrelated provisions."). As <u>Torres</u> notes, "The

Constitution also divests the States of like power" and "[t]he States ultimately

ratified the Constitution knowing that their sovereignty would give way to national

military policy." 597 U.S. at 590–92.

Article I, Section 8 grants Congress the ultimate power to "declare

war" and "repel invasions." U.S. Const. art. 1, § 8, cl. 11, 15. The Constitution

vests the President—not a governor—as the "Commander in Chief of the Army . . .

and of the Militia of the several States." <u>Id.</u> art. 2, § 2, cl. 1. It cannot be that the

President and Congress retain power to repel invasions, but the governor may also

supplant the federal government's authority when actually invaded. To the

contrary, even when the federal government lacks resources to respond, federal law

allows the President to direct state resources to repel the invasion.[44] The

---

[44] <u>See</u> 10 U.S.C. § 12406 ("Whenever— (1) the United States . . . is invaded or is in danger of invasion by a foreign nation; (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or (3) the President is unable with the regular forces to execute the laws of the United States; the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws. Orders for these purposes shall be issued through the governors of the States . . . .").

Constitution makes clear that the power to conduct war and repel invasions is entrusted to the federal government. The State War Clause, read consistently with other provisions of the Constitution, authorizes states to respond to invasion only as an emergency interim measure before the federal government may respond.

Put simply, if Texas is engaging in war by enacting SB 4, it must cede authority to the federal government to conduct that war once the federal government has had time to respond to the purported invasion. Here, the United States has had time to respond, and it has directed Texas to halt enforcement of SB 4. (Dkt. # 1-1). If the United States is truly at war, Texas may not direct its officers to disobey that command.

### B. Sovereignty arguments do not allow Texas to ignore the Supremacy Clause or countermand military directives.

If SB 4 constitutes engaging in war, the federal government may direct the war.[45] If SB 4 is not engaging in war, then the State War Clause is largely irrelevant to the constitutionality of the state's action. Attempting to get

---

[45] Texas suggests that the federal government is "unwilling" to repel its purported invasion, and therefore "the State [can] go it alone." (Dkt. # 25 at 25) (citing The Federalist No. 43 (Madison)). Again, Texas quotes from a passage that does not discuss invasion. Moreover, the federal government is not unwilling or unable to respond. The federal government has responded and continues to respond to surges of immigration as they occur on the border. See supra, p. 47–50. Texas may disagree with the scope of that response, but the adequacy of the response is not a question for courts to decide. The determination of when to declare war, as well as satisfaction of the guarantee to repel an invasion, are questions left to the political branches. See California v. United States, 104 F.3d at 1091. If the Court cannot declare that the United States is failing the Guarantee Clause, see Luther v. Borden, 48 U.S. 1 (1849), then it cannot grant Texas's "unnecessary or unwilling" argument. (Dkt. # 25 at 25)

around this, Texas suggests that the State War Clause instead provides for the more

general notion of sovereignty that allows the state to defend itself. (Dkt. # 25 at

26–27). The states' police powers, however, are already a part of the preemption

analysis. The invocation of the State War Clause may reflect the state's sovereign

powers, but it does not independently change the preemption analysis.

Instead, Texas quotes from Madison and John Marshall at Virginia's

ratification debate to suggest the state's sovereign power to repel invasions "cannot

be said to be repugnant to a concurrence of the [federal] power" to make war.[46]

(Dkt. # 25 at 26–27) (quoting 3 Debates in the Several State Conventions on the

Adoption of the Federal Constitution 425 (Jonathan Elliot ed., 1836)).

A full view of the Virginia ratification debates shows an argument

over whether states may raise militias at all, not whether they may use those

militias against the federal government's wishes. See Jeffrey M. Hirsch, War

Powers Abrogation, 89 Geo. Wash. L. Rev 593, 632 (2021). Both Madison and

---

[46] Madison's full quote is more expository:

> No state shall, without the consent of Congress, lay any duty on tonnage, keep troops or ships of war in time of peace, enter into any agreement or compact with another state, or with a foreign power, or engage in war, unless actually invaded, or in such imminent danger as will not admit of delay." They are restrained from making war, unless invaded, or *in imminent danger*. When in such danger, they are not restrained. I can perceive no competition in these clauses. They cannot be said to be repugnant to a concurrence of the power.

3 Debates in the Several State Conventions on the Adoption of the Federal Constitution 425 (Jonathan Elliot ed., 1836) (emphasis in original).

