# United States Court of Appeals for the Fifth Circuit

**FILED**

March 26, 2024

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ klw

DEPUTY

————————

No. 24-50149

————————

United States Court of Appeals
Fifth Circuit

**FILED**

March 26, 2024

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

*Plaintiff—Appellee,*

*versus*

STATE OF TEXAS; GREG ABBOTT, *in his official capacity as Governor of Texas*; TEXAS DEPARTMENT OF PUBLIC SAFETY; STEVEN C. MCCRAW, *in his official capacity as Director of Texas Department of Public Safety,*

*Defendants—Appellants,*

_____

LAS AMERICAS IMMIGRANT ADVOCACY CENTER; AMERICAN GATEWAYS; COUNTY OF EL PASO, TEXAS,

*Plaintiffs—Appellees,*

*versus*

STEVEN C. MCCRAW, *in his official capacity as Director of the State of Texas Department of Public Safety*; BILL D. HICKS, *in his official capacity as District Attorney for the 34th District,*

*Defendants—Appellants.*

_____

Appeal from the United States District Court

for the Western District of Texas
USDC Nos. 1:23-CV-1537, 1:24-CV-8

_____

Before RICHMAN, *Chief Judge*, and OLDHAM and RAMIREZ, *Circuit Judges*.

PRISCILLA RICHMAN, *Chief Judge*:

In an effort to stem the tide of illegal immigration into Texas, the state legislature passed a bill known as S. B. 4 that amended various statutes. The new laws prohibit noncitizens from illegally entering or reentering the state and set forth removal procedures. The United States, two nonprofit organizations, and the county of El Paso sued to enjoin enforcement of S. B. 4, arguing it is preempted by federal law. The district court granted a preliminary injunction.[1] Applying the factors set forth in *Nken v. Holder*,[2] we deny Texas's motion to stay that injunction pending appeal.[3]

## I

In November 2023, the Texas legislature passed Senate Bill 4 (S. B. 4).[4] Its preamble reflects that its purpose is to prohibit the illegal entry into or illegal presence in the state of a noncitizen, to "authoriz[e] or requir[e] under certain circumstances the removal of persons who violate those prohibitions," and to create criminal offenses.[5] S. B. 4 amended the Texas Penal Code to include new sections entitled: "Illegal Entry from

_____

[1] *United States v. Texas*, No. 24-CV-8, 2024 WL 861526, at *43 (W.D. Tex. Feb. 29, 2024).

[2] 556 U.S. 418 (2009).

[3] FED. R. APP. P. 8(a).

[4] Senate Bill 4, 88th Leg., 4th Called Sess. (Tex. 2023).

[5] *Id.*

2

No. 24-50149

Foreign Nation" and "Illegal Reentry by Certain Aliens."[6] Those and other implementing laws are the primary focus of our analysis.

The crime of "Illegal Entry from Foreign Nation" is codified at Texas Penal Code § 51.02, and provides: "A person who is an alien commits an offense if the person enters or attempts to enter this state directly from a foreign nation at any location other than a lawful port of entry."[7] That section also enumerates affirmative defenses, including: (1) the federal government has granted the defendant "lawful presence in the United States"; (2) the federal government has granted the defendant asylum under 8 U.S.C. § 1158; (3) the defendant's conduct does not constitute a violation of 8 U.S.C. § 1325(a), which prohibits illegal entry into the United States; and (4) the defendant was approved for benefits under the federal Deferred Action for Childhood Arrival program (DACA) between certain dates.[8]

The crime of "Illegal Reentry by Certain Aliens" is codified at Texas Penal Code § 51.03, and provides:

> A person who is an alien commits an offense if the person enters, attempts to enter, or is at any time found in this state after the person:
>
>> (1) has been denied admission to or excluded, deported, or removed from the United States; or
>>
>> (2) has departed from the United States while an order of exclusion, deportation, or removal is outstanding.[9]

---

[6] *Id.* § 2 (codified at Tex. Penal Code §§ 51.02-03).

[7] Tex. Penal Code § 51.02.

[8] *Id.*

[9] *Id.* § 51.03.

No. 24-50149

S. B. 4 also empowers Texas state judges and magistrates to order noncitizens to return to the country from which they entered or attempted to enter.[10]  A state judge or magistrate "may" enter such an order if "the person agrees to the order," among other requirements.[11]  A judge "shall" issue the order "[o]n a person's conviction of" a Chapter 51 crime (described above).[12]

Another S. B. 4 provision relevant to this appeal is codified at Texas Code of Criminal Procedure 5B.003.  It directs: "A court may not abate the prosecution of an offense under Chapter 51 . . . on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated."[13]

In December 2023, Las Americas Immigrant Advocacy Center and American Gateways (collectively, "Nonprofit Plaintiffs"), and El Paso County, sued the Director of the Texas Department of Public Safety, Steven McCraw, and the District Attorney for the 34th Judicial District of Texas, Bill Hicks.[14]  In January 2024, the United States sued Texas, Governor Greg Abbott, the Texas Department of Public Safety, and Director McGraw.[15]  The plaintiffs sought to enjoin Texas from enforcing S. B. 4.[16]

––––––––––––––––––––––––

[10] Senate Bill 4, 88th Leg., 4th Called Sess., § 1 (Tex. 2023) (codified at TEX. CODE CRIM. PROC. art. 5B.002).

[11] TEX. CODE CRIM. PROC. art. 5B.002(c).

[12] *Id.* art. 5B.002(d).

[13] *Id.* art. 5B.003.

[14] ROA.792.

[15] ROA.17.  We refer to the defendants collectively as "Texas."

[16] ROA.82, 906.

No. 24-50149

The district court consolidated the cases. In February 2024, days before S. B. 4's effective date, the district court granted a preliminary injunction.[17] In the interlocutory appeal now before us, the defendants moved for an administrative stay and a stay pending appeal. A motions panel of this court granted an administrative stay.[18] Two days later, the Supreme Court stayed that order.[19] On March 19, 2024, the Supreme Court vacated its own stay.[20] That same day, we lifted this court's administrative stay of the district court's preliminary injunction, and the following day, we heard oral argument. For the reasons explained below, we conclude that Texas's motion for stay pending appeal should be denied.

## II

We consider four factors in ruling on a motion for a stay pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure other parties interested in the proceeding; and (4) where the public interest lies."[21] "The first two factors of the traditional standard are the most

---

[17] *United States v. Texas*, No. 24-CV-8, 2024 WL 861526, at *43 (W.D. Tex. Feb. 29, 2024).

[18] *United States v. Texas*, No. 24-50149, 2024 WL 909612 (5th Cir. Mar. 2, 2024) (per curiam) (unpublished), *vacated*, No. 24-50149, 2024 WL 1174226 (5th Cir. Mar. 19, 2024) (per curiam).

[19] The Supreme Court granted the stay on March 4, 2024. No. 23A814, 2024 WL 909451 (U.S. Mar. 4, 2024). Subsequently, the Supreme Court extended the stay on March 12 and March 18. No. 23A814, 2024 WL 1055544 (U.S. Mar. 12, 2024); No. 23A814, 2024 WL 1151565 (U.S. Mar. 18, 2024).

[20] No. 23A814, 2024 WL 1163923 (U.S. Mar. 19, 2024).

[21] *Nken v. Holder*, 556 U.S. 418, 426 (2009) (internal quotation marks omitted) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

No. 24-50149

critical."[22] The third and fourth factors "merge when the Government is the opposing party."[23] A stay pending appeal "is not a matter of right, even if irreparable injury might otherwise result."[24]

## III

We begin with likelihood of success on the merits. When evaluating the first factor, "[i]t is not enough that the chance of success on the merits be 'better than negligible.'"[25] Texas must make a "strong showing."[26]

### A

Texas contends it is likely to succeed on the merits for several reasons, the first of which is its assertion that there are two threshold obstacles to the plaintiffs' claims: (1) the Nonprofit Plaintiffs and El Paso County (collectively, "Organization Plaintiffs") lack standing; and (2) the plaintiffs lack causes of action.

Texas does not dispute the United States' standing.[27] The Supreme Court has recognized that one plaintiff's successful demonstration of standing is sufficient to satisfy Article III's case-or-controversy requirement.[28] Accordingly, we do not consider at this juncture whether the Organization Plaintiffs have standing.

---

[22] *Id.* at 434.

[23] *Id.* at 435.

[24] *Id.* at 427 (quoting *Virginian R. Co. v. United States*, 272 U.S. 658, 672 (1926)).

[25] *Id.* at 434 (quoting *Sofinet v. INS*, 188 F.3d 703, 707 (7th Cir. 1999)).

[26] *Hilton*, 481 U.S. at 776.

[27] Texas Mot. at 5-7.

[28] *See, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) ("Only one of the petitioners needs to have standing to permit us to consider the petition for review."); *Rumsfeld v. F. for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006) ("The Court

No. 24-50149

In addressing whether the United States has identified a "cause of action," we turn first to the Supreme Court's decision in *Arizona v. United States*.[29]  In that case, the United States filed suit against Arizona seeking to enjoin state legislation that had been enacted to "discourage and deter the unlawful entry and presence of aliens and economic activity by persons unlawfully present in the United States."[30]  The Supreme Court did not expressly address whether the United States had a cause of action, but it expounded upon the longstanding recognition that the "Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens," which is grounded "in part, on the National Government's constitutional power to 'establish an uniform Rule of Naturalization,' Art. I, § 8, cl. 4, and its inherent power as sovereign to control and conduct relations with foreign nations."[31]  The Court then proceeded to discuss at length the necessity for the United States' sovereignty in immigration matters and the breadth of the scheme of regulation Congress has adopted.[32]  This discussion of the power of the United States granted both by the Constitution and Congress preceded the Court's preemption analysis under the Supremacy Clause.

―――――――――――――――――――

of Appeals did not determine whether the other plaintiffs have standing because the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.").

[29] 567 U.S. 387 (2012).

[30] *Id.* at 393 (internal quotation marks omitted) (quoting Note following Ariz. Rev. Stat. Ann. § 11-1051 (West 2012)).

[31] *Id.* at 394-95.

[32] *Id.* at 394-97.

No. 24-50149

Texas asserts, quite rightly, that the Supremacy Clause does not create a cause of action.[33] The Supreme Court explained in *Armstrong v. Exceptional Child Center, Inc.*,[34] that the Supremacy Clause "instructs courts what to do when state and federal law clash, but is silent regarding who may enforce federal laws in court, and in what circumstances they may do so."[35] The Court explained, "[t]he ability to sue to enjoin unconstitutional actions . . . is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England."[36] "It is a judge-made remedy . . . ."[37] The Court recounted that "we have long held that federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law" and "that has been true not only with respect to violations of federal law by state officials, but also with respect to violations of federal law by federal officials."[38] Because injunctive relief is available against federal officials, not just state actors, the Court pointedly observed that the Supremacy Clause "cannot be[] the explanation."[39] "What our cases demonstrate is that, 'in a

---

[33] *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324-25 (2015) (explaining that "the Supremacy Clause is not the source of any federal rights," and "certainly does not create a cause of action" (internal quotation marks omitted) (quoting *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 107 (1989))).

[34] 575 U.S. 320 (2015).

[35] *Id.* at 324-25.

[36] *Id.* at 327.

[37] *Id.*

[38] *Id.* at 326-27.

[39] *Id.* at 327.

proper case, relief may be given in a court of equity . . . to prevent an injurious act by a public officer.'"[40]

The Court further explained in *Armstrong* that "[t]he power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations."[41] The remainder of the *Armstrong* opinion analyzed whether the plaintiffs' preemption claim could "proceed against Idaho in equity" or whether the cause of action in equity was displaced by statute.[42] The opinion ultimately concluded that, "[i]n our view the Medicaid Act implicitly precludes private enforcement of § 30(A)," a broad, non-specific "judgment-laden standard" conferring enforcement for Medicaid plans "upon the Secretary alone," "and respondents cannot, by invoking our equitable powers, circumvent Congress's exclusion of private enforcement."[43]

The United States has broad powers and rights granted by the Constitution and Congress regarding immigration matters. Texas cites to no constitutional or statutory provision that expressly or impliedly displaces an action arising in equity to enjoin executive action with regard to the matters at issue in this litigation.

Texas asserts that "to the extent the United States seeks to rely on *Ex parte Young*[44] to show it 'has an equitable cause of action,' it cannot . . . because that cause of action may not be brought by

---

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.* at 328.

[44] 209 U.S. 123 (1908).

governments—it is limited to 'private parties.'"[45]    Texas cites *Whole Women's Health v. Jackson*[46] for this proposition, but the Supreme Court's decision in *Jackson* did not consider, top side or bottom, the question of whether the United States or other governmental entities may seek judicial orders in federal courts to obtain prospective relief against state officers.

The Court's decisions in *Jackson* and other cases mention "private parties" when discussing *Ex parte Young* in the context of sovereign immunity.[47]    The decision in *Ex parte Young* created an exception to the Eleventh Amendment's grant of sovereign immunity, "less delicately called a fiction," that "permit[s] the federal courts to vindicate federal rights."[48] That "fiction" permits private parties to obtain injunctive relief against state officials notwithstanding the Eleventh Amendment.   That "fiction" is unnecessary, however, when the United States and other sovereigns bring an action in equity to enjoin unlawful actions of state officials because "States have no sovereign immunity as against the Federal Government."[49]    The

---

[45] Texas Mot. at 9 (first quoting *Freedom from Religion Found., Inc. v. Mack*, 4 F.4th 306, 311 n.3 (5th Cir. 2021); and then quoting *Whole Women's Health v. Jackson*, 595 U.S. 30, 39 (2021)).

[46] 595 U.S. 30 (2021).

[47] *See, e.g.*, *id.* at 39 ("[I]n *Ex parte Young*, this Court recognized a narrow exception [to state sovereign immunity] grounded in traditional equity practice—one that allows certain private parties to seek judicial orders in federal court preventing state executive officials from enforcing state laws that are contrary to federal law."); *see also, e.g.*, *City of Austin v. Paxton*, 943 F.3d 993, 998 (5th Cir. 2019).

[48] *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011) (internal quotation marks omitted) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105, 114 n.25 (1984)).

[49] *West Virginia v. United States*, 479 U.S. 305, 311 (1987); *United States v. Minnesota*, 270 U.S. 181, 195 (1926) ("[T]he immunity of the state is subject to the constitutional qualification that she may be sued in this Court by the United States, a sister state, or a foreign state."); *see also EEOC v. Bd. of Supervisors for Univ. of La. Sys.*, 559 F.3d 270, 272 (5th Cir. 2009) ("[I]t is well-established that sovereign immunity under the

"private parties" references are not linked to the part of *Ex parte Young* that explains that an action to obtain an injunction against unlawful official action arises in equity. Courts using the "private party" language have *not* suggested a limitation that excludes governmental entities from an *Ex parte Young* action. Indeed, in *Virginia Office for Protection and Advocacy v. Stewart*,[50] the Supreme Court held that a state agency could bring an *Ex parte Young* action.[51] The Court observed that "there is no warrant in our cases for making the validity of an *Ex parte Young* action turn on the identity of the plaintiff."[52]

The United States, as distinguished from private parties, does not need to rely on *Ex parte Young* to avoid a claim of sovereign immunity when it sues a state or state official. Nothing in *Ex parte Young* indicates that an action sounding in equity is available to private parties but not sovereigns. Neither Texas nor the dissenting opinion[53] has cited a case that offers any explanation as to why the United States would or should be barred from asserting an equitable right against state actors who allegedly are about to violate federal law. What logical basis is there for courts to say private parties and government agencies or actors may bring an action sounding in equity but not the United States? Neither Texas nor the dissenting opinion offers a rationale that would support such a distinction.

---

Eleventh Amendment operates only to protect States from *private lawsuits*—not from lawsuits by the federal government.").

[50] 563 U.S. 247 (2011).

[51] *Id.* at 256.

[52] *Id.*

[53] *Post* at 71-76.

No. 24-50149

Texas asserts that "[t]hough Congress may create public causes of action . . . it has not done so here."[54]  Even if a statute "does not confer a private right, a plaintiff is not prevented from gaining equitable relief on preemption grounds."[55]  The "ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity."[56]

We see no basis in the precedent of this court or the Supreme Court for concluding that the United States lacks a cognizable path for seeking to enjoin an allegedly preempted state law.  We bear in mind the United States has asserted that the laws at issue may disrupt or interfere with its core constitutional authority, including authority with regard to foreign policy and relations with other countries, as well as its authority over immigration.

**B**

Texas asserts that it is likely to prevail on the merits of its argument that S. B. 4 is not preempted under the Supremacy Clause.  Alternatively, it asserts that it is likely to prevail on the merits as to at least parts of S. B. 4. We first consider field preemption.

**1**

Field preemption occurs when "States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has

---

[54] Texas Mot. at 8.

[55] *Crown Castle Fiber, L.L.C. v. City of Pasadena*, 76 F.4th 425, 434-45 (5th Cir. 2023).

[56] *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015); *see also Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 475 (5th Cir. 2020) (en banc) (holding that the plaintiff "has a cause of action against [state officials] *at equity*, regardless of whether it can invoke § 1983").

Case: 24-50149    Document: 61    Page: 103    Date Filed: 03/26/2024

No. 24-50149

determined must be regulated by its exclusive governance."[57]  The Supreme
Court has indicated that courts should hesitate to infer field preemption
unless "the nature of the regulated subject matter permits no other
conclusion" or "Congress has unmistakably so ordained."[58]    When
Congress has not expressly preempted state law, field preemption may still
"be inferred from a scheme of federal regulation so pervasive as to make
reasonable the inference that Congress left no room for the States to
supplement it."[59]  Field preemption may also be inferred "where an Act of
Congress touch[es] a field in which the federal interest is so dominant that
the federal system will be assumed to preclude enforcement of state laws on
the same subject."[60]  When analyzing field preemption, "the relevant field
should be defined narrowly."[61]  The operative question, therefore, is whether
Congress intended to "occupy the field"[62] of immigration policies
concerning entry into and removal from the United States.

Here, the district court concluded that "the federal government has
both a dominant interest and a pervasive regulatory framework" to control

---

[57] *Arizona v. United States*, 567 U.S. 387, 399 (2012).

[58] *De Canas v. Bica*, 424 U.S. 351, 356 (1976) (quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142 (1963)).

[59] *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990) (internal quotation marks and ellipsis omitted) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

[60] *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Rice*, 331 U.S. at 230).

[61] *City of El Cenizo v. Texas*, 890 F.3d 164, 177 (5th Cir. 2018) (first citing *Arizona*, 567 U.S. at 400-01; and then citing *De Canas*, 424 U.S. at 360 n.8).

[62] *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (quoting *California v. ARC Am. Corp.*, 490 U.S. 93, 100 (1989)).

No. 24-50149

immigration into the United States, "preclud[ing] state regulation in the area."[63]

For nearly 150 years, the Supreme Court has held that the power to control immigration—the entry, admission, and removal of noncitizens—is *exclusively* a federal power.[64] Despite this fundamental axiom, S. B. 4 creates separate, distinct *state* criminal offenses and related procedures regarding unauthorized entry of noncitizens into Texas from outside the country and their removal.

The Supreme Court's decision in *Arizona v. United States* provides considerable guidance as to whether Texas is likely to succeed on the merits of the preemption issue. There, the relevant state-law provision—Section 3 of S. B. 1070, an Arizona bill—punished a noncitizen's "willful failure to complete or carry an alien registration document."[65] The state provision

---

[63] *United States v. Texas*, No. 24-CV-8, 2024 WL 861526, at *11 (W.D. Tex. Feb. 29, 2024).

[64] *See, e.g.*, *Plyler v. Doe*, 457 U.S. 202, 228 n.23 (1982) ("[T]he State has no direct interest in controlling entry into this country, that interest being one reserved by the Constitution to the Federal Government . . . ."); *De Canas*, 424 U.S. at 354 ("Power to regulate immigration is unquestionably exclusively a federal power."); *Galvan v. Press*, 347 U.S. 522, 531 (1954) ("[T]hat the formulation of . . . policies [regarding the entry of noncitizens and their right to remain here] is entrusted exclusively to Congress has become about as firmly embedded in the legislative and judicial tissues of our body politic as any aspect of our government."); *Truax v. Raich*, 239 U.S. 33, 42 (1915) ("The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal government." (citing *Fong Yue Ting v. United States*, 149 U.S. 698, 713 (1893))); *Chy v. Freeman*, 92 U.S. 275, 280 (1875) ("The passage of laws which concern the admission of citizens and subjects of foreign nations to our shores belongs to Congress, and not to the States."); *Henderson v. Mayor of New York*, 92 U.S. 259, 271 (1875) (holding immigration is a "power[], which, from [its] nature, [is] exclusive in Congress").

[65] *Arizona v. United States*, 567 U.S. 387, 400 (2012) (quoting ARIZ. REV. STAT. ANN. § 13-1509(A)). The Court analyzed four provisions of Arizona's S. B. 1070. It analyzed Section 3 of S. B. 1070 under the doctrine of field preemption. *See id.*

adopted the same substantive standards as the federal law that required noncitizens to carry proof of registration.[66]   After analyzing the federal regulations in the "field of alien registration," the Court observed "[t]he framework enacted by Congress leads to the conclusion . . . that the Federal Government has occupied the field of alien registration."[67]   The Court noted "[t]he federal statutory directives provide a full set of standards governing alien registration, including the punishment for noncompliance."[68]   The Court explained this national registration scheme "was designed as a 'harmonious whole.'"[69]

Texas correctly observes the statutes at issue in *Arizona* did not regulate unlawful entry and removal of noncitizens.  But the Court's holding in *Arizona* provides guiding principles.  The Court held: "Where Congress occupies an entire field, as it has in the field of alien registration, even complementary state regulation is impermissible.  Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards."[70]

In 1952, Congress enacted the Immigration and Nationality Act (INA) to establish a "comprehensive federal statutory scheme for regulation of immigration and naturalization" and to set "the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in

---

[66] *Id.* at 402.

[67] *Id.* at 401.

[68] *Id.*

[69] *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 72 (1941)).

[70] *Id.* (citing *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 249 (1984)).

the country."[71] The Act's "central concern" is the "entry and stay of aliens" in the United States.[72] The Act makes it unlawful for any noncitizen to enter the United States other than through a port of entry,[73] and punishes any noncitizen who unlawfully reenters or remains in the United States.[74] These provisions—§§ 1325(a) and 1326(a)—closely resemble Sections 51.02 and 51.03 of S. B. 4. In fact, an affirmative defense under Section 51.02 is that "the defendant's conduct does not constitute a violation of 8 U.S.C. Section 1325(a)."[75] Moreover, the language in Section 51.03 is similar to that of § 1326(a). These features make the Court's analysis in *Arizona* particularly salient. In the same way Arizona S. B. 1070 "add[ed] a state-law penalty for conduct proscribed by federal law,"[76] S. B. 4 criminalizes behavior already prohibited by the INA. Particularly applicable in the present case, the Supreme Court held in *Arizona* that "[p]ermitting the State to impose its own penalties for the federal offenses here would conflict with the careful framework Congress adopted."[77] That is just as true regarding the Texas laws regarding entry and removal.

It is also important to understand that as part of its field-preemption analysis in *Arizona*, the Supreme Court pointed to the fact that the Arizona law regarding noncitizen registration "rules out probation as a possible sentence (and also eliminates the possibility of a pardon)," while federal law

---

[71] *De Canas v. Bica*, 424 U.S. 351, 353, 359 (1976); *Chamber of Com. v. Whiting*, 563 U.S. 582, 587 (2011).

[72] *De Canas*, 424 U.S. at 359.

[73] 8 U.S.C. § 1325(a).

[74] 8 U.S.C. § 1326(a).

[75] Tex. Penal Code § 51.02(c)(2).

[76] *Arizona v. United States*, 567 U.S. 387, 400 (2012).

