# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 24, 2026

Lyle W. Cayce
Clerk

———————

No. 24-50149

———————

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

STATE OF TEXAS;
GREG ABBOTT, *in his official capacity as Governor of Texas*;
TEXAS DEPARTMENT OF PUBLIC SAFETY;
FREEMAN F. MARTIN, *in his official capacity as
Director of Texas Department of Public Safety*,

*Defendants—Appellants*,

—————————————————————

LAS AMERICAS IMMIGRANT ADVOCACY CENTER;
AMERICAN GATEWAYS; COUNTY OF EL PASO, TEXAS,

*Plaintiffs—Appellees*,

*versus*

FREEMAN F. MARTIN, *in his official capacity as
Director of the State of Texas Department of Public Safety*,

*Defendants—Appellants*.

_____

Appeal from the United States District Court
for the Western District of Texas
USDC Nos. 1:23-CV-1537, 1:24-CV-8

_____

Before Elrod, *Chief Judge*, and Jones, Smith, Stewart, Richman, Southwick, Haynes, Graves, Higginson, Willett, Ho, Duncan, Engelhardt, Oldham, Wilson, Douglas, and Ramirez, *Circuit Judges*.

Jerry E. Smith, *Circuit Judge*, joined by Elrod, *Chief Judge*, and Jones, Haynes, Willett, Ho, Duncan, Engelhardt, Oldham, and Wilson, *Circuit Judges*.

"Courts sometimes make standing law more complicated than it needs to be." *Bost v. Ill. State Bd. of Elections*, 146 S. Ct. 513, 523 (2026) (Roberts, C.J.) (citation omitted). "[P]laintiffs must have a 'personal stake' in a case to have standing to sue." *Id.* at 519 (citing *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024)). "Plaintiffs cannot 'manufacture standing by voluntarily' incurring costs." *Id.* at 522 (citation omitted).

That should be the end of this matter: These Plaintiffs voluntarily incurred costs to advocate for clients. Under recent Supreme Court precedent, that falls far short of conferring standing. We vacate the preliminary injunction to the contrary.

\* \* \* \* \*

This case concerns whether the State of Texas, exercising its historic, sovereign police powers, can legislatively protect its citizens from a surge of illegal aliens in response to an unprecedented border crisis and a declared invasion. The district court judge and a divided panel held that it cannot. Because the Plaintiffs that are challenging the new statute lack standing, we vacate the preliminary injunction without addressing the merits of the pre-emption claim.

No. 24-50149

## I. Facts

### A. The Backdrop

In 2023, Texas enacted Senate Bill 4 ("S.B. 4") in response to widespread illegal, disruptive immigration into the State. The jarring statistics of the human toll are as follows: More than 6 million illegal aliens, from over 100 countries, flooded Texas's international border during approximately 2021–2023.[1] In one year alone, about 2.5 million unlawfully crossed, well over 100,000 of whom were unaccompanied minors.[2] And in a three-year period, Border Patrol agents arrested over 15,000 illegal aliens with criminal convictions, apprehended roughly 2,000 gang members, and encountered, at the border, 336 persons on the terrorist watchlist.[3] There, violent transnational cartels became paramilitary forces, whose illicit conduct ranged from pumping "illegal drugs like fentanyl" into the United States to "trafficking humans," all to the tune of billions of dollars.[4]

—————————————————

[1] ROA.283 (noting that "more than 6 million illegal immigrants from more than 100 countries have crossed the U.S. southern border").

[2] ROA.283 ("CBP data reflects that unlawful crossings of the Southwest border in Fiscal Year 2023 reached a record high of 2,475,699, and that number does not include known or unknown 'gotaways.'"); ROA.284 ("That [DHHS] data reflects that the number of unaccompanied minors the department has cared for over the course of a year has skyrocketed from 15,381 in FY 2020 to 118,938 in FY 2023.").

[3] ROA.285 ("The data reflects that in FY 2023, Border Patrol agents arrested 15,267 illegal immigrants with criminal convictions in the United States, a record high."); ROA.285 ("Border Patrol reported that it apprehended 1,819 illegal immigrants with gang affiliations from FY 2021 to FY 2024."); ROA.285 ("In addition, Border Patrol has encountered 336 persons on the terrorist watchlist from FY 2021 to FY 2024 at the southern border.").

[4] *Texas v. DHS*, 123 F.4th 186, 193 (5th Cir. 2024); Miriam Jordan, *Smuggling Migrants at the Border Now a Billion-Dollar Business*, N.Y. Times (July 25, 2022), https://tinyurl.com/487kykkh; William P. Barr, *The U.S. Must Defeat Mexico's Drug Cartels*, Wall St. J. (Mar. 2, 2023), https://tinyurl.com/drxcdnmv.

No. 24-50149

### B. Texas Enacts S.B. 4

S.B. 4 amends the Texas Penal Code to include two state offenses that track federal immigration crimes prohibiting unlawful entry and reentry: 8 U.S.C. §§ 1325(a) and 1326(a). At issue are S.B. 4's three operative provisions.

The first offense criminalizes the entry of aliens into the United States if they cross into Texas other than at a lawful port of entry. Tex. Penal Code § 51.02(a). This language tracks federal law.[5] The statute includes affirmative defenses to prosecution,[6] all of which defer to federal determinations of admissibility.

The second offense prohibits an alien from "enter[ing], attempt[ing] to enter," or being "found in," the State after he "(1) has been denied admission to or excluded, deported, or removed from the United States; or (2) has departed from the United States while an order of exclusion, deportation, or removal is outstanding." Tex. Penal Code § 51.03(a). This language also tracks federal law.[7]

The third operative provision establishes the removal procedures for

---

[5] *See* 8 U.S.C. § 1325(a) (prohibiting "enter[ing] or attempt[ing] to enter the United States at any time or place other than as designated by immigration officers").

[6] The affirmative defenses include when (1)(A) the federal government has granted the defendant lawful presence in the United States; (1)(B) the federal government has granted the defendant asylum under 8 U.S.C. § 1158; (2) the defendant's conduct does not constitute a violation of 8 U.S.C. § 1325(a); and (3) the defendant "was approved for benefits under" the DACA program between certain dates. Tex. Penal Code § 51.02(c).

[7] *See* 8 U.S.C. § 1326(a) (prohibiting "enter[ing], attempt[ing] to enter, or [being] at any time found in, the United States" after an alien "has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding").

4

violations of Texas Penal Code §§ 51.02 and 51.03. If an alien charged with either of the two offenses agrees to an order to return, a judge may dismiss the charge and enter an order "requir[ing] the person to return to the foreign nation from which the person entered or attempted to enter." Tex. Code Crim. Proc. art. 5B.002.

The parties dispute how return orders will be enforced.[8] State officials have consistently represented that they will coordinate with federal immigration authorities if aliens have return orders or pending asylum applications.

## C. Plaintiffs Sue

Before S.B. 4 took effect, Las Americas Immigrant Advocacy Center and American Gateways (herein "Nonprofit Plaintiffs") and El Paso County sued, seeking (1) a declaration that S.B. 4 is unlawful in its entirety and (2) a pre-enforcement facial injunction prohibiting S.B. 4's application to anyone under any circumstances.[9] The Plaintiffs averred that S.B. 4 is preempted by the Immigration and Nationality Act. Nonprofit Plaintiffs are organizations that provide legal services to aliens and allege that S.B. 4's enforcement will

_____

[8] Plaintiffs allege that a return order requires state officials to ensure that the alien leaves the country. Texas contends that a return order does not itself remove anyone but merely requires that a state official transport the alien to a port of entry. *See* Tex. Code Crim. Proc. art. 5B002(e)(1)–(2). Because this case arrives as a pre-enforcement challenge, no state court has interpreted the removal (or any) provision. The pre-enforcement challenge comes at a cost: Since "[t]here is a basic uncertainty about what the law means and how it will be enforced . . . it would be inappropriate to assume [S.B. 4] will be construed in a way that creates conflict with federal law." *Arizona v. United States*, 567 U.S. 387, 415 (2012).

[9] The United States filed a separate suit. Though the cases were consolidated, the United States voluntarily dismissed its complaint without prejudice in March 2025, which was before the divided panel issued its decision. Its appeal is therefore moot, and we need not address its standing.

Case 1:24-cv-01049-DAE    Document 445    Filed 03/15/26    Page 6 of 159

No. 24-50149

"frustrate [their] mission[s]" and "require [them] to restructure [their] ser-vices," causing them "to divert resources away from those [they] currently serve[] in the community." El Paso County alleges that S.B. 4's enforcement will "dilut[e] the trust the El Paso Community has in its local government" and will cause it to incur costs, including building jail space and hiring addi-tional officers.

### D. Procedural History

The district court issued a preliminary injunction against S.B. 4's en-forcement and concluded that S.B. 4 is likely preempted by federal immi-gration law[10] and that the other preliminary injunction factors were satisfied. *United States v. Texas*, 719 F. Supp. 3d 640 (W.D. Tex. 2024). The court credited Plaintiffs' standing theories based on alleged frustration of the organizations' purposes, resource diversions, and increased expenditures. *Id.* at 655–61. Texas appealed, whereupon a divided administrative panel denied a stay pending appeal. *United States v. Texas*, 97 F.4th 268, 272 (5th Cir. 2024). A week later, the merits panel heard oral argument.

Before the merits panel had rendered its decision, the Supreme Court decided *FDA v. Alliance for Hippocratic Medicine ("Alliance")*, 602 U.S. 367 (2024), which narrowed organizational standing and rejected the diversion-of-resources theory upon which Nonprofit Plaintiffs and El Paso County had relied. The President, after taking office in January 2025, issued an executive order recognizing that "the current situation at the southern border qualifies as an invasion." Proclamation 10888 (Jan. 20, 2025). In March 2025, the United States dismissed its claims and withdrew from the suit.

In July 2025, the panel majority *à quo*, in a comprehensive and impres-

---

[10] Because we hold that there is no standing, it is unnecessary to explain or opine on preemption.

sive opinion, affirmed the preliminary injunction over JUDGE OLDHAM's compelling dissent. 144 F.4th 632 (5th Cir. 2025). Like the Plaintiffs, the majority placed heavy reliance on *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), concluding that it "strongly signals that Las Americas has demonstrated injury and has standing." 144 F.4th at 643. The court voted to rehear the case en banc, thus vacating the panel opinion. 150 F.4th 656 (5th Cir. 2025) (per curiam).

## I. Standing

The issue is whether Plaintiffs have standing to challenge S.B. 4 under *Alliance*. The answer is no. And the reason is evident: Plaintiffs have not suffered a cognizable Article III injury.

S.B. 4 is enforceable only against aliens illegally present in Texas, not against advocacy organizations or Texas counties. Because Plaintiffs challenge an alleged "unlawful regulation of someone else," standing is "substantially more difficult" to establish. *Alliance*, 602 U.S. at 382 (citation modified); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). Each of Plaintiffs' theories of standing is fatally flawed.

### A. Nonprofit Plaintiffs Do Not Have Organizational Standing

### 1. Voluntary Resource Diversion

Nonprofit Plaintiffs, which are organizations that provide legal services to aliens, claim that S.B. 4's enforcement will "frustrate [their] mission[s]" and "require [them] to restructure [their] services," causing them "to divert resources away from those [they] currently serve[ ] in the community," even if those injuries are "willingly incurred." The Court repudiated such theories in *Alliance*, rejecting the proposition that "standing exists when an organization diverts its resources in response to a defendant's actions." *Alliance*, 602 U.S. at 395; *see also id.* at 394 (noting that the argu-

ment that the government has "'impaired [organizations'] ability to provide services and achieve their organizational missions' . . . does not work to demonstrate standing").

Because an organization cannot "spend its way into standing" or "manufacture its own standing," Nonprofit Plaintiffs' claim that they spent money "countering the effects of S.B. 4 consistent with the organizations' missions" does not fare any better. *See id.* at 394–95 ("[T]hat theory would mean that all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies."). That Nonprofit Plaintiffs are ideologically opposed to S.B. 4 does not demonstrate standing either. *See id.* at 394 ("[A]n organization may not establish standing simply based on the 'intensity of the litigant's interest' or because of strong opposition to the government's conduct[.]" (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 486 (1982))). Nor because of "the fervor of [its] advocacy." *Valley Forge*, 454 U.S. at 486. These Plaintiffs cannot escape the fundamental precept that where there is no injury, there is no standing.

### 2. Performing Ordinary Legal Work

Nonprofit Plaintiffs' scheme to invent Article III standing based on their "core activities" of providing ordinary legal representation does not save the day. This makes intuitive sense for at least two reasons.

#### a.

At its base, standing here turns on the interplay between *Havens* and *Alliance*. Like the Plaintiffs, the panel majority rightly pointed to *Havens*, noting that *Havens* upheld the standing of an organization that brought suit "in its own right" to enjoin unlawful practices that "had frustrated the organization's counseling and referral services, with a consequent drain on

8

resources." 144 F.4th at 643. From that, the majority surmised that "[i]mplementation of S.B. 4 would cause a concrete injury to Las Americas's provision of legal services to immigrants." *Id.*

Enter *Alliance*, which the Supreme Court announced 42 years after *Havens* and a year before the instant panel opinion. The Nonprofit Plaintiffs claim that *Alliance* reinforces *Havens*; the State maintains that *Alliance*, while not explicitly overruling *Havens*, substantially narrowed its application, depriving these Plaintiffs of standing. The well-intentioned panel majority sided with the Plaintiffs, concluding that *Alliance* "reinforces, rather than undermines, our conclusion that Las Americas has likely established standing." *Id.* at 648. To its credit, however, the panel majority candidly acknowledged the strict limitation that the *Alliance* Court placed on *Havens*: "Although *Havens Realty* 'was an unusual case,' and the Supreme Court 'has been careful not to extend the *Havens* holding beyond its context,' it is not a dead letter, as *Alliance* . . . confirms." *Id.* at 651 (quoting *Alliance*, 602 U.S. at 396).

Dissenting on the panel, Judge OLDHAM carefully explained why, under its peculiar facts, there was standing in *Havens*: "In *Havens*, the defendant told falsehoods *to the plaintiff* [, which] thus suffered a real, concrete and particularized injury, caused by the defendant . . . ." *Id.* at 698. By way of contrast, "S.B. 4 says nothing about Las Americas or any of the services it wants to provide. That makes Las Americas a complete stranger to the statute and its enforcement." *Id.*

In urging a narrow view of *Havens* in the wake of *Alliance*, the State has the better of the debate. In *Alliance*, the Court unanimously rejected the notion that plaintiffs could "spend [their] way into standing." *Alliance*, 602 U.S. at 394. And this court long ago rejected the creative notion that a legal-advocacy organization has standing because of its mandate "to protect

9

and advocate the rights of . . . individuals," including "to provide [them] with legal representation." *Ass'n for Retarded Citizens of Dall. v. Dallas Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*, 19 F.3d 241, 244 (5th Cir. 1994).

The Nonprofit Plaintiffs ignore Article III's requirement that the "plaintiffs have a 'personal stake' in the alleged dispute." *Raines v. Byrd*, 521 U.S. 811, 819 (1997) (citation modified). In other words, Nonprofit Plaintiffs must be able sufficiently to answer the question: "What's it to you?" *Bost*, 146 S. Ct. at 519 (quoting Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983)). Because they have no particularized answer to that question, Nonprofit Plaintiffs have no standing.

b.

And second, *if* Nonprofit Plaintiffs were to have standing, any enterprising legal-advocacy organization could repackage a generalized grievance as an "injury" to its "core business activities" and manufacture Article III standing every time a new law or regulation goes into effect. As we quote above, this court has already rejected such imaginative theories of standing. *See Ass'n for Retarded Citizens*, 19 F.3d at 244 (rejecting the creative contention that a legal-advocacy organization has standing because of its mandate "to protect and advocate the rights of . . . individuals," including "to provide [them] with legal representation"). And for good reason— "If this were not so, then, for example, indigent defender organizations established pursuant to the Criminal Justice Act or any other self-styled advocacy group could assert standing to sue whenever it believed the rights of its targeted beneficiaries had been violated." *See id.* (noting that such a theory would allow "any sincere plaintiff [to] bootstrap standing by expending its resources" or to claim that "it believed the rights of its targeted beneficiaries had been

No. 24-50149

violated").

We say it again, to avoid any misunderstanding: A legal-services organization cannot have Article III standing merely because a new law or regulation requires it to understand the legal change, to adjust resources in response, or to increase the degree or scope of legal representation for its current or prospective clients who may be adversely affected.

### B. El Paso County Does Not Have Standing

El Paso County's standing theories fare no better. The County maintains that S.B. 4's enforcement will "dilut[e] the trust the El Paso Community has in its local government" and will cause it to incur costs, including building jail space and hiring officers. Its theories are wrong for multiple reasons.

For one, "eroding the public trust" is a non-cognizable reputational harm without a "close historical or common law analogue" to an injury recognized by this court or the Supreme Court. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021). El Paso County's alleged reputational harm is entirely subjective. After all, those opposed to the scourge of illegal immigration may believe that public trust is undermined to a greater extent by the unchecked influx of illegal aliens into the country compared to the faithful enforcement of the Texas Legislature's duly enacted law, S.B. 4. If El Paso County has standing based on this alleged reputational harm, any political subdivision could sue to challenge any state law, which flatly is not the case.[11]

Second, El Paso County chose to bring a pre-enforcement challenge,

---

[11] *See also Donelon v. La. Div. of Admin. Law ex rel. Wise*, 522 F.3d 564, 567 n.6 (5th Cir. 2008) (noting as a "general rule" that political subdivisions lack standing to sue a state except in limited circumstances recognized in this circuit); *see also, e.g.*, *Coleman v. Miller*, 307 U.S. 433, 441 (1939).

11

which comes at a cost—any assumption about how the law will be enforced is highly speculative. It is premature to assume that Texas will not reimburse the County for any *de minimis* budgetary impact of "hous[ing] and process-[ing]" illegal aliens detained under S.B. 4. It is conjectural to assume that illegal aliens convicted under S.B. 4 will be detained in El Paso (and not State) prisons for lengthy periods. It is suppositional to assume that illegal aliens convicted under S.B. 4 won't be punished with small fines in lieu of imprisonment. It is speculative to assume that robust S.B. 4 enforcement will not free up El Paso's facilities by removing illegal aliens and deterring additional border crossings. And there are many more reasons why El Paso County lacks standing.[12]

Like the Nonprofit Plaintiffs, El Paso County does not have standing for one plain and obvious reason—"no injury" means "no standing."

\*     \*     \*     \*     \*

Federal courts have a solemn responsibility to apply neutral principles, such as standing, to the cases that come before them and must resist the temptation to confer Article III standing any time an advocacy group or political subdivision challenges a law it passionately dislikes. When enterprising plaintiffs repackage a generalized grievance as an "injury," courts should rightly exercise caution. Otherwise, they risk being led astray by plaintiffs' artful articulations or backhanded bootstrapping. Instead, courts must enforce Article III's limits and dismiss cases for want of jurisdiction in the absence of standing.

The preliminary injunction is VACATED.

---

[12] *See United States v. Texas*, 144 F.4th at 702 n.6 (OLDHAM, J., dissenting) (citing the plethora of reasons and opining that "[p]erhaps recognizing the weakness of these theories, El Paso spares nary a word" from the panel majority).

No. 24-50149

JAMES C. HO, *Circuit Judge*, concurring:

I agree that Plaintiffs lack standing to challenge S.B. 4, and thus concur in vacating the preliminary injunction on that ground. The State of Texas also presses a broader theory of relief, based on its power to engage in war in response to an invasion. I agree with that theory as well, for the reasons that I previously noted in *United States v. Abbott*, 110 F.4th 700, 725 (5th Cir. 2024) (Ho, J., concurring in the judgment in part and dissenting in part). In sum, exercising the war power to defend against an invasion is a quintessential judgment for chief executives, not federal judges.

My dissenting colleagues don't just disagree on standing. They also reject the State's war power defense. I am compelled to respond accordingly.

## I.

The President, not the judiciary, determines the existence of an invasion. *See id.* at 726–30 (collecting authorities). That same logic applies to the States under Article I, section 10 of the Constitution. *See id.* at 725 (citing U.S. CONST. art. I, § 10, cl. 3).[1] And that should decide this appeal.

## A.

Nations have long weaponized migration to harm other nations. *See id.* at 734. Weaker countries can punch above their weight against stronger military forces by using unconventional tactics like forced migration to destabilize and disrupt their enemies. *See id.* (citing *United States v. Abbott*, 92 F.4th 570, 579 (5th Cir. 2024) (Ho, J., dissenting) (collecting sources)). *See also* Aaron R. Petty, *Migrants as a Weapons System*, 13 J. NAT'L SEC. L.

---

[1] *See also, e.g.*, John C. Yoo, *War and the Constitutional Text*, 69 U. CHI. L. REV. 1639, 1661, 1666–67 (2002) (comparing text of Article I, section 10 to Commander in Chief Clause of Article II, section 2); John Yoo & James C. Ho, *Commander in Chief, in* THE HERITAGE GUIDE TO THE CONSTITUTION 195–97 (1st ed. 2005) (same).

No. 24-50149

& Pol'y 113, 114 (2022) ("The weaponization of migration has a long and generally successful history of being employed by weaker powers to significant effect against stronger ones.").

These concerns date back to our Nation's Founding. *See*, *e.g.*, *Abbott*, 92 F.4th at 580 & n.4 (Ho, J., dissenting) (quoting James Madison). Alexander Hamilton, for example, warned that "incorporating a large number of foreigners" into the United States could "divide the community . . . by promoting in different classes different predilections in favor of particular foreign nations, and antipathies against others." *The Examination Number VIII* (Jan. 12, 1802), *in* 25 The Papers of Alexander Hamilton, *July 1800–April 1802*, 495–97 (Harold C. Syrett ed. 1977). Hamilton noted that "their force may be actually employed in assisting an invader." *Id.* And he concluded that "admit[ting] foreigners indiscriminately to the rights of citizens, the moment they put foot in our country . . . would be nothing less, than to admit the Grecian Horse into the Citadel of our Liberty and Sovereignty." *Id.*

There are numerous examples of nations using mass migration to harm other nations. *See*, *e.g.*, Kelly M. Greenhill, Weapons of Mass Migration: Forced Displacement, Coercion, and Foreign Policy 262 (2010) (noting that "instrumental exploitation" of migration "has a long and influential history that includes both war and peacetime use"); *id.* (documenting "at least fifty-six attempted cases of migration-driven coercion (or coercive engineered migration) between 1951 and 2006 alone—nearly three-quarters of which were at least partially successful in achieving their stated goals").

In 2015, for example, Russia "deliberately weaponize[d] migration from Syria in an attempt to overwhelm European structures and break European resolve." *Full Spectrum Security Challenges in Europe and Their*

14

*Effects on Deterrence and Defense Before the H. Comm. on the Armed Services*, 114th Cong. 4 (2016) (statement of General Philip M. Breedlove, Commander, U.S. European Command).

More recently, the Russo-Ukrainian war has provided "the largest and most dramatic case of weaponized migration." *Weaponized Mass Migration: A Security Risk to Europe and the United States, Before the Subcommittee on Europe of the H. Comm. on Foreign Affairs*, 119th Cong. 5 (2026) (statement of Matt Boyse, Senior Fellow, Hudson Institute). "Russian forces displaced over 6.5 million people, overwhelming EU energy and food resources and placing countries in a state of chaos." *Id.* at 2 (statement of Rear Admiral (Ret.) Mark Montgomery, Senior Director & Fellow, Foundation for Defense of Democracies).

In sum, "Russia employs migration not as a foreign policy instrument, but as a weapon of war." *Id.* "Weaponized migration can impact alliance readiness by forcing allies to divert military resources, stretch border infrastructure, and create sustained operational pressures along critical frontiers." *Id.* at 7.

These and other historical examples should "put the nail in the coffin of assertions that migrants and refugees do not represent a 'real' security issue." GREENHILL, WEAPONS OF MASS MIGRATION 261. There is broad consensus among national security scholars and experts that countries deliberately weaponize mass migration to harm other countries just as much as conventional arms. "[T]urning people into 'demographic bombs' has been an attractive and relatively successful instrument of cross-domain persuasion for those state and nonstate actors who are willing to employ it." Petty, *Migrants as a Weapons System*, at 130 (quoting Kelly M. Greenhill, *Asymmetric Advantage: Weaponizing People as Nonmilitary Instruments of Cross-Domain Coercion, in* CROSS-DOMAIN DETERRENCE: STRATEGY

IN AN ERA OF COMPLEXITY 261 (Jon R. Lindsay & Erik Gartzke eds., 2019)). Weaponized migration "may not necessarily be violent in the traditional sense," but it can nonetheless "inflict substantial and potentially irreversible consequences," making it "far closer to bombs and bullets than to electronic jamming or dropping leaflets." *Id.* at 134. *Cf.* Alan Dowty & Gil Loescher, *Refugee Flows as Grounds for International Action*, 21 INT'L SEC. 43, 50 (1996) ("When refugees are being used as a weapon, the target state is within its rights in invoking the right of self-defense.").

As the former Dean of Harvard Law School quipped over a quarter century ago: "the nature of war [itself] has changed; now the refugees *are* the war." GREENHILL, WEAPONS OF MASS MIGRATION 262 (quoting comments of Professor Martha Minow, Harvard Law School, conference on the 1999 Kosovo conflict, Brandeis University, Dec. 11, 2000).

**B.**

The use of migration as a weapon against other nations has only increased over time. *See, e.g.*, Kelly M. Greenhill, *Strategic Engineered Migration as a Weapon of War*, 39 SUFFOLK TRANSNAT'L L. REV. 615, 636 (2016) ("[E]vidence suggests both the attractiveness of this weapon and frequency of its use appear to be growing."); Petty, *Migrants as a Weapons System*, at 115 ("[T]he weaponization of migrants, i.e., the use of migrants as a weapon system, is likely to increase against the United States."); *Weaponized Mass Migration*, 119th Cong. 1 (statement of Rear Admiral (Ret.) Mark Montgomery) ("The effects of weaponized migration are only compounding."); *id.* at 3 (statement of Natalia Banulescu-Bogdan, Deputy Director, Migration Policy Institute) ("The reach of weaponization is also expanding.").

And the United States has become one of the most popular targets of these threats. *See, e.g.*, GREENHILL, WEAPONS OF MASS MIGRATION

16

63 ("[T]he United States appears to have been the single most popular target of migration-driven coercion between 1951 and 2006."). For example, "Russia's military operations in Libya . . . enabled it to generate migration flows towards Europe and even the United States (via Nicaragua) in what numerous analysts have described as a destabilizing tactic." *Weaponized Mass Migration*, 119th Cong. 4 (statement of Natalia Banulescu-Bogdan). The Nicaraguan government has facilitated charter flights to shuttle aliens from Asia, Europe, and Africa into the United States. *See* Gus Contreras, Justine Kenin & Mary Louise Kelly, *How Nicaragua is weaponizing immigration to the U.S.*, NPR (Jan. 4, 2024). Like Russia, Nicaragua's government acknowledged their inability to confront the United States using conventional military tactics, so they instead employed "armed migration as a way to attack." Megan Janetsky, *Nicaragua is 'weaponizing' US-bound migrants as Haitians pour in on charter flights, observers say*, AP (Oct. 24, 2023).

Similarly, "Mexico's interest in mass migration results from its hopes of reclaiming or reconquering . . . the territories it lost to us in the nineteenth century." Peter Schweizer, The Invisible Coup: How American Elites and Foreign Powers Use Immigration as a Weapon 199 (2026). The former President of the Mexican Senate, for example, recently declared that "Los Angeles is migrant land," and parts of America are "occupied territories," so Mexico should "once again demand the recovery of these territories." *Id.* at 12, 56. Other Mexican senior officials have similarly stated that "our mission is to organize militancy abroad." *Id.* at 44 (quoting a former member of the Mexican Chamber of Deputies). And Russia is actively encouraging Mexico in this regard. *See, e.g.*, *Weaponized Mass Migration*, 119th Cong. 4 (statement of Matt Boyse) ("[I]n 2023, former FSB Director and Security Council Secretary Nikolai Patrushev travelled to Cuba and Latin America and spoke approvingly of our southern neighbors regaining control of territory in the Southwestern United

17

States allegedly stolen from Mexico, describing the United States as 'a patchwork quilt that can easily come apart at the seams.'").

## C.

Not surprisingly, then, Presidential Administrations of both parties have recognized that weaponized migration presents a serious threat to the security of the United States. *See*, *e.g.*, Exec. Order No. 14159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443 (Jan. 20, 2025); Vice President JD Vance, *Remarks at the Munich Security Conference* (2025) ("[O]f all the pressing challenges that the nations represented here face, I believe there is nothing more urgent than mass migration."); Secretary of State Marco Rubio, *Remarks at the Munich Security Conference* (2026) ("Mass migration . . . isn't some fringe concern of little consequence. It was and continues to be a crisis which is transforming and destabilizing societies all across the West."); The White House, *Statement from President Joe Biden on the Bipartisan Senate Border Security Negotiations* (Jan. 26, 2024) (describing the "border crisis" and calling for robust government action to "shut down the border"); The White House, Report on the Impact of Climate Change on Migration (Oct. 2021) ("adversaries could incite or aid irregular migration to destabilize U.S. allies/partners"); Franco Ordoñez, *Authoritarians are Using Migrants as Weapons. The White House Frets It's on the Rise*, NPR (Dec. 13, 2021) ("The White House has become increasingly concerned about migration being used as a weapon."); *Authority to Use Military Force in Libya*, 35 Op. O.L.C. 20, 35 (2011) (President Obama justified military force in Libya due to concerns about "large refugee movements," noting that Libya's "illegitimate use of force was forcing many civilians to flee to neighboring countries, thereby destabilizing the peace and security of the region.") (cleaned up); *id.* (President Clinton "justified extensive airstrikes" in Yugoslavia due to "concerns about the threat to regional security" from "pushing refugees

across borders."); National Intelligence Council, Growing Global Migration and Its Implications for the United States 30 (Mar. 2001) ("The United States will remain vulnerable to explicit or implicit threats by foreign governments to use illegal and especially mass emigration as leverage in bilateral relations or to reduce political pressures arising from domestic policy failures."). And both Congress and a majority of the Nation's Governors have likewise recognized the threat. *See Abbott*, 92 F.4th at 578 (Ho, J., dissenting) (collecting authorities).