Marshall emphasize that a state militia may respond to more immediate exigent circumstances, but speak at the convention of the need for the *federal* government to respond to invasion.[47] Madison's quote about a "concurrence of the power" fits within that context, because the state's power to raise a militia to engage in a temporary and limited defensive war in pressing emergencies is not repugnant to the federal government's ultimate authority over war. 3 Debates in the Several State Conventions on the Adoption of the Federal Constitution 425 (Jonathan Elliot ed., 1836).

By relying on partial quotes taken in the context of the power to raise militias, Texas reads far too much into the Virginia debates.[48] The notion that

---

[47] Madison begins his speech by arguing that state control of militias in times of invasion would be disastrous. 3 Debates in the Several State Conventions on the Adoption of the Federal Constitution 424 (Jonathan Elliot ed., 1836) ("Is [the war power] to be vested in the state governments? If so, where is the provision for general defence? If ever America should be attacked, the states would fall successively. It will prevent them from giving aid to their sister states; for, as each state will expect to be attacked, and wish to guard against it, each will retain its own militia for its own defence. Where is this power to be deposited, then, unless in the general government, if it be dangerous to the public safety to give it exclusively to the states?"). Similarly, Marshall notes,

> What government is able to protect you in time of war? Will any state depend on its own exertions? The consequence of such dependence, and withholding this power from Congress, will be, that state will fall after state, and be a sacrifice to the want of power in the general government. *United we are strong, divided we fall.* Will you prevent the general government from drawing the militia of one state to another, when the consequence would be, that every state must depend on itself?

Id. at 420 (emphasis added).

[48] It is worth noting that Madison grew exasperated by hyper-technical arguments on this point, noting, "If we object to the Constitution in this manner, and consume our time in verbal criticism, we shall never put an end to the business." 3 Debates in the Several State Conventions on the Adoption of the Federal Constitution 425 (Jonathan Elliot ed., 1836).

states may call out the militia (or in modern terms, the National Guard), to respond to genuine exigencies is uncontroversial. The Virginia Debates speak to this uncontroversial power to call militias—not to a unilateral authority to declare and conduct war in contravention of the federal government's command.[49] See 10 U.S.C. § 12406 (authorizing President to command national guard); Hirsch, War Powers Abrogation, at 618 ("[T]here was no dispute that states were completely subservient to the federal government when it came to war powers.").[50] Madison's quote must be read in context. Courts must rely on more than just selective

---

[49] Marshall's entire argument is in support of federal war power. Elsewhere in the debates, he argues that the federal government's aim is to "protect the United States, and to promote the general welfare. Protection, in time of war, is one of its principal objects." 3 Debates in the Several State Conventions on the Adoption of the Federal Constitution 226 (Jonathan Elliot ed., 1836)). States "cannot do these things" and the power is vested "[b]y the national government only . . . . It is, then, necessary to give the government that power, in time of peace, which the necessity of war will render indispensable, or else we shall be attacked unprepared." Id. at 226–27.

[50] As Hamilton stated in ratification debates, for example:

> The great leading objects of the federal government, in which revenue is concerned, are to maintain domestic peace, and provide for the common defence. In these are comprehended the regulation of commerce,—that is, the whole system of foreign intercourse,—the support of armies and navies, and of the civil administration. . . . This principle assented to, let us inquire what are the objects of the state governments. Have they to provide against foreign invasion? Have they to maintain fleets and armies? Have they any concern in the regulation of commerce, the procuring alliances, or forming treaties of peace? No. Their objects are merely civil and domestic[.]"

2 The Debates in the Several State Conventions on The Adoption Of The Federal Constitution, 350 (Jonathan Elliot ed., 2d ed., 1836).

Hamilton noted that "federal control of military matters was unconstrained, as there was 'no limitation of that authority . . . to provide for the defence and protection of the community,' especially 'any matter essential to the formation, direction, or support of the national forces.'" Hirsch, supra, at 632 (quoting The Federalist No. 23, at 148 (Hamilton) (Jacob E. Cooke ed., 1961)).

quotations of extemporaneous remarks at one of many ratifying conventions to inform their understanding of the Constitution. And beyond one selective quote about a "concurrence of power," it is established constitutional law that "[t]he States ultimately ratified the Constitution knowing that their sovereignty would give way to national military policy." <u>Torres</u>, 597 U.S. at 592.[51]

In sum, for Texas to invoke the temporary "invasion" defense, the state must be "engaging in war" through SB 4. And if Texas is "engaging in war," then the federal government retains complete authority to direct that war once it has capacity to respond. "[T]he structure of the Constitution prevents States from frustrating national objectives in this field." <u>Torres</u>, 597 U.S. at 590. Texas either *is* engaging in war, in which case it must obey federal war directives once the federal military has responded, or it *is not* engaging in war, in which case the State War Clause does not apply.