[77] *Id.* at 402.

did not.[78]  In the present case, a defendant may be removed before federal proceedings that would permit her to remain in the United States lawfully have been initiated or concluded.  Sources of such relief include asylum, relief based on a Convention Against Torture (CAT) claim, or dispensation from the United States Attorney General.[79]

Equally importantly, in concluding there was field preemption, the Supreme Court in *Arizona* relied on the fact that "[w]ere § 3 to come into force, the State would have the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine[d] that prosecution would frustrate federal policies."[80]  The same is true of the Texas laws at issue here.

The Supreme Court in *Arizona* spent considerable time and ink in explaining how the removal procedures work under federal law.  "Removal is a civil, not criminal, matter."[81]  The Texas and federal laws are not congruent on this score.  The Supreme Court also explained that "[a] principal feature of the [federal] removal system is the broad discretion exercised by immigration officials."[82]  "Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all."[83] "If removal proceedings commence, aliens may seek asylum and other discretionary

---

[78] *Id.* at 403.

[79] *See, e.g.*, 8 U.S.C. §§ 1158, 1129b; 8 C.F.R. § 208.16.

[80] *Arizona*, 567 U.S. at 402.

[81] *Id.* at 396.

[82] *Id.*

[83] *Id.*

relief allowing them to remain in the country or at least to leave without formal removal."[84]

Under federal law, a noncitizen who does not enter through a designated port of arrival may nevertheless seek asylum.[85] A claim for asylum can be pursued before, during, or after the conclusion of prosecution under federal law for illegal entry.[86] In contrast, the Texas laws do not permit abatement of prosecution and removal proceedings,[87] and as a result, a noncitizen may be removed under Article 5B.002(d) before asylum proceedings are concluded.

Similarly, the Texas laws preclude a noncitizen from pursuing a CAT claim once proceedings are commenced. Federal law markedly differs. A noncitizen in removal proceedings with a reasonable fear of persecution or torture in his home country may request relief from removal based on the CAT.[88] "[T]he Attorney General has no discretion to deny relief to a noncitizen who establishes his eligibility. [Even a] conviction of an aggravated felony has no effect on CAT eligibility . . . ."[89]

It is evident that the Texas entry and removal laws also significantly impair the exercise of discretion by federal immigration officials. Though the Texas laws carve out some room for instances in which the federal

---

[84] *Id.* (citing 8 U.S.C. §§ 1229a(c)(4), 1158 (asylum), 1229b (cancellation of removal), 1229c (voluntary departure)).

[85] 8 U.S.C. § 1158(a)(1).

[86] *See, e.g., United States v. Vasquez-Hernandez*, 924 F.3d 164, 169 (5th Cir. 2019).

[87] Tex. Code Crim. Proc. art. 5B.003.

[88] *See* 8 C.F.R. §§ 208.16, 208.31.

[89] *Moncrieffe v. Holder*, 569 U.S. 184, 187 n.1 (2013).

government has exercised such discretion,[90] they limit others.  For example, Congress has given the Attorney General authority to waive various requirements that would otherwise stand in the way of admission.[91] Noncitizens cannot pursue these avenues once Texas proceedings are instituted against them.  The dissenting opinion's assertion that S.B. 4 "has no impact whatsoever on which aliens Congress chooses to admit"[92] is simply incorrect.

The broadest exercise of federal discretion is the Executive's decision not to pursue either civilly or criminally the very noncitizens whom Texas has drawn a bead upon in enacting new state laws.  The discretion to pursue these same noncitizens likely lies exclusively with the Executive.

In *United States v. Texas*,[93] Texas and Louisiana challenged the Biden Administration's guidelines that "prioritize the arrest and removal from the United States of noncitizens who are suspected terrorists or dangerous

---

[90] *See* TEX. PENAL CODE § 51.02(c).

[91] *See*, *e.g.*, 8 U.S.C. § 1158(b)(2)(A)(v) (providing Attorney General discretion to waive asylum eligibility requirements if he believes "there are not reasonable grounds for regarding the alien as a danger to the security of the United States"); *id.* § 1227(a)(1)(H) (providing Attorney General discretion, under certain circumstances, to waive removal provisions for noncitizens deemed inadmissible because of misrepresenting material facts when seeking admission); *id.* § 1182(a)(9)(B)(v) (providing Attorney General the "sole discretion" to waive certain admissibility bars for noncitizens "unlawfully present" if refusal to admit the noncitizen would result in "extreme hardship" to "lawfully resident spouse or parent"); *id.* § 1182(d)(1) (providing Attorney General discretion to waive admissibility requirements for noncitizens aiding law enforcement when the Attorney General believes it is in the "national interest to do so"); *id.* § 1182(d)(14) (providing Secretary of Homeland Security discretion to waive admissibility requirements for noncitizens that are victims of certain crimes and helpful to law enforcement when the Secretary considers it to be "in the public or national interest to do so").

[92] *Post* at 90.

[93] 599 U.S. 670 (2023).

criminals, or who have unlawfully entered the country only recently."[94] Texas and Louisiana also "contend[ed] that for certain noncitizens, such as those who are removable due to a state criminal conviction, § 1226(c) of Title 8 says that the Department 'shall' arrest those noncitizens and take them into custody when they are released from state prison."[95]  Though the Supreme Court resolved the case based on standing, the reasoning supporting the Supreme Court's holding appears to be equally applicable in assessing whether Texas's enactment of laws aimed at increasing arrests and prosecutions of illegally present noncitizens impinges on discretion granted by the Constitution to the Executive.  The Supreme Court held: "Article II of the Constitution assigns the 'executive Power' to the President and provides that the President 'shall take Care that the Laws be faithfully executed.'"[96]  The Court said: "Under Article II, the Executive Branch possesses authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law.'"[97]  "[T]he Executive Branch has *exclusive* authority and absolute discretion to decide whether to prosecute a case."[98]  The Supreme Court held that this exclusive authority extended to enforcement of the immigrations laws at issue: "That principle of enforcement discretion over arrests and prosecutions extends to the immigration context, where the Court has stressed that the Executive's enforcement discretion implicates not only 'normal domestic law

---

[94] *Id.* at 673.

[95] *Id.* at 674.

[96] *Id.* at 678 (citing U.S. Const., art. II, § 1, cl. 1; § 3).

[97] *Id.* (quoting *TransUnion LLC v. Ramirez*, 594 U. S. 413, 429 (2021)).

[98] *Id.* at 679 (emphasis added) (quoting *United States v. Nixon*, 418 U.S. 683, 693 (1974)).

enforcement priorities' but also 'foreign-policy objectives.'"[99]    The exclusive authority over removal was expressly set forth: "In line with those principles, this Court has declared that the Executive Branch also retains discretion over whether to remove a noncitizen from the United States."[100] This is likely quintessential field preemption.

There is more.  Congress has given the Executive statutory authority to request help from the states in arresting and detaining, at least for short periods of time, noncitizens who are illegally present.  When states cooperate in this way, their actions and officers are generally supervised by the Executive Branch pursuant to federal law.  These statutes are discussed at 39-40 infra.  If it chose to do so, the Executive could rely upon statutory authority to request Texas to assist, under the supervision of federal officers, in arresting the very noncitizens whom Texas now says it has the authority to arrest under state law, unsupervised by any federal officer or agency.  The Executive Branch has in fact sought Texas's assistance under various statutes, but the federal government has not utilized Texas's resources to the extent desired by Texas.  Regardless of the wisdom of the Executive's actions and inactions, it is for the Executive to decide whether, and if so, how to pursue noncitizens illegally present in the United States.

It is worth noting that one root cause for the lack of action by the Executive could well be the failure of Congress to spend the funds necessary to address the massive increases in the numbers of noncitizens illegally entering the United States.  The Supreme Court's decision in *United States v. Texas* recited that "[f]or the last 27 years since § 1226(c) and § 1231(a)(2)

---

[99] *Id.* at 679 (quoting *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490-91 (1999)).

[100] *Id.* (citing *Arizona v. United States*, 567 U.S. 387, 396 (2012)).

were enacted in their current form, all five Presidential administrations have determined that resource constraints necessitated prioritization in making immigration arrests."[101]   The results of the lack of funding coupled with the lack of political will are apparent.   Texas, nobly and admirably some would say, seeks to fill at least partially the gaping void.   But it is unlikely that Texas can step into the shoes of the national sovereign under our Constitution and laws.

The Court observed in *Arizona* that "[r]eturning an alien to his own country may be deemed inappropriate even where he has committed a removable offense or fails to meet the criteria for admission."[102]   "The dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy with respect to these and other realities."[103]

When analyzing Section 3 of S. B. 1070, the *Arizona* Court explained that "[f]ederal law makes a single sovereign responsible for maintaining a comprehensive and unified system to keep track of aliens within the Nation's borders."[104]   Texas fails to explain why this logic does not apply to the equally—if not more—sensitive topic of noncitizens entering the country. Congress established a comprehensive framework to identify *who* may

---

[101] *Id.* at 680.

[102] 567 U.S. at 396.

[103] *Id.* at 397.

[104] *Id.* at 401-02.

enter,[105] *how* they may enter,[106] *where* they may enter,[107] and *what* penalties apply for those who enter unlawfully.[108]

Field preemption of the entry and removal of noncitizens is indicated by the breadth of the United States' power "to control and conduct relations with foreign nations," and the reasons for the existence of that power.[109] The Supreme Court said in *Arizona*:

- "Decisions [regarding removal] touch on foreign relations and must be made with one voice."[110]
- "Removal decisions, including the selection of a removed alien's destination, may implicate [the Nation's] relations with foreign powers and require consideration of changing political and economic circumstances."[111]

---

[105] *See, e.g.*, 8 U.S.C. § 1182 (establishing classes of noncitizens ineligible for visas or admission).

[106] *See, e.g.*, *id.* § 1181 (establishing document requirements for admission); *id.* § 1225 (establishing noncitizens "who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers"); *id.* § 1185 ("Unless otherwise ordered by the President, it shall be unlawful . . . for any alien to depart from or enter . . . the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe.").

[107] *See, e.g.*, *id.* § 1224 (authorizing the Attorney General to designate ports of entry for noncitizens arriving by aircraft); *see also* 8 C.F.R. § 100.4 (establishing different ports of entry for different classes of noncitizens).

[108] *See, e.g.*, 8 U.S.C. § 1325(a) (establishing criminal penalties for improper entry by noncitizens); *id.* § 1326(a) (establishing criminal penalties for improper reentry of removed noncitizens).

[109] *See Arizona*, 567 U.S. at 395.

[110] *Id.* at 409.

[111] *Id.* (quoting *Jama v. ICE*, 543 U.S. 335, 348 (2005)).

No. 24-50149

- "The federal power to determine immigration policy is well settled. Immigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws."[112]

- "Perceived mistreatment of aliens in the United States may lead to harmful reciprocal treatment of American citizens abroad."[113]

- "It is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States."[114]

- "This Court has reaffirmed that '[o]ne of the most important and delicate of all international relationships . . . has to do with the protection of the just rights of a country's own nationals when those nationals are in another country.'"[115]

These considerations certainly auger in favor of concluding that Congress intended to occupy the field regarding removal of noncitizens. The Texas removal provisions bestow powers upon itself that are likely reserved to the United States.

---

[112] *Id.* at 395.

[113] *Id.*

[114] *Id.* (first citing *Chy Lung v. Freeman*, 92 U.S. 275, 279-80 (1876); and then citing THE FEDERALIST NO. 3, at 39 (John Jay) (C. Rossiter ed. 2003) (observing that federal power would be necessary in part because "bordering States . . . under the impulse of sudden irritation, and a quick sense of apparent interest or injury" might take action that would undermine foreign relations)).

[115] *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 64 (1941)).

No. 24-50149

We outline in detail additional provisions of federal immigration law that are relevant to noncitizen removal. If a noncitizen enters the United States "at any time or place other than as designated by the Attorney General" they are "inadmissible" and "removable" under 8 U.S.C. §§ 1182(a)(6)(A)(i) and 1229a(e)(2).[116] The "usual removal process involves an evidentiary hearing before an immigration judge."[117] At that hearing, the noncitizen may be represented by counsel, present evidence on their behalf, and attempt to show why he or she should not be admitted.[118] Among other things, the noncitizen may claim asylum by expressing fear of persecution or harm upon return to his or her home country.[119] If their claim is rejected and the noncitizen is ordered removed, they can appeal the removal order to the Board of Immigration Appeals.[120] If that appeal is unsuccessful, the noncitizen is generally entitled to review in a federal court of appeals.[121] There is also a more expedited procedure for removal. If an immigration officer determines that a noncitizen who is arriving in the United States is inadmissible because they misrepresented their admission status or lack valid admission documentation, the officer must order the noncitizen removed from the United States without further hearing or review.[122] Other noncitizens who are already present in the United States are subject to the

---

[116] After the Homeland Security Act of 2002, many references in the INA to the "Attorney General" are now read to mean the Secretary of Homeland Security. *See* 6 U.S.C. § 557; *Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005).

[117] *DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1964 (2020).

[118] *See* 8 U.S.C. § 1229a(b)(4); 8 C.F.R. § 1240.11(c) (2020).

[119] *See* 8 C.F.R. § 1240.11(c) (2020).

[120] 8 U.S.C. § 1229a(c)(5); 8 C.F.R. § 1003.1(b).

[121] 8 U.S.C. § 1229a(c)(5), 1252(a).

[122] *Id.* §§ 1225(b)(1)(A)(i), 1182(a)(6)(C), 1182(a)(7).

same expedited removal if they "(1) [are] inadmissible because he or she lacks a valid entry document; (2) [have] not 'been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility'; and (3) [are] among those whom the Secretary of Homeland Security has designated for expedited removal."[123] All noncitizens subject to this expedited removal procedure can avoid removal by claiming asylum or a fear of persecution, at which point they are referred to an asylum officer.[124] If the asylum officer finds the applicant does not have a credible fear, a supervisor will review the asylum officer's determination.[125] The supervisor's review can be appealed to an immigration judge.[126]

This system is comprehensive, complex, and national in scope. It provides multiple procedural channels to determine whether a noncitizen should be removed and establishes a detailed process for reviewing those determinations. S. B. 4's removal provision intrudes on this system by giving *state* judges and magistrate judges the power to order a noncitizen removed without an opportunity to avail himself of rights he has under federal law.

Although state officers may "cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States,"[127] federal law does not authorize or contemplate "cooperation" on removal decisions. By creating a complex,

---

[123] *DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1964-65 (2020) (citing 8 U.S.C. §§ 1225(b)(1)(A)(i), 1225(b)(1)(A)(iii)(I)-(II)).

[124] 8 U.S.C. § 1225(b)(1)(A)(ii).

[125] 8 C.F.R. § 208.30(e)(8).

[126] *Id.* § 1003.42.

[127] 8 U.S.C. § 1357(g)(10)(B).

national system for determining whether a noncitizen should be removed, there is strong evidence Congress intended to occupy the field for any decision related to noncitizen removal.

In *De Canas v. Bica*,[128] the Supreme Court observed that the "comprehensiveness" of this scheme "was to be expected in light of the nature and complexity of the subject."[129] If every state could regulate the unlawful entry and reentry of noncitizens, "[e]ach additional statute [would] incrementally diminish[] the [federal government]'s control over enforcement" and "detract[] from the 'integrated scheme of regulation' created by Congress."[130]

Supreme Court authorities and the detailed statutory scheme governing who will be permitted to remain in the United States and removal procedures strongly indicate that Congress "occupies [the] entire field" of unlawful entry and reentry of noncitizens as well as removal.[131]

Texas makes three counterarguments. First, Texas argues that "[s]tate laws that 'mirror[] federal objectives' are *more*—not less—likely to be upheld."[132] The Supreme Court, however, rejected this exact argument

---

[128] 424 U.S. 351 (1976).

[129] *Id*. at 359. The Court also noted that federal immigration law controls "who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *Id*. at 355; *cf. Truax v. Raich*, 239 U.S. 33, 42 (1915).

[130] *Wis. Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*, 475 U.S. 282, 288-89 (1986).

[131] *See Arizona v. United States*, 567 U.S. 387, 401 (2012); *see also Hines v. Davidowitz*, 312 U.S. 52, 68 (1941) ("[I]t is of importance that this legislation is in a field which affects international relations, the one aspect of our government that from the first has been most generally conceded imperatively to demand broad national authority. Any concurrent state power that may exist is restricted to the narrowest of limits . . . .").

[132] Texas Mot. at 13 (quoting *Plyler v. Doe*, 457 U.S. 202, 225 (1982)).

in *Arizona*, stating it "ignores the basic premise of field preemption—that States may not enter, in any respect, an area the Federal Government has reserved for itself."[133]

Second, Texas cites several federal statutes that it contends reflect that federal immigration law "regularly encourages States to aid federal entry and removal."[134]  It cites 18 U.S.C. § 758 for the proposition that it is a crime for a noncitizen to "flee" from "State[] or local law enforcement" around immigration checkpoints.[135]  But that federal statute makes it a *federal* crime when someone "flees Federal, State, or local enforcement agents in excess of the legal speed limit."[136]  This statute would not prohibit Texas from arresting or prosecuting a person for violating state-established speed limits under state law.  Indeed, a federal statute provides that state law extends over immigration stations and that officers in charge of immigration stations shall admit "State and local officers charged with law enforcement . . . in order that such State and local officers may preserve the peace and make arrests for crimes under the laws of the States and Territories."[137]  But it does not authorize Texas to (1) enact a statute making it a *state* crime to flee a checkpoint, or (2) arrest or prosecute anyone under § 758.  Most importantly, this statute does not pertain to whether someone should be allowed to enter or remain in the United States or whether they should be deported or removed if they enter illegally.

---

[133] *Arizona*, 567 U.S. at 402.

[134] Texas Mot. at 11-12.

[135] Texas Mot. at 11-12.

[136] 18 U.S.C. § 758.

[137] 8 U.S.C. § 1358.

Texas points to 8 U.S.C. § 1324(c), arguing "States have authority to make arrests for violations of alien smuggling prohibition[s]."[138] But, here again, this statute has nothing to do with whether a noncitizen should be prosecuted or deported for being in the United States illegally. Rather, this statute makes it a crime for anyone, whether they are a noncitizen, a United States citizen, or a person lawfully in the United States, to engage in smuggling noncitizens into the United States or harboring or transporting them.

Texas argues that 22 U.S.C. § 7105(c)(3)(C)(i), 8 U.S.C. § 1101(a)(15)(T)(i), and 8 U.S.C. § 1101(a)(15)(U), contemplate state prosecution or investigation of illegal trafficking.[139] But, here again, these statutes do not authorize Texas to determine whether a person is illegally present in the United States in order to take action to remove or deport that person.

Texas fails to explain how these laws are relevant to the entry or removal provisions. While Texas undoubtedly can assist the federal government in arresting noncitizens who violate federal law when federal law permits it to do so,[140] the question is not whether Congress intended to occupy the entire field of immigration.[141] The laws cited by Texas do not facilitate the inquiry pertinent in the present case, which is whether Congress

---

[138] Texas Mot. at 12.

[139] Texas Mot. at 12.

[140] *See, e.g.*, 8 U.S.C. § 1357(g) (allowing a state to enter an agreement with the federal government to aid in "the investigation, apprehension, or detention" of noncitizens).

[141] *See City of El Cenizo v. Texas*, 890 F.3d 164, 177 (5th Cir. 2018) (first citing *Arizona*, 567 U.S. at 400-01; and then citing *De Canas v. Bica*, 424 U.S. 351, 360 n.8 (1976)).

intended to "occupy the field" of immigration policies concerning entry into or removal from the United States or both.[142]

In its merits briefing, Texas maintains the federal government has "abandoned" the field because the Executive Branch has failed to enforce immigration policy in dereliction of its statutory duties.[143]  Regardless of whether these claims are accurate, our task is to determine whether Congress "'legislated so comprehensively' in a particular field that it 'left no room for supplementary state legislation.'"[144]  "Evidence of pre-emptive purpose is sought in the text and structure of the statute at issue," not enforcement decisions by the Executive.[145]  Here, there is strong support for the conclusion that Congress has "legislated so comprehensively" in the field of noncitizen entry, reentry, and removal that it "left no room for

---

[142] *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).

[143] Texas Br. at 24.

[144] *Kansas v. Garcia*, 140 S. Ct. 791, 804 (2020) (quoting *R.J. Reynolds Tobacco Co. v. Durham Cnty.*, 479 U.S. 130, 140 (1986)).  Texas references *Parker v. Brown*, 317 U.S. 341, 358 (1943), for the proposition that the mere adoption of an act by Congress, without executive action putting the legislation into effect, does not implicate field preemption.  However, *Parker* is distinguishable for two reasons.  First, *Parker* did not involve the Executive Branch allegedly abandoning a field but rather related to a congressional act (the Federal Agricultural Marketing Agreement Act of 1937).  Second, the Supreme Court held there was no field preemption because the Act specifically "contemplate[d] the existence of state programs at least until such time as the Secretary [of Agriculture] shall establish a federal marketing program."  *Parker*, 317 U.S. at 354.  Because the Secretary had not adopted implementing regulations, the Court held there was no "occupation of the legislative field."  *Id.* at 358.  In contrast, the intersecting web of national immigration laws does not contemplate state regulation.

[145] *See CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993); *see also Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1905 (2019) (opinion of GORSUCH, J., joined by THOMAS & KAVANAUGH, JJ.) (noting "Congress's authority to delimit the preemptive effect of its laws").

supplementary state legislation."[146]  Texas has not demonstrated it is likely to prevail on its argument that the district court erred by holding that S. B. 4 is likely field preempted.

## 2

Even if there is likely no field preemption, Texas has not demonstrated that it is likely to succeed on the merits regarding conflict preemption.  Generally speaking, the Supreme Court has recognized that a state statute may be preempted by federal law when (1) it is impossible for a person to comply with both the state law and federal law, or (2) when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[147]  The Supreme Court has described these concepts in this way:

> This Court, when describing conflict pre-emption, has spoken of pre-empting state law that "under the circumstances of th[e] particular case . . . stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"—whether that "obstacle" goes by the name of "conflicting; contrary to; . . . repugnance; difference; irreconcilability; inconsistency; violation; curtailment; . . . interference," or the like.  The Court has not previously driven a legal wedge—only a terminological one—between "conflicts" that prevent or frustrate the accomplishment of a federal objective and "conflicts" that make it "impossible" for private parties to comply with both state and federal law.

---

[146] *Kansas*, 140 S. Ct. at 804 (internal quotation marks omitted) (quoting *R.J. Reynolds Tobacco Co.*, 479 U.S. at 140).

[147] *See Crosby*, 530 U.S. at 372-73 (internal quotation marks omitted) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

Rather, it has said that both forms of conflicting state law are "nullified" by the Supremacy Clause.[148]

Two seminal cases that considered whether state laws addressing immigration-related issues were preempted employed an "obstacle" analysis, *Arizona*[149] and *Hines*.[150] Neither has been overruled or abrogated in that regard.

The Texas entry provisions make it unlawful for a noncitizen to enter or reenter the state from outside the country.[151] Texas contends that these provisions mirror federal-law standards, arguing "there can by definition be no conflict" between federal and state law because they comport with one another.[152] The mere fact that state laws "overlap" with federal criminal provisions does not, by itself, make a case for conflict preemption.[153] But, as the Supreme Court has cautioned, "conflict is imminent" when "two

---

[148] *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 873 (2000) (alterations and omissions in original) (citations omitted) (first quoting *Hines*, 312 U.S. at 67; and then citing *Jones v. Rath Packing Co.*, 430 U.S. 519, 526 (1977)); *see also Arizona v. United States*, 567 U.S. 387, 399-400 (2012); *Hines*, 312 U.S. at 67 ("In the final analysis, there can be no one crystal clear distinctly marked formula. Our primary function is to determine whether, under the circumstances of this particular case, Pennsylvania's law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.").