The judiciary, by contrast, has "no business deciding which national security threats are sufficiently serious to warrant a military response, and which are not." *Abbott*, 110 F.4th at 726 (Ho, J., concurring in the judgment in part and dissenting in part). "Supreme Court precedent and longstanding Executive Branch practice confirm that, when a President decides to use military force, that's a nonjusticiable political question not susceptible to judicial reversal." *Id. See also id.* at 726–30 (collecting authorities).

That principle readily applies here. Federal judges may not hamstring the Executive's evaluation and response to evolving threats just because they don't involve individuals in army fatigues. *See, e.g., id.* at 728 ("[N]umerous officials have concluded that military action was warranted in response to bands of Mexican criminals in the 19th century and terrorist attacks in the 20th and 21st centuries. Determining where the present illegal immigration crisis falls along this spectrum is not a legal question for judges, but a political determination for the other branches of government."); John C. Yoo & James C. Ho, *The Status of Terrorists*, 44 Va. J. Int'l L. 207, 211 (2003) ("President Bush has found that the [9/11 terrorist] attacks have placed the United States in a state of armed conflict. . . . [T]he President's finding settles the question whether the United States is at war," and "[t]he judiciary [is] bound by the President's determination.") (collecting cases).

If anything, the fact that threats to national security are increasingly "undertaken in non-traditional domains . . . where the strength of the rules-based order is less fully developed" only further underscores that these questions belong outside the judiciary. Petty, *Migrants as a Weapons System*, at 118. "[I]t may be difficult to meaningfully distinguish where the conduct in these domains becomes 'militarized' and how to distinguish such uses from the use of non-military elements of national power in, for example, the diplomatic or economic domains." *Id. See also*, *e.g.*, *Weaponized Mass Migration*, 119th Cong. 3 (statement of Natalia Banulescu-Bogdan) ("Recent incidents of weaponization may also involve non-state actors too (such as smugglers, militias, or criminal gangs), adding to the complexity of forging an effective response.").

It is precisely these kinds of threats that motivated the State of Texas to enact S.B. 4 in 2023. According to the Governor's Special Advisor on Border Matters, "[t]he alarming influx of immigrants with criminal convictions and suspected terrorists along the southern border presents a grave security risk. . . . As a result of the spike in illegal migration, and accompanying crime, counties along the southern border have been under a continuous state of disaster since May 31, 2021." Declaration of Michael Banks, Special Advisor on Border Matters to the Governor of Texas.

In the three years preceding the passage of S.B. 4, "more than 6 million illegal immigrants from more than 100 countries . . . crossed the U.S. southern border." *Id.* In Fiscal Year 2023, "unlawful crossings of the Southwest border . . . reached a record high of 2,475,699, and that number does not include known or unknown 'gotaways.'" *Id.* Border Patrol agents also "arrested 15,267 illegal immigrants with criminal convictions in the United States, [likewise] a record high." *Id.*

Moreover, these unlawful crossings include hundreds of individuals on the terrorist watchlist. *See id.* ("Border Patrol has encountered 336 persons on the terrorist watchlist from FY 2021 to FY 2024 at the southern border. This is up from 15 of such individuals encountered from FY 2017 to 2020."). And Border Patrol apprehended nearly 2,000 gang affiliates in this period. *See id.*

## II.

My dissenting colleagues don't challenge these points. Instead, they counter that it doesn't matter that the State of Texas wishes to treat illegal immigration as an invasion under Article I, section 10 of the Constitution, because federal statutes supersede federal constitutional rights. *See post*, at 136 (Richman, J., dissenting) ("[F]ederal statutes addressing matters such as alien entry and removal are still supreme even when the State War Clause has been triggered."); *post*, at 149 (Higginson, J., dissenting) (same).

But "federal statutes ordinarily must give way to federal constitutional rights." *Abbott*, 110 F.4th at 737 (Ho, J., concurring in the judgment in part and dissenting in part). No one in *Abbott* offered a "principled reason why Congress may enact statutes that violate rights under Article I, but not under the First Amendment." *Id.* Nor does anyone here.

For their part, the dissenters invoke *Torres v. Tex. Dep't of Pub. Safety*, 597 U.S. 580 (2022). *See post*, at 136 & n.487 (Richman, J., dissenting). But tellingly, they didn't invoke *Torres* in *Abbott* (even though *Torres* was briefed there, too). No one in *Abbott* claimed that *Torres* somehow precludes Texas from treating illegal immigration as an invasion. And for good reason. *Torres* is about a *federal* law protecting federal soldiers. It says nothing about a *state's* efforts to protect its sovereign interests. Indeed, there was no state law at issue in *Torres* at all—let alone one invoking the state's war power. And

*Torres* itself fully acknowledges that states may indeed engage in war in case of invasion. *See* 597 U.S. at 590.

The dissenters also claim that there was no discussion of the state war power during the ratification process. *See post*, at 136 (Richman, J., dissenting).

But in *Abbott*, I observed that the Virginia ratification debates constitute "the most authoritative historical source for interpreting the war power." 110 F.4th at 731–32 (quoting Yoo, *War and the Constitutional Text*, at 1660). James Madison observed that states may engage in war in case of invasion under Article I, section 10, and that when states find themselves "in such danger, they are not restrained." *Id.* at 731 (quoting 3 Debates in the Several State Conventions on the Adoption of the Federal Constitution 425 (Jonathan Elliot ed., 1836)). John Marshall thought it "unquestionable" that "the state governments can call forth the militia . . . in the same manner as they could have done before" the Constitution. *Id.* at 732 (quoting Elliot at 419). He repudiated any suggestion that "the states cannot defend themselves without an application to Congress." *Id.* As he put it: "Does not every man feel a refutation of the argument in his own breast?" *Id.* "When invaded, they can engage in war, as also when in imminent danger. *This clearly proves that the states can use the militia when they find it necessary.*" *Id.* (quoting Elliot at 419–20) (emphasis added).

Finally, my colleagues conclude that the war power doesn't include measures like S.B. 4 in any event. *See post*, at 149 (Higginson, J., dissenting) ("'[T]he State War Clause provides authority to do a particular thing: namely, to *make war*,' not to enact a state immigration scheme.").

No. 24-50149

But "[t]he power to wage war is the power to wage war successfully." *Lichter v. United States*, 334 U.S. 742, 780 (1948) (quoting Charles E. Hughes, *War Powers Under the Constitution*, 42 A.B.A. Rep. 232, 238 (1917)).

And "detention . . . is a fundamental incident of waging war." *Hamdi v. Rumsfeld*, 542 U.S. 507, 519 (2004) (plurality opinion of O'Connor, J.). *See also id.* at 518 (same); *id.* at 586–87 (Thomas, J., dissenting) (same); *Moyer v. Peabody*, 212 U.S. 78, 84–85 (1909) (recognizing the power of "seizing the bodies of those whom [the Governor] considers to stand in the way of restoring peace," "not necessarily for punishment, but . . . by way of precaution, to prevent the exercise of hostile power"); *United States v. Salerno*, 481 U.S. 739, 748 (1987) (citing *Ludecke v. Watkins*, 335 U.S. 160 (1948)) ("[I]n times of war or insurrection, when society's interest is at its peak, the Government may detain individuals whom the Government believes to be dangerous."); William Whiting, War Powers Under the Constitution of the United States 191 (10th ed. 1864) ("[T]he military commander has the power, in time of war, to arrest and detain all persons who, being at large he has reasonable cause to believe will impede or endanger the military operations of the country.").

So it's hard to understand how S.B. 4 could possibly be beyond the scope of the war power. After all, "any policy toward aliens is vitally and intricately interwoven with . . . the war power." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952). Indeed, "[w]ar . . . is the most usual occasion for extensive resort to the power" to "terminate [the Government's] hospitality" toward aliens. *Id.* at 587. *See also*, *e.g.*, James Kent, 1 Commentaries on American Law 53 (1826) ("When hostilities have commenced, the first objects that naturally present themselves for detention and capture, are the persons and property of the enemy, found within the territory at the breaking out of the war. According to strict authority, a state has a right to deal as an enemy with persons and property

23

so found within its power, and to confiscate the property and detain the persons as prisoners of war."). And "[s]uch matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades*, 342 U.S. at 589.

\* \* \*

War is the continuation of politics by other means. *See*, *e.g.*, *de Sanchez v. Banco Central De Nicaragua*, 770 F.2d 1385, 1386 (5th Cir. 1985) (quoting Carl von Clausewitz). Our Founders thus naturally vested the war power in elected officials, not federal judges. The judiciary decides matters of law, not war. So if our constitutional separation of powers means anything, it means that the judicial branch must defer to the executive when it comes to the exercise of the war power.

Just as citizens may disagree over the propriety of treating terrorism as an act of war, rather than as a crime, citizens may disagree over the proper response to the illegal immigration crisis. *See*, *e.g.*, Yoo & Ho, *The Status of Terrorists*, at 208. But if our adversaries are going to weaponize mass migration to harm America as well as other countries, our elected officials are entitled to respond accordingly. And in any event, these are political matters for which elected officials are held accountable by voters, not judges. *See*, *e.g.*, *id*. at 211–12.

Moreover, these principles don't just govern this case, or future plaintiffs who may have standing to challenge S.B. 4. They may also have profound consequences in other contexts that turn on the existence of an invasion. So my disagreement with the dissenters isn't just relevant today—it may be relevant in a number of future cases to come.[2]

_____

[2] For example, the existence of an invasion authorizes detention and removal under the Alien Enemies Act. *See*, *e.g.*, Amicus Curiae Brief of South Carolina and 24 Other

_____

States in Support of Respondents-Appellees, at 20, in *W.M.M. v. Trump*, No. 25-10534 (5th Cir. June 17, 2025) (invoking my solo opinion in *Abbott*); Response to Motion for Temporary Restraining Order in *Y.A.P.A. v. Trump*, at 12, No. 4:25-cv-144-CDL-CHW (M.D. Ga. May 14, 2025) (same). It also has obvious implications for the Fourteenth Amendment. *See*, *e.g.*, Ted Cruz, *North Is Still North*, 30 Tex. Rev. L. & Pol. 1, 16–17 & n.84 (2026) ("solo opinion in *Abbott* firmly supports [Executive Order 14160]," because "birthright citizenship indisputably does not apply in cases of war or invasion") (citing Josh Blackman, *Four Questions and Few Answers About the Invasion Clause*, Civitas (Feb. 13, 2025); Amicus Curiae Brief of U.S. Senator Ted Cruz, Representative Jim Jordan, and Other Members of Congress in Support of Petitioners, at 21 & n.9, in *Trump v. Barbara*, No. 25-365 (Jan. 28, 2026); and Amicus Curiae Brief of Tennessee, Iowa, 23 Other States, and Guam in Support of Petitioners, at 29-30, in *Trump v. Barbara*, No. 25-365 (Jan. 27, 2026)); Amicus Curiae Brief of Iowa and 19 Other States in Support of Applicants, at 14, in *Trump v. CASA, Inc.*, No. 24A884 (Mar. 28, 2025) (same); Daniel Whitehead, *Securitization: A Solution to the Migration Crisis in the United States*, New Digest (Nov. 28, 2024) (same).

No. 24-50149

ANDREW S. OLDHAM, *Circuit Judge*, joined by ELROD, *Chief Judge*, and JONES, WILLETT, HO, DUNCAN, and ENGELHARDT, *Circuit Judges*, concurring[*]:

I concur in the majority opinion. These plaintiffs have not come close to establishing standing.

In reaching a contrary conclusion, my dissenting colleagues address a host of other justiciability and merits issues. I will not delay the issuance of today's decision to respond to all the assertions in the dissents, which span more than 100 pages. I have already responded to much of them in previous phases of this long-running dispute. *United States v. Texas*, 97 F.4th 268 (5th Cir. 2024) (OLDHAM, J., dissenting) (stay); *United States v. Texas*, 144 F.4th 632 (5th Cir. 2025) (OLDHAM, J., dissenting) (merits).

Instead, this opinion is limited to one merits issue: whether Texas Penal Code § 51.02 is conflict-preempted. Section 51.02 is the arrest provision in Texas's S.B. 4, and it is the particular focus of today's dissents. Those dissents overlook three problems, however: (I) the burden required to mount a facial conflict-preemption challenge, (II) plaintiffs' failure to meet that burden as to Texas Penal Code § 51.02, and (III) the many ways *Arizona* is not to the contrary.

## I

Plaintiffs brought a facial challenge to Texas's S.B. 4. "[T]hat decision comes at a cost." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). Facial challenges are, "of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of

---

[*] CHIEF JUDGE ELROD joins in all but footnote 5.

circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also Bondi v. VanDerStok*, 604 U.S. 458, 466–67 (2025) (rejecting facial challenge against regulation of weapon parts kits because statute covered "at least some" kits). Attempting to show that the challenged law can never be validly applied creates a host of conceptual and legal difficulties. *See Moody*, 603 U.S. at 752–66 (Thomas, J., concurring in the judgment). As a result, facial challenges are "disfavored" and "hard to win." *Id.* at 723, 744 (majority opinion). The court cannot "focus[] on hypothetical scenarios where [the challenged law] might raise constitutional concerns." *United States v. Rahimi*, 602 U.S. 680, 701 (2024). Were we to do so, we'd be left "slaying a straw man." *Ibid.* Instead, we must conclude that "no set of circumstances exists under which the [law] would be valid." *Moody*, 603 U.S. at 723 (quotation omitted). Because these plaintiffs chose to bring a facial challenge, the no-set-of-circumstances burden "is the price of [their] decision." *Id.* at 744. A steep price indeed.

## II

Here, plaintiffs cannot meet *Salerno*'s no-set-of-circumstances test. It is easy to imagine an application of S.B. 4 that is not conflict preempted. Take for example the most common, heartland application of the state law. I suppose it's a hypothetical because the federal courts have not allowed the state law to take effect for even one day. But it's an easy hypothetical to posit—because during the previous presidential administration, the underlying facts happened virtually every day. And in this hypothetical, not only is the application of S.B. 4 consistent with federal law, but S.B. 4 actively *facilitates* federal law.

Imagine a Texas rancher who owns 10,000 acres abutting the United States-Mexico border. The ranch is situated just north of Eagle Pass—the town that became ground zero for illegal border crossings between 2021 and 2024. The ranch owner is frustrated because illegal aliens are crossing from

Mexico, cutting his fences, and leaving tents, backpacks, and drug paraphernalia scattered across his property. Angry that the migrants are letting his cattle escape and making his ranch look like downtown Austin, the rancher calls the Maverick County Sheriff's Office and complains. The Sheriff sends his deputies, who spot a group of migrants cutting the rancher's fence, crossing the Rio Grande, and scrambling up its banks. The deputies arrest the migrants.

Now, the dissent is correct that, according to the Supreme Court, our "assessment of a facial challenge is limited to a law's applications that are not already legitimately authorized by other laws." *Post*, at 95 (Richman, J., dissenting) (citing *City of Los Angeles v. Patel*, 576 U.S. 409, 418 (2015)). So, in my hypothetical, consider (1) what happens under S.B. 4 and (2) what happens in the absence of S.B. 4.

*First*, suppose the Texas officers arrest the migrants under S.B. 4. *See* Tex. Penal Code § 51.02(a) (authorizing this). The aliens are arrested and brought before a magistrate within 48 hours. *See* Tex. Crim. Proc. Code art. 15.17. At magistration, the state judge learns the migrants are from Nicaragua and fear returning to that country because they'll be tortured. The aliens agree to return to Mexico, where they had been living before they cut the rancher's fence. So in lieu of additional criminal process, the magistrate orders the aliens to return to Mexico and orders state officers to transport them to a port of entry. *See id.* art. 5B.002(a), (c); Texas En Banc Br. at 6 ("[T]he State has consistently represented that it will transport aliens to a port of entry and deliver them to federal officials." (citing ROA.315–16)). When the sheriff's office turns the group over to federal authorities, CBP processes the aliens in accordance with federal immigration law and the

Case 1:24-cv-00408-DAE    Document 445-2    Filed 05/15/25    Page 32 of 159

No. 24-50149

Convention Against Torture.[1] None of this is authorized by any other provision of state law. *See Patel*, 576 U.S. at 418.

*Second*, consider what happens without S.B. 4. Texas officials still arrest the migrants pursuant to the State's criminal trespass law. *See* TEX. PENAL CODE § 30.05(a). The State officers then take the migrants to a state facility and deposit them into the state criminal justice system. Because violations of § 30.05(a) are generally a Class B misdemeanor, *see id.* § 30.05(d), the state judge arraigns the migrants and denies them bail because they are a proven flight risk—after all, they've already demonstrated their willingness to abscond. And because *Younger* abstention bars federal courts from interfering in ongoing state judicial proceedings, the migrants cannot turn to federal court for injunctive relief. *Gates v. Strain*, 885 F.3d 874, 880 (5th Cir. 2018). As a result, the aliens are stuck in the state system for months if not years.

Now, which outcome is more consistent with federal immigration law? The application of S.B. 4, in which the migrants end up in federal custody and are processed consistent with federal law? Or the application of § 30.05(a), in which the migrants end up in state jail for criminal trespass? And if it is okay to jail or imprison aliens for a host of state law crimes, *see post*, at 91 (RICHMAN, J., dissenting) (conceding that), why is it not okay to deliver the same aliens to federal authorities in lieu of state prosecution? To ask these questions is to answer them. And the fact that this obvious application of S.B. 4 is consistent with—and even promotes—the objectives

---

[1] The alien who faces torture in Nicaragua may be deported to Mexico because migrants who assert a claim under the Convention Against Torture "still may be removed to other countries." *Nasrallah v. Barr*, 590 U.S. 573, 575 (2020).

of federal law means the former cannot possibly conflict with the latter. *Moody*, 603 U.S. at 723.[2]

## III

The Supreme Court's decision in *Arizona* is not to the contrary.

In that case, the most salient provision of state law was Arizona's § 6. That provision authorized a state officer "without a warrant, [to] arrest a person if the officer has probable cause to believe . . . [the person] has committed any public offense that makes [him] removable from the United States." *Arizona v. United States*, 567 U.S. 387, 407 (2012) (quotation omitted). The Court emphasized three conflicts between § 6 and federal law. First, § 6 authorized state officers to make warrantless arrests—in conflict with federal law, which specifies when warrants can be issued to arrest aliens during removal proceedings. *See id.* at 407–08 (citing 8 C.F.R. § 241.2(a)(1)). Second, § 6 authorized state officers to make unilateral decisions when they had probable cause that an alien committed a "public offense." *Id.* at 408. The concept of a "public offense" has no analogue in federal law—so it "could be exercised without any input from the Federal Government about

---

[2] The dissenters' principal response is to decry this example as fantastical. *Post*, at 51–53, 89–90 (RICHMAN, J., dissenting). Rhetoric aside, the dissenters are correct—no one knows how Texas would enforce S.B. 4. And that is entirely the fault of the federal courts, which have universally enjoined every potential application of the State's law before it could go into effect. But we do know two things. First, Texas has insisted—in its briefs and in its oral arguments before our court—that its courts and its officers will promote federal immigration prerogatives by delivering arrested aliens to federal immigration authorities. And second, "our federal system requires us to presume that state courts will in good faith at least try to honor federal law." *Texas*, 97 F.4th at 331 (OLDHAM, J., dissenting) (citing, *inter alia*, *Robb v. Connolly*, 111 U.S. 624, 637 (1884)). So in a facial pre-enforcement challenge—where *everything* is hypothetical—which is more fantastical: presuming that Texas will honor federal law or presuming that Texas will intentionally violate the Convention Against Torture? *See post*, at 46, 138–39 (RICHMAN, J., dissenting) (asserting the latter).

whether an arrest is warranted in a particular case. This would allow the State to achieve its own immigration policy." *Ibid.*; *see also id.* at 410 (finding that Arizona's law would facilitate "the unilateral decision of state officers to arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government."). And third, § 6 turned on "removability"—which is a term of art in federal immigration law. The INA has numerous provisions that allow the Attorney General to adjust the status of otherwise removable aliens. *See, e.g.*, 8 U.S.C. §§ 1158(b) (asylum), 1159(b) (adjustment of status), 1182 (inadmissibility), and 1227(a) (removal). So by allowing state officials to arrest aliens who the Attorney General could authorize to stay in the United States, § 6 authorized "unnecessary harassment of some aliens (for instance, a veteran, college student, or someone assisting with a criminal investigation) who federal officials determine should not be removed." *Arizona*, 567 U.S. at 408. These three features—(1) warrantless arrests, (2) unilateral decisions, and (3) state determinations of removability—created intolerable conflicts between Arizona law and the INA.

Texas's S.B. 4 has none of these features. It says nothing about warrantless arrests. It does not authorize state officials to make unilateral decisions with vague terms like "public offense" that could be interpreted to create state immigration policy, to conduct immigration raids at workplaces or homes, or to otherwise "harass[]" lawfully present aliens. *Ibid.* To the contrary, Texas law expressly incorporates *federal* immigration policy. *See, e.g.*, TEX. PENAL CODE § 51.02(c) (providing affirmative defenses to prosecution based on federal law). And S.B. 4 is not keyed to removability; rather, it is keyed to illegal entry into Texas outside ports of entry—by, for example, cutting the border fence at Eagle Pass. *Compare id.* § 51.02(a), *with* 8 U.S.C. § 1325 (prohibiting the same thing).

Case: 24-50149    Document: 445-2    Page: 32    Date Filed: 05/15/2025

No. 24-50149

True, *Arizona* never mentioned the *Salerno* no-set-of-circumstances requirement. The real rub in this case is what to make of that silence. In my view, *Salerno* should nonetheless apply for two reasons. First, the Supreme Court has repeatedly reversed this court for not applying it. *See* Part I, *supra*. And second, *Arizona* itself cautioned that facial pre-enforcement challenges create "a basic uncertainty about what the law means and how it will be enforced." 567 U.S. at 415. It is thus difficult if not impossible to say that all applications of the State's law are preempted when all those applications are, by definition, hypothetical. *See ibid.* (relying on this problem to hold provision of Arizona law *not* preempted).

Today's dissenters, by contrast, think we should create our own "inverse *Salerno* doctrine": We should "look[] for one possible unconstitutional application here, and another there, and then conclude[] that S.B. 4 is facially preempted." *Texas*, 144 F.4th at 726 (OLDHAM, J., dissenting). Here's how the dissents' inverse *Salerno* doctrine works, step-by-step:

1. Imagine the most aggressive, furthermost, outer-bound potential applications of the state law—ones that no one actually contemplates, ones that are independently illegal, and ones that presume bad faith on behalf of State actors. For example, the principal dissent asserts that state officials *want* and are *actively planning* to remove aliens in violation of federal law. *See post*, at 46 (RICHMAN, J., dissenting).

2. Ignore the State's repeated and adamant assurances to the contrary. *See, e.g.*, Texas En Banc Br. at 6 (citing ROA.315–16).

3. Adjudicate the case in a facial, pre-enforcement posture so there is no way to know how the State will *actually* enforce its law. And insist that this uncertainty—created solely by the plaintiffs' litigation choices—allows federal courts to presume

the worst and most illegal motivations on behalf of the State defendants.

4. Find that one potential application of state law could conflict with federal law.

5. Facially enjoin the entirety of state law before any of it goes into effect; deprive the State of its obviously constitutional applications of state law; and find a "conflict" where state law is consistent with and actively promotes federal law. *Post*, at 120–35 (RICHMAN, J., dissenting) (doing that).

The Supreme Court has never embraced this. And the Supreme Court has expressly rejected it in *Salerno* itself—as well as in *Moody*, *VanDerStok*, and *Rahimi* (among others).[3] And the entirety of preemption doctrine supports it. As the Supreme Court has emphasized, *all* preemption cases must be guided by the "two cornerstones of our pre-emption jurisprudence. First, 'the purpose of Congress is the ultimate touchstone in every pre-emption case.'" *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quotation omitted). And the second is the presumption against preemption: "[W]e start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Ibid.* (quotation omitted). How can it be Congress's purpose to preempt state laws that are consistent with and promote federal law? And how can the presumption against preemption survive if the dissenters are correct that we should preempt the entirety of Texas law—including applications of it that are obviously lawful—based on

---

[3] While the dissent collects citations from our sister circuits expressing "uncertainty" about whether *Salerno* applies in the preemption context, those citations uniformly predate the Court's recent reiterations of *Salerno* in *Moody*, *Rahimi*, and *VanDerStok*. *Post*, at 87 & n.258 (RICHMAN, J., dissenting).

No. 24-50149

hypothetical fears and based on hypothetical future applications of that law that the State actively disclaims?[4]

The dissenters' position does not improve even if we adopt the premise that no Supreme Court decision involving preemption has ever applied *Salerno*. *Post*, at 86–88 (RICHMAN, J., dissenting). In the typical preemption case, the State has already applied its law to a particular set of facts—say, finding a medical-device manufacturer liable for a plaintiff's injuries under New York tort law. *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 320 (2008). The court then compares that state-law application with the potentially conflicting federal statute—there, the Medical Device Amendments of 1976. *Id.* at 316. Say the Court then finds that application of New York tort law preempted. *Id.* at 330. The remedy is not to preemptively and facially invalidate *all* of New York tort law. The remedy is to let the State apply its law and hold the conflicting application or provision of the state law preempted. That is exactly what the Court has done time and again in preemption cases. *Cf. Arizona*, 567 U.S. at 416 (finding only three provisions of Arizona's S.B. 1070 preempted).

―――――――――――――――――

[4] As noted at the outset, this opinion is limited to conflict preemption. I've already addressed field preemption at length. *See Texas*, 144 F.4th at 721–24 (OLDHAM, J., dissenting). And it suffices for present purposes to say that the Supreme Court has applied field preemption to only one immigration field: the field of alien registration. And no one—not even the dissenters—says that S.B. 4 regulates in that field. And no one—not even the dissenters—can point to a single case finding field preemption where Congress has *affirmatively authorized* the States to participate. *See id.* at 722–23 (OLDHAM, J., dissenting) (collecting various provisions of federal law). Yet the dissenters also claim that any and all "unilateral" actions by any State anywhere in the field of immigration are somehow preempted. *See post*, at 51–52, 91–93 (RICHMAN, J., dissenting). Were that true, (1) the *Arizona* opinion would have been much shorter, and (2) the entirety of that State's law would have been preempted. *But see Arizona*, 567 U.S. at 411–15 (holding *not* preempted a state-law provision that authorized unilaterally detaining aliens while checking their immigration status); *id.* at 416 (holding only three provisions of Arizona law preempted).

No. 24-50149

The dissenters' contrary assertions are startling. In the dissenters' ideal world, S.B. 4 will be facially enjoined and will never go into effect for any potential applications. But what happens when the local sheriff's office arrests illegal aliens for criminal trespass under § 30.05 of Texas's Penal Code? *See* Part II, *supra.* Is that also conflict preempted? After all, that application of § 30.05(a) causes a significant intrusion into the federal immigration process. So under the dissent's inverse-*Salerno* theory of conflict preemption, presumably all of Texas criminal trespass law ought to be facially enjoined? So too with criminal trespass law in New Mexico, Arizona, California, and every northern border State? With all respect, that is the opposite of how conflict preemption works.

\*

*Arizona* held that "[f]ederal law specifies limited circumstances in which state officers may perform the functions of an immigration officer." 567 U.S. at 408. But the most obvious, mine-run applications of Texas's S.B. 4 do not transform state officials into federal immigration officers. Rather, they allow state officers to cooperate with their federal counterparts to stop illegal border crossings in perfect harmony with federal law. And from there, federal officers can make whatever removability determinations they want. At a minimum, such constitutional applications of S.B. 4 doom plaintiffs' facial pre-enforcement challenge—even assuming the plaintiffs have standing, which they plainly do not, and even assuming away the other justiciability problems,[5] which we plainly cannot.

––––––––––––––––––––

[5] For example, it is not at all clear that *Ex parte Young* applies. The principal dissent appears to concede that S.B. 4 can *never* be enforced against these plaintiffs. *See post*, at 80 (RICHMAN, J., dissenting). And no Supreme Court case has ever held that plaintiffs can invoke *Ex parte Young* in the absence of a violation of *their own* rights. *Cf. Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 250–51 (2011) (emphasizing the plaintiff's federal statutory rights and that the *Ex parte Young* suit in that case would vindicate plaintiff's own

No. 24-50149

With these observations, I concur.

_____

federal rights); *id.* at 260 ("In order to invoke the *Ex parte Young* exception to sovereign immunity, a state agency needs . . . a federal right that *it possesses*." (emphasis added)).

No. 24-50149

PRISCILLA RICHMAN, *Circuit Judge*, dissenting, in which STEWART, SOUTHWICK, HIGGINSON, and RAMIREZ, *Circuit Judges*, joined, and in which GRAVES and DOUGLAS, *Circuit Judges*, joined as to Part II:

Texas has enacted its own immigration laws. It has been widely reported that those laws were designed to challenge the Supreme Court's decision in *Arizona v. United States*[1] and that JUSTICE SCALIA's dissenting opinion in that case provided a "pathway."[2] The *Arizona* decision remains

---

[1] 567 U.S. 387 (2012).

[2] As one report stated:

The changes not only will give state and local police the authority to arrest suspected immigration offenders, but state judges could order them to return to Mexico. But can they do that? The Supreme Court said no when Arizona tried, but a dissenting opinion offered a possible way out. Gov. Abbott says, "Justice Scalia wrote a dissenting opinion in that case pretty much laying out a pathway that he thought would be a legal way for a state to go about the process of enforcing immigration laws."

Fred Cantu, *Texas Governor Signs Controversial Law to Empower State Arrest of Immigration Violators*, CBS AUSTIN (Dec. 18, 2023), https://cbsaustin.com/news/local/texas-governor-signs-controversial-law-to-empower-state-arrest-of-immigration-violators.

Other reports elaborated:

In a wide-ranging speech in Austin shortly after the hearing, Mr. Abbott, who has said that he expects the Supreme Court to eventually decide the constitutionality of the law, suggested that the statute had been crafted to challenge the high court's precedent in the 2012 case, *Arizona v. United States*, which was decided 5 to 3. "We found ways to try to craft that law to be consistent" with the dissent that the late Justice Antonin Scalia wrote in the Arizona case, Mr. Abbott said. Justice Scalia had suggested that the Arizona measures did not conflict with federal law but simply added state penalties to help enforce existing federal restrictions.