## V. Nonjusticiability

Finally, Texas argues that an "invasion" is a nonjusticiable political question and therefore, this Court must accept its claim of invasion at face value.

---

[51] The Constitution guarantees the safety of states in event of invasion. The Guarantee Clause requires the federal government to respond to "provide protection from foreign invasion . . . ." U.S. Const. art. IV, § 4, cl. 1. The states, in forfeiting their individual right to wage war, gained the benefit of an unwaivable federal guarantee that they would be protected. Nor is there some issue regarding states being left unable to defend themselves when Congress is not in session. Almost immediately after ratification, Congress passed the Calling Forth Acts to delegate temporary defensive military authority to the President, which have remained in some form since 1792. 1 Stat. 264, 2d Cong., Sess. I, Ch. 28 (1792).

(Dkt. # 25 at 23). This stretches the political question doctrine beyond recognition. The political question doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." Japan Whaling Ass'n v. Am. Cetacean Soc., 478 U.S. 221, 230 (1986).

Typically, a defendant contends that a plaintiff's claim is nonjusticiable and must therefore be dismissed. See, e.g., Rucho v. Common Cause, 139 S. Ct. 2484, 2495–96 (2019) (holding that claims of political gerrymandering are nonjusticiable by federal courts). Here, by contrast, Texas asserts an independent affirmative defense and then argues that its own affirmative defense is nonjusticiable. Put another way, there is a difference between the defense of nonjusticiability and a defense that is nonjusticiable.

Texas's argument conflates these two propositions. If the defense is nonjusticiable, then it should presumably be rejected in the same way that nonjusticiable claims are rejected.[52] See id. To hold otherwise would give any state the right to ignore the Supremacy Clause so long as it could imagine a

---

[52] Texas cites several circuit court cases for the proposition that claims of invasion are nonjusticiable. But those cases cited "invasion" in the context of the Guarantee Clause—not the State War Clause. See Chiles v. United States, 69 F.3d 1094, 1097 (11th Cir. 1995); Padavan v. United States, 82 F.3d 23, 28 (2d Cir. 1996); New Jersey v. United States, 91 F.3d 463, 468 (3d Cir. 1996); California v. United States, 104 F.3d 1086, 1091 (9th Cir. 1997). And the cases dealt with claims for declaratory judgments that the United States was failing its duties under the Invasion Clause. In other words, the claims, not the defenses, were nonjusticiable.

nonfrivolous claim of invasion.[53] That is not how constitutional adjudication works, especially where the incarceration of tens of thousands of individuals may depend on the "nonjusticiable" defense. See Baker v. Carr, 369 U.S. 186, 217 (1962) ("The courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority."). Indeed, the Supreme Court long ago rejected Texas's theory:

> If this extreme position could be deemed to be well taken, it is manifest that the fiat of a state Governor, and not the Constitution of the United States, would be the supreme law of the land; that the restrictions of the Federal Constitution upon the exercise of state power would be but impotent phrases, the futility of which the state may at any time disclose by the simple process of transferring powers of legislation to the Governor to be exercised by him, beyond control, upon his assertion of necessity. Under our system of government, such a conclusion is obviously untenable.

Sterling v. Constantin, 287 U.S. 378, 397–98 (1932) (Holmes, J.).

Overall, Texas's invasion defense must fail. The Constitution does not refer to immigration as an "invasion." Texas is not engaging in war by enacting SB 4. And even if it was, Texas would necessarily cede that war authority to the federal government. At each step of the way, Texas's radical position falters.

---

[53] If, for example, California wished to enact environmental regulations that conflict with the EPA's, it could claim that pollutants are "invading" the state and that regulations are a necessary response to "engage in war" on pollution. If the United States sued to enjoin the preempted regulations, federal courts would be powerless to decide California's "nonjusticiable" defense.