[149] *Arizona*, 567 U.S. at 410.

[150] *Hines*, 312 U.S. at 67.

[151] Tex. Penal Code §§ 51.02-03.

[152] Texas Mot. (quoting *Chamber of Com. v. Whiting*, 563 U.S. 582, 601 (2011)).

[153] *See Kansas v. Garcia*, 140 S. Ct. 791, 806 (2020).

separate remedies are brought to bear on the same activity."[154]  The Texas entry provisions are not congruent.[155]

First and foremost, Texas law punishes unlawful entry[156] while under federal law, there are various avenues by which a noncitizen may ultimately be admitted or receive absolution even though he or she initially entered illegally.  Second, relatedly, it does not appear there is any discretion given to state officials to decline to prosecute those who commit the offense set forth in Section 51.02.  But even if state law afforded discretion, it would vest that discretion in a *state official*, not the United States Attorney General or another federal officer.  That is in conflict with federal law.

The INA provides the federal government discretion to decide whether to initiate criminal proceedings or civil immigration proceedings once a noncitizen is apprehended.  The Texas scheme blocks this exercise of discretion.  A noncitizen apprehended illegally entering or remaining in Texas is charged with a crime, and the federal government has no voice in further proceedings.  An arrest or conviction would interfere with federal law because the Texas process for arrests and convictions suppresses or subverts federal authority over a noncitizen's status in the United States.

S. B. 4 affects noncitizens whom Congress has assigned a federal immigration status—that of a "applicant for admission"[157]—and interferes

---

[154] *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 380 (2000) (alterations and internal quotation marks omitted) (quoting *Wis. Dep't of Indus. v. Gould, Inc.*, 475 U.S. 282, 286 (1986)).

[155] *Compare* Tex. Penal Code §§ 51.02-03, *with* 8 U.S.C. § 1325(a); *see also* 8 U.S.C. § 1326(a) (stating the criminal punishment shall be a "fine[] under Title 18, or imprison[ment] not more than 2 years, or both").

[156] *See* Tex. Penal Code § 51.02.

[157] 8 U.S.C. § 1225(a)(1).

with federal immigration officials' ability to determine the applicant's admissibility. The relevant statute provides: "An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival . . . ) shall be deemed for purposes of this chapter an applicant for admission."[158] Congress directed that all applicants for admission "shall" be inspected by a federal immigration officer.[159] We described this process in more detail above and we summarize it again here. First, the immigration officer must determine whether the noncitizen falls into a category defined in part by statute and in part by a designation by the Secretary of Homeland Security.[160] Second, if the immigration officer determines that the noncitizen falls into that category (or if the noncitizen is arriving in the United States), the officer must then decide whether the noncitizen is inadmissible under two specified statutory provisions.[161] Those noncitizens are generally subject to expedited removal, unless they indicate an intention to apply for asylum.[162] Noncitizens who are not subject to expedited removal (and who are not "clearly and beyond a doubt entitled to be admitted") are detained for further proceedings before

---

[158] *Id.*

[159] *Id.* § 1225(a)(3).

[160] *Id.* §§ 1225(b)(1)(A), 1225(b)(2)(A); *see DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1964-65 (2020).

[161] 8 U.S.C. § 1225(b)(1)(A)(i) (directing the federal immigration officer to determine whether the noncitizen is inadmissible under either 8 U.S.C. §§ 1182(a)(6)(C) or 1182(a)(7)), § 1182(a)(6)(C) (designating as inadmissible noncitizens who, by fraud or willfully misrepresenting a material fact, procures or seeks to procure an immigration document or other immigration benefit), § 1182(a)(7) (designating as inadmissible noncitizens who did not have a valid entry document at the time they applied for admission).

[162] *Id.* § 1225(b)(1)(A)(i)-(ii); *see Thuraissigiam*, 140 S. Ct. at 1964-65.

No. 24-50149

an immigration judge.[163] The immigration judge "shall" determine whether the noncitizen is inadmissible.[164]

In light of this process, it is problematic that state courts will determine if a noncitizen has entered illegally. In *Villas at Parkside Partners v. City of Farmers Branch*,[165] a majority of our en banc court concluded that state courts may not assess the legality of a noncitizen's presence.[166] There, the ordinance at issue allowed for state judicial review as to whether an individual was lawfully present in the country.[167] The lead opinion concluded that because of "the discretion and variability inherent in a determination of whether an alien is 'lawfully present in the United States' . . . the judicial review section of the Ordinance [] is preempted by federal law."[168]

The Texas law regarding entry grants Texas judges significantly more power than the ordinance at issue in *Farmers Branch*.[169] It allows Texas courts to impose criminal sanctions, including significant terms of imprisonment, and order removal if a noncitizen is found to have entered or

---

[163] 8 U.S.C. §§ 1225(b)(2)(A), 1229a(a)(1).

[164] *Id.* § 1229a(a)(1).

[165] 726 F.3d 524 (5th Cir. 2013) (en banc).

[166] Although there was no majority opinion in *Farmers Branch*, ten judges agreed that the judicial review sections of the ordinance were preempted in part by federal law. *See id.* at 537 (HIGGINSON, J., joined by STEWART, DAVIS, SOUTHWICK, and HAYNES, JJ.); *id.* at 542 (REAVLEY, J., joined by GRAVES, J.); *id.* at 547 (DENNIS, J., joined by REAVLEY, PRADO, and GRAVES, JJ.); *id.* at 559 (RICHMAN, J.).

[167] *Id.* at 536.

[168] *Id.* at 537.

[169] In *Farmers Branch* the ordinance indicated that a noncitizen's unlawful presence was to be "determined under federal law." *Id.* at 536. S. B. 4 goes further, allowing state judges to determine a noncitizen's unlawful presence under state law. *See, e.g.*, TEX. PENAL CODE § 51.03(c).

35

remained in Texas illegally.[170]   As some jurists have recognized, "the structure of the [federal] immigration statutes makes it impossible for [a] State to determine which [noncitizens] are entitled to residence, and which eventually will be deported."[171]

The Texas unlawful entry and removal statutes also conflict with federal law because they prohibit abatement of prosecutions under Chapter 51 of the Penal Code on the grounds that federal proceedings have been or will be commenced regarding the immigration status of a noncitizen.  S. B. 4 amended the Texas Code of Criminal Procedure to add Article 5B.003.  It provides:

> **Art. 5B.003. Abatement of Prosecution on Basis of Immigration Status Determination Prohibited**
>
> A court may not abate the prosecution of an offense under Chapter 51, Penal Code, on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated.[172]

Federal law provides that a noncitizen may be permitted to remain in the United States lawfully even if he has been convicted of illegal entry. Removing a noncitizen before the federal government has made a decision as to whether (1) that noncitizen is permitted to remain in the United States because asylum should be granted, (2) a CAT claim is valid, or (3) the United States Attorney General would exercise discretion to waive obstacles to removal and admit a noncitizen would conflict with federal law.

---

[170] *See, e.g.*, Tex. Code Crim. Proc. art. 5B.002(d).

[171] *Plyler v. Doe*, 457 U.S. 202, 236 (1982) (Blackmun, J., concurring); *id.* at 241 n.6 (Powell, J., concurring).

[172] Tex. Code Crim. Proc. art. 5B.003.

The removal provision also appears to conflict with federal law because, again, the provision authorizes Texas state judges and magistrate judges to remove noncitizens from the United States without notice to or consent from the federal government.[173]  This appears to run headlong into federal law.  Congress has identified the grounds for removal, the requirements for commencing and administering removal proceedings, the protections afforded to noncitizens throughout the removal proceedings, *and the process for selecting the country to which noncitizens may be removed*.[174]  A "principal feature" of this complex removal system is the "broad discretion" exercised by federal immigration officials.[175]  Contrast the removal provision's grant to Texas judges the unilateral power to make removal decisions.  The removal provision sidesteps the sensitive issues that federal immigration officers are to consider.[176]

The Texas removal provisions will significantly conflict with the United States' authority to select the country to which noncitizens will be removed.  A large number of noncitizens who crossed into Texas from Mexico are not citizen or residents of Mexico.  Nevertheless, under Texas

---

[173] *See* TEX. CODE CRIM. PROC. art. 5B.002.

[174] *See, e.g.*, 8 U.S.C. §§ 1182(a), 1225, 1227, 1229, 1229a, 1231(a)-(b).

[175] *Arizona v. United States*, 567 U.S. 387, 396 (2012).

[176] *But see, e.g.*, *Plyler*, 457 U.S. at 241 n.6 (POWELL, J., concurring) ("But it is impossible for a State to determine which aliens the Federal Government will eventually deport, which the Federal Government will permit to stay, and which the Federal Government will ultimately naturalize.  Until an undocumented alien is ordered deported by the Federal Government, no State can be assured that the alien will not be found to have a federal permission to reside in the country, perhaps even as a citizen.  Indeed, even the Immigration and Naturalization Service cannot predict with certainty whether any individual alien has a right to reside in the country until deportation proceedings have run their course.").

law they would be removed to Mexico.  The United States would have no voice in the matter.

It is evident that the Texas entry and removal laws significantly eliminate the exercise of discretion by federal immigration officials, including the United States Attorney General.[177]  Though the Texas laws carve out some room for instances in which the federal government has exercised such discretion,[178] the Texas laws by no means afford a noncitizen the opportunity to benefit fully from the broad discretion available under federal law.

The State asserted at oral argument that at the very least, state law allowing the arrest of noncitizens who are illegally present should not be enjoined.  First, the state laws at issue provide that state officers may apprehend and detain noncitizens for unlawful entry and reentry for a violation of *state*, not federal, law.  If the entry and removal provisions are preempted, nothing is left for state officers to enforce by arresting noncitizens.  S. B. 4 does not purport to authorize state law enforcement officials to make arrests or detentions for violations of *federal* law.

Second, allowing state law enforcement officers to arrest noncitizens based on a preempted state offense, as the dissenting opinion suggests we should,[179] "would allow the State to achieve its own immigration policy.  The result could be unnecessary harassment of some aliens (for instance, a veteran, college student, or someone assisting with a criminal investigation) who federal officials determine should not be removed."[180]  The dissenting opinion recognizes that "[t]he principal concern motivating the *Hines* Court

---

[177] *See supra* note 91.

[178] *See* Tex. Penal Code § 51.02(c).

[179] *Post* at 53–54.

[180] *Arizona*, 567 U.S. at 408.

was that a State might use registration requirements to harass admitted aliens."[181] Allowing state law enforcement officials to arrest noncitizens who have not been admitted but who may be eligible for various status determinations that would allow them to remain in the United States raises the same concerns expressed in *Hines*.

In any event, "[f]ederal law specifies [the] limited circumstances in which state officers may perform the functions of an immigration officer."[182] At all times, those circumstances require federal supervision or authorization. Under 8 U.S.C. § 1357(g), the Secretary of Homeland Security "may enter into a written agreement with a State" or any of its "political subdivision[s]," allowing state or local officers "to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of [noncitizens] in the United States."[183] In performing those functions, the officers must "be subject to the direction and supervision of the [Secretary]."[184] That federal law expressly provides that an agreement is not required for any state or political subdivision of a state to communicate with the Attorney General about the immigration status of an individual, including "reporting knowledge that a particular alien is not lawfully present in the United States."[185] That same provision, §1357(g)(10),

---

[181] *Post* at 89 (citing *Hines v. Davidowitz*, 312 U.S. 52, 74 (1941)); *see Hines*, 312 U.S. at 74 (concluding that Congress manifested an intent to impose a uniform registration system to leave noncitizen "free from the possibility of inquisitorial practices and police surveillance").

[182] *Arizona*, 567 U.S. at 408.

[183] 8 U.S.C. § 1357(g)(1).

[184] *Id.* § 1357(g)(3); *see also City of El Cenizo v. Texas*, 890 F.3d 164, 177 (5th Cir. 2018) ("Federal law," including § 1357(g), "regulates *how* local entities may cooperate in immigration enforcement.").

[185] 8 U.S.C. §1357(g)(10)(A).

further provides that an agreement is not necessary for a state or local government "otherwise to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States."[186] This is not a grant of authority to a state to enact a statute making it a state crime to be unlawfully present. Nor is it a grant of authority to a state to enact a statute that gives authority under state law to state officials to arrest or remove someone illegally present. This provision does not even grant a state the authority to arrest or remove under *federal* law. Similarly, other statutes expressly authorize state officers' arrest authority—but only in narrow circumstances.[187] The Texas laws at issue permit state authorities to prosecute an individual for being unlawfully present and remove individuals who are unlawfully present or removable, without any consultation or cooperation with the Attorney General of the United States.

S. B. 4 also appears to permit an end-run around 8 U.S.C. § 1252c. Section 1252c authorizes "State and local law enforcement officials" to "arrest and detain" noncitizens "illegally present in the United States" only if the noncitizen "has previously been convicted of a felony in the United States and deported or left the United States after such conviction."[188] S. B. 4, however, permits Texas law enforcement to arrest and detain

---

[186] *Id.* § 1357(g)(10)(B).

[187] *See* 8 U.S.C. § 1103(a)(10) (empowering the Secretary of Homeland Security to "authorize any State or local law enforcement officer" to "perform or exercise the powers . . . conferred" to federal immigration officers "[i]n the event the [Secretary] determines that an actual or imminent mass influx of aliens arriving off the coast of the United States, or near a land border, presents urgent circumstances requiring immediate Federal response"), § 1324 (c) (permitting all officers "whose duty it is to enforce criminal laws" to make arrests for the offense of bringing in or harboring certain aliens").

[188] 8 U.S.C. § 1252c(a).

noncitizens illegally present in Texas regardless of whether the noncitizen has left the United States or been deported after being convicted of a felony.[189]  Compounding the problem, § 1252c contains another condition on state officers' arrest authority: the officer may arrest the noncitizen "only after the State or local law enforcement officials obtain appropriate confirmation from the Immigration and Naturalization Service of the status of such individual and only for such period of time as may be required for the Service to take the individual into Federal custody for purposes of deporting or removing the alien from the United States."[190]  S. B. 4 clearly conflicts with this statute.

Texas contends that S. B. 4 regulates entry and reentry coterminously with federal law, citing § 1357(g).  But the Supreme Court addressed a similar argument in *Arizona* when analyzing Section 6 of S. B. 1070, which authorized state officers to arrest a person if the officer had probable cause to believe that person was removable.[191]  The Supreme Court explained that "no coherent understanding of the term [cooperation] would incorporate the unilateral decision of state officers to arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government."[192]  Texas has not demonstrated why the same logic does not apply to S. B. 4's entry provisions.  Allowing Texas to detain noncitizens "without any input from the Federal Government about whether an arrest is

---

[189] Tex. Penal Code §§ 51.02-03; *see also* 8 U.S.C. § 1182(a)(9)(B)(ii) ("For purposes of this paragraph, an alien is deemed to be unlawfully present in the United States if the alien is present in the United States after the expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled.").

[190] 8 U.S.C. § 1252c(a).

[191] *Arizona v. United States*, 567 U.S. 387, 408 (2012).

[192] *Id.* at 410.

warranted in a particular case . . . would allow the State to achieve its own immigration policy."[193]

Texas argues that "S. B. 4 also provides for return orders and, in lieu of prosecution, permits an alien to depart voluntarily—something that no federal law prohibits, and which aliens are free to do themselves."[194] Relatedly, it asserts "[a]nd like federal law, S. B. 4 makes failure to comply with a return order a crime."[195]  These laws are not preempted, Texas maintains, because "[a]n alien can comply with both the federal immigration code and S.B.4 by entering this country legally at a port of entry, not reentering illegally, and complying with a valid return or removal order."[196] But as discussed above, state courts would determine whether the defendant is illegally present.  The defendant would be prosecuted for a crime under *state* law if he does not return to the country from which he illegally entered, without the ability to avail himself of federal laws that might permit him to remain in the United States.  That conflicts with federal law.

In sum, there are "significant complexities" in determining a noncitizen's immigration status.[197]  Texas has failed to persuade us that it is likely to show that the entry, removal, and arrest provisions do not "stand[]

---

[193] *Id.* at 408.

[194] Texas Mot. at 13 (first citing TEX. CODE CRIM. PROC. art. 5B.002(c)-(d); and then citing 8 U.S.C. §§ 1225(b)(1)(A)(i), 1229a(d), 1229c(a)(1)).

[195] Texas Mot. at 14 (first citing TEX. PENAL CODE §51.04(a); and then citing 8 U.S.C. §§ 1253(a)(1), 1229a(c)(5)).

[196] Texas Mot. at 14 (emphasis omitted).

[197] *Arizona*, 567 U.S. at 409.

No. 24-50149

as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[198]

## C

In a facial challenge to a legislative act, "the challenger must establish that no set of circumstances exists under which the Act would be valid."[199] Texas posits that the district court erred by granting a preliminary injunction in this facial challenge because some applications of S. B. 4 are valid.[200] Texas's argument for why S. B. 4 would be valid relates to Texas's contention that it has been invaded and has the right to defend itself. Texas asserts that Article I, § 10 of the Constitution (the State War Clause) permits some applications of S. B. 4. The State War Clause provides:

> No State shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay.[201]

Specifically, Texas contends that, at a minimum, S. B. 4's application to transnational cartel members is a constitutionally authorized response to an "invasion."[202]

---

[198] *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

[199] *United States v. Salerno*, 481 U.S. 739, 745 (1987).

[200] Texas Mot. at 15 (asserting that "even if S.B.4 somehow conflicted with federal statutory law or offended the dormant Commerce Clause, the district court erred because at least some applications of S.B.4 are constitutional").

[201] U.S. Const. art. I, § 10, cl. 3.

[202] Texas Mot. at 16.

No. 24-50149

But Texas does not demonstrate why it would be entitled to vacatur of the preliminary injunction.  Constitutional text, structure, and history provide strong evidence that federal statutes addressing matters such as noncitizen entry and removal are still supreme even when the State War Clause has been triggered.  Such statutes do not pertain to laying any duty of tonnage; keeping troops or ships of war in time of peace; or entering into any agreement or compact with another state or a foreign power.

Texas has not identified any authority to support its proposition that the State War Clause allows it to enact and enforce state legislation regulating immigration otherwise preempted by federal law.  One would expect a contemporary commentator to have noticed such a proposition.  Instead, in The Federalist No. 44, James Madison glossed over the portion of the State War Clause at issue here by writing: "The remaining particulars of this clause fall within reasonings which are either so obvious, or have been so fully developed, that they may be passed over without remark."[203]

Thus, we cannot say Texas has persuaded us that the State War Clause demonstrates it is likely to succeed on the merits.

In sum, Texas has not shown that it is likely to succeed on the merits of plaintiffs' preemption claims.  There is considerable authority supporting that the core provisions of S. B. 4 are field, or alternatively, conflict preempted by federal law.  Texas has not persuaded us that the State War Clause is likely to compel a contrary result.

---

[203] The Federalist No. 44, at 283 (James Madison) (Clinton Rossiter ed., 1961).

No. 24-50149

**D**

The remaining *Nken* factors are "(2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure other parties interested in the proceeding; and (4) where the public interest lies."[204]  They weigh against a stay.

We begin with "whether [Texas] will be irreparably injured absent a stay."[205]  When a state is seeking to stay a preliminary injunction, it is generally enough to say that "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."[206]

But we must also consider whether a stay would injure the United States, Organization Plaintiffs, and the public interest.[207]  Significantly, there is a high risk that enforcement of S. B. 4 would cause international friction. Mexico has already protested S. B. 4 and signaled that the statute's enforcement would frustrate bilateral efforts, including noncitizen removals.[208]  "In this case, repeated representations by the Executive Branch supported by formal diplomatic protests and concrete disputes are more than

---

[204] *Nken v. Holder*, 556 U.S. 418, 426 (2009) (internal quotation marks omitted) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

[205] *Id.*

[206] *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers).

[207] *See Nken*, 556 U.S. at 426.

[208] *See United States v. Texas*, No. 24-CV-8, 2024 WL 861526, at *17 (W.D. Tex. Feb. 29, 2024); Brief of the Government of the United Mexican States as *Amicus Curiae* 11-12; ROA.133-34 (Declaration of Eric Jacobstein).

45

sufficient to demonstrate that the state Act stands in the way of Congress's diplomatic objectives."[209]

Texas's enforcement of S. B. 4 also risks taking the United States out of compliance with its treaty obligations. Under the CAT, for example, "[n]o State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture."[210] S. B. 4 provides an affirmative defense if the United States has granted asylum to the defendant.[211] However, a noncitizen whose meritorious CAT claim has not yet been adjudicated may still be refouled under S. B. 4 in violation of the CAT.

Finally, there are no doubt competing public interest considerations in permitting S. B. 4 to go into effect as opposed to staying that legislation. However, the Supreme Court explained in *Hines v. Davidowitz*[212] that state and local interests are subservient to those of the nation at large, at least with regard to matters regarding foreign relations:

> The Federal Government, representing as it does the collective interests of the forty-eight states, is entrusted with full and exclusive responsibility for the conduct of affairs with foreign sovereignties. "For local interests the several states of the Union exist, but for national purposes, embracing our relations with foreign nations, we are but one people, one nation, one power." Our system of government is such that the interest of the cities, counties and states, no less than the interest of the

---

[209] *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 386 (2000).

[210] Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 3, *opened for signature* Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85.

[211] Tex. Penal Code § 51.02(c).

[212] 312 U.S. 52 (1941).

people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference. As Mr. Justice Miller well observed of a California statute burdening immigration: "If (the United States) should get into a difficulty which would lead to war, or to suspension of intercourse, would California alone suffer, or all the Union?"[213]

The harms counsel that the equities weigh against a stay.

## IV

We part company with the dissenting opinion in a number of respects, in addition to those discussed above.

The dissenting opinion asserts that the district court should not have granted a preliminary injunction because "Texas state officials should be trusted at least to try sorting those constitutional applications from any potentially unconstitutional ones."[214] There is no authority cited for this, and we are aware of none outside of the redistricting context. Which "Texas state officials should be trusted" to do this sorting?[215] How long should a federal district court stay its hand?

The dissenting opinion suggests that "state officials" would include state courts: "our federal system requires us to presume that state courts will in good faith at least try to honor federal law," citing an 1884 Supreme Court decision.[216] The dissenting opinion then says, "I am aware of no authority that authorizes a federal injunction on the assumption that state courts will

---

[213] *Id.* at 63 (first quoting *Ping v. United States*, 130 U.S. 581, 606 (1889); and then quoting *Chy Lung v. Freeman*, 92 U.S. 275, 279 (1875)).

[214] *Post* at 54.

[215] *Post* at 54.

[216] *Post* at 109 (citing *Robb v. Connolly*, 111 U.S. 624, 637 (1884)).

simply ignore federal law." [217]   Other than abstention doctrines, none of which have been invoked in this case, we are aware of no authority that suggests a federal court should decline to issue an injunction when a state statute is otherwise preempted by federal law on the basis that the federal court should wait to see if a state court proceeding will be filed and the state court will decline to uphold federal law.

We disagree that "this entire case is based on hypotheticals." [218] There is no doubt from the district court record that Texas stands ready to commence arrests, removals, and prosecutions upon the new laws taking effect.   This case is no more "based on hypotheticals" than was *Arizona*. Indeed, the Court in *Arizona* held that federal law preempted multiple provisions of S. B. 1070 and affirmed a pre-enforcement injunction to prevent those provisions from taking effect. [219]   The dissent's broad objection to pre-enforcement injunctions overlooks this context and invites our court to ignore *Arizona*'s mandate.   That mandate, despite the opinions of two dissenting Justices, [220] enjoined the preempted provisions of S. B. 1070 prior to their enforcement.   The *Arizona* Court did not wait and see. [221]

The dissenting opinion asks: "So what of the 1,292,830 aliens who have been ordered removed by the federal government after having fully

---

[217] *Post* at 109.