J. David Goodman, *Appeals Court Considers Reviving Texas Migrant Law, Now on Hold*, N.Y. TIMES (Mar. 20, 2024), https://www.nytimes.com/2024/03/20/us/texas-immigration-law.html#:~:text=In%20a%20wide%2Dranging%20speech,help%20enforce%20existing%20federal%20restrictions.

controlling, and the immigration laws Texas has enacted are preempted by federal law.[3] At least one of the plaintiffs in this case, Las Americas Immigrant Advocacy Center (Las Americas), has standing to seek an injunction against the enforcement of those preempted state laws. Because a majority of the en banc court concludes otherwise, I dissent. I would reach the merits and affirm the district court's preliminary injunction against the enforcement of the state laws that permit Texas to arrest and remove illegal immigrants. Federal laws on the books permit Texas to assist the federal government in apprehending illegal immigrants if the federal government so requests.[4] But Texas cannot enact its own immigration regime.

I address the majority opinion in more detail below, as well as the merits of whether Texas's immigration laws are preempted. JUDGE OLDHAM's concurring opinion is addressed in Parts V(A)(2) and V(B). But at the outset, I will "hit the high points."

_____

When he signed the law, Texas Republican Gov. Greg Abbott acknowledged that the issue could end up back at the Supreme Court. "We think that Texas already has the constitutional authority to do this, but we also welcome a Supreme Court decision that would overturn the precedent set in the Arizona case," Abbott told CNN's Rosa Flores.

Devan Cole, *Texas Immigration Controversy Rekindles Fight Over Arizona's 'Show Me Your Papers' Law*, CNN (Apr. 3, 2024), https://www.cnn.com/2024/04/03/politics/texas-immigration-law-sb-4#:~:text=%E2%80%9CThe%20(Arizona)%20law%20that,immigration%20law%20%E2%80%9Cmore%20effectively.%E2%80%9D.

[3] *See post* at 99-135.

[4] *See*, *e.g.*, 8 U.S.C. § 1357(g).

No. 24-50149

## *Standing*

Standing is a threshold issue in this case. The Supreme Court explained in *FDA v. Alliance for Hippocratic Medicine*,[5] that "[w]hen the plaintiff is an unregulated party, causation 'ordinarily hinge[s] on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well.'"[6] The Court said, "Therefore, to thread the causation needle in those circumstances, the plaintiff must show that the '"third parties will likely react in predictable ways"' that in turn will likely injure the plaintiffs."[7] The Texas laws at issue do not regulate Las Americas. But they do regulate illegal aliens. The record reflects that Las Americas is "one of the only organizations providing pro bono representation to immigrants, asylum seekers, and other persons migrating or in removal proceedings in the West Texas, New Mexico, and Ciudad Juarez area."[8] "For this reason, [Las Americas has] consistently focused [its] efforts on the most vulnerable to removal, such as asylum seekers and the victims of crime, and those whom the private bar may be less able or willing to represent."[9] It is highly predictable that if Texas's preempted immigration laws go into effect, at least some of the illegal aliens

---

[5] 602 U.S. 367 (2024).

[6] *Id.* at 383 (second alteration in original) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)).

[7] *Id.* (quoting *California v. Texas*, 593 U.S. 659, 675 (2021) (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019))).

[8] ROA.938, ¶ 14.

[9] ROA.938, ¶ 14.

apprehended in the West Texas area would be counseled or represented by Las Americas. How does that injure Las Americas?

If the preempted state laws were to go into effect, the resources (donations, grant money, and human resources) Las Americas would expend in representing clients pro bono in the state immigration system would be irretrievably lost. Those resources would otherwise be used in representing clients in the federal immigration system. The loss of dollars and cents expended in counseling clients caught up in a state immigration system that should not exist is not the only injury. Because Las Americas would be representing aliens in dual state and federal immigration regimes, it could not represent as many clients in the federal immigration system, to the detriment of its core function.

The preempted state laws open a second, entirely new front that Las Americas would have to navigate, in addition to the federal immigration system, in order to provide counseling and legal representation to its indigent clients. Navigating that new, separate, and unlawful system (including physically accessing the state's jails, prisons, or other holding facilities and appearing in state courts) comes at a cost, in dollars and cents and human resources.

As explained in greater detail below, under the new state laws, illegal aliens apprehended under the state immigration laws would be fast-tracked for removal from Texas. The laws expressly provide that a "court may not abate the prosecution of an offense under Chapter 51 . . . on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated."[10] Las Americas would prioritize clients

---

[10] S.B. 4, 88th Leg., 4th C.S., ch. 2, § 1, 2023 Tex. Gen. Laws 4750, 4752 (codified at TEX. CODE CRIM. PROC. art. 5B.003).

detained under Texas immigration laws who face expedited removal and potential loss of an opportunity to pursue federal asylum and Convention-Against-Torture-Act (CAT) claims because that is at the core of Las Americas's mission.[11]

Would Las Americas "voluntarily incur[] costs to advocate for clients"[12] prosecuted under Texas's unlawful immigration laws? Would that cause it to "divert"[13] resources from representing clients in the federal immigration system? The answer is decidedly "yes" to both questions. But that does not answer the question of whether the preempted state immigration laws would "perceptibly impair[] [Las Americas's] ability to provide counseling . . . services for low- and moderate-income" clients.[14] The answer to that question is also decidedly "yes." Asserting jurisdiction over illegal aliens, arresting or detaining them, and requiring their removal or "return" on the basis of federally-preempted state laws would "directly affect[] and interfere[] with [Las Americas's] core business activities"[15] just as the violations of federal law directly affected HOME's core business activities in *Havens Realty Corp. v. Coleman*.[16] Using labels such as "voluntary" costs or a "diversion" of funds does not alter the actual facts or the cause and character of the injury to Las Americas.

---

[11] ROA.937, ¶¶ 11-13.

[12] *Ante* at 2.

[13] *Ante* at 7.

[14] *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

[15] *Id.*

[16] 455 U.S. 363 (1982).

No. 24-50149

Las Americas has standing because, like the plaintiff in *Havens Realty* who "not only was an issue-advocacy organization, but also operated a housing counseling service,"[17] Las Americas operates an immigration counseling service. The fact that Las Americas is also "an issue-advocacy organization"[18] (which is not a basis for standing, as we all agree) does not strip it of standing.

Nor is the fact that the Texas immigration laws do not regulate Las Americas dispositive. In *Havens Realty*, HOME, a non-regulated "housing counseling organization,"[19] had standing to sue Havens Realty, a regulated apartment building owner. The majority opinion in the case before us today says that *Havens Realty* is inapposite because the regulated defendant *directly* made a misrepresentation to HOME.[20] That characterization of *Havens Realty* does not capture all the facts in that case. The misrepresentation was made to a black person HOME had hired as a "tester plaintiff" who had no intention of renting an apartment.[21] The tester plaintiff inquired if an apartment was available and was falsely told no.[22] The misrepresentation was not made to HOME, as an organization, but to an individual whom the apartment owner thought was seeking housing. But the Supreme Court held that HOME had standing to sue based on injury to its counseling and referral-service activities.[23] HOME "provide[d] counseling and referral

---

[17] *All. for Hippocratic Med.*, 602 U.S. at 395 (citing *Havens Realty*, 455 U.S. at 368).

[18] *Id.*

[19] *Id.*

[20] *Ante* at 9.

[21] *Havens Realty*, 455 U.S. at 368, 373.

[22] *Id.*

[23] *Id.* at 379 ("If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low-and

services for low- and moderate-income homeseekers."[24]    The misrepresentation amounted to unlawful racial steering.[25]

In *Alliance for Hippocratic Medicine*, the Supreme Court explained that "[d]etermining causation in cases involving suits by unregulated parties against the government is admittedly not a 'mechanical exercise.'"[26] "That is because the causation inquiry can be heavily fact-dependent and a 'question of degree.'"[27] The Court continued, "Unfortunately, applying the law of standing cannot be made easy, and that is particularly true for causation. Just as causation in tort law can pose line-drawing difficulties, so too can causation in standing law when determining whether an unregulated party has standing."[28] The Supreme Court's decision in *Havens Realty*, reaffirmed in *Alliance for Hippocratic Medicine*, allowed a "housing counseling organization" to sue housing owners for actions that violated a federal statute (misrepresentations to putative house hunters that amounted to "racial steering").[29] I cannot see a principled distinction between *Havens Realty*, the discussion of it in *Alliance for Hippocratic Medicine*, and the present case. Stated another way, I cannot see a principled basis for saying that housing counseling organizations across the country that provide counseling to low-

---

moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests.").

[24] *Id.*

[25] *All. for Hippocratic Med.*, 602 U.S. at 395.

[26] *Id.* at 384 (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)).

[27] *Id.* (quoting argument of counsel, Tr. of Oral Arg. 50).

[28] *Id.*

[29] *Id.* at 395.

income clients can sue apartment owners who violate federal law to the detriment of the housing-counseling organizations' businesses, but an organization that provides legal counseling to low-income illegal immigrants cannot sue a state that unlawfully subjects the organization's clients to its laws to the detriment of the counseling organization's business. Any further line-drawing in this area should be done by the Supreme Court, not this court.

### *Facial Challenges and Preemption*

The majority opinion's discussion of the mechanics of Texas's immigration laws suggests that there is no conflict with federal immigration laws, and in any event, it would be inappropriate to consider facial challenges to the state immigration laws because it is unclear how the state laws will be enforced. First, the Texas laws are absolutely clear that aliens will be arrested or detained and ordered to leave the state of Texas or suffer criminal prosecution under state law. Second, the Supreme Court's decision in *Arizona* sustained facial challenges to state immigration laws similar to Texas's laws based on the text of those statutes.[30] Third, the Texas immigration laws do conflict with federal law.

The majority opinion says, "The statute includes affirmative defenses to prosecution, all of which defer to federal determinations of admissibility."[31] This is inaccurate. The key word here is "determinations." The affirmative defenses only apply to "grant[s]" of asylum or lawful presence, or an approval of DACA benefits between certain dates.[32] As noted above, Texas law says, "[a] court may not abate the prosecution of an offense

---

[30] *Arizona v. United States*, 567 U.S. 387, 400-10 (2012).

[31] *Ante* at 4 (footnote omitted).

[32] *See* Tex. Penal Code § 51.02(c).

under Chapter 51 . . . on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated."[33]

The majority opinion says the parties dispute "how [exactly] *return* orders will be enforced" under the Texas immigration laws.[34] But this is a red herring. There is absolutely no dispute whatsoever that Texas intends to arrest or otherwise detain illegal aliens and subject them to processing under state law. The purpose of the Texas immigration laws is to apprehend and remove more illegal aliens from Texas than the federal government had been apprehending and removing when the state laws were enacted, and to do so faster than the federal government had done. It is farcical to suggest that it would be business as usual, with no difference in enforcement between the federal and state laws, if Texas is permitted to enforce its own immigration laws.

In the same vein, the majority opinion says, "State officials have consistently represented that they will coordinate with federal immigration authorities if aliens have *return* orders or pending asylum applications."[35] To the extent "State officials" refers to affidavits of Texas Department of Public Safety (DPS) officers, they have no say in the matter. Under the new Texas laws, once DPS (or another law enforcement agency, including county and local law enforcement officers)[36] apprehends an alien, the alien would appear

_____

[33] Tex. Code Crim. Proc. art. 5B.003.

[34] *Ante* at 4 (emphasis added).

[35] *Ante* at 5 (emphasis added).

[36] *See* Tex. Code Crim. Proc. art. 5B.002(e)(2), (g); *see also* Tex. Civ. Prac. & Rem. Code §§ 117.002, 117.003 (providing civil immunity for and indemnification of local and state government officials, employees, and contractors who enforce the newly created crimes in Chapter 51 of the Penal Code or the removal orders issued under Article 5B.002).

before a magistrate or judge.[37]  There is no provision allowing state or local law enforcement officers to hold an alien indefinitely so that they may pursue an asylum or CAT claim.  To the contrary, Texas law expressly provides that removal or "return" proceedings must proceed even if an asylum or CAT claim is pending.[38]  But most importantly, by the time a "return" order is issued by a state court, the time for resolving an affirmative defense based on a "determination" of a federal claim will have passed.  The injury to Las Americas will have occurred long before a DPS officer carries out a "return" order.  Furthermore, Texas laws give no discretion to DPS officers when they have a "return" order in hand.

To the extent the majority opinion refers to statements from attorneys in the Attorney General's office as to how removal orders would be enforced, those representations do not bind anyone who has actual enforcement authority, such as district and county attorneys, state district and county court judges, and county and other local law enforcement officers.  Texas law is clear that, with limited exceptions not relevant here, the Texas constitution does not permit the Attorney General of Texas to prosecute crimes under Texas's criminal laws "without the consent of the appropriate local county or district attorney by a deputization order."[39]  The Texas laws at issue are criminal laws.  No one claims the Attorney General has been authorized by any county or district attorney to enforce Texas's immigration laws.

For an alien illegally present who is apprehended under state law and does not have an affirmative defense (which are limited, as explained above), the Texas immigration laws culminate in (1) an order requiring the alien to

_____

[37] *See* TEX. CODE CRIM. PROC. art. 5B.002.

[38] *See id.* art. 5B.003.

[39] *State v. Stephens*, 663 S.W.3d 45, 55-56 (Tex. Crim. App. 2021).

return to the foreign nation from which that person entered or attempted to enter,[40] or (2) a fine or imprisonment, followed by an order requiring the alien to return to the foreign nation from which that person entered or attempted to enter.[41]  Removal orders "must include . . . the manner of transportation of the person to a port of entry" and "the law enforcement officer or state agency responsible for monitoring compliance with the order."[42]  If an alien "refuses to comply" with a removal order, they have committed a second degree felony under the Texas immigration laws.[43]

The Texas laws are clear.  There is no "basic uncertainty about what the law means and how it will be enforced," as the majority opinion suggests.[44]  In *Arizona*, cited by the majority opinion,[45] the Supreme Court sustained pre-enforcement, facial challenges to three of four state immigration laws.[46]  It did so based on the text of the statutes.  The text of Texas's entry and removal laws is likewise sufficient to sustain the pre-enforcement facial challenges before us.

In *Arizona*, the Supreme Court held that section 3 of the Arizona law was field preempted.[47]  It did so even though the state law not only mirrored but cited federal law.  There was no need to determine how a state would enforce that law.  Section 3 criminalized the "willful failure to complete or

_____

[40] Tex. Code Crim. Proc. art. 5B.002(a)-(c).

[41] *Id.* (d).

[42] *Id.* (e).

[43] Tex. Penal Code § 51.04.

[44] *Ante* at 5 n.8 (quoting *Arizona v. United States*, 567 U.S. 387, 415 (2012)).

[45] *Ante* at 5 n.8.

[46] *See Arizona*, 567 U.S. at 400-10.

[47] *Id.* at 400-03.

carry an alien registration document . . . in violation of 8 United States Code § 1304(e) or 1306(a)."[48]  The Supreme Court held that "the Federal Government has occupied the field of alien registration."[49]  The Court explained, "Where Congress occupies an entire field, as it has in the field of alien registration, even complementary state regulation is impermissible. Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards."[50]

The Supreme Court then held that section 5(C) of the Arizona law was conflict preempted.[51]  That statute "ma[de] it a state misdemeanor for 'an unauthorized alien to knowingly apply for work, solicit work in a public place or perform work as an employee or independent contractor' in Arizona. Violations [could] be punished by a $2,500 fine and incarceration for up to six months."[52]  The Court explained that "[t]he legislative background of IRCA underscores the fact that Congress made a deliberate choice not to impose criminal penalties on aliens who seek, or engage in, unauthorized employment."[53]  Again, there was no need to wait and see how the state would interpret or enforce this law.

The Supreme Court further held that section 6 of the Arizona law under scrutiny was preempted because  it "create[d] an obstacle to the full

---

[48] *Id.* at 400 (quoting Ariz. Rev. Stat. Ann. § 13-1509(A) (2010)).

[49] *Id.* at 401.

[50] *Id.*

[51] *Id.* at 406-07.

[52] *Id.* at 403 (citation omitted) (quoting Ariz. Rev. Stat. Ann. § 13-2928(C) (2010)).

[53] *Id.* at 405.

purposes and objectives of Congress."[54]  That law provided "that a state officer, 'without a warrant, may arrest a person if the officer has probable cause to believe . . . [the person] has committed any public offense that makes [him] removable from the United States.'"[55]  This provision is analogous to Texas's immigration laws, which allow state or local law enforcement agents to arrest an alien entering Texas "from a foreign nation at any location other than a lawful port of entry,"[56] and that directs a magistrate to take certain actions that lead to removal "after making a determination that probable cause exists for arrest for [illegal entry or illegal reentry]."[57]  The Supreme Court reasoned that the similar Arizona statute "would allow the State to achieve its own immigration policy,"[58] and that "§ 6 creates an obstacle to the full purposes and objectives of Congress."[59]  Again, there was no need to await actual enforcement by Arizona before deciding the statute was facially unconstitutional.

The Supreme Court finally considered section 2(B) in *Arizona*.  That statute "require[d] state officers to make a 'reasonable attempt . . . to determine the immigration status' of any person they stop, detain, or arrest on some other legitimate basis if 'reasonable suspicion exists that the person is an alien and is unlawfully present in the United States.'"[60]  "The law also provide[d] that '[a]ny person who is arrested shall have the person's

---

[54] *Id*. at 410.

[55] *Id*. at 407 (alterations in original) (quoting Ariz. Rev. Stat. Ann. § 13-3883(A)(5) (2010)).

[56] Tex. Penal Code § 51.02(a).

[57] Tex. Code Crim. Proc. art. 5B.002(a).

[58] *Arizona*, 567 U.S. at 408.

[59] *Id*. at 410.

[60] *Id*. at 411 (quoting Ariz. Rev. Stat. Ann. § 11-1051(B) (2010)).

No. 24-50149

immigration status determined before the person is released.'"[61]   The Supreme Court recounted that "[t]he accepted way to perform these status checks [was] to contact ICE, which maintains a database of immigration records."[62]  It further explained that there were "[t]hree limits . . . built into the state provision."[63]  The Supreme Court concluded that "if § 2(B) only requires state officers to conduct a status check during the course of an authorized, lawful detention or after a detainee has been released, the provision likely would survive preemption—at least absent some showing that it has other consequences that are adverse to federal law and its objectives."[64]  Of the four statutes facially challenged in *Arizona*, this is the only one where the Court held the government "cannot prevail in its current challenge" because "[t]here is a basic uncertainty about what the law means and how it will be enforced. At this stage, without the benefit of a definitive interpretation from the state courts, it would be inappropriate to assume § 2(B) will be construed in a way that creates a conflict with federal law."[65]   However, all of the Court's concerns and how the state might allay them related to Fourth Amendment issues.   With regard to the state's ability to apprehend aliens under its own state laws, it is highly significant that the Supreme Court said, "*it would disrupt the federal framework to put state officers in the position of holding aliens in custody for possible unlawful presence without federal direction and*

---

[61] *Id.* (second alteration in original) (quoting Ariz. Rev. Stat. Ann. § 11-1051(B) (2010)).

[62] *Id.*

[63] *Id.*

[64] *Id.* at 414.

[65] *Id.* at 415.

*supervision. The program put in place by Congress does not allow state or local officers to adopt this enforcement mechanism.*"[66]

JUDGE OLDHAM's concurring opinion offers a hypothetical scenario in which state law enforcement officers arrest illegal aliens from Nicaragua; they are taken before a state magistrate judge and agree to return to Mexico from whence they entered; a state court order is entered requiring the aliens to return to Mexico; state officers transport them to a port of entry and deliver them to federal officials; and "CBP processes the aliens in accordance with federal immigration law and the Convention Against Torture."[67] This, the concurring opinion says, is an example of an "application" of the state laws that does not conflict with federal law. The Supreme Court said otherwise in *Arizona*.[68] That is because, in the hypothetical in the OLDHAM opinion, every action taken under state law (those of the arresting officers, the magistrate, and the officers executing the return order) was taken without "any request, approval, or other instruction from the Federal Government."[69] In *Arizona*, the Supreme Court concluded that § 6 of the Act, which is analogous to the Texas entry, reentry and removal laws at issue here, conflicted with federal immigration law for that reason, among others.[70] The Supreme Court concluded that because § 6 permitted "the unilateral decision of state officers to arrest an alien for being removable absent any request, approval, or other instructions from the Federal Government," the state law "authoriz[ed] state and local officials to engage in . . . enforcement matters

---

[66] *Id.* at 413 (emphasis added) (citation omitted).

[67] *Ante* at 28.

[68] *Arizona v. United States*, 567 U.S. 387 (2012).

[69] *See id.* at 410.

[70] *Id.* at 410.

as a general matter," which "create[ed] an obstacle to the full purposes and objectives of Congress."[71] There are other conflicts identified in Arizona that are pertinent to the hypothetical that are addressed in part V(B) below.

The question that illuminates the conflict is this: what if Texas asked the federal government to enter an agreement that would allow Texas officers to arrest aliens they saw entering from Mexico at points other than a lawful point of entry? Texas could offer to take the aliens before a Texas magistrate to determine if they should be prosecuted under state law for trespass and— if Texas decided not to prosecute—Texas law enforcement officers would deliver them to federal immigration officials at a port of entry. In response to Texas's offer, the federal government said "no." Could Texas then enact its own immigration laws to do all of that anyway? I submit that the answer is no, because that law would be conflict preempted, if not field preempted for all of the reasons explained in *Arizona*.[72]

The hypothetical in JUDGE OLDHAM's concurring opinion fails for another reason. It does not demonstrate a valid "application" of the state laws at issue because it does not *apply* the state laws *as they are written*. The Texas laws require that, "in lieu of continuing the prosecution" for illegal entry or reentry,[73] a judge can issue an order requiring an alien to return to the foreign nation from which they entered only if the order actually "require[s] the person to return to that foreign nation."[74] Texas law similarly requires the alien to agree to the return order, that is, to agree to actually return to the nation

---

[71] *Id.*

[72] *See* 567 U.S. at 407-410.

[73] Tex. Code Crim. Proc. art. 5B.002(b).

[74] *Id.* art. 5B002(c).

from which they entered.[75]  Texas law follows through by requiring the return order to identify "the law enforcement officer or state agency responsible for *monitoring compliance with the order.*"[76]  If aliens pursue Convention Against Torture protection at the border to forestall their return to Mexico pursuant to a Texas court return order, that would be in violation of their required agreement under Texas law as well as the return order itself.

Additionally, nothing in Texas's immigration laws permits a law enforcement officer to decide unilaterally to deliver aliens who are the subject of a return order to federal authorities.  Texas law does not contemplate that state law enforcement officials can execute the return order by delivering aliens to federal authorities instead of "monitoring compliance with the order."[77]  The record does contain an averment from a Texas Department of Public Safety official that says, "Should DPS become aware that a detained alien has a pending application for asylum or other relief with the federal government at the time of executing his order to return under SB 4, DPS intends to coordinate with federal immigration authorities before executing the order to return."[78]  That affidavit was prepared after this litigation was initiated. Recognizing the strength of the preemption arguments the United States was making at the time, the State argued that the Texas laws would not actually be enforced as written.  It is one thing to make that argument.  It is quite another to say that for purposes of a *Salerno* facial challenge inquiry, courts must consider not what the statute actually says, but how state actors might choose to ignore the text of state laws.  Under *Salerno*, "the challenger must

---

[75] *Id*. art. 5B002(c)(1).

[76] *Id*. art. 5B002(e)(2) (emphasis added).

[77] *Id*.

[78] ROA.316, ¶13.

establish that no set of circumstances exists under which the Act would be valid."[79]  That means the statute as written.  It should be clear that when Texas law specifically prohibits judges from abating prosecution for illegal entry or reentry "on the basis that a federal determination regarding the immigration status of the defendant is pending *or will be initiated*,"[80] Texas law does not permit a law enforcement officer charged with executing a return order to decide to ignore the statutorily-required terms of a return order.  If law enforcement officers were to do so, that conduct would violate their duty under the state's immigration laws.  Hypothesizing actions unauthorized by the law's text cannot support an argument that Texas's immigration laws, as they are written, can be validly enforced.

I turn to consideration of the issues before us in more detail.

# I

In November 2023, the Texas legislature passed Senate Bill 4 (S.B. 4).[81]  The bill's preamble reflects that its purpose is to prohibit "the illegal entry into or illegal presence in [the] state by" an alien.[82]  The bill "authoriz[es] or requir[es] under certain circumstances the removal of persons who violate those prohibitions."[83]  S.B. 4 amended the Texas Penal Code to include two new criminal offenses entitled "Illegal Entry from Foreign Nation" and "Illegal Reentry by Certain Aliens."[84]  Those and other implementing laws are the primary focus of this appeal.

---

[79] *United States v. Salerno*, 481 U.S. 739, 745 (1987).

[80] TEX. CODE CRIM. PROC. art. 5B.003 (emphasis added).

[81] S.B. 4, 88th Leg., 4th C.S., ch. 2, 2023 Tex. Gen. Laws 4750.

[82] *Id.*

[83] *Id.*

[84] *Id.* § 2 (codified at TEX. PENAL CODE §§ 51.02-03).

No. 24-50149

The crime of "Illegal Entry from Foreign Nation" is codified at Texas Penal Code § 51.02. The section provides: "A person who is an alien commits an offense if the person enters or attempts to enter this state directly from a foreign nation at any location other than a lawful port of entry."[85] The section also enumerates affirmative defenses, including when: (1) the federal government has granted the defendant "lawful presence in the United States"; (2) the federal government has granted the defendant asylum under 8 U.S.C. § 1158; (3) the defendant's conduct does not constitute a violation of 8 U.S.C. § 1325(a), which prohibits illegal entry into the United States; and (4) the defendant "was approved for benefits under the federal Deferred Action for Childhood Arrivals" program between certain dates.[86]

The crime of "Illegal Reentry by Certain Aliens" is codified at Texas Penal Code § 51.03. This section prohibits aliens from "enter[ing], attempt[ing] to enter," or being "found in" the state after the person "(1) has been denied admission to or excluded, deported, or removed from the United States; or (2) has departed from the United States while an order of exclusion, deportation, or removal is outstanding."[87] This provision does not identify any affirmative defenses.[88]

If a person violates § 51.02 or § 51.03, S.B. 4 empowers Texas state judges and magistrates to order them to return to the foreign nation from which they entered or attempted to enter.[89] Under Texas Code of Criminal Procedure article 5B.002, a state judge or magistrate "may" enter such an

---

[85] Tex. Penal Code § 51.02(a).

[86] *Id.* § 51.02(c).

[87] *Id.* § 51.03(a).

[88] *See id.* § 51.03.

[89] S.B. 4 § 1 (codified at Tex. Code Crim. Proc. art. 5B.002).

order if "the person agrees to the order," among other requirements.[90] Under the same provision, the presiding judge "shall" issue the order if the defendant is convicted of either offense.[91] Failure to comply with an article 5B.002 order is a second-degree felony,[92] punishable by a fine of up to $10,000 and up to twenty years of imprisonment.[93]

Importantly, as already noted, S.B. 4 provides that a "court may not abate the prosecution of an offense under Chapter 51 . . . on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated."[94]

The district court granted a preliminary injunction precluding the enforcement of the new laws promulgated in S.B. 4. The only defendant who is a party to this appeal is the Director of the State of Texas Department of Public Safety, Freeman F. Martin. Director Martin urges the en banc court to vacate the preliminary injunction, arguing that the plaintiffs do not have standing and that, on the merits, S.B. 4 is not preempted by federal law.

## II

A threshold issue is standing. The Supreme Court has explained that "[a]t the preliminary injunction stage, . . . the plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing."[95] To establish standing, "a plaintiff must demonstrate (i) that she has suffered or

---

[90] Tex. Code Crim. Proc. art. 5B.002(c).

[91] *Id.* art. 5B.002(d).

[92] Tex. Penal Code § 51.04.

[93] *Id.* § 12.33.

[94] S.B. 4 § 1 (codified at Tex. Code Crim. Proc. art. 5B.003).

[95] *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).

likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief."[96] The injury "must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon."[97] "[W]hen a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury."[98] The Supreme Court has recognized that only one plaintiff must successfully demonstrate standing to satisfy Article III's case-or-controversy requirement.[99] Because I conclude Las Americas has standing, I do not address whether either of the other two plaintiffs, American Gateways or the County of El Paso, Texas, has standing.

## A

Las Americas has established a cognizable Article III injury in fact under *Alliance for Hippocratic Medicine* and *Havens Realty*. It has shown that state immigration laws "directly affect[] and interfere[] with [Las Americas]'s core business activities."[100] The Supreme Court explained in

---

[96] *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) (first citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009); and then citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).

[97] *Id.* at 381 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).

[98] *Id.* (citing *Clapper*, 568 U.S. at 401).

[99] *See, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) ("Only one of the petitioners needs to have standing to permit us to consider the petition for review."); *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006) ("The Court of Appeals did not determine whether the other plaintiffs have standing because the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.").

[100] *All. for Hippocratic Med.*, 602 U.S. at 395.

*Alliance for Hippocratic Medicine* why there was organizational standing in *Havens Realty* as follows:

> Critically, HOME not only was an issue-advocacy organization, but also operated a housing counseling service. And when Havens gave HOME's employees false information about apartment availability, HOME sued Havens because Havens 'perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers.' In other words, Havens's actions directly affected and interfered with HOME's core business activities—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer.[101]

The case before us is analogous. Las Americas is not only an issue-advocacy organization—it operates to provide legal services and legal counseling to low-income immigrants.

In considering the requirement of causation in *Alliance for Hippocratic Medicine*, the Supreme Court also explained that "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action. An organization cannot manufacture its own standing in that way."[102] The medical associations in that case had argued "that FDA has 'caused' the associations to conduct their own studies on mifepristone so that the associations can better inform their members and the public about mifepristone's risks."[103] The Supreme

---

[101] *Id.* at 395 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 368 (1982)).

[102] *Id.* at 394.