<u>IRREPARABLE HARM</u>

**I. The United States' Harm**

   The United States will suffer immediate irreparable harm if SB 4 takes effect. First, the United States has shown irreparable harm as a matter of law. "If a statute is expressly preempted, a finding with regard to likelihood of success fulfills the remaining [preliminary injunction] requirements." <u>Tex. Midstream Gas Servs., LLC v. City of Grand Prairie</u>, 608 F.3d 200, 206 (5th Cir. 2010); <u>see also</u> <u>United States v. Arizona</u>, 641 F.3d 339, 366 (9th Cir. 2011) (noting, in the context of obstacle preemption, that "an alleged constitutional infringement will often alone constitute irreparable harm"), <u>aff'd in part, rev'd on other grounds</u>, 567 U.S. 387 (2012); <u>New Orleans Pub. Serv., Inc. v. Council of New Orleans</u>, 491 U.S. 350, 366–67 (1989) ("<u>NOPSI</u>") (noting that irreparable injury may be established "by a showing that the challenged state statute is flagrantly and patently violative of" the Supremacy Clause). "Because the United States has established a likelihood that the [state law] violates the Supremacy Clause, irreparable harm is presumed." <u>United States v. Texas</u>, 557 F. Supp. 3d 810, 821 (W.D. Tex. 2021).

   Texas has not addressed per se irreparable harm, which this Court has previously held to effectively concede irreparable harm as a matter of law. <u>See id.</u> ("[F]ailure to enjoin the [state law] causes per se irreparable harm to the federal government. Texas did not respond to this argument in its Opposition brief, and . . .

Texas still did not address the issue at the hearing on this Motion."). Accordingly, it is uncontested that the federal government will suffer irreparable harm as a matter of law. If SB 4 violates the Supremacy Clause, irreparable harm to the United States follows. See NOPSI, 491 U.S. at 366–67.

The United States would also suffer irreparable harm because its foreign relations will be injured if SB 4 takes effect. A State Department representative expects that "SB 4 would result in significant and ongoing negative consequences for U.S. foreign relations." (Jacobstein Decl., Dkt. # 14-1 at 2). SB 4 would immediately disrupt sensitive foreign relations agreements, particularly around the destination for the removal of noncitizens. (Id.); *supra*, p. 42–44. These disruptions are costly, because the state's unconstitutional intrusion into foreign affair distracts from other productive discourse, risks antagonizing American allies, and undermines the country's ability to promulgate foreign policy with one voice. (Id.); Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 383–85 (2000) ("[T]he Executive has consistently represented that the state Act has complicated its dealings with foreign sovereigns and proven an impediment to accomplishing objectives assigned it by Congress.").

The United States engages in regular talks with Mexico to reduce irregular migration at the southern border. See Exec. Order 14010, 86 Fed. Reg. 8267 (Feb. 2, 2021). These discussions may become irreparably derailed if SB 4

takes effect. Id. Most recently, the two countries had a high-level diplomatic meeting resulting in the issuance of a joint communique to reduce irregular migration and continue diplomatic solutions in the area. The White House, Mexico-U.S. Joint Communique (Dec. 28, 2023), https://perma.cc/92CW-APKE. The two countries also lead multilateral negotiations to reduce irregular migration from the Northern Triangle and work to end corruption in the region. (Jacobstein Decl., Dkt. # 14-1 at 3–7). If the United States cannot speak with one voice, then it cannot engage in these talks effectively. The United States cannot, for example, make promises to Mexico about removing noncitizens to their original countries of origin if Texas removes noncitizens under SB 4 into Mexico regardless of their country of origin. It cannot guarantee that asylum applicants will have their claims adjudicated or promise uniform standards for admissibility under SB 4. Although SB 4 purports to deter irregular migration, it threatens to deteriorate diplomatic talks designed to achieve that same goal.

It is no surprise, then, that Mexico has engaged diplomatically with the United States to protest SB 4. (See Jacobstein Decl., Dkt. # 14-1 at 2); Crosby, 530 U.S. at 382 (noting that "a number of this country's allies and trading partners fili[ing] formal protests" was evidence the state law undermined effective diplomacy). Texas denigrates Mexico as "a failed narco-state," (Dkt. # 25 at 3), but that "failed narco-state" is also the United States's largest trading partner,

amounting to $863 billion in trade per year, or $2 million of trade each minute.

U.S. International Trade in Goods and Services, U.S. Census Bureau, available at

https://www.census.gov/foreign-trade/Press-

Release/current_press_release/index.html. More than 1.6 million U.S. citizens live

in Mexico, and the country is the top international tourist destination for

Americans, with over 33 million traveling to the country in 2022. See U.S.

Relations With Mexico, U.S. Dep't of State, https://www.state.gov/u-s-relations-

with-mexico; International Visitation to and from the United States, Int'l Trade

Admin., https://www.trade.gov/sites/default/files/2023-05/International-Visitation-

to-the-United-States.pdf. The United States has a paramount interest in maintaining

a strong diplomatic relationship with Mexico, and SB 4 would irreparably harm the

federal government by injecting the state's unilateral policymaking into that

diplomacy. See Arizona, 567 U.S. at 395 ("Perceived mistreatment of [noncitizens]

in the United States may lead to harmful reciprocal treatment of American citizens

abroad.").