[218] *Post* at 54.

[219] *Arizona v. United States*, 567 U.S. 387, 416 (2012).

[220] *Id*. at 426 (SCALIA, J., concurring in part and dissenting in part) ("Of course on this pre-enforcement record there is no reason to assume that Arizona officials will ignore federal immigration policy . . . ."); *id*. at 457 (ALITO, J., concurring in part and dissenting in part) ("The trouble with this premature, facial challenge is that it affords Arizona no opportunity to implement its law in a way that would avoid any potential conflicts with federal law.").

[221] *Post* at 113.

'completed' their 'legal process?'  If one of those aliens otherwise violates the provisions of S.B. 4, could Texas not constitutionally facilitate their removal?"[222]   The Supreme Court's opinion in *Arizona* seems to have answered this.  It explains that under federal law, "if an alien is ordered removed after a hearing, the Attorney General will issue a warrant."[223]  If state law permitted state officers to arrest such noncitizens "without any input from the Federal Government about whether an arrest is warranted in a particular case . . . [t]his would allow the State to achieve its own immigration policy."[224]  JUSTICE SCALIA's dissenting opinion in *Arizona* argued that "there is no reason Arizona cannot make it a state crime for a removable alien . . . to remain present in Arizona."[225]  But a majority of the Court rejected that proposition in *Arizona*.

The dissenting opinion asserts that "S.B. 4's arrest provisions mirror the INA's detention provisions."[226]  That may be so as far as prohibitions as to the premises on which an arrest can occur.  But what happens immediately following an arrest is in striking conflict with federal law.   Under the challenged state law, a defendant would be taken before a state magistrate who may order the defendant released from custody and order the defendant to return to the foreign nation from which the person entered or attempted to enter, if the defendant agrees to such an order and has not previously been convicted under Chapter 51 of the Texas Penal Code, or previously obtained

---

[222] *Post* at 106 (citation omitted).

[223] *Arizona*, 567 U.S. at 408 (citing 8 C.F.R. § 241.2(a)(1)).

[224] *Id.*

[225] *Id.* at 427 (SCALIA, J., concurring in part and dissenting in part).

[226] *Post* at 52.

a discharge order under the new state law.[227]  A defendant has no opportunity to seek asylum, to assert a CAT claim, or to seek waivers to admission bars from the United States Attorney General.  If a person is "removed" in this manner, that removal will count under Texas law such that if the defendant reenters the state, there are criminal consequences.[228]  Under federal law, as discussed above, a defendant arrested for illegal entry or reentry has the right to pursue asylum and CAT claims, as well as to seek relief from the United States Attorney General.  Under the challenged S. B. 4, if a defendant does not agree to return to the country from which he entered or attempted to enter, prosecution will proceed without the opportunity seek any of the relief described.

Many of the arguments the dissenting opinion puts forth are similar if not identical to those JUSTICE SCALIA discussed in his concurring and dissenting opinion in *Arizona*.  They did not carry the day in *Arizona*, and we are not free to ignore the reasoning in *Arizona*.

There is much more in the dissenting opinion with which we disagree. But in the interest of deciding the motion for a stay in a timely manner, we forego further discussion.

\*    \*    \*

Texas's motion for a stay pending appeal is DENIED.

---

[227] TEX. CODE CRIM. PROC. art. 5B.002(b).

[228] TEX. PENAL CODE § 51.03(c).

No. 24-50149

Andrew S. Oldham, *Circuit Judge*, dissenting:

I would grant the stay. The plaintiffs in this case won a facial, pre-enforcement injunction against Texas's Senate Bill 4. That injunction prevents enforcement of any part of S.B. 4 against anyone at any time and under any circumstances forever. To defend that global injunction, and to take from Texas its sovereign prerogative to enact a law that its people and its leaders want, plaintiffs must show that S.B. 4 is unconstitutional in every one of its potential applications.

Plaintiffs likely cannot make that showing. Start with field preemption. The Supreme Court has never extended field preemption to any part of the immigration laws beyond alien registration. Alien registration is of course an exclusively federal prerogative. *See Arizona v. United States*, 567 U.S. 387, 400–03 (2012); *Hines v. Davidowitz*, 312 U.S. 52, 74 (1941). But S.B. 4 does not have anything to do with alien registration. And it is hard to see how every application of every provision of S.B. 4 interferes with some other purportedly "exclusive" aspect of the Federal Government's power over immigration. One provision of the bill merely criminalizes something Congress already criminalized in the Immigration and Nationality Act ("INA"). *Compare* Tex. Penal Code § 51.02(a), *with* 8 U.S.C. § 1325(a). And that provision applies only to aliens whom Congress has deemed statutorily inadmissible. *See* 8 U.S.C. § 1182(a)(6). It is a mystery how the majority can hold that two materially identical provisions can "conflict" in every single one of their imaginable applications.

Congressional intent is the touchstone of preemption. *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992). The Department of Justice's field preemption argument thus boils down to the notion that Congress, by banning aliens from entering the United States somewhere other than a lawful port of entry, and by excluding aliens who attempt to enter the United

States somewhere other than a lawful port of entry, intended to disable States from taking action to prevent aliens from entering the United States somewhere other than a lawful port of entry. That makes little sense. The briefing and the record before us suggest this is the very first case in the history of our Nation to extend field preemption beyond the INA's alien-registration provisions. That is a momentous step, and this case presents no reason to take it.

Next consider conflict preemption. On this the majority opinion and the plaintiffs have much less to say. That is presumably because S.B. 4's arrest provisions mirror the INA's detention provisions. And without a conflict, of course, there can be no conflict preemption. The only other conflict preemption argument the majority can muster is that Congress affirmatively contemplated a role for states in enforcing federal immigration law. *See, e.g.*, 8 U.S.C. § 1252c; *id.* § 1357(g). The majority nowhere mentions that the very same Justice Department that now says those provisions preempt all state immigration laws once held precisely the opposite. *See, e.g.*, Off. Legal Couns., *Non-Preemption of the Authority of State and Local Law Enforcement Officials to Arrest Aliens for Immigration Violations* 11 (2002), https://perma.cc/TS4N-J4D5.

Today's decision means that we'll likely never know how Texas's state courts and its state law-enforcement officers would have implemented S.B. 4. The law has not gone into effect because a federal district judge entered a global injunction against it and against all of its hypothetical applications. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right."). Today the majority denies the State's request to stay that injunction. In a about a week, our same panel will consider the preliminary injunction under 28 U.S.C. § 1292(a)(1) and presumably affirm it for substantially the same reasons given in the majority opinion above. Then the

district court will presumably have a trial before entering a permanent injunction. But it's unclear what there is to try—both because of today's preemption holding and because then as now there will be zero applications of the state law to anyone. If the case comes back to us for another appeal, it will be controlled by our § 1292(a)(1) decision under the rule of orderliness. So, absent intervention by the en banc court or the Supreme Court, that will be that.

There is real peril in this approach. In our federal system, the State of Texas is supposed to retain at least some of its sovereignty. And its people are supposed to be able to use that sovereignty to elect representatives and send them to Austin to debate and enact laws that respond to the exigencies that Texans experience and that Texans want addressed. The people of Texas also elect state judges who are entrusted to interpret both state and federal law. And much (all?) of the federal system depends on the presumption of parity—that state courts are just as well-equipped and just as capable as their federal counterparts at interpreting and implementing federal law. *See* Henry M. Hart, *The Power of Congress to Limit the Jurisdiction of Federal Court: An Exercise in Dialectic*, 66 HARV. L. REV. 1362, 1363–64 (1953); Charles Warren, *Federal Criminal Laws and the State Courts*, 38 HARV. L. REV. 545, 547 (1925); THE FEDERALIST NO. 82, at 426–28 (Hamilton) (Carey & McClellan eds., 2001) ("[T]he inference seems to be conclusive, that the State courts would have a concurrent jurisdiction in all cases arising under the laws of the Union, where it was not expressly prohibited.").

If S.B. 4 had been allowed to go into effect, there are at least some applications of it that would have comported with the Constitution's Supremacy Clause. And even if a particular application of S.B. 4 raised particular preemption problems, they could be solved with the scalpel of as-applied relief in a future case as opposed to the machete of global invalidation

in this one. For example, the majority's principal concern—that aliens could be subjected to S.B. 4 without the procedural and substantive federal rights afforded to asylees, refugees, &c. under federal law—could be redressed by as-applied injunctions against the state law's non-abatement provision. That would allow the state law to go into effect in at least some cases while preserving the supremacy of federal law in all cases. The people of Texas are entitled to the benefit of state law right up to the point where any particular application of it offends the Supremacy Clause. And Texas state officials should be trusted at least to try sorting those constitutional applications from any potentially unconstitutional ones. That is the way federalism is supposed to work. As this case illustrates, however, all of that is nullifiable by one global, pre-enforcement injunction issued by a federal district judge.

Worse, this entire case is based on hypotheticals. "Under Article III, federal courts do not adjudicate hypothetical or abstract disputes. Federal courts do not possess a roving commission to publicly opine on every legal question." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Yet when it comes to a facial, pre-enforcement challenge and a global injunction like the one issued by the district court, the federal judge ignores the plaintiffs in this case—none of whom are the subjects of S.B. 4 and none of whom could *ever* be injured by it directly. And the judge instead says, "I have channeled my Nostradamusonian power to see every potential future application of this State's law to parties not before me, and I have imagined every conceivable argument that every conceivable hypothetical party could ever make for and against those imaginary applications of the State's law to those imaginary facts, and I hereby hold all of them are unconstitutional." Today's majority opinion embraces that conception of the federal judicial power. Our federalism is poorer for it. *See* 17B VIKRAM DAVID AMAR, WRIGHT & MILLER'S FEDERAL PRACTICE AND PROCEDURE § 4251 (3d ed.; Apr. 2023 update) ("[T]he doctrine of 'Our Federalism' . . . "teaches that federal

courts must refrain from hearing constitutional challenges to state action under certain circumstances in which federal action is regarded as an improper intrusion on the right of a [S]tate to enforce its laws in its own courts.").

Much ink has been spilled about whether one federal district judge can issue nationwide equitable relief pursuant to, for example, the Administrative Procedure Act. The APA authorizes federal courts to "hold unlawful and set aside" a federal agency's administrative action in certain circumstances. 5 U.S.C. § 706(2). Our court, like the D.C. Circuit and others, interprets that text to make vacatur the default administrative-law remedy. *See, e.g.*, *Brown Exp., Inc. v. United States*, 607 F.2d 695, 703 (5th Cir. 1979) (vacating rule); *Chamber of Com. of United States v. SEC*, 88 F.4th 1115, 1118 (5th Cir. 2023) (describing vacatur as APA's "default rule" (quotation omitted)); *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action."). The vacatur default rule might be right, or it might be wrong. But at a minimum, it's rooted in the text of a statute passed by Congress. And in any event, it's a remedy imposed by one federal branch (the judiciary) against another (the executive branch) under a statute passed by another (the legislative branch). The global, pre-enforcement remedy imposed by the district court and embraced by today's majority is based in no text. And it's implied to vacate a statute enacted by a sovereign State. So whatever concerns might surround nationwide APA remedies, they presumably apply *a fortiori* to the Statewide injunction here.

One final point by way of introduction. Today's majority opinion repeatedly accuses me of recycling points that Justice Scalia made in his dissenting opinion in *Arizona*. *See ante*, at 48, 49, 50. But that criticism is misplaced. My concerns about the facial, pre-enforcement posture of the injunction in this case come straight from the *Arizona majority's opinion*:

> The nature and timing of this case counsel caution in evaluating the validity of § 2(B) [in Arizona's law]. The Federal Government has brought suit against a sovereign State to challenge the provision even before the law has gone into effect. There is a basic uncertainty about what the law means and how it will be enforced. At this stage, without the benefit of a definitive interpretation from the state courts, it would be inappropriate to assume § 2(B) will be construed in a way that creates a conflict with federal law. *Cf. Fox v. Washington*, 236 U.S. 273, 277 (1915) ("So far as statutes fairly may be construed in such a way as to avoid doubtful constitutional questions they should be so construed; and it is to be presumed that state laws will be construed in that way by the state courts" (citation omitted)). As a result, the United States cannot prevail in its current challenge. *See Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 446 (1960) ("To hold otherwise would be to ignore the teaching of this Court's decisions which enjoin seeking out conflicts between state and federal regulation where none clearly exists"). This opinion does not foreclose other preemption and constitutional challenges to the law as interpreted and applied after it goes into effect.

*Arizona*, 567 U.S. at 415. I would embrace those same points here; allow Texas's law to go into effect; wait for an actual conflict to arise between state and federal law; and then consider an as-applied preemption challenge at the appropriate time. Because the majority holds otherwise, I respectfully dissent.

## I.

### A.

According to President Biden, our Nation is beset by an unprecedented immigration "crisis." THE WHITE HOUSE, *Statement from President Joe Biden on the Bipartisan Senate Border Security Negotiations* (Jan. 26, 2024), https://perma.cc/K9S8-TLZV. Congress estimates that more

than 6 million aliens[1] unlawfully crossed the Southern border between January 2021 and September 2023. *See* House Judiciary Comm., *New Data Reveal Worsening Magnitude of the Biden Border Crisis and Lack of Interior Immigration Enforcement*, at 2 (Jan. 18, 2024), https://perma.cc/5USD-YX6F. The Department of Homeland Security ("DHS") released 3.3 million of those aliens into the country. *Id.* at 1. In the same period, another 1.7 million aliens—so-called "gotaways"—entered the country while evading border security altogether. *Id.* at 2. As of January 18, 2024, DHS removed approximately 0.3% of the aliens it caught during the first 33 months of the Biden Administration and 0.175% of the estimated total who crossed illegally. *Id.* at 4.

Between FY2021 and FY2024, DHS encountered 336 aliens at the border who were on the terrorist watchlist. Banks Decl. ¶ 21. That is a 2,140% increase from the period FY2017 to FY2020. *See ibid.* DHS border personnel also arrested 1,819 gang-affiliated aliens. *Id.* at ¶ 23. And Texas alone seized 461 pounds of fentanyl near its border with Mexico—enough to kill roughly one-third of the entire American population. *Id.* at ¶ 31. That is on top of 27,800 pounds of marijuana, 6,000 pounds of cocaine, and 14,100 pounds of methamphetamine. *Ibid.* That is why the FBI Director recently testified that Border insecurity is "a source of great concern for [the FBI]." *FBI Director Wray Confirms the Border Crisis Poses Major Homeland Security Threat*, *DHS Secretary Mayorkas Stonewalls*, Homeland Sec. Comm.: Republican (Nov. 15, 2023), https://perma.cc/9H4V-WCX7.

---

[1] I use the term "alien" because that is the one Congress used throughout the INA. And even those who have expressed concern about the term nonetheless use it "where necessary to be consistent with the statutory language that Congress has chosen and to avoid any confusion in replacing a legal term of art with a more appropriate term." *Trump v. Hawaii*, 585 U.S. 667, 746 (2018) (Sotomayor, J., dissenting) (quotation omitted).

No. 24-50149

The problems at the border stem—at least in part—from DHS's decision not to enforce the immigration laws Congress wrote. As Chief Judge Moses observed from the frontline of the crisis in Del Rio, DHS is "obviously derelict in enforcing" its "statutory duties." *Texas v. DHS*, No. DR-23-CV-00055-AM, 2023 WL 8285223, at *14 (W.D. Tex. Nov. 29, 2023). Take for example, DHS's decision to release 3.3 million aliens who illegally entered the country. Congress affirmatively prohibited DHS from releasing those aliens. That is because Congress expressly made each of those aliens statutorily inadmissible. *See* 8 U.S.C. § 1182(a)(6)(A), (7). And Congress told DHS it "shall" remove from the country any alien who is inadmissible unless the alien "indicates either an intention to apply for asylum . . . or a fear of persecution." *Id.* § 1225(b)(1)(A)(i). If an alien indicates an intention to apply for asylum or a fear of persecution, Congress told DHS it "shall" detain that alien until DHS makes a final determination of the alien's admissibility. *Id.* § 1225(b)(1)(B)(iii)(IV).[2] Shall is a mandatory word, and mandatory words impose a duty. *Spivey v. Chitimacha Tribe of Louisiana*, 79 F.4th 444, 447 (5th Cir. 2023) (citing Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 112 (2012)). That means Congress imposed upon DHS a duty to remove inadmissible aliens who arrive at the border unless those aliens indicate an intention to apply for asylum or a fear of persecution. And in the event an alien does either of those things, Congress imposed upon DHS a duty to detain the alien pending evaluation of his claim to asylum or other relief from removal. Nowhere did Congress authorize DHS to disregard those duties and release millions of unauthorized aliens who have not yet been deemed

---

[2] The sole statutory alternative to detention pending admissibility proceedings is that DHS may temporarily return certain aliens to the country from which they entered the United States. 8 U.S.C. § 1225(b)(2)(C).

admissible. *See Texas v. Biden*, 20 F.4th 928, 993–96 (5th Cir. 2021), *rev'd on other grounds and remanded*, 597 U.S. 785 (2022); *see also Biden v. Texas*, 597 U.S. 785, 803–04 (2022) (assuming "that the Government is currently violating its obligations under [§ 1225(b)]" to detain covered aliens). The Government might have its reasons for not following § 1225(b)'s detention obligations, and would-be plaintiffs might not be able to use federal courts to enforce those obligations. *See Biden v. Texas*, 597 U.S. at 813–14. But it cannot be denied that Congress spoke clearly; that aliens covered by § 1225(b) "shall" be detained in ways that prevent their release into the United States; and that DHS has not followed Congress's instructions.

The effects of DHS's non-enforcement fall disproportionately on Texas because that State shares a 1,254-mile border with Mexico. The State tells us the recent influx of unauthorized aliens has resulted in "an increase in crimes against property owners and residents along the border," and that since 2021 there have been there have been 9,886 criminal trespass arrests and 4,353 vehicle bailouts in the border region. ROA.285. It also tells us that in the same time period it has made 39,054 criminal arrests near the border, including 35,289 felony arrests, and that it has seized inordinate quantities of illegal drugs. *Ibid.*

In light of those and other problems, Texas has taken dramatic steps to curb the flow of unauthorized aliens into the State. For example, Governor Abbott declared Texas's border with Mexico to be in a state of disaster on May 31, 2021, and he has renewed that declaration 32 times. ROA.286. Since the Governor's first disaster declaration, Texas has spent $11.2 billion on border security. *Ibid.* And it has deployed thousands of National Guard units to the border.

## B.

Texas's S.B. 4 is one part of Texas's border security effort. The Texas legislature passed S.B. 4 to prevent unlawful entry into Texas from a foreign Nation. Three provisions are relevant here.

### 1.

First, S.B. 4 prohibits "[a] person who is an alien" from "enter[ing] or attempt[ing] to enter [Texas] directly from a foreign nation at any location other than a lawful port of entry." Tex. Penal Code § 51.02(a). "Port of entry" is defined by reference to federal regulations, *see id.* § 51.01(2), so § 51.02(a) simply criminalizes as a matter of state law something that is already criminal as a matter of federal law. *See* 8 U.S.C. § 1325(a) (prohibiting entry or attempted entry into "the United States at any time or place other than as designated by immigration officers").

To ensure that the provision does not conflict with federal immigration law, § 51.02 contains two express affirmative defenses: (1) That the alien's "conduct does not constitute a violation of 8 U.S.C. [§] 1325(a)." Tex. Penal Code § 51.02(c)(2). And (2) that the federal government has granted the alien lawful presence or asylum. *Id.* § 51.02(c)(1). Section 51.02(a)'s penalty provisions are similar to those of its federal law analog. A violation of § 51.02(a) is a Class B misdemeanor punishable by up to $2,000 in fines and 180 days of imprisonment. *Id.* § 51.02(b); *see id.* § 12.22; *cf.* 8 U.S.C. 1325(a) (first offense punishable by fine or imprisonment of not more than six months, or both). A repeat offense is a felony punishable by a fine of up to $10,000 and imprisonment between 180 days and two years. Tex. Penal Code § 51.02(b); *see id.* § 12.35; *cf.* 8 U.S.C. § 1325(a) (second offense punishable by fine or imprisonment of not more than two years, or both).

2.

Second, S.B. 4 makes it unlawful for "[a] person who is an alien" to "enter[], attempt[] to enter, or [be] found in this state after the person: (1) has been denied admission to or excluded, deported, or removed from the United States; or (2) has departed from the United States while an order of exclusion, deportation, or removal is outstanding." Tex. Penal Code § 51.03(a). Like § 51.02(a), § 51.02(b) simply criminalizes as a matter of state law something that is already criminal as a matter of federal law. *See* 8 U.S.C. § 1326(a) (criminalizing entry or attempted re-entry by an alien into the United States after that alien "has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding").

Ordinarily, a violation of § 51.03(a) is a Class A misdemeanor punishable by fines up to $4,000 and imprisonment for up to one year. Tex. Penal Code § 51.03(b); *see id.* § 12.21. But like its federal law analog, § 51.03(b) prescribes more severe punishments for aliens who re-enter or attempt to re-enter Texas after being removed from the United States for certain conduct. A violation of § 51.03(b) is a third-degree felony punishable by a fine up to $10,000 and imprisonment between two and ten years in three circumstances: First, "the defendant's removal was subsequent to a conviction for commission of two or more misdemeanors involving drugs, crimes against a person, or both." *See id.* § 51.03(b)(1)(A); *cf.* 8 U.S.C. § 1326(b)(1). Second, the defendant was removed or excluded for terrorist-related activities. *See* Tex. Penal Code § 51.03(b)(1)(B)–(C); *cf.* 8 U.S.C. § 1326(b)(3). Third, the alien was removed while incarcerated for a non-violent offense pursuant to 8 U.S.C. § 1231(a)(4)(B). Tex. Penal Code § 51.03(b)(1)(D); *see* 8 U.S.C. § 1326(b)(4). A violation of § 51.03(b) is a second-degree felony punishable by fines up to $10,000 and imprisonment between two and twenty years if "the defendant was removed

subsequent to a conviction for the commission of a felony." Tex. Penal Code § 51.03(b)(2); *see* 8 U.S.C. § 1326(b)(1).

### 3.

Lastly S.B. 4 provides for the removal of aliens by the State in two circumstances. First, in most cases the bill allows a judge to dismiss a charge brought against an alien under § 51.02 or § 51.03 if the alien consents to an order requiring him "to return to the foreign nation from which [he] entered or attempted to enter" Texas. Tex. Code Crim. Proc. art. 5B.002(a)–(c). The practical effect of that provision is to allow an alien to voluntarily remove himself to Mexico instead of facing prosecution under S.B. 4. Second, if an alien is convicted of an offense defined by S.B. 4, the statute requires the presiding judge to "enter in the judgment in the case an order requiring the person to return to the foreign nation from which the person entered or attempted to enter" *Id.* art. 5(B).002(d). It is unclear from the text of S.B. 4 how precisely the State, its law-enforcement officials, and its courts intend to effectuate those removals.

### C.

This appeal consolidates suits brought by several plaintiffs to enjoin enforcement of S.B. 4 before its effective date. The United States sued the State of Texas, the Texas Department of Public Safety, Governor Abbott, and Texas Director of Public Safety Steven McCraw. Separately, two nonprofit legal organizations and a Texas county sued McCraw and District Attorney for the 34th District of Texas Bill Hicks. The plaintiffs sought an injunction against enforcement of S.B. 4—not a specific provision or set of provisions but rather the whole law. Plaintiffs argued they are entitled to such relief on the ground that S.B. 4 is preempted by federal immigration laws. The United States also argued it was entitled to relief because S.B. 4 unduly

No. 24-50149

discriminates against the movement of persons across an international border in violation of the Dormant Foreign Commerce Clause.