[103] *Id.*

Court held this did not suffice to establish causation of an injury for standing purposes.[104] The Court also explained that standing is not demonstrated just because "an organization diverts its resources in response to a defendant's actions."[105] In contrasting what *would* establish causation of injury, the Supreme Court pointed to its decision in *Havens Realty*.[106] The Court said, "Critically, HOME not only was an issue-advocacy organization, but also operated a housing counseling service."[107]

Las Americas operates a counseling service for aliens, some of whom would be apprehended or arrested under Texas's immigration laws. But the majority opinion contends that *Havens Realty* is distinguishable because "'In *Havens*, the defendant told falsehoods *to the plaintiff* [, which] thus suffered a real, concrete and particularized injury, caused by the defendant. . . .'"[108] As discussed above, it is not entirely accurate to say that the unlawful misrepresentation in *Havens Realty* was made to HOME, the plaintiff, which was a "housing counseling organization."[109] The representations in *Havens Realty* were made to an individual whom HOME had hired as a "tester plaintiff."[110] The tester plaintiff, who was black, told Havens Realty, the owner of two apartment buildings, that he was seeking housing,[111] though in

_____

[104] *See id.*

[105] *Id.* at 395.

[106] *Id.* (citing *Havens Realty*, 455 U.S. at 379).

[107] *Id.* (citing *Havens Realty*, 455 U.S. at 368).

[108] *Ante* at 9 (quoting the dissenting opinion when this case was before a panel, *United States v. Texas*, 144 F.4th 632, 698 (5th Cir. 2025) (OLDHAM, J., dissenting) (emphasis in original)).

[109] *All. for Hippocratic Med.*, 602 U.S. at 395.

[110] *Havens Realty*, 455 U.S. at 368.

[111] *Id.* at 368.

No. 24-50149

actuality, he was not.[112]  Havens Realty falsely said no apartments were available.[113]  The same day, Havens Realty told a white tester for HOME that apartments were available.[114]  In the ensuing suit HOME filed against Havens Realty, it alleged

> Plaintiff HOME has been frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services. Plaintiff HOME has had to devote significant resources to identify and counteract the defendant's [sic] racially discriminatory steering practices.[115]

The Supreme Court held in *Havens Realty* that

> If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact.  Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests.[116]

---

[112] *Id*. at 373 (explaining that "[i]n the present context, 'testers' are individuals who, without an intent to rent or purchase a home or apartment, pose as renters or purchasers for the purpose of collecting evidence of unlawful steering practices.").

[113] *Id*. at 368.

[114] *Id*.

[115] *Id*. at 379 (alteration in original).

[116] *Id.*

Forty-two years later, the Supreme Court reaffirmed this reasoning. It explained in *Hippocratic Medicine* that HOME adequately alleged its counseling business was injured for purposes of standing because the misrepresentation, which amounted to racial steering, "perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers.'"[117]

Las Americas operates a legal counseling service and has similarly alleged that aspects of Texas's preempted immigration laws would perceptibly impair its ability to provide counseling and legal representation to low-income aliens seeking to pursue relief under federal immigration law.

**B**

Facts in the record before us support Las Americas's allegations of injury. Las Americas is a nonprofit legal services organization based in El Paso, Texas.[118] It has provided legal, counseling, and referral services to immigrants for more than thirty-seven years, since 1987.[119] Its "staff consists of 15 people, including attorneys, accredited representatives, and paralegals. Two additional staff work in Mexico."[120] Its total budget in the fiscal year ending 2023 was approximately $1.4 million.[121]

Las Americas submitted an affidavit that says it seeks "to ensure that individuals have a fair opportunity to establish their eligibility for relief from removal from the United States, with a primary focus on ensur[ing]

---

[117] *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (quoting *Havens Realty*, 455 U.S. at 379).

[118] ROA.935, ¶ 3.

[119] ROA.937, ¶ 10.

[120] ROA.938, ¶ 16.

[121] ROA.938, ¶ 15.

individuals are not wrongfully removed to persecution or torture."[122]  It "provide[s] immigration counseling and representation to immigrants seeking asylum and those detained by the U.S. government in and around West Texas, New Mexico, and Ciudad Juarez, Mexico, including by assisting and representing individuals living in the community to apply affirmatively for asylum."[123]  It also counsels "individuals facing expedited removal who are undergoing Credible Fear Interviews (CFIs)" and "represent[s] people subject to reinstatement of a prior removal order in Reasonable Fear Interviews (RFIs)."[124]  The affidavit further explains that "[f]or individuals who are able to clear the CFI hurdle, [Las Americas's] detained team helps with subsequent stages of the immigration process when capacity allows, including asylum applications, evidence gathering, appeals, bond and parole requests, mental health screenings, competency evaluations, and more."[125] "Where resources allow, [it] provide[s] these services as part of full representation in immigration court and before the Board of Immigration Appeals.  In other cases, [it] offer[s] these services as *pro se* assistance.  For *pro se* individuals, [it] also provide[s] assistance with document preparation and translation."[126]

Las Americas maintains that its "purpose will be frustrated, as S.B. 4 will subject noncitizens to rapid removal outside of federal removal proceedings and before Las Americas can assist them in seeking the relief

---

[122] ROA.935, ¶ 3.

[123] ROA.935, ¶ 4.

[124] ROA.935-36, ¶ 4.

[125] ROA.939, ¶ 18.

[126] ROA.939, ¶ 18 (emphasis omitted).

federal law provides."[127]   An affidavit submitted by Las Americas explains that "reaching out when individuals are arrested [under the new Texas laws] is critical to ensuring that they are advised as to their ability to apply for asylum, and submit timely applications."[128]   Las Americas's success in helping state detainees obtain relief under federal immigration laws is also likely to be significantly less than when it represents federal detainees, due to the different procedures required by the new state immigration laws.[129]   And, because Las Americas cannot serve as many immigrants arrested and detained under S.B. 4 as it can through its existing operations for immigrants navigating the federal system, the total number of immigrants Las Americas can serve in obtaining asylum or other relief will be lower.[130]

The affidavit explains that until the passage of S.B. 4, "[t]he staffing of Las Americas, and the allocation of resources, has always been designed to provide the assistance and representation people need to seek protection through the federal immigration system."[131]   Las Americas counsels and represents immigrants in CBP or ICE detention[132] and has immigrant clients who are not in detention.[133]   For those detained by ICE, Las Americas "provides know-your-rights presentations in the ICE facilities, and then screens individuals for further legal representational needs."[134]   Las

---

[127] ROA.948, ¶ 56.

[128] ROA.942, ¶ 32.

[129] ROA.945-48.

[130] ROA.945-48.

[131] ROA.940, ¶ 22.

[132] ROA.941, ¶ 28.

[133] ROA.941, ¶ 26.

[134] ROA.941, ¶ 28.

Americas "has developed systems to gain access to detainees, arrange for group presentations, reserve sufficient time and space in the facility for confidential attorney-client meetings, track the progress of detained noncitizens, and remain in contact with clients through video conference, phone calls, and written correspondence throughout their case."[135]

The enactment of S.B. 4 opened an entirely new front that Las Americas must navigate to serve its clients. S.B. 4 "creates a new state system to regulate immigration that operates independently of the federal system."[136] The impact of S.B. 4 on Las Americas's delivery of services is direct.

Las Americas avers that it must prioritize among its numerous goals and services, and that its primary goal is "to serve as many asylum seekers as possible with [its] limited resources while focusing [its] efforts on ensuring that those noncitizens at the greatest danger from removal are able to access protection."[137] To that end, it "focus[es] on assistance to those facing summary removal in expedited removal proceedings."[138] In the past, Las Americas has "shifted [its] priorities . . . to meet this goal in response to changes in federal policies."[139] The affidavit avers that:

> We are one of the only organizations providing pro bono representation to immigrants, asylum seekers, and other persons migrating or in removal proceedings in the West Texas, New Mexico, and Ciudad Juarez area. For this reason,

---

[135] ROA.941, ¶ 28.

[136] ROA.940, ¶ 23.

[137] ROA.937, ¶ 12.

[138] ROA.937, ¶ 13.

[139] ROA.937, ¶ 13.

we have consistently focused our efforts on the most vulnerable to removal, such as asylum seekers and the victims of crime, and those whom the private bar may be less able or willing to represent.[140]

The affidavit states that "[r]esponding to S.B. 4 through changes to our programs is a necessary part of and consistent with our programmatic mission."[141]

The new Texas immigration laws also give rise to geographic and institutional considerations. Legal service providers would have to contend with the fact that their clients or those they seek to represent would be arrested by federal officers and detained in federal facilities, while state officers would independently conduct arrests and detain at least some, if not many, immigrants in state or county facilities.[142]

The state laws would seek to expedite the processing of immigrants, which would have the impact of limiting or in some cases eliminating the opportunity or time to seek admittance under numerous federal laws.[143] The new state laws specifically provide that a "court may not abate the prosecution of an offense under Chapter 51 . . . on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated."[144]

_____

[140] ROA.938, ¶ 14.

[141] ROA.938, ¶ 14.

[142] ROA.314-15, ¶¶ 3-4.

[143] *See infra* pp. 124-25, 134-35.

[144] Tex. Code Crim. Proc. art. 5B.003.

Las Americas has also alleged a direct economic injury. It has averred it will "need to train staff members to address the specific needs of those detained pursuant to S.B. 4, and develop new materials to advise defendants of their rights and the manner in which the state law intersects with their rights under federal law."[145] At a minimum, the cost of developing new materials and training staff to facilitate legal counseling and representation of those detained under Texas's new immigration laws is an economic, dollars and cents injury. "For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.' "[146] The new Texas immigration regulatory scheme would increase the time and resources focused on those detained under the new state laws.

Las Americas has sufficiently demonstrated S.B. 4 "directly affect[s] and interfere[s] with [Las Americas]'s core business activities."[147] It has accordingly demonstrated injury in fact under *Alliance for Hippocratic Medicine*.

## C

Las Americas has demonstrated causation. A plaintiff must show that "the injury likely was caused or will be caused by the defendant."[148] "When the plaintiff is an unregulated party, causation 'ordinarily hinge[s] on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well.' "[149] The Supreme Court has said, however, that "plaintiffs attempting to show

---

[145] ROA.943, ¶ 35.

[146] *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464, 137 (2017).

[147] *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024).

[148] *Id.* at 380.

[149] *Id.* at 383 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)).

causation generally cannot 'rely on speculation about the unfettered choices made by independent actors not before the courts.'"[150] "[T]o thread the causation needle in those circumstances, the plaintiff must show that the 'third parties will likely react in predictable ways' that in turn will likely injure the plaintiffs."[151] "The causation requirement precludes speculative links— that is, where it is not sufficiently predictable how third parties would react to government action."[152]

In discussing "alleged future injuries to unregulated parties from government regulation," the Supreme Court explained that "the causation requirement and the imminence element of the injury in fact requirement can overlap."[153] That is because "[b]oth target the same issue: Is it likely that the government's regulation or lack of regulation of someone else will cause a concrete and particularized injury in fact to the unregulated plaintiff?"[154]

DPS has the authority to arrest and detain illegal immigrants under S.B. 4. The Director intends to authorize DPS to exercise that authority.[155] The Director of DPS at the time S.B. 4 was debated in the Texas Legislature predicted that DPS would arrest large numbers of illegal immigrants under the new laws. Then-Director McCraw testified before the Texas Senate Committee on Border Security that he estimated immigration enforcement like that required under S.B. 4 may lead to an additional 75,000 to 80,000

---

[150] *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 415 n.5 (2013)).

[151] *Id.* (quoting *California v. Texas*, 593 U.S. 659, 675 (2021)).

[152] *Id.* (first citing *Allen v. Wright*, 468 U.S. 737, 757-59 (1984); and then citing *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-46 (1976)).

[153] *Id.* at 385 n.2.

[154] *Id.*

[155] ROA.314-15, ¶¶ 3-9; ROA.959-60, ¶ 10.

arrests per year in Texas.[156]  Given the number of illegal immigrants who reside in the El Paso area or illegally enter or reenter in that vicinity, it is reasonably predicable, if not highly probable, that arrests would be made by DPS in the El Paso area at the direction or under the leadership of the Director.

This is congruent with the Declaration of Victor Escalon, the Regional Director for DPS, submitted in the district court proceedings.[157]  He averred that "DPS has responsibility to enforce the criminal laws of the State of Texas" and that he is "personally familiar with the strategy DPS plans to deploy to enforce Texas's recently enacted law, SB 4."[158]  He explained that "DPS will prioritize enforcement of SB 4 in counties that are close to facilities operated by TDCJ and the State.  DPS expects to house and process aliens detained under SB 4 primarily in State-owned facilities."[159]  There is a state detention facility in El Paso, the Rogelio Sanchez State Jail, that has the capacity for 1,100 inmates.[160]

As already discussed, the fact that state detainees would be housed in facilities separate from federal detainees would add to the difficulties Las Americas would face in representing state detainees in addition to those it

---

[156] ROA.959-60, ¶ 10 & n.1 (citing *Tex. S. Comm. on Border Security*, at 49:19-50:45 (Nov. 1, 2023), https://senate.texas.gov/videoplayer.php?vid=18888&lang=en) (statement of Steve McCraw, Director, Tex. Dep't of Pub. Safety)).

[157] ROA.314-16.

[158] ROA.314, ¶ 3.

[159] ROA.315, ¶ 4.

[160] *See Sanchez (RZ)*, Tex. Dep't of Crim. Just., https://www.tdcj.texas.gov/unit_directory/rz.html [https://perma.cc/86QF-BAUN].

No. 24-50149

represents who are housed in federal facilities.[161]  The difficulty is not only a geographic one.  As noted, Las Americas would also have to establish new contacts and procedures to coordinate with completely separate state personnel.[162]

## D

Las Americas has shown redressability.  Las Americas seeks, and the district court granted, a preliminary injunction against Director Martin, enjoining him from enforcing Texas's new immigration laws.  DPS, under Director Martin's leadership, would make arrests under S.B. 4.[163]  The state defendants submitted a declaration (the Banks declaration) in the district court that said:

> SB 4 will provide law enforcement in Texas, primarily DPS, with important new tools to combat the massive influx of illegal migration and help stem the tide of illegal migration into Texas. When SB 4 is in effect, it will become a highly effective component of [Operation Lone Star's] ongoing efforts to combat the crisis at Texas's southern border.[164]

The Banks declaration explained that Operation Lone Star "utilizes multiple state and local agencies, including the DPS, TMD [Texas Military Department], TFC [Texas Facilities Commission],[165] and others to stem the

---

[161] ROA.941-43.

[162] ROA.943-44.

[163] ROA.288, ¶ 35 (Declaration of Michael Banks, Deputy Director, Border Czar, Office of Texas Governor Greg Abbott).

[164] ROA.288, ¶ 35.

[165] ROA.282, ¶ 9.

flow of unlawful immigration."[166]  However, as discussed above, it is DPS, led by Director Martin, who will decide where to concentrate its arrest efforts.[167]  The Escalon declaration says that DPS intends to "prioritize enforcement of SB 4 in counties that are close to facilities operated by TDCJ and the State."[168]  Such a facility exists in El Paso.

It is unlikely that the state will rely on the District Attorney who serves the El Paso area to take the lead, or virtually any role, in making arrests under the new state immigration laws.  That is because the District Attorney is a defendant in this litigation, and he was enjoined from enforcing the new immigration laws by the district court.  Though he initially appealed, he dismissed that appeal.  He remains subject to the injunction.  It appears that he will not seek to uphold the constitutionality of the new laws or enforce them.

*     *     *

In sum, I would hold Las Americas has established each element of standing.

## III

Director Martin is represented by the same counsel that represented the State of Texas and other state defendants.  He did not file separate briefs.  After the United States dismissed its suit, Director Martin is the only

---

[166] ROA.286, ¶ 27.

[167] *See* ROA.315, ¶ 4 (Declaration of Victor Escalon, Regional Director, Texas Department of Public Safety).

[168] ROA.315, ¶ 4.

70

remaining state officer that is a defendant, and he is the only remaining appellant.

In addition to standing, the Director raised a second jurisdictional issue. In the district court, he suggested that this case presents a nonjusticiable political question.[169] The Director likewise gestured toward that argument before our court. Regardless of whether that sufficed to preserve the issue,[170] the political question doctrine is a "jurisdictional limitation[] imposed upon federal courts by the 'case or controversy' requirement of Art. III."[171] "Unlike most arguments, challenges to subject-matter jurisdiction" must be considered by courts "sua sponte."[172]

"CHIEF JUSTICE MARSHALL famously wrote that it is 'the province and duty of the judicial department to say what the law is.'"[173] "Sometimes, however, 'the law is that the judicial department has no business entertaining the claim of unlawfulness—because the question is entrusted to one of the political branches or involves no judicially enforceable rights.'"[174] "In such a case the claim is said to present a 'political question'

---

[169] ROA.236.

[170] *See Rollins v. Home Depot USA, Inc.*, 8 F.4th 393, 397 (5th Cir. 2021) (explaining that a party can forfeit an argument "by failing to adequately brief the argument on appeal").

[171] *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 215 (1974); *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) ("The doctrines of mootness, ripeness, and political question all originate in Article III's 'case' or 'controversy' language, no less than standing does."); *Lane v. Halliburton*, 529 F.3d 548, 565 (5th Cir. 2008) ("[T]he political question doctrine implicates the district court's jurisdiction.").

[172] *Fort Bend County v. Davis*, 587 U.S. 541, 548 (2019) (emphasis omitted).

[173] *Rucho v. Common Cause*, 588 U.S. 684, 695 (2019) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)).

[174] *Id.* at 695-96 (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 277 (2004) (plurality opinion)).

Case: 24-50149  Document: 291-1  Page: 72  Date Filed: 05/13/2025

No. 24-50149

and to be nonjusticiable—outside the courts' competence and therefore beyond the courts' jurisdiction."[175]  A controversy involves a nonjusticiable political question "where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.'"[176]

As discussed further below, Director Martin contends that S.B. 4 is a lawful exercise of the authority of the state of Texas under Article I, § 10 of the Constitution.  The relevant portion of that provision, the State War Clause, provides:

> No State shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay.[177]

There is some caselaw supporting the proposition that whether Texas has been "actually invaded" or is "in such imminent Danger as will not admit of delay" is nonjusticiable.[178]  The Supreme Court has recognized that the

---

[175] *Id.* at 696 (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)).

[176] *Nixon v. United States*, 506 U.S. 224, 228 (1993) (quoting *Baker*, 369 U.S. at 217).

[177] U.S. Const. art. I, § 10, cl. 3.

[178] *See, e.g.*, *California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997) (holding that a claim there has been an invasion within the meaning of Article IV, § 4 "implicates foreign policy concerns which have been constitutionally committed to the political branches"); *Chiles v. United States*, 69 F.3d 1094, 1097 (11th Cir. 1995) ("[W]e conclude that whether the level of illegal immigration is an 'invasion' of Florida [within the meaning of Article IV, § 4] and whether this level violates the guarantee of a republican form of government present nonjusticiable political questions."); *see also Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996) (holding, in the alternative, that a claim that the United States

Texas Governor "is appropriately vested with the discretion to determine whether an exigency requiring military aid for that purpose has arisen," and that the Governor's "decision to that effect is conclusive."[179]

Still, the Supreme Court's cases make clear that we have jurisdiction to resolve this dispute. For example, in *Zivotofsky ex rel. Zivotofsky v. Clinton*,[180] the Court explained that evaluating the constitutionality of statutes is firmly within the bailiwick of the judiciary, even if an unreviewable political determination exists somewhere in the case.[181] In *Zivotofsky*, a federal statute required that certain official documents for U.S. citizens born in Jerusalem record the place of birth as Israel.[182] But the State Department refused to specify "Israel" on a U.S. citizen's official documents that reflected Jerusalem as his place of birth.[183] The district court and the D.C. Circuit held that the resulting case presented a nonjusticiable political question.[184] The Supreme Court reversed.[185] The Court explained:

> The federal courts are not being asked to supplant a foreign policy decision of the political branches with the courts' own unmoored determination of what United States policy toward Jerusalem should be. Instead, Zivotofsky requests that the

---

failed to protect a state from an invasion within the meaning of Article IV, § 4 is nonjusticiable).

[179] *Sterling v. Constantin*, 287 U.S. 378, 399 (1932).

[180] 566 U.S. 189 (2012).

[181] *Id.* at 197-98; *see also Baker*, 369 U.S. at 215 n.43 (discussing *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1 (1831), as "a noteworthy example of the limited and precise impact of a political question" when the case otherwise came in a justiciable form).

[182] *Zivotofsky*, 566 U.S. at 191.

[183] *Id.* at 192-93.

[184] *Id.* at 193-94.

[185] *Id.* at 194.

courts enforce a specific statutory right. To resolve his claim, the Judiciary must decide if Zivotofsky's interpretation of the statute is correct, and whether the statute is constitutional. This is a familiar judicial exercise.[186]

The Court sketched the relevant constitutional inquiry:

> In this case, determining the constitutionality of [the statute] involves deciding whether [it] impermissibly intrudes upon Presidential powers under the Constitution. If so, the law must be invalidated and Zivotofsky's case should be dismissed for failure to state a claim. If, on the other hand, the statute does not trench on the President's powers, then the Secretary must be ordered to issue Zivotofsky a passport that complies with [the statute]. Either way, the political question doctrine is not implicated.[187]

The task in this case involves a similarly familiar judicial exercise. Las Americas claims that statutes enacted under S.B. 4 may not be constitutionally enforced because they are preempted by federal law. One of the reasons Director Martin contends that Texas's arrest and removal laws may lawfully be enforced is because the statutes are authorized under the State War Clause. Examining "the textual, structural, and historical evidence put forward by the parties regarding the nature of" the relevant powers "is what courts do."[188]

The military aspect of the State War Clause power relied upon by the Director does not disrupt this usual order. In *Sterling v. Constantin*,[189] the Governor of Texas had issued a proclamation stating that certain Texas

_____

[186] *Id.* at 196.

[187] *Id.*

[188] *Id.* at 201.

[189] 287 U.S. 378 (1932).

counties were in a state of insurrection, and he directed the Texas National Guard to limit production of oil in those counties.[190]  Oil-leasehold owners sued, alleging, among other things, violations of the Due Process Clause.[191] A court enjoined the Governor, and he argued that the judiciary "was powerless thus to intervene, and that the Governor's order had the quality of a supreme and unchallengeable edict, overriding all conflicting rights of property and unreviewable through the judicial power of the federal government."[192]  The Supreme Court disagreed, explaining:

> If this extreme position could be deemed to be well taken, it is manifest that the fiat of a state Governor, and not the Constitution of the United States, would be the supreme law of the land; that the restrictions of the Federal Constitution upon the exercise of state power would be but impotent phrases, the futility of which the state may at any time disclose by the simple process of transferring powers of legislation to the Governor to be exercised by him, beyond control, upon his assertion of necessity.[193]

Instead, the Court said, a state's wide discretion during times of military exigency does not mean "that every sort of action the Governor may take, no matter how unjustified by the exigency or subversive of private right and the jurisdiction of the courts, otherwise available, is conclusively supported by mere executive fiat."[194]  The Court remarked that it was "well established"

---

[190] *Id.* at 387-88.

[191] *Id.* at 387.

[192] *Id.* at 397.

[193] *Id.* at 397-98.

[194] *Id.* at 400.

that "the allowable limits of military discretion, and whether or not they have been overstepped in a particular case, are judicial questions."[195]

Accordingly, I see no reason to conclude that this case is nonjusticiable. It calls upon the court to evaluate the claim that S.B. 4 is unenforceable under the Supremacy Clause and also to consider Director Martin's contrary invocation of the State War Clause. These questions of constitutional interpretation are "a familiar judicial exercise."[196]

## IV

Since I conclude this case is justiciable, I would reach the merits. "A preliminary injunction is an extraordinary remedy never awarded as of right."[197] A party seeking a preliminary injunction "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."[198] In deciding whether to issue such relief, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'"[199] "The purpose of such interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward."[200]

_____

[195] *Id.* at 401.

[196] *See Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012).

[197] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)).

[198] *Id.* at 20.

[199] *Id.* at 24 (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987)).

[200] *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017) (per curiam) (citation omitted) (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).

This court reviews the district court's grant of a preliminary injunction for abuse of discretion.[201] A district court abuses its discretion when it bases its decision on errors of law or clearly erroneous factual determinations.[202] This court reviews conclusions of law de novo and findings of fact for clear error.[203]

## V

Las Americas would likely succeed on the merits. Consideration of this issue proceeds in four parts. The first is whether the Eleventh Amendment bars Las Americas's claims against Director Martin and whether Las Americas has a cause of action to pursue its challenge. The second addresses the scope of the facial challenge inquiry. The third analyzes whether federal law likely preempts S.B. 4. The fourth part assesses Director Martin's argument that S.B. 4's application to transnational cartel members is a constitutionally authorized response to an "invasion."

### A

#### 1

Before the merits panel, Director Martin asserted that Las Americas's claims were barred by sovereign immunity. He maintained that the claims did not come within the *Ex parte Young*[204] exception to sovereign immunity.

---

[201] *See Benisek v. Lamone*, 585 U.S. 155, 158 (2018); *see also Planned Parenthood of Greater Tex. Fam. Plan. & Preventative Health Servs., Inc. v. Kauffman*, 981 F.3d 347, 354 (5th Cir. 2020) (en banc).

[202] *See Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 696 (5th Cir. 2018).

[203] *See Kauffman*, 981 F.3d at 354.

[204] 209 U.S. 123 (1908).

"As an exception to the general rule of state sovereign immunity, *Ex parte Young* permits plaintiffs to sue a state officer in his official capacity for an injunction to stop ongoing violations of federal law."[205] "The officer sued must have 'some connection with the enforcement of the [challenged] act.'"[206] The required "connection," our circuit has recognized, can be difficult to articulate.[207] Regardless, several "guideposts" aid our analysis.[208] "[T]he official must have 'the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty.'"[209] "A history of prior enforcement is not required, especially in the pre-enforcement context that applies here."[210] "Nevertheless," Las Americas "must allege *some* action taken by [Director Martin] to show a demonstrated willingness to enforce."[211] Additionally, an official "must have more than

---

[205] *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 785 (5th Cir. 2024) (quoting *Lewis v. Scott*, 28 F.4th 659, 663 (5th Cir. 2022)).

[206] *Id.* (alteration in original) (quoting *Lewis*, 28 F.4th at 663).

[207] *See Healthy Vision Ass'n v. Abbott*, 138 F.4th 385, 396 (5th Cir. 2025) ("[O]ur decisions are not a model of clarity on what constitutes a sufficient connection to enforcement." (alteration in original) (quoting *Mi Familia Vota v. Ogg*, 105 F.4th 313, 325 (5th Cir. 2024))); *Lewis*, 28 F.4th at 663 ("[O]ur circuit has struggled to define this 'connection' requirement . . . ."); *Tex. All. for Retired Ams. v. Scott* (*TARA*), 28 F.4th 669, 672 (5th Cir. 2022) ("How much of a 'connection' has been hard to pin down, though."); *Tex. Democratic Party v. Abbott* (*TDP II*), 978 F.3d 168, 179 (5th Cir. 2020) ("This circuit has not spoken with conviction about all relevant details of the 'connection' requirement.").

[208] *TARA*, 28 F.4th at 672.

[209] *Id.* (quoting *TDP II*, 978 F.3d at 179).

[210] *Mi Familia Vota*, 105 F.4th at 330 (citing *Calhoun v. Collier*, 78 F.4th 846, 851 (5th Cir. 2023)).

[211] *Id.* (citing *Tex. Democratic Party v. Abbott* (*TDP I*), 961 F.3d 389, 401 (5th Cir. 2020)).

'the general duty to see that the laws of the state are implemented.'"[212] Furthermore, an official must be able to "compel or constrain" obeyance of the challenged law.[213]

These requirements are met as to Director Martin as the Director of DPS. This court recently held that the DPS Director has "more than just the general duty to see that the state's laws are implemented—[he is] *directly* responsible for enforcing Texas's criminal laws."[214] Moreover, this court stated that DPS officers "arrest people for violating Texas law, exercising 'compulsion or constraint' in service of the law."[215] Finally, there is direct evidence from state officials that DPS, under the direction of the Director, will make arrests and detain immigrants to enforce Texas's new immigration laws.[216] As already noted, then-Director McCraw himself testified before a Texas legislative committee that S.B. 4 may lead to an additional 75,000 to 80,000 arrests per year in Texas.[217] Accordingly, the Director has demonstrated a willingness to enforce the new immigration laws and is not entitled to sovereign immunity.

---

[212] *TARA*, 28 F.4th at 672 (quoting *City of Austin v. Paxton*, 943 F.3d 993, 999-1000 (5th Cir. 2019)).

[213] *Id.* ("'[E]nforcement' means 'compulsion or constraint.' If the official does not compel or constrain anyone to obey the challenged law, enjoining that official could not stop any ongoing constitutional violation." (citation omitted) (quoting *City of Austin*, 943 F.3d at 1000)).

[214] *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 786 (5th Cir. 2024).

[215] *Id.* (quoting *TARA*, 28 F.4th at 672).

[216] *See supra* notes 155-160 and accompanying text.

[217] ROA.959-60, ¶ 10 & n.1 (citing *Texas Senate Committee on Border Security*, at 49:19-50:45 (Nov. 1, 2023), https://senate.texas.gov/videoplayer.php?vid=18888&lang=en (statement of Steve McCraw, Director, Tex. Dep't of Pub. Safety)).

No. 24-50149

The Supreme Court has clearly stated, "[I]n determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'"[218]    Las Americas has satisfied that requirement in its complaint and by evidence presented during the preliminary injunction proceedings.

Director Martin asserted that "no Texas official will enforce any part of this law against" Las Americas, so it cannot "avail itself of *Ex Parte Young*" to overcome sovereign immunity.  But Director Martin pointed to no holding that *Ex parte Young* suits must fail when the challenged law will not be enforced against the plaintiff.  Indeed, the Supreme Court and our court have permitted plaintiffs to overcome sovereign immunity based on *Ex parte Young* even when the challenged law is not being, or will not be, enforced directly against the plaintiff itself.[219]

---

[218] *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011) (second alteration in original) (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)).

[219] *See, e.g.*, *id.* at 255-57 (suit by independent state agency to obtain records from another state agency); *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 471-73 (5th Cir. 2020) (en banc) (suit by a utility district to prevent state officials from, inter alia, certifying other water- or wastewater-service entities); *TDP II*, 978 F.3d 168, 179-80 (5th Cir. 2020) (suit by, inter alia, a political party arguing that limitations on mail-in-voting were unconstitutional); *see also Book People, Inc. v. Wong*, 91 F.4th 318, 335 (5th Cir. 2024) ("[T]he same type of direct enforcement found in *Ex*[*p*]*arte Young*, for instance, where the attorney general threatened civil and criminal prosecution . . . is not required." (quoting *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 519 (5th Cir. 2017))).