      SB 4 also harms the United States's nonrefoulment obligations. As

explained *supra*, p. 56–57, SB 4 frustrates the United States' efforts and

obligations to protect individuals fleeing from persecution or torture. The State

Department's representative estimates that it will hamper the country's advocacy

"for the advancement of human rights" and could be seen as a sign that the country

is scaling back its commitment to international protection. (Jacobstein Decl., Dkt. #

14-1 at 6–11). This would risk incentivizing other countries to do the same—

including Mexico, which saw the third-largest number of asylum applications

globally last year, many of whom would have otherwise entered the United States.

(Id. at 8). The United States cannot, on the one hand, ask Latin American allies to

host asylum applicants while one of its own states simultaneously declines to do

the same. (See id.).

Other forms of irreparable harm will follow from SB 4's enforcement,

too numerous to spell out in detail. Border Patrol will be unable to conduct

immediate reviews of apprehended migrants. (BeMiller Decl., Dkt. # 14-2 at 2–4).

Even if Texas does share all data related to noncitizen arrets with DHS, the agency

will have a diminished ability to detect time-sensitive threats. (Id.). Hindrances to

the operations of the federal government, especially as to counterterrorism efforts,

constitute irreparable harm. For noncitizens arrested under SB 4, DHS will likely

lose the ability to pursue expedited removals, which must be used to remove

noncitizens within 14 days of their arrival into the country. (See BeMiller Decl.,

Dkt. # 14-2 at 2–4); Designating Aliens For Expedited Removal, 69 Fed. Reg.

48877–01, 48880 (Aug. 11, 2004). SB 4 will result in changes to immigration

flows at the southern border towards the New Mexico, Arizona, and California

borders. (BeMiller Decl., Dkt. # 14-2 at 1–3). These changes will force increased

DHS responses to the region, which will include building new facilities and infrastructure, and may take years to complete. (Id.) (estimating costs of $20 million for single new facility that may hold 500 noncitizens). Terrain along these borders is also more rugged, resulting in more immigrant deaths. (Id.). By changing immigration patterns to more dangerous terrain, SB 4 will also risk placing DHS officers in more danger as they mount emergency responses to individuals in life-threatening situations. (Id.). In sum, the United States has made a clear showing of irreparable harm.

## II. The Organizational Plaintiffs' harm

The United States' harm is more than sufficient on its own to justify enjoining the law. But the Organizational Plaintiffs have also shown they will suffer irreparable harm if the preempted law takes effect.

Both Las Americas and American Gateways currently serve many clients who have entered the United States outside ports of entry and now risk prosecution under SB 4. By advocating for incarcerated clients and expediting asylum applications, the organizations will incur significant costs due to SB 4. These cannot be readily recovered through suits against the state for money damages. Rest. Law Ctr. v. U.S. Dep't of Labor, 66 F.4th 593, 597 (5th Cir. 2023) (noting that "[i]n determining whether costs are irreparable, the key inquiry is not so much the magnitude but the irreparability") (cleaned up); id. ("Even purely

economic costs may count as irreparable harm "where they cannot be recovered in the ordinary course of litigation.") (cleaned up). Likewise, the organization will lose the ability to apply for asylum or withholding on behalf of their clients because SB 4 directs state courts to disregard pending federal determinations of removability. <u>See</u> *supra*, p. 56–58.

   SB 4 will particularly damage the Organizational Plaintiffs' programs that encourage victims of abuse or human trafficking to report crimes to the police. <u>Las Americas</u>, (Dkt. # 30 at 18). SB 4 contains no provision abating arrest or removal based on investigations into the abuse or trafficking.[54] Because SB 4 authorizes state police officers to arrest many unauthorized noncitizens, victims of abuse or human trafficking will risk arrest and removal if they report their crimes. This omission is particularly perverse because victims of trafficking will be removed while federal officials will lose key witnesses which may hinder the indictment, conviction, or removal of traffickers themselves. The requirement that state court judges disregard pending U or T visa determinations harms the United States, which uses those visas to help prosecute abuse and trafficking, as well as the Organizational Plaintiffs seeking to help victims to report their crimes and remain in the country.

---

[54] SB 4 does prevent officers from arresting individuals at a domestic violence "SAFE-ready facility" so long as they are "on the premises . . . for purposes of obtaining a forensic medical examination and treatment." Tex. Code of Crim. Proc. art. 5(B).004.