The district court agreed with the plaintiffs, so it granted a preliminary injunction against S.B. 4 in its entirety. As a threshold matter, the court held that all plaintiffs' claims are justiciable. In doing so, it rejected five arguments Texas lodged against justiciability: (1) that the non-profit plaintiffs lack standing because S.B. 4 does not cause them any judicially cognizable injury; (2) that the county lacks standing because counties lack standing to sue their parent states; (3) that the non-profit plaintiffs' and the county's suits against McCraw and Hicks are barred by sovereign immunity; (4) that the Federal Government has an equitable cause of action under *In re Debs*, 158 U.S. 564 (1895), only to abate a public nuisance; and (5) that the equitable cause of action under *Ex parte Young*, 209 U.S. 123 (1908), relied on by the non-profit plaintiffs and the county does not extend to suits brought to remedy indirect injuries.

The district court then identified two constitutional flaws in S.B. 4.

First, it held S.B. 4 violates the Supremacy Clause because it is preempted by federal immigration law. The court reasoned S.B. 4 is field preempted because the Federal Government "has a dominant and supreme interest in the field of immigration" and "has enacted a framework of regulation so pervasive that Congress left no room for the States to supplement it." Op. at 33–34. In the district court's view, S.B. 4's removal provisions are "an especially problematic intrusion on federal prerogatives" because removal "touches upon some of the most sensitive foreign affairs considerations of federal immigration policy." *Id.* at 38–39. The court also found that even if S.B. 4 is not field preempted, it is conflict preempted for four reasons: (1) S.B. 4 "provides state officials the power to enforce federal law without federal supervision," which conflicts with a purported

congressional directive that DHS supervise all enforcement of any law in any part of the nation touching on immigration. *Id.* at 54. (2) S.B. 4 "divests federal immigration authorities of the discretion of the enforcement of immigration laws," which is problematic because immigration "touches on delicate considerations of foreign affairs," especially in the context of removal. *Id.* at 55; *see id.* at 58. (3) S.B. 4 directs state judges "not [to] abate the prosecution" of noncitizens on "the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated." Tex. Code Crim. Proc. art. 5B.003. That means in some circumstances S.B. 4 may direct state judges to enter a removal order regarding a citizen to whom the federal government might eventually grant lawful presence of some kind. Op. at 55–56. (4) S.B. 4 conflicts with a provision in the federal immigration laws that specifies state officials may "cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." 8 U.S.C. § 1357(g)(10)(B); *see* Op. at 61.

Second, the court held S.B. 4 violates the Dormant Foreign Commerce Clause. The court explained that is so for two reasons: (1) S.B. 4 facially discriminates against the movement of persons across an international border, which is commerce. Op. at 64. And (2) S.B. 4 undermines "the ability of the federal government to speak with one voice in regulating commercial affairs with foreign states." *Id.* at 64–65 (quotation omitted).

The court proceeded to reject Texas's argument that—notwithstanding the Supremacy Clause, the Foreign Commerce Clause, or any other constitutional provision—Texas is constitutionally entitled to take unilateral action to secure the border because a situation in which hundreds of thousands of illegal aliens unlawfully cross into the United States through Texas constitutes an "invasion." *See* U.S. Const. art. I, § 10, cl. 3 ("No

No. 24-50149

State shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, *unless actually invaded*, or in such imminent Danger as will not admit of delay.") (emphasis added); *id.* art. IV, § 4, cl. 2 ("The United States . . . shall protect [every State in this Union] against Invasion[.]").

In doing so, the court quipped that "[t]o discuss 'invasion' at length is to take [Texas's] argument more seriously than it deserves." Op. at 65. Nevertheless, the court did discuss the argument at length. It first reasoned the question of whether immigration constitutes an invasion such that Texas is entitled to take action that would otherwise violate the Constitution is justiciable. *Id.* at 98. It then reasoned the word "invasion" in the Constitution is most naturally read to "refer to an armed, hostile, organized force entering an area to conquer or plunder." *Id.* at 69. Since the aliens crossing the border generally are neither armed nor coming to conquer or plunder, the court reasoned they are not invaders, which means Texas has no constitutional authority to engage in border-related self-help.

In sum, the court held plaintiffs were likely to succeed on the merits. And it held the remaining *Winter* factors supported preliminary injunctive relief. The court reasoned all plaintiffs would suffer irreparable harm if S.B. 4 were allowed to take effect. That is because in the court's view, the United States incurs per se irreparable harm any time a statute violates the Supremacy Clause. Moreover, the district court explained allowing S.B. 4 to take effect would interfere with federal immigration policy and could jeopardize the Federal Government's immigration-related talks with Mexico. And the court contended the non-profit plaintiffs and the county would suffer irreparable harm because they would incur monetary expenses that could not easily be recovered. Finally, the court held the public interest factor cut in favor of the plaintiffs because "a [S]tate's frustration of federal

statutes and prerogatives is not in the public interest." *Id.* at 108 (quotation omitted).

## II.

To succeed on its stay application, Texas must first demonstrate that it is likely to succeed on the merits in its appeal of the district court's preliminary injunction. *Nken v. Holder*, 556 U.S. 418, 426 (2009).

In my view, Texas satisfied that burden. I (A) explain it is doubtful that the claims in this suit are even justiciable. Then I (B) explain plaintiffs' preemption arguments are likely to fail. Next, I (C) explain the United States' Dormant Foreign Commerce Cause claim is likely to fail. Lastly, I (D) respond to two assertions in the majority opinion.

## A.

At the outset, it is unclear that any plaintiff has a right to bring this suit. A plaintiff ordinarily cannot ask for relief in federal court unless it can point to a statute authorizing it to bring suit—that is, unless it has a cause of action. *See Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 494 (5th Cir. 2020) (en banc) (Oldham, J., concurring) (noting that a court usually cannot act unless "Congress . . . empower[s] [the] specific parties to invoke our jurisdiction and to seek their specified remedy."). That is because "[c]ourts are not legislatures with a free-ranging ability to correct mistakes." *Ibid.* (Oldham, J., concurring). The cause-of-action requirement exists to "help[] courts stay in their lane." *Id.* at 497 (Oldham, J., concurring).

Here, no plaintiff alleges that Congress has authorized its suit. Instead, each plaintiff invokes only an implied equitable cause of action.[3] But

---

[3] This is a suit at equity, and it is technically incorrect to say that a plaintiff needs a cause of action to bring a suit at equity. *See* Samuel L. Bray & Paul B. Miller, *Getting into Equity*, 97 Notre Dame L. Rev. 1763, 1764 (2022). Nevertheless, a plaintiff cannot sue

No. 24-50149

courts of equity, like courts of law, cannot create causes of action *ex nihilo*. In fact, the Supreme Court has instructed that "the equity jurisdiction of the federal courts is the jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act, 1789." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318 (1999). That means if plaintiffs' claims are cognizable, they must be grounded in "traditional equity practice." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021).

Notwithstanding the majority's assertion to the contrary, *see ante*, at 9, it is plaintiffs' burden to establish a right to bring this suit. *See, e.g., Wilson v. Birnberg*, 667 F.3d 591, 595 (5th Cir. 2012); *see also Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 730 (1st Cir. 2016) ("[T]he plaintiff bears the burden of plausibly alleging a viable cause of action."). The United States alleges that its claim is authorized by the Supreme Court's decision in *In re Debs*. And the non-profit plaintiffs and the county allege their suit is authorized by *Ex parte Young*. I consider each contention in turn. Then I consider the majority's assertion that, if all else fails, DOJ can invoke *Ex parte Young* as if it were a private party.

1.

First, *Debs*. That case concerned the lawfulness of an order issued by a federal court to enjoin a labor strike. The case arose after the United States sought an injunction against strikers in federal district court. Aditya Bamzai & Samuel L. Bray, Debs *and the Federal Equity Jurisdiction*, 98 Notre Dame L. Rev. 699, 721 (2022). The United States had no statutory cause

---

at equity unless his suit comes within some traditional head of "equitable jurisdiction." *Ibid.* That is, to invoke equitable jurisdiction, a plaintiff is required to show that his grievance is the kind of grievance that equity has traditionally remedied. For simplicity, I refer to that requirement as a cause of action.

of action; it simply invoked the district court's equitable jurisdiction. In any event, the district court granted an injunction. *See Debs*, 158 U.S. at 581. Eugene Debs violated the injunction, so a district judge held him in contempt and sentenced him to six months imprisonment. Bamzai & Bray, *supra*, at 721.

Debs then sought a writ of habeas corpus from the Supreme Court. *Ibid.* He argued in relevant part that his imprisonment was invalid because the district court was without authority to enjoin him. Most importantly, Debs argued that federal courts are powerless to grant equitable relief to parties who do not have a property interest at stake in the proceedings. *Ibid.* That argument was grounded in the fact that, traditionally, courts of equity could not grant relief in suits that had no connection to a property interest. *See id.* at 714–16. Thus, the essence of the habeas claim was that the United States may not invoke the equitable jurisdiction of federal courts without statutory authorization unless the suit implicates some property interest held by the United States.

The Supreme Court rejected the habeas claim and upheld the district court's order granting injunctive relief. *In re Debs*, 158 U.S. at 600. But the Court's reasoning was ambiguous. On the one hand, the Court paid homage to the traditional limitations on its equitable jurisdiction. It explained the Federal Government's suit was authorized by the fact that one of its purposes was to protect its property interest in the mails. *See id.* at 583 ("It is said that equity only interferes for the protection of property, and that the government has no property interest. A sufficient reply is that the United States have a property in the mails, the protection of which was one of the purposes of this bill.").

On the other hand, the Court explained that it did "not care to place [its] decision upon this ground alone." *Id.* at 584; *see id.* at 586 ("[T]he mere

fact that the government has no pecuniary interest in the controversy is not sufficient to exclude it from the courts, or prevent it from taking measures therein to fully discharge those constitutional duties."). The Court noted that the labor strike obstructed the public highways. *Id.* at 587. And it explained that obstruction of the highways constitutes "a public nuisance, [which] has always been held subject to abatement at the instance of the government." *Ibid.* So for that additional reason, the Court held the United States' suit was justified, notwithstanding the lack of statutory authorization. *See id.* at 592; *see also United Steelworkers of Am. v. United States*, 361 U.S. 39, 61 (1959) (Frankfurter, J., concurring) ("The crux of the *Debs* decision" was "that the Government may invoke judicial power to abate what is in effect a nuisance detrimental to the public interest.").

The United States apparently reads *Debs* to suggest that it has unlimited power to seek nonstatutory equitable relief to remedy violations of the Supremacy Clause. But *Debs* does not say that. Instead, the *Debs* Court contemplated that there are limits on the Federal Government's power to seek nonstatutory equitable relief. The Federal Government was able to invoke equity jurisdiction in *Debs* only because (1) traditional equitable principle allowed the United States to protect its property interests, and (2) the United States brought the suit to abate a public nuisance in accordance with longstanding equitable principles.

Even that limited conception of the implied cause of action under *Debs* is peculiar. Ordinarily when the executive branch acts on behalf of the United States it acts pursuant to some congressional authorization: An executive branch "agency literally has no power to act . . . unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). By definition a *Debs* suit does not rest on congressional authorization. Rather, in seeking nonstatutory equitable relief under *Debs*, the Justice Department is asserting some unwritten implied power to seek

relief on behalf of the whole Federal Government. Under our system of separated powers, however, one administrative agency (even an important one like DOJ) is not the Federal Government. *See, e.g.*, Mila Sohoni, *Equity and the Sovereign*, 97 Notre Dame L. Rev. 2019, 2029 (2022) (noting that in *Debs* "the Court seemingly equated the executive branch with 'the government'; it neither broached nor answered the question of why the executive branch was entitled to seek an equitable remedy without being authorized to do so by Congress.").

Supremacy Clause violations do not implicate the Federal Government's property interests, nor do they constitute public nuisances. It is thus unclear that *Debs* helps the Federal Government here. Nor does the United States point to any case in which the Supreme Court or this court has expanded the *Debs* cause of action to encompass nonstatutory Supremacy-Clause-based suits for equitable relief. It can only muster that no one questioned the Federal Government's right to bring suit in *Arizona. See ante*, at 7 (embracing this argument). But *Arizona* is of no help to the United States or today's majority because the *Arizona* Court did not address its equitable jurisdiction at all. *Cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998) ("[D]rive-by jurisdictional rulings . . . have no precedential effect.").[4] Thus, the Federal Government has not grounded its invocation of our equitable jurisdiction in any precedent. And that matters because the Supreme Court has made clear that our equitable jurisdiction is constrained

---

[4] At oral argument, the United States invoked *United States v. American Bell Telephone Co.*, 128 U.S. 315 (1888). There, the Court held the United States had the power to bring a nonstatutory suit at equity to revoke a patent on the ground that it was obtained by fraud. But the *American Bell* Court explained it had equitable jurisdiction over the United States' suit because the King had the power to seek revocation of fraudulently granted patents in the court of chancery. *See id.* at 361. That obviously provides no support for the Federal Government's roving-Supremacy-Clause conception of equity jurisdiction.

by traditional equitable practice. *See Grupo Mexicano*, 527 U.S. at 318; *Whole Woman's Health*, 595 U.S. at 53; *see also Boise Artesian Hot & Cold Water Co. v. Boise City*, 213 U.S. 276, 285 (1909) (noting that an injunction must fall "within some clear ground of equity jurisdiction"). It is hard to see how a suit without precedential support could be justified by traditional principles.

2.

For their part, the non-profit plaintiffs and the county contend they may seek equitable relief under *Ex parte Young*. That case establishes that "federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983).

But not all plaintiffs may invoke *Ex parte Young*. Instead, that case allows only "*certain* private parties to seek judicial orders in federal court preventing state executive officials from enforcing state laws that are contrary to federal law." *Whole Woman's Health*, 595 U.S. at 39 (emphasis added). The traditional *Ex parte Young* plaintiff is a person who is "about to" be subject to proceedings brought by a state official. *Ex parte Young*, 209 U.S. at 156. The *Ex parte Young* Court merely authorized those plaintiffs to preemptively assert "in equity of a defense that would otherwise have been available in the State's enforcement proceedings at law." *Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606, 619–20 (2012) (Roberts, C.J., dissenting, joined by Scalia, Thomas, and Alito, JJ.); *Virginia Off. for Protection & Advoc. v. Stewart*, 563 U.S. 247, 262 (2011) (Kennedy, J., concurring, joined by Thomas, J.).

The non-profit plaintiffs and the county are nothing like the traditional *Ex parte Young* plaintiff. Texas is not "about to" commence proceedings against them. In fact, Texas will never commence proceedings against them because they are not people, and only people could possibly

engage in conduct covered by S.B. 4. These plaintiffs allege only that they will indirectly incur monetary harm as a result of Texas's potential enforcement of S.B. 4 against *other* unidentified people.

It is true that this court has assumed the *Ex parte Young* cause of action encompasses more than plaintiffs who are about to be on the receiving end of a suit brought by state officials. For example, in *Texas Democratic Party v. Abbott*, 978 F.3d 168 (5th Cir. 2020), we assumed plaintiffs affected by mail-in voting restrictions could sue to enjoin enforcement of those restrictions. *Id.* at 178. But the plaintiffs in that case were at least directly affected by the regulations they sought to enjoin. Put differently, the challenged law affected *their* rights. They did not—like plaintiffs here—file suit on the basis that the law could injure unidentified *third parties* and then indirectly inflict costs on the plaintiffs. *Cf. Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("[E]ven when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, this Court has held that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."); Richard M. Re, *Relative Standing*, 102 Geo. L.J. 1191, 1223–25 (2014) (describing courts' skepticism to indirect-injury plaintiffs and preference for "superior" plaintiffs).

Plaintiffs do not point to a single case in which the Supreme Court or this court has held that plaintiffs indirectly injured by a state enactment may sue under *Ex parte Young* for pre-enforcement relief. *See* Las Americas PI Br. 10–11. And that is true notwithstanding the fact that Texas raised the issue before the district court. *See* Texas PI Br. 40–41. The best they can muster is *Stewart*. But the agency plaintiff in that case alleged a violation of its own rights—the right to information it was entitled to under federal law. *See* 563 U.S. at 251.

No. 24-50149

Again, all this matters because our equitable jurisdiction is limited by traditional principles. *Ex parte Young* was at least arguably grounded in traditional equitable practice. *See* John Harrison, *Ex Parte Young*, 60 Stan. L. Rev. 989, 999 (2008). A nonstatutory cause of action brought by plaintiffs who stand to incur only indirect injuries from enforcement of a state law is far afield from *Ex parte Young*. Indeed, if plaintiffs are right, it seems anyone could sue for a pre-enforcement injunction of a state law so long as they could plausibly allege enforcement of the law against unidentified third parties would cost them a dollar. Plaintiffs have not grounded that maximalist theory of the *Ex parte Young* cause of action in history or precedent, so it accordingly appears they have not properly invoked our equitable jurisdiction.

3.

DOJ also contends, as its last line of defense, *Ex parte Young* provides its cause of action. The majority embraces this argument. *See ante*, at 10–11. But it is wrong.

As noted, the Supreme Court has made clear that any exercise of the federal equity jurisdiction must be grounded in traditional equitable practice. *See, e.g.*, *Grupo Mexicano*, 527 U.S. at 318. To the extent the *Ex parte Young* cause of action is consistent with traditional equitable practice, it is because courts of equity sometimes issued anti-suit injunctions to restrain actions at law. *See* Harrison, *supra*, 60 Stan. L. Rev. at 997 (citing 4 John Norton Pomery, Jr., Equity Jurisprudence § 1360 (3d ed. 1905)). For example, a defendant in legal proceedings could sometimes ask a court of equity to restrain those proceedings if he had a legal defense that, "though technically available, would not do full justice[.]" *Id.* at 999. Thus, when Minnesota enacted a confiscatory railroad rate regulation statute, the Supreme Court held that an inferior court had jurisdiction to entertain a suit

in equity by which plaintiffs preemptively sought an injunction against enforcement of the statute's unconstitutionally confiscatory penalties.

Unlike private parties, the United States cannot be sued without its consent. *See, e.g.*, *Lehman v. Nakshian*, 453 U.S. 156, 160 (1981) ("[T]he United States, as sovereign, is immune from suit save as it consents to be sued[,] and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." (quotation omitted)). So the United States cannot contend that it needs a court of equity to protect it from suit. Thus, allowing the United States to rely on the *Ex parte Young* cause of action would sever that cause of action from its roots in the traditional anti-suit injunction. Indeed, it would transform *Ex parte Young* cause of action into a license for the United States to compel federal courts to take sides in any and every legal dispute. It is hard to think of something more inconsistent with the Supreme Court's recent admonition that "[f]ederal courts do not possess a roving commission to publicly opine on every legal question." *TransUnion*, 594 U.S. at 423. That is reason enough to dispense with the DOJ's *Ex parte Young* argument. *Contra ante*, at 11 (contending the dissenting opinion offers no "logical basis" for concluding that the United States may not bring an *Ex parte Young* action).

But there is more. Just two years ago, the Supreme Court told us that *Ex parte Young* authorizes only "certain *private parties* to seek judicial orders in federal court preventing state executive officers from enforcing state laws that are contrary to federal law." *Whole Woman's Health*, 595 U.S. at 39 (emphasis added). The Court's admonition that the *Ex parte Young* cause of action is limited to private parties makes sense because, as the Court has repeatedly explained, the *Ex parte Young* cause of action works together with the other, more famous holding of that case, which allows private parties to get around state sovereign immunity. *See, e.g.*, *id.* at 39; *see also* RICHARD H. FALLON, JR., ET AL., HART AND WECHSLER'S THE FEDERAL

No. 24-50149

Courts and The Federal System 927–35 (7th ed. 2015) ["Hart & Wechsler"]. The Federal Government is not a private party, so state sovereign immunity is no obstacle to its suits. *See West Virginia v. United States*, 479 U.S. 305, 311 (1987) ("States have no sovereign immunity as against the Federal Government."). It is unclear why the Federal Government would be able to pick just half of the *Ex parte Young* doctrine.

The majority purports to avoid this problem by pointing to the Supreme Court's decision in *Stewart*, 563 U.S. at 256. In that case the Court allowed a state agency to invoke *Ex parte Young*'s exception to state sovereign immunity. But the state agency in that case did face a sovereign immunity defense. *See id.* at 252–54. That crucial difference means *Stewart* is inapposite; the "judge-made remedy" of *Ex parte Young* does not fit in a context where the litigant relies on one half of the case and not the other. *Cf. Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

DOJ's position seems to be that it can take the equitable "cause of action" part of *Ex parte Young* and leave the exception to sovereign immunity behind. But as the Supreme Court has reminded us, courts cannot mix and match parts of the *Ex parte Young* doctrine. *See Whole Woman's Health*, 595 U.S. at 39–45 (rejecting a novel application of *Ex parte Young*). *Ex parte Young* must be taken as a whole, consistent with its "traditional" limitations and the "historical practice" of courts in equity. *See ibid.* That history and tradition does not encompass suits by one sovereign against another. So *Ex parte Young* is inapplicable.

The majority does not meaningfully dispute any of this. It instead holds that DOJ may sue because Congress never said it could not. *Ante*, at 11. That is not how equitable causes of action work. If DOJ can sue, it is because there is some analogue for its suit in traditional equity practice. It is DOJ's obligation (and the majority's) to point to such an analogue. And the absence

of such evidence means no suit—the absence does not mean that we get to simply assume justiciability and move along to the merits.

Instead, the majority explains that the Federal Government has lots of power over immigration. *Ante*, at 7–9. And given that power, the majority assumes the power to prevent state immigration laws from taking effect simply must exist. *Id.* at 9. But that is an obvious non-sequitur. Even if S.B. 4 does interfere with the immigration scheme Congress created, it does not necessarily follow that DOJ may ask the federal courts to do something about it. *Cf. Biden v. Texas*, 597 U.S. at 813–14 (even if Federal Government does not enforce the INA, it does not follow that federal court can order enforcement). The question of whether S.B. 4 is preempted is entirely distinct from the question of whether DOJ may sue to enjoin its enforcement. By conflating distinct issues, the majority comes dangerously close to embracing a theory that DOJ has a roving commission to seek judicial invalidation of state statutes. There is no basis for that theory of our equitable jurisdiction.

B.

Even assuming plaintiffs' claims are cognizable, plaintiffs are unlikely to succeed on the merits of their preemption claim.

This is a facial challenge to S.B. 4 in its entirety. Plaintiffs have not asked for an injunction against any single provision or set of provisions but rather against the whole bill. And the district court did not enjoin enforcement of any single provision or set of provisions but rather the whole bill. *See United States v. Texas*, 2024 WL 861526, at *43 (W.D. Tex. Feb. 29, 2024) ("Defendants are preliminarily enjoined from enforcing SB 4." (quotation omitted)).

Pause for a moment to consider what that means. The elected representatives of the people of the State of Texas passed a law. Before that

law went into effect, a federal district court enjoined its enforcement. The Texas courts had no opportunity even to consider, let alone to cure, any of the bill's alleged constitutional defects. *Cf. O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (noting state courts should have the first opportunity to cure unconstitutional state action). And that is true even though the bill has an express and robust severability provision. *See* S.B. 4, § 8 ("It is the intent of the legislature that every provision, section, subsection, sentence, clause, phrase, or word in this Act, and every application of the provisions in this Act to every person, group of persons, or circumstances, is severable from each other."). We are thus bound to give effect to *every word* of S.B. 4 that has a constitutional application. *See Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) (noting that interpreting a severability provision in a state statute is "a matter of state law"). *See also infra*, Part IV (further considering S.B. 4's severability provision).