## 2

Director Martin also contends that Las Americas lacks a cause of action to pursue its claim. The Director advances two arguments in support. First, in his motion for a stay pending appeal, the Director argued that Las Americas lacks an equitable cause of action because it does "not allege enforcement of S.B. 4 threatens imminent legal proceedings against" it and it has not "sued any official who may potentially enforce the law against" it. The Director's briefing before the merits panel seemingly limited this "wrong plaintiff" argument to the sovereign immunity issue, as discussed above, but the en banc briefing renews this argument as to the cause-of-action issue. To the extent Director Martin argues that this characteristic of Las Americas's suit undermines its cause of action, that argument should likewise fail. JUDGE OLDHAM's concurring opinion, issued today, similarly questions whether "*Ex parte Young* applies," and whether Las Americas has asserted "a violation of [its] *own* rights."[220] The Supreme Court has allowed actions in equity to proceed based on *Ex parte Young* even when the government was not enforcing the challenged law directly against the plaintiff.

The Supreme Court's decision in *Truax v. Raich*[221] is one example. Arizona had enacted a law that made it a crime for most businesses to employ a workforce consisting of less than eighty percent "qualified electors or native-born citizens of the United States."[222] Truax, a restaurant owner, told his employee Raich, a native of Austria, he would be fired because of the new

---

[220] *Ante* at 35 n.5 (emphasis in original).

[221] 239 U.S. 33 (1915).

[222] *Id.* at 35.

law.[223] Raich filed a suit in equity against Truax, as well as Arizona's attorney general and a county attorney, seeking "a decree declaring the act to be unconstitutional and restraining action thereunder."[224] The defendants objected "that the complainant cannot sue save to redress his own grievance; that is, that the servant cannot complain for the master, and that it is the master who is subject to prosecution, and not the complainant."[225] The Supreme Court rejected this argument, concluding that the injury caused by the law would be felt by employees like Raich.[226] The Court said:

> It is, therefore, idle to call the injury indirect or remote. It is also entirely clear that unless the enforcement of the act is restrained the complainant will have no adequate remedy, and hence we think that the case falls within the class in which, if the unconstitutionality of the act is shown, equitable relief may be had.[227]

The same reasoning prevailed in *Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary*.[228] There, Oregon had imposed criminal penalties on parents and others who had charge of a child and who "fail[ed] or neglect[ed] or refuse[d] to send such child to a public school."[229] Religious corporations that owned or operated private schools sued the Governor of Oregon in equity alleging that the law violated the Fourteenth

---

[223] *Id.* at 36.

[224] *Id.*

[225] *Id.* at 38 (citation omitted).

[226] *Id.* at 38-39.

[227] *Id.* at 39.

[228] 268 U.S. 510 (1925).

[229] *Id.* at 530 n.1.

Amendment.[230] Even though the private schools were not regulated by the statute, the Supreme Court affirmed an injunction in the plaintiffs' favor, recognizing that a threatened injury to a business is the invasion of a legal right.[231] Citing *Truax*, the Court held "[p]revention of impending injury by unlawful action is a well-recognized function of courts of equity."[232] It was no obstacle that the Oregon law imposed penalties on children's custodians, not on schools. The same is true here for Las Americas. The fact that Director Martin will not enforce the entry and removal laws against Las America does not prevent it from suing in equity to challenge the enforcement of those laws.

Second, Director Martin argued in his briefing before the merits panel that Las Americas lacks a cause of action because Las Americas "alleges only a cause of action under the Supremacy Clause." As the Director points out, the Supreme Court held in *Armstrong v. Exceptional Child Center, Inc.*[233] that the Supremacy Clause "does not create a cause of action."[234] Director Martin argued that Las Americas must identify a statute containing "'rights-creating language' permitting [its] suit" but has not done so, making its suit "a nullity."[235]

The Director misunderstands both Las Americas's suit and the Supreme Court's analysis in *Armstrong*. Las Americas can sue in equity to

---

[230] *See id.* at 531-33.

[231] *Id.* at 536 (holding that the corporations could seek injunctive relief as "protection against arbitrary, unreasonable, and unlawful interference with their patrons and the consequent destruction of their business and property").

[232] *Id.* at 536.

[233] 575 U.S. 320 (2015).

[234] *Id.* at 324-25.

[235] *See Alexander v. Sandoval*, 532 U.S. 275, 288 (2001).

enjoin an allegedly preempted state law.  Even if a statute "does not confer a private right, a plaintiff is not prevented from gaining equitable relief on preemption grounds."[236]  "The 'ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity.'"[237]

The *Armstrong* decision itself exemplifies the existence of a preemption cause of action in equity.  There, the Supreme Court held the Supremacy Clause "certainly does not create a cause of action.  It instructs courts what to do when state and federal law clash, but is silent regarding who may enforce federal laws in court, and in what circumstances they may do so."[238]  The Court explained, "[t]he ability to sue to enjoin unconstitutional actions . . . is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England."[239]  "It is a judge-made remedy . . . ."[240]  Accordingly, despite rejecting the argument that the plaintiffs in that case could assert a cause of action under the Supremacy Clause, the remainder of the *Armstrong* opinion analyzed whether the plaintiffs' preemption claim could "proceed against Idaho in equity."[241]  The Court accepted that "equitable relief . . . is traditionally available to

---

[236] *Crown Castle Fiber, L.L.C. v. City of Pasadena*, 76 F.4th 425, 434-45 (5th Cir. 2023); *see also* Richard H. Fallon, Jr., et al., Hart and Wechsler's The Federal Courts and The Federal System 845 (7th ed. 2015) ("[T]he rule that there is an implied right of action to enjoin state or local regulation that is preempted by a federal statutory or constitutional provision . . . long appeared to be well-established.").

[237] *Crown Castle Fiber*, 76 F.4th at 434 (quoting *Armstrong*, 575 U.S. at 327); *see also Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 475 (5th Cir. 2020) (en banc) (holding that the plaintiff "has a cause of action against [state officials] *at equity*, regardless of whether it can invoke § 1983").

[238] *Armstrong*, 575 U.S. at 325.

[239] *Id.* at 327.

[240] *Id.*

[241] *Id.*

enforce federal law,"[242] but it ultimately held that Congress had displaced the *Armstrong* plaintiffs' equitable cause of action in that case by enacting the Medicaid Act.[243] Given the absence of such displacement here, as the district court recognized,[244] Las Americas should be permitted to proceed against Director Martin in equity.

Finally, while neither Director Martin nor Las Americas addressed this issue in their briefing before the merits panel, Director Martin contends in his en banc briefing that Las Americas lacks an equitable cause of action because enforcement of S.B. 4 will not invade its legal rights. The Supreme Court, however, addressed a similar argument in *Pierce*:

> Generally, it is entirely true, as urged by counsel, that no person in any business has such an interest in possible customers as to enable him to restrain exercise of proper power of the state upon the ground that he will be deprived of patronage. But the injunctions here sought are not against the exercise of any proper power. Appellees asked protection against arbitrary, unreasonable, and unlawful interference with their patrons and the consequent destruction of their business and property. Their interest is clear and immediate, within the rule approved in *Truax v. Raich*, *Truax v. Corrigan*,[245] and *Terrace v. Thompson*,[246] and many other cases where injunctions have issued to protect business enterprises against interference with the freedom of patrons or customers.[247]

---

[242] *Id.* at 329.

[243] *Id.* at 327-29.

[244] *See United States v. Texas*, 719 F. Supp. 3d 640, 661-62 (W.D. Tex. 2024).

[245] 257 U.S. 312 (1921).

[246] 263 U.S. 197 (1923).

[247] *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 535-36 (1925) (citation omitted).

No. 24-50149

Given the parallels between the patrons in *Pierce* and the immigrant-clients in this case, as well as Texas's improper exercise of power, Las Americas has likely successfully articulated a cognizable equitable cause of action. At this stage of the litigation, no more is necessary.

**B**

The Supreme Court has often said that "a plaintiff bringing a facial challenge must 'establish that no set of circumstances exists under which the [law] would be valid,' or show that the law lacks 'a plainly legitimate sweep.'"[248] Director Martin contends the preliminary injunction must be vacated if there is a single hypothetical application of S.B. 4 that may be legitimately enforced.

Of course, if a law regulates in a field occupied by Congress, every application of that law is preempted.[249] That is because "[w]here Congress occupies an entire field, . . . even complementary state regulation is impermissible."[250] The dissenting panel opinion pointed to the Supreme Court's decision in *Moody v. NetChoice, LLP*,[251] for the proposition that "in all cases outside the First Amendment, courts must apply *United States v.*

---

[248] *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) (alteration in original) (citations omitted) (first quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987); and then quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)).

[249] *See Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 589 (1987) (explaining that "[i]f the Federal Government occupied the field of environmental regulation of unpatented mining claims in national forests," state environmental regulation would be preempted regardless of their form).

[250] *Arizona v. United States*, 567 U.S. 387, 401 (2012).

[251] 603 U.S. 707 (2024).

*Salerno*" when a facial challenge is mounted.[252]  However, *Moody* was not a preemption case, and accordingly, it did not consider how, as a matter of logic, *Salerno* could apply when every application of a state law is preempted because Congress has occupied the field.

JUDGE OLDHAM's concurring opinion issued today again cites *Moody*,[253] *Bondi v. VanDerStok*,[254] and *United States v. Rahimi*,[255] in asserting that *Salerno* applies in the context of a facial preemption challenge.[256]  None of those decisions involved preemption, much less field preemption.  If a state law is preempted by federal law because Congress has occupied the field, it follows that no set of circumstances exists under which the state law would be valid.  A facial challenge to a state law that is field preempted can succeed.

Field preemption aside, it is not clear-cut that Director Martin's standard, based on *Salerno*, is correct in other preemption contexts such as conflict preemption.  Some of our sister circuits have expressed uncertainty about whether the *Salerno* standard—that a plaintiff must "establish that no set of circumstances exists under which the [law] would be valid"[257]—applies in the preemption context.[258]  Those circuits have further reasoned

---

[252] 144 F.4th 632, 725 (5th Cir. 2025) (OLDHAM, J., dissenting) (citing *Moody*, 603 U.S. at 723); *see United States v. Salerno*, 481 U.S. 739 (1987).

[253] *Ante* at 26, 27, 30, 33 and 33 n.3.

[254] 604 U.S. 458, 466–67 (2025); cited *ante* at 27, 33 and 33 n.3.

[255] 602 U.S. 680, 701 (2024); cited *ante* at 27, 33 and 33 n.3.

[256] *Ante* at 33.

[257] *Salerno*, 481 U.S. at 745.

[258] *See, e.g.*, *Club Madonna Inc. v. City of Mia. Beach*, 42 F.4th 1231, 1256 (11th Cir. 2022); *League of Women Voters of Ind., Inc. v. Sullivan*, 5 F.4th 714, 728-29 (7th Cir. 2021); *United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 917 (10th Cir. 2016); *Lozano v. City of Hazleton*, 724 F.3d 297, 313 n.22 (3d Cir. 2013).  *But see Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1104 n.6 (9th Cir. 2016).

that even if the *Salerno* standard applies, positing a hypothetical non-preempted application is not sufficient to defeat a facial preemption challenge.[259]

I see support for our sister circuits' interpretation in the Supreme Court's cases. In *Arizona*, the Supreme Court sustained facial challenges to three state statutes, on field preemption grounds as to one, conflict preemption grounds as to another, and as to the third, on the basis that the state law stood as "an obstacle to the full purposes and objectives of Congress,"[260] without discussing *Salerno* or the no-set-of-circumstances standard.[261] The Court did so despite JUSTICE ALITO's dissenting opinion, which discussed *Salerno* in connection with the statute the Court held was preempted as an "obstacle."[262] However, in a much earlier decision, the Court held that to defeat a facial challenge in which it was asserted that the federal regulation "per se" preempted state regulation, the state governmental authority "needed merely to identify a possible set of permit conditions not in conflict with federal law."[263] Ultimately, however, I need not take a side in this debate. For the reasons discussed below, I would hold

_____

[259] *See, e.g.*, *Club Madonna*, 42 F.4th at 1256; *Sullivan*, 5 F.4th at 728-29; *Sup. Ct.*, 839 F.3d at 917; *Lozano*, 724 F.3d at 313 n.22. *But see Metro PCS Cal., LLC v. Picker*, 970 F.3d 1106, 1122 (9th Cir. 2020).

[260] *See Arizona v. United States*, 567 U.S. 387, 410 (2012).

[261] *See id.* at 408-10 (holding, in facial challenges, that state laws were preempted without determining whether there were applications of the provisions that would be consistent with federal law, and without citing *Salerno*).

[262] *See id.* at 457-58 (ALITO, J., concurring in part and dissenting in part) (dissenting in part on the basis that "[t]he point is that there are plenty of permissible applications of § 6" and citing *Salerno*, contending the United States did not show there was no set of circumstances under which the statute would be valid).

[263] *Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 593 (1987).

that Las Americas has likely shown there are no non-preempted applications of Texas's new immigration laws.

JUDGE OLDHAM's concurring opinion issued today asserts that it is "easy to imagine an application of S.B. 4 that is not conflict preempted."[264] The imagined scenario is that a Texas rancher whose land abuts the border between Texas and Mexico contacts the Sheriff of the county in which the ranch is located because aliens are illegally entering from Mexico and trespassing on the ranch, inflicting various damages in doing so.[265] Sheriff's deputies respond and arrest the migrants, who are from Nicaragua and claim they will be tortured if returned to that country.[266] "[I]n lieu of additional criminal process, the magistrate orders the aliens to return to Mexico and orders state officers to transport them to a port of entry."[267] "When the sheriff's office turns the group over to federal authorities, CBP processes the aliens in accordance with federal immigration law and the Convention Against Torture."[268]

Two reasons this hypothetical does not posit a valid application of the Texas immigration laws have already been discussed above.[269] One is that all of the actions purportedly taken under state law by state officers or judges were unilateral, not at the request or approval of the federal government. The state laws "authoriz[e] state and local officers to engage in these enforcement activities as a general matter," and therefore "create[] an

---

[264] *Ante* at 27.

[265] *Ante* at 27-28.

[266] *Ante* at 28.

[267] *Id.*

[268] *Ante* at 28-29.

[269] *See ante* at 51-54.

obstacle to the full purposes and objectives of Congress."[270]  That is the short answer to the question in the concurring opinion: "if it is ok to jail or imprison aliens for a host of state law crimes . . ., why is it not ok to deliver the same aliens to federal authorities in lieu of state prosecution?"[271]  The second reason that the hypothetical is not a valid application of state law is that the hypothetical does not actually apply state law as it is written.  It instead assumes state law enforcement officer will take actions that the state laws do not permit.

JUDGE OLDHAM's concurring opinion purports to "consider (1) what happens under S.B. 4 and (2) what happens in the absence of S.B. 4."[272]  The opinion concludes that under (1), state officers turn the illegal aliens over to federal immigration authorities who consider the aliens' CAT claims.[273] Under (2), the opinion says, because of their prosecution under state trespass law, "the aliens are stuck in the state system for months if not years."[274]  The ultimate question JUDGE OLDHAM's opinion asks is: "Now, which outcome is more consistent with federal immigration law?  The application of S.B. 4, in which the migrants end up in federal custody and are processed consistent with federal law?  Or the application of § 30.05(a), in which the migrants end up in state jail for criminal trespass?"[275]  The fault lines running through this analysis are many.

---

[270] *Arizona v. United States*, 567 U.S. 387, 410 (2012).

[271] *Ante* at 29.

[272] *Ante* at 28.

[273] *Ante* at 28-29.

[274] *Ante* at 29 (citing TEX. PENAL CODE § 30.05(a)).

[275] *Ante* at 29.

No. 24-50149

Federal immigration law is indifferent as to whether Texas prosecutes the illegal aliens for trespass under Texas law.  Federal immigration law does not shield illegal aliens from the consequences of committing state criminal offenses such as trespass, theft, burglary, rape, assault, murder, etc.  States are free to apprehend, prosecute and imprison illegal aliens who violate such state laws.  If an alien has an asylum or CAT claim, she may pursue it while in state criminal proceedings or in state custody.[276]  It should also be noted that an illegal alien in state custody for allegedly committing a state crime other than illegal entry or reentry is not fast-tracked for removal, like the laws at issue in the present case do.

In any event, the imagined scenario does not defeat a facial challenge which asserts that § 51.02 and other Texas statutes that provide how it is to be enforced are preempted.  The *Arizona* decision explains why laws like the Texas immigration laws conflict with federal immigration law.

First, in *Arizona*, the Supreme Court rejected an argument almost identical to the one advanced in JUDGE OLDHAM's concurring opinion, which is that permitting state law enforcement officials to arrest illegal aliens under a state immigration law "actively *facilitates* federal law."[277]  In *Arizona*, Section 6 of the Arizona law at issue "provide[d] that a state officer, 'without a warrant, may arrest a person if the officer has probable cause to believe . . . [the person] has committed any public offense that makes [him] removable from the United States.'"[278]  The Supreme Court recounted that, "[i]n

---

[276] It is highly problematic, however, to prosecute an alien for illegal entry under *state* law, even if the alien could attempt to pursue an asylum claim while ensnared in state criminal proceedings.  I discuss this in more detail below.

[277] *Ante* at 27 (emphasis in original).

[278] *Arizona v. United States*, 567 U.S. 387, 407 (2012) (quoting ARIZ. REV. STAT. ANN. § 13–3883(A)(5)).

defense of § 6, Arizona notes a federal statute permitting state officers to 'cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States,'" which was and is 8 U.S.C. § 1357(g)(10)(B).[279] The Supreme Court held that this did not defeat the facial challenge to § 6. The Court said, "There may be some ambiguity as to what constitutes cooperation under the federal law; *but no coherent understanding of the term would incorporate the unilateral decision of state officers to arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government.*"[280] The Court explained that because the state law authorized unilateral action by state officers, it was preempted: "But the unilateral state action to detain authorized by § 6 goes far beyond these measures, defeating any need for real cooperation. . . . By nonetheless authorizing state and local officers to engage in these enforcement activities as a general matter, § 6 creates an obstacle to the full purposes and objectives of Congress."[281] The Texas laws at issue in this appeal, like § 6 of the Arizona law, permit state officers to arrest an alien who is unlawfully present in the United States without any request, approval, or other instruction from the federal government.

---

[279] *Id*. at 410.

[280] *Arizona*, 567 U.S. at 410 (emphasis added); *see also id*. (giving examples of what "cooperation" means as used in 8 U.S.C. § 1357(g)(10): "The Department of Homeland Security gives examples of what would constitute cooperation under federal law. These include situations where States participate in a joint task force with federal officers, provide operational support in executing a warrant, or allow federal immigration officials to gain access to detainees held in state facilities. *See* Dept. of Homeland Security, Guidance on State and Local Governments' Assistance in Immigration Enforcement and Related Matters 13–14 (2011), online at http://www.dhs.gov/files/resources/immigration.shtm (all Internet materials as visited June 21, 2012, and available in Clerk of Court's case file). State officials can also assist the Federal Government by responding to requests for information about when an alien will be released from their custody. *See* § 1357(d).").

[281] *Id*. (citing *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

JUDGE OLDHAM's concurring opinion asserts that unlike § 6 of the law at issue in *Arizona*, the Texas immigration laws under consideration here do "not authorize state officials to make unilateral decisions with vague terms like 'public offense.'"[282] That is correct but irrelevant. The Texas immigration laws (1) allow state law enforcement officers to arrest someone they see and have reason to believe is illegally entering the United States, (2) requires that the aliens be taken before a magistrate or judge, and unless one of the limited "affirmative defenses" applies, (3) requires that a court order that the alien return or be returned to the country from which they entered or suffer imprisonment or fines, followed by their required return to the country from which they entered. All of that can occur without authorization or even the knowledge of the executive branch of the federal government. That was precisely the problem with § 6 in *Arizona*.

Second, in *Arizona*, as already noted, JUSTICE ALITO's dissenting opinion contended that "there are plenty of permissible applications of § 6" of the challenged Arizona law, and, citing *Salerno*, asserted that the United States did not show there was no set of circumstances under which the statute would be valid.[283] The Supreme Court nevertheless sustained a facial challenge and held § 6 was preempted by federal law.[284] The Court likely did so because there was no set of *relevant* circumstances under which the state statute would be valid. The Supreme Court strongly implied as much, concluding "Congress has put in place a system in which state officers may not make warrantless arrests of aliens based on possible removability except in specific, limited circumstances. *By nonetheless authorizing state and local*

---

[282] *Ante* at 31.

[283] *See* n.250, *ante*.

[284] *Arizona*, 567 U.S. at 410.

*officers to engage in these enforcement activities as a general matter, § 6 creates an obstacle to the full purposes and objectives of Congress.*"[285] The Court emphasized in *Arizona* that decisions as to whether an alien who illegally entered may remain in the United States are exclusively a federal matter: "By authorizing state officers to decide whether an alien should be detained for being removable, § 6 violates the principle that the removal process is entrusted to the discretion of the Federal Government."[286] "A decision on removability requires a determination whether it is appropriate to allow a foreign national to continue living in the United States. Decisions of this nature touch on foreign relations and must be made with one voice."[287] The Court then cited *Jama v. Immigration and Customs Enforcement* for the proposition that "'[r]emoval decisions, including the selection of a removed alien's destination, may implicate [the Nation's] relations with foreign powers and require consideration of changing political and economic circumstances.'"[288] The Court cited *Galvan v. Press*, for the proposition that "[p]olicies pertaining to the entry of aliens and their right to remain here are . . . entrusted exclusively to Congress."[289] It cited *Truax v. Raich*, for the proposition that "[t]he authority to control immigration—to admit or exclude aliens—is vested solely in the Federal Government."[290] This discussion and elucidation of the nature of entry, remaining, and removal

---

[285] *Id*. (emphasis added).

[286] *Id*. at 409 (citing *Reno v. American–Arab Anti–Discrimination Comm.*, 525 U.S. 471, 483–84 (1999)).

[287] *Id*. (citing *Jama v. Immigration and Customs Enforcement*, 543 U.S. 335, 348 (2005)).

[288] *Id*. (quoting *Jama*, 543 U.S. at 348) (internal quotation marks omitted) (alterations in original).

[289] *Id*. (quoting *Galvan*, 347 U.S. 522, 531 (1954)).

[290] *Id*. at 409-10 (quoting *Truax v. Raich*, 239 U.S. 33, 42 (1915)).

decisions makes clear that there is no room for states to legislate in this regard. Accordingly, Texas's challenged immigration laws are not valid under any set of circumstances.

Another principle to bear in mind regarding facial challenges is that in *City of Los Angeles v. Patel*,[291] the Supreme Court explained that a court's assessment of a facial challenge is limited to a law's applications that are not already legitimately authorized by other laws. The *Patel* decision concerned a facial challenge to a Los Angeles ordinance that compelled "'[e]very operator of a hotel to keep a record' containing specified information concerning guests and to make this record 'available to any officer of the Los Angeles Police Department for inspection' on demand."[292] Los Angeles argued that "facial challenges to statutes authorizing warrantless searches must fail because such searches will never be unconstitutional in all applications."[293] The Supreme Court remarked that Los Angeles misunderstood how courts analyze facial challenges.[294] The Court said:

> Under the most exacting standard the Court has prescribed for facial challenges, a plaintiff must establish that a "law is unconstitutional in all of its applications." But when assessing whether a statute meets this standard, the Court has considered only applications of the statute in which it actually authorizes or prohibits conduct.[295]

---

[291] 576 U.S. 409 (2015).

[292] *Id.* at 412 (alteration in original) (quoting L.A., Cal. Municipal Code § 41.49(2), (3)(a), (4) (2015)).

[293] *Id.* at 417.

[294] *Id.* at 418.

[295] *Id.* (citation omitted) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)).

The *Patel* decision reasoned: "Similarly, when addressing a facial challenge to a statute authorizing warrantless searches, the proper focus of the constitutional inquiry is searches that the law actually authorizes, not those for which it is irrelevant."[296] The Court further rejected the argument that "a statute authorizing warrantless searches may still have independent force if it imposes a penalty for failing to cooperate in a search conducted under a warrant or in an exigency."[297] The Court explained that "[t]his argument gets things backwards. An otherwise facially unconstitutional statute cannot be saved from invalidation based solely on the existence of a penalty provision that applies when searches are not actually authorized by the statute."[298]

Nor does the severability clause in S.B. 4 save its entry and removal laws. In *Whole Woman's Health v. Hellerstedt*,[299] the Supreme Court explained that a robust severability clause is not sufficient to save an otherwise unconstitutional law. Of course, *Hellerstedt*, which held that a Texas law was facially unconstitutional because it imposed an undue burden on the ability to obtain an abortion, has been largely abrogated by *Dobbs v. Jackson Women's Health Organization*.[300] Nevertheless, the Court's analysis of the law's severability clause was not abrogated by *Dobbs* and remains good law.

---

[296] *Id.*

[297] *Id.* at 419 n.1.

[298] *Id.*

[299] 579 U.S. 582 (2016), *abrogated by, Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022).

[300] 597 U.S. 215 (2022).

After holding the law was unconstitutional, *Hellerstedt* turned to Texas's arguments against facial invalidation. Texas argued that "facial invalidation of both challenged provisions is precluded by H.B. 2's severability clause."[301] That severability clause was substantially identical to S.B. 4's severability clause in this case.[302] The severability clause in *Hellerstedt* stated that "every provision, section, subsection, sentence, clause, phrase, or word in this Act, and every application of the provision in this Act, are severable from each other."[303] It further provided that if "any application of any provision in this Act to any person, group of persons, or circumstances is found by a court to be invalid, the remaining applications of that provision to all other persons and circumstances shall be severed and may not be affected."[304] The Court rejected the idea that the severability clause precluded facial invalidation. It reiterated its reasons for holding that the statute imposed an undue burden and stated, "The provisions are unconstitutional on their face: Including a severability provision in the law does not change that conclusion."[305]

Significantly, the Court explained:

Severability clauses, it is true, do express the enacting legislature's preference for a narrow judicial remedy. As a general matter, we attempt to honor that preference. But our

---

[301] *Hellerstedt*, 579 U.S. at 624.

[302] S.B. 4's severability clause reads: "It is the intent of the legislature that every provision, section, subsection, sentence, clause, phrase, or word in this Act, and every application of the provisions in this Act to every person, group of persons, or circumstances, is severable from each other." S.B. 4, 88th Leg., 4th C. S., ch. 2, § 8, 2023 Tex. Gen. Laws 4750, 4755 (codified at Tex. Code Crim. Proc. art. 5B.003).

[303] 579 U.S. at 624.

[304] *Id.*

[305] *Id.* at 624-25.

cases have never required us to proceed application by conceivable application when confronted with a facially unconstitutional statutory provision. "We have held that a severability clause is an aid merely; not an inexorable command." *Reno v. American Civil Liberties Union*, [521 U.S. 844, 884 n.49] (1997) (internal quotation marks omitted). Indeed, if a severability clause could impose such a requirement on courts, legislatures would easily be able to insulate unconstitutional statutes from most facial review. See *ibid.* ("It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large. This would, to some extent, substitute the judicial for the legislative department of the government" (internal quotation marks omitted)). A severability clause is not grounds for a court to "devise a judicial remedy that . . . entail[s] quintessentially legislative work." *Ayotte v. Planned Parenthood of Northern New Eng.*, [546 U.S. 320, 329] (2006). Such an approach would inflict enormous costs on both courts and litigants, who would be required to proceed in this manner whenever a single application of a law might be valid. We reject Texas' invitation to pave the way for legislatures to immunize their statutes from facial review.[306]

The Court concluded that "Texas' attempt to broadly draft a requirement to sever 'applications' does not require us to proceed in piecemeal fashion when we have found the statutory provisions at issue facially unconstitutional."[307]

---

[306] *Id.* at 625.

[307] *Id.* at 626.

No. 24-50149

## C

The Supremacy Clause makes the laws of the United States "the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."[308] The Clause declares a simple truth—"which flows immediately and necessarily from the institution of a federal government"—that federal law preempts contrary state law.[309] In doing so, the Clause serves as a cornerstone of our system of federalism, providing the federal government with a "decided advantage" to "impose its will on the States."[310]

Under the doctrine of preemption, Congress may displace state law expressly by using explicit language in a federal statute.[311] In such a case, "the courts' task is an easy one."[312] We focus on the "plain wording" of the preemption language to determine the preemptive effect of the statute.[313] However, Congress does not always make its intent readily apparent. In the absence of an explicit preemption clause, congressional intent may be inferred "from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude

––––––––––––––––––––––

[308] U.S. Const. art. VI, cl. 2.

[309] The Federalist No. 33, at 205 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

[310] *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).

[311] *See, e.g.*, *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993).

[312] *Eng. v. Gen. Elec. Co.*, 496 U.S. 72, 78-79 (1990).

[313] *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 594 (2011) (quoting *CSX Transp., Inc.*, 507 U.S. at 664).

enforcement of state laws on the same subject.'"[314]   Courts refer to this doctrine as field preemption.

Federal law also "naturally preempt[s]" state law to the extent the state law conflicts with a federal statute.[315]   "This includes cases where 'compliance with both federal and state regulations is a physical impossibility,' and those instances where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"[316]   Courts refer to this doctrine as conflict preemption.

It is undisputed that Congress has not explicitly preempted S.B. 4 by including specific language in any of its enactments governing the entry and removal of aliens.   Instead, the plaintiffs contend S.B. 4 is both field and conflict preempted by federal law.   In light of these concerns, Las Americas brought a facial challenge to enjoin the enforcement of S.B. 4.   I address the preemption arguments in two parts: (1) whether S.B. 4 intrudes on a field Congress intended to occupy, and (2) the extent to which S.B. 4 conflicts with federal law.

**1**

Field preemption occurs when "States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance."[317]   The Supreme

_____

[314] *Arizona v. United States*, 567 U.S. 387, 399 (2012) (alterations in original) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

[315] *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).

[316] *Arizona*, 567 U.S. at 399 (first quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963); and then quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

[317] *Id.*

No. 24-50149

Court has indicated that courts should hesitate to infer field preemption unless "the nature of the regulated subject matter permits no other conclusion" or "Congress has unmistakably so ordained."[318]   When analyzing field preemption, "the relevant field should be defined narrowly."[319]   The operative question, therefore, is whether Congress intended to "occupy the field"[320] of immigration policies concerning entry into and removal from the United States.