Likewise, Las Americas and American Gateways will likely lose their ability to represent many asylum applicants. <u>Las Americas</u>, (Yang Decl., Dkt. # 30-2 at 3–4). Because state judges may not consider federal asylum applications as a reason to abate state removal proceedings, many of these applications may be mooted prior to adjudication, frustrating the organizations' missions. The organization will likely have to expedite asylum applications for those detained under SB 4 in hopes to achieve a determination prior to the state's removal. (<u>Id.</u>). For the same reason, SB 4 may also decrease the organizations' funding, which is partially based off the number of asylum cases. (<u>Id.</u>).

Finally, El Paso County will also likely suffer irreparable harm. It will have to pay to expand its jail, provide counsel for indigent defendants, and hire more Sheriff deputies and court personnel. <u>Las Americas</u>, (Carillo Decl., Dkt. # 30–3 at 4–5). El Paso County may lose the ability to focus on high risk or violent criminals, harming its jail cost containment efforts. (<u>Id.</u>). Although funds for hosting federal prisoners is the third-largest source of revenue for El Paso County, the County could lose several million dollars if it instead must hold noncitizens arrested under state law—expenses that it cannot readily recover under the state even if SB 4 is eventually declared unconstitutional. And finally, SB 4 will likely frustrate the County's efforts to integrate its law enforcement office with migrant

support services and will make noncitizen crime victims less likely to report

violent crimes.

<u>EQUITIES AND PUBLIC INTEREST</u>

When the United States is a party to a preliminary injunction motion,

the final two factors of the inquiry—balance of the equities and public interest—

merge. <u>Nken v. Holder</u>, 556 U.S. 418, 435 (2009). When the federal government

sues under the Supremacy Clause, the contest "is not a controversy between

equals." <u>Sanitary Dist. of Chicago</u>, 266 U.S. at 425. "The United States is asserting

its sovereign power to regulate" a field dedicated to the federal government. <u>Id.</u>

Texas may disagree with the federal government's policy decisions, but they are

the federal government's to make. <u>See Trump v. Hawaii</u>, 138 S. Ct. 2392, 2421

(2018). ("[W]e cannot substitute our own assessment for the Executive's predictive

judgments on such matters, all of which are delicate, complex, and involve large

elements of prophecy.") (internal quotations omitted).

A state's "[f]rustration of federal statutes and prerogatives [is] not in

the public interest." <u>United States v. Alabama</u>, 691 F.3d at 1301. That is

particularly true as to SB 4, which strips away an asylum applicant's option to raise

credible fears or torture or persecution in a state hearing. <u>See Nken v. Holder,</u> 556

U.S. 418, 436 (2009) ("[T]here is a public interest in preventing [noncitizens] from

being wrongfully removed, particularly to countries where they are likely to face

substantial harm."). And the record makes clear that removing noncitizens into

Mexico risks subjecting them to death, torture, and rape. See Las Americas,

(Junaid Decl., Dkt # 30-5).

Nor can Texas assert a legitimate interest in enforcing an unconstitutional

law. See Trans World Airlines, Inc. v. Mattox, 897 F.2d 773, 784 (5th Cir. 1990)

(states faced no injury from injunction of preempted regulation); United States v.

Alabama, 691 F.3d at 1301 ("[W]e discern no harm from the state's

nonenforcement of invalid legislation.").

Finally, despite Texas's statements that it must prevent against "drug

smuggling, human trafficking, and terrorism," nothing in this Order prevents the

state from doing so. (Dkt. # 25 at 56). Texas already criminalizes each of these

activities. See, e.g., Tex. Health & Human Safety Code § 481.011; Tex. Penal

Code § 20A.02; id. § 76.02. For the past century, Texas has relied on its expansive

police powers afforded to it under the Constitution to regulate crime within its

borders. Texas may continue to do so, but it cannot regulate the federal field of

unlawful entry and removal.

## SCOPE OF THE INJUNCTION

Next, the Court discusses the scope of the injunction. See Fed. R. Civ.

P. 65(d). Texas asks the Court to only enjoin the unconstitutional applications of

SB 4 and sever any remaining constitutional sections. (Dkt. # 25 at 60–61).

Although cognizant of the "normal rule" that "partial, rather than facial, invalidation is the required course," the nature of SB 4 does not lend itself to a partial injunction. Ayotte v. Planned Parenthood of N. New England, 546 U.S. 320, 329 (2006).

The main provisions of SB 4—criminalizing illegal entry, criminalizing illegal re-entry, authorizing removals of noncitizens, and denying the defense of a federal determination—are each preempted under this Court's analysis. The remaining provisions all depend on the validity of the criminal prohibitions and are therefore nullified by the injunction.[55] Accordingly, the Court will enjoin the law in full and prohibit Defendants and their officers, agents, and employees from enforcing any provision of SB 4. See Fed. R. Civ. P. 65(d)(2).