"It is axiomatic that a 'statute may be invalid as applied to one state of facts and yet valid as applied to another.'" *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) (quoting *Dahnke–Walker Milling Co. v. Bondurant*, 257 U.S. 282, 289 (1921)). That is why facial challenges are "disfavored." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008). As the Supreme Court has explained, facial challenges may seem efficient in the abstract, but "any gain is often offset by losing the lessons taught by the particular, to which common law method normally looks. Facial adjudication carries too much promise of 'premature interpretatio[n] of statutes' on the basis of factually barebones records." *Sabri v. United States*, 541 U.S. 600, 608–09 (2004) (quoting *United States v. Raines*, 362 U.S. 17, 22 (1960)). Thus the Court has repeatedly warned of the dangers of invalidating statutes on the basis of "hypothetical cases" like this one. *Raines*, 362 U.S. at 22; *see also Yazoo & Mississippi Valley R. Co. v. Jackson Vinegar Co.,* 226 U.S. 217, 219–20 (1912) (same); Re, *supra*, at 1226 ("*Outside*

*the First Amendment context*, a plaintiff normally has standing to challenge a statute only if she contends that the statute is unconstitutional as applied in her own case. This rule encourages 'as-applied' claims, whereby courts sever and invalidate only the unconstitutional applications of otherwise constitutional laws." (emphasis added; footnote omitted)).

Thus, because of plaintiffs' litigation choices, they "bear a heavy burden of persuasion." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 200 (2008). That burden is especially heavy in this case. It is one thing for plaintiffs to bring a facial challenge. *See* Gillian E. Metzger, *Facial and As-Applied Challenges Under the Roberts Court*, 36 FORDHAM URB. L.J. 773, 773 (2009) (noting the Supreme Court has expressed a strong "preference for as-applied over facial challenges"). It is an altogether different thing for plaintiffs to bring that challenge before the State has even attempted to enforce S.B. 4 against a single person. *See Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 497–504 (1982) (declining to entertain a pre-enforcement facial challenge, in large part due to a lack of evidence regarding how the challenged law would be enforced). And it is still another thing where the plaintiffs bringing the pre-enforcement facial challenge cannot show that the law could ever be enforced against them. *Cf. Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392–93 (1988) (considering a facial challenge where the plaintiffs "alleged an actual and well-founded fear that the law will be enforced against them"). And it is yet another thing where the plaintiffs' suit rests on a novel, non-statutory source of equitable relief. *Cf. Armstrong*, 575 U.S. at 327–28 (discussing constraints on such forms of equitable relief); *see also Whole Woman's Health*, 595 U.S. at 44 ("The equitable powers of federal courts are limited by historical practice.").

Put another way, plaintiffs may (sometimes) bring facial challenges. *See, e.g., Roemer v. Bd. of Pub. Works of Maryland*, 426 U.S. 736 (1976). Plaintiffs may (sometimes) bring pre-enforcement challenges. *See, e.g.,*

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967). Plaintiffs may (sometimes) bring challenges when the relevant law is not directly enforced against them. *Cf. Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992). And plaintiffs may (sometimes) base their challenge on an equitable cause of action, as in *Debs* and *Ex parte Young*. But a legal challenge that combines *all* these characteristics runs the risk of embroiling the federal courts in the adjudication of an abstract controversy with untold numbers of hypothetical and unforeseen permutations. *Cf. Ala. State Fed'n of Lab., Loc. Union No. 103, United Bhd. of Carpenters & Joiners of Am. v. McAdory*, 325 U.S. 450, 461 (1945) (reiterating the federal courts' deeply rooted policy against deciding "abstract, hypothetical or contingent questions").

That means in order to affirm the district court's injunction, we would have to conclude that plaintiffs demonstrated a likelihood "that no set of circumstances exists under which" *any provision*—indeed, *any word*—of S.B. 4 "would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also ibid.* ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully."). So when we eventually consider the preliminary injunction under 28 U.S.C. § 1292(a)(1), we will be able to affirm only if we hold that S.B. 4—*the whole bill*—"is unconstitutional in all of its applications." *Washington State Grange*, 552 U.S. at 449. That is because if even a single provision of S.B. 4 is constitutional, a state court confronting the bill would be required to give effect to that provision, no matter the constitutionality of any of the bill's other provisions. *See* S.B. 4, § 8. Obviously, state courts are allowed to apply provisions of state laws that do not violate the Constitution. To affirm an injunction of the entire bill, then—even if some of its provisions could be validly applied—would be to affirm an injunction prohibiting a sovereign from doing something it is entitled to do under our Constitution. The Constitution does not vest district courts with power to do that, so we cannot affirm an injunction that does that.

No. 24-50149

The majority contends I make too much of the facial pre-enforcement posture of this suit because the Supreme Court granted pre-enforcement relief in *Arizona*. *Ante*, at 48, 49, 50. But the injunction before the *Arizona* Court was nothing like the injunction before us. In *Arizona*, the Court considered an injunction against enforcement of four provisions of S.B. 1070. It analyzed each provision in isolation, asking whether that provision had any conceivable constitutional applications. And it let one provision of the law—§ 2(B)—go into effect. *See* 567 U.S. at 415. The Court's analysis of that provision is worth re-quoting at length:

> The nature and timing of this case counsel caution in evaluating the validity of § 2(B). The Federal Government has brought suit against a sovereign State to challenge the provision even before the law has gone into effect. There is a basic uncertainty about what the law means and how it will be enforced. At this stage, without the benefit of a definitive interpretation from the state courts, it would be inappropriate to assume § 2(B) will be construed in a way that creates a conflict with federal law. As a result, the United States cannot prevail in its current challenge. This opinion does not foreclose other preemption and constitutional challenges to the law as interpreted and applied after it goes into effect.

*Ibid.* (quotations omitted).

The *Arizona* Court was thus sensitive to the problems with pre-enforcement relief. And the concerns the Court espoused apply *a fortiori* here because, as explained above, the district court enjoined S.B. 4 in its entirety. To affirm that injunction is to hold that no provision of S.B. 4 could possibly be applied in a manner consistent with the Constitution. But of course "[t]here is a basic uncertainty about what [S.B. 4] means and how it will be enforced"—including whether state courts might sever certain provisions. *Ibid.* It is therefore untrue that my objection to enjoining enforcement of S.B.

4 in this pre-enforcement posture "invites our court to ignore *Arizona*'s mandate." *Ante*, at 48.

In sum, to show a likelihood of success on the merits of plaintiffs' preemption claim, Texas need only demonstrate a likelihood that the district court erred in finding that no provision of S.B. 4 has any constitutional application. Texas has made that showing. I (1) explain preemption doctrine. I then (2) explain that, at the very least, Texas has shown the provisions contained in Texas Penal Code § 51.02—providing for the arrest and detention of aliens who enter the United States at a location other than a lawful port of entry—are lawful in at least some (indeed, most) circumstances. Finally, I (3) explain S.B. 4's removal provisions likely have at least some constitutional applications.

1.

Plaintiffs' principal argument is that S.B. 4 is preempted. In other words, they argue S.B. 4 is "in conflict or at cross-purposes" with federal immigration law. *Arizona*, 567 U.S. at 399. And since the Supremacy Clause provides that the Constitution, federal statutes, and treaties "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding," U.S. Const. art. VI, cl. 2, plaintiffs argue that S.B. 4 falls to this supposed conflict.

Preemption analysis starts from the premise that under our federalist system "States retain substantial sovereign authority." *Wyeth v. Levine*, 555 U.S. 555, 584 (2009) (Thomas, J., concurring in the judgment) (citing U.S. Const., amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.")). In fact, States "possess sovereignty concurrent with that of the Federal Government, subject only to limitations imposed by the Supremacy Clause." *Tafflin v. Levitt*, 493 U.S. 455, 458

(1990). That means state laws are valid unless they are displaced by federal law.

Federal law may displace state law in several different ways. Most obviously, "Congress may preempt state authority by so stating in express terms." *Pacific Gas & Elec. Co. v. State Energy Resources Conservation and Development Comm'n*, 461 U.S. 190, 203 (1983). Equally obvious is that state law must yield when a court could not possibly give effect to both state and federal law—*e.g.*, where "compliance with both federal and state [law] is a physical impossibility." *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143 (1963). But plaintiffs do not point to any federal statute that expressly proscribes States from adopting laws like S.B. 4. And since each of the substantive provisions of S.B. 4 has a near-exact analog in the federal immigration statutes, plaintiffs do not argue that it is somehow impossible to give effect to both S.B. 4 and federal law.

Instead, plaintiffs argue that S.B. 4 is preempted by implication from congressional purpose. It is unclear that the original public meaning of the Constitution countenances that kind of preemption. *See, e.g.*, *Wyeth*, 555 U.S. at 583 (Thomas, J., concurring in the judgment) ("[I]mplied pre-emption doctrines that wander far from the statutory text are inconsistent with the Constitution."); Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225, 260–261 (2000) ("Under the Supremacy Clause, preemption occurs if and only if state law contradicts a valid rule established by federal law, and the mere fact that federal law serves certain purposes does not automatically mean that it contradicts everything that might get in the way of those purposes.").

Nevertheless, the Supreme Court has held that state laws are preempted by implication in two circumstances. First, the Court has held a state law is preempted when it appears that Congress intended to displace States from regulating in an entire field—so-called field preemption. A state

law may be field preempted where a federal interest in the relevant field is especially dominant or where Congress enacts a regulatory framework so pervasive that it leaves no room for state supplementation. *See, e.g.*, *Arizona*, 567 U.S. at 399. Second, the Court has held a state law is preempted when it appears to a court that the law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of [the United States] Congress"—a variant of so-called conflict preemption. *Hines*, 312 U.S. at 67.

These categories—implied field preemption and implied conflict preemption—"are not rigidly distinct." *Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1900 (2019) (Lead Opinion of Gorsuch, J.). In applying them, "the purpose of Congress is the ultimate touchstone." *Cipollone*, 505 U.S. at 516 (quotation omitted). But since "only federal laws made in pursuance of the Constitution, through its prescribed processes of bicameralism and presentment, are entitled to preemptive effect . . . any [e]vidence of preemptive purpose . . . must [] be sought in the text and structure of the statute at issue." *Virginia Uranium*, 139 S. Ct. at 1907 (Lead Opinion of Gorsuch, J.). "Invoking some brooding federal interest or appealing to a judicial policy preference does not show preemption." *Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020) (quoting *Virginia Uranium*, 139 S. Ct. at 1901 (Lead Opinion of Gorsuch, J.)). Rather, in holding that a law is preempted, courts "must point specifically to . . . a federal statute that does the displacing or conflicts with state law." *Virginia Uranium*, 139 S. Ct. at 1901 (Lead Opinion of Gorsuch, J.); *see Garcia*, 140 S. Ct. at 804 ("[A]ll preemption arguments[] must be grounded in the text and structure of the statute at issue." (quotation omitted) (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)).

Moreover, the Supreme Court has repeatedly explained that "courts should assume that the historic police powers of the States are not superseded unless that was the *clear and manifest* purpose of Congress." *Arizona*, 567 U.S. at 400 (emphasis added) (quotation omitted). States

Case: 24-50149      Document: 168-1      Page: 84      Date Filed: 03/26/2024

historically exercised their police powers to regulate immigrants crossing into their territory from foreign nations. *See* Gerald L. Neuman, *The Lost Century of American Immigration Law (1776-1875)*, 93 Colum. L. Rev. 1833, 1846–59 (1993) (cataloging examples from eight States of measures regulating the immigration of "foreign paupers" between 1776 and 1875); *see also Arizona*, 567 U.S. at 417–421 (Scalia, J., concurring in part and dissenting in part). So this "presumption against preemption" applies to state laws like S.B.4. *Arizona*, 567 U.S. at 448 (Alito, J., concurring in part and dissenting in part) (quotation omitted).[5]

In light of the Supreme Court's preemption cases, plaintiffs must establish—by reference to the text of the federal immigration statutes—that it was the clear and manifest purpose of Congress to overcome the presumption against preemption and to displace state laws empowering state officials to arrest and prosecute aliens who cross the border at places other than those by designated federal officials in every circumstance. Plaintiffs cannot shoulder that burden.

### 2.

### a.

I begin with the argument that the provisions of § 51.02 are implicitly field preempted. At the outset, it bears emphasis that field preemption is rare: "Only a demonstration that complete ouster of state power including state

---

[5] The Federal Government contends the presumption does not apply in areas in which "there is a history of federal presence." The origin of that notion is *United States v. Locke*, U.S. 89, 108 (2000), which held the presumption does not apply in cases that "bear upon national and international maritime commerce." *Ibid.* The reason, the Court explained, was not merely that there was a history of federal presence but that "Congress has legislated in the field from the earliest days of the Republic." *Ibid.* The same is not true of immigration. *See* Neuman, *supra*, at 1838 (noting the first federal immigration statute was enacted in 1875).

power to promulgate laws not in conflict with federal laws was the clear and manifest purpose of Congress" justifies a finding of field preemption. *DeCanas v. Bica*, 424 U.S. 351, 357 (1976). We must first define the field from which Congress allegedly displaced state laws. On plaintiffs' telling, the relevant field is the field of entry and removal of aliens. DOJ FRAP 8 Opp. at 6. While the plaintiffs' reasoning is not pellucid, I can distill four distinct arguments in their FRAP 8 submissions. I take each in turn.

i.

First, plaintiffs contend the Supreme Court has recognized that Congress's interest in the field of entry and removal is so dominant that there is no room for state regulation. True, the Supreme Court has often said Congress has certain powers over immigration that are exclusive. *See, e.g.*, *DeCanas*, 424 U.S. at 354. It is also true that the Supreme Court has held Congress entirely displaced States from regulating in one field related to immigration—namely alien registration. *See Hines*, 312 U.S. at 62; *see also Garcia*, 140 S. Ct. at 806 (explaining *Hines* held that "federal immigration law occupied the field of alien registration"). Plaintiffs apparently take these two propositions as evidence that the Supreme Court has recognized States may not regulate the entry and removal of unauthorized aliens.

But even accepting plaintiffs' premises, the conclusion does not follow. The fact that Congress has implicitly exercised field preemption in one area of immigration law does not mean States may never pass laws touching on immigration. To the contrary, the Supreme Court has blessed state laws touching on immigration—in the very case plaintiffs invoke to say S.B. 4 is entirely field preempted. *See Arizona*, 567 U.S. at 414 (upholding a state law requiring officers to check the immigration status of every person stopped, detained, or arrested if reasonable suspicion exists that the person is unlawfully present in the United States); *see also Plyler v. Doe*, 457 U.S. 202,

225 (1982) ("As we recognized in *De Canas* . . . the States do have some authority to act with respect to illegal aliens, at least where such action mirrors federal objectives and furthers a legitimate state goal." (quotation omitted)); *Chamber of Comm. v. Whiting*, 563 U.S. 582, 588, 600 (2011) (noting the federal interest in immigration does not completely supersede States' "broad authority under their police powers" to enact immigration-related laws).

Nor does the reasoning undergirding the Supreme Court's immigration-related preemption cases support a finding that state laws touching on the entry and removal of unauthorized aliens are all somehow field preempted. In fact, the Court's cases stand for two much more modest propositions.

First, States have no power over the terms upon which an alien is admitted to the United States. *See Chy Lung v. Freeman*, 92 U.S. 275, 280 (1875) ("The passage of laws which concern the admission of citizens and subjects of foreign nations to our shores belongs to Congress, and not to the States."). That is for the obvious reason that state laws respecting admission cannot possibly co-exist with federal laws respecting the same subject. If a State purports to admit an alien Congress excluded, the State by definition undermines Congress's decision to exclude that alien. And if a State purports to exclude an alien Congress admitted, the State by definition undermines Congress's decision to admit that alien. Thus, States must be preempted from determining the terms of alien admission.

Second, States have no power to enact laws that regulate aliens on the basis of their alien status. Consider *Hines*. There the Court considered a state law that required:

> every alien 18 years or over, with certain exceptions, to register once each year; provide such information as is required by the

statute, plus any 'other information and details' that the
Department of Labor and Industry may direct; pay $1 as an
annual registration fee; receive an alien identification card and
carry it at all times; show the card whenever it may be
demanded by any police officer or any agent of the Department
of Labor and Industry; and exhibit the card as a condition
precedent to registering a motor vehicle in his name or
obtaining a license to operate one.

312 U.S. at 56. The question presented was whether that law was preempted
by a federal statute providing for less stringent alien registration
requirements. *See id.* at 60–61.

The Court held yes because Congress expressly set one uniform
standard for alien registration. Then the State attempted to impose more
burdensome obligations upon aliens, after Congress determined they should
be admitted to the United States, for no reason except their alien status. Put
differently, the State was attempting to impose conditions—over and above
the conditions imposed by Congress—on the ability of aliens to reside within
its borders. As the Court put it, the state law "imposed distinct, unusual and
extraordinary burdens and obligations upon aliens—such as subjecting them
alone, though perfectly law-abiding, to indiscriminate and repeated
interception and interrogation by public officials." *Id.* at 65–66; *see id.* at 68
("[I]t is . . . of importance that this legislation deals with the rights, liberties,
and personal freedoms of human beings . . . ."). That kind of burden on "the
rights, liberties, and personal freedoms" of authorized aliens was
inconsistent with Congress's decision to admit those aliens into the country
because it is Congress's job alone to regulate "the conduct of an alien before
naturalization . . . ." *Id.* at 66 (citation omitted). Moreover, the United States
has obligations—via treaty and the law of nations—to protect the aliens
residing in its borders. *See id.* at 65, 68; *see id.* at 69 ("Numerous
treaties . . . have pledged the solemn obligation of this nation to the end that

aliens residing in our territory shall not be singled out for the imposition of discriminatory burdens."). In the Court's view, a state law discriminating against aliens previously admitted by Congress risked putting the United States in violation of those obligations, which risked "provok[ing] questions in the field of international affairs." *Id.* at 66.

*Hines* obviously means States are preempted from the field of alien registration. But the Court made clear that is not because States are powerless over the field of immigration. Rather, it is because alien registration requirements are inherently prone to be abused for discriminatory ends. *See id.* at 73–74 (noting registration requirements treat aliens "as a thing apart"). That suggests to the extent *Hines* has any application beyond alien registration, it stands for the proposition that once Congress decides to admit an alien, States may not impose burdensome obligations on that alien solely because of his alien status. Since that alien has come under the protection of the United States, it is Congress's job to determine the conditions upon which he may reside in this country. *Hines* says *nothing* about a State's power to regulate aliens Congress decided to *exclude*.

Next consider *Arizona*. There, the Court held the State of Arizona was field preempted from enacting a state-law penalty for violations of a federal-law registration requirement. The INA requires aliens registered under congressionally prescribed standards to carry alien-registration cards. *See* 8 U.S.C. § 1304(e). Arizona passed a statute making it a state-law misdemeanor for aliens to violate § 1304(e) by failing to carry their federal registration cards. *See Arizona*, 567 U.S. at 400. As in *Hines*, the *Arizona* Court held that States are field preempted from regulating alien registration. Because States are preempted from regulating in the field of alien registration, it did not matter that Arizona's state-law penalty was consistent with the INA's federal-law penalty. *See Arizona*, 567 U.S. at 402. Congress's occupation of

the field of alien registration means no state law in that field—period. *See id.* at 402–03.

The fact that Congress occupied the field of aliens who must register to seek admission says nothing about the field of aliens whom Congress deemed inadmissible. And *Arizona* certainly does not suggest States may never supplement any federal immigration laws. Rather, its holding followed logically from *Hines*. The principal concern motivating the *Hines* Court was that a State might use registration requirements to harass admitted aliens. *See* 312 U.S. at 408 (noting Congress intended "to leave [admitted aliens] free from the possibility of inquisitorial practices and police surveillance"). But a State need not necessarily impose new registration obligations to do that. A State could achieve the same end by overzealously prosecuting violations of federal alien registration statutes, or by imposing exceptional penalties on aliens caught without a federal registration card. The effect of those actions might be less dramatic than the effect of a State-enacted parallel alien registration scheme, but the difference would be one of degree and not kind. Both tactics might be used by States to impose burdens on aliens whom Congress admitted and hence to undermine Congress's decision to admit them.

The Court's other cases suggesting some degree of immigration-related field preemption are similar. For example, in *Truax v. Raich*, 239 U.S. 33 (1915), the Court held that States lack "authority to deny to aliens the opportunity of earning a livelihood when lawfully admitted to the [S]tate" because "the practical result would be that those lawfully admitted to the country under the authority of the acts of Congress, instead of enjoying in a substantial sense and in their full scope the privileges conferred by the admission, would be segregated in such of the [S]tates as chose to offer hospitality." *Id.* at 42. Likewise in *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410 (1948), the Court held States may not deny resident aliens the ability

to engage in commercial fishing in state-controlled ocean waters. In doing so, the Court explained "[t]he Federal Government has broad constitutional powers in determining what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization," which means States "can neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization and residence of aliens in the United States or the several [S]tates." *Id.* at 419. Both those cases establish that Congress alone has the power to admit aliens, and that a State may not subvert that power by enacting discriminatory laws.

In sum, plaintiffs appear to misunderstand the scope of the Federal Government's "exclusive power" over immigration. *DeCanas*, 424 U.S. at 354. Congress has exclusive power to determine which aliens may enter the country and the terms of their admission. *See Chy Lung*, 92 U.S. at 280. And when Congress deems an alien admitted, that alien comes within the protection of the United States. *See, e.g.*, *Takahashi*, 334 U.S. at 420 ("The Fourteenth Amendment and the laws adopted under its authority [] embody a general policy that all persons *lawfully in this country* shall abide 'in any [S]tate' on an equality of legal privileges with all citizens under non-discriminatory laws." (emphasis added)). If States could enact laws regulating persons Congress admitted simply because those persons are aliens, States could deny aliens the privileges and protections Congress meant to confer through admission. That is why registration is an exclusively federal domain.

But § 51.02 says nothing about alien registration and has no impact whatsoever on which aliens Congress chooses to admit, the terms under which Congress chooses to admit them, or any part of the INA even tangentially related to admission. Section 51.02 says only that Texas may arrest aliens when they cross the border somewhere other than a lawful port

of entry. That section therefore falls outside the bounds of *Hines*, *Arizona*, and the Court's field-preemption precedents.[6]

### ii.

Second, plaintiffs contend States are preempted from the field of alien entry and removal because those matters implicate important federal interests. In their view, we should infer a congressional intent to preempt the entry and removal fields for two reasons: (1) immigration enforcement involves discretionary choices that are intertwined with foreign policy, and (2) border-control policies are important to national security and foreign policy. Plaintiffs do not point to the text of any federal law to support this argument.

Instead, plaintiffs rely principally on dicta from *Arizona*. For example, plaintiffs make much of the *Arizona* Court's statement that a decision about removability "requires a determination whether it is appropriate to allow a foreign national to continue living in the United States," which means it "touch[es] on foreign relations and must be made with one voice." *See* 567 U.S. at 409.

There are several problems with plaintiffs' argument. First, even as the *Arizona* Court acknowledged that removal decisions affect foreign policy,

---

[6] The majority contends S.B. 4 interferes with the executive branch's discretion to waive various requirements that would otherwise stand in the way of an alien's admission. *Ante*, at 18. Even assuming that is a viable theory of preemption, only S.B. 4's removal provisions could interfere with executive discretion in that manner. Absent the removal provisions, § 51.02 merely allows Texas to imprison aliens for up to six months for the offense of crossing the border somewhere other than a lawful port of entry. A law allowing Texas to temporarily detain an alien who crosses the border unlawfully could not possibly interfere with the executive's discretion to waive admission requirements because the executive could waive admission requirements while or after the alien is detained. And since the removal provisions are severable, *see supra*, at 76–77, and *infra* Part IV, this argument does not justify the district court's sweeping facial injunction.

it did not hold that Congress preempted states from the field of entry and removal. Instead, the Court held States may not arrest aliens for being removable because such arrests would stand as an obstacle to the removal system Congress created. *See id.* at 410. That makes sense. Congress said that, *after an alien is admitted*, it is the Attorney General's federal prerogative to remove him or her in accordance with the INA's deportability instructions. *See* 8 U.S.C. § 1227(a) (governing removal of an alien who is "in *and admitted to* the United States") (emphasis added). And Congress similarly vested the Attorney General with discretion to determine whether and when an alien should be detained in the removal proceedings. *See id.* § 1226(a) ("On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."). If a State could make warrantless arrests of aliens solely on the ground that they were removable, States could undermine the Attorney General's exercise of his congressionally conferred discretion over the removal process with respect to admitted aliens. Thus, the *Arizona* Court did not hold—as plaintiffs seem to believe—that the State was preempted from the field of removal because of "some brooding federal interest" like foreign policy or national security. *Garcia*, 140 S. Ct. at 801 (quoting *Virginia Uranium*, 139 S. Ct. at 1901 (Lead Opinion of Gorsuch, J.)). Rather, the Court held that Arizona's law was *conflict* preempted because it undermined and hence conflicted with the Attorney General's congressionally authorized powers. And the *Arizona* Court reached that result based on the *text* of Title 8. *See* 567 U.S. at 408–10.