The district court concluded that "the federal government has both a dominant interest and a pervasive regulatory framework" to control immigration into the United States, "preclud[ing] state regulation in the area."[321]   I agree.

For nearly 150 years, the Supreme Court has recognized that the power to control immigration—the entry, admission, and removal of aliens—is *exclusively* a federal power.[322]   Despite this fundamental axiom, S.B. 4

---

[318] *DeCanas v. Bica*, 424 U.S. 351, 356 (1976) (quoting *Fla. Lime & Avocado Growers*, 373 U.S. at 142).

[319] *City of El Cenizo v. Texas*, 890 F.3d 164, 177 (5th Cir. 2018) (first citing *Arizona*, 567 U.S. at 400-01; and then citing *DeCanas*, 424 U.S. at 360 n.8).

[320] *Crosby*, 530 U.S. at 372 (citing *California v. ARC Am. Corp.*, 490 U.S. 93, 100 (1989)).

[321] *United States v. Texas*, 719 F. Supp. 3d 640, 663 (W.D. Tex. 2024).

[322] *See, e.g.*, *Plyler v. Doe*, 457 U.S. 202, 228 n.23 (1982) ("[T]he State has no direct interest in controlling entry into this country, that interest being one reserved by the Constitution to the Federal Government . . . ."); *Hampton v. Mow Sun Wong*, 426 U.S. 88, 102 n.21 (1976) ("It is important to note that the authority to control immigration is . . . vested solely in the Federal Government, rather than the States . . . ."); *DeCanas*, 424 U.S. at 354 ("Power to regulate immigration is unquestionably exclusively a federal power."); *Galvan v. Press*, 347 U.S. 522, 531 (1954) ("[T]hat the formulation of . . . policies [regarding the entry of aliens and their right to remain here] is entrusted exclusively to Congress has become about as firmly [e]mbedded in the legislative and judicial tissues of our body politic as any aspect of our government."); *Truax v. Raich*, 239 U.S. 33, 42 (1915) ("The authority to control immigration—to admit or exclude aliens—is vested solely in

creates separate, distinct *state* criminal offenses for unauthorized entry and reentry of aliens into Texas from a foreign nation, and it provides procedures for their removal. More specifically, §§ 51.02 and 51.03 prohibit the unlawful entry and reentry of aliens into the state from outside the country,[323] and article 5B.002 empowers Texas state judges and magistrates to order aliens to return to the foreign nation from which they entered or attempted to enter.[324]

The Supreme Court's decision in *Arizona v. United States*[325] provides considerable guidance as to whether these provisions are field preempted by federal law. There, the Court held a provision of Arizona's S.B. 1070—§ 3—was field preempted.[326] The state provision punished an alien's "willful failure to complete or carry an alien registration document,"[327] adopting the same substantive standards as the federal law that required aliens to carry proof of registration.[328] After analyzing the federal regulations in the "field of alien registration," the Court observed that "the framework enacted by Congress leads to the conclusion . . . that the Federal Government has

_____

the Federal government."); *Fong Yue Ting v. United States*, 149 U.S. 698, 713 (1893) ("The power to exclude or to expel aliens, being a power affecting international relations, is vested in the political departments of the government, and is to be regulated by treaty or by act of [C]ongress . . . ."); *Chy Lung v. Freeman*, 92 U.S. 275, 280 (1875) ("The passage of laws which concern the admission of citizens and subjects of foreign nations to our shores belongs to Congress, and not to the States."); *Henderson v. Mayor of New York*, 92 U.S. 259, 272 (1875) (holding immigration is a "power[], which, from [its] nature, [is] exclusive in Congress").

[323] Tex. Penal Code §§ 51.02-03.

[324] Tex. Code Crim. Proc. art. 5B.002.

[325] 567 U.S. 387 (2012).

[326] *Id.* at 403.

[327] *Id.* at 400 (quoting Ariz. Rev. Stat. Ann. § 13-1509(A)).

[328] *Id.* at 402.

occupied the field of alien registration."[329]  The Court noted: "The federal statutory directives provide a full set of standards governing alien registration, including the punishment for noncompliance."[330]  The Court explained this national registration scheme "was designed as a 'harmonious whole.'"[331]

In his opening brief, Director Martin correctly observes that the statutes at issue in *Arizona* did not regulate the entry and removal of aliens. But the Court's holding in *Arizona* provides guiding principles.  The Court held: "Where Congress occupies an entire field, as it has in the field of alien registration, even complementary state regulation is impermissible.  Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards."[332]

Applying *Arizona*'s guiding principles, Congress also intended to occupy the field of immigration policies concerning entry into and removal from the United States.  In 1952, Congress enacted the Immigration and Nationality Act (INA) to establish a "comprehensive federal statutory scheme for regulation of immigration and naturalization" and to set "the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country."[333]  The Act's "central concern" is the "entry and stay of aliens" in the United States.[334]  The Act makes it

---

[329] *Id.* at 401.

[330] *Id.*

[331] *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 72 (1941)).

[332] *Id.* (citing *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 249 (1984)).

[333] *DeCanas v. Bica*, 424 U.S. 351, 353, 359 (1976); *accord Chamber of Com. v. Whiting*, 563 U.S. 582, 587 (2011).

[334] *DeCanas*, 424 U.S. at 359.

unlawful for any alien to enter the United States other than through a port of entry,[335] and it punishes any alien who unlawfully reenters or remains in the United States.[336]   By enacting the INA, Congress established a comprehensive framework to identify *who* may enter,[337] *how* they may enter,[338] *where* they may enter,[339] and *what* penalties apply for those who enter unlawfully.[340]

When analyzing § 3 of S.B. 1070, the *Arizona* decision explained that "[f]ederal law makes a single sovereign responsible for maintaining a comprehensive and unified system to keep track of aliens within the Nation's borders."[341]  This logic applies equally—if not more—to the sensitive topic of aliens entering and remaining in the country.

The very moment an alien enters the United States, they are subject to an intricate system of federal commands.  In describing this system, I note

---

[335] 8 U.S.C. § 1325(a).

[336] *Id.* § 1326(a).

[337] *See, e.g.*, *id.* § 1182 (establishing classes of aliens ineligible for visas or admission).

[338] *See, e.g.*, *id.* § 1181 (establishing document requirements for admission); *id.* § 1225(a)(3) (establishing aliens "who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers"); *id.* § 1185(a) ("Unless otherwise ordered by the President, it shall be unlawful . . . for any alien to depart from or enter . . . the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe.").

[339] *See, e.g.*, *id.* § 1224 (authorizing the Attorney General to designate ports of entry for aliens arriving by aircraft); *see also* 8 C.F.R. § 100.4 (establishing different ports of entry for different classes of aliens).

[340] *See, e.g.*, 8 U.S.C. § 1325(a) (establishing criminal penalties for improper entry by aliens); *id.* § 1326(a) (establishing criminal penalties for improper reentry by removed aliens).

[341] *Arizona v. United States*, 567 U.S. 387, 401-02 (2012).

at the outset that after the Homeland Security Act of 2002, many references in the INA to the "Attorney General" are now read to mean the Secretary of Homeland Security.[342]

When an alien enters the United States, they immediately receive the federal immigration status of "applicant for admission" and may lawfully remain in this country only with federal permission.[343] If an alien enters the United States "at any time or place other than as designated by the Attorney General," they are "inadmissible" and removable under 8 U.S.C. §§ 1182(a)(6)(A)(i) and 1229a(e)(2).[344] But, before they are removed, all aliens are subject to federal inspection.[345] Congress has created a comprehensive—and likely exclusive—system for federal immigration officers to determine the admissibility and removability of aliens.

Congress criminalized the unlawful entry and reentry of aliens under 8 U.S.C. §§ 1325(a) and 1326(a). But regardless of whether an alien violates these provisions, an immigration officer must still determine whether they may remain in the United States or whether they must be removed. The "usual removal process involves an evidentiary hearing before an immigration judge."[346] At that hearing, the alien may be represented by counsel, present evidence on their behalf, and attempt to show why they should be admitted.[347] Among other things, the alien may claim asylum by expressing fear of persecution or harm upon return to their home country;

---

[342] *See* 6 U.S.C. § 557; *Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005).

[343] 8 U.S.C. § 1225(a)(1); *see also id.* §§ 1181, 1182.

[344] *Id.* §§ 1182(a)(6)(A)(i), 1229a(e)(2).

[345] *Id.* § 1225(a)(3).

[346] *DHS v. Thuraissigiam*, 591 U.S. 103, 108 (2020).

[347] *See* 8 U.S.C. § 1229a(b)(4); 8 C.F.R. § 1240.11(c).

seek relief from removal by asserting a Convention Against Torture (CAT) claim; or seek dispensation from the Attorney General.[348]  If their claim is rejected and the alien is ordered removed, they can appeal the removal order to the Board of Immigration Appeals.[349]  If that appeal is unsuccessful, the alien is generally entitled to review in a federal court of appeals.[350]

There is also a more expedited procedure for removal.  If an immigration officer determines that an alien who is arriving in the United States is inadmissible because they misrepresented their admission status or lack valid admission documentation, the officer must order the alien removed from the United States without further hearing or review.[351]  Other aliens who are already present in the United States are subject to the same expedited removal if they "(1) [are] inadmissible because [they] lack[] a valid entry document; (2) [have] not 'been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility'; and (3) [are] among those whom the Secretary of Homeland Security has designated for expedited removal."[352] Aliens subject to this expedited removal procedure can avoid removal by claiming asylum or a fear of persecution, at which point they are referred to

---

[348] *See* 8 C.F.R. § 1240.11(c) (asylum); *id.* § 208.16 (CAT); 8 U.S.C. § 1229b (dispensation from Attorney General); *see also Arizona v. United States*, 567 U.S. 387, 396 (2012) ("If removal proceedings commence, aliens may seek asylum and other discretionary relief allowing them to remain in the country or at least to leave without formal removal.").

[349] 8 U.S.C. § 1229a(c)(5); 8 C.F.R. § 1003.1(b).

[350] 8 U.S.C. § 1229a(c)(5), 1252(a).

[351] *Id.* §§ 1225(b)(1)(A)(i), 1182(a)(6)(C), 1182(a)(7).

[352] *DHS v. Thuraissigiam*, 591 U.S. 103, 109 (2020) (citing 8 U.S.C. § 1225(b)(1)(A)(i), (b)(1)(A)(iii)(I)-(II)).

an asylum officer.[353] If the asylum officer finds the applicant does not have a credible fear, a supervisor will review the asylum officer's determination.[354] The supervisor's review can be appealed to an immigration judge.[355]

Against the backdrop of this national immigration system, and applying the guiding principles espoused in *Arizona*, it becomes clear that the new Texas laws pertaining to entry and removal infringe on a preempted field.

First, the Supreme Court in *Arizona* explained that "[a] principal feature of the [federal] removal system is the broad discretion exercised by immigration officials."[356] As part of this discretion, the *Arizona* Court acknowledged, "[f]ederal officials, as an initial matter, must decide whether it makes sense to pursue removal at all."[357]

Indeed, the INA indicates executive discretion is an integral part of immigration policy. Congress gave the Executive the authority to establish "reasonable rules, regulations, and orders" regarding any aliens attempting to depart from or enter the United States.[358] Congress gave the Attorney General authority to waive various requirements that would otherwise stand in the way of admission.[359] Congress also allowed immigration judges the

---

[353] 8 U.S.C. § 1225(b)(1)(A)(ii).

[354] 8 C.F.R. § 208.30(e)(8).

[355] *Id.* § 1003.42.

[356] *Arizona v. United States*, 567 U.S. 387, 396 (2012).

[357] *Id.*

[358] 8 U.S.C. § 1185(a)(1).

[359] *See, e.g.*, *id.* § 1158(b)(2)(A)(v) (providing Attorney General discretion to waive asylum eligibility requirements if he believes "there are not reasonable grounds for regarding the alien as a danger to the security of the United States"); *id.* § 1227(a)(1)(H) (providing Attorney General discretion, under certain circumstances, to waive removal

ability to "cancel removal" of an alien who meets certain statutory criteria.[360]

Congress has given the Executive statutory authority to determine when state officers can "perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States," and has generally subjected any state officers performing one of these functions to supervision by the Executive.[361] If it chose to do so, the Executive could rely upon statutory authority to request Texas to assist, under the supervision of federal officers, in arresting the very aliens whom the Director now says DPS has the authority to arrest under state law, unsupervised by any federal officer or agency. The Executive Branch has in fact sought Texas's assistance under various statutes, but the federal government has not utilized Texas's resources to the extent desired by the Director. Regardless of the wisdom of the Executive's actions and inactions, the congressionally designed system allows the Executive to decide whether and how to pursue aliens illegally present in the United States.

Congress evinced an intent that the Executive should have the sole discretion to enforce the INA's entry and removal provisions. The broadest exercise of this discretion is the Executive's decision not to pursue either

---

provisions for aliens deemed inadmissible because of misrepresenting material facts when seeking admission); *id.* § 1182(a)(9)(B)(v) (providing Attorney General the "sole discretion" to waive certain admissibility bars for aliens "unlawfully present" if refusal to admit the alien would result in "extreme hardship" to a "lawfully resident spouse or parent"); *id.* § 1182(d)(1) (providing Attorney General discretion to waive admissibility requirements for aliens aiding law enforcement when the Attorney General believes it is in the "national interest to do so"); *id.* § 1182(d)(14) (providing Secretary of Homeland Security discretion to waive admissibility requirements for aliens that are victims of certain crimes and helpful to law enforcement when the Secretary considers it to be "in the public or national interest to do so").

[360] *Id.* § 1229b(a)-(b).

[361] *See id.* § 1357(g)(1)-(3); *see also infra* notes 442-47 and accompanying text.

civilly or criminally the very aliens whom the Texas legislature has drawn a bead upon in enacting new state laws. In fact, the Court observed in *Arizona* that "[d]iscretion in the enforcement of immigration law embraces immediate human concerns" and "policy choices that bear on this Nation's international relations."[362] For instance, "[r]eturning an alien to his own country may be deemed inappropriate even where he has committed a removable offense or fails to meet the criteria for admission."[363] "The dynamic nature of relations with other countries requires the *Executive Branch* to ensure that enforcement policies are consistent with this Nation's foreign policy with respect to these and other realities."[364]

The Supreme Court again recognized the Executive's discretion in enforcing immigration laws in *United States v. Texas*.[365] There, Texas and Louisiana challenged the Biden Administration's guidelines that "prioritize[d] the arrest and removal from the United States of noncitizens who are suspected terrorists or dangerous criminals, or who have unlawfully entered the country only recently."[366] Texas and Louisiana also "contend[ed] that for certain noncitizens, such as those who are removable due to a state criminal conviction, § 1226(c) of Title 8 says that the Department 'shall' arrest those noncitizens and take them into custody when they are released from state prison."[367] Though the Supreme Court resolved the case based on standing, the reasoning supporting the Supreme Court's

---

[362] *Arizona*, 567 U.S. at 396.

[363] *Id.*

[364] *Id.* at 397 (emphasis added).

[365] 599 U.S. 670 (2023).

[366] *Id.* at 673.

[367] *Id.* at 674.

holding appears to be equally applicable in assessing whether S.B. 4—which is aimed at increasing arrests and prosecutions of illegally present aliens—impinges on discretion granted by the Constitution to the Executive.  The Supreme Court held: "Article II of the Constitution assigns the 'executive Power' to the President and provides that the President 'shall take Care that the Laws be faithfully executed.'"[368]  The Court said: "Under Article II, the Executive Branch possesses authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law.'"[369]  "[T]he Executive Branch has *exclusive* authority and absolute discretion to decide whether to prosecute a case."[370]  The Supreme Court held that this exclusive authority extended to enforcement of the immigrations laws at issue: "That principle of enforcement discretion over arrests and prosecutions extends to the immigration context, where the Court has stressed that the Executive's enforcement discretion implicates not only 'normal domestic law enforcement priorities' but also 'foreign-policy objectives.'"[371]  The Court expressly set forth the exclusive authority over removal: "In line with those principles, this Court has declared that the Executive Branch also retains discretion over whether to remove a noncitizen from the United States."[372]

Second, as part of its field-preemption analysis in *Arizona*, the Supreme Court pointed to the fact that the Arizona law regarding alien

---

[368] *Id.* at 678 (citing U.S. Const. art. II, §§ 1, 3).

[369] *Id.* (quoting *TransUnion LLC v. Ramirez*, 594 U. S. 413, 429 (2021)).

[370] *Id.* at 679 (emphasis added) (quoting *United States v. Nixon*, 418 U.S. 683, 693 (1974)).

[371] *Id.* (quoting *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490-91 (1999)).

[372] *Id.* (citing *Arizona v. United States*, 567 U.S. 387, 396 (2012)).

registration "rules out probation as a possible sentence (and also eliminates the possibility of a pardon)," while federal law did not.[373] In the present case, a defendant may be removed before federal proceedings permitting her to remain in the United States lawfully are initiated or concluded. Under federal law, an alien who does not enter through a designated port of arrival may nevertheless seek asylum.[374] A claim for asylum can be pursued before, during, or after the conclusion of prosecution under federal law for illegal entry.[375] In contrast, the Texas laws do not permit abatement of prosecution and removal proceedings,[376] and, as a result, an alien may be removed under article 5B.002(d) before asylum proceedings are initiated or concluded.[377]

The Texas laws also fail to provide an alien the ability to pursue a CAT claim once proceedings are commenced. Federal law markedly differs. An alien in removal proceedings with a reasonable fear of persecution or torture in her home country may request relief from removal based on the CAT.[378] "[T]he Attorney General has no discretion to deny relief to a noncitizen who establishes his eligibility. [Even a] conviction of an aggravated felony has no effect on CAT eligibility . . . ."[379]

Finally, the Supreme Court in *Arizona* emphasized the breadth of the United States' power "to control and conduct relations with foreign

---

[373] *Arizona*, 567 U.S. at 403.

[374] *See* 8 U.S.C. § 1158(a)(1).

[375] *See, e.g.*, *United States v. Vasquez-Hernandez*, 924 F.3d 164, 168-69 (5th Cir. 2019).

[376] Tex. Code Crim. Proc. art. 5B.003.

[377] *See id.* art. 5B.002(d).

[378] *See* 8 C.F.R. §§ 208.16, 208.31.

[379] *Moncrieffe v. Holder*, 569 U.S. 184, 187 n.1 (2013).

nations" and the reasons for the existence of that power.[380]  The Supreme Court said in *Arizona*:

- "Decisions [regarding removal] touch on foreign relations and must be made with one voice."[381]
- "Removal decisions, including the selection of a removed alien's destination, may implicate [the Nation's] relations with foreign powers and require consideration of changing political and economic circumstances."[382]
- "The federal power to determine immigration policy is well settled. Immigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws."[383]
- "Perceived mistreatment of aliens in the United States may lead to harmful reciprocal treatment of American citizens abroad."[384]
- "It is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States."[385]

---

[380] *See Arizona v. United States*, 567 U.S. 387, 395 (2012).

[381] *Id.* at 409.

[382] *Id.* (alteration in original) (quoting *Jama v. ICE*, 543 U.S. 335, 348 (2005)).

[383] *Id.* at 395.

[384] *Id.*

[385] *Id.* (first citing *Chy Lung v. Freeman*, 92 U.S. 275, 279-80 (1875); and then citing The Federalist No. 3, at 44-45 (John Jay) (Clinton Rossiter ed., 1961) (observing that federal power over foreign relations avoids situations where "bordering States . . . under the impulse of sudden irritation, and a quick sense of apparent interest or injury" might take actions that could undermine foreign relations)).

No. 24-50149

- "This Court has reaffirmed that '[o]ne of the most important and delicate of all international relationships . . . has to do with the protection of the just rights of a country's own nationals when those nationals are in another country.'"[386]

These considerations apply with full force to S.B. 4 and certainly augur in favor of concluding that Congress intended to occupy the field regarding the entry and removal of aliens.

To be sure, in *Arizona*, the Supreme Court was not called upon to decide whether alien entry and removal is field preempted. But the Supreme Court has held that federal law occupies a variety of other fields, including alien registration;[387] nuclear safety;[388] aircraft noise;[389] the "design, construction, alteration, repair, maintenance, operation, equipping, personnel qualification, and manning" of tanker vessels;[390] wholesales of natural gas in interstate commerce;[391] and locomotive equipment.[392] Alien entry and removal is equally, if not more important, to the interest of the

---

[386] *Id.* (alterations in original) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 64 (1941)).

[387] *See, e.g.*, *id.* at 401; *see also Hines*, 312 U.S. at 68 ("[I]t is of importance that this legislation is in a field which affects international relations, the one aspect of our government that from the first has been most generally conceded imperatively to demand broad national authority. Any concurrent state power that may exist is restricted to the narrowest of limits . . . .").

[388] *See, e.g.*, *Eng. v. Gen. Elec. Co.*, 496 U.S. 72, 81-86 (1990).

[389] *See, e.g.*, *City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 633 (1973).

[390] *See, e.g.*, *United States v. Locke*, 529 U.S. 89, 111 (2000) (quoting 46 U.S.C. § 3703(a)).

[391] *See Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 305, 310 (1988); *Exxon Corp. v. Eagerton*, 462 U.S. 176, 184, 187 (1983).

[392] *See Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 636 (2012); *Napier v. Atl. Coast Line R. Co.*, 272 U.S. 605, 613 (1926).

113

national sovereign.[393]  Congress's creation of a complex, national system for determining whether an alien may enter and remain in the United States is strong evidence Congress intended to occupy the field of alien entry and removal.  The national immigration system in the INA touches a field "in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject."[394]

We do not write on a clean slate.  There is Supreme Court precedent spanning nearly 150 years suggesting that the power to control the entry and removal of aliens is "vested solely in the Federal Government, rather than the States."[395]  In *DeCanas v. Bica*,[396] the Supreme Court declared—in unmistakable terms—that the "[p]ower to regulate immigration is unquestionably exclusively a federal power."[397]  The Court further explained that the "comprehensiveness of legislation governing *entry and stay of aliens* was to be expected in light of the nature and complexity of the subject."[398]  In light of this caselaw, Texas cannot step into the shoes of the national

---

[393] *Cf. United States v. Valenzuela-Bernal*, 458 U.S. 858, 864 (1982) ("The power to regulate immigration—an attribute of sovereignty essential to the preservation of any nation—has been entrusted by the Constitution to the political branches of the Federal Government.").

[394] *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) (citing *Hines v. Davidowitz*, 312 U.S. 52 (1941)).

[395] *Hampton v. Mow Sun Wong*, 426 U.S. 88, 101 n.21 (1976); *see also supra* note 288-291 and accompanying text.

[396] 424 U.S. 351 (1976).

[397] *Id.* at 354.

[398] *Id*. at 359 (emphasis added).  The Court also noted that federal immigration law controls "who should or should not be admitted into the country, and the conditions under which a legal entrant may remain."  *Id*. at 355; *cf. Truax v. Raich*, 239 U.S. 33, 42 (1915) ("The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal government." (citing *Fong Yue Ting v. United States*, 149 U.S. 698, 713 (1893))).

sovereign under our Constitution and federal laws. If every state could regulate the unlawful entry, reentry, and removal of aliens, "[e]ach additional statute [would] incrementally diminish[] the [federal government]'s control over enforcement" and "detract[] from the 'integrated scheme of regulation' created by Congress."[399]

The panel dissent, citing a law review article and a quote from an 1837 case, retorted that states regulated immigration in the nineteenth century as part of their police powers until Congress began to legislate on immigration in 1875.[400] Even assuming that the panel dissent's historical assertions are true, they do not control because a preemption analysis can change upon the introduction of new federal legislation. In *Arizona*, the Court explained that "[w]hen there was no comprehensive federal program regulating the employment of unauthorized aliens, this Court found that a State had authority to pass its own laws on the subject," but "[c]urrent federal law is substantially different from the [previous] regime" because "Congress enacted IRCA as a comprehensive framework for 'combating the employment of illegal aliens.'"[401] Therefore, a portion of Arizona S.B. 1070 barring unauthorized aliens for working or seeking employment in Arizona was preempted by IRCA.[402]

---

[399] *Wis. Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*, 475 U.S. 282, 288-89 (1986).

[400] 144 F.4th at 720 (OLDHAM, J., dissenting) (citing *Mayor of New York v. Miln*, 36 U.S. 102, 132-33 (1837); Gerald L. Neuman, *The Lost Century of American Immigration Law (1776-1875)*, 93 COLUM. L. REV. 1833, 1846-59 (1993)).

[401] *Arizona v. United States*, 567 U.S. 387, 404 (2012) (quoting *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002)).

[402] *Id.* at 403-07.

Director Martin makes three counterarguments. First, he argues that "state laws that 'mirror[] federal objectives' are *more*—not less—likely to be upheld."[403] The Supreme Court, however, rejected this exact argument in *Arizona*, stating it "ignores the basic premise of field preemption—that States may not enter, in any respect, an area the Federal Government has reserved for itself."[404] In fact, the resemblance between S.B. 4's provisions and the federal provisions criminalizing illegal entry and reentry—§§ 1325(a) and 1326(a)—make the Court's analysis in *Arizona* particularly salient. In the same way Arizona's S.B. 1070 "add[ed] a state-law penalty for conduct proscribed by federal law,"[405] S.B. 4 criminalizes behavior already prohibited by the INA.

The Supreme Court in *Arizona* explained why § 3 was field preempted despite its apparent congruence with federal law. The Court relied on the fact that "[w]ere § 3 to come into force, the State would have the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine[d] that prosecution would frustrate federal policies."[406] The Supreme Court explained that "[p]ermitting the State to impose its own penalties for the federal offenses here would conflict with the careful framework Congress adopted."[407] This logic applies with equal force to the Texas laws regarding entry and removal.

_____

[403] *See Plyler v. Doe*, 457 U.S. 202, 225 (1982) ("[T]he States do have some authority to act with respect to illegal aliens, at least where such action mirrors federal objectives and furthers a legitimate state goal.").

[404] *Arizona*, 567 U.S. at 402.

[405] *Id.* at 400.

[406] *Id.* at 402.

[407] *Id.*

Second, Director Martin cites several federal statutes that he contends reflect that federal immigration law regularly encourages States to aid in federal entry and removal. The Director cites 18 U.S.C. § 758 for the proposition that it is a crime for an alien to "flee" from "State[] or local law enforcement" around immigration checkpoints. But that federal statute makes it a *federal* crime when someone "flees Federal, State, or local law enforcement agents in excess of the legal speed limit."[408] This statute would not prohibit Texas from arresting or prosecuting a person for violating state-established speed limits under state law. Indeed, a federal statute provides that state law extends over immigration stations and that officers in charge of immigration stations shall admit "State and local officers charged with the enforcement of the laws of the State or Territory . . . in order that such State and local officers may preserve the peace and make arrests for crimes under the laws of the States and Territories."[409] But it does not authorize Texas to (1) enact a statute making it a *state* crime to flee a checkpoint or (2) arrest or prosecute anyone under § 758. Most importantly, this statute does not pertain to whether someone should be allowed to enter or remain in the United States or whether they should be deported or removed if they enter illegally.

Director Martin points to 8 U.S.C. § 1324(c), arguing that "States may make arrests for violation[s] of alien smuggling prohibition[s]." But, here again, this statute has nothing to do with whether an alien should be prosecuted or removed for being in the United States illegally. Rather, this statute makes it a crime for anyone, whether they are an alien, a United States

_____

[408] 18 U.S.C. § 758.

[409] 8 U.S.C. § 1358.

citizen, or a person lawfully in the United States, to engage in smuggling aliens into the United States or harboring or transporting them.[410]

The Director argued in his opening brief that 22 U.S.C. § 7105(c)(3)(C)(i), 8 U.S.C. § 1101(a)(15)(T)(i), and 8 U.S.C. § 1101(a)(15)(U) contemplate state prosecution or investigation of illegal trafficking. But, here again, these statutes do not authorize Texas to determine whether a person is illegally present in the United States in order to take action to remove or deport her.

Director Martin failed to explain how these laws are relevant to the entry or removal provisions. Texas undoubtedly can assist the federal government in arresting aliens who violate federal law when federal law permits it to do so.[411] The question is not whether Congress intended to occupy the entire field of immigration; "the relevant field should be defined narrowly."[412] The laws cited by Director Martin do not facilitate the inquiry pertinent to the present case, which is whether Congress intended to occupy the field of immigration policies concerning entry into or removal from the United States.

Third, Director Martin asserted in his opening brief that the federal government has "abandoned" the field because the Executive Branch has failed to enforce immigration policy in dereliction of its statutory duties. Regardless of whether these claims are accurate, our task is to determine

---

[410] *Id.* § 1324(a).

[411] *See, e.g.*, *id.* § 1357(g) (allowing a state to enter into an agreement with the federal government to aid in "the investigation, apprehension, or detention" of aliens).

[412] *See City of El Cenizo v. Texas*, 890 F.3d 164, 177-78 (5th Cir. 2018) ("One could perhaps define the field broadly enough to include both SB4 and federal legislation, but the relevant field should be defined narrowly.") (first citing *Arizona v. United States*, 567 U.S. 387, 400-01 (2012); and then citing *DeCanas v. Bica*, 424 U.S. 351, 360 n.8 (1976))).

whether Congress "'legislated so comprehensively' in a particular field that it 'left no room for supplementary state legislation.'"[413] "Evidence of pre-emptive purpose is sought in the text and structure of the statute at issue," not enforcement decisions by the Executive.[414] Here, there is strong support for the conclusion that Congress has "legislated so comprehensively" in the field of alien entry and removal that it "left no room for supplementary state legislation."[415]

## 2

Las Americas has shown that it is likely to prevail on its argument that certain provisions of S.B. 4 are conflict preempted. Generally speaking, the Supreme Court has recognized that a state statute may be preempted by federal law when (1) it is impossible for a person to comply with both the state law and federal law, or (2) the state law "stands as an obstacle to the

---

[413] *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (quoting *R.J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 140 (1986)). In its opening brief, Texas referenced *Parker v. Brown*, 317 U.S. 341, 358 (1943), for the proposition that the mere adoption of an act by Congress, without executive action putting the legislation into effect, does not implicate field preemption. However, *Parker* is distinguishable for two reasons. First, *Parker* did not involve the Executive Branch allegedly abandoning a field but rather related to a congressional act (the federal Agricultural Marketing Agreement Act of 1937). *Id.* at 352-58. Second, the Supreme Court held there was no field preemption because the Act specifically "contemplate[d] the existence of state programs at least until such time as the Secretary [of Agriculture] shall establish a federal marketing program." *Id.* at 354. The Secretary had not adopted implementing regulations, and the Court held there was no "occupation of the legislative field" by the adoption of the Agricultural Marketing Agreement Act. *Id.* at 358. In contrast, the intersecting web of national immigration laws does not contemplate state regulation.