More fundamentally, SB 4 is not like Arizona's SB 1070 in one critical aspect: SB 4 operates as an intertwined whole.[56] See Tex. Penal Code §§

---

[55] Sections 4, 6, and 7 all deal with supervision or parole of defendants under SB 4, which are necessarily nullified by the underlying injunction on the criminal prohibitions themselves. SB 4 §§ 4, 6, 7. Section 5 requires criminal databases to include offenses under SB 4, which is likewise nullified. Id. § 5. Section 8 is a severability clause, while Section 9 states that the law will take effect on March 5, 2024. Id. §§ 8, 9.

[56] In Arizona, SB 1070 contained largely separate provisions, dealing with (1) authorizing stops for officers to determine immigration status, (2) requiring noncitizen registration, (3) criminalizing employment while being undocumented, and (4) authorizing arrests with probable cause that a person is removable. See Arizona, 567 U.S. at 390. In the underlying litigation, the district court made clear that it intended to address SB 1070 piecemeal, and that procedural posture carried through on appeal. See Lucas Guttentag, Immigration Preemption and the Limits of State Power: Reflections on Arizona v. United States, 9 Stan. J. C.R. & C.L. 1, 12–13 (2013) (recounting procedural history of Arizona). Although each provision generally aimed to deter immigration, see id., SB 1070 sought to accomplish that deterrence though the relatively different fields of registration, employment, immigration status, and police stops.

51.02–03; Tex. Code of Crim. Proc. arts. 5(B).001–5(B).003. Removal orders

under SB 4 operate for noncitizens accused of illegal entry (Tex. Penal Code §

51.02) or illegal re-entry (id. § 51.03). And the removal order provision (Tex. Code

of Crim. Proc. art. 5B.002(c)) serves as a potential alternative to incarceration

under SB 4.[57] One provision cannot be enjoined without significantly eliminating

or mooting other key remedies under another provision. Despite the law's

severability clause, SB 4 must be enjoined in whole.

## STAY PENDING APPEAL

At the Court's hearing on February 15, 2024, the parties debated

whether the Court should stay any injunction pending appeal. In light of the

parties' arguments, and to allow the parties increased time to brief the matter

before the Fifth Circuit, the Court will concurrently address Texas's conditional

request for a stay. See Fed. R. App. P. 8(a)(2)(A)(ii).

The Fifth Circuit "consider[s] four factors in deciding whether to

grant a stay pending appeal: (1) whether [Texas] has made a strong showing that

[it] is likely to succeed on the merits; (2) whether [Texas] will be irreparably

injured absent a stay; (3) whether issuance of the stay will substantially injure the

---

[57] Section 9 of SB 4 contains a severability clause. While federal courts should normally respect severability clauses, it would not be practicable here. The only possibility of severance under the law would be if a court ruled that the removal provisions were preempted but not the underlying criminal offenses (the reverse could not be true because there could be no removal order absent an underlying offense). However, that would raise its own conflict preemption problem, because removal is an option to avoid incarceration under federal immigration law.

other parties interested in the proceeding; and (4) where the public interest lies."
<u>SEC v. Barton</u>, 79 F.4th 573, 581 (5th Cir. 2023) (quoting <u>Nken</u>, 556 U.S. at
434).[58] Applying the Fifth Circuit's framework, the Court finds that a stay is not
warranted.

First, given the discussion herein, Texas is not likely to succeed on the
merits. Its arguments rest upon a narrow and untenable reading of <u>Arizona</u> and the
many immigration preemption cases that preceded it. SB 4 intrudes onto especially
dominant federal interests, such as the removal of noncitizens, and conflicts with
federal law by disallowing consideration of pending asylum or withholding
determinations. Texas's "actually invaded" defense, meanwhile, asserts a novel
reading of "invasion" never once affirmed by any federal court (and, indeed,
unanimously rejected by three circuit courts). Texas is unlikely to succeed on the
merits.