Plaintiffs here by contrast point to nothing in the INA that vests Federal Government officials with discretion to arrest an alien for crossing the border at an unlawful location. *See* 8 U.S.C. § 1325 ("Any alien who [] enters or attempts to enter the United States at any time or place other than as designated by immigration officers . . . *shall*, for the first commission of

any such offense, be fined under title 18 or imprisoned not more than 6 months, or both, and, for a subsequent commission of any such offense, be fined under title 18, or imprisoned not more than 2 years, or both." (emphasis added)). True, executive branch officials have "traditional enforcement discretion" over whether to take action against violators of federal law. *United States v. Texas*, 599 U.S. 670, 683 (2023). It might also be true that some particular hypothetical future application of S.B. 4 could interfere with discretionary choices made by federal officials. But "the possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption. The Supremacy Clause gives priority to 'the Laws of the United States,' not the criminal law enforcement priorities or preferences of federal officers." *Garcia*, 140 S. Ct. at 807 (citation omitted). Thus, an invocation of enforcement discretion is not enough to show preemption unless there is a specific textual basis for inferring that Congress intended to confer discretion upon a particular federal official. *Contra ante*, at 19 (contending S.B. 4 is preempted because it might interfere with the enforcement priorities of the executive branch).

Plaintiffs' "brooding interest" theory of field preemption suffers from two additional problems. First, if plaintiffs are correct that brooding federal interests are sufficient to trigger field preemption, the *Arizona* opinion would have been much shorter. The Court would have simply said immigration implicates important federal interests, so the Arizona law was field preempted in its entirety.

And second, plaintiffs' "brooding interest" theory of field preemption would radically undermine States' sovereignty. That is because immigration is hardly the only area of state regulation that implicates important federal interests. *See Garcia*, 140 S. Ct. at 801 (quoting *Virginia Uranium*, 139 S. Ct. at 1901 (Lead Opinion of Gorsuch, J.)). For example, the Federal Government has important interests in drug safety and even has an

administrative agency dedicated to promoting it—but that does not preempt state law from the field. *See Wyeth*, 555 U.S. at 573–81. The Federal Government has important interests in antitrust law and even has *two* administrative agencies dedicated to it—but that does not preempt state law from the field. *See California v. ARC America Corp.*, 490 U.S. 93, 101–02 (1989). The Federal Government has important interests in the foreign-affairs and national-security consequences of drug trafficking—but that does not preempt state law from the field. *See* Daniel Raisbeck & Ian Vásquez, *The International War on Drugs*, Cato Inst. (2022), https://perma.cc/8653-FX9Y. And so on and so forth.

Plaintiffs' atextual "brooding interests" theory therefore must be rejected. *See Garcia*, 140 S. Ct. at 804 ("[A]ll preemption arguments[] must be grounded in the text and structure of the statute at issue." (quotation omitted) (quoting *CSX Transp.*, 507 U.S. at 664)).

iii.

Plaintiffs next contend the federal framework governing alien entry and removal is so pervasive that Congress left no room for States to supplement it. Put differently, plaintiffs argue that States may not pass laws relating to the entry and removal of aliens because Congress has passed many laws related to that subject. The basis for this argument is the Supreme Court's decision in *Hines*. As explained above, the Court in that case held States are preempted from legislating in the field of alien registration. In part, that was because the Court concluded Congress designed the federal alien registration as a "harmonious whole." 312 U.S. at 72.

The Court reaffirmed that the federal alien registration system constitutes a "harmonious whole" in *Arizona*. *See* 567 U.S. at 401. But it did not say any other provisions in the immigration statutes constitute a

harmonious whole. And outside of *Hines*, the Court has only "rare[ly]" found field preemption on this ground. *Garcia*, 140 S. Ct. at 804.

For good reason. The Court's finding in *Hines* was based on "[t]he Congressional purpose, as announced by the chairman of the Senate subcommittee which drafted the final bill." 312 U.S. at 72. As several members of the Court have since recognized, "only federal laws made in pursuance of the Constitution, through its prescribed processes of bicameralism and presentment, are entitled to preemptive effect." *Virginia Uranium*, 139 S. Ct. at 1907 (Lead Opinion of Gorsuch, J.); *see also Wyeth*, 555 U.S. at 587–88 (Thomas, J., concurring in the judgment). That is because stray statements from individual legislators—even committee chairs—do not necessarily evince the intent of the whole Congress, which "is the ultimate touchstone" in implied preemption analysis. *Cipollone*, 505 U.S. at 516. In fact, members of Congress may hold "many other disparate or conflicting goals in mind when they vote[] to enact" a statute. *Virginia Uranium*, 139 S. Ct. at 1908 (Lead Opinion of Gorsuch, J.). "If polled, they might have reached very different assessments, as well, about the consistency of [a] law with their own purposes and objectives. The only thing a court can be sure of is what can be found in the law itself." *Ibid.*; *cf. Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 144 S. Ct. 457, 471 (2024) (noting sovereign immunity may not be displaced by "inferences from legislative history without clear statutory direction"). Thus, it is not clear the "harmonious whole" theory of field preemption is viable outside the context of alien registration.

In all events, plaintiffs do not point to anything—not even legislative history—suggesting Congress intended the immigration statutes to operate as a "harmonious whole." They merely explain that Congress has already legislated against the conduct that S.B. 4 proscribes. Put differently, plaintiffs contend S.B. 4 is unlawful because it coincides with federal law.

But "there is no basis for inferring that federal [] statutes preempt state laws whenever they overlap. Indeed, in the vast majority of cases where federal and state laws overlap, allowing the States to prosecute is entirely consistent with federal interests." *Garcia*, 140 S. Ct. at 806. As the Court has explained:

> Respondents' automatic 'coincidence means invalidity' theory . . . would lead us to the conclusion that a state may not make a dealer in perishable agricultural commodities respect its laws on the fraudulent nonpayment of an obligation, if that fraud occurred after an interstate shipment . . . . We would hold, too, that extortion or robbery from interstate commerce under is immune from state action; that the wrecking of a bridge over an interstate railroad is an 'exclusively federal' offense, that the transmittal of a ransom note in interstate commerce cannot be punished by local authorities. In short, we would be setting aside great numbers of state statutes to satisfy a congressional purpose which would be only the product of this Court's imagination.

*People of State of Cal. v. Zook*, 336 U.S. 725, 733 (1949).

Thus, absent some concrete evidence of a congressional intent to confer enforcement discretion, the only possible inference from the fact that Congress proscribed certain conduct related to the entry and removal of unauthorized aliens is that Congress wanted to prevent that conduct. I therefore do not understand how a court could infer that Congress occupied a field whenever it proscribes something. In my view, the exact opposite inference is warranted: If Congress sets out to prevent certain conduct, we should ordinarily presume that Congress welcomes state supplementation of that federal effort.

The Justice Department's contrary position in this case is the height of irony. It says Congress passed statutes prohibiting aliens from entering the United States; the executive branch has substantially declined to enforce

those statutes; the executive branch's decision not to enforce Congress's laws field preempts Texas from enacting its own coincident statutes; so the field Congress occupied is now a vacant, "harmonious whole" of nothingness. I am aware of no precedent to support that understanding of field preemption.

## iv.

The fourth and final argument that I can discern in plaintiffs' submissions is that we should infer field preemption from INA provisions like 8 U.S.C. § 1252c and § 1357(g). Plaintiffs infer from these provisions that Congress must displaced States from the field of alien entry and removal in all other circumstances. Plaintiffs also make much of the fact that federal law confers upon the Secretary of Homeland Security "the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens." 8 U.S.C. § 1103.

In my view, these are conflict-preemption arguments—not field-preemption ones. For example, as to § 1252c and § 1357(g), the real question is whether Congress's enumeration of some forms of federal-state cooperation impliedly conflicts with any other form of unenumerated state participation. Likewise with § 1103, the real question is whether Congress's enumeration of a federal duty to guard the border impliedly conflicts with any other effort to guard the border. I turn to conflict preemption in the following section, Part II.B.2.b.

## b.

I next consider the argument that § 51.02 is implicitly conflict preempted in every imaginable application. Plaintiffs lodge several arguments as to why they think S.B. 4 conflicts with Congress's immigration goals. Most of those arguments center on S.B. 4's re-entry provisions and removal provisions. *See* TEX. PENAL CODE § 51.03 (reentry); TEX.

CODE CRIM. PROC. art. 5B.002 (removal). But as explained above, at this stage of the litigation, Texas need only demonstrate that one of S.B. 4's provisions can be applied in a constitutional way. *See supra*, at 76–79. Given the exigencies of this proceeding and the legal standard, here I consider only whether the arrest provisions in § 51.02 conflict with federal law.

i.

The only federal statutory provisions that could plausibly clash with § 51.02 are those that expressly authorize state officials to detain aliens under federal law in certain circumstances. *See* 8 U.S.C. § 1103(a)(10) (vesting the Attorney General with the power to authorize state officials to enforce federal immigration law in the event of a "mass influx of aliens"); *id.* § 1252c (authorizing state officials to arrest and detain some unlawfully present aliens who have previously been convicted of a felony for a limited period of time); *id.* § 1357(g) (vesting the Attorney General with power to enter into written agreements with States authorizing state officials "to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States"). Plaintiffs contend that these provisions authorizing state enforcement of federal immigration laws under certain circumstances evince a congressional intent to preempt states from enacting any laws of their own. *Expressio unius est exclusio alterius*. So in plaintiffs' view, S.B. 4 "creates an unacceptable obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Wyeth*, 555 U.S. at 563–64 (quotation omitted).

If plaintiffs are right, it is difficult to understand why the Supreme Court in *Arizona* engaged in a provision-by-provision analysis of Arizona's S.B. 1070. If the INA's state-federal cooperation provisions cited above preempted States from passing their own immigration statutes, the Supreme Court could've simply said that and been done. The *Arizona* Court's analysis

was much more nuanced, which suggests plaintiffs' conflict preemption argument proves too much.

Moreover, plaintiffs' *expressio unius* argument suffers from the obvious defect that provisions like §§ 1103(a), 1252c, and 1357(g) authorize state officials to take certain actions as a matter of *federal* law. They say nothing at all about whether States can enact and enforce their own *state* laws. For example, consider § 1252c, which provides:

> Notwithstanding any other provision of law, to the extent permitted by relevant State and local law, State and local law enforcement officials are authorized to arrest and detain an individual who—
>
> > (1) is an alien illegally present in the United States; and
> >
> > (2) has previously been convicted of a felony in the United States and deported or left the United States after such conviction,
>
> but only after the State or local law enforcement officials obtain appropriate confirmation from the Immigration and Naturalization Service of the status of such individual and only for such period of time as may be required for the Service to take the individual into Federal custody for purposes of deporting or removing the alien from the United States.

8 U.S.C. § 1252c(a). That provision "merely creates an additional vehicle for the enforcement of *federal* immigration law." *United States v. Vasquez-Alvarez*, 176 F.3d 1294, 1295 (10th Cir. 1999) (emphasis added).[7] That is, a

---

[7] That the statute authorizes arrests "to the extent permitted by relevant state and local law" does not suggest Congress meant States need to enact a state law analog to § 1252c to effectuate arrests pursuant to that provision. Rather, that language means only that a state § 1252c arrest must comply with any generally applicable provisions of state law governing arrests—*e.g.*, warrantless arrest provisions. *See United States v. Di Re*, 332

No. 24-50149

state official who is arresting an alien under § 1252c(a) is exercising the federal sovereign's power, shared under the terms Congress prescribed. That says nothing about whether Congress wanted, expected, or would be otherwise bothered by a State's choice to exercise its own sovereign power to vest arrest authority in its officials. Far from evincing an intent to preempt all *state* laws touching on immigration, the statutory text suggests Congress intended only ensure that state officials had power to make certain arrests in reliance on *federal* law.

That makes sense. In the absence of a congressional directive to the contrary, States have inherent authority to make arrests for violations of federal law. *See Arizona*, 567 U.S. at 438 (Thomas, J., concurring in part and dissenting in part) (citing *Di Re*, 332 U.S. at 589); Warren, *supra*, 38 Harv. L. Rev. at 548–96 (collecting examples of State enforcement of federal criminal law).[8] So for example, absent some federal law prescribing otherwise, Texas could arrest illegal aliens who cross the border in violation of 8 U.S.C. § 1325—the provision proscribing crossing the border at some point other than a lawful port of entry. And it could do so even absent S.B. 4.

But Congress might reasonably have feared that federal courts would "misconstrue the provisions of the INA as preempting state authority to

---

U.S. 581, 589 (1948) (holding that state law determines the validity of a warrantless arrest for a violation of federal law "in [the] absence of an applicable federal statute").

[8] Charles Warren's impressive article collects examples between the Founding and the Civil War. He concludes: "Congress, in the first fifty years, left to the State Courts concurrent jurisdiction with the Federal Courts over certain offenses against the criminal and penal statutes of the United States, and trial in the State Courts of such violations of Federal criminal law was regarded by Congress as natural, feasible, and desirable." Warren, *supra*, 38 Harv. L. Rev. at 545. Twenty-three years after Warren published that article, in 1948, Congress expressly preempted state courts from trying federal crimes. *See* Act of June 25, 1948, Pub. L. No. 80-772, 62 Stat. 683, 826 (codified as 18 U.S.C. § 3231). But it has never preempted state police officers from making arrests.

arrest" for immigration-related crimes. *United States v. Arizona*, 641 F.3d 339, 390 (9th Cir. 2011) (Bea, J., dissenting) (citing OFF. LEGAL COUNS., *Non-Preemption*, *supra*, at 11), *aff'd in part, rev'd in part, and remanded*, 567 U.S. 387 (2012). Section 1252c thus ensures that "state police at least retain[] the authority to make such arrests of aliens who had previously been convicted of a felony and had been deported or had left the United States after such conviction." *Arizona*, 641 F.3d at 390 (Bea, J., dissenting) (citing OFF. LEGAL COUNS., *Non-Preemption*, *supra*, at 11). That Congress wanted to ensure state officials could make arrests in reliance on federal law in certain circumstances does not suggest that Congress wanted to preempt States from enacting their own laws empowering state officials to make immigration-related arrests in other circumstances. The United States said so itself in proceedings before the Tenth Circuit in 1999, and the Tenth Circuit agreed. *See Vasquez-Alvarez*, 176 F.3d at 1296. And OLC maintained that was the correct position in 2002. *See* OFF. LEGAL COUNS., *Non-Preemption*, *supra*, at 11 ("We agree with the Tenth Circuit that section 1252c has no preemptive effect.").

In short, § 1252c exists to ensure that no court will hold federal law precludes state officials from arresting certain aliens for violating *federal* law. And even if the provision stands for something more than that—*e.g.*, that by specifically vesting state officials with authority to enforce federal immigration law in some circumstances, Congress meant to preclude those officials from enforcing federal law in other circumstances—plaintiffs' contention would not follow. It may be true that state officials cannot enforce *federal* immigration laws unless such enforcement is authorized by a *federal* statute like § 1252c. But a state official enforcing a *state* law does not need to rely on federal law. That means § 1252c simply has nothing to say about the dispute before us today. *Contra ante*, at 40–41 (contending § 51.02 "clearly conflicts" with § 1252c).

Section 1357(g) is similarly inapposite. That provision authorizes the Attorney General to enter into agreements with States to enable state officials to perform the functions of a federal immigration officer. 8 U.S.C. § 1357(g)(1). The subsection also makes clear that Congress did not intend to preempt states from "cooperat[ing] with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States" in the absence of an agreement. *Id.* § 1357(g)(10). Congress explained that it adopted this provision out of concern that state-federal cooperation agreements would otherwise have been precluded by 31 U.S.C. § 1342, which generally bars the United States from accepting "voluntary services." *See* 8 U.S.C. § 1357(g)(1) ("Notwithstanding section 1342 of Title 31, the Attorney General may enter into a written agreement with a State . . . ."). Section 1357(g) thus makes clear that the Federal Government can accept help from States in enforcing the INA.

But like § 1252c, § 1357(g) only provides a mechanism to enable state officials to enforce *federal* immigration laws. Even accepting, as plaintiffs contend, that the canon of *expressio unius* applies, the statute would only preclude state officials from enforcing *federal* immigration law in circumstances not contemplated by § 1357(g). That is, absent an agreement with the Attorney General, or in a manner that otherwise constitutes cooperation under § 1357(g), plaintiffs might be right that States cannot enforce the INA's *federal-law* arrest provisions. Section 1357(g) does not express an intent to preclude States from enacting and enforcing *state-law* arrest provisions.

*Arizona* is not to the contrary. There, the Court found the INA conflict-preempted a state-law provision authorizing state officials to make a warrantless arrest of an alien if the official had probable cause to believe the alien had "committed any public offense that [made] him removable from

the United States." 567 U.S. at 407 (citation and quotation omitted). The state law thus purported to clothe state officials with authority to effectuate arrests of aliens who committed offenses that made them deportable as a matter of federal law. That is, Arizona tried to authorize its officers to perform the duties of federal immigration officers. *Id.* at 408.

But as the Court explained, "[f]ederal law specifies limited circumstances in which state officers may perform the functions of a[] [federal] immigration officer"—namely when a State enters into an agreement with, or otherwise cooperates with, the Attorney General under §§ 1252c and 1357(g). *Ibid.* Of course, a state official who effectuates an arrest pursuant to a provision in state law is not performing the functions of a federal immigration officer. He is performing the function of a state police officer. And no provision of federal law suggests Congress intended to preclude that. *Contra ante*, at 39–40 (contending § 51.02 conflicts with § 1357(g)).

But even if all that is wrong—even if § 51.02 is conflict preempted to the extent that it clothes state officials with authority to effectuate arrests that are not affirmatively authorized by federal law—plaintiffs still could not demonstrate that *all applications* of § 51.02 are preempted. That is because *Arizona* suggests federal approval transforms an otherwise invalid arrest into an arrest authorized by the cooperation provision of § 1357(g)(10). *See* 567 U.S. at 410.

So imagine Texas discovers that an alien has crossed the border at a location other than a lawful port of entry, in violation of both 8 U.S.C. § 1325(a) and Texas Penal Code § 51.02(a). Texas then notifies the Federal Government that it plans to arrest and prosecute the alien for violating § 51.02(a). It also offers to give federal officials access to Texas facilities to visit the alien. *See Arizona*, 567 U.S. at 410 (allowing "federal immigration

officials to gain access to detainees held in state facilities" constitutes evidence of cooperation). The Federal Government consents, so Texas proceeds.

If nothing else, that kind of arrest is surely authorized by § 1357(g)(10). That means there is at least one valid application of § 51.02(a). And that one valid application of § 51.02(a) is enough to defeat this facial challenge. *See Wash. State Grange*, 552 U.S. at 449. Thus, even if plaintiffs are correct that Texas may not enforce S.B. 4 unless the enforcement is expressly authorized by federal law, the district court's injunction should be stayed and likely vacated.

ii.

The majority does not meaningfully refute any of this. It contends §§ 1252c and 1357(g) conflict preempt § 51.02, *ante*, at 39–41, but it ignores that DOJ previously said § 1252c has no preemptive effect, *see supra*, at 100–01101. Section 1252c has not changed—only DOJ's interpretation of it has. The same with § 1357(g). *See supra*, at 102. So in the majority's view, § 51.02 is conflict preempted because it might interfere with the executive branch's discretion to enforce § 1325(a) or its ever-evolving understanding of § 1252c and § 1357(g). *Ante*, at 32–33, 39–41. But that does not matter because "the possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption. The Supremacy Clause gives priority to 'the Laws of the United States,' not the criminal law enforcement priorities or preferences of federal officers." *Garcia*, 140 S. Ct. at 807 (citation omitted).

The rest of the majority's conflict preemption argument is directed at S.B. 4's removal provisions and its non-abatement provision. The majority's argument goes like this: S.B. 4 directs state courts to enter orders of removal against aliens who are prosecuted for crossing the border unlawfully. And S.B. 4 has a non-abatement provision, which means that a state court may be

compelled to enter an order of removal against an alien without allowing him to vindicate his rights to seek asylum or CAT relief or some other right to remain in the United States under federal law. *Ante*, at 36.

Even assuming the majority is correct that S.B. 4's removal and non-abatement provisions are conflict preempted, those provisions are severable. Texas courts might allow prosecutions for § 51.02 violations but decline to enter orders of removal. In that case, an alien who crosses the border in violation of § 51.02 would be arrested, prosecuted, imprisoned for six months, and released. The alien's imprisonment would not affect his ability to pursue relief from removal because the alien could pursue that relief while he served his § 51.02 sentence. In fact, Texas has affirmatively represented that it will not interfere with an alien's effort to obtain such relief. *See* ROA.311–12 (explaining the Texas Department of Criminal Justice "will not interfere with confined and incarcerated aliens' ability to fully participate in federal immigration proceedings or state or federal court hearings").

Thus, the majority's conflict preemption argument could be right only if federal statutes somehow preclude Texas from temporarily imprisoning aliens while they pursue federal relief from removal. But that could not possibly be inconsistent with federal statutes because Congress has prescribed that aliens "shall" be detained while they pursue such relief. 8 U.S.C. § 1225(b)(1)(B)(iii)(IV). So the majority's conflict preemption argument is simply wrong.

3.

Because the district court enjoined S.B. 4 in full, Texas can show the injunction is overbroad (and must be vacated) simply by showing that § 51.02 is not preempted. S.B. 4's other provisions—including those governing removal—are irrelevant at this juncture.

No. 24-50149

But in any event, Texas is likely to succeed in challenging the district court's facial injunction against the statute's removal provisions. That is because (a) there are at least some instances in which S.B. 4's removal provisions could be constitutionally applied. And because (b) the lingering uncertainty with respect to those provisions invalidates the district court's facial, pre-enforcement injunction.

a.

There are at least some potentially constitutional applications of the removal provision that the district court never considered.

Take for example the common situation of an alien who is already subject to a final order of removal under federal immigration law and not in the custody of the federal government.[9] The Federal Government says that in FY2023 there were 6,199,629 aliens "released from agency custody" within the United States. U.S. Immigration and Customs Enforcement, *Fiscal Year 2023 ICE Annual Report*, 23 https://perma.cc/ZX24-GUEE. Roughly 20% off these "non-detained" aliens (1,292,830) had "completed the legal process and ha[d] been ordered removed." *Ibid.*

So what of the 1,292,830 aliens who have been ordered removed by the federal government after having fully "completed" their "legal process?" *Ibid.* If one of those aliens otherwise violates the provisions of S.B. 4, could Texas not constitutionally facilitate their removal?

Or consider the following hypothetical: A Mexican citizen unlawfully enters Texas in violation of Texas Penal Code § 51.02(a) and

---

[9] For reasons discussed in Part II.B.2.a, *supra*, Congress has not preempted the field of alien entry and removal.