[414] *See CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993); *see also Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 773 (2019) (GORSUCH, J., joined by THOMAS and KAVANAUGH, JJ.) (lead opinion) (noting "Congress's authority to delimit the preemptive effect of its laws").

[415] *Kansas*, 589 U.S. at 208 (quoting *R.J. Reynolds Tobacco Co.*, 479 U.S. at 140).

accomplishment and execution of the full purposes and objectives of Congress."[416]    The Court has described the relationship between these concepts this way:

> This Court, when describing conflict pre-emption, has spoken of pre-empting state law that "under the circumstances of th[e] particular case . . . stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"—whether that "obstacle" goes by the name of "conflicting;    contrary    to; . . . repugnance;    difference; irreconcilability; inconsistency; violation; curtailment; . . . interference," or the like.  The Court has not previously driven a    legal    wedge—only    a    terminological    one—between "conflicts" that prevent or frustrate the accomplishment of a federal objective and "conflicts" that make it "impossible" for private parties to comply with both state and federal law. Rather, it has said that both forms of conflicting state law are "nullified" by the Supremacy Clause . . . .[417]

---

[416] *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

[417] *Geier v. Am. Honda Motor Co.,* 529 U.S. 861, 873 (2000) (alterations and omissions in original) (citations omitted) (first quoting *Hines*, 312 U.S. at 67; then citing *Jones v. Rath Packing Co.*, 430 U.S. 519, 526 (1977); then citing *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152-53 (1982); then citing *United States v. Locke*, 529 U.S. 89, 109 (2000); and then citing *Eng. v. Gen. Elec. Co.*, 496 U.S. 72, 78-79 (1990)); *see also Arizona v. United States*, 567 U.S. 387, 399-400 (2012); *Hines*, 312 U.S. at 67 ("In the final analysis, there can be no one crystal clear distinctly marked formula.  Our primary function is to determine whether, under the circumstances of this particular case, Pennsylvania's law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (citing *Savage v. Jones*, 225 U.S. 501, 533 (1912))).

No. 24-50149

In *Arizona*, the Supreme Court employed an "obstacle" analysis to assess whether state laws related to immigration were preempted.[418] So did *Hines v. Davidowitz*,[419] another similar case.[420]

The Texas entry provisions make it unlawful for an alien to enter or reenter the state from a location other than a port of entry.[421] Director Martin contends that these provisions mirror federal-law standards, with S.B. 4 "adopt[ing]" federal law. It is true that the "mere fact" that a state law "overlap[s]" with a federal criminal provision does not, by itself, make a case for conflict preemption.[422] But Las Americas has done much more than merely identify that S.B. 4 overlaps with its federal criminal analogues— indeed, conflicts abound between S.B. 4 and a number of federal laws.

To begin, S.B. 4 affects aliens whom Congress has assigned a federal immigration status of an "applicant for admission,"[423] and interferes with federal immigration officials' ability to determine the applicant's admissibility. The relevant statute provides: "An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival . . . ) shall be deemed for purposes of this chapter an applicant for admission."[424] Congress directed that all applicants for admission "shall" be inspected by a federal

---

[418] *Arizona*, 567 U.S. at 410.

[419] 312 U.S. 52 (1941).

[420] *Id.* at 67.

[421] Tex. Penal Code §§ 51.02-03.

[422] *Kansas v. Garcia*, 589 U.S. 191, 211 (2020).

[423] 8 U.S.C. § 1225(a)(1).

[424] *Id.*

121

immigration officer.[425]  This process is described in more detail above.  To summarize, first, the immigration officer must determine the alien's admissibility, a status defined in part by statute and in part by a designation from the Secretary of Homeland Security.[426]  Second, if the immigration officer determines that an alien who is "arriving in the United States" or is present but has "not been admitted or paroled" may be inadmissible, the officer must then decide whether the alien is inadmissible under two specified statutory provisions.[427]  Aliens deemed inadmissible under those specific statutory provisions are generally subject to expedited removal unless they indicate an intention to apply for asylum.[428]  Aliens who are not subject to expedited removal (and who are not "clearly and beyond a doubt entitled to be admitted") are detained for further proceedings before an immigration judge, who "shall" determine whether the alien is in fact inadmissible.[429]

In light of this process, it is problematic that state courts will determine if an alien has entered illegally and order their removal.  In *Villas at Parkside Partners v. City of Farmers Branch*,[430] a majority of our en banc court concluded that state courts may not assess the legality of an alien's

---

[425] *Id.* § 1225(a)(3).

[426] *Id.* § 1225(b)(1)(A), (b)(2)(A); *see DHS v. Thuraissigiam*, 591 U.S. 103, 108-09 & n.3 (2020).

[427] *See* 8 U.S.C. § 1225(b)(1), (b)(1)(A)(i) (directing the federal immigration officer to determine whether the alien is inadmissible under either 8 U.S.C. § 1182(a)(6)(C) or (a)(7)); *id.* § 1182(a)(6)(C) (designating as inadmissible aliens who, by fraud or willfully misrepresenting a material fact, procure or seek to procure an immigration document or other immigration benefit); *id.* § 1182(a)(7) (designating as inadmissible aliens who did not have a valid entry document at the time they applied for admission).

[428] *Id.* § 1225(b)(1)(A)(i)-(ii); *see Thuraissigiam*, 591 U.S. at 108-09.

[429] 8 U.S.C. §§ 1225(b)(2)(A), 1229a(a)(1).

[430] 726 F.3d 524 (5th Cir. 2013) (en banc).

presence.[431] There, the ordinance at issue allowed for state judicial review as to whether an individual was lawfully present in the country.[432] The lead opinion concluded that because of "the discretion and variability inherent in a determination of whether an alien is 'lawfully present in the United States,' . . . the judicial review section of the Ordinance [] is preempted by federal law."[433]

The Texas law regarding entry grants Texas judges significantly more power than the ordinance at issue in *Farmers Branch*.[434] It allows Texas courts to impose criminal sanctions and order removal if an alien is found to have entered or remained in Texas illegally.[435] But as some jurists have recognized, "the structure of the [federal] immigration statutes makes it impossible for [a] State to determine which aliens are entitled to residence, and which eventually will be deported."[436]

---

[431] *Id.* at 537. Although there was no majority opinion in *Farmers Branch*, ten judges agreed that the judicial review sections of the city ordinance at issue were preempted in part by federal law. *See id.* (HIGGINSON, J., joined by STEWART, C.J., and DAVIS, SOUTHWICK, and HAYNES, JJ.) (lead opinion); *id.* at 542-43 (REAVLEY, J., joined by GRAVES, J., concurring in the judgment); *id.* at 547 (DENNIS, J., joined by REAVLEY, PRADO, and GRAVES, JJ., specially concurring); *id.* at 559 (RICHMAN, J., concurring in part and dissenting in part).

[432] *Id.* at 536 (lead opinion).

[433] *Id.* at 537 (citing 8 U.S.C. § 1229a(a)(3)).

[434] In *Farmers Branch*, the ordinance indicated that an alien's unlawful presence was to be "determined under federal law." *Id.* at 536. S.B. 4 goes further, allowing state judges to determine an alien's unlawful presence under state law. *See, e.g.*, TEX. PENAL CODE § 51.03(c).

[435] *See, e.g.*, TEX. CODE CRIM. PROC. art. 5B.002(d).

[436] *Plyler v. Doe*, 457 U.S. 202, 236 (1982) (BLACKMUN, J., concurring); *see id.* at 241 n.6 (POWELL, J., concurring).

The Texas entry and removal provisions also conflict with federal law because they prohibit abatement of prosecutions under Chapter 51 of the Penal Code on the grounds that federal proceedings have been or will be commenced regarding the immigration status of the defendant. S.B. 4 amended the Texas Code of Criminal Procedure to add article 5B.003. It provides:

> **Art. 5B.003. Abatement of Prosecution on Basis of Immigration Status Determination Prohibited**
>
> A court may not abate the prosecution of an offense under Chapter 51, Penal Code, on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated.[437]

S.B. 4 then requires a court convicting a defendant of a Chapter 51 offense to order the removal of the defendant.[438] But federal law provides that an alien may be permitted to remain in the United States lawfully even if they have been convicted of illegal entry.[439] It would therefore conflict with federal law to remove an alien before (1) the federal government has decided whether that alien is permitted to remain in the United States because asylum should be granted, (2) the federal government has decided whether a CAT claim is valid, or (3) the United States Attorney General has decided whether to exercise discretion to waive obstacles to removal and admit the alien.[440]

The removal provision appears to create another conflict by authorizing Texas state judges and magistrate judges to remove aliens from

---

[437] TEX. CODE CRIM. PROC. art. 5B.003.

[438] *Id.* art. 5B.002(d).

[439] *See supra* notes 347-351 and accompanying text.

[440] *Id.*

the United States without notice to, or consent from, the federal government.[441] This runs headlong into federal law. Congress has identified the grounds for removal, the requirements for commencing and administering removal proceedings, the protections afforded to aliens throughout removal proceedings, and the process for selecting the country to which aliens may be removed.[442] A "principal feature" of this complex removal system is the "broad discretion" exercised by federal immigration officials.[443] Contrast this discretion with the S.B. 4 removal provision's grant to *Texas judges* of the unilateral power to order aliens removed. The removal provision sidesteps the sensitive issues that federal immigration officers are to consider.[444]

The Texas removal provisions will significantly conflict with the United States' authority to select the country to which aliens will be removed. Many aliens who cross into Texas from Mexico are not citizens or

---

[441] *See* Tex. Code Crim. Proc. art. 5B.002.

[442] *See, e.g.*, 8 U.S.C. §§ 1182(a), 1225, 1227, 1229, 1229a, 1231.

[443] *Arizona v. United States*, 567 U.S. 387, 396 (2012).

[444] *Cf., e.g.*, *Plyler v. Doe*, 457 U.S. 202, 241 n.6 (1982) (Powell, J., concurring) ("But it is impossible for a State to determine which aliens the Federal Government will eventually deport, which the Federal Government will permit to stay, and which the Federal Government will ultimately naturalize. Until an undocumented alien is ordered deported by the Federal Government, no State can be assured that the alien will not be found to have a federal permission to reside in the country, perhaps even as a citizen. Indeed, even the Immigration and Naturalization Service cannot predict with certainty whether any individual alien has a right to reside in the country until deportation proceedings have run their course.").

No. 24-50149

residents of Mexico.[445]  Nevertheless, S.B. 4 would require removing them to Mexico.[446]  The United States would have no say in the matter.

Furthermore, the Supreme Court has cautioned that "conflict is imminent" when "two separate remedies are brought to bear on the same activity."[447]  The remedies available under S.B. 4 are not congruent with federal remedies.[448]

The INA provides the federal government discretion to decide whether to initiate criminal proceedings or civil immigration proceedings once an alien is apprehended.  The Texas scheme blocks this exercise of discretion.  An alien apprehended illegally entering or remaining in Texas who does not agree to a return order is charged with a crime punished by removal, and the federal government has no voice in further proceedings.  To the extent that state law affords prosecutorial discretion, it vests that discretion in a *state official*, not the United States Attorney General or another federal officer.  An arrest or conviction under S.B. 4 would interfere with federal law because the Texas process for arrests and convictions

---

[445] *See* Br. of the Government of the United Mexican States as *Amicus Curiae* at 12 (noting that "that enforcement of SB 4 would interfere with Mexico's sovereign right to determine who enters its territory").

[446] *See* Tex. Code Crim. Proc. art. 5B.002(c)-(d) (directing that an order pursuant to S.B. 4 shall "require the person to return to the foreign nation from which the person entered or attempted to enter"); Tex. Penal Code § 51.02 (criminalizing entry into Texas "directly from a foreign nation").

[447] *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 380 (2000) (alteration omitted) (quoting *Wis. Dep't of Indus., Lab. & Hum. Rels. v. Gould, Inc.*, 475 U.S. 282, 286 (1986)).

[448] *Compare* Tex. Penal Code §§ 51.02-03, *and* Tex. Code Crim. Proc. art. 5B.002, *with* 8 U.S.C. § 1325(a).  *See also* 8 U.S.C. § 1326(a) (stating the criminal punishment for a removed alien attempting to reenter the United States shall be a "fine[] under Title 18, or imprison[ment] not more than 2 years, or both").

suppresses or subverts federal authority over an alien's status in the United States.

It is evident that the Texas entry and removal laws significantly eliminate the exercise of discretion by federal immigration officials, including the United States Attorney General.[449] Though the Texas laws carve out some room for instances in which the federal government has already exercised such discretion,[450] the Texas laws by no means afford an alien the opportunity to benefit fully from the broad discretion available under federal law.

Additionally, the challenged provisions are not preempted because they conflict with the policy preferences of a particular administration—but because, inter alia, they rob every administration of the very discretion in alien removal matters that Congress granted to the federal executive and not to the States. The preliminary injunction does not prohibit Director Martin from arresting illegal aliens and turning them over to federal authorities if and when the federal executive branch requests Texas to do so. The injunction only prohibits Director Martin from asserting authority based on a *state* law that is likely preempted. The Director may arrest tens of thousands of aliens that are in Texas illegally as long as Texas has been requested to do so by the federal government and complies with all federal laws and regulations that govern such a request. But the fact that federal law permits such cooperation does not save a state law from preemption that allows its law enforcement officers to arrest and remove aliens, independent of federal law.

The federal laws do not permit a state to arrest an illegal alien *under state law*. A state may arrest and detain an illegal alien only at the request and

---

[449] *See supra* note 357 and accompanying text.

[450] *See* Tex. Penal Code § 51.02(c).

under the supervision of the federal government, under *federal law*. The Supreme Court directly addressed this in *Arizona*.[451] As mentioned earlier, the Supreme Court said that "it would disrupt the federal framework to put state officers in the position of holding aliens in custody for possible unlawful presence without federal direction and supervision. The program put in place by Congress does not allow state or local officers to adopt this enforcement mechanism."[452]

Director Martin's briefing before the merits panel invited this court to read S.B. 4's removal provisions as merely requiring that an alien subject to an order under Texas Code of Criminal Procedure article 5B.002 "be transported to a port of entry, at which point—as both a practical and legal matter—the alien's potential removal is a question for federal immigration officers."[453] That is not what the statute says. The statute says that the order shall "requir[e] the person to return to the foreign nation from which the person entered or attempted to enter."[454] An alien subject to an order commits a second-degree felony if they "refuse[] to comply with the order."[455] A second-degree felony carries a punishment of two to twenty years of imprisonment and up to a $10,000 fine.[456] In short, S.B. 4 directs state judges to order an alien to leave the United States on pain of up to twenty years in prison and a $10,000 fine. It blinks reality to argue the statute's plain terms do anything other than require the removal of aliens.

---

[451] *See Arizona v. United States*, 567 U.S. 387, 408 (2012).

[452] *Id.* at 413 (internal citation omitted).

[453] *See* Tex. Code Crim. Proc. art. 5B.002(e).

[454] *Id.* art. 5B.002(d).

[455] Tex. Penal Code § 51.04.

[456] *See id.* § 12.33.

Director Martin directs this court to the declaration of Victor Escalon,[457] a Regional Director for DPS, who explained DPS's plans for enforcing S.B. 4.[458] But that declaration, too, confirms that article 5B.002 orders are removal orders. Regional Director Escalon stated that, to enforce an article 5B.002 order, DPS plans to contact Mexican immigration authorities and inform U.S. Customs and Border Protection before bringing the alien to a port of entry.[459] He further explained that "[i]f Mexican authorities do not accept the entrance of an alien subject to an order to return, the escorting DPS officer will deliver him to the American side of a port of entry and observe the alien go to the Mexican side."[460] He continued: "Upon witnessing the alien[] cross to the Mexican side of the international bridge, the officer will consider the alien[] to have complied with the return order and will cease monitoring the alien."[461] Director Martin envisions a scheme in which aliens subject to an article 5B.002 order are brought to a port of entry and either are released directly into Mexican custody or are expected to cross to Mexico. An officer who is statutorily directed to "monitor[] compliance with the order"[462] will not consider the alien to have complied with the order unless and until the officer witnesses the alien cross into

_____

[457] ROA.314-16.

[458] ROA.314, ¶¶ 1, 3.

[459] ROA.315, ¶ 9-11.

[460] ROA.316, ¶ 15.

[461] ROA.316, ¶ 15.

[462] TEX. CODE CRIM. PROC. art. 5B.002(e)(2) (requiring that an order include "the law enforcement officer or state agency responsible for monitoring compliance with the order").

Mexico.  Failure to comply is a second-degree felony.[463]  That is a removal scheme.

Even setting aside S.B. 4's removal consequence, the remaining provisions nevertheless conflict with federal law.  "Federal law specifies [the] limited circumstances in which state officers may perform the functions of an immigration officer."[464]  At all times, those circumstances require federal supervision or authorization.

Under 8 U.S.C. § 1357(g), the Attorney General "may enter into a written agreement with a State" or any of its "political subdivision[s]," allowing state or local officers "to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States."[465]  In performing those functions, state or local officers must "be subject to the direction and supervision of the Attorney General."[466]  This federal law expressly provides that an agreement is not required for any state or political subdivision of a state to communicate with the Attorney General about the immigration status of an individual, including "reporting knowledge that a particular alien is not lawfully present in the United States."[467]  That same provision further provides that an agreement is not necessary for a state or local government "otherwise to cooperate with the Attorney General in the identification, apprehension, detention, or

_____

[463] Tex. Penal Code § 51.04.

[464] *Arizona v. United States*, 567 U.S. 387, 408 (2012).

[465] 8 U.S.C. § 1357(g)(1).

[466] *Id.* § 1357(g)(3); *see also City of El Cenizo v. Texas*, 890 F.3d 164, 177 (5th Cir. 2018) ("Federal law," including § 1357(g), "regulates *how* local entities may cooperate in immigration enforcement.").

[467] 8 U.S.C. §1357(g)(10)(A).

removal of aliens not lawfully present in the United States."[468] This is not a grant of authority to a state to enact a statute making it a state crime to be unlawfully present. Nor is it a grant of authority to a state to enact a statute that gives authority under state law to state officials to arrest or remove someone illegally present. This provision does not even grant a state the authority to arrest or remove under *federal* law.

Similarly, other statutes expressly authorize state officers' arrest authority—but only in narrow circumstances.[469] The Texas laws at issue permit state authorities to prosecute an individual for being unlawfully present without any consultation or cooperation with the Attorney General of the United States.

S.B. 4 also permits an end run around 8 U.S.C. § 1252c. Section 1252c authorizes "State and local law enforcement officials" to "arrest and detain" aliens "illegally present in the United States" only if the alien "has previously been convicted of a felony in the United States and deported or left the United States after such conviction."[470] S.B. 4, however, permits Texas law enforcement to arrest and detain aliens illegally present in Texas regardless of whether the alien has been deported after being convicted of a

---

[468] *Id.* § 1357(g)(10)(B).

[469] *See id.* § 1103(a)(10) (empowering the Secretary of Homeland Security to "authorize any State or local law enforcement officer" to "perform or exercise any of the powers . . . conferred" to federal immigration officers "[i]n the event the [Secretary] determines that an actual or imminent mass influx of aliens arriving off the coast of the United States, or near a land border, presents urgent circumstances requiring an immediate Federal response"); *id.* § 1324(c) (permitting all officers "whose duty it is to enforce criminal laws" to make arrests for the offense of "[b]ringing in and harboring certain aliens").

[470] 8 U.S.C. § 1252c(a).

felony or has otherwise left the United States after such conviction.[471] Compounding the problem, § 1252c contains another condition on state officers' arrest authority: the officer may arrest the alien

> only after the State or local law enforcement officials obtain appropriate confirmation from the Immigration and Naturalization Service of the status of such individual and only for such period of time as may be required for the Service to take the individual into Federal custody for purposes of deporting or removing the alien from the United States.[472]

S.B. 4 clearly conflicts with this statute.

A motivating concern for the Supreme Court in *Hines* was that a state might use the registration requirement at issue there to harass aliens.[473] Allowing state law enforcement officials to arrest aliens who have not been admitted but who may be eligible for various status determinations that would allow them to remain in the United States raises the same concerns. Permitting state law enforcement officers to arrest and prosecute aliens in these circumstances "would allow the State to achieve its own immigration policy. The result could be unnecessary harassment of some aliens (for

---

[471] *See* Tex. Penal Code §§ 51.02-03; *see also* 8 U.S.C. § 1182(a)(9)(B)(ii) ("For purposes of this paragraph, an alien is deemed to be unlawfully present in the United States if the alien is present in the United States after the expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled.").

[472] 8 U.S.C. § 1252c(a).

[473] *See Hines v. Davidowitz*, 312 U.S. 52, 74 (1941) (concluding that Congress manifested an intent to impose a uniform registration system to leave aliens "free from the possibility of inquisitorial practices and police surveillance").

instance, a veteran, college student, or someone assisting with a criminal investigation) who federal officials determine should not be removed." [474]

In his briefing before the merits panel, Director Martin cited § 1357(g) as evidence of state-federal cooperation that allows states "wide latitude" to "prosecute crimes involving illegal entry and removal." But the Supreme Court addressed a similar argument in *Arizona* when analyzing § 6 of S.B. 1070, which authorized state officers to arrest a person if the officer had probable cause to believe that person was removable. [475] The Supreme Court explained that "no coherent understanding of the term [cooperation, under 8 U.S.C. § 1357(g),] would incorporate the unilateral decision of state officers to arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government." [476] The same logic applies to S.B. 4's entry provisions. Allowing Texas to detain aliens "without any input from the Federal Government about whether an arrest is warranted in a particular case . . . would allow the State to achieve its own immigration policy." [477]

Director Martin emphasizes the Supreme Court's decision in *Kansas v. Garcia*. [478] In *Garcia*, the Court held that a Kansas law criminalizing the fraudulent use of another person's identifying information was not conflict preempted when applied to aliens who used false identities on work forms. [479]

---

[474] *Arizona v. United States*, 567 U.S. 387, 408 (2012).

[475] *Id.* at 407-08.

[476] *Id.* at 410.

[477] *Id.* at 408; *see also United States v. Texas*, 599 U.S. 670, 723 (2023) (ALITO, J., dissenting) ("Texas's entry into the Union stripped it of the power that it undoubtedly enjoyed as a sovereign nation to police its borders and regulate the entry of aliens.").

[478] 589 U.S. 191 (2020).

[479] *Id.* at 210-11.

The challengers claimed the conflict arose from upsetting federal prosecutorial discretion and enforcement priorities given federal laws criminalizing the same conduct.[480] The Court explained that "there is no basis for inferring that federal criminal statutes preempt state laws whenever they overlap."[481] But the conclusion here does not depend one whit on S.B. 4's overlap with its federal criminal analogues. The discussion above identifies the many ways in which S.B. 4 conflicts with a variety of different statutes.

In his briefing before the merits panel, Director Martin contended that "S.B. 4's directive not to abate prosecution" pending applications for asylum or other relief "does not require removal," and that "S.B. 4 does not prevent state officers from coordinating with federal immigration authorities" while those applications are pending. S.B. 4, however, states that a judge "shall" enter a removal order "[o]n a person's conviction of an offense under Chapter 51," and that order will "take[] effect on completion of the term of confinement or imprisonment imposed by the judgment."[482] Because "[a] court may not abate the prosecution of an offense under Chapter 51 . . . on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated,"[483] a defendant with an unresolved claim for federal immigration relief will be pushed toward removal regardless of the status of their claim. No amount of "coordinating with federal immigration authorities" can soothe this conflict.

_____

[480] *Id.* at 211.

[481] *Id.* at 212.

[482] Tex. Code Crim. Proc. art. 5B.002(d).

[483] *Id.* art. 5B.003.

No. 24-50149

In sum, there are "significant complexities" in determining an alien's immigration status.[484]  S.B. 4 runs roughshod over them.  Las Americas is likely to succeed as to its contention that the entry and removal provisions are conflict preempted.

## D

In a facial challenge to a legislative act, "the challenger must establish that no set of circumstances exists under which the Act would be valid."[485] Director Martin posits that the district court erred by granting a preliminary injunction in this facial challenge because some applications of S.B. 4 are valid.  The Director's argument for why S.B. 4 would be valid relates to the State's contention that it has been invaded and has the right to defend itself. Director Martin asserts that Article I, § 10 of the Constitution (the State War Clause) permits some applications of S.B. 4.  The State War Clause provides:

> No State shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay.[486]

Specifically, Director Martin contends that, at a minimum, S.B. 4's application to transnational cartel members is a constitutionally authorized response to an "invasion," and federal statutes cannot "preempt a State's effort to defend itself."

---

[484] *Arizona v. United States*, 567 U.S. 387, 409 (2012).

[485] *United States v. Salerno*, 481 U.S. 739, 745 (1987).

[486] U.S. CONST. art. I, § 10, cl. 3.

135

Constitutional text, structure, and history provide strong evidence that federal statutes addressing matters such as alien entry and removal are still supreme even when the State War Clause has been triggered. The Supreme Court recently framed the State War Clause as *divesting* the states of power when "the Constitution's text . . . strongly suggests a complete delegation of authority to the Federal Government to provide for the common defense."[487] It seems strange that a state could rely on this Clause—which, with limited exceptions, primarily divests states of power—as a defense to a suit seeking to vindicate the Supremacy Clause, especially in an area of regulation that the Supreme Court has consistently reiterated is exclusively a federal power.[488] One would expect a contemporary commentator to have noticed such a proposition. Instead, in The Federalist No. 44, James Madison glossed over the relevant portion of the State War Clause by writing: "The remaining particulars of this clause fall within reasonings which are either so obvious, or have been so fully developed, that they may be passed over without remark."[489]

Las Americas would likely succeed on the merits despite Texas's State War Clause arguments.

*  *  *

In sum, Las Americas would likely succeed on the merits of its preemption claims. There is considerable authority supporting that the core provisions of S.B. 4 are either field or conflict preempted by federal law, and the State War Clause likely does not compel a contrary result.

---

[487] *Torres v. Tex. Dep't of Pub. Safety*, 597 U.S. 580, 590 (2022).

[488] *See supra* note 299 and accompanying text.

[489] The Federalist No. 44, at 283 (James Madison) (Clinton Rossiter ed., 1961).

## VI

The remaining preliminary injunction factors require the plaintiff to demonstrate "[2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."[490] They weigh in favor of a preliminary injunction.

The harm that Las Americas will likely suffer if Director Martin enforces the new immigration laws—considered above in subpart II(A)—is irreparable under our precedents.[491] To summarize, Las Americas could never regain the time and expense it would expend representing immigrants detained under preempted Texas laws. Las Americas's expenditures of actual costs in paying its employees to represent those improperly entangled in a state immigration regime would also force it to cut back representation of clients navigating only the federal regime. These losses cannot be recouped.

When weighing the risk of irreparable harm to the Director, I recognize that our court has acknowledged "any time a State is enjoined by a

---

[490] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

[491] *See Clarke v. Commodity Futures Trading Comm'n*, 74 F.4th 627, 643 (5th Cir. 2023) (noting that economic harms are irreparable when "the [defendant] cannot be sued due to its sovereign immunity," as here (citing *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021))); *Rest. L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 598 (5th Cir. 2023) (stating that "nonrecoverable compliance costs are usually irreparable harm"); *Wages & White Lion Invs., L.L.C.*, 16 F.4th at 1142 ("Indeed, complying with [an agency order] later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." (alterations in original) (quoting *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016))); *see also Texas*, 829 F.3d at 433-34 (noting that when analyzing whether costs constitute irreparable harm, "it is not so much the magnitude but the irreparability that counts" (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985))).

court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."[492]  Additionally, the new immigration laws are intended to protect the citizens of Texas, as demonstrated by its arrest and removal provisions.

There are countervailing public interest considerations, however. There is a high risk that enforcement of S.B. 4 would cause international friction. Mexico—the United States' largest trading partner[493]—has already protested S.B. 4 and signaled that the statute's enforcement would frustrate bilateral efforts, including alien removals.[494]  The Supreme Court has said that "repeated representations by the Executive Branch supported by formal diplomatic protests and concrete disputes are more than sufficient to demonstrate that the state Act stands in the way of Congress's diplomatic objectives."[495]

The enforcement of S.B. 4 also risks taking the United States out of compliance with its treaty obligations.  Under the CAT, for example, "[n]o State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture."[496]  S.B. 4 provides an affirmative defense if the United States has granted asylum to the defendant.[497]

---

[492] *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers).

[493] *See United States v. Texas*, 719 F. Supp. 3d 640, 696 (W.D. Tex. 2024).

[494] *See id.* at 670; Br. of the Government of the United Mexican States as *Amicus Curiae* 11-12; ROA.133-34 (Declaration of Eric Jacobstein).

[495] *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 386 (2000).

[496] U.N. Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 3, Dec. 10, 1984, 1465 U.N.T.S. 85.

[497] Tex. Penal Code § 51.02(c).

No. 24-50149

Nevertheless, an alien whose meritorious CAT claim has not yet been adjudicated may still be refouled under S.B. 4 in violation of the CAT.

Furthermore, the Supreme Court explained in *Hines v. Davidowitz*[498] that state and local interests are subservient to those of the nation at large, at least with regard to matters regarding foreign relations:

> The Federal Government, representing as it does the collective interests of the forty-eight states, is entrusted with full and exclusive responsibility for the conduct of affairs with foreign sovereignties. "For local interests the several states of the Union exist, but for national purposes, embracing our relations with foreign nations, we are but one people, one nation, one power." Our system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference. As Mr. Justice Miller well observed of a California statute burdening immigration: "If (the United States) should get into a difficulty which would lead to war, or to suspension of intercourse, would California alone suffer, or all the Union?"[499]

The harms counsel that the equities weigh in favor of a preliminary injunction.