---

[58] In <u>NAACP v. Tindell</u>, the court of appeals announced that it "evaluate[s] a request for an
injunction pending appeal according to the standard for granting or denying a stay pending
appeal." 90 F.4th 419, 422 (5th Cir. 2024) (citing <u>Texas v. DHS</u>, 88 F.4th 1127 (5th Cir. 2023),
<u>vacated</u>, No. 23A607, 2024 WL 222180 (U.S. Jan. 22, 2024)); <u>Mock v. Garland</u>, 75 F.4th 563,
577 (5th Cir. 2023) (noting same). An injunction pending appeal is an extraordinarily high
burden. "That authority is to be used 'sparingly and only in the most critical and exigent
circumstances.'" <u>Wisconsin Right to Life, Inc. v. Fed. Election Comm'n</u>, 542 U.S. 1305, 1306
(2004) (citing <u>Ohio Citizens for Responsible Energy, Inc. v. NRC</u>, 479 U.S. 1312, 1313, (1986)
(Scalia, J., in chambers)). "It is only appropriately exercised where (1) [n]ecessary or appropriate
in aid of our jurisdiction . . . and (2) the [issues] are indisputably clear[.]" <u>Id.</u> (cleaned up). The
more likely understanding of <u>Tindell</u> and <u>Mock</u> is that the Fifth Circuit meant to lower the
standard for an injunction pending appeal—rather than raise the standard for a stay. But because
the Court is uncertain, it notes that Texas has not shown the issues are so "indisputably clear" as
to warrant a stay under the potentially heightened standard. <u>Id.</u>

Second, Texas will not suffer sufficient irreparable injury to warrant a stay. Although an injunction generally automatically results in a form of irreparable injury to the state, several factors mitigate that injury here. See Vote.Org v. Callanen, 39 F.4th 297, 308 (5th Cir. 2022). Unauthorized immigration is not new to the Texas border, and Texas has relied for decades on the existing federal regime to regulate immigration. See Wireless Agents, L.L.C. v. T–Mobile USA, Inc., 2006 WL 1540587, at *3 (N.D. Tex. June 6, 2006) ("[D]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction.") (cleaned up). Additionally, federal law already provides for state officers to conduct immigration enforcement measures. See 8 U.S.C. § 1357(g). In its responsive briefing, Texas failed to address § 1357(g) at all. Its true harm, then, is not that the state cannot enforce immigration laws, but that it cannot do so free of federal supervision. Finally, the Court does not doubt the risk that cartels and drug trafficking pose to many people in Texas. But as explained, Texas can (and does) already criminalize those activities. Nothing in this Order stops those enforcement efforts. No matter how emphatic Texas's criticism of the Federal Governments handling of immigration on the border may be to some, disagreement with the federal government's immigration policy does not justify a violation of the Supremacy Clause.

The third and fourth <u>Nken</u> factors largely merge as applied to SB 4. The United States has shown it will suffer diplomatic harms, as it will lose the ability to speak "with one voice" on immigration. It has shown that SB 4 will strain relations with Mexico, which has already protested the law and will likely continue to do so as Texas deports Central and South American immigrants into the country. Texas may remove or incarcerate many noncitizens with valid asylum or withholding claims, in violation of U.S. treaty obligations, which may induce other countries to follow suit. It has shown that federal agencies' ability to detect security risks will be harmed as Texas police disrupt DHS's ability to centrally and timely monitor illicit drug trades, human trafficking, and imminent threats.

If SB 4 takes effect, the law would immediately impose criminal liability on thousands of noncitizens who re-entered the state. The removal of noncitizens cannot be undone, even if a stay on this injunction is ultimately lifted. Thousands of individuals should not be arrested, incarcerated, or removed prior to resolution of SB 4's constitutionality.

Texas's "invasion" defense would make a stay particularly inappropriate here, as Texas has invoked a clause that would authorize the state to engage in war on Latin American immigrants arriving from Mexico. A summary stay of the injunction would leave open the question of whether Texas is being

"actually invaded" or at war. If Texas is to be granted these extreme powers, the consequences of that radical determination must be laid out in full.

If allowed to proceed, SB 4 could open the door to each state passing its own version of immigration laws. The effect would moot the uniform regulation of immigration throughout the country and force the federal government to navigate a patchwork of inconsistent regulations. SB 4 threatens the fundamental notion that the United States must regulate immigration with one voice.

In the final analysis, it is clear that the Plaintiffs, particularly the United States, will suffer grave irreparable harm were SB 4 to take effect, especially where Texas has other aspects of Operation Lone Star in full force. The balance of equities unequivocally weighs in favor of denying the stay pending appeal.

<u>CONCLUSION</u>

**IT IS ORDERED** that the motions for preliminary injunctions, <u>United States</u> (Dkt. # 14) and <u>Las Americas</u>, (Dkt. # 30) are **GRANTED**. Defendants are preliminarily **ENJOINED** from enforcing SB 4.

**DATED**: Austin, Texas, February 29, 2024.

David Alan Ezra
Senior United States District Judge