8 U.S.C. § 1325(a). That individual is detained by federal immigration officials. The Department of Homeland Security serves the alien with a Notice to Appear and charges him with removability. *See* 8 U.S.C. § 1227. DHS does not detain the alien. *See id.* § 1226. The alien fails to appear, an immigration judge orders him removed, and the Federal Government enters a final order of removal *in absentia*. *See id.* § 1229a.[10] The Federal Government never removes the alien, notwithstanding the final order of removal. *Cf. Djie v. Garland*, 39 F.4th 280, 281 (5th Cir. 2022) (DHS failed to enforce final removal order for 20 years).

After the alien's removal order becomes final, he gets pulled over by Texas State Troopers for driving while intoxicated. While the alien is in custody for the DWI charge, the State discovers the final order of removal and the circumstances of the alien's entry into Texas, which violated both Texas Penal Code § 51.02(a) and 8 U.S.C. § 1325(a). With the benefit of able counsel, the alien tells state officials that he wants to satisfy his federal removal order *and* obviate state charges under S.B. 4 by voluntarily agreeing to return to Mexico. *See* 8 U.S.C. § 1231(b)(2)(A); Tex. Code Crim. Proc. art. 5B.002(c)(1) (agreed removal). Could the State remove the alien pursuant to S.B. 4? What if Texas told the Federal Government about its plans, and the Federal Government did not object? What if the Federal Government affirmatively approved? *See* 8 U.S.C. § 1357(g)(10)(B). What if the alien voluntarily waives any rights he might have to challenge the final

---

[10] Plaintiffs incorrectly contend that state removal proceedings conflict with § 1229a. That provision makes § 1229a proceedings the exclusive means for removing aliens *who have been admitted. See id.* § 1229a(3) ("[A] proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, *if the alien has been so admitted*, removed from the United States." (emphasis added)). S.B. 4 applies to aliens who have not been admitted to the United States, so § 1229a is irrelevant to the preemption analysis.

order of removal or to seek relief under the INA's asylum provision, the Convention Against Torture, &c.? It is not crazy to think that the Federal Government might approve of removing one or more of these aliens because, after all, DHS has already ordered this alien removed—just as it has with more than one million other aliens who are currently in the United States notwithstanding their final orders of removal. The district court did not even consider these questions.

b.

It is also unclear to me how S.B. 4's removal provisions would operate in practice. For example, the Federal Government argues that aliens could be removed under S.B. 4 in violation of their federal rights under the Convention Against Torture or the INA's statutory protections for asylees. But Texas assures us its state courts would interpret the statute to avoid any conflict with federal law:

> [T]o the extent SB4's text omits other defenses available under federal law, it does not preclude them. Texas "courts must determine whether federal law prevents enforcement of a conflicting state law," *In re Academy, Ltd.*, 625 S.W.3d 19, 35 n.19 (Tex. 2021)—and those courts will construe SB4 to be consistent with federal law to the extent possible. *See Stockton v. Offenbach*, 336 S.W.3d 610, 618 (Tex. 2011); *Lebo v. State*, 90 S.W.3d 324, 326 (Tex. Crim. App. 2002); *Toledo v. State*, 519 S.W.3d 273, 279 (Tex. App.–Houston [1st Dist.] 2017) ("We presume that the legislature intended to enact a statute that comports with the Texas and federal constitutions.") (citing Tex. Gov't Code § 311.021(1)). Aliens may raise federal preemption as a defense in Texas courts under SB4. *See Sabine Consol., Inc. v. State*, 806 S.W.2d 553, 554–55 (Tex. Crim. App. 1991). Indeed, facial and as-applied constitutional challenges are cognizable in Texas courts on pretrial habeas review. *Ex parte Perry*, 483 S.W.3d 884, 896 (Tex. Crim. App. 2016).

ROA.227. The district court was apparently confident that no Texas court could do that. ROA.533. But I do not see how the district court could be so sure. And more to the point, our federal system requires us to presume that state courts will in good faith at least try to honor federal law. *See* Hart, *supra*, at 1363–64; *Robb v. Connolly*, 111 U.S. 624, 637 (1884) (emphasizing "the principle that state courts have the solemn responsibility, *equally with the federal courts* to guard, enforce, and protect every right granted or secured by the constitution of the United States . . . ." (quotation omitted)). I am aware of no authority that authorizes a federal injunction based on the assumption that state courts will simply ignore federal law.

Additional questions abound. For example, at oral argument we discussed with counsel what would happen if Texas took an alien to the border for removal and the Federal Government choose to re-release him into Texas. We also discussed whether S.B. 4 applies to an alien who is arrested in Texas but who unlawfully entered the United States by crossing Mexico's border with Arizona. No one knows the answers to these questions, of course, because the law has never been enforced against anyone.

In the face of uncertainty over whether state law can accommodate federal rights, "abstention may be required 'in order to avoid unnecessary friction in federal-state relations, interference with important state functions, tentative decisions on questions of state law, and premature constitutional adjudication.'" *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 306 (1979) (quoting *Harman v. Forssenius*, 380 U.S. 528, 534 (1965)); *Railroad Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501 (1941) ("[T]he federal courts, exercising a wise discretion, restrain their authority because of scrupulous regard for the rightful independence of the state governments and the smooth working of the federal judiciary."); *see also Roy v. City of Monroe*,

950 F.3d 245, 252 (5th Cir. 2020).[11] We cannot simply assume the worst and enjoin the State's law on the assumption that the State's officials and courts will ignore federal law and the Supremacy Clause.

\*     \*     \*

Pre-enforcement facial challenges to state laws pose unique challenges to our federal system. That is because they "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *NetChoice, LLC v. Paxton*, 49 F.4th 439, 449 (5th Cir. 2022) (quoting *Washington State Grange*, 552 U.S. at 451). Thus, the burden to prevail on a facial challenge is rightly high. *See Salerno*, 481 U.S. at 745 ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully[.]"). In my view, Texas is likely to prevail in showing the district court's preemption holdings and facial relief are overbroad.

---

[11] That the United State is a party in this suit does not alter *Pullman*'s applicability. As the Supreme Court has explained:

> [T]he fact that the United States is not a party to the state court litigation does not mean that the federal court should initiate interpretation of a state statute. In fact, where questions of constitutionality are involved—and the Government contends that an application of the state statute adverse to its interests would be unconstitutional—our rule has been precisely the opposite: 'as questions of federal constitutional power have become more and more intertwined with preliminary doubts about local law, we have insisted that federal courts do not decide questions of constitutionality on the basis of preliminary guesses regarding local law.

*Leiter Mins., Inc. v. United States*, 352 U.S. 220, 228–29 (1957); *see also* FEDERAL PRACTICE AND PROCEDURE, *supra*, at § 4242 ("[A]bstention . . . may be ordered, in a *Pullman*-type situation, even in a suit brought by the United States.").

No. 24-50149

C.

Next, the "dormant" Commerce Clause. The Justice Department argues S.B. 4 violates that clause by criminalizing the illegal movement of aliens across Texas's border with Mexico. Yet again, this is a facial challenge to all of S.B. 4, so Texas need only demonstrate that some provisions of the bill comport with the dormant Commerce Clause. In my view, Texas is likely to prevail on the merits of this point. That is so for at least two reasons.

First, § 51.02 does not promote economic protectionism. As the Supreme Court has explained, "the dormant Commerce Clause's fundamental objective [is] preserving a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 299 (1997); *see Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369–70 (2023) (discussing cases). Section 51.02 is not about economic protectionism; it is about unlawful immigration. Moreover, § 51.02 does not even limit immigration into Texas; it only mirrors the federal restrictions on where aliens enter the State. So § 51.02 is not a discriminatory provision at all.

Second, to the extent that movement of persons across an international border is commerce, § 51.02 applies only to the movement-*cum*-commerce that Congress has affirmatively prohibited. *See* 8 U.S.C. § 1325(a). That means the same Federal Government that is trying to enjoin § 51.02 has banned the very "commerce" Texas purportedly banned. And there is no basis for concluding that the dormant Foreign Commerce Clause applies to commerce that violates federal law.

D.

The majority closes with two confounding claims. First, it contends this case is not based on hypotheticals because Texas assures us it stands

ready to "commence arrests, removals, and prosecutions upon the new laws taking effect." *Ante*, at 48. But whether Texas plans to enforce S.B. 4 is beside the point. The majority does not know—because it could not possibly know—whom Texas will arrest under S.B. 4, or what kind of federal law conflicts that prosecution might present, or how state courts might resolve those conflicts. All the majority knows is that the Federal Government has lots of power over immigration. But without answers to the questions posed above, it is unclear how the majority can say S.B. 4 has no constitutional applications. And the Texas Legislature has dictated that any constitutional application of any provision of S.B. 4 should be given effect. And if there is a single constitutional application of a single provision of S.B. 4, the people of Texas are entitled to it. The majority's readiness to invalidate S.B. 4—even before anyone can know how it would actually work or what actual cases or controversies it might present—is thus exceedingly troubling.

Second, the majority argues there is "no authority" for the proposition that state courts should be trusted to sort the constitutional applications of S.B. 4 from the potentially unconstitutional ones. *Ante*, at 48. But there is a veritable mountain of authority for that proposition. For example, the whole edifice of habeas procedural default doctrine rests on the notion that it would be "unseem[ly]" for federal district courts to invalidate convictions without giving state courts the first opportunity to cure constitutional defects. *Boerckel*, 526 U.S. at 845; *see ibid.* ("[T]he exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts . . . ."). Parties must generally exhaust legislative and administrative remedies afforded by state law before seeking judicial review in federal court. *Prentis v. Atlantic Coast Line*, 211 U.S. 210 (1908); *Porter v. Investors Syndicate*, 286 U.S. 461 (1932). And the Supreme Court has created abstention doctrines precisely for the purpose of allowing state courts to

interpret state law before federal courts enter the fray. *See supra*, at 53–55, 108–10 & n.11.

In fact, the majority gets things exactly backwards. The majority is evidently troubled by the idea that federal courts might sometimes have to wait for state courts to apply the federal Constitution. The Framers were more troubled by the idea that federal courts might overzealously interfere with state affairs. That is why the Framers' Constitution did not mandate the creation of inferior federal courts at all. *See* Michael G. Collins, *Article III Cases, State Court Duties, and the Madisonian Compromise*, 1995 WIS. L. REV. 39, 42 (1995). If federal courts need not exist, state courts must be constitutionally competent to apply federal law and to honor the Supremacy Clause. In fact, the Supremacy Clause itself contemplates this. *See* U.S. CONST. art. IV, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and *the Judges in every State shall be bound thereby*, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." (emphasis added)). The majority would deny Texas courts that opportunity, at least so far as S.B. 4 is concerned. That is hard to reconcile with our federalist system.

\*　　\*　　\*

In sum, to prevail on the merits, plaintiffs must demonstrate that every conceivable application of every provision of S.B. 4 is unlawful. That means to carry its burden on the first *Nken* factor, Texas must conceive of only one valid application of one provision of S.B. 4. At the very least, Texas has demonstrated a likelihood that § 51.02 has valid applications, so Texas has demonstrated a likelihood of success on the merits.

III.

Next, Texas must demonstrate that it is irreparably injured by the district court's preliminary injunction. *Nken*, 556 U.S. at 426. This showing is so straightforward that it does not merit much explanation.

"When a 'State is seeking to stay a preliminary injunction, it's generally enough to say' that '[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" *Vote.org v. Callanen*, 39 F.4th 297, 308 (5th Cir. 2022) (quoting *Valentine v. Collier*, 956 F.3d 797, 803 (5th Cir. 2020)); *see also Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers) (same); *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, (1977) (Rehnquist, J., in chambers) (same). The State incurs that injury because "[t]he district court's injunction prevents [it] from effectuating the Legislature's choice . . . ." *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 411 (5th Cir. 2020) (quoting *Valentine*, 956 F.3d at 803). Thus, the injunction alone satisfies the irreparable injury requirement.

The State's irreparable injuries are all the more serious where the enjoined statute concerns the State's resources, the protection of the State's citizens, or a core area of state interest. *Cf. Valentine*, 956 F.3d at 803 (discussing state interest in the administration of prisons); *Vote.org*, 39 F.4th at 308 (discussing state interest in preventing voter fraud). In this case, the district court enjoined a provision of Texas criminal law. Few state activities are "more intricately bound up with state laws, regulations, and procedures" than the enforcement of criminal law. *Valentine*, 956 F.3d at 803 (discussing prisons); *see also Juidice v. Vail*, 430 U.S. 327, 335 (1977) (implying that "the State's interest in the enforcement of its criminal laws" is among the most important state interests). So Texas has shown irreparable injury arising from the injunction.

IV.

Lastly, we must "assess[] the harm to the opposing party and weigh[] the public interest." *Nken*, 556 U.S. at 435. The Federal Government opposes the motion for stay, so these factors merge, and we simply consider whether the stay is in the public interest. *See id.* at 435–36. Here, the public interest weighs in favor of a stay. I first (A) explain why. Then I (B) explain why the Federal Government's counterarguments are unpersuasive.

A.

In my view, a stay would promote the public interest for three reasons.

First, it appears uncontroverted on the record before us that enforcement of S.B. 4 will decrease illegal border crossings and associated harms like drug and human trafficking. That decrease is obviously in the public interest, especially since the influx of illegal immigrants affects many more States than just Texas. *See, e.g.*, U.S. HOUSE HOMELAND SECURITY COMMITTEE, *"Every State is Now a Border State": House Homeland Security Committee Hears Testimony from Colleagues on Impacts of the Border Crisis* (Dec. 7, 2023), https://perma.cc/HTS5-BP7U.

Second, a stay would promote federalism by honoring the State Legislature's severability clause. *Cf. Freedom From Religion Found., Inc. v. Abbott*, 58 F.4th 824, 836 (5th Cir. 2023) (discussing the relevance of federalism concerns to the public interest analysis). As noted above, S.B. 4 contains an extraordinarily broad severability clause. That clause makes severable "every provision, section, subsection, sentence, clause, phrase, or word in th[e] Act," and also "every application of the provisions in th[e] Act to every person, group of persons, or circumstances." S.B. 4 § 8. The force of that clause is a state law question. *See Jane L.*, 518 U.S. at 138 ("Severability is of course a matter of state law."); *Dorchy v. Kansas*, 264 U.S. 286, 290 (1924) (same). And Texas law accords nearly dispositive

weight to a severability clause. *See, e.g.*, *Builder Recovery Servs., LLC v. Town of Westlake*, 650 S.W.3d 499, 507 (Tex. 2022).

The district court should have applied that clause, and the court's failure to do so undermines if not altogether invalidates its facial injunction. *See, e.g.*, *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 501 & n.14 (1985) (enforcing an application-severability requirement in a statute that contained an overbroad definition of prurience, and holding that "facial invalidation of the statute was . . . improvident"); *see also* HART & WECHSLER, *supra*, at 170 ("[T]he premise that statutes are typically 'separable' or 'severable,' and that invalid applications can somehow be severed from valid applications without invalidating the statute as a whole . . . is deeply rooted in American constitutional law.").

Yet the district court chose to ignore the severability clause with little explanation. *See* ROA.587 n.57. That cannot be squared with the limited powers afforded to federal judges by our Constitution. As Justice Alito has explained:

> Under the Supremacy Clause, federal courts may strike down state laws that violate the *Constitution* or conflict with federal statutes, Art. VI, cl. 2, but in exercising this power, federal courts must take great care. The power to invalidate a state law implicates sensitive federal-state relations. Federal courts have no authority to carpet-bomb state laws, knocking out provisions that are perfectly consistent with federal law, just because it would be too much bother to separate them from unconstitutional provisions.

*See Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 635 (2016) (Alito, J., dissenting); *see also NetChoice*, 49 F.4th at 449 ("The respect owed to a sovereign State thus demands that we look particularly askance at a litigant who wants unelected federal judges to countermand the State's democratically accountable policymakers."). Given that the district court

made no effort to narrowly tailor its interference with Texas state law, a stay would protect the public interest in federalism.

Third, a stay would promote the public interest by ensuing the district court's injunction comports with traditional equitable principles. Nationwide injunctions have received understandable criticism for many reasons, among them that they extend equitable relief to parties not before the court and empower one district judge to alter the legal status quo far outside the boundaries of his or her district or division. *See, e.g.*, *Trump v. Hawaii*, 138 S. Ct. 2392, 2424–29 (2018) (Thomas J., concurring); *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 599–601, (2020) (mem.) (Gorsuch, J., concurring); *Arizona v. Biden*, 31 F.4th 469, 483 (6th Cir. 2022) (Sutton, C.J., concurring) ("A valid Article III remedy 'operate[s] with respect to specific parties,' not with respect to a law 'in the abstract.'") (quoting *California v. Texas*, 141 S. Ct. 2104, 2115 (2021)); *see also* Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 457–82 (2017).

It is unclear to me how or why the district court's injunction in this case is meaningfully different. It applies far outside the Western District of Texas. And it extends relief to countless aliens—not a single one of whom is before the court. A stay would promote the public interest by limiting the universal effect of the district court's injunction.

## B.

In response, the Federal Government argues that enforcement of S.B. 4 through removal of non-Mexican nationals into Mexico will impede our Nation's diplomatic relationships with Mexico and other Central American nations. Of course, every judge must be sensitive to the Government's concerns about international affairs. *Cf. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 385 (2000).

But those concerns do not change the public interest for three reasons. First, any concern that Mexico might have about removals could be remedied by an injunction against S.B. 4's *removal* provisions. Those concerns do not justify enjoining the statute's *arrest* provisions, as the district court did. The State arrests aliens every day for violations of other, non-immigration-related provisions of the Texas Penal Code. And apparently none of those arrests trigger Mexico's objection.

Second, we have no reason to believe that Texas's state courts would be deaf to the Federal Government's international-affairs concerns. Like federal courts, state courts are bound to apply the federal Constitution. *See* U.S. CONST. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; *and the Judges in every State* shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." (emphasis added)). And Texas's state courts could hold S.B. 4's removal provisions are unconstitutional in as-applied challenges that implicate the Federal Government's foreign-affairs concerns.

Third, allowing S.B. 4 to take effect would not risk our obligations under the Convention Against Torture. *Contra ante*, at 46. That is because we could allow S.B. 4's *arrest* provisions to go into effect without allowing a single alien (let alone a CAT-protected alien) to be removed under the state law's removal provisions. Or Texas's courts could allow aliens arrested under S.B. 4 to vindicate their CAT claims, as the State has assured it us it would do. The majority's invocation of the CAT is just another manifestation of its refusal to believe that Texas courts are willing or capable of faithfully applying federal law.

No. 24-50149

In contrast, if we leave the district court's injunction in effect, Texas will have no other avenue to vindicate its interest in interpreting and applying its laws. That is because a facial, pre-enforcement injunction will keep S.B. 4 on ice forever. So a real S.B. 4 case will never arise, and Texas's sovereign interests will be forever defeated. Thus, the public interest factor weighs in favor of a stay.

*       *       *

Many people will be understandably frustrated by today's ruling. A high-profile state statute—duly enacted by the people's representatives to address a problem that Texans personally experience—likely will never go into effect. Why? Because a federal district judge enjoined the law in its entirety before anyone ever used it to do anything. And because today's majority opinion does not let state officials and state judges attempt to implement the state law passed by the state legislature and signed by the Texas Governor.

Given the stakes for federalism, federal courts doctrine, immigration, and the ongoing border "crisis,"[12] you might reasonably expect the majority opinion to rest on a rock-solid legal foundation. But sadly, it rests on the sands of implication and inference:

- DOJ has no statutory right to sue Texas. DOJ instead rests on a nonstatutory right to sue in equity, based on an 1895 case involving public nuisance and the U.S. mail. From that precedent, the majority infers that DOJ has a freestanding constitutional right to sue States whenever Justice officials think state law conflicts with federal law.

- The non-profit plaintiffs have no statutory right to sue Texas. The non-profits instead rest on a nonstatutory right to sue in equity, based

---

[12] President Biden's term. *See Statement from President Joe Biden*, *supra*, https://perma.cc/K9S8-TLZV.

on a 1908 case involving a railroad shareholder and the Attorney General of Minnesota. From that precedent, the majority infers that non-profits with no direct stake in this case and who can never be subjected to S.B. 4 nevertheless can sue the State to set aside the law.

- We have before us no plaintiff who ever has been injured by S.B. 4 in any way. Nor do we have before us any plaintiff who ever could be subjected to S.B. 4 in the future. *See* Re, *supra*, 102 Geo. L.J. at 1223–25. Nor do we have before us any defendant who ever did anything unconstitutional. That should be enough to vacate the preliminary injunction because it has been true since the Founding that a federal court cannot opine on legal questions in the absence of a concrete case or controversy. *See Correspondence of the Justices*, *in* Hart & Wechsler, *supra*, at 50–52. The majority nonetheless infers that if the law went into effect, someone would be injured by the law eventually—so we have power today to prevent those future cases from ever arising.

- The majority cannot point to any provision of the statutes passed by Congress that field preempts Texas's law. It instead infers congressional intent from the overall gestalt of the INA.

- The majority cannot point to anything in Supreme Court precedent that requires us to hold Texas is field preempted from passing immigration-related laws. It instead looks at Supreme Court cases like *Hines* and *Arizona*—both of which involved *registration* rules applicable to aliens who had been or could be *admitted* to the United States—and infers field preemption of a Texas law that says nothing about registration and that applies only to aliens who are *inadmissible*.

- Then the majority piles all of those inferences together to imply a federal judicial power to issue facial, pre-enforcement injunctions against a state statute that by its terms does not apply to the plaintiffs. No matter that no court may "lawfully enjoin the world at large" or enjoin "laws themselves." *Whole Women's Health*, 595 U.S. at 44.

Beyond these inferences, the majority opinion offers the State of Texas two bitter ironies. First, the majority does not dispute, nor could it,

that DHS has violated the INA's commands and abandoned large swaths of the purportedly occupied field. *See ante*, at 21–22. And that means the State is forever helpless: Texas can do nothing because Congress apparently did everything, yet federal non-enforcement means Congress's everything is nothing. And second, while the dispute before us is entirely hypothetical, the consequences of today's decision will be very real.

I respectfully dissent.

# *United States Court of Appeals*
## FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

March 26, 2024

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW:

        No. 24-50149   USA v. State of Texas
                        USDC No. 1:24-CV-8
                        USDC No. 1:23-CV-1537

Enclosed is the opinion entered in the case captioned above.

                        Sincerely,

                        LYLE W. CAYCE, Clerk

                        By: _____
                        Casey A. Sullivan, Deputy Clerk
                        504-310-7642

Ms. Munera Al-Fuhaid
Mr. Spencer Amdur
Mr. Anand Balakrishnan
Mr. Maxwell A. Baldi
Ms. Jo Anne Bernal
Mr. Brian Boynton
Mr. Matt A. Crapo
Mr. Bernardo Rafael Cruz
Mr. Philip Devlin
Ms. Susanna Dokupil
Mr. David A. Donatti
Ms. Heather Lee Dyer
Mr. Thomas Elliot Gaiser
Mr. Lee P. Gelernt
Ms. Tamara Goodlette
Mr. Daniel Hatoum
Ms. Amy Snow Hilton
Ms. Kateland R. Jackson
Mr. Omar C. Jadwat
Ms. Jean Lin
Mr. Joseph N. Mazzara
Mr. Aaron Lloyd Nielson
Ms. Sinead Mary O'Carroll
Mr. William Jeffrey Olson
Mr. Francisco Javier Ortega
Mr. Leif Eric Overvold
Ms. Adriana Cecilia Pinon
Mr. Jacob Przada

Mr. Samuel M. Shapiro
Mr. Kyle Tebo
Mr. Daniel Bentele Hahs Tenny
Mr. Erin D. Thorn
Mr. Ryan Daniel Walters
Mr. Coy Allen Westbrook
Mr. Cody Wofsy