## VII

On June 27, 2025, the Supreme Court issued its decision in *Trump v. CASA, Inc.*[500] Discussing the limits of injunctive relief that federal courts

---

[498] 312 U.S. 52 (1941).

[499] *Id.* at 63-64 (footnotes omitted) (first quoting *Ping v. United States*, 130 U.S. 581, 606 (1889); and then quoting *Chy Lung v. Freeman*, 92 U.S. 275, 279 (1875)).

[500] 606 U.S. 831 (2025).

may provide under the Judiciary Act of 1789,[501] the Court held that the Government is likely to succeed on its argument that federal courts do not have equitable authority to issue "universal injunctions."[502] To the extent that Director Martin argues this court should accordingly direct the district court to amend its injunction, I would, like the Supreme Court in *Trump v. CASA*, "decline to take up . . . in the first instance" arguments as to the permissible scope of injunctive relief in the present case.[503] I would "therefore leave it" to the district court to consider any arguments the parties may present in this regard.[504]

*    *    *

For the foregoing reasons, I would affirm the district court's grant of a preliminary injunction against Director Martin.

---

[501] *See id.* at 841-47.

[502] *Id.* at 841-42.

[503] *Id.* at 854.

[504] *Id.*

No. 24-50149

James E. Graves, Jr., *Circuit Judge*, joined by Stewart, Richman, Higginson, Douglas, and Ramirez, *Circuit Judges*, dissenting:

No doubt, courts sometimes overcomplicate standing doctrine. But courts sometimes oversimplify it. Simplicity is the majority's watchword—but also its error. We should not oversimplify a party's injury, nor should we oversimplify controlling caselaw. The majority does both here, with troubling consequences. It allows a law that plainly frustrates the federal immigration scheme to take effect, disrupting the delicate balance between state interests and the firmly established federal power over immigration.

I dissent.[1]

# I

The majority trivializes plaintiffs' injury. It frames the Nonprofits' function as merely "ordinary legal representation" and their injury as "voluntary [r]esource [d]iversion." If this were so, they would have no standing. But in fact, the Nonprofits do more. They provide legal advocacy *and* counseling and referral services. If SB4 took effect, they would have to rework or abandon those services. Not by choice, but by necessity.

Take Las Americas, for example. It is "dedicated to serving the legal needs of low-income noncitizens and asylum seekers." It serves these needs across several domains. True, it offers legal representation. But it also educates migrants about their legal rights. It screens migrants to connect them with services. And it works to "integrate noncitizens in[to] the community through referrals with shelters and local partners."

These counseling and referral services present significant logistical complexity. To serve detained migrants, Las Americas "has developed

---

[1] I concur in Section II of Judge Richman's dissent. Because the majority addresses only standing, I limit my discussion to that issue.

141

systems to gain access to detainees, arrange for group presentations, reserve sufficient time and space in the facility for confidential attorney-client meetings, track the progress of detained noncitizens, and remain in contact with clients." Las Americas also partners with "shelters, churches, hospitals, and consulates" to locate service-eligible migrants in the community.

As with any community nonprofit, resources are scarce. Las Americas must conserve its "limited resources" to "serve as many asylum seekers as possible." So adapting its programs to respond to legal changes "is a necessary part of [its] . . . mission." Indeed, it has done so in the past. For example, when the federal government increased expulsions during the COVID-19 pandemic, Las Americas adapted to reach "asylum seekers in Mexico."

SB4 would force Las Americas to adapt again. Before, it could confine its search for detained migrants to federal facilities. But now, Texas "expects to house and process aliens detained under [SB4] in State-owned facilities." "To continue to pursue its mission, Las Americas [must] develop an entirely new system of tracking, counseling, and representing individuals held in state and county jails and prisons."

By expediting removals, SB4 would significantly strain these existing systems. Quickly contacting asylum-eligible migrants is critical, because the federal application process is time sensitive. So "Las Americas will need to prioritize outreach and assistance to noncitizens arrested under" SB4. This is true even if Las Americas does not represent migrants in state prosecutions, because state-law defendants might be eligible for representation in federal asylum proceedings.

Although Las Americas offers legal services, it alleges injury to its counseling and referral services. To continue the same services for the same population, it must expend resources or dramatically alter its longstanding

mission. This assuredly differs from an organization that provides only ordinary legal representation. Nor can the choice between abandoning a mission or diverting resources to save it fairly be called voluntary. By overlooking these facts, the majority manufactures an illusory analogy to previous cases, which it then employs to reject the Nonprofits' standing.

## II

The majority compounds its factual error with a legal error. Again seeking simplicity, the majority reduces *Havens* to a single fact: a direct misrepresentation to an employee. Yet this approach elides *Havens*'s core holding, which *Alliance* reinforced: when a defendant's actions "perceptibly impair[] [an organization's] ability to provide counseling and referral services . . . with [a] consequent drain on . . . resources," the organization has standing. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Because SB4 does so, the Nonprofits have standing.

## A

Start with *Havens*'s facts. A nonprofit, HOME, offered "counseling and referral services for . . . homeseekers." *Id.* HOME sued Havens, a realty company, under the Fair Housing Act, alleging that its "racial steering practices" frustrated HOME's "efforts to assist equal access to housing through counseling and other referral services." *Id.* HOME discovered these practices when Havens misled HOME's black "tester" employees about apartment availability. *Id.* at 368.

Because these steering practices "perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers," it "ha[d] suffered injury in fact." *Id.* at 379. Once an organization can show "such [a] concrete and demonstrable injury to [its] activities—with a consequent drain on [its] resources—" it has shown "far more than simply a setback to [its] abstract social interests." *Id.*

No. 24-50149

In *Alliance*, the Court rejected several medical associations' bid to extend *Havens* beyond this context. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393–96 (2024). The associations alleged that the FDA's approval of mifepristone had caused them to perform "their own studies on mifepristone so that [they could] better inform their members and the public about mifepristone's risks." *Id.* at 394. And that the FDA had "forced" them to "engag[e] in public advocacy and public education." *Id.* They maintained that *Havens* gives any organization standing that "diverts its resources in response to a defendant's actions." *Id.* at 395.

This theory misread *Havens*, so the Court rightly disposed of it. The "critical[]" fact in *Havens* was that "HOME not only was an issue-advocacy organization, but also operated a housing counseling service." *Id.* (citing *Havens*, 455 U.S. at 368). So when Havens had a practice of giving black renters false information, it "directly affected and interfered with HOME's core business activities." *Id.* Of course, this was "not the kind of injury that the medical associations ha[d] alleged." *Id.* at 395.

But the Nonprofits *do* allege that kind of injury. While Las Americas has policy goals, it primarily operates as a direct-service organization, providing legal, counseling, and referral services to migrants. Before SB4, Las Americas accomplished this through detailed systems for locating and serving migrants. Yet SB4 forces it to expend resources to develop new methods to perform the same function. In other words, SB4 perceptibly impairs Las Americas's core business function, with a consequent drain on resources. *See Havens*, 455 U.S. at 378–79. This is readily distinguishable from the medical associations' standing theory, and under *Havens*, such an injury confers standing.

144

**B**

To escape this outcome, the majority reimagines *Havens*'s context. It claims that the only reason HOME had standing was that "defendant told falsehoods to the plaintiff." (emphasis omitted). But if that fact was dispositive, surely the *Havens* or *Alliance* Courts would have said so.

The *Havens* Court told us what was important. One paragraph of the complaint drove the organizational-standing outcome. *See Havens*, 455 U.S. at 379. In it, HOME alleged that it "ha[d] been frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services," which caused it "to devote significant resources to identify and counteract the [practices]." *Id.* Conspicuously absent from this dispositive paragraph is any mention of defendant's lies to HOME's employees. So the majority's fixation on a direct falsehood finds little support in *Havens*.

And when *Alliance* clarified *Havens,* it did not resurrect the direct-falsehood theory. The *Alliance* Court emphasized one fact in *Havens* as "critical[]": that HOME "operated[] a housing counseling service," which Havens "directly affected and interfered with." *Alliance*, 602 U.S. at 395. This meant that "Havens's actions directly affected and interfered with HOME's core business activities." *Id.* The medical associations' challenge was different because the "FDA's actions relaxing regulation of mifepristone ha[d] not imposed any similar impediment to the medical associations' advocacy businesses." *Id.* Hence, the *Alliance* court relied on the same facts that *Havens* signaled were important: a plaintiff's core business function, and whether the defendant's actions impaired that function.

Granted, the *Alliance* court mentioned Havens's misrepresentation to HOME's employee. *See id.* at 395. But our duty is "to harmonize [the Supreme Court's] decisions as well as possible." *Nelson v. Quarterman*, 472

F.3d 287, 339 (5th Cir. 2006) (JONES, J., dissenting). Hence we cannot read *Alliance* to reimagine *Havens* without a clear instruction to do so. And a harmonious reading of the cases reveals that *Alliance*'s mention of Havens's misrepresentation was to explain racial steering, to illustrate how it impaired HOME's core business. *See Alliance*, 602 U.S. at 394–95.

In short, *Alliance* instructs that *Havens*'s "critical[]" fact was that HOME operated a counseling and referral service. That fact is critical here too. The Nonprofits operate counseling and referral services, which SB4 would injure. Under *Havens* and *Alliance* this shows an injury-in-fact.

The majority also claims that if the Nonprofits had standing, then "any enterprising legal-advocacy organization could repackage a generalized grievance as an 'injury' to its 'core business activities.'" Hardly. The fact remains that the Nonprofits are hybrid organizations, part legal advocacy and part counseling and referral. So the majority's analogies to indigent defender or "self-styled advocacy" organizations elide a crucial distinction: those organizations have one function, while the nonprofits have many.

\* \* \*

"Everything should be made as simple as possible, but no simpler."[2] The simpler solution fails here. The majority overlooks crucial aspects of the Nonprofits' activities and injury to create an easy analogy to *Alliance*. And reduces a still-binding case, *Havens*, to a peripheral fact—obscuring its true context. I agree that we have "a solemn responsibility to apply neutral principles, such as standing." That charge goes unmet.

Respectfully, I dissent.

---

[2] Attributed to Albert Einstein.

No. 24-50149

Stephen A. Higginson, *Circuit Judge*, joined by Stewart, Richman, Southwick, Douglas, and Ramirez, *Circuit Judges*, dissenting:

As Justice Scalia described, standing distills to one simple question: "What's it to you?" Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk Univ. L. Rev. 881, 882 (1983).

For plaintiffs, who have great stake in challenging S.B. 4, the answer is not complex. I fully and gratefully concur in Judge Richman's thorough principal dissent. I write separately to highlight that Texas's Supremacy Clause violation is indivisible from plaintiffs' injury.

Plaintiffs include nonprofit organizations and the City of El Paso, all of which work within and have an interest in federal immigration law. Yet, Texas's law not only transforms federal immigration into a state criminal matter, but also requires cities and organizations alike to respond to Texas's new state criminal expulsion scheme—one that conflicts fundamentally with federal law. Las Americas Immigrant Advocacy Center ("Las Americas"), one of the two non-profit plaintiffs,[1] is a legal services organization dedicated to supporting clients through the *federal* immigration process, including direct legal representation, counseling, and referral services.

To understand the injury to plaintiffs, we must first understand how Texas unilaterally extends its criminal authority beyond that of the federal government, contrary to the majority's cursory discussion of S.B. 4. My

---

[1] I refer to Las Americas, and not American Gateways as well, because both nonprofits suffered similar injuries. *See United States v. Texas*, 144 F.4th 632, 640 (5th Cir.), *reh'g en banc granted, opinion vacated*, 150 F.4th 656 (5th Cir. 2025). On appeal, plaintiffs focused on the injuries to Las Americas.

central point, stated differently, is that it is impossible to disentangle preemption from injury in this case. The conflict between federal law and state law is at the core of the harm itself. And with a fuller understanding of how the laws conflict, there is no basis to claim that plaintiffs are willingly manufacturing their injury.

I.

S.B. 4's provisions overreach and even counteract key aspects of federal immigration law, rendering Texas's criminal immigration scheme punitively more restrictive than its federal counterpart. These restrictions not only damage national cohesion on immigration law and policy, but also injure parties like Las Americas. Therefore, I begin with a condensed reiteration of the principal dissent's discussion of the clash between Texas and federal law, which lays bare the deep injury at issue.

Beginning with the challenge to S.B. 4 in the broadest sense, it is well-established that immigration is the province of the federal government. Dating back to 1875, we benefit from over a century of Supreme Court precedent that is clear on this matter. *See Chy Lung v. Freeman*, 92 U.S. 275, 280 (1875) ("The passage of laws which concern the admission of citizens and subjects of foreign nations to our shores belongs to Congress, and not to the States."); *Truax v. Raich*, 239 U.S. 33, 42 (1915) ("The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal Government."); *Arizona v. United States*, 567 U.S. 387, 399 (2012) ("Congress, acting within its proper authority, has determined [that the field] must be regulated by its exclusive governance."); *see also Fla. Immigrant Coal. v. Att'y Gen.*, No. 25-11469, 2025 WL 1625385, at *3 (11th Cir. June 6, 2025) (denying a stay of the injunction of Florida's immigration law, in part because it is likely to be field preempted), *application for stay denied*, 145 S. Ct. 2872 (July 9, 2025). Indeed, "[i]t is axiomatic that *the*

*United States*, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity." *United States v. Flores-Montano*, 541 U.S. 149, 153 (2004) (emphasis added).

Texas's proffered justification for entering the field of immigration law lies in the revealing caption of this case, initially a federal government suit against Texas.[2] S.B. 4 was enacted because Texas asserted that the federal government had abandoned immigration enforcement, indeed so much so that S.B. 4 was proper under the State War Clause to repel an invasion from Mexico. Texas contends that this is a political question. And still, it is within the Judicial Branch's Article III duty to review "where the question is whether [a branch] is 'aggrandizing its power at the expense of another branch.'" *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 197 (2012) (quoting *Freytag v. Commissioner*, 501 U.S. 868, 878 (1991)). Examining whether a law such as S.B. 4 conflicts with the longstanding federally occupied field of immigration law is squarely a judicial inquiry. As plaintiffs recognize, Texas's argument of an invasion cannot save its case to preclude judicial review: "[T]he State War Clause provides authority to do a particular thing: namely, to *make war*," not to enact a state immigration scheme. *See* U.S. CONST. art. I, § 10, cl. 3 (providing that no state shall "engage in War, unless actually invaded"). Thus, whether framed as state

---

[2] The Supreme Court recognized in *Arizona* a core truth about immigration policy. Each administration must be afforded the opportunity to carry out its policies as it was democratically elected to do. This case presents the consequences of that authority: what one administration views as complementary state and federal law, may be out of favor and an overreach in the next—and it is the Executive Branch's prerogative to exercise its congressionally authorized discretion in accordance with such policy designs. Thus, it is of no moment that the federal government initially brought this litigation and, upon an administration change, has backed out of it and takes the view that S.B. 4 is complementary to federal immigration policy.

political action or not, judicial review over state imposition on a federally occupied field is within the province—and responsibility—of the judiciary.

The majority still fearmongers with the same invasion statistics Texas cited to justify S.B. 4 to fill the field of noncitizen removal the U.S. government had allegedly abandoned.[3] Factually, the alleged invasion has now become just a whisper and intimation of invasion. And legally, there is no "invasion" exception to the Supremacy Clause, just as there is no evading the centuries-old truth that immigration is, first and foremost, federal prerogative.

In a broad sense, Texas's attempted U-turn away from this balance highlights the settled truth the Supreme Court announced in *Arizona*, which Mexico plaintively notes as an amicus[4]: that removing foreign nationals who reside in our country is indivisible from national security and foreign relations powers. *See also Arizona*, 567 U.S. at 396 ("Some discretionary decisions involve policy choices that bear on this Nation's international relations."); *Jama v. Immigration and Customs Enforcement,* 543 U.S. 335, 348 (2005) ("Removal decisions, including the selection of a removed alien's destination, may implicate [the Nation's] relations with foreign powers and require consideration of changing political and economic circumstances."

---

[3] The concurrence, too, scares by describing noncitizens as "demographic bombs," by relying on selective quotes from acontextual cases regarding individual detentions, and by citing to unsubstantiated news. If "[t]he judiciary decides matters of law, not war," as the concurrence states, the judiciary most certainly does not decide matters of an entire foreign nation's militant, migratory intent. As the concurrence recognizes, presidential administrations have a stake in immigration that "presents a serious threat to the security of the United States"—and it is this very reason that immigration remains a *federal* responsibility, just as it remains our responsibility to maintain the constitutionally embedded principle of separation of powers.

[4] Brief of Amicus Curiae the Government of the United Mexican States in Support of Plaintiffs-Appellees at 8–10 (24-50149).

(internal quotation marks omitted)). Thus, generally, Texas has frustrated enforcement of federal authority.

But even if field preemption did not serve to entirely prohibit this state criminal immigration scheme, conflict preemption does.

While Judge Richman has fully explored the intricacies of these conflicts, I briefly re-address conflict preemption to highlight the contours of the injury to plaintiffs.

In *Arizona v. United States*, the Supreme Court invalidated Arizona's effort to criminalize immigration violations and to empower state officials to enforce immigration law. Openly seeking to overturn *Arizona* and extend into the domain of the federal government, Texas enacted S.B. 4, the instant regime similarly seeking to criminalize, using state police powers, the removal of foreign nationals.[5] Texas openly acknowledged that S.B. 4 conflicts with binding Supreme Court law. Governor Abbott stated that "Justice Scalia wrote a dissenting opinion in [*Arizona*,] pretty much laying out a pathway that he thought would be a legal way for a state to go about the process of enforcing immigration laws." Fred Cantu, *Texas governor signs controversial law to empower state arrest of immigration violators*, CBS Austin (Dec. 18, 2023), https://cbsaustin.com/news/local/texas-governor-signs-controversial-law-to-empower-state-arrest-of-immigration-violators.

---

[5] *See, e.g.*, Letter from Greg Abbott, Governor, Tex., to Joseph R. Biden, Jr., President, U.S., (Nov. 16, 2022), https://gov.texas.gov/uploads/files/press/BidenJoseph _11.16.22.pdf ("Your sustained dereliction of duty compels Texas to invoke the powers reserved in Article I, § 10, Clause 3 . . . . Using that authority, Texas will escalate our efforts to repel and turn back any immigrant who seeks to enter our State at a border crossing that Congress has designated as illegal; to return to the border those who do cross illegally; and to arrest criminals who violate Texas law.").

No. 24-50149

Texas cites to *Arizona* because one provision of the law was upheld, Section 2(b). But the Supreme Court's reasoning in upholding Section 2(b) is enlightening: it was permitted because the Court read it to merely authorize communication with federal authorities, not to take any actions beyond what federal law allows. The Court struck down the rest of the Arizona law, holding that "it would disrupt the federal framework" to allow state detention "for possible unlawful presence without federal direction and supervision." *Arizona*, 567 U.S. at 413. Citing *Arizona*, Las Americas appropriately reasons, "If state officers may not unilaterally detain or arrest for immigration violations, they [] cannot unilaterally detain, arrest, prosecute, sentence and imprison for such violations."

Moreover, in *Arizona*, the Supreme Court recognized that "[r]emoval is a civil, not criminal, matter," and that "[a] principal feature of the removal system is the broad discretion exercised by immigration officials." *Id.* at 396. Certain aspects of the now-stricken Arizona law parallel the fundamental framework of S.B. 4. Namely, Section 6 of Arizona's law provided "that a state officer, 'without a warrant, may arrest a person if the officer has probable cause to believe . . . [the person] has committed any public offense that makes [him] removable from the United States.'" *Id.* at 407. In assessing this provision, the Court specifically recognized the "general rule" that it is "not a crime for a removable alien to remain present in the United States." *Id.* (citing *INS v. Lopez–Mendoza*, 468 U.S. 1032, 1038 (1984)). Accordingly, "[b]y authorizing state officers to decide whether an alien should be detained for being removable, § 6 violates the principle that the removal process is entrusted to the discretion of the Federal Government." *Id.* at 409.

Texas argues, to the contrary, that "Congress has expressly invited the States to 'cooperate' in the 'apprehension, detention, or removal of aliens not lawfully present in the United States.'" But as the Supreme Court held, and as the panel majority aptly recognized, "[f]ederal law specifies [the]

152

*limited* circumstances in which state officers may perform the functions of an immigration officer." *Arizona*, 567 U.S. at 408 (emphasis added). This is not a carte-blanche grant of authority for states to enact their own criminal schemes; this is authority that is "subject to the direction and supervision of the Attorney General." 8 U.S.C. § 1357(g)(3).

The majority briefly describes S.B. 4, but advocates for waiting to see how the law is enforced, speculating that somehow, ultimately, there may not be a conflict with federal law. However, preemption—and injuries derived from preemption—is not concerned principally with enforcement, so much as it is with whether a state has surpassed its authority and now burdens parties that are inextricably impacted by such policies. S.B. 4, both on its face and in its original justification, dispels any notion of cooperation or "mirroring."[6] As our sister circuit recently catalogued comprehensively in a case that goes unmentioned by the majority, S.B. 4 and state legislation like it elsewhere fundamentally conflict with federal immigration law enforcement discretion. *See generally Iowa Migrant Movement for Just. v. Bird*, 157 F.4th 904 (8th Cir. 2025).

Comparing S.B. 4 and federal law side-by-side makes clear that Texas law—and today, our court—runs afoul of settled Supreme Court precedent, reiterated as recently as *Arizona*.

For one, federal law provides noncitizens with a defense if they are applying for federal status, including asylum. Under S.B. 4, no such defense exists. Federal law also prohibits prosecution for reentry with express consent. Under S.B. 4, Texas permits prosecution of noncitizens who reenter

---

[6] *See Plyler v. Doe*, 457 U.S. 202, 225 (1982) (permitting states to act with respect to immigration "at least where such action mirrors federal objectives and furthers a legitimate state goal").

even with the express consent of the federal government and excludes any affirmative defenses a noncitizen might have. Finally, and perhaps most egregiously, federal law vests extensive discretion in the Executive to effectuate removals, thereby granting each administration the democratically instilled autonomy to implement its policies. However, under S.B. 4, federal discretion is instead replaced with a state requirement: a Texas judge "shall issue" an order requiring a noncitizen to return to the nation from which they entered or reentered. On this final point, Texas argues that S.B. 4 does not allow the state to deport anyone, that it only triggers voluntary removal, and that noncitizen defendants are merely delivered "to federal officials at lawful points of entry." But this argument merely obfuscates the practical realities of the law, which are apparent on the face of the text alone. S.B. 4 *requires* removal. State judges shall issue return orders, or noncitizens face up to 20 years in prison and a $10,000 fine. It is not voluntary merely because of the appendage of a potential criminal sentence and fine as the second-best option. Texas forces a decision: you either leave now or face criminal prosecution, which will be followed with a mandatory state deportation order in any case.

Unsurprisingly, Texas and the majority press eagerly to avoid federal court review of this clear S.B. 4 defiance of settled Supreme Court preemption doctrine. *Cf. Uthmeier v. Fla. Immigrant Coal.*, 145 S. Ct. 2872 (2025) (denying a stay in the Eleventh Circuit's case halting a similar Florida law). At its core, Texas's law interferes with the federal scheme addressing who may be removed, how, and to where.

## II.

Armed with the injury's source, we can better understand the obviousness of the injury itself.

The majority imagines that Las Americas impermissibly has manufactured its own standing. Yet, this conclusion simply flouts our

organizational standing case law as well as, factually, the clear injury at issue here.

The legal landscape of standing is an area that is subtle and developing. The debate between the parties—and now opinions—centers around the scope and limitations the Supreme Court set on organizational standing two years ago when it decided *FDA v. Alliance for Hippocratic Medicine*. 602 U.S. 367 (2024). There, the Court examined its decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), and emphasized that an organization's diversion of resources can be a self-inflicted injury.

I agree in full with Judge Richman's principal dissent and its characterization of our binding precedent. *Alliance* reinforces standing here and did not simplistically limit *Havens* to its facts. As the Court said in *Alliance*: an organizational plaintiff must show that a defendant's "actions directly affected and interfered with [the plaintiff's] core business activities." *Alliance*, 602 U.S. at 395. In so holding, *Alliance* did not uninhibitedly reject standing for any advocacy organization; standing was rejected because the regulation at issue "ha[d] not imposed any similar impediment to the [plaintiffs'] advocacy businesses." *Id.* Thus, at base, for any business, there must be a *direct interference* to confer standing—just like there was in *Havens*, and just as there is at present.

The throughline that remains from these cases is what does *not* constitute standing: injury that is derived from a manufactured or self-inflicted harm. Las Americas agrees. Plaintiffs cannot *create* standing by expending resources to challenge the policy at issue—but in contrast to *Alliance*, the challenged law at issue here impacts preexisting, core activities. Las Americas asserts, and the district court found, that its standing is rooted in the fact that S.B. 4 directly interferes and "perceptibly impairs" its preexisting, core activities. *See Alliance*, 602 U.S. at 395 (citing *Havens*, 455

U.S. at 379); *see also OCA-Greater Houston v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) (finding standing for a voter services organizations that "went out of its way to counteract the effect of Texas's allegedly unlawful voter-interpreter restriction—not with a view toward litigation, but toward mitigating its real-world impact on [the plaintiff organization's] members and the public"). "Las Americas will need to create an unprecedented system in state jails and prisons, dramatically undermining its ability to serve current and new clients." As the district court specifically concluded, Las Americas will now have to "help noncitizens navigate the federal immigration process while in state prison," and they will have to attempt to do so "quickly" before removal triggers under Texas law. It bears emphasizing here: with federal law displaced, Las Americas now has to work within Texas's additional restrictions, including the fact that noncitizen clients who may have once had a defense if they are applying for federal status, such as asylum, are left without one if they are under Texas's criminal purview. Tex. Penal Code § 51.02(c).

The majority employs sleight-of-hand reasoning to instead characterize the basis of Las Americas's standing as "voluntarily incurred costs to advocate for clients." Op. at 1. This use of the word "advocate" is misleading. Las Americas is not "advocating" like the plaintiff organizations in *Alliance*, which were in the business of "public advocacy and public education." *Alliance*, 602 U.S. at 370. As we all well recognize in our legal field, advocacy done by Las Americas is tantamount to our profession, it is core legal representation and support for clients in need.

Further, the majority asserts that Las Americas claims "that they spent money 'countering the effects of S.B. 4 consistent with the organizations' missions.'" Op. at 8 (quoting *Alliance*, 602 U.S. at 394–95). However, Las Americas does not make this claim simply on the basis of dollars spent and, even if it had, any "diversion" of resources it suffers is

easily distinguishable from the diversion in *Alliance*. A "diversion" of resources can be broad in range; it is a red herring to merely assign a label of "diversion" and close the courthouse doors. The important question is what "resources" are being diverted—money being used for *Alliance*-type advocacy against a law is not of equal standing value, per Supreme Court precedent, as money that must go toward fundamentally reshaping preexisting core services provided. Once again, Las Americas agrees that diversion alone (i.e., for purpose of counteracting a policy through advocacy) is insufficient. But here, S.B. 4 directly interferes with Las Americas's preexisting, core service activities, and that "injury to the organization's activities—with the consequent drain on the organization's resources" caused by necessarily having to respond to an unconstitutional state criminal expulsion law—provides standing.[7] *Havens*, 455 U.S. at 379.

Determinatively, the majority, like Texas, fails to mention what should be dispositive, the district court's jurisdictional findings of fact:

> SB 4 will completely change the manner in which Plaintiffs must reach, counsel, and represent noncitizens, including forcing them to identify clients earlier, help noncitizens navigate the federal immigration process while in state prison, and seek federal relief as quickly as possible before a removal under state law.

The majority simply disregards the jurisdictional fact-finding done by Judge Ezra under his Article III responsibility to vindicate a crucial Supreme Court decision that Texas now decries. By ignoring the only relevant

---

[7] *See also Bost v. Illinois State Bd. of Elections*, 146 S. Ct. 513, 524 (2026) (Barrett, J., concurring) ("Pocketbook harm is a traditional Article III injury. That is so not only when a law directly imposes costs on a plaintiff, but also when a plaintiff 'reasonably incur[s] costs to mitigate or avoid' the 'substantial risk' of a harm caused by a statute." (citations omitted)).

jurisdictional fact, which aligned with controlling Supreme Court law, the majority facilitates Texas's effort to defy federal law. This is unsurprising; as described above, the conflict is glaring. *Cf. Uthmeier*, 145 S. Ct. at 2872. Notably, contrary to the majority's description, the district court made *no* finding of diversion of resources as its basis to apply *Arizona* and the Supremacy Clause. To suggest otherwise is a strawman. We cannot conveniently dodge our obligation to review deferentially district court fact-finding,[8] nor, by doing so, can we shoulder-push a constitutional lawsuit into an organizational standing mirage of our own imagination.

The district judge correctly found direct interference. Not just perceptible impairment, but utter impairment to Las Americas's pre-existing programs and activities. S.B. 4 injures Las Americas itself, harming it as concretely as it would a private plaintiff. Las Americas will no longer engage squarely in the activities for which it was formed, namely assisting migrants through the federal immigration process. Texas intends to arrest and incarcerate those migrants, moving them into state criminal courts and state prisons. Defenses once available to Las Americas to leverage for clients may no longer be afforded to them under Texas's mandatory criminal expulsion scheme. Thus, S.B. 4 effectively upends Las Americas's existence, unless it becomes a state prison services supplicant or state public defender.[9]

\* \* \*

---

[8] *See Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 77 (1978).

[9] "Government regulations that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements. So in those cases, standing is usually easy to establish." *Alliance*, 602 U.S. at 382; *see also Get Loud Arkansas v. Jester*, No. 24-2810, 2026 WL 881736, at *3 (8th Cir. Mar. 31, 2026).

Our nation's history "is in part made of the stories, talents, and lasting contributions of those who crossed oceans and deserts to come here." *Arizona*, 567 U.S. at 416. Although "[Texas] may have understandable frustrations with the problems caused by illegal immigration . . . the State may not pursue policies that undermine federal law." *Id.* Las Americas merely seeks to challenge S.B. 4 because this state subversion of federal law now undermines its ability to carry out its core services as well.

Organizational standing is neither all-encompassing, nor can it be self-inflicted. But it also cannot be less than a person gets. Just as the district court did in making its jurisdictional findings of fact, it is our Article III responsibility to invalidate state law flatly contrary to settled Supreme Court precedent.

Respectfully, I dissent.